James Hall

56

```
 1  meetings?
 2       A.  Yes.
 3       Q.  And that was your understanding?
 4       A.  Yes.
 5       Q.  Was there any discussion in this meeting at
 6  the farm prior to the jury trial what damages we were going
 7  to take out of the trial?
 8       A.  What damages we were going to take out of the
 9  trial?
10       Q.  What damages you weren't going to seek at the
11  federal trial?
12       A.  There may have been, I don't recall
13  specifically.
14            MR. HABER:  I have no further questions.
15            MR. CONNER:  That's all the questions we have.
16                   *      *      *
17            JAMES FRANCIS HALL, having been duly sworn, was
18  examined and testified as follows:
19                     DIRECT EXAMINATION
20  BY MR. HABER:
21       Q.  Would you state your full name?
22       A.  James Francis Hall.
23       Q.  Mr. Hall, you were present during the
24  deposition of Mr. Bush?
25       A.  Just moments ago, yes, I have.
```

Annette Seager Reporting

James Hall

57

```
 1       Q.  Did you hear the instructions I gave him prior
 2  to the start of the deposition?
 3       A.  Yes, sir.
 4       Q.  Do you recall those instructions?
 5       A.  To leave you complete the question before I
 6  answer was a specific one, and you'll give me an opportunity
 7  to answer.
 8       Q.  Right.  And if you don't hear or understand
 9  the question please let me know.
10       A.  All right.
11       Q.  Otherwise I'll assume you heard and understood
12  the question, okay?
13       A.  Yes.
14       Q.  What is your current address?
15       A.  I just moved.  384 Ridgemont Drive, Midland,
16  PA. 15059.
17       Q.  What's your date of birth?
18       A.  8/20/41.
19       Q.  And are you currently employed?
20       A.  No.
21       Q.  You're retired?
22       A.  I'm retired from the Commonwealth of
23  Pennsylvania.
24       Q.  When did you retire from the Commonwealth of
25  Pennsylvania?
```

Annette Seager Reporting

James Hall

58

```
 1   A.   '93.  I say that with a question.
 2   Q.   What was your position with the Commonwealth?
 3   A.   My last position was assistant district
 4   forester for Northwestern Pennsylvania.
 5   Q.   When did you first meet Mr. Carlisle?
 6   A.   A meeting at Mr. Lainard Bush's house prior to
 7   the Pittsburgh trial and that would have been probably '95,
 8   but I couldn't give you a date on that for sure.
 9   Q.   How were you contacted to serve as an expert
10   or help Mr. Carlisle in the federal trial?
11   A.   Mr. Carlisle called me.
12   Q.   Do you know how he learned about you?
13   A.   Through a man by the name of Jim Bissel who
14   works for the Cleveland Museum of Natural History.
15   Q.   Do you recall when this meeting occurred in
16   Mr. Bush's house?
17   A.   Not the exact date, no, sir.
18   Q.   But it was sometime -- do you recall the year?
19   A.   It was -- the trial was --
20   Q.   The trial was in December of 1997?
21   A.   Right.  It would have been more than a year
22   before that but I wouldn't want to give you a date without me
23   looking at my schedule.
24   Q.   Do you recall who was at this first meeting
25   when you first met Mr. Carlisle?
```

James Hall

59

```
 1   A.   Mr. Carlisle, Mr. Bush, and Mr. Hare and
 2   myself.
 3   Q.   Do you recall what was discussed at that
 4   meeting, that initial meeting?
 5   A.   I'm just trying to put that -- at that point
 6   in time I was pretty new -- a new boy on the block.  I felt
 7   like I was under the microscope and probably was.  They
 8   discussed what the agreement of purchase was, and handed me a
 9   copy of it at that time, and asked me to read it later and
10   briefly went over what they intended to do or what their goal
11   was and where I fit into the picture.
12   Q.   This agreement that you were asked to read is
13   what I'm showing to you that was previously marked as Exhibit
14   B in Mr. Carlisle's deposition.
15   A.   Yes, that looks like it.
16   Q.   And it was your understanding that this -- the
17   agreement that was marked as Exhibit B at Mr. Carlisle's
18   deposition developed the timber rights between Mr. Carlisle
19   and Matson Lumber?
20   A.   That's what I understood, that's correct.
21        MR. CONNER:  Let's stop here for a second.
22        (An interruption.)
23   BY MR. HABER:
24   Q.   You were advised at that initial meeting that
25   this agreement of sale from June -- dated --
```

James Hall

60

```
 1   A.   '69 or '70.
 2   Q.   '69 or '70 controlled the timber rights
 3   between the parties?
 4        MR. CONNER:  I'm going to object to the form of
 5   the question.  Go ahead and answer the question.
 6   A.   That's what I understood that to mean, yes,
 7   at that time.
 8   Q.   And you were asked to review that document?
 9   A.   They were looking for my opinions on what that
10   document meant in certain areas, yes.
11   Q.   You were ultimately retained as an expert in
12   the case; is that correct?
13   A.   That's correct.
14   Q.   And you authored an opinion relative to the
15   damages to the property caused by Matson?
16   A.   I did.
17   Q.   I would ask that you look at what I have
18   marked as Deposition Exhibit 1, and ask you if you could
19   identify that document?
20   A.   This was my expert report on what I observed
21   on the property, and what some of my opinions were relating
22   to that contract.
23   Q.   You concluded on page eight of the report that
24   Matson Lumber unlawfully removed timber that had a value of
25   ten thousand nine hundred -- correct me, it was one third of
```

James Hall

61

```
 1   that, because you trebled that?
 2   A.   Correct, that's trebled.
 3   Q.   Was that all the timber?  Did you conclude
 4   that all of the timber that Matson removed was improperly
 5   removed?
 6   A.   Based on what we saw in that agreement, yes,
 7   sir.
 8   Q.   And why did you come to that conclusion?
 9   A.   Because on Clauses A and B over whatever
10   section that was, 13 A and B, I believe, said that Carlisle
11   had the right of first purchase for any tree that Matson
12   intended to cut, and because they didn't give him that
13   opportunity, they, in my opinion, took those trees illegally.
14   Q.   And the next part of your damages is damage to
15   timber left standing.  Is that damage caused by Matson's, and
16   I'll use the term poor timbering practices?
17   A.   Yes.
18   Q.   And that was to trees located throughout the
19   farm?
20   A.   Just on the area where Matson operated?
21   Q.   Right.
22   A.   Yes.
23   Q.   And the third number you have there is lost
24   future value.  Could you tell me what that is?
25   A.   I was asked to calculate that by Mr. Hare and
```

James Hall

62

```
 1   we used -- and I really don't remember how the exact
 2   procedure -- I'd have to go back to my notes, but what I was
 3   trying to do was project what Carlisle lost from the future
 4   value based on what Matson did there.  That is strictly
 5   dealing with timber, trees.
 6        Q.    I understand.
 7        A.    Okay.
 8        Q.    Were you prepared to testify as to any other
 9   damages other than damage to trees?
10        A.    No, sir.
11        Q.    You had mentioned the Clauses A and B you were
12   going to indicate that Matson had violated Clauses A and B,
13   that any tree that they removed was in violation of the
14   agreement, correct?
15        A.    15 A and B, that's the number here, and it had
16   been 15 A is what I was referring to on that.
17        Q.    Ultimately you weren't permitted to testify
18   relative to these numbers, were you, at the trial?
19        A.    They were excluded when the judge threw that
20   out, right.
21        Q.    And the judge limited -- your understanding is
22   the judge limited the damages in the no-cut zone?
23        A.    That's what we understood, yes.
24        Q.    And you prepared a new report relative to
25   trees removed in the no-cut zones?
```

Annette Seager Reporting

James Hall

63

```
 1        A.    I did at Scott's request.
 2        Q.    And that was done like on the eve of trial?
 3        A.    That was done during trial at the table in --
 4   in the courtroom.
 5        Q.    And how did you calculate those trees that
 6   were moved from the no-cut zone?  Was that based on
 7   information that Matson had provided?
 8        A.    That's part of the information, yes.
 9        Q.    Was it your understanding that Matson, at the
10   time of the trial, that Matson had a right to harvest trees
11   that existed prior to 1969?
12        A.    Not the way I interpreted that.
13        Q.    How did you interpret that?
14        A.    I interpreted that to mean that he had the
15   right to harvest those trees that were sixteen inches in
16   diameter prior to 1969.
17        Q.    At the date of 1969 if the diameter was more
18   than sixteen inches he could harvest it?
19        A.    That's how I interpreted it.
20        Q.    How could you determine whether a tree was --
21   had a diameter of sixteen inches in 1969, in 1995?
22        A.    I went back and counted the rings on the
23   stumps --
24        Q.    Would you have to know --
25        A.    -- many of them.
```

Annette Seager Reporting

James Hall
64

1   Q.   Would you have to know the date the tree was
2  cut?
3   A.   Yes. I did have -- at least a close date.
4   Q.   So to determine that you'd have to look at
5  each individual tree?
6        MR. CONNER: I object to the form. Go ahead.
7   A.   I looked at plots. I didn't look at every
8  single stump. I did a plot survey of that, yes.
9   Q.   Did you ever calculate the trees that Matson
10 may have cut down that were not sixteen inches in diameter?
11  A.   Yes.
12  Q.   And was that contained in your report?
13  A.   No.
14  Q.   Did you -- do you recall the number -- the
15 damaged number that that added up to?
16  A.   No, I don't.
17  Q.   Do you know why you didn't testify to that at
18 trial?
19  A.   I did that after the trial.
20  Q.   You didn't do it prior to the trial?
21  A.   No.
22  Q.   Do you know why you didn't do it prior to the
23 trial?
24  A.   I wasn't asked to do it.
25  Q.   Who asked you to do it?

James Hall
65

1   A.   That was Mr. Krembs asked me to do that.
2   Q.   Do you know why Mr. Krembs asked you to do
3  that?
4   A.   We were carrying forth the damages that Scott
5  had said we should do, and that was some of the damages that
6  we felt were appropriate.
7   Q.   Do you know when you did this calculation?
8   A.   That was in '97 -- I think probably '98, I'm
9  going to say fall of '98 that the leaves weren't -- were
10 gone.
11  Q.   So the fall of '98 you calculated the amount
12 of trees that Matson cut down that were standing in '69 but
13 did not have a diameter of sixteen inches?
14  A.   That's correct.
15  Q.   Do you know -- can you give me a rough
16 estimate of that amount?
17  A.   No.
18  Q.   Did you ever suggest to Scott Hare that you
19 wanted to calculate that amount prior to the 1997 verdict?
20  A.   We had discussed that, yes, but Scott didn't
21 feel that was necessary and I don't know why.
22  Q.   Did you indicate to him at this meeting that
23 you could -- you were able to do that?
24  A.   Not at that meeting. At a later meeting, yes.
25  Q.   Prior to the verdict, though?

James Hall
66

1  A.  Yes.
2  Q.  Was Mr. Carlisle present at those meetings?
3  A.  He was present at most of them but I wouldn't
4  say he was present at that particular time.
5  Q.  And what was Mr. Hare's response?
6  A.  He didn't see the contract the same way I did
7  in that particular issue, and consequently that was put off.
8  Q.  He didn't believe that you were entitled --
9  Mr. Carlisle was entitled to damages for trees that weren't
10 sixteen inches in diameter and cut down by Matson; is that
11 correct?
12 A.  No, he didn't say that. He just didn't agree
13 with the way I was interpreting that and he was the attorney
14 and I agreed with him, I didn't argue with him.
15 Q.  There was discussion whether to proceed with
16 those damages for trees that weren't sixteen inches in
17 diameter and Mr. Hare made a decision not to proceed with
18 that?
19 A.  He kept talking about going for damages later,
20 and I don't know -- when I use the word damages I think he
21 was using all inclusive because that's what I understood it
22 to mean.
23 Q.  You prepared a report for him that included
24 damages for every tree that Matson cut down?
25 A.  Based on --

Annette Seager Reporting

James Hall
67

1  Q.  Clause A?
2  A.  Clause A and B, that's correct.
3  Q.  When you were looking at these trees that were
4  cut down with diameters less than sixteen inches, could you
5  tell what year they were cut down?
6  A.  Pretty close.
7  Q.  When you say pretty close, what do you mean?
8  A.  Probably within two years. We knew when they
9  were operating in what parts of the property and I knew decay
10 rates of certain species.
11 Q.  So you could give it within a couple year
12 range of when it was cut down?
13 A.  Yes, at that time.
14 Q.  Would that be, in part, based on your visual
15 inspection of the tree?
16 A.  Part.
17 Q.  And part based on records provided by Matson?
18 A.  Correct.
19 Q.  Would I be correct that it would be hard to
20 pinpoint the exact year that a tree was cut down?
21 A.  In some areas where it would have been very
22 difficult; in other areas where Matson's records showed he
23 was in there that year, I would have been right on.
24 Q.  Did he forest in the same area in different
25 years?

Annette Seager Reporting

James Hall
68

1   A.   Yes. That's the reasons some areas it would
2   have been difficult.
3   Q.   Do you recall having discussions with Scott
4   about the ability to pinpoint a year in which trees were cut
5   down and that was the reason why he --
6   A.   No.
7   Q.   -- did not want to pursue some damages?
8   A.   No, we never discussed that.
9   Q.   He never discussed with you your ability to
10  pinpoint a year trees were cut down?
11  A.   No.
12  Q.   So it's your understanding that the court
13  would not allow you to testify regarding your understanding
14  of Clause A?
15  A.   Correct.
16  Q.   Um-hum.
17  A.   So for that reason you prepared a new damage
18  report?
19  A.   Right there.
20  Q.   Right there. When you discussed with Mr. Hare
21  the preparation of this new damage report was Mr. Carlisle
22  present?
23  A.   We all sat at the front table at the same
24  time, yes.
25  Q.   And Mr. Carlisle was advised that the damages

Annette Seager Reporting

---

James Hall
69

1   that you were going to testify to were limited to trees
2   removed from the no-cut zone?
3   A.   Yes.
4   Q.   And ultimately the jury had to decide what the
5   no-cut zone was, right?
6   A.   That's correct. So we were working under a --
7   before the jury made that decision we were making some
8   assumptions, which turned out to be incorrect.
9   Q.   Assumptions as regarding what the no-cut zone
10  was?
11  A.   Yes.
12  Q.   And the reasons why we -- you didn't know what
13  the no-cut zone was was because the map was never located.
14  A.   Correct.
15  Q.   Prior to 1995, and meeting Mr. Carlisle, did
16  you do anything with regard to this property known as the
17  Clough Farm?
18  A.   I didn't even know it existed.
19  Q.   I'm going to show you what's been marked as
20  Exhibit 2, and is this the report that you prepared during
21  the course of the trial?
22  A.   That is correct.
23  Q.   And the damages you calculated based on the
24  potential width of the no-cut zone was that based on part on
25  records Matson Lumber provided?

Annette Seager Reporting

James Hall

70

```
 1    A.    They were based on records Matson provided,
 2  yes.
 3    Q.    You were present when Mr. Bush discussed a
 4  meeting that occurred in 1997 at his house on the Clough Farm
 5  regarding discussions about a potential second lawsuit?
 6    A.    I was present at that meeting, yes.
 7    Q.    Do you recall discussions about pursuing
 8  damages in another lawsuit?
 9    A.    This is my first meeting there this occurred.
10  What I recall was that Mr. Hare wanted to simplify the
11  lawsuit and wanted to break it down into two parts; one part
12  being contractual, the other part being damages.
13        He did not speak of a second lawsuit as such, because
14  -- it was just assumed, at least on my part. Part of the
15  reason why we didn't go into measuring the stump diameters is
16  he didn't want to add more confusion to the jury, so we were
17  simplifying it to just the contract at that time.
18    Q.    Did he indicate to you that he wanted to -- or
19  do you recall him saying that he wanted to limit it to the
20  contract because there was a 20-year statute of limitations
21  on the contract and other claims might have a shorter statute
22  of limitations?
23    A.    I don't recall him talking about a statute of
24  limitations on the contract. I remember him talking about a
25  seal that I got the impression meant that it was open forever
```

Annette Seager Reporting

---

James Hall

71

```
 1  but I didn't hear a year time.
 2    Q.    Do you remember him discussing that it may be
 3  easier to pursue damages under the contract than under other
 4  theories?
 5    A.    No, I didn't get that impression.
 6    Q.    Do you recall any discussion about dismissing
 7  parts of the federal court case?
 8    A.    The first knowledge I had of that is whenever
 9  Mr. Fryling brought it to my attention.
10    Q.    That would have been --
11    A.    A couple years go.
12    Q.    That would have been three or four years after
13  the verdict?
14    A.    Yes.
15    Q.    Do you recall any discussions at the time of
16  the trial about dismissing a trespass claim?
17    A.    No, I do not.
18    Q.    About dismissing a conversion claim?
19    A.    No.
20    Q.    You are aware that -- I mean, you are aware,
21  based on your report of May 2, 1997, that there's a
22  Pennsylvania statute that allows trebling of damages for
23  improper removal of trees; correct?
24    A.    Correct.
25    Q.    Do you know why you did not treble that amount
```

Annette Seager Reporting

James Hall

72

```
 1   in your Exhibit 2?
 2       A.   No, I do not.
 3       Q.   You don't recall?
 4       A.   I don't know that I had time to even think
 5   about that. This was done really on very short notice.
 6       Q.   Am I correct that prior to the start of the
 7   trial you were prepared to testify relative to this ten
 8   million dollar number?
 9       A.   Yes.
10       Q.   And it's my understanding that based on the
11   judge's rulings -- Judge Lancaster's rulings you had to
12   change your theory, correct?
13       A.   Well, he threw out those two clauses.
14       Q.   Correct.
15       A.   It's not my theory. But I had to change what
16   I based all my work on, yes.
17       Q.   And that change occurred right before the
18   trial?
19       A.   I mean minutes before the trial, yes.
20       Q.   Did you attend the entire trial?
21       A.   Yes, sir.
22       Q.   I'm assuming Mr. Hare advised you that the
23   judge had made these rulings and now we have to change your
24   testimony? Or change your theory?
25       A.   That's a good assumption, he did.
```

Annette Seager Reporting

James Hall

73

```
 1       Q.   Was Mr. Carlisle present when these occurred?
 2       A.   We were all present when that occurred.
 3       Q.   Do you recall anything Mr. Carlisle said when
 4   Mr. Hare was relating what the judge had decided and how we
 5   were going to change your theory?
 6       A.   We were all disappointed.
 7       Q.   You heard -- when Mr. Bush testified you heard
 8   him mention a meeting that occurred in Ashtabula, Ohio
 9   following the verdict. Were you there?
10       A.   No, sir.
11       Q.   That will make it quicker. Based on the
12   Answers to Interrogatories in the present suit that Mr.
13   Carlisle has filed against Mr. Hare and other defendants it
14   was indicated that you prepared an expert report and
15   calculated damages, correct? Do you recall doing that?
16       A.   That's right here.
17       Q.   Not there but another report you prepared.
18   I'm going to show you a copy of that report.
19       A.   Okay.
20            MR. CONNER:  October 7th.  I have a copy.
21       Q.   October 7th.  A report dated October 7, 2005.
22   That is a report that you prepared?
23       A.   Yes.
24            MR. CONNER:  Do you want to mark that as an
25   exhibit if he's going to refer to it?
```

Annette Seager Reporting

James Hall
74

1  Q.  I'd ask you to read the report while he's
2  making copies.
3      (Witness complied.)
4  Q.  Have you reviewed what we have marked as Hall
5  Exhibit 3?
6  A.  Yes, I just did.
7  Q.  And that's a report you authored dated October
8  7, 2005; is that correct?
9  A.  That's correct.
10 Q.  I refer you to the last paragraph on page one,
11 and the first paragraph on page two. Does that summarize the
12 testimony that you were prepared to give in the federal court
13 action prior to the judge making rulings immediately before
14 trial?
15     MR. CONNER: Again, David, it's the last
16 paragraph on page one?
17     MR. HABER: And the first paragraph on page
18 two.
19 A.  That summarizes it. I had actually tripled
20 the value when I did that report for Scott but that
21 summarizes what I did, yes.
22 Q.  You tripled the amount based on the
23 Pennsylvania statute?
24 A.  Using 15 A.
25 Q.  Right, I understand. And under your

James Hall
75

1  interpretation of 15 A any tree that Matson removed, they
2  removed in violation of the contract?
3  A.  That's correct.
4  Q.  I'd like you to take a look at the second
5  paragraph and in the second paragraph on page two you
6  calculate trees removed by Matson in '93/'94 and '94/'95,
7  correct?
8  A.  Correct.
9  Q.  How did you calculate those numbers?
10 A.  Those numbers were taken directly from
11 Matson's reports.
12 Q.  And those are all the trees that Matson
13 timbered in those two years?
14 A.  That's right.
15 Q.  Were those damages that you were prepared to
16 testify to in the federal court action?
17 A.  No, not specifically for those two years, no.
18 Q.  Why do you conclude that Matson removed those
19 trees, or do you conclude that Matson removed those trees
20 improperly?
21 A.  You mean for this report here?
22 Q.  Yes.
23 A.  Because Mr. Carlisle's attorneys located a
24 document in the Warren County Courthouse that indicated that
25 Carlisle has always -- has owned the timber since 1978.

James Hall

76

1  Q.  And that deed was located long after the
2  federal court trial?
3  A.  Yes.
4  Q.  And so in 1997, based on the information you
5  had available, you would not have been able to testify as to
6  those trees in '93 through '95 being improperly removed by
7  Matson?
8      MR. CONNER: I'm going to object to the form
9  of the question but go ahead and answer the question.
10 A.  I could have testified to that, yes, because I
11 had the data right there.
12 Q.  You could have testified as to the amount
13 removed?
14 A.  Right.
15 Q.  But without that deed located in 2002 or 2003
16 you could not have testified that Matson improperly removed
17 the trees, correct?
18 A.  Well based on this one I could, if that had
19 been included.
20 Q.  But the judge wouldn't let you do that.
21 A.  Threw it out, therefore I could not.
22 Q.  So this calculation of timber improperly
23 removed by Matson in '93 through '95, totaling four hundred
24 and thirty-eight thousand dollars is based upon the deed
25 located in 2002 or 2003?

James Hall

77

1  A.  That's correct.
2  Q.  So that theory was not available to you or Mr.
3  Hare in 1997, correct?
4      MR. CONNER: Object to the form of the
5  question.
6      MR. FRYLING: Object to the form of the
7  question.
8  Q.  You can answer the question.
9  A.  It wasn't available, at least we never saw it,
10 should I say.
11 Q.  This -- these trees that it's contended that
12 were improperly harvested by Matson in the '93/'94 season and
13 '94/'95 season, are any of those trees contained in the
14 no-cut zone?
15 A.  Yes, they are, because the no-cut zone was
16 maybe defined differently than when we did the initial
17 calculations, so I did exclude those trees that Mr. Carlisle
18 was already paid for.
19 Q.  So this calculation you did in the second
20 paragraph of page two excluded trees contained in the no-cut
21 zone as determined by the federal court jury?
22 A.  No, just some of it.
23 Q.  Just some of it?
24 A.  Yes.
25 Q.  Do you know what part of it?

James Hall
78

```
 1    A.   The part that Carlisle was paid for.
 2    Q.   I understand that. Maybe I'm -- let's start
 3  it again. In Answers to Interrogatories Mr. Carlisle has
 4  indicated that part of his damages in this case is your
 5  calculations in paragraph two of page two, in the 1993/1994
 6  harvesting season, and that's what it refers to, right?
 7    A.   Um-hum.
 8    Q.   What period of time is that? What's the
 9  harvesting season from '93 to '94?
10    A.   They're allowed to harvest from November 1st
11  to March 31st.
12    Q.   So that represents November 1, 1993 to March
13  31, 1994; is that correct?
14    A.   Yes.
15    Q.   And you calculated timber wrongfully harvested
16  by Matson is approximately three hundred and twelve thousand
17  dollars, right?
18    A.   Right.
19    Q.   And that's based upon the deed located in 2002
20  or 2003 --
21    A.   Right.
22    Q.   -- that indicates that Matson had no timber
23  rights after 1978?
24    A.   Correct.
25    Q.   This three thousand and -- three hundred and
```

James Hall
79

```
 1  twelve thousand dollar number, does that represent any trees
 2  that were removed from the no-cut zone as determined by the
 3  federal court jury?
 4    A.   Yes, it does.
 5    Q.   Do you know how much of that?
 6    A.   What I did was I calculated the acreage that
 7  was impacted by Tom's Run and Spring Creek on those two
 8  areas, and excluded that value, because Carlisle was already
 9  compensated for that. The other waterways on the property
10  when we calculated the damages, didn't know that the jury was
11  going to include all waterways so those waterways -- that
12  timber is included in that.
13    Q.   Maybe I'm still confused.
14         MR. CONNER:  Let's go off the record.
15  (whereupon, an off-the-record discussion occurred.)
16  BY MR. HABER:
17    Q.   The number three hundred and twelve thousand
18  dollars does that include any timber that was removed from
19  the no-cut zones in which you calculated damages in what is
20  marked as Hall Number 2?
21    A.   No.
22    Q.   And this number three hundred twelve thousand
23  dollars is based on records provided by Matson Lumber?
24    A.   Yes.
25    Q.   And the 1994/'95 of a hundred and twenty-five
```

James Hall
80

1  thousand, approximately, runs from November 1, '94 through
2  March 31, 1995?
3      A.    Correct.
4      Q.    And, again, that number is based on records
5  provided by Matson?
6      A.    The same.
7      Q.    And, again, that does not include trees
8  removed from the no-cut zones as you calculated in your Hall
9  Number 2?
10     A.    That's correct.
11     Q.    And these, the records which you relied upon
12 in calculating the numbers for '93/'94 and '94 through '95
13 harvesting season, those records were available to you back
14 in 1997?
15     A.    Yes.
16     Q.    The next paragraph, paragraph three on page
17 two, is this the calculation of the value of the trees that
18 were standing as of 1969?
19     A.    Rephrase your question or state it again.
20     Q.    You say pre-1969 timber remaining on the
21 property excluding timber in the no-cut zone has a value of
22 approximately nine hundred and forty-seven thousand dollars,
23 correct?
24     A.    That's right, and that's what I'm saying there
25 is after Matson did his harvest these were the trees that

James Hall
81

1  were left, yes.
2      Q.    And they were there in 1969? They were
3  pre-1969 trees?
4      A.    Yes.
5      Q.    And you're calculating those as a damage based
6  upon the deed that was discovered in 2002 or 2003?
7      A.    No. I'm calculating that as a remaining
8  timber that's there the day I did that survey.
9      Q.    And that timber is still on the property?
10     A.    Well, it's being removed as we speak, some of
11 it, yes.
12     Q.    And why did you conclude that that belongs to
13 Mr. Carlisle as opposed to Matson Lumber?
14     A.    Because of a deed that was found in the
15 courthouse by Mr. Fryling.
16     Q.    So you could not have testified as to that
17 damage at the trial in 1997?
18     A.    No.
19           MR. FRYLING: Object to the form of the
20 question.
21     Q.    Let me ask it a different way. You were not
22 prepared to render an opinion that the pre-1969 timber
23 belonged to Mr. Carlisle as opposed to Matson Lumber?
24     A.    I was prepared to render an opinion that based
25 on, again, this one thing, yes.

James Hall
82

```
 1   Q.   But the judge took that away from you?
 2   A.   Took that away from me. So in that case, no.
 3   Q.   So that damage that the pre-1969 timber is
 4   based solely upon the deed that was later found at the
 5   courthouse?
 6   A.   That's correct.
 7   Q.   Can you read the next paragraph, the one that
 8   begins I also calculated --
 9   A.   And was prepared to testify --
10   Q.   You can read to yourself.
11   A.   Go for it.
12   Q.   You were prepared to testify as to that in the
13   1997 trial?
14   A.   Um-hum.
15   Q.   Is that contained in the report that's dated
16   of -- in your report dated May 2, 1997?
17   A.   Yes, it is page eight paragraph three.
18   Q.   Page eight paragraph three. And the basis of
19   that conclusion was also paragraph 15 A of the agreement?
20   A.   Yes.
21   Q.   So once the judge said you can't testify as to
22   paragraph 15 A you weren't able to testify as to the five
23   hundred eighty-four thousand dollar damage to the residual
24   trees.
25   A.   That's correct.
```

James Hall
83

```
 1   Q.   But after the new deed was found or the
 2   missing deed was found in 2003, you would have been able to
 3   testify that these trees that were damaged belonged to Mr.
 4   Carlisle?
 5   A.   Yes.
 6   Q.   Do you know where these trees were located
 7   that were damaged based on Matson's alleged poor harvesting
 8   practices?
 9   A.   Over the entire area where he harvested.
10   Q.   In Answers to Interrogatories Mr. Carlisle,
11   through his counsel, set forth damages that they're seeking
12   to recover in this action based upon an expert report
13   prepared by you.
14        Just so I can clarify things, the first part is
15   timber wrongfully harvested by Matson in the period '93/'94
16   cutting seasons, and we discussed those numbers.
17   A.   Um-hum.
18   Q.   And those numbers are based upon the deed
19   located in 2002 or 2003?
20   A.   The numbers are based upon Matson's records
21   but we have --
22   Q.   The wrongfully harvesting part is based upon
23   that deed?
24   A.   Correct.
25   Q.   And it also says the value of timber remaining
```

James Hall

84

```
 1   to be harvested by Matson, approximately nine hundred
 2   forty-seven thousand dollars, that's the pre-1969 trees that
 3   they're continuing to harvest, correct?
 4        A.   Right now, correct.
 5        Q.   And that if the improper harvesting of those
 6   by Matson is also based upon the 2002 or 2003 located deed,
 7   right?
 8        A.   Correct.
 9        Q.   And the damage to the residuals trees of five
10   hundred and eighty-four thousand dollars is also based upon
11   that deed discovered in 2002 or 2003, correct?
12        A.   Yes.
13        Q.   Were there any damages that you were prepared
14   to testify to at the trial that Mr. Hare indicated to you
15   that he didn't want you to testify to?
16        A.   Nothing that I was involved with at all.
17        Q.   What do you mean you weren't involved in?
18        A.   Well, meaning that anything I was part of or
19   became part of he never asked me not to testify about
20   anything.
21        Q.   Your testimony was changed by, your
22   understanding, a court ruling?
23        A.   Correct.
24        Q.   But you were prepared up until the time of
25   trial to testify as to the ten million dollar number?
```

Annette Seager Reporting

---

James Hall

85

```
 1        A.   Yes.
 2        Q.   And you fully expected to testify as to that
 3   until you learned about the court ruling?
 4        A.   Until the judge pulled it out from under us,
 5   correct.
 6        Q.   And your calculation of the ten million
 7   dollars was based upon paragraph 15 A of the agreement?
 8        A.   That's right.
 9        Q.   Do you recall any discussions among anybody
10   that that agreement, that we've referenced, that was marked
11   as Exhibit B in Mr. Carlisle's deposition, did not control
12   the timber rights of Mr. Carlisle and Matson Lumber?
13               MR. FRYLING:  Object to the form.
14        A.   Can you ask that question again?
15        Q.   Do you recall anybody mentioning or discussing
16   that Exhibit B to Mr. Carlisle's deposition did not control
17   the timber rights of Mr. Carlisle and Matson Lumber?
18        A.   No.
19        Q.   Are you a defendant in a lawsuit filed by
20   Matson Lumber?
21        A.   Yes.
22        Q.   How many?
23        A.   Two.
24        Q.   Who's defending you?
25        A.   Mr. Fryling and Mr. Conner.
```

Annette Seager Reporting

James Hall
86

```
 1   Q.   And those lawsuits are both filed in Warren
 2  County?
 3   A.   Yes.
 4   Q.   After the jury verdict did you ever attend a
 5  meeting with Mr. Hare?
 6   A.   Immediately after, yes, we did.
 7   Q.   When you say immediately after --
 8   A.   I mean we went out together afterwards and
 9  discussed what happened and talked to the jury and had a
10  general confab between us on what happened and what didn't
11  happen, and what we expected to happen down the road, yes.
12   Q.   And this was on the day of the verdict?
13   A.   Yes.
14   Q.   And what was Mr. Carlisle's reaction to the
15  verdict?
16   A.   His first reaction to the verdict was the same
17  as mine, we were happy that we prevailed in all issues
18  brought forth.
19       He was disappointed that we didn't succeed in
20  bringing A and B forth, so he was looking forward to more and
21  that's what Scott had said to him right afterwards because he
22  knew Bert was disappointed.
23       Scott had said:  Bert, we've won, and I can remember
24  him saying that because we just had finished talking to the
25  jury outside and he says:  We won, Bert.  This sets the stage
```

James Hall
87

```
 1  for the next step.
 2   Q.   Did Mr. Hare indicate what the next step would
 3  be? What you could recover in the next step?
 4   A.   No.
 5   Q.   It was just this isn't over, we may file
 6  another lawsuit.
 7   A.   He didn't even say we may file another lawsuit
 8  but when he said the next step, I assumed that, and it was
 9  pretty clear that that's what was on his mind.
10   Q.   Was there any discussion about what would be
11  sought in the next lawsuit?
12   A.   He used the term damages all the time.
13   Q.   Anything specific about what type of damages?
14   A.   Not at that time specific that I'm aware of.
15   Q.   After this verdict, after this meeting on the
16  day of the verdict, did you ever have any further discussions
17  with Mr. Hare?
18   A.   No, I didn't.
19   Q.   You had discussions with Attorney Krembs
20  because he asked you to prepare a damage analysis, correct?
21   A.   Yes.
22   Q.   Did Mr. Krembs ever criticize what Scott Hare
23  had done?
24   A.   Not in my presence he never did.
25   Q.   Did Mr. Carlisle ever tell you that Mr. Krembs
```

James Hall

88

```
 1   had criticized what Scott Hare had done?
 2      A.    Not that I'm aware of.  As far as I was
 3   concerned and I thought that -- even though Mr. Krembs was
 4   now involved, we were still going on Scott Hare's
 5   recommendations and Scott Hare's actions before.
 6      Q.    Why did you have that understanding?
 7      A.    Because Mr. Krembs was an Ohio attorney.
 8      Q.    Scott Hare never represented you, did he?
 9      A.    No.
10      Q.    Who paid you for your expert services in the
11   federal court action?
12      A.    Mr. Carlisle.
13      Q.    Paid you directly?
14      A.    Yes.
15            MR. HABER:  That's all the questions I have.
16            MR. FRYLING:  I don't have anything.
17            MR. CONNER:  We don't have any questions.
18   We'll attach the exhibits to the transcript.
19                       *     *     *
20       (Deposition concluded at 12:20 p.m.)
21
22
23
24
25
```