## Page 2

I N D E X

Witness                        Examination by:

Albert Carlisle                Haber    4/154
                               Conner   152

E X H I B I T S

Carlisle Deposition Exhibit A                                    15
(Deed of January 19, 1970)
Carlisle Deposition Exhibit B                                    15
(Agreement of Sale of 1/20/70)
Carlisle Deposition Exhibit C                                    37
(Complaint 3/13/95)
Carlisle Deposition Exhibit D                                    40
(Stipulation for dismissal 12/15/97)
Carlisle Deposition Exhibit E                                    43
(Excerpt of transcript from trial)
Carlisle Deposition Exhibit F                                    46
(Timber no-cut zone by Hall)
Carlisle Deposition Exhibit G                                    59
(Praecipe - June '98)
Carlisle Deposition Exhibit H                                    75
(Deed of 4/20/73)
Carlisle Deposition Exhibit I                                    117
(Quit Claim Deed - Squatriti to Matson)
Carlisle Deposition Exhibit J                                    119
(Deed from Kinkead to Fisher & Young)
Carlisle Deposition Exhibit K                                    119
(Articles of Agreement Fisher & Young and Kinkead)

## Page 3

E X H I B I T S

Carlisle Deposition Exhibit L                                    121
(Letter of 2/11/71)
Carlisle Deposition Exhibit M                                    125
(Letter 12/23/70 Warren to Kookogey)
Carlisle Deposition Exhibit N                                    129
(Letter of 4/28/70 Kookogey to Warren)
Carlisle Deposition Exhibit O                                    132
(Letter of 2/13/70 Warren to Kookogey)
Carlisle Deposition Exhibit P                                    134
(Letter of 3/27/73)
Carlisle Deposition Exhibit Q                                    136
(Request from Fisher & Young 3/15/73)
Carlisle Deposition Exhibit R                                    138
(Letter of Enders to Matson)
Carlisle Deposition Exhibit S                                    142
(Letter of Enders)
Carlisle Deposition Exhibit T                                    146
(Letter 6/30/88 Matson to Carlisle)
Carlisle Deposition Exhibit U                                    148
(Letter of 6/23/98 Hare to Bush)
Carlisle Deposition Exhibit V                                    152
(Letter of 4/28/99 Hare to Krembs)

ALBERT CARLISLE

4

1  MR. CONNER:  All objection except as to form
2  are reserved.
3       MR. HABER:  Sounds good.
4  ALBERT CARLISLE, having been duly placed under oath,
5  was examined and testified as follows:
6           DIRECT EXAMINATION
7  BY MR. HABER:
8       Q.   Would you state your full name, sir?
9       A.   Albert Tyler Carlisle.
10      Q.   Mr. Carlisle, my name is David Haber.  I
11  represent defendants in a lawsuit that you filed in the
12  United States District Court for the Western District of
13  Pennsylvania.
14           This morning I'm going to ask you some questions
15  regards that matter.  A couple rules I'd like you to follow
16  to help things proceed hopefully quickly and smoothly.
17           One, the court reporter sitting here is taking down
18  everything that's said, so she can't take down the shrug of
19  the shoulders or nod of the head, so please verbalize your
20  responses.
21           Also, if you do not understand my question, or did
22  not hear it, please ask me to repeat or clarify the question.
23  If you answer the question, I'm going to assume that you
24  heard and understood the question.
25           Finally, please let me finish my question before you

ALBERT CARLISLE

5

1  answer.  You're going to be able to anticipate some of the
2  questions, but if you start talking before I'm done, the
3  court reporter is going to have trouble taking down what's
4  said.  So if you let me finish my question, I'll let you
5  finish your answer before I move to the next question.  Okay?
6       A.   Okay.
7       Q.   What is your current address?
8       A.   1210 Oak Drive.
9       Q.   And where is that located?
10      A.   It's in Ashtabula, Ohio.
11      Q.   And do you reside there with anyone?
12      A.   No.
13      Q.   How long have you lived there?
14      A.   Thirty years probably.
15      Q.   Are you married?
16      A.   No, single.
17      Q.   Ever been married?
18      A.   No.
19      Q.   Any brothers or sisters?
20      A.   One sister.
21      Q.   And what's her name?
22      A.   Her name is Mary Betts, B-E-T-T-S, Trembley,
23  T-R-E-M-B-L-E-Y.
24      Q.   Where does she reside?
25      A.   She lives in Grand Junction, Colorado.

ALBERT CARLISLE

1   Q.  Are you currently employed?

2   A.  No.

3   Q.  What is your date of birth?

4   A.  October 27, 1937.

5   Q.  When was the last time you were employed,

6  would you say?

7   A.  Oh, well. I need a clarification of that. By

8  employment do you mean a full-time forty-hour a week job or

9  --

10   Q.  I know at times you managed, I don't know,

11  investments or things of that nature. When was the last

12  time, if any, you were employed by someone else?

13   A.  I was on the board of directors of the family

14  company.

15   Q.  What company was that?

16   A.  Carlisle Retailers.

17   Q.  Does that still exist?

18   A.  No.

19   Q.  Were you ever employed by a third party in a

20  job, like a manufacturing plant, a retail store?

21   A.  I had three jobs.

22   Q.  What was the last one?

23   A.  Lakeland Community College.

24   Q.  You said Lake?

25   A.  Lakeland Community College.

6

---

ALBERT CARLISLE

1   Q.  Where is that located?

2   A.  In Mentor, Ohio.

3   Q.  What was your position there?

4   A.  Instructor.

5   Q.  And when was that?

6   A.  Oh, late sixties, early seventies.

7   Q.  Can you tell me your educational background?

8   A.  Well, graduated from high school 1955. I got

9  an AB degree from Oberlin College in 1959. And I got an MBA

10  from Dartmouth College 1961.

11   Q.  After you got the MBA from Dartmouth in 1961,

12  did you attend any other schools?

13   A.  I went to the University of Virginia for one

14  year.

15   Q.  University of Virginia?

16   A.  Yes.

17   Q.  When was that?

18   A.  Well, that would have been in '61, '62.

19   Q.  What were you seeking? Another degree at the

20  University of Virginia?

21   A.  I enrolled in the law school. I completed one

22  year of law school.

23   Q.  And that was in '61?

24   A.  '61, um-hum.

25   Q.  Is there a reason you did not finish?

7

ALBERT CARLISLE

1  A.  Yes, um-hum.
2  Q.  What was the reason?
3  A.  Well, you can't -- it's a long reason.
4  Q.  Okay.
5  A.  I was called by the president of Lake Erie
6  College, who was a friend of mine, personal friend of mine,
7  his son was graduating from Yale and he wanted to know what I
8  thought of the University of Virginia Law School. His son
9  was interested in going to law school. We had lunch
10  together, and in the course of the lunch he asked me if I
11  ever thought I'd like to teach. I said I have thought about
12  it. He said: I have an opening. So I left law school and
13  went to teach at Lake Erie College. That's exactly how it
14  happened.
15  Q.  Any further education after the University of
16  Virginia Law School for one year?
17  A.  No.
18  Q.  What did you teach at Mentor or Lake --
19  A.  At Lakeland. Basically I taught economics and
20  accounting.
21  Q.  This lawsuit concerns somewhat the Clough
22  farm.
23  A.  Um-hum.
24  Q.  And you know what I refer to as the Clough
25  farm?

8

ALBERT CARLISLE

1  A.  Yes.
2  Q.  You purchased the property in the early
3  seventies, correct?
4  A.  I guess so. I never can remember exactly. I
5  thought it was late sixties.
6  Q.  Late sixties, early seventies?
7  A.  Somewhere in that area --
8  Q.  That's when you recall purchasing it?
9  A.  Um-hum.
10  Q.  And when you purchased it, you purchased it by
11  yourself, correct, individually?
12  A.  Yes, I did.
13  Q.  How did you become interested in the Clough
14  farm?
15  A.  I became interested in the Clough farm because
16  I intended to buy some property for the Boy Scout Council of
17  Northeastern Ohio.
18  Q.  And it's my understanding that the Boy Scout
19  Council ultimately decided they weren't interested in
20  purchasing it.
21  A.  They -- I'll explain that exactly. I had
22  bought the farm -- I had a farm in Ashtabula County, I bought
23  a second farm in Ashtabula County. The neighbor to my farm
24  in Ashtabula County, the first farm, was active in the Boy
25  Scouts. When he heard that I bought the second farm, he

9

1  asked me if I would like to allow the Boy Scouts to camp on
2  it. Not to own it, just to camp there, and I said yes.
3     They went to look at it, they decided they'd like a
4  wilder area. So they asked me if they could find some
5  property in Pennsylvania that was of a wilder nature. What
6  they wanted -- what they wanted, what they called a high
7  adventure campsite. And so I said I would help them buy it,
8  and I did.
9     Q.  But they didn't -- the Boy Scouts never bought
10  it.
11     A.  No, they never bought it. I bought it.
12     Q.  Were you buying it for the Boy Scouts to use
13  it or that had already passed?
14     A.  We had decided that -- no, we decided I would
15  buy it. I would run -- the preliminary discussion was that I
16  would hire somebody to run the farm part, and then they would
17  establish what they called three -- they called them high
18  adventure campsites. That's all they wanted, campsites that
19  were away from the road and away from any buildings, and the
20  same person that ran the farm could check to make sure that
21  the campsites were okay. So that was the original intention.
22     Q.  Did the Boy Scouts ever use it as a campsite?
23     A.  Yes, they did, um-hum.
24     Q.  For how long a period of time?
25     A.  They just came over and camped overnight.

1     Q.  For how long? Through the seventies? Through
2  the eighties?
3     A.  No, just for a couple of years.
4     Q.  Did you ever live on the farm?
5     A.  No.
6     Q.  Has anyone ever lived on the farm?
7     A.  Oh, yes.
8     Q.  Who has lived on the farm?
9     A.  Well, when I got the farm a young man named
10  John Wood lived there and when he left, it was empty -- the
11  farmhouse was empty for a while, and there's a fellow named
12  Lainard Bush that lives there.
13     Q.  How long has Mr. Bush lived there?
14     A.  At least ten years, I would say.
15     Q.  Well, the lawsuit that Mr. Hare filed for you
16  in federal court was filed in 1995, I believe.
17     A.  That's right.
18     Q.  Was Mr. Bush living there at the time?
19     A.  I don't remember if he was living there when
20  the lawsuit was filed. Certainly shortly after he was, but I
21  don't remember the exact --
22     Q.  After the Boy Scouts stopped using the
23  property, after a couple years after your purchase, what was
24  your intention with regard to the property? What were your
25  plans for the property?

ALBERT CARLISLE

12

```
 1        A.     My plans were to turn it into -- the first I
 2   thought I could run a farm operation with -- the farm is
 3   eighty percent wooded.  So I thought I could run a small farm
 4   operation with the tillable open land and then preserve the
 5   wooded land as a nature preserve; that was the intent.  So we
 6   hired -- when John Wood was there we had a herd of a hundred
 7   Black Angus cows.
 8        Q.     When you acquired the property, what did you
 9   understand you were acquiring?  When I say that, were you
10   acquiring just the land?  Acquiring the land and the timber?
11   What was your understanding of what you were acquiring?
12        A.     We were acquiring a dream, really, I guess.
13   We were acquiring a -- I really intended that was going to be
14   an area that the Boy Scouts could enjoy and make it as
15   natural an area as we could.  That's really what I intended.
16        Q.     Maybe my question wasn't clear.  When you
17   purchased the property, you purchased the property from
18   Fisher & Young?
19        A.     Right, yes, um-hum.
20        Q.     You purchased the land?
21        A.     Um-hum.
22        Q.     And also there was an agreement with Fisher
23   and Young --
24        A.     Right.
25        Q.     -- that they retain a certain interest --
```

ALBERT CARLISLE

13

```
 1        A.     Um-hum.
 2        Q.     -- certain interest of the timber?
 3        A.     Right.
 4        Q.     My question to you, what was your
 5   understanding what you were purchasing?
 6        A.     Certainly purchasing the land, and purchasing
 7   the mineral rights, and at the time I thought purchasing most
 8   of the timber.
 9        Q.     So you agree that there was -- whatever the
10   agreement said, there was an agreement between you and Fisher
11   & Young that Fisher & Young retain certain rights in the
12   timber and you got certain rights in the Timber.
13               MR. CONNER:  I'm going to object to the form,
14        but go ahead and answer the question.  My
15        objection is on the record.  Go ahead.
16        A.     Well, certainly Fisher & Young had certain
17   restrictions that they had.  They never exercised them but
18   they had them.
19        Q.     I understand that, but it was your
20   understanding that you had certain rights in the timber?
21        A.     Right.  That was always vague, that's what I'm
22   trying to say.
23        Q.     I understand that.  I mean, that's why lawyers
24   get involved.
25        A.     Okay.
```

ALBERT CARLISLE

14

1     Q.   I'm trying to get your understanding and not
2 too specific, but you understood that you were acquiring the
3 land.
4     A.   Right.
5     Q.   When you say mineral rights, you mean the
6 mineral rights under the land?
7     A.   Under the land.
8     Q.   And with regard to the timber, you had certain
9 rights and Fisher & Young had certain rights.
10     A.   That's right.
11     Q.   When you purchased this property from Fisher &
12 Young, were you represented by an attorney?
13     A.   Well, that is difficult -- the Boy Scouts were
14 represented by an attorney.
15     Q.   Who was that?
16     A.   His name, David Eardley. E-A-R-D-L-E-Y.
17     Q.   Is he still alive?
18     A.   I think he is but I haven't seen him for a
19 while. I taught his father. His father took a class from me
20 when I was teaching at the Lake Erie College.
21     Q.   Ultimately you're the one that purchased it?
22     A.   Yes. When the Boy Scouts -- the Boy Scouts
23 did the preliminary work, and when they called me in, then I
24 asked an attorney that was a family attorney that also
25 advised me as to whether he thought it was -- to look over

ALBERT CARLISLE

15

1 the material.
2     Q.   Who was that?
3     A.   Terry Warren.
4     Q.   Is Mr. Warren still alive?
5     A.   Still alive, he's retired. I'm sure David
6 Eardley is retired, too.
7     Q.   Do you know where Mr. Warren lives today?
8     A.   Well, yes, in a way. He lives in Ashtabula
9 but he spends his winters in Arizona, I don't know where.
10     Q.   I'm going to show you what I marked as Exhibit
11 A, and is that the deed from Fisher & Young to you
12 transferring the Clough farm?
13     A.   I think it is.
14     Q.   And the purchase price you paid was a hundred
15 thousand dollars.
16     A.   Yes, it was.
17     Q.   Do you recall if you paid it in one lump sum,
18 over time?
19     A.   Two sums.
20     Q.   And the date of the deed is January 9, 1970,
21 correct?
22     A.   Yes, um-hum.
23     Q.   I'm going to show you what's been marked as
24 Exhibit B and ask you whether you recognize that document?
25     A.   Yes, I recognize it.

ALBERT CARLISLE

16

1    Q.    What is that?

2    A.    The Agreement of Sale between Fisher & Young

3    and myself.

4    Q.    And is that -- is it your understanding that

5    is the agreement that delineated or set forth the rights of

6    Fisher & Young and yourself and the timber?

7    A.    Yes.

8    Q.    And Mr. Warren represented you regarding the

9    negotiations?

10    A.    He reviewed them, um-hum.

11    Q.    And was Mr. Kookogey the attorney for Fisher &

12    Young?

13    A.    The attorney for Fisher & Young.

14    Q.    Other than Mr. Warren, did you have any other

15    lawyer look at this agreement before it was signed?

16    A.    Dave Eardley, but he was representing the Boy

17    Scouts, so.

18    Q.    To your knowledge, did anyone -- not a lawyer

19    -- review this document before you signed it? Did you have

20    anyone else look at it, a friend, family?

21    A.    I don't think so.

22    Q.    Prior to this Agreement of Sale, which we've

23    marked as Exhibit B, had you ever purchased land or owned

24    land where timber -- the rights to timber was reserved in

25    someone else or given to someone else?

ALBERT CARLISLE

17

1    A.    No.

2    Q.    This is the first time you've ever done that?

3    A.    First time.

4    Q.    Do you recall whose idea it was or how it came

5    about that you purchased land -- purchased the land but some

6    rights of the timber were reserved in another party?

7    A.    That was done with the Boy Scouts; they had

8    done most of the bargaining before I got involved.

9    Q.    So most of the negotiation was done between

10    the Boy Scouts and Fisher & Young --

11    A.    That's right.

12    Q.    -- and when the Boy Scouts decided not to

13    purchase, you kind of stepped in and closed the deal?

14    A.    That's right.

15    Q.    Do you know who at the Boy Scouts was doing

16    most of the negotiations for them?

17    A.    I guess it was probably Mr. Eardley and the

18    scout executive at the time, whose name was Don King.

19    Q.    Don King.

20    A.    No relation to --

21    Q.    Not the boxing.

22    A.    No. But a very, very nice man.

23    Q.    Do you know if he's still with the Boy Scouts?

24    A.    In fact, I think he's died. When he retired

25    he moved out west somewhere. I always liked Don. But I

ALBERT CARLISLE                                                          18

1   think someone told me he died.
2        Q.   Today you still own the property, the farm?
3        A.   Yes.
4        Q.   Do you have any intentions of selling the
5   property, as we sit here today?
6        A.   It would be very difficult to sell it at the
7   minute.
8        Q.   Have you made any attempts to sell the
9   property in the last ten years?
10       A.   No.
11       Q.   And you're the sole owner of the property
12  today?
13       A.   Yes, um-hum.
14       Q.   Does Mr. Bush still live on the property?
15       A.   Yes, he does.
16       Q.   And what does he do on the property?
17       A.   Well, he's basically a -- he's not a paid
18  employee.  He lives there as a place to live but he enjoys
19  the farm and looks after it for me.
20       Q.   Are there any animals on the farm?
21       A.   No, we don't have any animals.
22       Q.   Does he raise any crops?
23       A.   No, we don't.  Small garden.
24       Q.   Does anybody use it as a campground?
25       A.   No.

ALBERT CARLISLE                                                          19

1        Q.   Maybe somewhere there was some talk at some
2   time of opening some type of hunting club or sporting club.
3        A.   We're always approached -- we were approached
4   last year by someone who wanted to convert the barns into a
5   hunting lodge and have a hunting or fishing camp there.
6        Q.   And you didn't do that?
7        A.   It's difficult to do at the minute.  I might
8   think of it.
9        Q.   Difficult to do with what?
10       A.   I think it's difficult to think about that at
11  the minute.
12       Q.   At any point in the, say, 35 years you've
13  owned the property has it ever been a hunting lodge or
14  sporting camp?
15       A.   Just for my friends.
16       Q.   Does Mr. Bush live there with anyone?
17       A.   No.
18       Q.   would I be correct in 1995 is the first time
19  you contacted Mr. Hare relative to this property?
20       A.   Yes.
21            MR. CONNER:  1995?
22       Q.   Yes.
23            MR. CONNER:  No, it's '94.
24       Q.   '94, excuse me.  I apologize.
25       A.   That's probably right.

ALBERT CARLISLE

20

1    Q.   Prior to that time did you know Mr. Hare?
2    A.   Yes.
3    Q.   How did you know Mr. Hare?
4    A.   He was a very bright student in high school,
5    and I went to Oberlin College, so I interviewed students who
6    were bright with a possibility of suggesting that they go to
7    Oberlin College. He did not go there, he went to Cornell
8    instead. That's how I met him.
9    Q.   Did you stay in contact or he stay in contact
10   with you?
11   A.   We might have met -- I can't remember that. I
12   mean, I liked Scott, I thought he was a very bright fellow.
13   I remember taking him to Allegheny College to a program. But
14   once he went away to Cornell -- I was aware that he was
15   around because his mother worked at a bakery that I went to
16   and I would ask his mother about him.
17   Q.   Prior to -- it's my understanding that in the
18   1980's there was a lawsuit that you were involved in in
19   Warren County.
20   A.   Yes, that's right.
21   Q.   And it's my understanding that you and Fisher
22   & Young Hardwoods, Inc. were the plaintiffs.
23   A.   That's exactly right.
24   Q.   And the defendants, William McChesney and
25   Joyce McChesney?

ALBERT CARLISLE

21

1    A.   Yes. McChesneys.
2    Q.   Who represented you in that lawsuit?
3    A.   An attorney from Warren named William Morgan.
4    Q.   And is this the same Attorney Morgan that's
5    now the judge in Warren?
6    A.   He's now Judge Morgan.
7    Q.   Prior to his representation of you in this
8    lawsuit had he ever represented you before?
9    A.   I knew him but I don't think that he had --
10   I'm sorry, I don't remember. I knew Bill but I can't
11   remember.
12   Q.   Do you know how you knew him?
13   A.   I think I knew him -- I think he was a friend
14   of a friend, that's how I knew him.
15   Q.   Can you tell me what the lawsuit was about.
16   A.   Yes. The McChesneys decided that our common
17   boundary was in dispute and they claimed ownership of certain
18   property.
19   Q.   Okay. And your claim -- what was your claim
20   against the McChesneys? What were you seeking from the
21   court?
22   A.   Relief from the trees that were mine that were
23   cut.
24   Q.   And Fisher & Young was also represented by a
25   separate attorney?

ALBERT CARLISLE    22

```
 1      A.    Mr. Kookogey.
 2      Q.    Do you recall how it became that you and
 3  Fisher & Young filed a lawsuit together?
 4      A.    Well, because I had -- sure, because McChesney
 5  wrote the letter to me saying that they were going to come
 6  and cut the trees, and their border -- and they also -- he
 7  also wrote a letter to Fisher & Young. So we both were
 8  notified.
 9      Q.    And these trees that he -- he cut trees down?
10      A.    He did cut trees down.
11      Q.    These trees down, how was it determined which
12  trees he cut down were Fisher & Young's and which trees he
13  cut down were yours?
14      A.    That began part of the dispute that we've --
15  that's been ongoing ever since then. But basically it turned
16  out that the trees that were of a certain height, diameter,
17  whatever that phrase is, were Fisher & Young's and the
18  smaller trees were mine.
19      Q.    And when you say diameter, certain diameter
20  off the ground?
21      A.    It's in here.
22      Q.    I'm trying to get what happened twenty years
23  ago.
24      A.    That's how it was done.
25      Q.    And this was done through the negotiations
```

ALBERT CARLISLE    23

```
 1  between your respective attorneys?
 2      A.    Yes.
 3      Q.    When you say that's what is said in there,
 4  you're referring to Exhibit 8?
 5      A.    Yes.
 6      Q.    So Exhibit 8 was the basis of your agreement
 7  with Fisher & Young regarding whose trees -- whose trees were
 8  being cut down by McChesney?
 9      A.    I'm just going to say partially. There was a
10  dispute with me as to whose trees belonged to whom. I had
11  hired a forester to represent me named Kurt Bower and he flip
12  flopped several times so I wasn't exactly clear as to whose
13  trees were whom.
14      Q.    It was disputed?
15      A.    It was disputed.
16      Q.    Ultimately you and Fisher & Young came to some
17  kind of agreement?
18      A.    We did. We did -- for that trial we did.
19      Q.    Is that agreement written anywhere, do you
20  know?
21      A.    I don't think so.
22      Q.    It was just an agreement between -- ultimately
23  agreed to between your attorneys?
24      A.    Yes.
25      Q.    Did you ever see a letter between the
```

ALBERT CARLISLE

24

1   attorneys indicating how it was going to be resolved?
2       A.   No.  I mean, I might have, I don't remember.
3       Q.   Ultimately there was a verdict in favor of
4   both you and Fisher & Young?
5       A.   Yes, that's right.
6       Q.   If I remember, Fisher & Young recovered most
7   of the money?
8       A.   They recovered most of the trees were
9       Q.   was that because most of the trees were
10  determined to be Fisher & Young's?
11      A.   At that time that's the way it was, yes.
12      Q.   Did the -- were there any damages awarded for
13  -- other than for trees?
14      A.   You know, it's been so long, there might have
15  been some damage for aesthetics, but I don't remember that
16  anymore, there was an issue that came up.
17      Q.   To your knowledge did Mr. Morgan ever do a
18  title search while he was representing you in that property?
19      A.   I don't know.
20      Q.   You don't know?
21      A.   No.
22      Q.   He never advised you that he'd done a title
23  search?
24      A.   I never asked him.
25      Q.   You never asked him if he did one, or you

ALBERT CARLISLE

25

1   never asked him to do one?
2       A.   I never asked either one.
3       Q.   What's your -- what I've marked as Exhibit B
4   in front of you, did you give Mr. -- would you have given
5   Mr. Morgan a copy of Exhibit B?
6       A.   Sure, um-hum.  Mr. Morgan was -- well, okay.
7       Q.   Go ahead.
8       A.   That's enough.
9       Q.   Prior to the lawsuit that you instituted
10  against the McChesneys, and you retained Mr. Morgan, did you
11  have any other counsel that you utilized with any -- for any
12  matter relative to the Clough farm?  I know you had
13  Mr. Warren.
14      A.   Mr. Morgan.
15      Q.   And prior to hiring Mr. Morgan, did any other
16  attorney do work for you relative to the Clough farm?
17      A.   Wait, one time.  I think I did consult with
18  John Enders, an attorney in Erie.  I can't remember the
19  sequence of that.
20      Q.   And do you recall what you consulted
21  Mr. Enders for?
22      A.   I'm sure it had to do with the timber
23  controversy but I don't remember the exact reason.
24      Q.   Prior to your contacting Mr. Hare, did you
25  have any other lawsuits relative to the Clough farm, other

26

1  than the McChesney lawsuit?
2      A.  No.
3      Q.  Now, currently you're involved in several
4  lawsuits relative to the Clough farm.
5      A.  Too many.
6      Q.  Not counting the one we're here for today that
7  you filed against Mr. Hare, what other lawsuits are currently
8  pending relative to the Clough farm?
9      A.  Well, we have at least one in Warren County.
10  I don't know how many we have in Warren County, I think
11  three.  Two initiated by Matson Lumber Company; one by me,
12  and then we have an appeal that's going for the -- I'm not
13  sure which court it is anymore.
14      Q.  There's two suits that Matson Lumber has filed
15  against you and other defendants, I believe.
16      A.  Yes, that's right.
17      Q.  And who's representing you in those lawsuits?
18      A.  Jim Fryling.
19      Q.  And you have a lawsuit that you filed against
20  Matson Lumber that was filed back in 1998, around there,
21  right?
22      A.  Let's see.
23      Q.  That's in Warren County?
24      A.  In Warren County.  I don't think we filed -- I
25  don't remember when it was filed.  That would be around --

27

1      Q.  It was filed after the verdict in the federal
2  court action?
3      A.  After the verdict.
4      Q.  And that is still pending?
5      A.  That is still pending.
6      Q.  Do you know the status of that lawsuit at all,
7  sir?
8      A.  Not really.
9      Q.  And who's representing you in that lawsuit?
10      A.  Mr. Fryling and Mr. Conner.
11      Q.  Is Mr. Krembs from Ohio representing you in
12  that lawsuit?
13      A.  No, he's not.
14      Q.  Does he represent you at all today in
15  anything?
16      A.  Nothing.
17      Q.  You said there was also an appeal pending.  Is
18  that the appeal from the dismissal of the quiet title action
19  in federal court?
20      A.  Yes, um-hum.
21      Q.  And Mr. Fryling and Mr. Conner are again
22  representing you in that one?
23      A.  Yes, they are.
24      Q.  To your knowledge, has the quiet title action
25  been re-filed in state court?

ALBERT CARLISLE
28

```
 1   A.    In state court?
 2   Q.    It was dismissed in federal court.
 3   A.    Right.
 4   Q.    And my understanding, the judge dismissed it
 5   because of the lack of jurisdiction.
 6   A.    So it's being appealed, that's all I know.
 7   Q.    You don't know whether it's been re-filed in
 8   state court or not?
 9   A.    I think the issue has been raised in Warren
10   County as well.
11   Q.    What caused you to see Mr. Hare -- contact Mr.
12   Hare relative to the Clough farm? What was the problem you
13   were having?
14   A.    Actually it had nothing to do with the Clough
15   farm. I was having a problem with my family company and had
16   heard that Scott was representing someone that I knew in
17   Ashtabula, so I called him and asked him to see me when he
18   came to Ashtabula to see another client.
19   Q.    Do you know who that person -- that other
20   person he was representing was? Do you remember?
21   A.    No. It was a friend of his father's who had
22   been injured in an accident in a factory. I can't remember
23   the -- I didn't know the man, I don't know who he is.
24   Q.    So you contacted Scott relative to a problem
25   you were having with Carlisle Retail?
```

ALBERT CARLISLE
29

```
 1   A.    Right, um-hum.
 2   Q.    Prior to contacting Scott, had you discussed
 3   this problem with any other attorneys?
 4   A.    I must have. I don't remember. Yes, I
 5   certainly did, um-hum.
 6   Q.    Do you recall the names of those attorneys?
 7   A.    Sure. John Wheeler, he's the basic one.
 8   Q.    And where is he located?
 9   A.    I think he's now retired. He was the managing
10   partner for Calfee, Halter and Griswold in Cleveland. He was
11   chairman of the board of Allegheny College. I don't think
12   he's at Allegheny anymore.
13   Q.    Did Mr. Wheeler decline to help you?
14   A.    No, he looked into the problem of the Carlisle
15   company and actually we put him -- I say we, my family put
16   him on the board. He served on the board of directors for a
17   year.
18   Q.    What was the problem, I guess, you were
19   having?
20   A.    Minority shareholder.
21   Q.    You were a minority?
22   A.    We were a minority.
23   Q.    You said we?
24   A.    Well, my mother and my sister and I, we were
25   minority shareholders.
```

ALBERT CARLISLE

30

```
 1    Q.    And by putting Mr. Wheeler on the board, that
 2  was -- you were trying to get representation on the board?
 3    A.    We, yeah.  This was when my father was still
 4  alive, and he was really too old to represent us very well,
 5  so we decided we should have somebody on the board so we got
 6  Mr. Wheeler.
 7    Q.    My understanding is that the company, your
 8  father, and he had brothers that also owned it --
 9    A.    Yes, he did.
10    Q.    So it's my understanding that the company
11  would have been started by your grandfather?
12    A.    Actually, further back than that.  It was
13  started in 1865.
14    Q.    I believe you indicated it's no longer in
15  existence.
16    A.    It's been merged.
17    Q.    When you met with -- you met with Mr. Hare in
18  Ashtabula?
19    A.    He came to see me.
20    Q.    Do you recall when that was?
21    A.    No, I don't remember, but he came to see me at
22  my house, I know that.
23    Q.    The lawsuit that was ultimately filed against
24  Matson was filed in March of 1995?
25    A.    '95.
```

ALBERT CARLISLE

31

```
 1    Q.    How long before that would you say you first
 2  met with Mr. Hare?
 3    A.    Not a lot before that.  The thinking was we
 4  were going to file it -- Matson -- the provisions were that
 5  Matson had to stop cutting trees at the end of March, so we
 6  decided to wait until March to file the lawsuit so they would
 7  be gone from the property.
 8    Q.    I guess --
 9    A.    I think less than a year.
10    Q.    So sometime in 1994?
11    A.    Less than a year.
12    Q.    And when you say when he first came up to see
13  you it was to discuss the matter involving Carlisle
14  Retailers?
15    A.    That was the initial --
16    Q.    During that first meeting with him did the
17  subject of Matson Lumber come up?
18    A.    It must have.
19    Q.    Had you discussed the problems you were having
20  with Matson Lumber with any other attorney before you
21  discussed it with Mr. Hare?  When I say that, the two-year
22  period, and then we'll go back to --
23    A.    Again, with John Wheeler I had.
24    Q.    What was the problem that you were having with
25  Matson Lumber in 1994?
```

ALBERT CARLISLE

32

```
1     A.    Well, there was a difference in opinion as to
2  who owned what, and that was it.
3     Q.    Who at Matson Lumber -- was there a person at
4  Matson Lumber you were mainly dealing with?
5     A.    Bob Matson.  Robert Matson and his daughter
6  Becky.
7     Q.    Bob and Robert are two different people?
8     A.    No, I'm sorry.  Robert Matson was then the
9  president, and he had a daughter who was working there named
10 Becky Matson, and she's still there, I think.  Bob has died
11 but she was still there.  She's still there.
12    Q.    When you say a difference in opinion, you mean
13 a difference in opinion as to what rights you had in the
14 timber and what rights they had in the timber?
15    A.    Right.
16    Q.    And when you say a difference, that would have
17 been your interpretation under Exhibit B.
18          MR. CONNER:  Object to the form of the
19 question.  Go ahead.
20    Q.    Your interpretation of Exhibit B --
21          MR. CONNER:  Same objection.  Go ahead.
22    A.    Well, that -- that plus the first forester
23 that Matson had working for them when they began cutting
24 trees on the farm became a good friend named Norman
25 Sunderland, S-U-N-D-E-R-L-A-N-D.  And he let me know that he
```

ALBERT CARLISLE

33

```
1  thought things weren't just right.  So I was getting clues
2  from other people that something was wrong.
3     Q.    Did you ever discuss the problems you were
4  having with Matson Lumber with any other attorney from the
5  Pittsburgh area?
6     A.    No, not from Pittsburgh.  I didn't know
7  anybody.
8     Q.    Did you ever discuss with any other lawyer the
9  filing of a suit against Matson Lumber relative to --
10    A.    No.
11    Q.    So Mr. Hare was the only attorney you
12 discussed --
13    A.    That's right.
14    Q.    -- discussed with the filing of the suit?
15    A.    Um-hum.
16    Q.    When you met with Mr. Hare, did you provide
17 him a copy of Exhibit B?
18    A.    I did.
19    Q.    And did you tell him that Exhibit B was the
20 agreement between you and Fisher & Young relative to the
21 rights between the parties?
22          MR. CONNER:  Object to the form of the
23 question.  Go ahead.
24    A.    I can't remember what I told him.  It was a
25 document that I had.
```

ALBERT CARLISLE

34

1    Q.    That is the document you had?

2    A.    I had that.

3    Q.    You understood that Matson Lumber was the

4    successor to Fisher & Young?

5    A.    Yes, um-hum.

6    Q.    To your knowledge, did you provide Mr. Hare

7    with any other documents regarding the rights of timber on

8    the property?  Were there any other documents that you were

9    aware of at that time?

10    A.    He was going to go to the courthouse in Warren

11    and look up the deed which I didn't have.

12    Q.    The deed from?

13    A.    Fisher & Young.

14    Q.    From them to you?

15    A.    Yes.

16    Q.    And that's what we marked as Exhibit A?

17    A.    He said he would go to the courthouse and

18    check that.

19    Q.    Do you know if he ever did?

20    A.    Well, I thought he did.  I don't know for sure

21    if he did.

22    Q.    Did he ever provide you a copy of the Exhibit

23    A?  Mr. Hare ever provide a copy of Exhibit A?

24    A.    No.  I shouldn't say that.  Maybe he did, I

25    don't know.

ALBERT CARLISLE

35

1    Q.    Do you recall providing Mr. Hare any other

2    documents, other than what's been marked as Exhibit B, when

3    you first met with him in Ashtabula, Ohio?

4    A.    I doubt it.

5    Q.    Do you recall whether you advised him of the

6    lawsuit involving the McChesneys?

7    A.    Yes, I did.

8    Q.    You did?

9    A.    Certainly.

10    Q.    Did you have any documents from that lawsuit

11    that you could have provided him?

12    A.    No.  He was going to look those up at the

13    courthouse.

14    Q.    The McChesney lawsuit?

15    A.    Yes.

16    Q.    Do you recall if you ever signed a retainer

17    agreement with Mr. Hare?  Do you recall?

18    A.    I don't.

19    Q.    You don't recall?

20    A.    I don't recall.

21    Q.    You retained Mr. Hare to represent you with

22    regard to your problems with Matson Lumber, correct?

23    A.    That's right.

24    Q.    What were you looking for?  What did you want to happen?

25    relief you wanted from this?  What was the

ALBERT CARLISLE

36

```
1        A.      Several things.  I thought that they had
2   stolen some of my property.
3        Q.      When you say property, you mean trees?
4        A.      Trees.  And I felt I wanted to get rid of them from
5   the farm.  They were -- I felt they no longer belonged there.
6        Q.      Why did you feel that?
7        A.      Well, variety of reasons.  I mean, I can't --
8   I wish I could tell you from what Mr. Sunderland told me; the
9   first forester Kurt Bower told me, I felt it was time they
10  had -- just better look into what they were doing.
11       Q.      To your recollection when did Matson Lumber
12  first start harvesting trees or lumbering on the property?
13       A.      I don't remember but it was in the mid
14  eighties, I think.
15       Q.      Was it after the lawsuit in Warren County
16  involving the --
17       A.      It was after that.
18       Q.      It was after that?
19       A.      The McChesneys.  Because while we were having
20  lunch -- well, it was just after that.  It was after that
21  lawsuit from McChesneys.
22       Q.      Had ended?
23       A.      Had ended.
24       Q.      And that's when Matson Lumber became involved.
25       A.      They appeared at the trial.
```

ALBERT CARLISLE

37

```
1        Q.      They appeared at the trial, what do you mean?
2        A.      Some representative from Matson Lumber Company
3   came to the trial between myself and McChesney.
4        Q.      So you think Matson Lumber became involved in
5   the property in the mid eighties?
6        A.      Must have been sometime in there.
7        Q.      When did they first start performing --
8        A.      They sent me a letter.
9        Q.      Let me stop you.  When did they first start
10  performing timber work on the property?
11       A.      I don't remember.
12       Q.      When did you first come to the conclusion that
13  they were a problem and you wanted to get rid of them or they
14  had stolen some of your timber?
15       A.      Well, again, as I said, after talking with
16  Mr. Sunderland and Mr. Bower, I began to -- I had an inkling
17  from Terry Warren, who represented me first, that there might
18  be some questions as to the ownership of the trees, so there
19  was all these things were bothering me.  I thought I better
20  look into it in a deeper way.
21       Q.      I'm going to show you what's been marked as
22  Exhibit C.
23       A.      Okay.
24       Q.      And is that the -- to your recollection is
25  that the copy of the complaint that was filed on your behalf
```

ALBERT CARLISLE

38

```
1    by Mr. Hare?
2         A.    I guess it is.
3         Q.    Did you review that complaint prior to it
4    being filed?
5         A.    Yes.
6         Q.    And you were satisfied with it?
7         A.    Well, I had confidence in Mr. Hare, so when
8    you say satisfied, I'm not a lawyer.
9         Q.    Did you request that Mr. Hare make any changes
10   to the complaint that he refused to do?
11        A.    No.  We did meet with Mr. Hare frequently, so
12   I just assumed that what he did was correct.
13        Q.    When you say we, who's we?
14        A.    Mr. Bush that I mentioned, and at that time I
15   had a forester consultant named Jim Hall.
16        Q.    When you say met, did you meet with Mr. Hare
17   prior to the filing of the lawsuit?
18        A.    Yes.  Oh, yes.
19        Q.    Prior to the filing of the lawsuit did you
20   ever meet with Mr. Edson?
21        A.    I can't remember when I met him.  I met with
22   him, of course.  He came to Ashtabula and we had lunch
23   together.
24        Q.    Did he come with Mr. Hare or did he come by
25   himself?
```

ALBERT CARLISLE

39

```
1         A.    He came with Mr. Hare.
2         Q.    But that is different than the first time that
3    Mr. Hare came out?
4         A.    Oh, yes.  In fact, when I first started with
5    Mr. Hare, Mr. Edison was not a partner, that came later.
6         Q.    But you did review this before it was filed?
7         A.    Yes.
8         Q.    And you authorized Mr. Hare to file this
9    complaint?
10        A.    Yes, I did.
11        Q.    During the course of the litigation, and I'm
12   going to say up to the time of -- up to the time a month
13   before the jury trial, did you ever request that Mr. Hare do
14   something that he refused to do or did not do?
15        A.    I don't remember.  There were some
16   disagreements between Mr. Hare and Mr. Hall.
17        Q.    Mr. Hall?
18        A.    Was the forester.
19        Q.    And he was retained to be your expert in the
20   case.
21        A.    He was our expert, right.
22        Q.    Do you recall what those differences were?
23        A.    No.  I just remember lots of discussions.
24        Q.    Ultimately the case resulted in a jury trial?
25        A.    That's right.
```

1    Q.    To your knowledge, did the defendants ever

2  make a settlement offer to you?

3    A.    No.

4    Q.    Never made one?

5    A.    You mean before the --

6    Q.    Verdict.

7    A.    No.

8    Q.    I'll show you what we've marked as Deposition

9  Exhibit D.  Have you ever seen that before?

10    A.    I guess I have, I don't remember it.

11    Q.    Do you recall discussions with Mr. Hare

12  relative to the dismissal of the trespass count in the

13  complaint?

14    A.    No.

15    Q.    You recall no discussion relative to that?

16    A.    No.

17    Q.    When did you first learn that trespass count

18  had been dismissed?

19    A.    I can't remember.  We learned it after the

20  completion of the trial but I don't remember when I learned

21  it.

22    Q.    After the completion of the trial.  When you

23  say we --

24    A.    I'm always referring to Lainard and Jim Hall.

25  We were a team so we --

1    Q.    How long after the verdict would you say you

2  learned it?

3    A.    I don't remember.

4    Q.    A month, two months, a year?

5    A.    I can't remember.

6    Q.    How did you learn it?

7    A.    I'm trying to remember.  If I remembered that,

8  I could tell you when.  I don't remember.  I honestly don't

9  remember how I learned it.  It may come to me later but I

10  don't remember it now.

11    Q.    Is it possible you learned it from another

12  attorney?

13    A.    Could be possible but I doubt it.

14    Q.    Is it possible Mr. Hare told you; you learned

15  it from Mr. Hare?

16    A.    At some point I learned it from Mr. Hare, I

17  don't remember when.

18    Q.    Would that have been prior to his ending his

19  representation of you?

20    A.    Yes.

21    Q.    And just so I understand, the verdict was

22  appealed by the defendants to the Third Circuit Court of

23  Appeals?

24    A.    That's right.

25    Q.    And another counsel represented you on appeal?

ALBERT CARLISLE

42

```
 1     A.     That's right.
 2     Q.     So you would have learned that the trespass
 3  count had been dismissed prior to the termination of the
 4  third Circuit appeal, correct?
 5     A.     I'm sure I did, I just don't remember the
 6  circumstances.
 7     Q.     But you believe it's -- Mr. Bush and Mr.
 8  Lainard (sic) may have been there when you learned about it?
 9     A.     I think they probably were.  We were all
10  surprised, that's all I could say.
11     Q.     You were surprised that trespass count had
12  been dismissed?
13     A.     We were surprised we hadn't been consulted.
14     Q.     Prior to the trial you had meetings with Mr.
15  Hare to prepare for the same, correct?
16     A.     Many.
17     Q.     These meetings you had were Mr. Bush and Mr.
18  Lainard (sic) at all of them?
19     A.     It's Mr. Bush and Mr. Hall.
20     Q.     Lainard Bush, sorry.  It's been a long drive
21  up.  Were they at the meetings as well?
22     A.     Always.
23     Q.     Now, there was an attorney, the name Michael
24  Bruzzese, B-R-U-Z-Z-E-S-E.  Do you know who that was?
25     A.     Was he involved in the mediation or something?
```

ALBERT CARLISLE

43

```
 1     Q.     He's an attorney that assisted Mr. Hare during
 2  the trial.
 3     A.     All right.  He came in -- he came in, I think,
 4  the afternoon before the trial as sort of a devil's advocate,
 5  that's what he did.
 6     Q.     To help prepare your testimony?
 7     A.     To question us a little bit.  I wouldn't
 8  remember his name but now you told me, that's who it was.
 9     Q.     Do you recall you authorized Mr. Hare to bring
10  him in to help --
11     A.     It was his idea, I wouldn't know.
12     Q.     You knew it was happening?
13     A.     When it happened.  I didn't know it was going
14  to happen ahead of time.
15     Q.     You didn't?
16     A.     No.
17     Q.     How many times do you recall meeting this
18  attorney, Mr. Bruzzese?
19     A.     I don't remember more than once.
20     Q.     I'm going to represent to you that Exhibit E
21  is part of the transcript of the trial in front of Judge
22  Lancaster that was -- in which Mr. Hare was representing
23  you.
24     A.     Okay.
25     Q.     On page 76 of the transcript, I think it's
```

ALBERT CARLISLE

44

1  three, four pages into the exhibit, it's in the wrong order.

2    A.    Okay.

3    Q.    There's a discussion on page 76 regarding the

4  withdrawal of the conversion claim and I'd ask you to read

5  from line six down.

6    A.    (Witness complied.)    Okay.

7    Q.    That indicates that Mr. Hare was withdrawing

8  the conversion claim; do you agree with me?

9    A.    Apparently, I'm not a lawyer but it may be.

10    Q.    Did Mr. Hare discuss with you the withdrawal

11  of the conversion claim prior to it being done?

12    A.    No.

13    Q.    Did you know the conversion claim was being

14  withdrawn during the course of the jury trial?

15    A.    No.

16    Q.    When did you first learn that the conversion

17  claim had been withdrawn?

18    A.    I wish I could tell you, but I don't --

19    Q.    Can we agree that you learned it around the

20  same time that you learned the trespass claim was withdrawn?

21    A.    Probably.

22    Q.    Prior to the termination of the appeal?

23    A.    Yes.

24    Q.    And, again, you don't remember how?

25    A.    I don't remember, no, it's sort of a blur.

---

ALBERT CARLISLE

45

1    Q.    In the transcript Mr. Hare states:    It is too

2  difficult a question to ask anyone to resolve how much, if

3  any, of the cutting took place within a two-year period.

4    Do you agree with him that it would be difficult to

5  determine if a tree was cut down within two years of the

6  filing of the lawsuit or four years within the filing of the

7  lawsuit or five years?

8    A.    I don't know.

9    Q.    You don't know that?

10    A.    I'm not an expert.

11    Q.    I'm just asking if you have an opinion.

12    A.    Well, I don't know.    I would -- if Mr. Hall

13  were here I could ask him but --

14    Q.    Does Mr. Hall still work on the farm as a

15  forester?

16    A.    He helps us, yes, um-hum.

17    Q.    Am I correct that Mr. Hall is a defendant in

18  one of the lawsuits that Watson Lumber filed against you?

19    A.    He is.

20    Q.    Do you know who's representing Mr. Hall?

21    A.    Is Jim?    I don't know.    Jim Fryling?

22    Q.    Don't ask him.

23    A.    I'm sorry, I don't know.

24        MR. CONNER:    Let me go off the record.

25  (Off the record.)

ALBERT CARLISLE

46

```
 1   BY MR. HABER:
 2        Q.    Let me show you what's been marked as Exhibit
 3   F, and ask you whether you recognize that?
 4        A.    Yes, I do.
 5        Q.    And what is that?
 6        A.    When we went to the trial, the 1997 trial --
 7        Q.    December of '97?
 8        A.    -- the judge had changed everything on it.
 9   And all of a sudden Jim Hall had to come up with a report to
10   try to establish a no-cut zone and where it was and if Matson
11   had cut any trees within that.    And this is an effort to
12   decide how much damage had been done in the no-cut zone.
13        Q.    When you say the judge had changed everything,
14   your understanding was the judge made pretrial rulings that
15   kind of changed the trial?
16        A.    As far as I knew.    I mean, I wasn't there.
17        Q.    I understand that.    But that's what you were
18   told?
19        A.    Right.
20        Q.    And this no-cut zone, it's around the streams?
21        A.    It's around -- it was defined by waterways,
22   and including the streams.
23        Q.    And if I understand correctly, there was at
24   one time, allegedly, a map that showed the no-cut zones?
25        A.    There was.
```

ALBERT CARLISLE

47

```
 1        Q.    But nobody can find the map?
 2        A.    I saw it but I have no idea where it was.
 3        Q.    You say you saw it back in the seventies?
 4        A.    Never saw it again.
 5        Q.    So one of the issues in the trial was what was
 6   the width of the no-cut zone?
 7        A.    That's right, and where was it.
 8        Q.    And where was it.    And the jury resolved that
 9   there was a no-cut zone.
10        A.    Yes.
11        Q.    And I think they resolved the width at a
12   hundred feet?
13        A.    Of either side.
14        Q.    Of the stream?
15        A.    Of the stream or wetlands.
16        Q.    Wetlands?
17        A.    Not wetlands, waterways.    I'm trying to think
18   of the exact word they used, waterways.
19        Q.    And it's your understanding that Mr. Hall
20   prepared Exhibit E like in the middle of the trial?
21        A.    In the middle of the night.
22        Q.    Were you dissatisfied with the verdict in the
23   federal court action?
24        A.    Yes.
25        Q.    In what way?
```

48

1   A.   In almost every way. One was, of course, to
2  begin with, I would hope that Matson would be off the
3  property and in a sense what they got was a right to cut
4  trees for 50 more years.
5       Q.   Why do you say that?
6       A.   Because that's what they said.
7       Q.   The jury verdict didn't say that.
8       A.   The jury verdict said that Matson had the
9  right to cut trees that were existing in 1969. Those trees
10 can grow a long time, so that was a disappointment, that they
11 could come back and cut trees.
12       The second thing is, the -- I was led to believe
13 there was going to be much more in damages for the trees that
14 Matson did cut. So that was disappointment number two.
15       And it created a cloud on my title, that's still
16 there. Aggravation and the cloud on the title.
17       Q.   So you were dissatisfied with the damage
18 result?
19       A.   Oh, yeah, sure.
20       Q.   And you were dissatisfied on the day the
21 verdict came in, you knew what the verdict was?
22       A.   We knew the verdict -- it was sort of a mixed
23 feeling because when the verdict was read there was some
24 degree of optimism because Matson didn't win any of those
25 particular points, but it was so vague that it left

49

1  everything still open. Nothing really was settled.
2       Q.   I understand that, but you knew the damage
3  result when it was -- when the jury returned the verdict.
4       A.   I knew what the jury said about damage.
5       Q.   And you were dissatisfied on that date?
6       A.   Yeah, sure.
7       Q.   Did you express that dissatisfaction to Mr.
8  Hare?
9       A.   Probably not that day.
10       Q.   Did you subsequently express that
11 dissatisfaction to him?
12       A.   Sure.
13       Q.   And that was written or verbal?
14       A.   That would be verbal.
15       Q.   You said you were dissatisfied that Matson
16 Lumber would have the right to continue to harvest trees that
17 were standing in 1969, correct?
18       A.   Yes.
19       Q.   And it was your understanding that one of the
20 issues that you were seeking to resolve in the federal court
21 action was whether they could cut trees that were standing
22 prior to 1969?
23       A.   That was my understanding. My hope was that
24 we would be able to -- they had cut a lot of trees. My hope
25 was that that was the end, we could exclude them from the

ALBERT CARLISLE

1  property.
2      Q.   Were you seeking relief from the federal court
3  that they would not be permitted to cut trees that were
4  standing prior to 1969?
5      A.   I had hoped that was going to happen.
6      Q.   Based on your understanding is there a way to
7  tell today, 2005, if a tree was standing in 1969 or not
8  standing in 1969?
9      A.   They say there is.
10      Q.   Who is they?
11      A.   Matson would say there is.
12      Q.   I'm asking you based on your discussions with
13  your people do you think there's a way to determine that?
14           MR. CONNER:  Just for clarification, he's
15  asking you to repeat what Hall might have said or --
16      Q.   Or anyone else.
17      A.   Sure.  Jim Hall could make a measure of trees
18  that would be standing that -- in 1969.  Sure, Jim Hall could
19  give me a report on that.
20      Q.   Was there any other dissatisfaction you had
21  with the jury verdict, other than the fact that they could
22  continue to timber trees prior to 1969?
23      A.   Nothing -- unfortunately, nothing got resolved
24  with this -- very little got resolved with this jury verdict.
25  Everything was left open ended.  We're still fighting the

50

ALBERT CARLISLE

1  same battles that we were fighting.
2      Q.   Was there anything that Mr. Hare did during
3  the course of the trial that you saw that you were
4  dissatisfied with or disagreed with?
5      A.   We certainly had our disagreements, but I
6  assumed he was the expert.
7      Q.   What were those disagreements?
8      A.   I don't remember.  We had a lot of them, we
9  had a lot of disagreements.
10      Q.   Was there a witness that he -- you wanted him
11  to call that he didn't call?
12      A.   Maybe.
13      Q.   Do you recall who that may have been?
14      A.   Might have been Steve Madewell.
15      Q.   Who's Steve Madewell?
16      A.   Steve Madewell is an employee of Lake County
17  Metro parks.
18      Q.   What would he have added?
19      A.   He's an expert in land acquisition and
20  contracts and so forth.
21      Q.   Did you request that he retain him as an
22  expert?
23      A.   I don't remember.  We certainly talked to
24  Steve, yes, I can -- some things are coming back.  I wasn't
25  happy with a lot of Scott's decisions and I did consult with

51

ALBERT CARLISLE
52

1 another attorney.
2 Q. Well, was this before the trial?
3 A. Before the trial.
4 Q. Before the trial. Who was that lawyer?
5 A. Dan Hill.
6 Q. And where is he located?
7 A. Erie.
8 Q. Do you know if he's still practicing today?
9 A. I don't know what he does. He's still in
10 Erie, but he's now on the Pennsylvania Game Commission. I
11 don't know what he does.
12 Q. And what problems did you --
13 A. We just didn't feel Scott was seeing the big
14 picture.
15 Q. I understand. Is there a specific issue that
16 you consulted Mr. Hill with?
17 A. I don't remember, no.
18 Q. Do you recall any correspondence between you
19 and Mr. Hill?
20 A. Not written.
21 Q. That's the only type of correspondence there
22 are.
23 A. That's right. Just verbal.
24 Q. Back then we didn't do a lot of emailing.
25 A. Just verbal.

ALBERT CARLISLE
53

1 Q. When you met with him was anyone else present?
2 A. Always Mr. Hall and Mr. Bush.
3 Q. And you said you met with Mr. Hill prior to
4 the trial?
5 A. Yes.
6 Q. During the trial did you ever call another
7 lawyer up and say: Hey, Mr. Hare did this, I disagree with
8 that?
9 A. I don't remember. Might have. Might have
10 called Dan Hill, I don't remember.
11 Q. And did you attend the entire trial?
12 A. Oh, yes.
13 Q. Did Mr. Bush -- was Mr. Bush there for the
14 whole trial?
15 A. Mr. Bush was there and Mr. Hall was there.
16 Q. For the whole trial?
17 A. The whole trial.
18 Q. Was anyone else there on your behalf?
19 A. I don't think so.
20 Q. Did Mr. Hare try the case himself?
21 A. Yes, he tried it himself.
22 Q. When you retained Mr. Hare to handle this
23 case, did you ask him about whether he had any prior
24 experience in timber litigation?
25 A. I don't think so. He seemed very eager to get





ALBERT CARLISLE
54

1   the case.
2          Q.    And the damage verdict was a hundred and ten
3   thousand dollars?
4          A.    I think so.
5          Q.    And you received that?
6          A.    Yes, I did.
7          Q.    And my recollection is the Third Circuit Court
8   of Appeals affirmed the entire verdict in your favor.
9          A.    Yes, that's right.
10          Q.    Did you ever discuss with Mr. Hare, or any
11  other attorney, you filing an appeal to the Third Circuit
12  from the verdict?
13          A.    I don't follow that.
14          Q.    Well, Matson filed an appeal, correct?
15          A.    I don't remember how that happened. I just
16  know --
17          Q.    Did you ever talk to anyone about filing an
18  appeal? You said you were dissatisfied with the verdict.
19  I'm asking whether you asked anybody or talked to anybody
20  about filing an appeal?
21          A.    I think it automatically happened, we knew it
22  was going to be appealed.
23          Q.    Matson appealed. Maybe you don't understand
24  this. Matson appealed, right? Do you understand how a case
25  gets to the appellate --

ALBERT CARLISLE
55

1          A.    I guess so.
2          Q.    Did you ever discuss with anybody filing an
3   appeal?
4          A.    Scott.
5          Q.    You did?
6          A.    Sure.
7          Q.    What was the discussion?
8          A.    I assumed if the case was appealed, the
9   verdict was appealed, he would represent me in the --
10          Q.    Who represented you in the appeal?
11          A.    An attorney out of Cleveland called Peter
12  Krembs.
13          Q.    Krems?
14          A.    Krembs, K-R-E-M-B-S.
15          Q.    B or V?
16          A.    B.
17          Q.    Prior to the verdict did Mr. Edson do any
18  work, to your knowledge, on the case?
19          A.    If he did, I don't know.
20          Q.    Why are you suing Mr. Edison?
21          A.    He's a partner.
22          Q.    Not because of any work he did, just because
23  he was a partner?
24          A.    He was involved certainly.
25          Q.    What did he do?

1    A.    I have no idea. I have no idea.

2    Q.    You don't know of any specific work he did?

3    A.    No.

4    Q.    I mean, whether he wrote a brief or did something

5    specifically in the case, you're not aware of that?

6    A.    No.

7    Q.    Did you ever meet Mr. Bartony?

8    A.    Just once.

9    Q.    And was that in relation to some aspect of

10    this case or just socially?

11    A.    Just he was in the office and I met him that

12    way.

13    Q.    To your knowledge, did he do any work on the

14    case?

15    A.    I have no idea. Scott relied on both of them,

16    so I have no idea, but specifically they might.

17    Q.    And you're also saying Mr. Bartony because

18    he's Mr. Hare's partner?

19    A.    Certainly.

20    Q.    When you say Scott relied upon them, in what

21    way do you --

22    A.    He mentioned to me that he would check with

23    one or the other, I don't remember -- I don't remember

24    specific details.

25    Q.    Without getting into details, would you agree

with me that there was a dispute regarding the amount of

---

money you owed Mr. Hare following the trial?

1    A.    Yes, um-hum.

2    Q.    Ultimately those fees were paid?

3    A.    Those fees were paid.

4    Q.    Out of the settlement?

5    A.    Yes, they were, um-hum.

6    Q.    As I understand, the verdict came down in

7    December of 1997, correct?

8    A.    That's right.

9    Q.    You said you talked to an Attorney Krens (sic)

10    who represented --

11    A.    Krembs.

12    Q.    Krembs who represented you on the appeal,

13    during the appeal?

14    A.    Yes, um-hum.

15    Q.    When did you first consult Mr. Krembs?

16    A.    I don't remember. We had filed something in

17    Warren County -- we had filed something for the Warren County

18    case that Scott had prepared, I don't remember the legal term

19    for it.

20    Q.    Writ of Summons?

21    A.    I don't remember.

22    Q.    It's a piece of paper to start the lawsuit?

23    A.    A piece of paper, and then it became apparent

24    to me that Scott was not going to follow through on it.

ALBERT CARLISLE

58

```
 1    Q.    And Scott expressed that, that he wasn't going
 2  to continue to represent you because of the fee dispute.
 3    A.    He said that.  I wasn't sure that that's
 4  exactly what he meant but he did say that.  There was also --
 5    Q.    Go ahead, there was also?
 6    A.    Nothing.
 7    Q.    But you contacted Mr. Krembs in 1998?
 8    A.    I guess, probably.
 9    Q.    The year following the verdict?
10    A.    Yeah, must have been.
11    Q.    Had he represented you prior to that?
12    A.    No, I never met him.
13    Q.    How did you get in contact with him?
14    A.    Steve Madewell.
15    Q.    Where does Steve Madewell reside?
16    A.    Well, I don't know.  He lives in, I think,
17  Painsville, but I'm not sure, Ohio.  He used to live in
18  Chardon, I think.
19    Q.    He's not a lawyer, correct?
20    A.    No, no, he's a -- he works for Lake County
21  Metro Parks.
22    Q.    And Lake County is in Ohio?
23    A.    Lake County, it's in the county right next to
24  Ashtabula, between Ashtabula and Geauga County is where it
25  is.  Can we take a five minute break?
```

ALBERT CARLISLE

59

```
 1                MR. HABER:  Sure.
 2    (whereupon, a break was had.)
 3  BY MR. HABER:
 4    Q.    Let me show you what's been marked as Exhibit
 5  G.  You had previously mentioned the document that had been
 6  filed in the Warren County action.
 7    A.    Yes.
 8    Q.    And that's filed on your behalf, correct?
 9    A.    Right, um-hum.
10    Q.    And when it was -- when you filed the
11  document, were you represented by Mr. Hare?
12    A.    Yes.
13    Q.    You believe he was still representing you as
14  of June 24th?
15    A.    Well, he was, sure.
16    Q.    Did he ever represent you in this Warren
17  County action?
18    A.    What do you mean?
19    Q.    Did he ever do anything for you on your behalf
20  in the Warren County action?
21    A.    I don't remember.  I'm sorry.
22    Q.    Do you know how this -- the writ was filed in
23  Praecipe for writ was filed in Warren County --
24    A.    Scott sent a letter to Lainard Bush because we
25  were running out of time because there was a time element and
```

1  Lainard and I took the letter over to the Warren County
2  courthouse. That's how we did it.
3     Q.  Did you personally file with the prothonotary?
4     A.  We left it there, yes. Scott prepared it and
5  he told us we better do it that day.
6     Q.  At the time this was filed in Warren County --
7  when I say this, Exhibit G -- had you already talked to Mr.
8  Krembs?
9     A.  No, didn't know him.
10    Q.  When you first talked to Mr. Krembs did you
11 discuss with him Scott's representation in the federal court
12 action?
13    A.  I was dismayed to find out that Scott wasn't
14 going to represent me.
15    Q.  In the Warren County action?
16    A.  In the Warren County action.
17    Q.  Did you discuss with Mr. Krems --
18    A.  Krembs.
19    Q.  Krembs. Did you discuss with Mr. Krembs
20 Scott's handling of the federal court action?
21    A.  I must have.
22    Q.  And to your knowledge did Mr. Krembs contact
23 Scott to discuss the things? To your knowledge did Mr.
24 Krembs ever contact Scott?
25    A.  I don't know.

1     Q.  You can think of no reason that Mr. Krembs
2  would contact Scott other than regarding your matter?
3     A.  Not really.
4     Q.  Did you discuss with Mr. Krembs the dismissal
5  of the conversion or the dismissal of the trespass action in
6  the federal court action?
7     A.  I don't remember.
8     Q.  Did Mr. Krembs or Mr. -- did Mr. Krembs ever
9  tell you that what Scott had done was improper or wrong, that
10 he had given you wrong advice?
11    A.  I think we were relying on what Scott had
12 done.
13    Q.  I understand that. When you went to talk to
14 Mr. Krembs, did you discuss what Scott had done may have been
15 improper?
16    A.  I don't think so, but I can't say for sure.
17    Q.  Did Scott ever tell you that -- discuss with
18 you the effect of the dismissal of the conversion or trespass
19 claim?
20    A.  I think we discussed it following the 1979
21 verdict. He came home for Christmas.
22       MR. CONNER:  To Ashtabula?
23    A.  To Ashtabula, and we met with my accountant
24 and that may have been when I first heard it.
25    Q.  That it was dismissed?

ALBERT CARLISLE

62

```
 1          A.    But I'm not sure.
 2          Q.    Did he discuss with you the effect of the
 3    dismissal and whether you could re-file them in state
 4    court?
 5          A.    Scott said we -- even in the trial which we
 6    had in federal court, Scott announced before the other trial
 7    we would probably be filing another suit -- lawsuit, so I
 8    just assumed this was an ongoing process.
 9          Q.    Did you have a discussion with him regarding
10    the effect of the dismissal of those counts in the federal
11    count action and whether they could be re-filed in state
12    court?
13          A.    I assumed.  We thought they could.  I don't
14    remember.
15          Q.    When you say we, you mean Mr. Bush --
16          A.    Well, and this time my accountant was
17    involved, too.
18          Q.    What was his name?
19          A.    Robert Gabrich, G-A-B-R-I-C-H.
20          Q.    Did you ever discuss with Mr. Hare a statute
21    of limitations issue relative to the dismissal of these
22    claims in federal court?
23          A.    I don't remember.  I know that he was very
24    concerned about a filing date.  That was this.
25          MR. CONNER:  When you say this, you have to
                          refer to an exhibit.
```

ALBERT CARLISLE

63

```
 1          A.    Exhibit G.  He sent an express letter to
 2    Lainard so we could get it there in Warren and get it to the
 3    courthouse.
 4          Q.    Do you know what the term tolling the statute
 5    of limitations means?
 6          A.    No.
 7          Q.    Did you ever discuss that with Mr. Hare
 8    relative to the dismissal of the federal court claims?
 9          A.    I don't remember.  I know what a statute -- I
10    don't know what the word tolling means.
11          Q.    To stop it from running.
12          A.    Okay, no, I don't think we ever did.  I don't
13    know.
14          Q.    In this lawsuit you're contending that Mr.
15    Hare was wrong in advising that the voluntary dismissal of
16    the two counts in federal court the statute of limitations
17    was tolled.  Do you understand that?
18          A.    Not really.
19          Q.    Did Mr. Krembs ever tell you that any advice
20    that Mr. Hare had given you was wrong?
21          A.    No.
22          Q.    Did Mr. Krembs ever criticize anything that
23    Mr. Hare had done?
24          A.    I don't recall that he did.
25          Q.    When did you first consider filing a lawsuit
```

1  against Mr. -- Hare?

2     A.    I guess we considered it when the judge in

3  Warren County -- and I think his name is Miltin -- rejected

4  our claims. I don't know what the word is.

5     Q.    The lawsuit's still pending?

6     A.    But he rejected the major part of it.

7     Q.    If I understand, the judge said you could

8  collect damages for what Watson did after the verdict but not

9  before the verdict in federal court.

10    A.    I guess.

11    Q.    Did you discuss with anyone prior to the date

12 the judge -- or the date you read the verdict, the decision

13 of the court, did you ever discuss with anybody bringing a

14 claim against Mr. Hare?

15    A.    No.

16    Q.    Does Mr. Krembs still represent you?

17    A.    No.

18    Q.    Did Mr. Krembs at all represent you in the

19 Warren County action?

20    A.    Yes.

21    Q.    Why did he cease representing you?

22    A.    Long story, I guess, but I felt I could do

23 better.

24    Q.    You were dissatisfied with his work?

25    A.    I was dissatisfied.

1     Q.    In what way were you dissatisfied?

2     A.    I don't know, I just was dissatisfied, I

3  guess.

4     Q.    Have you brought any claim against Mr. Krembs

5  for legal malpractice?

6     A.    No, I haven't.

7     Q.    Did you consider it?

8     A.    No.

9     Q.    After the judge rendered his decision in the

10 Warren County action, why did you then consider a lawsuit

11 against Mr. Hare?

12    A.    I began to realize that I had been damaged by

13 Mr. -- I relied on Mr. Hare and what I hoped was going to

14 happen didn't happen.

15    Q.    What way had you been damaged?

16    A.    My claims had disappeared.

17    Q.    And what claims had disappeared?

18    A.    I don't know the legal terms but they were

19 disappeared.

20    Q.    Are you referring to the claim that had been

21 voluntarily dismissed in the federal court action?

22    A.    Yes.

23    Q.    And prior to the decision of the judge in

24 Warren County had you discussed with anyone Mr. Hare's advice

25 relative to the dismissal of those claims?

ALBERT CARLISLE

66

```
 1        A.    No.
 2        Q.    When Mr. Hare first -- you discussed with Mr.
 3   Hare was -- first raised the dismissal of those claims you
 4   said it might have been the accountant, what was said?
 5        A.    I really don't remember.  I remember being
 6   very surprised.  As I said, the real surprise came during the
 7   trial when Scott announced we probably would be seeking
 8   another trial.  That certainly was far from what I had
 9   intended but --
10        Q.    Did he -- he told you that -- he didn't
11   announce it --
12        A.    Sure, he announced it in the trial.
13        Q.    Who did he announce it to?
14        A.    Everybody in the courtroom.
15        Q.    The jury, too?
16        A.    Sure.
17        Q.    During what phase of the trial?
18        A.    It was toward the end of the trial.  There
19   were -- the trial went on several days, I'm going to say the
20   last day.
21        Q.    Was it during the -- what we refer to as the
22   closing argument to the jury? Do you know what I mean by
23   closing argument?
24        A.    Yes.  I don't remember anymore, I'd have to
25   look it up.
```

ALBERT CARLISLE

67

```
 1        Q.    So the decision of the judge in the Warren
 2   County action in -- I think it was in --
 3              MR. CONNER:  January 30, 2002.
 4        Q.    -- what made you first consider a lawsuit
 5   against Mr. Hare?
 6        A.    It triggered the response from me.
 7        Q.    And at the time, in 2002, when the judge made
 8   this decision, who was representing you?
 9        A.    At that time it was Mr. Krembs.
10        Q.    And did you discuss the filing of the lawsuit
11   with Mr. Krembs?
12        A.    I don't remember.
13        Q.    Did Mr. Krembs still practice law in Ohio?
14        A.    I haven't seen him for about a year.  I assume
15   he does.
16        Q.    He's in Cleveland?
17        A.    He's in Cleveland, um-hum.
18        Q.    Earlier you had testified that you were
19   dissatisfied with the verdict in the federal court action,
20   the amount of the damages, you thought they should have been
21   more than a hundred and ten thousand dollars, correct?
22        A.    Right.
23        Q.    And that the other part of the verdict, called
24   the declaratory relief, the jury answered certain
25   questions --
```

ALBERT CARLISLE 68

1   A.   Right.
2   Q.   -- that it gave -- the answers weren't clear
3   that it resolved the problem, and it gave the right of Matson
4   to cut trees that were standing prior to 1969, correct?
5   A.   That's right.
6   Q.   Did you discuss that dissatisfaction -- your
7   dissatisfaction with the verdict with Mr. Krembs?
8        MR. CONNER: I think he already said no, but
9   go ahead.
10  A.   I doubt it.
11  Q.   Do you recall discussing this dissatisfaction
12  with anyone? Other than Mr. Bush and Mr. Hall?
13  A.   Those -- we rode together always to where we
14  were going, so it was certainly on the way back home we were
15  all let down a great deal.
16  Q.   You've been litigating this case in Warren
17  County, the one that was filed in 1998, for about seven years
18  now.
19  A.   Um-hum.
20  Q.   What's the purpose of the lawsuit? What are
21  you trying to seek in that lawsuit?
22  A.   Well, we were trying to seek damages for --
23  I'm not good at this. We were trying to seek damages for the
24  environment, environmental damages. There are probably
25  others, I don't remember.

ALBERT CARLISLE 69

1   Q.   Were you seeking damages for Matson cutting
2   down trees?
3   A.   I think so. I don't remember, isn't that
4   awful.
5   Q.   Have they cut trees since the verdict in the
6   federal court action?
7   A.   Of course, they started cutting trees -- the
8   trial in Pittsburgh ended in 1997, they came in and began
9   cutting trees in 1998, that's about a month afterwards.
10  Q.   So you're seeking damages for the trees that
11  Matson Lumber has cut down since the jury verdict in federal
12  court?
13       MR. CONNER: I'm going to object to the
14  form of the question, because we all know the case
15  -- the claims are re-filed, so re-filed claims arise
16  out of the '95 declaratory judgment action as well as
17  the trees that are cut since '97.
18       MR. HABER: I'm not saying -- I didn't say
19  you're limited to that. I said that's one of the
20  elements of damage.
21       MR. CONNER: I didn't mean to interrupt.
22  Q.   One of the elements of damages you're seeking
23  in the Warren County action is trees that Matson Lumber cut
24  down since the date of the verdict.
25  A.   Right.

1     Q.   Are they still cutting trees now?

2     A.   As far as I know.

3     MR. CONNER:  I didn't mean to interrupt you,

4  Dave.

5     MR. HABER:  No problem.

6     Q.   Prior to the judge's decision, in January

7  2002, did you understand that you were seeking to recover

8  damage for trees that were cut down prior to the date of the

9  jury verdict?

10     A.   Yes, um-hum.

11     Q.   And why did you think that? Where did you get

12  that understanding?

13     A.   Well, I -- I don't remember.  I mean, I'm

14  trying to think we were concerned about certain years of tree

15  cutting.  That's all I --

16     Q.   Is it your understanding that because Mr. Hare

17  dismissed these claims, the conversion and the trespass

18  claims in federal court, that that hurt your ability to

19  recover damages?

20     A.   Oh, yes, it did.

21     Q.   So Mr. Hare's dismissal of these two counts,

22  the conversion and the trespass action has limited your right

23  to recover damages in the Warren County action?  Is that your

24  contention?

25     A.   I don't know; I have no idea.  I'm trying to

---

1  think that through.

2     Q.   Let me try to rephrase it.

3     A.   I don't understand.

4     Q.   You told me once you read the decision or got

5  the decision from the Warren County judge --

6     A.   Right.

7     Q.   -- that's when you first considered a lawsuit

8  against Mr. Hare.

9     A.   Yes.

10     Q.   What part of that decision made you consider a

11  lawsuit against Mr. Hare?

12     A.   Well, it was a multitude of things at that

13  point.  Nothing that I thought good had happened from that

14  1997 trial.  Nothing.

15     Q.   Well, can you be more specific than nothing?

16     A.   Yeah.  Matson is still cutting; they have a

17  claim to a lot of trees that I think probably weren't

18  their's; they put a cloud on my title because I -- it's an

19  ongoing title.  I don't know if there's anything else other

20  than that but --

21     Q.   Well, Matson Lumber had started cutting in

22  1998.

23     A.   Right.

24     Q.   And you knew that?

25     A.   Yes.

1    Q.   You didn't need the judge to tell you that in

2  2002.

3    A.   No.

4    Q.   So I want to focus on the decision of the

5  judge in 2002.  What about that decision made you consider a

6  lawsuit against Mr. Hare?

7    A.   I think -- I think I've answered it.  I think

8  that I felt dissatisfied.  I relied on Scott to get certain

9  things done that didn't happen, that they weren't done.  I

10  was still dealing with the same problems that I was dealing

11  with in 1995.

12    Q.   I understand that, but, you know, your

13  dissatisfaction, you said, was that you wanted Matson off the

14  property.

15    A.   Right.

16    Q.   Well, within a month, I think you told me, of

17  the jury verdict in the federal court they were back there

18  harvesting trees.

19    A.   Right there.

20    Q.   So you knew that in 1998.  Am I correct that

21  they harvested in 1999, 2000?

22    A.   No.  Just -- they just harvested in 1998.

23    Q.   When was the next time they harvested?

24    A.   Probably -- I'd have to ask Jim Hall.  But

25  several years later.

1    Q.   But did they harvest again prior to the

2  judge's decision in 2002?

3    A.   No.

4    Q.   We'll go back to my original question.  What

5  about the judge's decision in 2002 made you consider a

6  lawsuit against Scott Hare?

7    A.   Well, all of a sudden the judge ruled that

8  what I thought was the basis for the 1997 lawsuit, whatever

9  that was, the judge said didn't apply.  And I'm not good at

10  describing legal terms but he threw out basically everything

11  that I thought I had.

12    Q.   And you believed that was Scott's fault?

13    A.   It was.

14    Q.   Why was it his fault?

15    A.   Because I relied on him to do that, to get

16  that part done.

17    Q.   Get what part done?

18    A.   All the items we have gone through before.

19    Q.   You relied --

20    A.   Nothing changed is what I'm trying to say.

21    Q.   You're dissatisfied because the jury verdict

22  in 1997 didn't change anything?

23    A.   Things changed very little.

24    Q.   It got you a hundred and ten thousand dollars.

25    A.   Yeah.

ALBERT CARLISLE
74

```
 1      Q.    During the course of the litigation in Warren
 2   County would you get copies of the pleadings from your
 3   lawyers?
 4      A.    Yes.
 5      Q.    And prior to the judge's decision in January
 6   2002 were you aware that Matson Lumber had filed a motion to
 7   dismiss part of the claim?
 8      A.    Probably. That's just standard.
 9      Q.    Your lawyers kept you apprised of what was
10   going on.
11      A.    Sure. They filed that same kind of motion when
12   -- that we filed in 1995.
13      Q.    And the court denied it back then.
14      A.    Yeah.
15      Q.    The trial judge right before the --
16      A.    But there was a lot of dickering back and
17   forth as to what was going on before the trial.
18      Q.    But your lawyers kept you apprised of what was
19   going on?
20      A.    Yes.
21      Q.    I might have asked you this. What is the
22   current status of the litigation in Warren County?
23      A.    On hold, I guess.
24      Q.    Do you know why it's on hold?
25      A.    No.
```

ALBERT CARLISLE
75

```
 1      Q.    Have you been deposed in that action in Warren
 2   County?
 3      A.    Yes, um-hum.
 4      Q.    Do you recall when you were deposed?
 5      A.    I was deposed by John Dennison, I think his
 6   name is, but that was several years ago.
 7      Q.    Did any attorney other than Mr. Krens --
 8      A.    Krembs.
 9      Q.    I'm sorry. Krembs represent you in the Warren
10   County action, other than your present counsel?
11      A.    Peter had an assistant, so.
12      Q.    But it would have been from his same office?
13      A.    From his firm, sure.
14      Q.    Was there any attorney in Warren County that
15   represented you?
16      A.    No.
17      Q.    I'm going to show you what's been marked as
18   Exhibit H and ask you whether you recognize that document?
19      A.    I don't.
20      Q.    Have you ever seen that document before?
21      A.    No. No, I have not seen this.
22      Q.    You don't recall seeing this before?
23      A.    No, I don't.
24      Q.    This is a deed from Mary Kinkead to Fisher &
25   Young in 1973.
```

1     A.  Yes.

2     Q.  That would have been after you purchased the

3  property?

4     A.  Right.

5     Q.  And one of your contentions in this lawsuit is

6  that Mr. Hare did not locate this deed. Do you recall that

7  -- asserting that

8     A.  Yes, um-hum.

9     Q.  And I'm assuming that if you're asserting that

10  Mr. Hare should have located this, you saw this deed prior to

11  today?

12     A.  No. I heard about it, I didn't see it.

13     Q.  When did you first learn about this deed?

14     A.  That I can't tell you.

15     Q.  Do you recall whom you first learned about it

16  from?

17     A.  Mr. Conner.

18     MR. CONNER: Quickly, this is what I'll call

19  the timber deed, is it not, David?

20     MR. HABER: Okay.

21     MR. CONNER: I think it's the timber deed

22  conveyed in September.

23     MR. HABER: Yes.

24  BY MR. HABER:

25     Q.  During the course of the time Mr. Hare was

---

1  representing you did you know about what we marked as Exhibit

2  H?

3     A.  No.

4     Q.  To your knowledge, has anyone told you that

5  they knew of the existence of Exhibit H during the time Mr.

6  Hare was representing you?

7     A.  My attorney, Terry Warren, had some concern

8  about the -- who owned the timber, and before he allowed me

9  to sign the agreement with Fisher & Young he had some

10  correspondence with them. That's all I know. They satisfied

11  him.

12     Q.  That was back in 1970?

13     A.  That was back in 1970.

14     Q.  We'll get to that later. Have you leased any

15  part of the property to anyone? Ever enter into a lease

16  agreement?

17     A.  No. When I first got the property there was a

18  fishing club that had a lease on it. They leased the fishing

19  rights to the stream, and, no, never had leased it.

20     Q.  That's a copy of the Answers to

21  Interrogatories that you served in this matter. I want to go

22  over a few things with you.

23     A.  Okay.

24     Q.  If you turn to the second page, listed on

25  there are some names of some individuals.

ALBERT CARLISLE

78

1    A.    Okay.
2    Q.    I'd like to go through them and you can tell
3    me what you think these individuals know relative to this
4    matter, okay?
5    A.    Um-hum.
6    Q.    Who is John Arway?
7    A.    I have no idea.
8    Q.    Lainard Bush we have already discussed.
9    A.    Yes.
10    Q.    The next person is you.
11    A.    Right.
12    Q.    Richard Conrad.  Do you know Richard Conrad?
13    A.    I think he was a forester for Matson.
14    Q.    Is 132 Main Street the address of Matson
15    Lumber?
16    A.    Probably is, yeah.
17    Q.    Richard Conti would he also be an employee of
18    Matson?
19    A.    He's a relative, he's married.
20    Q.    John Dennison is an attorney that was
21    involved.
22    A.    Right.
23    Q.    Leonard Domenic?
24    A.    Yeah, he's an employee of Matson.  He might be
25    treasurer, I'm not sure.

ALBERT CARLISLE

79

1    Q.    David Eardley we have already discussed.
2    A.    Right.
3    Q.    Todd Fankaskey?
4    A.    That should be F-A-N-K-A-S-K-E-Y.  I have no
5    idea where he is.  He was with Warren County Conservation
6    District.  He's gone someplace else.
7    Q.    Chet Fossee was the attorney for Matson?
8    A.    Right.
9    Q.    Joe Kelly?
10    A.    I don't know him.
11    Q.    John Kookogey was the attorney for --
12    A.    Matson.
13    Q.    Also for Fisher & Young?
14    A.    Yes, um-hum.
15    Q.    Steven Madewell?
16    A.    You skipped Ronald Lee.
17    Q.    It says he's with the Pennsylvania Fish and
18    Boat --
19    A.    Okay.  Steve Madewell I mentioned before, and
20    there's Becky Matson.
21    Q.    What about Norman Sunderland?
22    A.    He was their forester when I first became
23    involved with Matson.  I knew him because he had worked with
24    Fisher & Young as well.
25    Q.    Terry Warren?

ALBERT CARLISLE

1   A.   Attorney, right.
2   Q.   You don't know whether he still practices
3   today?
4   A.   I think he does but has an office by himself
5   and he's gone six months of the year, and he
6   saw him the other day, but I don't know what he does.
7   Q.   He's the one that lives in Arizona?
8   A.   Six months of the year he lives there.
9   Q.   And John Wood?
10  A.   He lives there in Spartansburg.
11  Q.   Do you know what knowledge he has relative to
12  this matter?
13  A.   He wouldn't have much anymore. He was the one
14  that lived at the farm first, before Lainard.
15  Q.   I want you to turn to page seven of the
16  answer.
17  A.   Okay.
18  Q.   The number is on the bottom.
19  A.   I see it.
20  Q.   In the Answer to Interrogatory 6A (1) you say:
21  Defendants were negligent in causing the negligence, trespass
22  and conversion claims in counts V, VI and VII of the 1995
23  declaratory judgment action to be dismissed.
24  A.   Right.
25  Q.   We discussed the trespass and conversion

80

---

ALBERT CARLISLE

1   action. Do you recall a dismissal of the negligence count?
2   A.   I don't.
3   Q.   Is that a mistake, typo?
4        MR. CONNER: The word negligence is probably
5   a miss -- either negligence or trespass, I think it's
6   really counts V and VII.
7        MR. HABER: I'm not misreading. There was
8   never a negligence count in the declaratory
9   judgement.
10       MR. CONNER: I don't think so. Let's save some
11  time --
12       MR. HABER: I thought it was just the
13  trespass and conversion claim.
14       MR. CONNER: You're correct. It's count --
15  let's just -- by talking about the numbers, I think
16  it's counts V and VII were the two counts that were
17  dismissed, and I think we can agree to that.
18       MR. HABER: Right. There was never a
19  negligence and you're not asserting any claim that we
20  dismiss the negligence count?
21  A.   Correct. V and VII.
22  Q.   Correct.
23       MR. CONNER: Correct. Save some time.
24  Q.   The next one says: Defendants were negligent
25  in causing the trespass and conversion claims to be dismissed

81



ALBERT CARLISLE

82

```
 1   without the plaintiff's consent.
 2        So your position is that Scott Hare never discussed
 3   with you the dismissal of those two counts?
 4        A.   No.  He had a pretrial or a conversation with
 5   the judge that we didn't know about.
 6        Q.   Can you read A3?
 7             (Witness complied.)  Okay.
 8        A.   We can agree it should only refer to trespass
 9   and conversion, but when did you come to the conclusion that
10   he had not timely filed the trespass and conversion claim in
11   the Pennsylvania court?
12        A.   I don't know.  I mean, I would have gotten
13   advice on that.
14        Q.   You would have gotten advice from an attorney?
15        A.   Sure.
16        Q.   You don't understand the statute --
17        A.   Not really.
18        Q.   -- statute of limitations.  Go to A4.
19        A.   Right.
20        Q.   Can you tell me what your understanding that
21   the defendants failed to do?
22        A.   Well, failed to conduct a title search on the
23   property.
24        Q.   And did you request Mr. Hare to do a title
25   search?
```

ALBERT CARLISLE

83

```
 1        A.   I didn't specifically request it.
 2        Q.   Did he ever say he was going to do a title
 3   search?
 4        A.   He said he was going to go to the courthouse
 5   and check records, that's what he said.
 6        Q.   And is it your position that if he had done a
 7   title search, he would have found Exhibit H?
 8        A.   Yes, um-hum.
 9        Q.   And it's your position that Exhibit H cuts off
10   Matson's right to timber as of 1978?
11        A.   Yes.
12        Q.   What is your understanding that if Matson did
13   not own the timber rights as of 1978, who owned the timber?
14        A.   Either Mrs. Kinkead or I did.
15        Q.   Why do you say that?  Why do you say Mrs.
16   Kinkead or yourself?
17        A.   I think there was one agreement that said that
18   the timber reverted to the owner of the property.  I think
19   there was another agreement that said the owner reverted to
20   Mrs. Kinkead.
21        Q.   Or reverted to the grantor?
22        A.   The grantor, correct.
23        Q.   And Exhibit H said it reverted to the grantor,
24   correct?
25        A.   I guess.  I didn't read it thoroughly but --
```



ALBERT CARLISLE

84

```
 1   Q.    Go to page three of Exhibit H.
 2   A.    Okay.  Whereabouts does it say that?
 3   Q.    The next to last paragraph on page three.
 4   A.    All right.  Right.
 5   Q.    In Exhibit H -- did you ever discuss with
 6   Mr. Warren whether he ever saw Exhibit H?
 7   A.    No.
 8   Q.    Did you ever ask him?
 9   A.    No.
10   Q.    And Mr. Warren would have been the attorney
11   that was representing you in 1973?
12   A.    Let's see.  1973.  He was really more
13   representing me just when we bought the property.
14   Q.    Was somebody representing --
15   A.    I think he continued to advise me to some
16   extent in '73 but --
17   Q.    Do you know who prepared the document that we
18   marked as Exhibit H?
19   A.    No.  Doesn't really say somebody from --
20   Q.    So it's your position that Mr. Hare should
21   have discovered this document, Exhibit H?
22   A.    Sure.
23   Q.    Do you also believe that the attorney that
24   represented you in the prior lawsuit in Warren County should
25   have discovered Exhibit H?
```

ALBERT CARLISLE

85

```
 1   A.    Probably.
 2   Q.    Have you brought claim against him?
 3   A.    No.
 4   Q.    Have you considered bringing a claim against
 5   Mr. Morgan?
 6   A.    I think it's too late.
 7   Q.    Now Mr. Krems represented --
 8   A.    Krembs.
 9   Q.    I don't want to insult the man, I may get to
10   meet him.  Mr. Krembs represented you for some period in the
11   Warren County action?
12   A.    Right.
13   Q.    Did he do a title search?
14   A.    I doubt it.
15   Q.    Did he locate Exhibit H?
16   A.    I don't know.  I really don't know.
17   Q.    Did he ever advise you of Exhibit H?
18   A.    I know that he knew about it at some point,
19   but I don't know whether he found it or somebody found it.
20   Q.    Who first told you about Exhibit H?
21   A.    I think he did.
22   Q.    Mr. Krembs?
23   A.    But I think that was after he was working with
24   here, too.
25   Q.    When you say here --
```

ALBERT CARLISLE

86

```
 1    A.    He consulted maybe with you -- with -- I'm
 2   sorry, with Mr. Conner.
 3    Q.    Do you know how Exhibit H was located?
 4    A.    No.
 5    Q.    Have you ever considered a lawsuit against Mr.
 6   Krembs for not locating Exhibit H?
 7    A.    No.
 8    Q.    Do you know when Exhibit H -- you were first
 9   told about Exhibit H? When I say when, the year 2001, 2002,
10   2003?
11    A.    I don't remember.
12    Q.    Do you know how it was discovered by your
13   attorney or a representative --
14    A.    I suppose a title search, that's all I know.
15    Q.    Do you know who did that title search?
16    A.    I'm guessing it was Jim Fryling, but I don't
17   know.
18    Q.    Do you know who Lori Sakarak is?  Did you ever
19   hear that name?
20    A.    I have heard of her.  Is she in here?
21    Q.    She's eventually in here.  Do you understand
22   her to be the person that did the title search?
23    A.    I don't know that.  Maybe she did.  I have
24   heard her name mentioned but I've never met her.
25    Q.    You never met her or talked to her?
```

ALBERT CARLISLE

87

```
 1    A.    No.
 2    Q.    So it's your position that if Mr. Hare had
 3   located this Exhibit H, he would have been able to argue that
 4   Matson had no right of any timer they cut down?
 5    A.    We wouldn't be here.
 6    Q.    Well --
 7    A.    Probably.
 8    Q.    You understand Matson's position is that it
 9   reverted back to Mrs. Kinkead if this --
10    A.    Yes.
11    Q.    Would anything have prevented you, from 1973
12   to 2004, from doing a title search on your property?
13    A.    No.
14    Q.    Did you ever place the property up as
15   collateral for a loan?
16         MR. CONNER:  During what time period?
17    Q.    Since when he bought it until the present.
18    A.    Maybe for a couple of years I might have.
19    Q.    When was that?
20    A.    I don't remember.
21    Q.    Do you remember from whom you borrowed that
22   money?
23    A.    It was the bank, and I just put general, I
24   think.  But I'm not sure we put the -- I'm not sure.
25    Q.    Do you know which bank it was?
```

ALBERT CARLISLE

88

1     A.   It's out of existence now. It was National
2  Bank of Ashtabula.
3     Q.   When you purchased the property, did you
4  borrow money to purchase it?
5     A.   No.
6     Q.   You got a title certificate for title
7  insurance.
8     A.   Actually my mother borrowed the money.
9     Q.   Your mother borrowed it.
10    A.   My mother borrowed the money.
11    Q.   But your mother was never the owner of the
12 property.
13    A.   No. I was teaching, that's all I'm going to
14 say. So she went to the bank and got the money so we could
15 send the check.
16        MR. HABER: Off the record.
17    (Off the record.)
18 BY MR. HABER:
19    Q.   Next on page eight, can you read that, and we
20 can agree that refers only to the trespass and conversion
21 claims.
22    A.   Which? The whole page?
23    Q.   A5.
24    A.   Oh, A5, sorry.
25    Q.   Correct. Throughout it refers to a negligence

ALBERT CARLISLE

89

1  count but there is no negligence count that was ever in
2  there, correct?
3        MR. CONNER: Correct. It should just read
4  trespass and conversion claims as opposed to a
5  negligence, trespass and conversion claims.
6        MR. HABER: You made me think a lot when you
7  sent this to me.
8     Q.   Now in relation to A5, what proof of damages
9  are you contending the defendants failed to present?
10    A.   There were a lot of -- there were a lot of
11 damages that we talked about which Scott just didn't present
12 any.
13    Q.   He didn't present them. Did he discuss with
14 you why he wasn't presenting them?
15    A.   No.
16    Q.   Isn't it true that the judge kind of changed
17 the scope of the trial?
18    A.   That's right. Of course we didn't know that.
19    Q.   We didn't know that?
20    A.   Well, I was always with Jim Hall and Lainard,
21 we kept waiting for these things to happen.
22    Q.   What damages did he not present evidence to
23 recover?
24    A.   Major damages.
25    Q.   Like what?

1  A.   Mud slides into the trout stream and siltation
2  of the trout stream. I think we've got a report someplace.
3        MR. CONNER: You're talking about the Jim Hall
4  report or another --
5  A.   I think there's another report that some
6  environmental group made.
7  Q.   Are you talking about the report of Daniel
8  Wallace from Wallace and Pincher?
9  A.   No, but that could be it. Let me look what
10 page is that?
11 Q.   It says the subject is Spring Creek Land
12 Restoration.
13 A.   That probably sounds like --
14 Q.   Do you know when these things occurred, the
15 mud slide? Do you know when this mud slide and infiltration
16 occurred?
17 A.   Yeah, it occurred basically just prior to the
18 1995 lawsuit.
19 Q.   Do you know what caused it?
20 A.   Poor timber practice.
21 Q.   And do you know if that has ever been
22 restored?
23 A.   It's not been restored. Still working on it.
24 Q.   Any other proof of damages that he failed to
25 present -- Mr. Hare failed to present to the jury?

1  A.   In what way? Damages environmental or --
2  Q.   Any damages. I mean, you told me that you
3  were dissatisfied with the amount of damages that you got.
4  A.   Right.
5  Q.   You told me that he failed to present damages
6  relative to the mud slide.
7  A.   Well, certainly a major issue would be that we
8  were supposedly compensated for trees cut in the no-cut zone
9  but the no-cut zone hadn't been set aside so that was just
10 stabbing at a figure.
11 Q.   When you say the no-cut zone hadn't been set
12 aside.
13 A.   Hadn't been defined.
14 Q.   That wasn't Mr. Hare's fault.
15 A.   Well, it was left in such a vague position at
16 the end of the trial.
17 Q.   Well, the no-cut zone was determined to be a
18 hundred feet wide.
19 A.   The jury did that.
20 Q.   Well, that's who made the decision, right?
21 A.   Yeah.
22 Q.   But part of the problem with regard to the
23 no-cut zone was that nobody could find the map.
24 A.   That's right.
25 Q.   And that wasn't Mr. Hare's fault.

1    A.   No.

2    Q.   You told me you saw the map in the early

3    seventies and never saw it again.

4    A.   That's right, I saw it in the seventies.

5    Q.   So, what other damages did he not present to

6    the jury, damages for what?

7    A.   Well, that would -- that was certainly a basic

8    one; the trees that were cut that were -- probably shouldn't

9    have been cut.

10   Q.   These would be trees outside the no-cut zone?

11   A.   Yeah.

12   Q.   Under what theory was these trees that were

13   cut improperly cut? Why were they improperly cut, in your

14   mind?

15   A.   Timing, I think, for me.

16   Q.   What do you mean timing?

17   A.   Age and when they should have been cut.

18   Q.   When you say age, you mean the trees were post

19   1969?

20   A.   They cut lots of trees -- there's a limit in

21   the deed agreement, whatever that thing is, there's a limit

22   of certain diameter, so they cut lots of trees that were

23   below that.

24   Q.   Is your claim -- part of your claim that is if

25   Mr. Hare discovered Exhibit H, the deed in 1973, he could

1    have argued that Matson had no right to cut any tree?

2    A.   Yes.

3    Q.   That was part of it?

4    A.   Sure.

5    Q.   Are you arguing that if he had discovered H,

6    you recovered damages for any tree that Matson cut down two

7    years prior to the lawsuit?

8    A.   I think so.

9    Q.   Assuming H does not exist, never existed,

10   nobody ever discovered it, and we're still relying on Exhibit

11   A, the contract, are there damages for trees that were cut

12   down that he did not present?

13   A.   Yes, that's what the point I'm trying to make,

14   even the deed, whatever that agreement of sales were, they

15   defined certain restrictions on timbering, none of which

16   Matson followed, and Scott decided not to bring those up, I

17   don't know why.

18   Q.   Did he discuss that with you?

19   A.   We discussed it a lot.

20   Q.   Did you disagree with his decision?

21   A.   He's the lawyer.

22   Q.   Did you and Scott come to a consensus of how

23   to present the damages to the jury?

24   A.   No, he came to them, it was his call.

25   Q.   He consulted you, he discussed it with you?

ALBERT CARLISLE

94

1       A.    We met -- as I said, we met often with Lafnard
2  and Jim. They weren't always happy either with what -- but
3  we weren't lawyers, we don't know.
4       Q.    So there were trees that were cut down and
5  damages weren't presented to the jury that you believe were
6  cut down in violation of Exhibit A?
7       A.    Absolutely.
8       Q.    Do you have an idea what that number would
9  have been?
10      A.    Jim Hall would know. There was damage to the
11  trees that were left. Anyway, enough of that.
12      Q.    You say damage to the trees that were left,
13  you mean when Matson was timbering they damaged trees that
14  were still standing?
15      A.    Sure, lots of them.
16      Q.    Do you know when they did that?
17      A.    Every time they came in to cut.
18      Q.    And when did they first cut?
19      A.    I don't remember. Jim Hall -- we have a
20 report of that. '80 something. '86 maybe.
21      Q.    Can you read A9 of that same page?
22      A.    Sure.
23      Q.    Do you understand what that means?
24      A.    Not exactly, but it means title search, I
25 suppose.

ALBERT CARLISLE

95

1       MR. CONNER:   A9?
2       A.    Oh, A9, I'm sorry. Well, that's just what it
3  says we were -- we were not told ahead of time and we assumed
4  that we had certain claims which we found out we didn't have.
5       Q.    So your understanding was that you could
6  re-file the conversion and the trespass claim in state court,
7  correct?
8       A.    I guess.
9       Q.    Yes?
10      A.    Well, yes, I guess.
11      Q.    And when did you first learn that you weren't
12 able to fully litigate the trespass and conversion claims in
13 state court?
14      A.    I don't remember.
15      Q.    Did you ever discuss that issue with Mr.
16 Krembs?
17      A.    Probably, but I don't remember.
18      Q.    Do you recall ever seeing a letter from Mr.
19 Krembs talking about that issue?
20      A.    No. But that doesn't mean that there wasn't
21 one.
22      Q.    Do you recall Mr. Krembs ever telling you that
23 he had talked to Mr. Hare about the effect of those
24 involuntary dismissals of the conversion and trespass claims?
25      A.    I'm sure they must have conversed.

ALBERT CARLISLE

96

```
 1         Q.    I'm sure they did, but did he ever -- did Mr.
 2    Krembs ever tell you that he had talked to Mr. Hare?
 3         A.    That I don't remember.  I'm sure they did
 4    communicate.
 5         Q.    Can you read A10?
 6         A.    (Witness complied.)
 7         Q.    Did you ever discuss with Mr. Hare ever
 8    bringing a quiet title action?
 9         A.    I think we did discuss it.  I can't remember
10    the details because it's -- quiet title means nothing to me,
11    I have to be honest with you.  The fact that I recognize it,
12    I think we must have discussed it.
13         Q.    But you don't have any specific recollection?
14         A.    I don't have any specific --
15         Q.    All, can you read that one?
16         A.    Um-hum.  Yes.
17         Q.    Is A11 referring to Exhibit H?
18         A.    Might be.  I assume it is.
19         Q.    Can you read A12?
20         A.    Okay.
21         Q.    In relation to A12, did you ever tell Mr. Hare
22    that the 1969 articles of agreement did not control or may
23    not control the rights of you and Matson Lumber on the
24    property?
25         A.    Not specifically.
```

ALBERT CARLISLE

97

```
 1         Q.    Did you believe that that document controlled
 2    the --
 3         A.    I believe it was certainly an important
 4    document.
 5               MR. CONNER:  Go ahead and finish the answer.
 6         A.    As I said, Terry Warren had some question as
 7    to who really owned the timber and so that question lingered
 8    in my own mind.
 9         Q.    For twenty years?
10         A.    For quite a while.
11         Q.    And you never sought advice of any other
12    attorney relative to that?
13         A.    Not really.  I assumed it would all come out
14    with this Scott -- when Scott took this on.
15         Q.    Can you read A13?
16         A.    Sure.
17         Q.    Have you read A13?
18         A.    Yes.
19         Q.    You contend there that the defendants were
20    negligent in failing to know or realize that Rule 41 -- and
21    that Rule 41 refers to the Federal Rules of Civil Procedure
22    -- dismissal does not toll the statute of limitations.  Did
23    you ever discuss that, that issue right there, with Mr.
24    Krembs?
25         A.    I don't remember discussing it with him.
```

1    Q.   Did you ever discuss with him the effect of a
2 Rule 41 dismissal?
3    A.   No.
4    Q.   I'd like you to turn to page nine of the
5 Answers to Interrogatories, and it says in the Answers to
6 Interrogatories you're seeking to recover two million nine
7 hundred and eighty-eight thousand eight hundred -- two million nine hundred
8 and eighty-eight thousand eight hundred thirty-four dollars
9 and eighty cents in this action.
10    A.   Right.
11    Q.   As part of your damages is timber wrongfully
12 harvested by Matson in the years 1993 through 1994 in the
13 amount of three hundred and twelve thousand dollars?
14    A.   Yes.
15    Q.   Do you know how that number was calculated?
16    A.   Yes.  And I'm beginning to question that
17 figure.  That figure was provided to us by Matson Lumber
18 Company.
19    Q.   That is the amount of timber Matson Lumber
20 timbered in 1993 through --
21    A.   That's what they said.  They provided that
22 number to Jim Hall, our expert.
23    Q.   Is that all the timber they harvested?
24    A.   That's what they said.  We're beginning to
25 doubt that.

1    Q.   Is this -- so this number under your
2 understanding is based on the fact that Matson had a right --
3 under your understanding, had no right to harvest any timber
4 in 1993?
5    A.   Yes.
6    Q.   And in 1994 through 1995 that number of a
7 hundred and twenty-five thousand nine hundred and
8 ninety-seven dollars and twenty-six cents, is that also all
9 the timber that Matson took in those years?
10    A.   That's what they reported they took.
11    Q.   Have you done any independent study?
12    A.   No.  We wish we had.  We hadn't done any.
13    Q.   Is there a way to do that now?
14    A.   I don't know.  I'm going to find out.
15    Q.   So it's your contention that Mr. Hare should
16 have sought damages for every tree that Matson Lumber cut
17 down for the period two years prior to you filing the
18 lawsuit?
19    A.   Well, if he had done a title search, he would
20 have done that -- been able to do that.
21    Q.   That's your -- one of your claims in this
22 case?
23    A.   Yeah, um-hum.
24    Q.   Have you attempted to calculate what
25 additional damages he should have sought under the Articles

ALBERT CARLISLE

100

```
 1   of agreement, which we've marked as Exhibit A?
 2        A.   That's a tough question.  We went through so
 3   many figures when we met with Scott.  Scott was -- would come
 4   to the farm and Lainard and Jim and myself.  We discussed all
 5   kinds of figures, all kinds.  That's all I can tell you.  I
 6   can't tell you specific numbers but --
 7        Q.   And so it's your position that if Scott Hare
 8   had learned about Exhibit H, he would have been able to set
 9   forth a conversion claim on the timber of Matson Lumber for
10   two years prior to the statute --
11        A.   Prior?  Sure.
12        Q.   -- prior to the lawsuit?
13        A.   Lawsuit.
14        Q.   The next item of damages is value of timber
15   remaining to be harvested by Matson.  It's approximately nine
16   hundred and forty-seven thousand dollars.
17        A.   Correct.
18        Q.   Can you tell me what that represents?
19        A.   Okay, that represents a report that Jim Hall
20   prepared for us.  He went through the property and estimated
21   the trees that had sprouted before 1969, and that represents
22   that total -- what the value of those trees would be if they
23   were cut.
24        Q.   Can you explain that again?
25        A.   Well, Matson -- the way it is now Matson can
```

ALBERT CARLISLE

101

```
 1   come in and cut any tree that sprouted 1969 or before, that
 2   is what that figure is.
 3        We went through and did a survey, a timber survey.
 4        Q.   So these represent trees that are still
 5   standing on the property --
 6        A.   Still standing.
 7        Q.   -- that sprouted prior to 1969?
 8        A.   Right.
 9        Q.   So, again, your position is, if Mr. Hare had
10   known about Exhibit H, he would have been able to argue that
11   Matson had rights in no timber?
12        A.   In no timber.
13        Q.   So the federal declaratory judgment action
14   allows Matson to cut trees prior to 1969.
15        A.   Right.
16        Q.   And if Exhibit H had been known, you could
17   have been able to argue to the contrary?
18        A.   Of course.
19        Q.   I think number four we've discussed and that
20   deals with the repair to the property damaged by the --
21        A.   Um-hum, sure.
22        Q.   Let me finish.  Damaged by their harvesting
23   practices?
24        A.   Right.
25        Q.   And that was damage you could have sought in
```

ALBERT CARLISLE

102

```
 1   the federal court action regardless of whether you knew about
 2   it or not?
 3        A.   Right.
 4        Q.   Because under the agreement they were required
 5   to use good timbering practices, correct?
 6        A.   Correct.
 7        Q.   And do you know why that wasn't presented to
 8   the jury, why Mr. Hare decided not to present that to the
 9   jury?
10        A.   I don't.
11        Q.   You don't?
12        A.   We certainly talked about it.
13        Q.   Would Mr. Hall have been able to testify as to
14   that?
15        A.   Oh, yes.
16        Q.   The final element of damages is damage to
17   residual trees.  Can you tell me what that is?
18        A.   Certainly.  When Matson came in to cut trees,
19   they were very careless about how they did it and where they
20   did it, so we could walk through the woods and you could see
21   big trees that had been stripped by other trees falling down,
22   skid marks that would cause the interruption of the flow of
23   the sap.  In fact, Jim Hall's position is that Matson knew
24   and that they came in to get as much as they could before we
25   found out.
```

ALBERT CARLISLE

103

```
 1        Q.   This damage to the residual trees, did you
 2   know about it in 1995 and '96?
 3        A.   We certainly knew some was going on, of
 4   course.
 5        Q.   And Mr. Hare did not seek that damage?
 6        A.   He didn't.  He was -- he had other theories
 7   which -- that was his prerogative.
 8        Q.   But you knew in 1997 he wasn't seeking to
 9   recover that damage when the case went to verdict?
10        A.   We did then.
11        Q.   You did then?
12        A.   Yeah.
13        Q.   And you knew he wasn't seeking to recover the
14   cost of repair to the real estate in 1997?
15        A.   We knew that he had his mind made up of what
16   he was going to pursue and that's the way it was going to be.
17        Q.   I understand that, but you knew the only
18   damages he was seeking at the time of the verdict was damages
19   for trees removed in the no-cut zone.
20        A.   Right.
21        Q.   And you knew, in 1997, that he had decided not
22   to seek damages to the residual trees?
23        A.   We didn't know until the time of the trial.
24        Q.   I understand that.  That's what I'm talking
25   about, the time of the trial.  And you knew he wasn't going
```

ALBERT CARLISLE

104

1    to present that?

2        A.    He didn't. We did discover that but we didn't

3    know it at the beginning of the trial.

4        Q.    I understand that. You knew that by the time

5    the verdict came in.

6        A.    Yes.

7        Q.    And you knew he wasn't seeking damages for

8    repairs to the real estate?

9        A.    Right.

10       Q.    In the value of the timber remaining to be

11   harvested, a little less than a million dollars, you could

12   not have sought recovery for that unless you knew about

13   Exhibit H; is that right?

14       A.    That's right.

15       Q.    In relation to damage number D, the

16   approximately four hundred and thirty-eight thousand dollars,

17   could you have sought recovery for that if you did not know

18   about Exhibit H?

19       A.    I would think so.

20       Q.    You could have sought all of it or just part

21   of it?

22       A.    All of it.

23       Q.    Why?

24       A.    Because they didn't own the trees; they cut

25   trees that did not belong to them.

ALBERT CARLISLE

105

1        Q.    Every tree they cut did not belong to them in

2    '93?

3        A.    No.

4        Q.    None of them?

5        A.    Not if this Exhibit H --

6        Q.    Assuming Exhibit H -- you did not know about

7    Exhibit H.

8        A.    Well, that raises another question, because we

9    know they cut a lot of trees they weren't entitled to cut but

10   I can't tell you what the percentage is.

11       Q.    Some of those trees they cut in '93, '94 and

12   '95, if you didn't know about Exhibit H, they would have been

13   entitled to cut and some of them they would not have been?

14             MR. CONNER:    I'm going to object to the form

15   because the question is asking for a legal conclusion

16   because it goes to the question whether or not he

17   knows they own that timber.

18       Q.    Let me try to clarify. If your position is if

19   you knew about Exhibit H, Matson, under Exhibit H, you

20   believe Matson owned no trees --

21       A.    That's right.

22       Q.    -- in 1993, '94 and '95?

23       A.    Um-hum.

24       Q.    Part of your damages is which timber they cut

25   in those three years?

ALBERT CARLISLE

106

1    A.    Right.

2    Q.    My question to you is, is it your

3    understanding that if Exhibit H did not exist, you did not

4    know about Exhibit H, some of those trees that they cut in

5    those three years they were entitled to cut.

6          MR. CONNER:  Same objection.  It calls for a

7    legal conclusion.

8    Q.    His understanding.

9    A.    Some trees maybe.  That's all I'm going to

10   say, and I'm going to have to leave in a minute to move my

11   car.

12         MR. HABER:  Why don't we take about a twenty

13   minute break.  I probably have another hour to go.  I

14   need a break.

15   (whereupon, a break was had.)

16   BY MR. HABER:

17   Q.    Prior to coming to the deposition today did

18   you review any documents in preparation for the deposition?

19   A.    Yes.

20   Q.    What did you review?

21   A.    I reviewed Jim Hall's statistics, cutting

22   thing, and I reviewed excerpts of certain -- excerpts of

23   Scott Hare's deposition, and maybe something else, I'm not

24   sure.

25   Q.    Do you recall what part of Scott Hare's

---

ALBERT CARLISLE

107

1    deposition you reviewed, what was the subject?

2    A.    Just looked through them.

3    Q.    Do you recall what parts of the deposition,

4    what was discussed in those deposition transcripts?

5    A.    I could look at them and remember but I don't

6    remember.

7    Q.    I want to go back to the damages that were set

8    forth on page nine in the Answers to Interrogatories.

9    A.    Sure.

10   Q.    I don't think I was asking the questions very

11   clearly, so I'm going to try to summarize it.  I'm going to

12   start at the bottom, number five, damage to residual trees.

13   A.    Right.

14   Q.    You knew of that damage in 1997, correct?

15   A.    I think we -- some of it.  I'm not sure if --

16   when Jim Hall made that particular report but we certainly

17   knew there was damage to trees.

18   Q.    And you knew Scott Hare did not present that

19   to the jury?

20   A.    We knew that.

21   Q.    Because the only damages he presented to the

22   jury were for the damages of trees removed in the no-cut

23   zone?

24   A.    For the value of the trees removed, right.

25   Q.    In the no-cut zone?

ALBERT CARLISLE

108

```
 1        A.    Right.
 2        Q.    In regard to number four, cost of repairs to
 3  real property caused by Matson's timbering operations, you
 4  knew of that in 1997, correct?
 5        A.    We did.  I'm not sure if we had an exact
 6  figure but we knew, yes, that there had been damage done.
 7        Q.    You told me, I think, that the mud slide had
 8  occurred right before you filed the lawsuit?
 9        A.    It occurred before we filed the lawsuit.
10  Scott had certainly seen it.
11        Q.    And you knew Scott didn't present damages
12  relative to that?
13        A.    Right.
14        Q.    Three, value of timber remaining to be
15  harvested by Matson.  If my recollection is correct that
16  dealt with trees that sprouted prior to 1969, correct?
17        A.    That's right.
18        Q.    And you knew after the verdict that Matson was
19  entitled to harvest trees that sprouted prior to 1969, based
20  on the verdict.
21        A.    Based on the verdict we knew that, yes.
22        Q.    And the timber that was wrongfully harvested
23  by Matson in D, on page nine, the four hundred and
24  thirty-eight thousand dollars --
25        A.    Um-hum.
```

ALBERT CARLISLE

109

```
 1        Q.    -- that goes to trees outside the no-cut zone?
 2        A.    I expect those are any trees that they cut in
 3  1993 and 1994.
 4        Q.    Well, you -- Scott sought damages for trees in
 5  the no-cut zone?
 6        A.    Well, he did and he didn't.  We didn't know
 7  what the no-cut zone was.
 8        Q.    The jury had to determine what it was.
 9        A.    Right.
10        Q.    Matson disagreed that there was a no-cut zone,
11  right?
12        A.    They disagreed they -- they agreed they didn't
13  know where it was, that is what they said.
14        Q.    Couldn't find the map?
15        A.    Couldn't find the map.
16        Q.    So the jury had to determine where the no-cut
17  zone was?
18        A.    Yes.
19        Q.    And then they had to award damages for the
20  trees cut in the no-cut zone?
21        A.    Right.
22        Q.    These trees that totalled four hundred
23  thirty-eight thousand dollars in your Answers to
24  Interrogatories you don't know whether those are trees inside
25  or outside the no-cut zone?
```

ALBERT CARLISLE

110

```
1        A.   Both.
2        Q.   Both?
3        A.   Maybe I could refer to that sheet there,
4   although it's not going to help any, that is Jim Hall's
5   report.
6        Q.   If I wanted to ask somebody specifically, Jim
7   Hall would be the person to ask?
8        A.   Jim Hall knows.
9        Q.   Jim Hall calculated those two numbers.
10       A.   No.  Jim Hall relied on Matson to provide the
11  numbers.
12       Q.   For the value of the trees they cut?
13       A.   He assumed their records were correct.  We had
14  no reason to believe that that wasn't true.
15       Q.   Why do you have reason to believe that?
16       A.   Well, they're cutting trees now, and they went
17  -- before they cut them they marked them, the trees that are
18  uncut, and we have done a survey of the trees that are cut,
19  and two-thirds of the trees that they cut were not marked; a
20  third were marked and two-thirds weren't marked.
21       Q.   Have you cut any trees on the property?
22       A.   I've cut a few.
23       Q.   What was the reason for --
24       A.   Well, we got a request from the state to cut
25  some trees along the road right-of-way and Jim Hall knew of
```

ALBERT CARLISLE

111

```
1   an extremely fine cherry tree that was there, veneer cherry
2   tree, and he was afraid that might have been damaged.  So we
3   cut very small amount of trees.  Most of the trees were in a
4   right-of-way road.
5        Q.   Right-of-way for the state?
6        A.   For the state.
7        Q.   So they were cut mainly at the request of the
8   state?
9        A.   They wanted to, yeah.
10       Q.   And the cherry tree you mentioned was cut so
11  it wouldn't be damaged?
12       A.   It was so it wouldn't lose its veneer
13  category, and it was in what we would say was a no-cut zone
14  anyway, so we felt absolutely right to cut it.  It was when
15  -- it was within a hundred feet of the waterway.
16       Q.   So the no-cut zone only applied to Matson and
17  could you cut --
18       A.   I could cut, yeah, Jim had been watching that
19  tree for a long time, he didn't want anybody to get it.
20       Q.   Are there any other damages you're seeking to
21  recover in this action against Mr. Hare and the other
22  defendants other than what's set forth in the answer on page
23  nine?
24       MR. CONNER:   I think you also mentioned the
25  cloud on the title.
```

ALBERT CARLISLE
112

```
 1      A.   I did mention a cloud on the title.
 2      Q.   That wouldn't be damages, would it?
 3           MR. CONNER:  Well, damage, you can't market
 4   the property.
 5           MR. HABER:  You didn't list that.  I guess
 6   that would be a supplemental answer.
 7      Q.   You're trying to sell the property?
 8      A.   No, not at the minute, but I might try to sell
 9   it.  And so I couldn't.  I mean, there's no way I could sell
10   it.
11      Q.   Because of the cloud on the title.  What cloud
12   on the title?
13      A.   That's part of it, but Matson could come and
14   cut these trees and they're not careful about following any
15   restrictions that might be in place.
16      Q.   You're in litigation with Matson regarding
17   what, if any, right they have to the trees on the property?
18      A.   That's right.
19      Q.   And Mr. Hare hasn't been your attorney since
20   1998, correct?
21      A.   I guess that's right.
22      Q.   And since 1998 are you any closer to resolving
23   the dispute with Matson Lumber than you were back in 1998?
24      A.   No.  But if we had resolved it correctly in
25   1997, we wouldn't be having this problem.
```

ALBERT CARLISLE
113

```
 1      Q.   And you believe because Mr. Hare's negligence
 2   you didn't resolve the problem, correct?
 3      A.   I really do believe that.
 4      Q.   And that negligence is failure to find
 5   document H?
 6      A.   Yes.
 7      Q.   And failure to present the damages to the
 8   jury?
 9      A.   Proper damages.
10      Q.   Part of your claim in this case is that he
11   voluntarily dismissed the trespass and the conversion --
12      A.   Right.
13      Q.   -- case.  You didn't learn that until sometime
14   after the jury verdict.
15      A.   That's right.
16      Q.   But the only thing you knew at the time of the
17   jury verdict was you received what you believed to be
18   inadequate damages?
19      A.   That's right.
20      Q.   Without knowing H -- without knowing that
21   Exhibit H existed, do you believe Mr. Hare should have argued
22   that Matson Lumber had no right to trees that sprouted prior
23   to 1996?
24      A.   I think he should have done a title search.
25      Q.   I understand that.  But what I'm trying to --
```

1  I mean, when the case was litigated, I'm assuming nobody knew
2  that Exhibit H existed.
3      A.  Okay, nobody knew there were -- I can't go
4  into this but -- because I don't remember the figures -- but
5  Jim Hall and Lainard had all kinds of damages they thought we
6  -- Scott never brought them up.
7      Q.  I understand.  There were damages that you
8  believe Scott Hare should have presented that he didn't
9  present?
10     A.  Right.
11     Q.  That's one part of the case.  Damages was one
12  part.  The other part was declaratory relief regarding what
13  rights Matson had with regards to the lumber.
14     A.  Okay.
15     Q.  And my question to you is:  Do you believe
16  Scott should have argued to the jury or to the court that
17  Matson had no right to trees that sprouted prior to 1969 if
18  he didn't know about Exhibit H?
19     A.  I think there could have been reason for that.
20     Q.  Why?
21     A.  A variety of reasons.  One is that -- I'll
22  stop there.
23     Q.  I need to know what those reasons are.
24     A.  Well, some people told me timber rights don't
25  last forever, that would be one, and Scott didn't want to

1  address that.
2      Q.  You knew that prior to -- at the time of the
3  --
4      A.  We didn't really know what Scott was going to
5  present, we really didn't.  It changed on a weekly -- we went
6  down to a meeting --
7      Q.  Go ahead, I'm sorry.  Go ahead.
8      A.  -- with Scott in October and he changed
9  everything that we had worked on.
10     Q.  But at the time of the verdict you knew Scott
11  wasn't arguing that Matson had no right to trees prior to
12  1969?
13     A.  We knew after -- we knew after the trial was
14  over.
15     Q.  At the time of the verdict?
16     A.  Sure, at the time of the verdict.
17     Q.  I guess I didn't follow up this.  About the
18  cloud on your title you have no intention presently to sell
19  the property?
20     A.  No.
21     Q.  And you believe that you can't sell the
22  property till your disagreements with Matson are resolved?
23     A.  Here's what I believe.  I believe that the
24  value of the property resides in the timber and the streams
25  that go through the property which is greatly affected by the

ALBERT CARLISLE                                                          116

```
 1   timber, and other than that, it's just farmland and there's
 2   not much value in farmland in Spring Creek, Pennsylvania.
 3       Q.   When you purchased the property in 1970 what
 4   did you understand you were purchasing with regard to the
 5   timber rights?
 6       A.   I thought we were purchasing the property, I
 7   thought that Matson -- Fisher & Young had the right to come
 8   in and cut a few trees.  In fact, there was a whole series of
 9   letters between Fisher & Young and myself as to when they
10   were going to come and cut the trees.  They didn't do it.  It
11   just kept getting worse and worse as time went on.  We
12   protected -- we thought we protected sites for the Boy Scouts
13   camping areas, we thought we were fairly careful, but, as
14   usual, there's always surprises.
15       Q.   When you say cut a few trees, what are you --
16       A.   We thought they could cut -- we thought they
17   did have some rights to cut trees.  We didn't know about H.
18       Q.   H didn't exist at the time you purchased the
19   property.
20       A.   Not the extent of the cutting that they did.
21       Q.   Did Fisher & Young do any cutting on the
22   property?
23       A.   Not at all.
24       Q.   After you purchased the property the first
25   cutting was done by Matson?
```

ALBERT CARLISLE                                                          117

```
 1       A.   Matson.
 2       Q.   In the mid eighties?
 3       A.   Yes.
 4       Q.   So for approximately fifteen years no cutting
 5   was done.
 6       A.   No cutting.
 7       Q.   When you purchased the property in 1970, did
 8   anyone ever give you a value regarding the timber on the
 9   property -- what the timber was worth on the property?
10       A.   Not really.  I'd say no.  I had no idea.
11       Q.   I'm showing you what's been marked as Exhibit
12   I, and that is a quitclaim deed from Dora Squatriti to Matson
13   Lumber Company.
14       A.   Right.
15       Q.   When did you first learn this?
16       A.   Well, what day did she sign it?
17       Q.   May 22, 2003.
18       A.   I learned about it sometime around maybe late
     May, early June.
19       Q.   of 2003?
20       A.   Right.
21       Q.   And how did you learn about it?
22       A.   I don't know who told me, somebody told me.
23       Q.   Excuse me.
24       A.   I don't know who told me, somebody told me.
```

1  Q.  Did you ever approach Dora Squatriti regarding

2  her giving you a quitclaim deed?

3  A.  I didn't.

4  Q.  You did not?

5  A.  No.

6  Q.  Did anybody on behalf of you approach Dora

7  squatriti about giving you a quitclaim deed?

8  A.  I really don't know.

9  Q.  Did you ever ask anyone to approach Miss

10 Squatriti regarding a quitclaim deed?

11 A.  No.

12 Q.  Did you ever talk to Miss Squatriti?

13 A.  Yes, I did.

14 Q.  When did you first talk to her?

15 A.  I talked to her when we had the trial with the

16 McChesneys whenever that was, 1985 or so.

17 Q.  Did you ever talk to her since she gave this

18 quitclaim deed to Matson Lumber?

19 A.  No.  She lives in Italy, or at least she was

20 living in Italy.  She married an Italian and lived in Rome, I

21 think, because her mother used to go spend three or four

22 months in Rome every year.

23 Q.  But you don't know where she lives today?

24 A.  Unless she's changed, I think she still lives

25 in Rome, or somewhere outside of Rome but I don't know that.

1  She still has relatives in Warren and I think comes back to

2  visit.

3  Q.  When you first became interested -- or the Boy

4  Scouts and you became interested in purchasing this property,

5  did you have an understanding of how Fisher & Young acquired

6  the property?

7  A.  Vaguely, just a vague -- I'll tell you all I

8  know.  The Boy Scouts found the property, heard about it

9  through a trust officer in a bank somewhere in Warren County,

10 they heard it was for sale, they went over to talk to the

11 trust office and found out that Fisher & Young had just made

12 some arrangement with Mrs. Kinkead, so we were a little late.

13 But they found out through some trust office in a bank in

14 Warren County somewhere.

15 Q.  What I marked as Exhibit J is the deed from

16 Marian Kinkead to Fisher & Young.

17 Q.  In 1969, correct?

18 MR. CONNER:  '69.

19 A.  Okay.

20 Q.  Now, what I have marked as Exhibit K is the

21 Article of Agreement between Ms. Kinkead and Fisher & Young,

22 correct?

23 A.  Exhibit which?

24 Q.  K?

25 A.  K, right, um-hum.

ALBERT CARLISLE                                                    120

1    Q.    Prior to you purchasing the property from
2  Fisher & Young, did you know the existence of J and K?
3    A.    No.
4    Q.    To your knowledge, did your attorney know the
5  existence of J and K?
6    A.    I think Terry Warren had some inkling.
7    Q.    Inkling of what?
8    A.    Well, I just know that he was concerned about
9  the timber rights, that's all I know, that he wasn't sure
10  that Fisher & Young completely had them.  I certainly
11  mentioned that to Scott several times.
12    Q.    That he -- he was concerned -- Terry Warren
13  was concerned that Fisher & Young did not have the timber
14  rights?
15    A.    Total control of them.
16    Q.    And I don't know what you mean total control.
17    A.    Well, I think they hadn't paid Mrs. Kinkead a
18  certain amount and their answer to Terry was we'd be foolish
19  not to pay because the value was there.  But I never saw that
20  correspondence, I just heard about it.
21    Q.    In Exhibit K it indicates that the eighty
22  thousand dollars will be paid in installments, correct?
23    A.    Um-hum.
24    Q.    Until it's paid off.  So when you went to
25  purchase the property in 1970, isn't it your understanding

---

ALBERT CARLISLE                                                    121

1  that Fisher & Young had not fully paid Mrs. Kinkead for the
2  timber rights?
3    A.    It wasn't my understanding but I think that is
4  what worried Terry.
5    Q.    That would worry Terry.
6    A.    I'm sure it did.
7    Q.    Didn't Terry discuss that with you?
8    A.    No.  He said he had some concerns.
9    Q.    Can you read L -- read L to yourself?
10    A.    Sure.  I never saw this.  It says copy but I
11  don't remember ever seeing it.  That's interesting, I never
12  did see it.
13    Q.    Exhibit L is a letter from your attorney,
14  Mr. Warren --
15    A.    Um-hum.
16    Q.    -- to Mr. Kookogey, who was the attorney for
17  Fisher & Young, right?
18    A.    Right.
19    Q.    And you'll agree that you were cc'ed on the
20  letter?
21    A.    I do agree with that.
22    Q.    You don't recall --
23    A.    I don't recall seeing this letter.
24    Q.    And the date of the letter is February 11,
25  19717

ALBERT CARLISLE

122

1        A.    Right.

2        Q.    That is after you purchased the property,

3  correct?

4        A.    Right, um-hum.

5        Q.    And does the letter not discuss a problem

6  regarding Fisher & Young's failure to complete the purchase

7  of timber rights --

8        A.    Sure it does.

9        Q.    Let me finish.    The failure to complete the

10  purchase of the timber rights from Mrs. Kinkead?

11        A.    Yes.

12        Q.    And wouldn't Exhibit H have been the

13  resolution of that problem regarding Fisher & Young's

14  purchase of the timber rights?

15        A.    Pardon.

16        Q.    Wouldn't Exhibit H, the deed in 1973, been the

17  resolution of how Fisher & Young secured the timber rights

18  from Mrs. Kinkead?

19              MR. CONNER:    Object to the form of the

20  question.    It asks for a legal conclusion.    Go ahead

21  answer the question.

22        A.    I still don't get it.

23        Q.    You recognize that there's a problem as set

24  forth in Exhibit L, that Fisher & Young has not completed

25  the purchase of the timber rights from Mrs. Kinkead.

---

ALBERT CARLISLE

123

1        A.    Um-hum.

2        Q.    How was that resolved?

3        A.    I don't know.

4        Q.    Wasn't it resolved by Exhibit H?

5        A.    Maybe, maybe not.    I don't know.

6        Q.    Are you aware of any other agreement

7  subsequent to this letter of February 11, 1971, between Mrs.

8  Kinkead and Fisher & Young relative to the timber rights?

9        A.    No.

10        Q.    Did Mr. Warren ever communicate to you how

11  this problem was going to be resolved regarding the failure

12  of Fisher & Young to fully pay off Mrs. Kinkead?

13        A.    It says here Fisher & Young will cut timber

14  and pay off Mrs. Kinkead.    That's what it says.    That looks

15  like Terry's handwriting.

16        Q.    But you will agree that as of February 11,

17  1971 your counsel was aware of a problem?

18        A.    He was aware of a problem.

19        Q.    And there is no other deed or agreement other

20  than Exhibit H that occurred after this letter?

21        A.    Well, I don't know.

22        Q.    You're not aware of any?

23        A.    I'm not aware of any.

24        Q.    That's what I'm saying.    Don't put the letter

25  away.

ALBERT CARLISLE

124

```
 1        A.    I've got it right on top.
 2        Q.    On the bottom of the first page, going onto
 3  the top of the second page, it says: I, referring to
 4  Mr. Warren, had proposed to you that we work out some plan
 5  concerning a terminable interest of the timber rights.
 6        A.    Right.
 7        Q.    Do you know what he means there?
 8        A.    That's what -- we assumed there was a terminal
 9  date.
10        Q.    So, as of 1971 you -- your counsel, had a
11  disagreement with Fisher & Young's counsel regarding when --
12  if the timber rights were terminated?
13        A.    We assumed there would be a terminal date,
14  right.
15        Q.    And what was that assumption based on?
16        A.    Common sense.  Timber rights aren't usually
17  given for -- I mean, they're given for a specific number of
18  years.  This wasn't.
19        Q.    And you had told me that you had never been
20  involved in this type of timber dealing before.
21        A.    No, never.
22        Q.    What was your basis of concluding that timber
23  rights are not usually given in perpetuity?
24        A.    I think Terry said it would be unusual for
25  them not to have a cut-off date.
```

Annette Seager Reporting

ALBERT CARLISLE

125

```
 1        Q.    Mr. Warren is a lawyer that dealt with timber
 2  rights before?
 3        A.    Oh, I don't know.  I have no idea.
 4        Q.    But if you learned that, that timber rights
 5  aren't usually given in perpetuity, that would have probably
 6  been from Mr. Warren?
 7        A.    Probably been from Mr. Warren.
 8        Q.    As of 1971 did you know Mr. Hall?
 9        A.    No.
10        Q.    When did you first meet Mr. Hall?
11        A.    I don't remember.  I met him -- I met him
12  through the museum of natural history in Cleveland.  He's
13  their appraiser.  And when they found out I needed an
14  appraiser, I met him so it was before 1995, I'm not sure what
15  year.  Maybe 1993, '94, something like that.
16        Q.    I'd like you to read that.
17        A.    Okay.
18        Q.    Is the letter dated December 23, 1970?
19        A.    Yes.
20        Q.    To Mr. Kookogey?
21        A.    Yes.
22        Q.    From Mr. Warren?
23        A.    Right.
24        Q.    And Mr. Philip Cochran is cc'ed.  Is he the
25  person from the Boy Scouts?
```

Annette Seager Reporting

1   A.   No. He was the president of Fisher & Young.
2   Q.   Okay. This letter also discusses a problem
3   with Fisher & Young being able to convey the rights and the
4   timber, correct?
5   A.   Um-hum.
6   Q.   And in the first sentence of the letter it
7   relates to a defect that appears in the title?
8   A.   Right.
9   Q.   Guaranteed. Is that defect the inability of
10  Fisher & Young to convey rights in the timber?
11  A.   Apparently.
12  Q.   And the reason that there was a defect was
13  because they had not completed their purchase --
14  A.   That's right.
15  Q.   -- from Mrs. Kinkead, correct?
16  A.   Right.
17  Q.   And you were aware of this when it was going
18  on?
19  A.   I wasn't aware of the details. Terry told me
20  there was some problem.
21  Q.   There was a problem in the title?
22  A.   I wasn't sure what the problem was.
23  Q.   But you knew there was a problem relative to
24  Fisher & Young getting rights from Mrs. Kinkead.
25  A.   I just knew there was a problem revolving

1   around the timber rights.
2   Q.   In the middle of the second paragraph it
3   indicates that Mr. Warren was concerned about the underlying
4   agreement between Fisher & Young and Mrs. Kinkead.
5   A.   Right.
6   Q.   That would have been the timber agreement?
7   A.   Yes.
8   Q.   When you purchased the property, which was
9   earlier this year -- earlier in 1970 --
10  A.   Right, earlier.
11  Q.   -- were you aware of this agreement?
12  A.   (Nodded head.)
13       MR. CONNER: You have to give a verbal answer.
14  A.   No.
15  Q.   And when Mr. Warren became aware of this
16  timber agreement between Mrs. Kinkead and Fisher & Young, did
17  he advise you of it?
18  A.   Indirectly. I just -- again, he just told me
19  there was a problem.
20  Q.   There was a problem. How do you -- what is
21  your understanding of how that problem was resolved?
22  A.   I didn't know.
23  Q.   You didn't know?
24  A.   I had confidence -- Terry was my friend and
25  neighbor, I had confidence that Terry would take care of

1    everything so I just --
2        Q.    And you don't know how the problem was
3    resolved?
4        A.    No.  I'll give you another example.  I later
5    bought a cabin that's on the property that had been sold, the
6    Kinkeads had sold off a couple acres and Terry handled it for
7    me, and he called me one day and said there was a cloud on
8    the title, and he said:  I'll take care of it.  I never did
9    know what the cloud on the title was.  I just knew there was
10   one.
11       Q.    I understand, and I'm testing your knowledge
12   thirty-five years ago.
13       A.    I'm telling you the truth, I never got
14   involved with the details.
15       Q.    I understand that, but you believe Mr. Warren
16   would have told you how the problem was resolved?
17       A.    He probably was dealing with Dave Eardley and
18   he probably thought I didn't need to be involved with it.
19       Q.    Dave Eardley is the attorney for the Boy
20   Scouts?
21       A.    For the Boy Scouts.
22       Q.    But the Boy Scouts weren't purchasing the
23   property?
24       A.    No.
25       Q.    You purchased it?

1        A.    I purchased it.
2        Q.    I may have asked you this question before but
3    I apologize.  Since you learned about Exhibit H --
4        A.    Right.
5        Q.    -- which is the 1973 deed, did you ever ask
6    Mr. Warren if he knew about the deed?
7        A.    I didn't.  As I said, he's retired, I saw him
8    -- my mother died this year, he came to the service.  I think
9    that's the last time I have seen him.
10       Q.    And I think I have asked you, you don't have
11   personal knowledge of who prepared Exhibit H.
12       A.    No.
13       Q.    Please read Exhibit N.
14       A.    Okay.  I tried to figure out who it was from.
15   Okay.
16       Q.    Do you recall ever seeing this letter?
17       A.    No, I never did.
18       Q.    And you'll agree this is a letter from
19   Mr. Kookogey to your attorney Mr. Warren.
20       A.    Yes.
21       Q.    And the date of the letter is April 28, 1970?
22       A.    Right.
23       Q.    And that's subsequent to your purchase of the
24   property.
25       A.    Right.

ALBERT CARLISLE

130

```
 1        Q.      And, again, this letter discusses a problem
 2   relative to Fisher & Young securing all the timber rights
 3   from Mrs. Kinkead.
 4        A.      Um-hum.
 5        Q.      Correct?
 6        A.      Yes.
 7        Q.      The letter, in paragraph two, I guess,
 8   proposes that Fisher & Young assign the Kinkead agreement to
 9   yourself to be held in escrow with the right of Carlisle,
10   upon 30 day default thereunder by Fisher & Young, to pay Mrs.
11   Kinkead in full or by installments as stipulated in the
12   agreement.  Do you recall ever discussing that resolution
13   with Mr. Warren?
14        A.      No, I don't.
15        Q.      Do you know what that means?
16        A.      Well, I expect that Terry -- they provided
17   Terry with some document that Fisher & Young defaulted, then
18   I could come in and take the payments; is that what it means?
19        Q.      I'm asking you.
20        A.      I'm guessing that's what it means.
21        Q.      That was never discussed?
22        A.      Never was.  And I think the reason was -- when
23   I talked with Terry about this, but just over the phone,
24   because I was -- see I was teaching, I wasn't living in
25   Ashtabula.  Fisher & Young has no -- had any intention of
```

ALBERT CARLISLE

131

```
 1   letting a good partner go in default and Terry felt that that
 2   was a genuine statement.
 3        Q.      Prior to you purchasing the property, did you
 4   get any appraisal of the property?
 5        A.      No.
 6        Q.      How did you come to the amount of a hundred
 7   thousand dollars?
 8        A.      Boy Scouts did that.  I was a -- I was a
 9   Johnny-come-lately.  The Boy Scouts had made the
10   arrangements.
11        Q.      And so the hundred thousand dollars that you
12   agreed to pay was more the number the Boy Scouts had agreed
13   to?
14        A.      It was the number.
15        Q.      I'm assuming the Boy Scouts, if they would
16   have purchased the property, they weren't purchasing it for
17   timber?
18        A.      Well --
19        Q.      Maybe I'm wrong.
20        A.      Yeah, I think you are.  Well, I don't want to
21   go into it, but they purchased another property, which I
22   don't want to go into, it has nothing to do with this
23   property, they did timber it.  They purchased property about
24   twenty miles away.
25        Q.      The fourth paragraph says Fisher & Young will
```

ALBERT CARLISLE

132

1 furnish Carlisle with an independent appraisal of the present
2 value of the timber which was estimated by Fisher & Young two
3 years ago to approximately a hundred thousand dollars. Do
4 you recall ever receiving that appraisal?
5    A. No. This is the first I think I've ever seen
6 this.
7    Q. I would ask that you read Exhibit O.
8    A. (Witness complied.) Okay.
9    Q. Have you ever seen this letter before?
10    A. No, I haven't.
11    Q. This is a letter from your attorney to
12 Mr. Kookogey, correct?
13    A. Yes, um-hum.
14    Q. Dated February 13, 1970?
15    A. Right.
16    Q. It referenced that neither Mr. Carlisle or I
17 knew anything concerning the relationship between Fisher &
18 Young and Mrs. Kinkead, correct? The end of the first
19 paragraph.
20    A. Yeah.
21    Q. And that refers to the timber agreement.
22    A. Must have been, they didn't know at that time.
23    Q. Do you know if that timber agreement was ever
24 filed in Warren County in the recorder of deeds? Do you know
25 that?

ALBERT CARLISLE

133

1    A. No.
2    Q. Prior to your purchase of the property was a
3 title search done?
4       MR. CONNER: If you know.
5    A. I don't know.
6    Q. I'm just asking.
7    A. I don't know. We got a title insurance
8 policy, I know we got that.
9    Q. Do you know if Mr. Warren ever did a title
10 search?
11    A. I don't know who would have done it.
12    Q. There's handwriting on Exhibit O.
13    A. Right.
14    Q. Do you know whose handwriting that is?
15    A. I'm guessing it's Terry's but I'm not sure.
16    Q. You're not sure?
17    A. No.
18    Q. It's not yours?
19    A. It's not mine. We know it's not mine, no,
20 because it says signed by Burt.
21    Q. What do you mean signed by Burt?
22    A. It says: Original agreement to our complaint
23 was signed by Burt. So that means somebody other than Burt
24 signed that -- wrote that.
25    Q. When you purchased the property you had no

ALBERT CARLISLE                                                134

```
 1   idea about the timber agreements.
 2       A.    No. I'm glad to see these. I have never seen
 3   these letters.
 4       Q.    Exhibit P is a letter from Attorney Harry
 5   Martin --
 6       A.    Right.
 7       Q.    -- to your attorney Mr. Warren --
 8       A.    Yes.
 9       Q.    -- dated March 27, 1973, correct?
10       A.    Yes, um-hum.
11       Q.    And it indicates that American Hardwood
12   Industries is purchasing the timber rights which Fisher &
13   Young reserved under its agreement with yourself, correct?
14       A.    Right.
15       Q.    And you've never seen this letter before?
16       A.    I saw this letter.
17       Q.    You did see this letter?
18       A.    Um-hum.
19       Q.    Did you do anything or you or your attorney do
20   anything in relation to this letter?
21       A.    Yes.
22       Q.    What did you do?
23       A.    We arranged to have a meeting with
24   Mr. Ascherman.
25       Q.    The man who was --
```

ALBERT CARLISLE                                                135

```
 1       A.    Herbert Ascherman. Here it is on the second
 2   page, second to the last paragraph. Its principal Herbert S.
 3   Ascherman and we came down and had dinner with him at the
 4   Erie Club, as a matter of fact.
 5       Q.    What was the purpose of the meeting?
 6       A.    To discuss what his intentions were and
 7   whether we could work out some kind of arrangement.
 8       Q.    And at this time, in 1973, you understood that
 9   the relationship -- the timber rights on the property were
10   controlled by your agreement with Fisher & Young?
11            MR. CONNER: Object to the form of the
12   question, but go ahead, answer the question.
13       Q.    What was -- that was your understanding?
14            MR. CONNER: Same objection. Go ahead.
15       A.    Please give me that again.
16       Q.    As of the date of this letter, March 27, 1973,
17   did you understand that your rights in the timber and Fisher
18   & Young's rights in the timber were controlled by your
19   agreement with Fisher & Young?
20            MR. CONNER: Same objection.
21       A.    I would guess that I did.
22       Q.    And that American Hardwood was purchasing
23   whatever rights Fisher & Young had under that agreement?
24       A.    Yes. But there was a question there because
25   in that agreement that I had with Fisher & Young I was
```

```
 1   supposed to have been given right of first refusal if they
 2   were -- if the timber rights were ever sold.
 3       Q.    Did that issue come about in 1973?
 4       A.    One of the things we meet with Mr. Ascherman
 5   about.
 6       Q.    Did you want to exercise that agreement?
 7       A.    We tried to work out an arrangement with him
 8   so that basically we were going to divide the trees, but he
 9   never cut any, so it didn't make any difference.
10       Q.    American Hardwood?
11       A.    American Hardwood never cut any trees.
12       Q.    The only person that cut any trees was Matson?
13       A.    Matson.
14       Q.    Have you seen Exhibit Q?
15       A.    Yes, I have seen this.
16       Q.    Exhibit Q is a request from Fisher & Young
17   regarding their decision to sell --
18       A.    Right.
19       Q.    -- timber rights in March of 1973?
20       A.    Right.
21       Q.    It makes reference to the agreement between
22   you and Fisher & Young dated May 25, 1969.
23       A.    Right.
24       Q.    Is that the date of your agreement with them?
25       A.    I think it is.
```

```
 1       Q.    Is that the date of the agreement?
 2       A.    That's a good question.
 3             MR. CONNER: Let's go off the record.
 4             (Off the record.)
 5             BY MR. HABER:
 6       Q.    So the '69 agreement is between you and Fisher
 7   & Young?
 8       A.    Yes.
 9       Q.    Which they described it as a reservation of
10   rights to certain timber.
11       A.    Certain timber.
12       Q.    And we can agree that you never actually had a
13   dispute with Fisher & Young relative to the timber?
14       A.    Never.
15       Q.    Now I want to go back to the lawsuit in 1985,
16   in which you and Fisher & Young filed suit.
17       A.    Um-hum.
18       Q.    Why was Fisher & Young the plaintiff when
19   apparently they sold their rights.
20       A.    I never quite understood how the rights were
21   transferred but Fisher & Young was right back -- it was a
22   different name, Fisher & Young Hardwoods.
23       Q.    You don't know why?
24       A.    No.
25       Q.    Was Mr. Cochran involved in that lawsuit?
```

1    A.   No, I don't think so.  No, he wasn't, I

2 remember that specifically.

3    Q.   And you did not exercise your option to

4 purchase?

5    A.   Well, we went over -- as I said, we went over

6 and met with Mr. Ascherman two or three times, once in his

7 office in Union City, one at the Erie Club, to see what his

8 intentions were, and -- but nothing ever came of it.

9    Q.   You did not exercise your options?

10    A.   No, we did not exercise our rights.

11    Q.   Exhibit R is a letter from John Enders to Bob

12 Matson, correct?

13    A.   Right.

14    Q.   And John Enders is an attorney that

15 represented you?

16    A.   Yes.

17    Q.   And you are cc'ed on the letter, correct?

18    A.   Yes, um-hum.

19    Q.   And Mr. Wood is cc'ed on the letter?

20    A.   Right.

21    Q.   Mr. Wood was somebody that lived on the

22 property?

23    A.   He lived on the farm.

24    Q.   Was he still living there in 1992?

25    A.   He might have been.

---

1    Q.   And the letter begins by indicating that the

2 firm had been engaged or Mr. Enders had been engaged by you

3 to represent your interest under the Agreement of Sale dated

4 May 28, 1969?

5    A.   Right.

6    Q.   Which was recorded on January 20, 1970.

7    A.   Um-hum.

8    Q.   And that agreement is what we've marked as

9 Exhibit B.

10    A.   B.

11    Q.   Correct?

12    A.   Um-hum.

13    Q.   And did you provide Mr. Enders a copy of

14 Exhibit B?

15    A.   Yes, I did.

16    Q.   What were the problems you were having in

17 October of 1992 with Matson?

18    A.   Well, the one problem was that they were

19 logging outside of the November 1, March 31 period.  They

20 were making a mess of the -- it says here:  The bulldozer had

21 been cutting new roads in the property in violation of

22 paragraph 7, and that was causing a great deal of

23 sedimentation in my trout stream or the trout stream, and

24 John was a classmate of mine in college and he said let's

25 jump into this, so this was just basically after I had seen

1 him maybe a week before.
2 Q. You'll notice that Exhibit R, the letter dated
3 October 21, 1992, references Exhibit A to the agreement.
4 A. Yes.
5 Q. Is that Exhibit A the one that contained the
6 no-cut zone?
7 A. Yes.
8 Q. Do you believe Mr. Enders had a copy of
9 Exhibit A?
10 A. That's an interesting question and the reason
11 Mr. Enders stopped working with me because we found out there
12 was a conflict in his firm. I forget -- maybe I'll remember
13 the name, but he said he could not address -- go back, I
14 think it was Harry Martin but I'm not sure. And he said he
15 could not go back to the agreement, there was some conflict
16 of interest. So we had to look someplace else.
17 Q. So he could not represent you because of a
18 conflict?
19 A. He could represent me as of this date, but he
20 couldn't go back. Now, you can -- I don't understand that
21 exactly, but he said their firm would have a conflict, maybe
22 with Fisher & Young. Maybe they represent Fisher & Young,
23 maybe they represented somebody else. I didn't go into it.
24 Q. Did you discuss with Mr. Enders the filing of
25 a lawsuit against Matson Lumber?

1 A. Not really, but I think -- no, not really.
2 Q. I guess back to the original question. Do you
3 believe Mr. Enders had a copy of Exhibit A?
4 A. Yes, he did.
5 Q. Did you ever try to secure it from him --
6 A. No.
7 Q. -- while Mr. Hare was representing you?
8 A. No.
9 Q. Did Matson Lumber ever have a copy of Exhibit
10 A during the trial?
11 A. I'm sure they did.
12 Q. Was Exhibit A ever produced during the trial?
13 A. I don't remember.
14 Q. I probably didn't ask you this, the jury
15 determined the width of the no-cut zone. What was your
16 understanding of what the no-cut zone was?
17 A. The no-cut zone was much broader than what the
18 jury determined and it excluded carved out property around
19 buildings, farm fields, so really the jury in some ways
20 opened up the no-cut zone a little bit. But in other ways
21 they really restricted it.
22 Q. Part of the problem was nobody could find the
23 original --
24 A. They wouldn't let me -- I could almost draw it
25 -- the map, I could still see it, but they wouldn't let me do

ALBERT CARLISLE

142

```
 1   that.
 2       Q.   Who wouldn't let you do that, the court?
 3       A.   Yeah.
 4       Q.   The judge?
 5       A.   The judge. And Terry saw it. I should say
 6   that, too, Terry saw it.
 7       Q.   Terry Warren?
 8       A.   Terry Warren saw it, I saw it.
 9       Q.   And the letter Exhibit R indicates that
10   Mr. Enders was representing your interest under the agreement
11   dated May 28, 1969?
12       A.   Right.
13       Q.   At this point, in 1992, what we've marked as
14   Exhibit H had already been filed with the recorder of deeds,
15   correct?
16       A.   I guess, yeah.
17       Q.   Did Mr. Enders do a title search?
18       A.   This represented about all he did, was this
19   letter and he made a couple phone calls to Mr. Kookogey.
20       Q.   Did Mr. Enders do a title search?
21       A.   I don't think so. He discovered that he had
22   this conflict with, I think it was Harry Martin, but I could
23   be wrong.
24            At that time, before this -- I'll just add one
25   comment. I went to John Enders because he was counsel for
```

ALBERT CARLISLE

143

```
 1   Hammermill and I figured he'd be an expert on lumber. He was
 2   a classmate of mine.
 3       Q.   Exhibit S is a letter from Mr. Enders --
 4       A.   Yeah.
 5       Q.   -- to Mr. Kookogey?
 6       A.   I was sure he had some contact with
 7   Mr. Kookogey.
 8       Q.   CC'ed on the letter is yourself,
 9       A.   Right.
10       Q.   Mr. Wood.
11       A.   Yes.
12       Q.   William Madesell.
13       A.   I have no idea who that is.
14       Q.   You anticipated my question and Todd
15   Fantaskey?
16       A.   Right.
17       Q.   Who is he, again?
18       A.   He was the fellow that worked for the Warren
19   County Conservation District.
20       Q.   And do you recall seeing this letter?
21       A.   Yes.
22       Q.   This letter sets forth the dispute you're
23   having with Matson Lumber, correct?
24       A.   Right.
25       Q.   And in the letter is referenced the agreement
```

ALBERT CARLISLE
144

1   of 1969, correct?
2       A.   Yes.
3       Q.   It also indicates that you were trying or in
4   the process of recreating Exhibit A to the Agreement of Sale?
5       A.   We tried to do that.
6       Q.   Did you ever finish that?
7       A.   No.
8       Q.   Did Exhibit A show anything other than the
9   no-cut zones?
10      A.   Well, it was a map of the farm.  I mean, it
11  was an outlined map of the farm, and it would have shown the
12  stream.
13      Q.   I guess my question, did it show any other
14  information regarding where or -- where somebody could timber
15  the property?
16      A.   Just lines outlining properties where you
17  couldn't cut.
18      Q.   Did it show any other information?
19      A.   I don't remember.  I don't think so.  It's
20  been such a long time.
21      Q.   It indicates that Mr. Carlisle and --
22  Mr. Enders and yourself inspected the property on October
23  26th of 1992, correct?
24      A.   Yes.
25      Q.   Did anyone else go with you?

ALBERT CARLISLE
145

1       A.   Probably John Wood went with me.
2       Q.   I apologize.  It says with representatives of
3   the Warren County Conservation District and the Pennsylvania
4   Fish Commission.
5       A.   So Todd Fantaskey went and so probably William
6   Madesell, although I don't remember him, he's with the fish
7   commission.
8       Q.   The letter goes on to say that you had seen
9   soil erosion and sedimentation of the Spring Creek and
10  tributary streams, correct?
11      A.   Right.
12      Q.   Is that damage we had previously talked about,
13  the landslide and things of that nature?
14      A.   That would have been part of it, um-hum.
15      Q.   And that would be caused by bad timbering
16  practices --
17      A.   Yes.
18      Q.   -- by Matson?
19      A.   By Matson.
20      Q.   You said Mr. Enders then indicated sometime
21  after this, after November 2nd, that he had a conflict and
22  could not represent you.
23      A.   Yes.  Well, he could represent me from this
24  time forward but he couldn't go back to the original
25  agreements.

ALBERT CARLISLE

146

1

2    (Off the record.)

3        BY MR. HABER

4        Q.        Back on the record.  After Mr. Enders advised

5    you that he had a conflict for whatever reason and couldn't

6    represent you, did you seek other counsel?

7        A.        Not right then, but I was thinking about it.

8        Q.        Did you contact any other attorney before you

9    talked to Mr. Hare in 1994?

10        A.        No.  It was Mr. Hare.

11        Q.        So from 19 -- whenever he told you the

12    conflict, sometime around the end of 1992, you contacted Mr.

13    Hare in 1994, you didn't discuss this with any other

14    attorney?

15        A.        I don't think so.  Certainly not on the basis

16    of representation.

17        Q.        On any other basis?

18        A.        Well, I'm not -- at cocktail parties.

19        Q.        I'm talking about you discussed with possible

20    representation --

21        A.        No, no, nothing like that.

22        Q.        We all discuss things at cocktail parties.

23        A.        I can't remember who I talked with.

24        Q.        This is a letter to you from Matson Wood

25    Products?

MR. HABER:  off the record for a second.

Annette Seager Reporting

---

ALBERT CARLISLE

147

1        A.        Yes, um-hum.

2        Q.        And it indicates that there is -- Matson

3    Hardwoods has become the successor interest of Fisher & Young

4    Hardwoods.

5        A.        Yes.

6        Q.        Do you believe that Matson was doing lumbering

7    on the property prior to the date of this letter?

8        A.        I don't think so.

9        Q.        And the letter, again, makes reference to the

10    May 28, 1969 agreement, correct?

11        A.        Right.

12        Q.        When you received this letter did you contact

13    any attorney relative to this matter?

14        A.        You know what, let's see here.  I can't

15    remember -- I remember thinking that I would but I don't

16    remember whether I did.  There was some question as to

17    whether this -- Scott felt this was clearly outside the

18    agreement.  Scott was going to use this as real evidence

19    against --

20        Q.        Scott Hare?

21        A.        Yeah, against Matson.

22        Q.        So you disagreed with Matson's interpretation

23    of the agreement in paragraph two.

24        A.        Scott did for sure.

25        Q.        I'm not worried -- Scott comes in the picture

Annette Seager Reporting

ALBERT CARLISLE

148

1   six years later. I'm asking when you received this letter,
2   did you disagree --
3       A.   I wasn't sure.
4       Q.   And you don't recall if you contacted counsel?
5       A.   I can't remember at the time.
6       Q.   There's a writing on the top of the letter.
7       A.   Yes.
8       Q.   Do you know who's writing that is?
9       A.   No, I don't. I have no idea.
10      Q.   I'm showing you what's been marked as Exhibit
11  U.
12      A.   Yes.
13      Q.   And that is a letter from Mr. Hare to
14  Mr. Bush --
15      A.   Right.
16      Q.   -- dated June 23, 1998.
17      A.   Uh-hum.
18      Q.   And a request that Mr. Bush file the praecipe
19  for writ of summons?
20      A.   Right.
21      Q.   Did you know this was happening?
22      A.   Yeah, I was there.
23      Q.   You were there when Mr. Bush went to the
24  courthouse?
25      A.   I went with him.

ALBERT CARLISLE

149

1       Q.   After this occurred, did Mr. Hare do any
2   further work for you? Did he do anything further after he
3   forwarded to Mr. Bush this praecipe for writ of summons?
4       A.   I'm sure he did but I don't know exactly.
5       Q.   This was about six months after the jury
6   verdict.
7       A.   Yes.
8       Q.   Do you know if you had already contacted Mr.
9   Krembs?
10      A.   I don't remember but I don't think I had.
11          MR. HABER: Give me five minutes, I think I'm
12  done.
13      (Whereupon, a break was had.)
14  BY MR. HABER:
15      Q.   When you had originally talked to Mr. Hare it
16  was about a family -- you had family problems.
17      A.   I had two problems, one was a family problem.
18      Q.   Mr. Hare prepared a complaint that he proposed
19  filing against your family.
20      A.   Yes.
21      Q.   And you made a decision not to pursue.
22      A.   No, I wanted to file it.
23      Q.   Who didn't want to file it?
24      A.   He didn't file it.
25      Q.   He didn't want to file it --

ALBERT CARLISLE 150

1  A.  I had lunch with Scott and my mother and our
2  accountant and we talked about the pros and cons of filing
3  it, and I turned to the accountant and I said: Should we
4  file it? He said: Yes. And Scott wanted a further advance
5  of fees so I paid him whatever it was that he wanted, then
6  that's enough but, yes, I wanted to file it. I have always
7  been sorry we didn't file it.
8  Q.  I don't understand. You wanted to file it but
9  Mr. Hare did not want to file it?
10  A.  I think he thought he couldn't win, I don't
11  know.
12  Q.  Did you go to another attorney regarding
13  filing it?
14  A.  No. I was surprised that he didn't file it,
15  and I went to see another attorney, but got a letter to
16  explain to Scott what he thought, and Scott still didn't file
17  it, so.
18  Q.  Did you go to -- did you try to get another
19  attorney to file it?
20  A.  No, no, I didn't.
21  Q.  But nothing would have prevented you from
22  doing that?
23  A.  Well, no, I just -- I was just amazed that
24  Scott didn't want to file it. I was just amazed because we
25  had talked about it, he had had several meetings with Terry

ALBERT CARLISLE 151

1  Warren. That's when John Edison came to --
2  Q.  Where would this lawsuit have been filed?
3  A.  I'm not sure. That would have been up to
4  them. I don't know.
5  Q.  There was no discussion over where to file it?
6  A.  If there was, I don't remember.
7  Q.  Carlisle Retailers was solely in the state of
8  Ohio?
9  A.  No, Pennsylvania as well.
10  Q.  Pennsylvania, too?
11  A.  Um-hum.
12  Q.  Where was the main store?
13  A.  The first store was in Ashtabula, so that
14  would be the main store, I guess.
15  Q.  You had indicated to me the date of that
16  previous exhibit is June when Mr. Hare sent a letter to
17  Lainard Bush --
18  A.  Yes.
19  Q.  -- to file the writ. You indicated you
20  believe you had not contacted Mr. Krembs by that time?
21  A.  I don't think I had.
22  Q.  I'm going to show you a letter dated April 28,
23  1999 from Mr. Hare to Mr. Krembs.
24  A.  Okay.
25  Q.  You can make a copy.

ALBERT CARLISLE    152

1  
2        MR. CONNER: Sure.
3        Q.  I'm showing you what's been marked as Exhibit
4  V, it's a letter April 28th from Mr. Hare to Mr. Krembs.
5        A.  Right.
6        Q.  Correct?
7        A.  Yes.
8        Q.  Would Mr. Hare know of Mr. Krembs other than
9  if you told him? Do you have any other reason why Mr. Hare
10 would be writing to him?
11       A.  No, he wouldn't.
12       Q.  Apparently you had contacted Mr. Krembs by
   April 28th?
13       A.  I must have.
14       Q.  And the dispute -- there was a dispute at that
15 time regarding payment of the bill, correct?
16       A.  Yes. And that -- yes, that's true.
17       Q.  Do you know if you had discussed anything else
18 with Mr. Krembs by April 28, 1999 other than the outstanding
19 bill?
20       A.  No, I don't remember. I don't think -- I
21 can't remember.
22       MR. HABER: I have no further questions.
23             CROSS EXAMINATION
24 BY MR. CONNER:
25       Q.  Just a couple follow-up questions. Mr.

ALBERT CARLISLE    153

1  Carlisle, you indicated, first of all, with regards to
2  Mr. Krembs, the lawyer that's on the letter that is addressed
3  in the last exhibit that you had -- he no longer represented
4  you. Was that a mistake?
5        A.  I think that's a mistake.
6        Q.  Why don't you -- do you know if there's any
7  formal separation --
8        A.  There's been no formal separation. I just
9  haven't seen him in the last couple weeks.
10       Q.  Second area of questions is, you were asked
11 some questions about the -- when you first became aware of
12 certain claims that were part of the declaratory judgment
13 action as to when they were dismissed by Scott Hare, and I
14 just want to call your attention to the time period after the
15 verdict in December of '97 and up until the time that this
16 summons was sent in the June 23, 1998. Was it
17 sometime during that six-month time period that you first
18 became aware that certain claims were dismissed out of the
19 original declaratory judgment action?
20       A.  Probably.
21       Q.  Now, during that time period I'm talking
22 about, that six-month time period in '98, can you tell us
23 whether or not on one or more occasions Scott Hare made
24 representations to you in the presence of others as to the
25 value -- dollar value of those dismissed claims that could be

1   re-filed in Warren County?

2     A.  He always held out a value of about five

3   million dollars.

4     Q.  And can you tell us whether or not the actual

5   order and opinion of Judge Mellon, which I think is dated

6   January 30 of 2002, was that your first notice that you could

7   not proceed with those re-filed claims?

8     A.  Yes.

9         MR. CONNER:  That's all the questions I have.

10              REDIRECT EXAMINATION

11   BY MR. HABER:

12     Q.  You said Scott indicated to you that the

13   claims that had been voluntarily dismissed in federal court

14   had a value of five million dollars of potential value?

15     A.  Potential value.

16     Q.  And you said that that was in the presence of

17   others?

18     A.  Yes.

19     Q.  Who else?

20     A.  Well, that came up even when we had the

21   mediation following the trial. And that figure was used

22   during the mediation.

23     Q.  And who else was present?

24     A.  Lainard Bush, Jim Hall and probably at one

25   point my accountant heard that.

1     Q.  Did you ever give authority to Mr. Hare to

2   settle the claims at a certain figure?

3     A.  No.

4     Q.  You never told him you would take three

5   million or four million, or half a million?

6     A.  No.

7     Q.  So you never gave him authority to settle the

8   case?

9     A.  Because we never -- we never came close to

10   settling.

11     Q.  My question was: Did you ever give him

12   authority at a number to settle the case?

13     A.  No, because he picked the number, he picked

14   five million dollars.

15     Q.  He didn't discuss it with you before picking

16   it?

17     A.  No, he picked it. At one time he said to me:

18   Pick a number. I mean, he thought the damages were in the

19   tens of millions.

20     Q.  That was what Mr. Hall had written in a

21   report?

22     A.  Well, Hall, and when Scott would come to the

23   farm and talk this over I remember going down to a meeting

24   and he said: Pick a number.

25     Q.  To your knowledge did Mr. Hare have any

ALBERT CARLISLE                                                              156

1   knowledge of values of trees?

2       A.      He did after meeting with Jim Hall and

3   Lainard.

4       Q.      Prior thereto?

5       A.      I don't believe so.

6       Q.      In determining the value of the trees that

7   were cut or damaged, were you mainly -- you were relying on

8   Mr. Hall's expertise?

9       A.      Yes, absolutely.

10      Q.      You would agree that Mr. Hall was the person

11  that Scott was relying upon to tell him the value of the

12  trees?

13      A.      Yes.

14              MR. HABER:  I have no further questions.

15              MR. CONNER:  Okay.  We'll waive the reading.

16

17  (Deposition concluded at 11:45 a.m.)

18

19

20                      *        *        *

21

22

23

24

25

Annette Seager Reporting

---

ALBERT CARLISLE                                                              157

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF ERIE                )

3               I, Annette Seager, a Notary public in and for the

4   Commonwealth of Pennsylvania, duly commissioned and

5   qualified, do hereby certify that the aforementioned deponent

6   ALBERT CARLISLE was, before the giving of his testimony,

7   first duly sworn to testify to the truth in the cause

8   aforesaid.

9               That the testimony then given by him as above set

10  forth was reduced to stenotype by Annette Seager, Court

11  Reporter.

12              I do hereby further certify that the deposition was

13  taken at the time and place in the caption specified and was

14  completed.  Signature of the deponent to the deposition

15  transcript was waived.

16              I further certify that I am not a relative, counsel

17  or attorney of either party or other person interested in the

18  event of this action.

19              IN WITNESS WHEREOF, I have hereunto set my hand and

20  affixed my seal of office at Erie, Pennsylvania on this

21  _____ day of _____ 2006.

22

23

24                              _____

25

Annette Seager Reporting