1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

ALBERT T. CARLISLE,           )
              Plaintiff,      )
    vs.                       ) Civil Action
                              ) No. 04-25 ERIE
BARTONY, HARE & EDSON;        )
SCOTT M. HARE, ESQUIRE;       )
HENRY E. BARTONY, JR., ESQUIRE; )
and JOHN JOY V. EDSON, ESQUIRE, )
              Defendants.     )

- - -

Deposition of PETER J. KREMBS

Tuesday, February 21, 2006

- - -

The deposition of PETER J. KREMBS, called as a witness by the defendants, pursuant to notice and the Federal Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Darla J. Carabotta, Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Hermann, Cahn & Schneider, 1301 East Ninth Street, Suite 500, Cleveland, Ohio 44114, commencing at 9:35 o'clock a.m., the day and date above set forth.

- - -

COMPUTER-AIDED TRANSCRIPTION BY
MORSE, GANTVERG & HODGE, INC.
ERIE, PENNSYLVANIA
814-833-1799


ORIGINAL

4

1   Q   Are you licensed in any other state?
2   A   No.
3   Q   Were you ever licensed in Pennsylvania?
4   A   No.
5   Q   What is your business address here?
6   A   1301 East Ninth Street, Suite 500,
7   Cleveland 44114.
8   Q   And what law school did you attend?
9   A   Case Western Reserve University.
10  Q   And what year did you graduate?
11  A   1973.
12  Q   When did you first meet Albert Carlisle?
13  A   Sometime in 1998.  And I don't recall
14  whether it was in the spring or the summer, but it
15  was, I think, during the first half of the year of
16  '98.
17  Q   Do you know how he was referred to you, or
18  came to you?
19  A   I think I learned about Bert from a
20  gentleman by the name of Steve Madewell.  Steve is the
21  Deputy Director of the Lake County MetroParks System
22  here in this area, and I just knew Steve, and I think
23  Steve brought Bert to me.
24  Q   When you first met with Mr. Carlisle, I'm
25  assuming it was at your office?

5

1   A   Boy, I don't recall.  It could have been
2   here, or I could have driven half-way to meet him, I
3   just don't recall.
4   Q   When you first met him was anyone else
5   present other than yourself and Mr. Carlisle?
6   A   Mr. Madewell might have been present, but I
7   can't recall.
8   Q   Do you know a person named Lainard Bush?
9   A   Yes.
10  Q   Was he present at your first meeting with
11  Mr. Carlisle?
12  A   I don't think so.
13  Q   When you first met with Mr. Carlisle, what
14  were his concerns, what did he want to see you for?
15          MR. CONNER:  I'm going to object to the
16  question.  Because the question is a question
17  that's directed to the witness here to relate
18  communications made by a lay person seeking legal
19  counsel, and I believe under both the
20  Pennsylvania and the Ohio law and the Federal
21  Rules of Civil Procedure it's protected by the
22  attorney/client privilege.
23          MR. HABER:  I'll disagree with you.  We
24  have raised the statute of limitations defense,
25  and under Pennsylvania, if a person seeks counsel

6

1  from a lawyer, and they discuss bringing the
2  claim or discuss the potential negligence of a
3  lawyer, that raises the statute and puts the
4  person on notice, and they have to bring the
5  claim within two years. So I think by bringing
6  this suit, Mr. Carlisle in some instances has
7  waived the attorney/client privilege.
8       I'm not going to get into greatly the
9  advice as to the proceedings in Warren County. I
10 want to get into the discussions between
11 Mr. Krembs and Mr. Carlisle regarding what
12 occurred in the Federal Court action, which is
13 now over. I'm not seeking work product or the
14 advice he gave him regarding what he can or can't
15 do in the Warren County action.
16      MR. CONNER: But you are seeking the
17 communications from Mr. Carlisle to Mr. Krembs in
18 the context of the change of counsel that
19 occurred in June of '98, and that relates to
20 communications to a lawyer with regard to seeking
21 legal advice, and I don't see how that's not
22 protected by the attorney/client privilege.
23      MR. HABER: But by filing this lawsuit, by
24 Mr. Carlisle filing the lawsuit contending the
25 negligence of Mr. Hare and the representation of

7

1  him in the Federal Court action, and then seeking
2  advice relative to that, it could raise the issue
3  of the statute of limitations.
4       MR. CONNER: Let me see if I can shortcut
5  this. I don't think he sought -- in good faith,
6  I don't think Mr. Carlisle sought legal advice
7  with respect to any claims that are involved in
8  the claim of Mr. Carlisle against Mr. Hare.
9       MR. HABER: Let me jump ahead.
10      MR. CONNER: Okay.
11      MR. HABER: And we'll get back to that. I
12 don't necessarily agree with you, but maybe I can
13 ask it so we don't get into that.
14 BY MR. HABER:
15  Q     In the summer of 1998 Mr. Carlisle had a
16 case proceeding in the Federal Courts, correct?
17  A     Yes.
18  Q     And Mr. Hare was his attorney at that time,
19 but Mr. Hare, for reasons I'm not going to get into
20 with you, was going to withdraw or severe the
21 relationship, and Mr. Carlisle was seeking new
22 counsel.
23  A     Correct.
24  Q     At the time he came to see you, was there a
25 case pending in Warren County, do you know?

8

1   A   No.
2   Q   So the only case he had pending at that
3   time was the case in Federal Court?
4   A   Correct.
5   Q   Did you ultimately represent him during the
6   appeal to the Third Circuit?
7   A   Yes.
8   Q   You had discussions with Mr. Hare?
9   A   Yes.
10  Q   Do you recall how many discussions you had
11  with Mr. Hare?
12  A   Well, I only recall one discussion back
13  during this time, and it had to do with the necessity
14  of getting his file in order to handle the appeal.
15  Q   Did you have a discussion with Mr. Hare
16  relative to the voluntary or withdrawal of claims in
17  Federal Court and the effect of that on the statute of
18  limitations?
19  A   I may have had that kind of a conversation
20  with him, but it would have been later on in time, I
21  would think.
22  Q   When you say "later on in time?" When I
23  say this, Mr. Hare has notes of telephone
24  conversations in potentially June and July of 1998
25  with you and Mr. Fried, who was associated with you?

9

1   A   Mr. Fried was an associate here, yes.
2   Q   He's no longer here?
3   A   He's no longer here.
4   Q   Regarding the effect of the discontinuances
5   and whether they toll the statute of limitations or
6   not, and whether the new action in Warren County and
7   what the statute of limitations would be, do you
8   recall conversations with Mr. Hare relative to that?
9   A   I recall having conversations with Mr. Hare
10  that were directed at activities at the trial level,
11  because I needed to have a pretty substantial amount
12  of information for purposes of handling the appeal.
13       But, you know, the several conversations
14  or -- you know, there may have been as many as three
15  or four conversations with him, but I don't think
16  there were more than two or three.  I don't remember.
17  I remember the concerns I had about the case, but my
18  focus was really the appeal.
19  Q   You ultimately began to represent
20  Mr. Carlisle in the Warren County action?
21  A   Yes.
22  Q   At that point was there a concern you
23  raised regarding whether parts or part of that action
24  was time barred with Mr. Hare?
25  A   I don't think so.  I may have had one

10

```
 1   conversation with him where I asked him -- you have to
 2   understand, in order for me to even know much of the
 3   detail of the trial action in the Federal Court, I had
 4   to look at quite a few documents, and so I don't think
 5   it was June of '98, it must have been sometime after
 6   that that we had this conversation.  I don't remember.
 7   But I do remember having a conversation with him where
 8   I may have asked him why he dismissed these -- I
 9   remember he dismissed a trespass claim, which is I
10   guess in Pennsylvania, trespass and negligence in Ohio
11   are essentially the same.
12        Q    Well, trespass and negligence are separate
13   in Pennsylvania.
14        A    Oh, okay.  Well, then referred to as
15   trespass, but he dismissed that, and he also dismissed
16   a conversion claim, and I'm sure I asked him why he
17   did that.
18        Q    My question was probably a little bit more
19   specific.
20             In Pennsylvania there's what is called a
21   "savings statute," that if you are in Federal Court
22   and for some reasons the case are dismissed, the
23   statute of limitation relates back from the date you
24   first filed.  And there was some concern raised
25   whether the voluntary dismissal of these claims would
```

11

```
 1   allow the statute of limitations to be related back,
 2   or would start only from the date you filed in Warren
 3   County.
 4             And that's my question, did you have any
 5   conversations with Mr. Hare relative to the savings
 6   statute in Pennsylvania?
 7        A    I don't know as if I ever discussed the
 8   savings statute with Mr. Hare, but I certainly
 9   discussed the savings statute with other attorneys in
10   my office, including Mr. Fried.
11        Q    Is it possible Mr. Fried discussed it with
12   Mr. Hare?
13        A    He may have.
14        Q    Is Mr. Fried still practicing in Cleveland?
15        A    As far as I know, yes.
16        Q    Do you know where he's practicing?
17        A    I think he's at the Reminger Law Firm.
18        Q    Do you know if there's any memorandum in
19   the file relative to this savings statute issued that
20   were prepared and placed in the file?
21        A    There may have been, but you know, I don't
22   know.  I just don't know.  I know it was a concern
23   that we had.
24        Q    And that would have been around the time
25   you filed the Warren County -- or filed the complaint
```

12

1 in the Warren County action?
2  A    Yes.
3  Q    And my understanding is the complaint was
4 filed in late 1998
5  A    Something like that.
6  Q    And your office prepared the complaint?
7  A    Yes.
8  Q    At that time in 1998 when you prepared the
9 complaint, did you have local counsel?
10  A    Yes. And I don't remember her name, but we
11 did have a local attorney.
12  Q    And it wasn't from Mr. Conner's firm?
13  A    No, no, this was a person I believe that
14 was recommended by Mr. Carlisle.
15  Q    You can't recall her name?
16  A    She played a really minor role, and
17 frankly, she was a sole practitioner, and I don't
18 remember her name right now.
19  Q    Do you recall when you retained
20 Mr. Conner's firm to be local counsel?
21  A    Quite a bit later. And I don't recall when
22 it was.
23  Q    The reason I ask the question, there's a
24 pleading filed, that was filed October 12th of '01,
25 which probably was three years after you filed the

13

1 complaint, and it lists them on the pleading, it's a
2 motion for partial summary judgment. And I was just
3 wondering if it was long before then, around then, if
4 you can recall when Mr. Conner was retained as local
5 counsel?
6  A    I know the appeal was over. I know that
7 Mr. Carlisle's deposition in the Warren County case
8 had been conducted by Matson's counsel. And I don't
9 recall -- I remember making the oral argument on the
10 motion for summary judgment in Warren County in front
11 of Judge Millin, and I can't tell you whether
12 Mr. Conner was our local counsel by then or not. He
13 may have been.
14  Q    But it was at least several years after the
15 commencement of the action?
16  A    It was sometime following the initiation of
17 the action, yes. And I think Mr. Conner may have been
18 our local counsel at the time I made the oral
19 argument, he may have been.
20  Q    On the motions for summary judgment?
21  A    Yes.
22  Q    Going back to the savings statute issue,
23 you said it was a concern around the time you filed
24 the complaint in Warren County?
25  A    Or prior to filing the complaint, sure.

14

1  Q    Do you recall whether there was any
2  correspondence to Mr. Carlisle relative to that issue?
3  A    I don't recall that.
4  Q    Do you recall any discussions you had with
5  Mr. Carlisle relative to the savings statute issue?
6  A    I may have had some discussions about that
7  with him.
8  Q    Do you believe there are any notes in your
9  file or memorandum relative to your discussions with
10 Mr. Carlisle?
11 A    I don't know.  I don't know.  There could
12 be.
13 Q    I'm not asking you to give me a yes or no
14 whether they're producible.  Okay?  What I would ask
15 you to do is check to see if there are any memorandum
16 on the savings statute.
17         MR. CONNER:  And I'll get back to you.
18         MR. HABER:  And whether there's any
19 memorandum relative to communications with
20 Mr. Carlisle relative to that.
21         MR. CONNER:  Okay, let me just check, memos
22 re savings statute, and check re communications
23 with Mr. Carlisle.
24         MR. HABER:  And if there are none, then we
25 don't have an issue.

15

1         MR. CONNER:  Okay.
2  Q    Would I be correct that Mr. Fried probably
3  did more research on that issue than you would have
4  done?
5  A    You're absolutely correct.
6  Q    Do you know when Mr. Fried left this firm?
7  A    No.  I don't think Mr. Fried was involved
8  in the preparation of our motion for summary judgment,
9  however.
10 Q    After the Federal Court case was concluded,
11 did you have any other further communications with
12 Mr. Hare?
13 A    I think I had one conversation with him, or
14 it may have just been a letter, but Chet Fosse had the
15 check for the verdict, and Chet wanted to make certain
16 that Mr. Hare was paid.
17 Q    There was a dispute for -- I don't want to
18 use the word dispute -- there was outstanding legal
19 fees due at the time the verdict was paid?
20 A    Correct.
21 Q    And that was Mr. Fosse's concern because
22 Scott Hare had raised that issue?
23 A    Correct.
24 Q    Mr. Hare retained you to -- strike that.
25      Mr. Carlisle retained you to represent him

16

```
 1   in the Warren County action?
 2        A    Correct.
 3        Q    And the Warren County action was a dispute
 4   with Matson over timbering on the Clough Farm,
 5   correct?
 6        A    Yes.
 7        Q    Did you prior to filing the complaint do a
 8   title search?
 9        A    No.
10        Q    Did Mr. Carlisle ever request you do a
11   title search?
12        A    No.
13        Q    Is there any particular reason you did not
14   do a title search?
15        A    Frankly, it never occurred to me.  I mean,
16   I took over a case that had already been litigated.
17   And my main purpose in the Warren County action, was
18   to litigate the issues that Mr. Hare had voluntarily
19   dismissed prior to trial, and to present to the Warren
20   Court what we considered to be a contract case
21   following a dec action, where the rights of the
22   parties had been determined under that contract.
23   Because the jury, as I recall in the federal case, was
24   asked to interpret the contract for the parties, which
25   it did, and it drew some conclusions in a specific
```

17

```
 1   jury verdict, and we were litigating those
 2   conclusions, and then Judge Millin saw fit to come up
 3   with a res judicata rule, which I think is wrong.
 4        Q    That ruling by the Judge in Warren County
 5   on res judicata has not been appealed to the Superior
 6   Court?
 7        A    Not to my knowledge, no.
 8        Q    Are you still actively involved in the
 9   Warren County action?
10        A    I'm not as involved as I used to be, but I
11   still consider it to be a case in which I'm counsel of
12   record and working with Andy.
13             (Thereupon, Krembs Deposition Exhibit A was
14        marked for identification.)
15        Q    Could you look at what I've marked as
16   Exhibit A.?  Do you recognize that document?
17        A    Yes.
18        Q    Could you tell us what it is?
19        A    This is the agreement between Fisher and
20   Young and Mr. Carlisle, in which Mr. Carlisle acquired
21   the land of the Clough Farm subject to timber rights.
22        Q    When Mr. Carlisle first saw you, did he
23   provide you a copy of this document?
24        A    I can't answer that, I don't know.
25        Q    You indicated that you basically believe
```

18

1  that the Warren County action was a contract action,
2  and also based on the verdict in the Federal Court?
3      An enforcement of the verdict in the Federal Court
4  action.
5      A    Well, it was a contract action, it was also
6  a negligence action, it was a conversion action, and I
7  believe there were two contract theories that were
8  proposed in that action.
9      Q    Was this the contract that the Warren
10 County action was in part based on?
11     A    Yes, the jury was asked to interpret this
12 contract between the parties. The jury in the federal
13 case.
14     Q    Correct. It never got to the jury in the
15 Warren County case.
16     A    No.
17          (Thereupon, Krembs Deposition Exhibit B was
18 marked for identification.)
19 BY MR. HABER:
20     Q    I show you what was marked as Exhibit B,
21 and ask whether you recognize this document?
22     A    Yes, this is the -- oh, this is a deed
23 stamped April 23rd, '73 between Marion Kinkead and
24 Fisher and Young.
25     Q    You haven't seen that before today?

19

1      A    Oh, yes, I've seen it before today. I
2  think.
3      Q    Do you recall when you first saw it?
4      A    I believe I first saw this after
5  Mr. Conner's firm had become more involved in the
6  case. This would have been a relatively recent event,
7  my seeing of it. I mean, it was well after the
8  arguments on the motion for summary judgment in the
9  State court.
10     Q    When you say "recently, after Mr. Conner's
11 firm got involved," is there anything in your file
12 that would indicate when you retained Mr. Conner as
13 local counsel?
14     A    There might be. I just don't know. I'm
15 not sure when I retained Mr. Conner's firm whether
16 Mr. Fryling was at the firm or not. He may have been,
17 I just don't recall.
18     Q    Did you know Mr. Fryling?
19     A    No.
20     Q    How did you come about to retain
21 Mr. Conner's firm?
22     A    I think it was recommended to me by Bert
23 Carlisle, but I'm unsure of that.
24     Q    And you say what we marked as Exhibit B was
25 located after Mr. Conner's firm became involved as

Page 20

```
 1   local counsel?
 2        A     That's the best of my recollection.
 3        Q     Is it your understanding that it was
 4   located through a title search?
 5        A     That I can't answer, I don't remember that.
 6        Q     You don't know how it was?
 7        A     No.
 8        Q     Do you recall any discussions with
 9   Mr. Conner regarding doing a title search?
10        A     Yes.
11        Q     Was there any event that occurred that
12   precipitated the discussions regarding having a title
13   search done?
14        A     Not that I recall.
15        Q     It was Mr. Conner's or Mr. Fryling's
16   suggestion to do a title search?
17        A     Well, not only was it their suggestion, but
18   it may have been partially conducted or completely
19   conducted before I even was aware that the title
20   search was done.
21        Q     Okay.  Did you have any discussions with
22   Mr. Hare regarding whether he had performed the title
23   search?
24        A     No.  I took the litigation over rather late
25   in the game, Mr. Hare had been around for a couple
```

Page 21

```
 1   years, if there were any title issues, I would assume
 2   they would have been at the early end of the
 3   litigation, or at the start of the litigation.
 4        Q     When Mr. Carlisle came to you, were you
 5   aware or shortly thereafter that he had purchased this
 6   property back in 1970?
 7        A     Correct.
 8        Q     Were you aware that there had been a prior
 9   litigation in Warren County in the mid '80s over
10   somebody cutting trees?  The Chesney litigation?
11        A     I remember that.  I don't remember much
12   about that litigation, but I remember I thought it was
13   a neighbor dispute, where somebody had taken some
14   trees from this property that he was not entitled to
15   take.
16        Q     So would I be correct that you didn't
17   perform a title search because you assumed that if one
18   needed to be done, it would have been done prior to
19   your involvement?
20        A     Correct.  The issue just never came up.  I
21   mean, I would think that Matson would not even acquire
22   the property without a title search.
23        Q     We can discuss that off the record.
24              Prior to this case have you had much
25   experience in litigating, I'll say, timber cases?
```

22

```
 1    A    No.
 2    Q    This was your first timber case?
 3    A    Correct.
 4    Q    And you perceived it more as a breach of
 5   contract enforcement of a verdict as opposed to a
 6   timber case?
 7    A    Oh, without question. Without question.
 8   And a negligence case. Because I thought that based
 9   on what I had heard from the expert that Bert had,
10   that the actual conduct of the harvest was sub par.
11    Q    And that expert would have been Mr. Hall?
12    A    Correct.
13    Q    Did you ever have any discussions with
14   Mr. Carlisle in 1998 about bringing a claim against
15   Mr. Hare?
16         MR. CONNER: I'm going to object to that
17   question. Frankly, I mean, it's going to elicit
18   attorney/client communication.
19         MR. HABER: Well, the answer to the
20   question is yes or no.
21         MR. CONNER: You're right. Okay. Let's go
22   back.
23    A    You have to restate the question.
24    Q    Did you have any discussions with
25   Mr. Hare relative to -- strike that -- with
```

23

```
 1   Mr. Carlisle regarding bringing a claim against
 2   Mr. Hare for legal malpractice?
 3    A    When?
 4    Q    In 1998?
 5    A    I don't think so.
 6    Q    Did you ever have a conversation with
 7   Mr. Carlisle regarding bringing a negligence claim
 8   against Mr. Hare?
 9    A    I may have at some later date, but
10   certainly not in 1998.
11    Q    Can you give me a time frame when you may
12   have first had that conversation?
13    A    I really can't. I remember we were all
14   disappointed when Judge Millin issued a ruling that he
15   issued.
16    Q    When you say "issued a ruling," you mean
17   his opinion in January of 2002 on the motions for
18   summary judgment?
19    A    Correct. I think that's the only opinion
20   he ever issued.
21    Q    And you believe it was sometime after that
22   opinion?
23    A    Likely.
24    Q    Sitting here today you have no recollection
25   of any conversation with Mr. Carlisle prior to that
```

24

1  opinion regarding bringing a claim against Mr. Hare?
2      A.   No.
3           MR. HABER:  Again, Andy, I'm going to ask,
4  and I don't know if these documents exist or not,
5  would be a letter or a memorandum in the file
6  regarding a potential claim against Mr. Hare.
7           MR. CONNER:  Okay.
8           MR. HABER:  If one doesn't exist, then we
9  don't have a problem.
10          MR. CONNER:  Okay.
11 BY MR. HABER:
12     Q.   Prior to the deposition today did you
13 review your file?
14     A.   No.  I reviewed some material that Andy had
15 furnished me, but I did not review my file.
16     Q.   And what material would that be?
17     A.   Well, there was some material that
18 constituted some correspondence between I think
19 Mr. Hare and me, if I'm not mistaken.
20     Q.   And much of that correspondence dealt with
21 fees, correct?
22     A.   Yes.  And the complaint that I filed in the
23 Warren County case was included in the package.
24     Q.   Did you review any deposition transcripts
25 from the legal malpractice case?

25

1      A.   That's right, there was a small section of
2  Mr. Hare's deposition, I believe, where my name was
3  mentioned.
4      Q.   And Mr. Hare testified as to conversations
5  he had with your office relative to the savings
6  statute?
7      A.   His testimony where my name came up I
8  believe was about attorneys fees.
9      Q.   The defendant in the Warren County action
10 raised res judicata as a defense and also the statute
11 of limitations as a defense, correct?
12     A.   Correct.
13     Q.   The defendant argued that the Federal Court
14 verdict barred anything that happened prior to 1997,
15 correct?
16     A.   I think to.
17     Q.   And that's what Judge Millin ultimately
18 ruled.
19     A.   Um-hum.
20     Q.   That's what you said you disagree with.
21     A.   Correct.
22     Q.   As pleadings were filed in the Warren
23 County action, would you keep Mr. Carlisle advised as
24 to what was going on?
25     A.   You know, Mr. Carlisle as a client was not

26

 1  particularly sophisticated. And when I have a
 2  sophisticated client, I usually keep them right up to
 3  speed. When I have somebody who is not particularly
 4  sophisticated, I don't ignore them, but I certainly
 5  don't feed them regular pleadings and things of that
 6  nature.
 7  Q    When you say "sophisticated," you mean
 8  sophisticated in the legal system? Or not? You mean
 9  sophisticated --
10  A    Having a sense of business judgment, it
11  doesn't have to be legal, but, you know, understand
12  the issues, et cetera.
13  Q    Would you keep him generally advised that
14  "the defendant filed a motion for summary judgment,
15  we're going to have an argument".
16  A    Oh, yes, without a question.
17  Q    Would you provide him copies of the
18  pleadings?
19  A    I may have provided him copies of major
20  pleadings, but I'm not sure. When I say "major
21  pleadings," I may have furnished him with a copy of
22  the arguments we prepared on our motion for summary
23  judgment, but I'm not sure I sent him a copy of our
24  petitions and Matson's answer.
25       MR. HABER: One more request. If there are

27

 1  letters from Mr. Krembs to Mr. Carlisle saying
 2  "here's the preliminary objections, here's what
 3  they say, here's the summary judgment, what they
 4  say." What I don't want is Mr. Krembs' analysis
 5  of the merits of it and how you're going to
 6  defend them. So it would just be the facts.
 7       I don't know if these letters exist or not,
 8  but it would just be the facts, "they filed
 9  motion for summary judgment, here's the
10  argument". I would agree with you that his
11  analysis of the validity of them, the merits of
12  them, is clearly protected, and I don't want
13  that.
14       MR. CONNER: Okay.
15       MR. HABER: And I don't know if those
16  letters exist.
17  Q    Was Mr. Carlisle, from 1998 to say 2001,
18  was he the type of client that would repeatedly call
19  you and ask you what was going on in the case, what
20  the status of it was?
21  A    Yes.
22  Q    You said you went to argument on the motion
23  for summary judgment.
24  A    Correct.
25  Q    Do you know if Mr. Carlisle attended?

28

1   A   Yes, he did.
2   Q   And I think you indicated you weren't
3   certain at that time whether Mr. Conner's office was
4   your local counsel or not?
5   A   I think they were, but I'm not sure.
6   Q   Am I correct that the statute of
7   limitations defense that the defendants raised was
8   that since the writ was filed in 1998, only claims
9   that went two years before the filing of the writ were
10  able to be litigated, that you could not go back to
11  the date of the filing of the Federal Court action?
12  A   I don't recall the specifics of their
13  argument. We had argued that the savings statute in
14  fact did protect Mr. Carlisle.
15  Q   Did the Court ever reach that issue?
16  A   I don't think so.
17      (Thereupon, Krembs Deposition Exhibit C was
18  marked for identification.)
19  Q   I show you what we marked as Exhibit C. Do
20  you recognize that document?
21  MR. CONNER:   Is this the quitclaim deed?
22  MR. HABER:    Yes.
23  MR. CONNER:   What was the date on that?
24  MR. HABER:    The date of it, May 6, 2003.
25  A   I'm not sure I've ever seen this deed

29

1   before.
2   Q   Do you remember discussions regarding this
3   quitclaim deed being given by the estate of
4   Mrs. Kinkead to Matson Lumber?
5   A   Yes.
6   Q   Do you recall in relationship to when
7   Exhibit B was found, when this quitclaim deed was
8   given, or discussed? B being the 1973 deed.
9   A   Well, it was sometime subsequent to the
10  title search that was performed by Mr. Fryling.
11  Q   You believe that Mr. Fryling did the title
12  search, or had someone do it?
13  A   I think so, yes.
14  Q   Do you recall how long after the title
15  search was performed that the quitclaim deed was
16  given?
17  A   No.
18  Q   Did you ever have any contact with
19  Mrs. Squatriti, I think that's how she pronounces her
20  name, regarding the quitclaim deed, or securing one
21  for Mr. Carlisle?
22  A   No.
23  Q   Did you ever meet Mrs. Squatriti?
24  A   No.
25  Q   Do you recall receiving any information

30

1   that anybody on behalf of Mr. Carlisle contacted
2   Mrs. Squatriti regarding securing a quitclaim deed?
3   A   I recall having conversations as co-counsel
4   for Mr. Carlisle with Mr. Conner about efforts to
5   reach her.
6   Q   Do you know if anybody on behalf of
7   Mr. Carlisle ever talked to Mrs. Squatriti about a
8   quitclaim deed?
9   A   No, I don't think so. I know I never spoke
10  with her.
11  Q   Mr. Fried, do you know if he was licensed
12  to practice law in Pennsylvania?
13  A   No, he was not, to the best of my
14  knowledge.
15  Q   Were you admitted pro hac vice in
16  Pennsylvania?
17  A   Yes.
18  Q   Was Mr. Fried for this case?
19  A   I don't think so.
20  Q   Was anyone else from your firm admitted
21  other than yourself?
22  A   I think Tom Marotta might have been
23  admitted pro hac vice along with me.
24  Q   Can you spell his last name?
25  A   M-a-r-o-t-t-a.

31

1   Q   Is he still with the firm?
2   A   No.
3   Q   Do you know where he is?
4   A   No, I don't. I know he's in Cleveland, but
5   that's all I know.
6   Q   Do you remember that local attorney in
7   Pennsylvania you first had, the female?
8   A   I don't remember her name.
9   Q   Do you know if she was from Erie or Warren
10  County?
11  A   I think she was from Warren County.
12  Q   Prior to preparing the complaint in the
13  Warren County action, did you do any investigation of
14  the property other than securing information from
15  Mr. Carlisle and reviewing the Federal Court file?
16  A   Well, I familiarized myself with the
17  property, I reviewed the Federal Court file, and I had
18  conversations with Mr. Hall as well as Mr. Carlisle.
19  Q   Mr. Hall is the lumber expert, tree expert?
20  A   Right, retired forester.
21  Q   Retired forester. But at that time in 1998
22  he was not retired yet, I believe.
23  A   That, I don't know.
24  Q   Your consultation with Mr. Hall was
25  relative to damages?

32

1       A       Correct.
2       Q       When the complaint was filed in 1998, what
3   damages were you seeking to recover through the Warren
4   County action?
5       A       We were seeking to recover damages for
6   destruction of a trout stream that ran through the
7   property by virtue of Matson's harvesting practices.
8               We were seeking damages for the destruction
9   of trees, for lack of a better word, destroyed by
10  Matson in connection with their harvest practices,
11  since the jury had concluded that Matson's right to
12  harvest was a one-time right, it was not perpetual.
13  All the trees that had sprouted since Mr. Carlisle
14  bought the property were his property, and a lot of
15  his property was destroyed by Matson.
16              And we were also seeking damages for
17  conversion, on the theory that the trees harvested by
18  Matson, since they had a one-time right to harvest,
19  had to be in existence in 1969 or 1970, whatever the
20  year was when Mr. Carlisle purchased the property.
21  And under the terms of the contract, the trees that
22  they harvested at that point in time, '69 or '70, had
23  to be 16 inches in diameter, one foot from the
24  ground.  And it was our position that if Matson
25  harvested a tree in the late '80s or '90s that was

33

1   only eight inches in diameter, a foot off the ground
2   back in 1969, that that was not their property to
3   harvest.
4       Q       Did you have a concern whether the statute
5   of limitations would bar recovery for a claim of a
6   tree that was cut down in say 1989?
7       A       No.
8       Q       And why not?
9       A       Because we were pursuing -- we had concerns
10  about the statute as it related to the negligence
11  theories and the conversion theories, but we weren't
12  concerned about the statute as it related to our
13  breach of contract theory, because we interpreted the
14  federal action as a dec action, and the rights of the
15  parties under the contract were not clear until the
16  federal action had concluded.
17      Q       So your view was that the Federal Court
18  jury determined the rights of the parties under the
19  contract?
20      A       Correct.
21      Q       And if somebody had breached the contract
22  two or four years before that jury verdict, you could
23  file that suit within two years of the jury verdict?
24      A       Right.  Because the rights were unknown,
25  and the Federal Court asked the jury to declare the

34

```
 1  rights of the parties under the contract, so the
 2  statute didn't begin to run until that right was
 3  declared.
 4      Q    And that's your disagreement with the Judge
 5  in Warren County?
 6      A    That's one of my disagreements, correct.
 7      Q    But that's your disagreement regarding the
 8  res judicata or collateral estoppel?
 9      A    Correct.
10      Q    So under your view, you could go back to
11  the first time Matson cut a tree, and if it violated
12  the Federal Court jury verdict, it's your view that
13  that's not barred by the statute?
14      A    That's right.  And that raised the issue of
15  how do you quantify those damages.
16      Q    I don't know what you mean by that.
17      A    Well, I mean, if you go back that far in
18  harvesting, what is the damage?  Is the damage
19  Matson's net profit, that improper harvesting?  Or is
20  the damage the fact that the property now is void of a
21  tree which should remain there today.  That was --
22  there was a whole lot of discussion, and frankly, I
23  don't remember how we came out on that.
24      Q    In other words, the difference between what
25  you make from cutting the tree down, or what the land
```

35

```
 1  is worth if the tree is still standing there?
 2      A    That's correct.
 3           MR. HABER:  Subject to you finding those
 4  documents and discussing whether you produce
 5  them, I have nothing further.
 6           MR. CONNER:  I just have a couple, they're
 7  very short questions.
 8           MR. HABER:  Sure.
 9           MR. CONNER:  Let's go off the record a
10  second.
11           (Discussion off the record.)
12           MR. CONNER:  Back on the record.
13  I just want to mark some exhibits,
14  documents for the record.  Let's call this D, E,
15  and F, if you will.
16           (Thereupon, Krembs Deposition Exhibits D,
17  E, and F were marked for identification.)
18                        EXAMINATION
19  BY MR. CONNER:
20      Q    Mr. Krembs, you were asked by Mr. Haber
21  with regards to the Warren action, and just for the
22  record I've had some documents that have been
23  identified as deposition exhibits.  With regards to
24  the Warren action, that is Civil Action 00353, 1998
25  C.D. in the Court of Common Pleas of Warren County,
```

36

1  Pennsylvania, can you tell me whether or not from your
2  understanding of the file if that action was initiated
3  as a consequence of a Praecipe for a Writ of Summons
4  which was prepared by Mr. Hare's office?
5      A    Correct.
6      Q    I'm just, for the record, showing you what
7  has been marked first of all as Exhibit D, a letter.
8  Do you recognize this as a letter that when you took
9  over the representation of Mr. Carlisle, you became
10 aware of the fact that Mr. Hare had written Mr. Bush
11 on June 23rd, 1998 enclosing a writ of summons, and
12 suggesting that a writ of summons that he prepared be
13 filed by Mr. Bush in the Court of Common Pleas of
14 Warren County to initiate that one action?
15     A    I recall this, yes. He did this as a
16 courtesy to my office.
17     Q    Let me just show you what has been marked
18 as Exhibit E just for the record, if you can take a
19 moment and look at that, and just tell us whether or
20 not at least from your understanding if that is a copy
21 of the writ with Mr. Carlisle's signature on the
22 second page that initiated what Mr. Haber has been
23 referring to as the Warren action; is that correct?
24     A    Yes.  Our focus at that time was on the
25 appeal, and it was my understanding that this was

37

1  something that should have been done under the
2  Pennsylvania law.
3      Q    Okay.  In any case, just going forward a
4  second, you were asked about the complaint that
5  eventually you filed in the Warren action, and this is
6  the amended complaint containing all four counts, and
7  it purports to be dated -- I think the affidavit or
8  verification of Mr. Carlisle is January 6, 1999.
9           Just take a moment, take a look at that,
10 and tell us whether or not that is a copy of the
11 amended complaint with all four of the causes of
12 action that you have discussed here today with
13 Mr. Haber?
14     A    Yes, it is.
15     Q    And just so we're clear, the action number
16 on the complaint is the same action number that's on
17 the Praecipe for the Writ of Summons; is that correct?
18     A    Right.
19     Q    And in other words, the same caption is on
20 Exhibit E as on Exhibit F; is that correct?
21     A    Yes.
22     Q    Let me just go back and ask you just a
23 couple of other questions.
24           You were asked about your past experience
25 with regard to doing timber cases, and I think you

1  indicated that this was your first timber case; is
2  that correct?
3     A    That's correct.
4     Q    How many real estate litigations -- you
5  have been involved in real estate litigation prior to
6  being involved in --
7     A    Yes, I have been.
8     Q    With what frequency have you been involved
9  in real estate litigation?
10    A    Several occasions.  Lease disputes, zoning
11 disputes, lots of them.
12    Q    Now, with that background, and recognizing
13 that you had previously testified that you were taking
14 over a case that Mr. Hare had apparently worked on for
15 three or four years, I think you indicated that you
16 had made an assumption that a title search had been
17 done by Mr. Hare's office of the subject property
18 that's filed in this case, which is the Clough Farm;
19 is that correct?
20    A    I assumed that whatever title issues were
21 involved were handled either by Mr. Hare, or there was
22 just no title issue at all.  I was familiar with the
23 history of the transaction, and I knew that Matson had
24 acquired this asset from Fisher and Young, and I can't
25 believe that timber companies don't do title searches

38

1  as well.
2     Q    And why would you have made that
3  assumption, that somebody in front of you, or prior to
4  you had made the title search, or researched the
5  title?
6     A    Well, I just think a timber case, it's
7  probably kind of a rule of thumb that that's the sort
8  of thing you do.
9     Q    At least from your experience in doing real
10 estate cases in Ohio generally, when you have been
11 involved with a client initially is that a practice
12 that you customarily follow?
13    A    Yes.
14           MR. CONNER:  That's all the questions I
15 have.
16           MR. HABER:  I just have a couple of
17 follow-up.
18
19                    EXAMINATION
20 BY MR. HABER:
21    Q    You have indicated, maybe I misheard you,
22 that the Praecipe for Writ that Mr. Hare prepared was
23 as a courtesy to your office?
24    A    Correct.
25    Q    You had requested that he prepare it?
   A    I think he suggested that it be prepared.

39

                                   40

 1  There was something to do with a change in
 2  Pennsylvania law on the statute of limitations
 3  relating to a contract.
 4      Q    Contract under seal, as opposed to --
 5      A    Probably. Probably.
 6      Q    And when the writ was prepared at that
 7  point, June 23rd, you had already been contacted by
 8  Mr. Carlisle to represent him?
 9      A    In the appeal, yes.
10      Q    And what about in the Warren County action?
11      A    I don't know as if we had agreed that I
12  would represent him in that action at that point.
13      Q    If you had not agreed to represent him, why
14  would you ask Mr. Hare to prepare the writ?
15           MR. CONNER:  Object.  I don't think
16  Mr. Krembs said he asked him to prepare the writ.
17      Q    You said as a courtesy to your office,
18  correct?
19      A    But it was Mr. Hare's suggestion that this
20  be prepared.
21           MR. CONNER:  When you say "this," you are
22  referring to the writ?
23      A    Yes.
24      Q    Why do you believe it was as a courtesy to
25  your office I guess would be my question?

                                   41

 1      A    Well, I wasn't licensed to practice in
 2  Pennsylvania, and for us to get geared up and do
 3  something that needed to be done in a matter of days,
 4  as I recall, it just wasn't realistic.
 5      Q    So you had discussions with Mr. Hare
 6  regarding the filing of this writ in the State court?
 7      A    I'm sure I did.
 8           MR. HABER:  That's all I have.
 9           MR. CONNER:  Do you want to read and sign,
10  or do you want to waive?
11           THE WITNESS:  Whatever you recommend.
12           MR. CONNER:  Well, just as a matter of
13  protection maybe you better read and sign.
14           THE WITNESS:  Okay.
15                        - - -
16           (Thereupon, at 10:33 o'clock a.m. the
17  deposition was concluded.)
18                        - - -