IN THE COURT OF COMMON PLEAS
OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH- CIVIL ACTION

MATSON LUMBER COMPANY,

    Plaintiff,

    vs.          No. A.D. 579 of 2005

ALBERT T. CARLISLE, JAMES
HALL, JOHN MARTIN and DONALD
F. (D.J.) HOLMES,

    Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,

    Plaintiff,

    vs.          No. 04-25 Erie

BARTONY, HARE & EDSON; SCOTT
M. HARE, ESQUIRE; HENRY E.
BARTONY, JR., ESQUIRE; and
JOHN JOY V. EDSON, ESQUIRE,

    Defendants.

DEPOSITION OF JOHN C. DENNISON

REPORTED BY:
STEPHANIE MYERS - COURT REPORTER
P.O. BOX 1332, MEADVILLE, PA 16335
(814) 333-1545

COPY

1

---

DEPOSITION OF JOHN C. DENNISON, a witness
herein, called by Albert T. Carlisle, for examination,
taken pursuant to the Pennsylvania Rules of Civil
Procedure, by and before Stephanie Myers, a Court Reporter
and a Notary Public in and for the Commonwealth of
Pennsylvania, at the law offices of Dennison & Dennison,
293 Main Street, Brookville, Pennsylvania, on February 9,
2006, at approximately 12:04 p.m.

COUNSEL PRESENT:

For the Albert T.
Carlisle:    James R. Fryling, Esquire
Conner, Riley & Fryling
Bell Telephone Building
17 West Tenth Street
Erie, Pennsylvania 16512

For Matson:    Robert P. Ging, Esquire
2095 Humbert Road
Confluence, Pennsylvania 15424

For Scott Hare:    Amy J. Coco, Esquire
Weinheimer, Schadel & Haber
602 Law & Finance Building
429 Fourth Avenue
Pittsburgh, Pennsylvania 15219

Also present:    Leonard Domenick

2

I N D E X

| WITNESS | PAGE |
|---|---|
| JOHN C. DENNISON | |
| Examination By Mr. Fryling | 5, 99 |
| Examination By Ms. Coco | 92 |
| Examination By Mr. Ging | 94 |

E X H I B I T S

| NO. | PAGE |
|---|---|
| 1 – January 23, 1987 invoice | 23 |
| 2 – Timber deed – April 1, 1973 | 24 |
| 3 – Kinkead/Fisher & Young deed – April 22, 1969 | 27 |
| 4 – August 10, 1993 correspondence | 38 |
| 5 – April 18, 1994 correspondence | 38 |
| 6 – Deed – December 29, 1989 | 38 |
| 7 – Deed – December 22, 1990 | 38 |

E X H I B I T S

| NO. | PAGE |
|---|---|
| 8 – May 5, 1995 correspondence | 42 |
| 9 – June 13, 1995 correspondence | 42 |
| 10 – October 30, 1987 correspondence | 46 |
| 11 – List of exhibits | 47 |
| 12 – Deed – April 23, 1973 | 54 |
| 13 – Article of Agreement – April 1968 | 54 |
| 14 – Article of Agreement – April 1, 1968 | 54 |
| 15 – May 8, 2003 correspondence | 69 |

---

**Page 5**

```
 1
 2                    P R O C E E D I N G S
 3                           - - -
 4                  JOHN C. DENNISON, a witness
 5   herein, having been first duly sworn, was examined and
 6   testified as follows:
 7                        EXAMINATION
 8   BY MR. FRYLING:
 9        Q.   Good afternoon, Mr. Dennison.  My name is James
10   Fryling, and I represent Albert T. Carlisle.
11        We have noticed your deposition here today on two
12   different captions.  One is a case pending in the Court of
13   Common Pleas of the 37th Judicial District, Warren County,
14   Matson Lumber Company versus Albert T. Carlisle, James
15   Hall, John Martin and Donald F. (D.J.) Holmes, which has a
16   Docket No. 579 of 2005.
17        We have noticed it under caption of the case pending
18   in the United States District Court for the Western
19   District of Pennsylvania, Albert T. Carlisle, Plaintiff,
20   versus Bartony, Hare & Edson; Scott M. Hare, Esquire; Henry
21   E. Bartony, Jr., Esquire; and John Joy V. Edson, Esquire,
22   Defendants, at Docket No. 04-25, Erie.
23        We have noticed your deposition specifically for
24   today.  We have also noticed the deposition of a
25   representative of Matson Lumber Company pursuant to FRCP
```

5

---

**Page 6**

```
 1   30(b)(6) and Rule 4007.1(2(e) with regard to the areas of
 2   inquiry that were listed in one through seven of that
 3   Notice.
 4        It is my understanding, from Attorney Ging, who
 5   represents Matson Lumber Company in the Warren County
 6   action, that you are being appointed or you're appearing
 7   here today not only in the individual capacity, but also as
 8   the corporate representative designated by Matson Lumber
 9   Company for purposes of answering those questions; is that
10   correct?
11        A.   That's correct.
12        Q.   You have had an opportunity to review the Notice?
13        A.   Yes.
14             MR. GING:  For the record, Jim, we have the
15   original Notice that you had provided us, and it had
16   another caption on it.  We don't have the final Notice.  I
17   assume they are the same.
18             MR. FRYLING:  That was a draft of the
19   original Notice.
20             MR. GING:  Correct.
21             MR. FRYLING:  And, at your request, we
22   replaced the Warren County case caption of Carlisle versus
23   Matson Lumber Company with the Matson Lumber Company versus
24   Carlisle, Hall, Martin and Holmes.
25             MR. GING:  But in terms of the content, one
```

6

1 through seven, they are the same?
2 MR. FRYLING: Correct.
3 MR. GING: Okay.
4 MR. FRYLING: In fact, I have a copy of
5 that, if you would like it.
6 MR. GING: Thank you.
7 BY MR. FRYLING:
8 Q. I have asked you to come here today to ask you
9 some questions regarding Matson Lumber Company and your
10 involvement, if any, with Matson Lumber Company.
11 If I ask you a question that you don't understand,
12 please stop me, and I will reask or rephrase the question.
13 You obviously, as a practicing attorney, you know of
14 depositions and deposition procedures. My only word of
15 caution would be if you can give us a verbal response to my
16 questions as opposed to a gesture or a nod of the head, I
17 would appreciate that, okay?
18 A. Okay.
19 Q. May I have your full name, please?
20 A. John C. Dennison.
21 Q. Mr. Dennison, what is your business address?
22 A. 293 Main Street, Brookville, Pennsylvania.
23 Q. And your occupation?
24 A. Attorney.
25 Q. Tell me a little bit about your education. Where

7

1 did you go to high school?
2 A. Brookville High School.
3 Q. Your year of graduation?
4 A. 1970.
5 Q. Where did you go to college?
6 A. My first year, I went to the University of
7 Buffalo and transferred from there and I went to
8 Westminster College; I graduated in 1974. I then worked on an
9 extra year and got my Master's in education. I then worked
10 for a year at a correctional facility for juveniles and
11 then went to law school at Valparaiso University and
12 graduated in December of 1978.
13 Q. What was your undergraduate degree in?
14 A. History.
15 Q. Upon graduation in 1978, did you sit for the bar
16 exam?
17 A. Yes.
18 Q. And you passed the bar exam?
19 A. Yes.
20 Q. And when did you begin practicing?
21 A. Well, 1978, in December, I came back here, so I
22 took the bar exam in February of '79 and I passed. I got
23 my notice, I think April 15th, 1979, and I started
24 practicing then.
25 Q. You're currently with a practice now?

8

9

1    A.  Correct.

2    Q.  The name of that practice?

3    A.  Dennison, Dennison and Harper.

4    Q.  Is that a partnership?

5    A.  Yes.

6    Q.  Have you practiced with this firm since you

7    started practicing?

8    A.  It's changed over the years. My brother and my

9    sister-in-law were in here until ten or so years. My

10   father has always been in here, and he died in 2002, and

11   Troy came in, I think October of 1995, Troy Harper.

12   Q.  What type of practice, or how would you

13   characterize your type of practice?

14   A.  We do about six or seven different things. We do

15   a lot of insurance defense work; we do estate planning; we

16   do commercial litigation, real estate, corporate law. Troy

17   does some criminal, small criminal matters and some small

18   domestic things.

19   Q.  So, with the exception of small domestic things

20   and small criminal matters, your practice would involve the

21   insurance defense, estate planning, real estate and

22   corporate work?

23   A.  That's basically what I work on, those four

24   areas.

25   Q.  Has that generally been true for the years that

10

1    you have been in practice?

2    A.  Yes.

3    Q.  With regard to your real estate practice, is that

4    residential, commercial or both?

5    A.  Both.

6    Q.  All right. Is it weighted more heavily towards

7    one or the other?

8    A.  I can't put a percentage, but I do a lot of

9    commercial real estate work, too, buying and selling

10   motels, timber land, businesses in general, and then, plus

11   we do a lot of residential work, too.

12   Q.  How long, or how many years would your practice

13   have involved commercial real estate deals involving timber

14   or timber lands?

15   A.  Since the early '80s.

16   Q.  In the course of your practice involving

17   commercial timber land, have you come to represent a

18   company known as Matson Hardwoods or Matson Lumber Company?

19   A.  Yes.

20   Q.  How long have you represented Matson?

21   A.  Since the early '80s.

22   Q.  Okay, that would be prior to 1985?

23   A.  Yes.

24   Q.  Do you have any relationship, formal relationship

25   with Matson Hardwoods or Matson Lumber Company other than

11

1  your status as outside counsel?

2    A.  No.

3    Q.  Was Matson Lumber Company a client of the firm

4  when you joined?

5    A.  No.

6    Q.  Were you the only attorney in your firm during

7  those periods of time that represented Matson Lumber

8  Company in a professional capacity?

9    A.  No, my father did, too.

10   Q.  Your father was?

11   A.  Donald J. Dennison.

12   Q.  Between yourself and your father, who would have

13  had primary responsibility for that client?

14   A.  Probably in the '90s, in the early '80s when we

15  first started, it was maybe co-extensive, but as time wore

16  on, my father was in his 60s at that point, so I did more

17  and more.  But, my father had a direct relationship with

18  Bob Matson, so they would do a lot of things together, talk

19  business a lot.

20   Q.  Okay, so he had a personal relationship, as well

21  as a professional relationship with Robert Matson?

22   A.  Right.  Maybe I would do the nuts-and-bolts-type

23  thing and my father would have the general discussions with

24  Mr. Matson, and they would tell me what I needed to do or

25  whatever.

---

12

1    Q.  And just for the record, Robert Matson was an

2  officer or director of Matson Lumber Company or Matson

3  Hardwoods?

4    A.  He was the owner.

5    Q.  He was the owner, okay.

6    With regard to your being here today as designated by

7  Matson Lumber Company with regard to the items of inquiry

8  included in the Notice of Deposition, can you tell me what

9  investigation you undertook in order to prepare for your

10  deposition today as Matson's designated representative?

11   A.  The only thing I did was I reviewed the

12  Deposition Notice, and I did not look at anything else in

13  preparation for today's testimony.

14   Q.  Did you have any conversations or talk to any

15  employees of Matson Hardwoods or Matson Lumber Company?

16   A.  No.

17   MR. GING:  Just for clarification, you have

18  done other things dealing with this subject matter prior to

19  today; is that correct?

20   THE WITNESS:  Oh, yes, but in actual

21  preparation for this, I didn't review anything.

22  BY MR. FRYLING:

23   Q.  Okay, as I understand it, then, your firm began

24  doing legal work for Matson back in the early 1980s.  Do

25  you know whether your firm did all of Matson's work or

13

```
 1   whether Matson farmed out work to other lawyers during that
 2   period of time?
 3   A.   We were always general counsel for Matson Lumber
 4   since the early 1980s.   Bob Matson would retain attorneys
 5   to help him with his estate plan, and to the extent that
 6   maybe his estate plan would impact upon Matson Lumber
 7   Company, I would have discussions with those attorneys.
 8   Q.   Okay.   It's my understanding, through papers that
 9   have been filed in this case, that there was a merger that
10   occurred, I believe in December of 1986, wherein Matson
11   Hardwoods merged with Fisher & Young Hardwoods, Inc.; is
12   that correct?
13   A.   Correct.
14   Q.   Would you and/or your firm have participated in
15   that merger, as far as representing Matson Hardwoods?
16   A.   Yes.
17   Q.   Did you personally participate in that?
18   A.   Yes.
19   Q.   Okay.   It's my understanding that at the time of
20   that merger there was some litigation pending between -- or
21   with Albert Carlisle and at the time Fisher & Young
22   Hardwoods versus Mr. and Mrs. McChesney (phonetic) in
23   Warren County, Pennsylvania.   Are you familiar with that?
24   A.   Not really.   I know of it.   I have heard of it.
25   At the time of the merger, it was my understanding that I
```

14

```
 1   think that case was on appeal that the -- Mr. Carlisle and
 2   Fisher & Young had prevailed and John Kookogey was the
 3   attorney of record, and that's the only knowledge I really
 4   have of that.   I think I have seen some of the pleadings.
 5   I know that I have seen some of the pleadings.   That's the
 6   only knowledge that I have had of that.
 7   Q.   It's my understanding from reviewing the
 8   McChesney litigation that that matter actually went to
 9   trial in 1987, which I believe would have post dated the
10   actual merger.   Would that be true?
11   A.   If your statement is correct, that would be true.
12   Q.   Okay.   And it's my understanding, and I believe
13   yours as well, that Attorney John Kookogey, at that time,
14   was representing Fisher & Young?
15   A.   Correct.
16   Q.   Were you asked or were you required to provide
17   any information or any documents during that litigation to
18   anybody in order to establish that Matson was now the real
19   party in interest for that trial?
20   A.   Not to my knowledge.
21   Q.   Also, if I understand your testimony, you were
22   not asked by anyone from Matson to review the status of
23   that litigation or to investigate the status of that
24   McChesney litigation?
25   A.   That's correct.
```

15

```
1   Q.   It's my understanding further then that Attorney
2   Kookogey would have handled that litigation for Matson or
3   on behalf of Matson through the end of that litigation?
4   A.   Correct.
5   Q.   Could you tell me what your role and
6   participation was in the merger?
7   A.   Now we are going back almost 20 years.  I
8   prepared the articles of merger.
9   Q.   Okay.
10  A.   And I cannot remember who was advising Matson
11  concerning any kind of tax matters related to that merger.
12  Q.   So there would have been other potential lawyers
13  involved overlooking tax matters or other business matters?
14  A.   Correct.
15  Q.   But your firm took care of at least drafting and
16  working through the articles of merger?
17  A.   Yes.
18  Q.   And do you recall who was representing Fisher &
19  Young at that time?
20  A.   It was sort of a collection of attorneys who
21  represented the individual shareholders.
22  Q.   Okay.
23  A.   That's who attended the closing.
24  Q.   And I believe, if I'm correct, the actual merger
25  was with Matson Hardwoods?
```

16

```
1   A.   Correct.
2   Q.   Was Matson Hardwoods a partnership at the time?
3   A.   No.  I had filed the articles of incorporation
4   for Matson Hardwoods at some point for Matson Hardwoods,
5   Inc.
6   Q.   And then, as I understand it, each of the
7   shareholders of Matson Hardwoods, Inc. would have been
8   represented by their own counsel at the time of the merger?
9   A.   They all attended the closing, and there was an
10  attorney from Erie, Harry Martin, and he represented -- I
11  remember him by name that he represented some of the
12  shareholders and/or Fisher & Young itself.  I can't
13  remember.
14       MR. GING:  Excuse me, for clarification, the
15  question was -- I believe the question was directed to each
16  of the shareholders of Matson Hardwoods not Fisher & Young.
17  You meant Fisher & Young?
18       MR. FRYLING:  No, I did not.  He indicated,
19  if I understood him correctly, that he represented Matson
20  Hardwoods but that each of the shareholders of Matson
21  Hardwoods --
22       THE WITNESS:  Oh, no.
23       MR. FRYLING:  -- may have been represented
24  by counsel as well.
25       THE WITNESS:  No.  Matson Hardwoods was
```

17

```
1   owned -- was a subsidiary, at that point, of Matson
2   Industries.  I misunderstood you.
3        MR. GING:  For clarification, his earlier
4   testimony was that a collection of lawyers for the
5   shareholders of Fisher & Young were present at the closing.
6        MR. FRYLING:  Okay.
7        THE WITNESS:  Right.
8        MR. FRYLING:  I misunderstood.  I thought
9   they were shareholders of Matson.
10       THE WITNESS:  No, Fisher & Young.
11       MR. GING:  I apologize.  I just wanted to
12  clarify that.
13       MR. FRYLING:  That's fine.  Thank you.
14  BY MR. FRYLING:
15  Q.   What did Fisher & Young acquire in the merger --
16  or I'm sorry, what did Matson acquire from Fisher & Young
17  in the merger?
18  A.   Various tracts of land.
19  Q.   Was there any kind of physical plant that they
20  acquired in the merger?
21  A.   Not that I recall.
22  Q.   All right.  Were there business records and
23  documents that were acquired in the merger?
24  A.   Not that I recall.
25  Q.   Do you know if Matson acquired any corporate
```

18

```
1   records?
2   A.   We would have probably had copies of their
3   articles of incorporation and things like that that we
4   verified, but I don't remember acquiring -- Well, let me
5   back up.  We would have had to have acquired the stock and
6   the -- since it was a merger.
7        So, yes, we would have acquired the stock and anything
8   we needed to effectuate the merger as a matter of law, we
9   would have acquired.
10  Q.   Did Fisher & Young, at the time, have a physical
11  location, plant, offices?
12  A.   No, not to my knowledge.  Not that I remember, I
13  should say.
14  Q.   Okay.  So there wouldn't have been office space
15  or office furniture and those kinds of things that were
16  acquired during the merger?
17  A.   Not that I recall.
18  Q.   Okay.  So my understanding, then, is what was
19  acquired through the merger was the acquisition of timber
20  and real estate?
21  A.   That's what I was concerned with.
22  Q.   Were there other lawyers involved in the overall
23  deal that were concerned with acquiring other things, other
24  assets?
25  A.   I don't have any recollection of anything being
```

19

```
1  important except the timber and land.
2  Q.  I believe you testified that there was actually a
3  closing that occurred?
4  A.  Yes.
5  Q.  What was acquired at the time of the closing as
6  far as documents that were created and executed by the
7  parties?
8  A.  There's a whole stack of, I think Ien calls it
9  the bible or whatever, of documents that were acquired at
10 that closing.
11 Q.  Do you recall generally what those would have
12 included?
13 A.  Not without actually looking at them.
14 Q.  And those documents would be in the possession of
15 Matson?
16 A.  Yes.
17 Q.  With regard to the merger and acquisition by
18 Matson Lumber Company, were you requested by Matson to do a
19 title search or title abstract on the timber and real
20 property that was being acquired by Matson Lumber Company
21 or Matson Hardwoods at the time?
22 A.  Yes.
23 Q.  And did you perform a title search or a title
24 abstract on the timber and real property that was being
25 acquired?
```

20

```
1  A.  No.
2  Q.  And why not?
3  A.  We didn't have time.
4  Q.  And could you explain that?
5  A.  Well, this thing all came about very quickly, and
6  when we realized how many tracts of land were involved, my
7  father and I, and when they wanted to close, it simply did
8  not make any sense for us to do any of the title work.
9  Even though economically that would have been great,
10 we couldn't have gotten it done within that time frame to
11 get the closing done, and in the midst of all of this,
12 somehow we became aware that John Kookogey had searched
13 and/or was in a position to issue a title certificate on
14 all these properties.  So, it was on that basis that we
15 went to closing.
16 Q.  Did you contact Attorney Kookogey directly with
17 regard to inquiring about title to the properties?
18 A.  That's 20 years ago.  I can't remember exactly
19 who contacted whom or whatever.  I just remember my father
20 and I saying, We can't do this and then finding out that
21 Kookogey was willing to do it.  And we were then able to
22 close before the end of the year, which was the critical
23 part.
24 Q.  I take it, then, that Attorney Kookogey was in a
25 position to be able to provide, at least to your
```

21

1  satisfaction, the information necessary in order for the
2  merger to go through?
3  A.     Yes, as far as on all the titles to the real
4  estate.
5  Q.     Can you tell me what documents or information
6  Attorney Kookogey provided you with regard to the title for
7  the properties that were being acquired through the merger?
8  A.     He gave us a certificate of title.
9  Q.     Did he give you anything else other than a
10 certificate of title?
11 A.     Not to my knowledge, not that I can remember.
12 Q.     And what did the certificate of title include?
13 Do you know?
14 A.     I mean, it's of record.  If you show it to me ...
15 Q.     Let me see if I brought a copy with me.
16        MR. GING:  It was in our response to the
17 document in question.
18 BY MR. FRYLING:
19 Q.     Mr. Dennison, I'm going to show you a copy of
20 answer to Defendant Carlisle's request for production of
21 documents on behalf of Matson Lumber Company in the
22 Carlisle, Hall, Martin and Holmes case, and attached
23 thereto, the first document has an exhibit label on the
24 bottom of it of 64.
25        I'm going to show you that document and ask if you can

22

1  identify that as the certificate of title that was issued
2  by Attorney Kookogey to either yourself or to Matson
3  Hardwoods?
4  A.     That's it.
5  Q.     What does that document consist of?
6  A.     Two pages.
7  Q.     Were there any other documents attached to that
8  two-page certificate of title?
9  A.     No, I don't think there's an Exhibit A to that.
10 Q.     Did you, at any time prior to the merger, look at
11 any of the actual title work that may have been
12 Mr. Kookogey's possession upon which he relied in
13 presenting to you or to Matson the certificate of title
14 that's enclosed in the request for the production of
15 documents?
16 A.     No.
17 Q.     Wasn't that made available to you, or why not?
18 A.     We were in such a rush to get that thing done,
19 and I was worried about and concerned about a whole bunch
20 of other things, and as long as Mr. Kookogey gave us that
21 certificate, I didn't even concern myself then with that
22 aspect of the closing.
23 Q.     With regard to the certificate of title, I'm
24 going to show you an invoice that's dated January 23, 1987,
25 addressed to Matson Hardwoods, Inc. in Brookville, and at

23

1   the bottom says due Jack, Kookogey and Felton.

2        MR. FRYLING: We'll mark that as Exhibit 1.

3   (Deposition Exhibit No. 1 was marked for identification.)

4        Q. Do you recall having seen Exhibit 1 before?

5        A. No, I don't.

6        Q. Do you know whether or not that invoice would

7   relate to the properties that were included within the

8   certificate of title that was given by Mr. Kookogey dated

9   December 19 of 1986?

10       A. It appears that they are all the costs.

11       Q. And those would be, if I understand from

12   reviewing that document, certain deeds or certain documents

13   were required to be filed at various counties documenting

14   the merger or the transfer of the property from Fisher &

15   Young to Matson, correct?

16       A. I don't know that we would have had to record the

17   articles of merger in each county, and these are recording

18   timber deeds, so I'm not sure what this really -- why this

19   was done.

20       He was holding some timber deeds, but I don't know --

21   I don't know what that invoice is really for. I can't

22   remember.

23       Q. That's fine.

24       A. I remember we had to record the articles of

25   merger in each county, but I don't think there is transfer

24

1   tax due on those.

2       Q. Did Matson receive, as a result of the merger

3   from Fisher & Young, any type of deeds transferring either

4   the timber and/or the real estate for any of the properties

5   to Matson?

6       A. Did they receive a deed?

7       Q. Yeah.

8       A. In '86?

9       Q. Correct.

10       A. No, not to my knowledge.

11       (Deposition Exhibit No. 2 was marked for

12   identification.)

13   BY MR. FRYLING:

14       Q. Mr. Dennison, I'm going to hand you what was

15   marked as Exhibit No. 2 and ask if you can take a look at

16   that document for us, please.

17       A. (Witness complied.)

18       Q. Mr. Dennison, with regard to Exhibit 2, have you

19   seen that document before?

20       A. Not to my knowledge.

21       Q. All right. This is a document that was provided

22   to us by counsel for Matson, Mr. Ging, in request -- or in

23   response to a subpoena that was issued to Matson Lumber

24   Company for copies of deeds relating to the properties that

25   they acquired from Fisher & Young.

25

```
 1          It appears that that is a deed that was prepared by
 2   Elderkin, Martin, Kelly, Messena & Zamboldi in Erie,
 3   Pennsylvania. I believe you testified that Harry Martin of
 4   that firm may have represented Fisher & Young at the time
 5   of the closing at the merger, correct?
 6       A.   Yes.
 7            MR. GING: Just for clarification, Jim, I
 8   think that that may have been in the box of Matson
 9   information we provided to you as opposed to something that
10   we provided in response to a subpoena.
11            MR. FRYLING: Okay.
12            MR. GING: I'm not sure, but I think that
13   that was in the box that we sent up.
14            MR. FRYLING: It was.
15            MR. GING: I don't know that it was in
16   response to a subpoena.
17            MR. FRYLING: That's fine. A document that
18   I received from Matson through Matson's counsel --
19            MR. GING: Correct.
20            MR. FRYLING: -- either pursuant to the
21   request for production of documents or through subpoena
22   that was issued.
23   BY MR. FRYLING:
24       Q.   It appears to be a timber deed between Fisher &
25   Young, Inc., and I have difficulty reading upside down --
```

26

```
 1   Fisher & Young Hardwoods, Inc. Does that appear to be
 2   correct?
 3       A.   Yes, from Fisher & Young, Inc. and Fisher & Young
 4   Hardwoods with a bunch of other grantors involved.
 5       Q.   It's my understanding, from just kind of a
 6   history, when Mr. Carlisle purchased the land that is known
 7   as Clough Farm, he purchased from Fisher & Young, Inc., who
 8   would be named as the grantor in that timber deed, correct?
 9       A.   They are one of the grantors, yes.
10       Q.   And that ultimately Fisher & Young, Inc. became
11   American Hardwoods, which became Fisher & Young Hardwoods,
12   which ultimately was the company that merged with Matson.
13   Is that your understanding as well?
14       A.   That's what my understanding is.
15       Q.   This appears to be a timber deed, then, from
16   Fisher & Young, Inc. to Fisher & Young Hardwoods, Inc.
17   transferring presumably whatever properties and timber were
18   owned by Fisher & Young, Inc. at the time to Fisher & Young
19   Hardwoods, Inc.?
20       A.   Yes.
21       Q.   There is a similar type of deed that was created
22   from Fisher & Young Hardwoods, Inc. to Matson Lumber
23   Company -- or Matson Hardwoods?
24       A.   No.
25       Q.   It's my understanding that to the extent that
```

27

```
 1    Matson Hardwoods acquired timber rights to the Clough Farm,
 2    they would have acquired through the merger whatever
 3    interest Fisher & Young Hardwoods held at the time; is that
 4    correct?
 5         A.   That's correct.
 6         Q.   In reviewing this timber deed from Fisher &
 7    Young, Inc. to Fisher & Young Hardwoods, Inc., it appears
 8    that the only parcel that was transferred to Fisher &
 9    Young, Inc. regarding the Clough Farm appears on page seven
10    of the exhibit.  And you can take a quick look.  I have
11    done it, and I couldn't find any other reference to Kinkead
12    or to the Clough Farm in that deed.
13              MR. GING:  I am going to object to the form
14    of the question, as it relates to the Clough Farm, but you
15    can answer the question.
16         A.   Can you restate that because, see, I don't know
17    -- I'm not familiar with this deed.  I'm not familiar,
18    without looking at the description, legal description for
19    the Clough Farm.
20         Q.   Okay.
21         A.   So, this don't really --
22              MR. FRYLING:  Let me mark this 3.
23              (Deposition Exhibit No. 3 was marked for
24    identification.)
25    BY MR. FRYLING:
```

28

```
 1         Q.   I'm going to show you what we marked as Exhibit
 2    3, which is a copy of a deed between Marion C. Kinkead and
 3    Fisher & Young, Inc.
 4         This deed is dated March 27, 1969, and you can take my
 5    representation that this, to the extent that we know, is
 6    the deed by which Mrs. Kinkead transferred the real
 7    property to Fisher & Young, Inc.  That deed includes a
 8    description of the real estate that was transferred by
 9    Mrs. Kinkead to Fisher & Young.
10         A.   Okay.
11         Q.   Now, I believe that that legal description
12    includes 18 enumerated parcels of land.  It's my further
13    understanding that at the time that Mrs. Kinkead sold to
14    Fisher & Young, Inc. that one of those parcels had
15    previously been sold to a third party, so that one of the
16    parcels included within that description actually wasn't
17    owned by Mrs. Kinkead at the time that she sold it to
18    Fisher & Young.
19              MR. GING:  Before we go on -- I'm sorry, go
20    ahead.  I apologize.
21         Q.   It's my further understanding that in reviewing
22    the deed from Fisher & Young to Mr. Carlisle that one other
23    parcel of property that was acquired from Mrs. Kinkead was
24    not transferred to Mr. Carlisle.  So, the original Kinkead
25    deed lists 18 parcels, the deed to Fisher & Young was 17
```

29

1  parcels, the deed from Fisher & Young to Carlisle consisted
2  of 16 parcels.
3      Having said that, that's the original deed or copy of.
4  the original deed from Mrs. Kinkead, and my question to you
5  is, does that legal description for the Carlisle Farm,
6  either in whole or in part, appear in the timber deed
7  between Fisher & Young, Inc. and Fisher & Young Hardwoods
8  that we have marked as Exhibit 2?
9      A.   Correct.
10     Q.   Do you want me to compare the descriptions in
11 these two deeds? Or can you tell me what ...
12     A.   Well, I have reviewed this deed. There is only
13 one county listed, a Spring Creek Township, and it's my
14 understanding that the Clough Farm was located in Spring
15 Creek Township, Warren County?
16     A.   Correct.
17     Q.   The only reference to Kinkead or to any property
18 that appears within the chain of title to the Kinkead
19 property, I will use Kinkead because she was the last
20 common owner, the only parcel that appears to be included
21 within this timber deed that's Exhibit 2 is a parcel number
22 16 containing 153 acres?
23     A.   If you're asking me if that's the only parcel in
24 Exhibit 2 that states Kinkead, you're correct. As far as
25 Spring Creek Township, it says 153 acres.
       Q.   Okay. Are you aware of any timber deed between

30

1  Fisher & Young, Inc. and Fisher & Young Hardwoods, Inc.
2  whereby the title to either the timber and trees or to real
3  estate or to anything was deeded between Fisher & Young,
4  Inc. and Fisher & Young Hardwoods, Inc.?
5      A.   Yes.
6      Q.   Okay, and what deed would that be?
7      A.   Sometime in late 2002 or early 2003, Peter Crems
8  (phonetic) called me and wanted to see the deed between
9  Fisher & Young and Fisher & Young Hardwoods, Inc.
10     Q.   Okay.
11     A.   So, I went through the file, and the only thing
12 that I found was the photocopy of the first page of the
13 deed, and I think I was able to identify that it did apply
14 to the Clough Farm, but I couldn't find the rest of the
15 deed.
16     Q.   And do you have a copy of that first page of the
17 deed?
18     A.   Somewhere in all the shuffling around; it's
19 somewhere. It's with Bob.
20          MR. GING:  We provided all the documents
21 that we had, and I do recall that there were a couple first
22 pages of deeds, I think. One of the responses, it might
23 have been the articles of agreement, it might have been a
24 deed, but you should have gotten a couple of first pages in
25 one of our document responses.

31

1        MR. FRILING:  I did receive a number of

2   first pages of articles of agreement, but those were

3   between Kinkead and Fisher & Young.

4        I can purport that the only documents in my box that

5   has titled on it Fisher & Young, Inc. to Fisher & Young

6   Hardwoods, Inc. is represented by the timber deed that we

7   have marked as Exhibit 2, hence my question as to whether

8   there was another deed existing between Fisher & Young,

9   Inc. and Fisher & Young Hardwoods, Inc. addressing

10  specifically the Carlisle Farm, since this deed doesn't

11  appear to include that rather lengthy description.

12   A.   There was another deed.

13   Q.   I will follow up with a supplemental request, but

14  if you could --

15   A.   We have looked for it.  I asked Leonard for that.

16   Q.   Do you know whether or not that deed has been

17  recorded?

18   A.   It has not been recorded.

19   Q.   So, you believe that there is an unrecorded deed

20  between Fisher & Young, Inc. and Fisher & Young Hardwoods,

21  Inc. specifically for the Carlisle/Clough Farm?

22   A.   Yes.

23   Q.   Do you know why Exhibit 2 would have been

24  recorded but this other deed unrecorded?

25   A.   I have no idea.

32

1    Q.   And just so --

2    A.   When I said no idea, what happened in late 2002

3   or 2003, when Peter Crems called me for that deed, I looked

4   through my file and I found just the first page of that

5   deed.  And then, I thought, Well, it should be recorded.

6    Q.   So, I asked Lauri Sekerak to get me a copy of it.

7    A.   We have had a couple of conferences over the

8   phone back and forth with regard to document requests and

9   whether there were documents and/or other documents.

10       It was my understanding, from prior conversation with

11  Attorney Ging and yourself, in response to that that there

12  was a 1973 timber deed that Peter Crems had inquired about

13  getting a copy of, and it was my understanding that in

14  response to that you had contacted Ms. Sekerak and asked

15  her to provide you with a copy of that deed.

16       Are you talking about the same deed?

17   A.   Right.  He called me and wanted to see the deed,

18  as I recall, from Fisher & Young to Fisher & Young

19  Hardwoods, and I thought that was sort of a curious -- I

20  thought, Well, why don't you just get a copy of it.

21       So, I remember thinking, Well, I will just get a copy

22  from Len, and I remember thinking that Len wouldn't have it

23  because we didn't have anything from -- Len wouldn't have

24  that because we didn't have anything regarding the chain of

25  title.

33

1    And the only thing that I could find was the first
2    page of that deed. Somehow, we got that, I don't know how,
3    but then I asked -- Then I just sort of didn't look for it
4    anymore because I got busy on other things, and then Crems
5    called me again and wanted -- I'm trying to think of this.
6    He called me, and that's when I found the first page of
7    that deed and I sent him the first page of the deed.
8        I can't remember exactly what happened after that
9    except that I called Lauri Sekerak and I said, Get me the
10   deed between Fisher & Young and Fisher & Young Hardwoods,
11   Inc.
12       And then, in the mail, I got the deed that had Marion
13   Kinkead's name on it, and I looked at that deed and I
14   thought to myself. She must have misunderstood what I was
15   talking about because I had never heard of Marion Kinkead
16   before.   I thought we had just gotten our signals crossed,
17   and I'm not familiar with the legal description with the
18   Clough Farm, so I didn't look at it to see if it jived or
19   anything.   All I remember is seeing Kinkead and thinking
20   this must be some mistake.
21       So then some period of time went by, and then, Crems
22   called me again and said, I want to -- can you please send
23   me the deed between Fisher & Young and Fisher & Young
24   Hardwoods, Inc.   I think at that point I called Lauri
25   Sekerak, and I said, Lauri, I wanted you to send a deed

34

1    between Fisher & Young and Fisher & Young Hardwoods,
2    and you sent me this Kinkead deed.   And she said to me, she
3    said, Well that's the last deed of record.
4        So, then, I think I went through my file and I found
5    the first page of that Fisher & Young to Fisher & Young
6    Hardwoods, Inc. deed, but that's all I had.   And I remember
7    I sent it to Crems.
8        Q.   Okay.
9        A.   But then, I started to wonder, Well, why was that
10   the last -- why was that Kinkead deed the last deed of
11   record.
12       So then I think I went to -- figured out I went to the
13   certificate of title, and it said that Kookogey was holding
14   some deeds.   So, I tried to find Kookogey, and he was no
15   longer practicing, so I called an attorney over there that
16   I knew, and I said, Do you know where John Kookogey is?   He
17   said, He is retired, but sometimes he goes into the office
18   every once in a while with an attorney over there in
19   Titusville.
20       So, that's when I contacted John Kookogey and I said,
21   Do you have these deeds that you reference in your
22   certificate of title, and he didn't know, but he said, I
23   would be more than happy to go down to my old office, if
24   you can go over, and we can go through my files and we can
25   see if I have those deeds.

35

```
 1        So, that's what I did.  I went over to his office, and
 2   he had several deeds, one of which was the original
 3   unrecorded deed from Fisher & Young to Fisher & Young
 4   Hardwoods, Inc.
 5   Q.   Did you make copies of those?
 6   A.   I brought them back to my office, and I gave them
 7   to Len.
 8   Q.   Tell me when this occurred.
 9   A.   This would have occurred in -- let me see
10   something.  (Witness on computer.)  I think it would have
11   occurred in -- What was the date of the Squatriti deed?
12   Q.   May 6th of 2003.
13   A.   It would have been prior to that.  It would have
14   been March or April of 2003, in that range.
15   Q.   Okay.
16   A.   Because I got the call from Crems in December,
17   January, sometime in that time frame, and then there was a
18   delay.  And then, I called Lauri, and she told me that that
19   was the last deed of record, and it was after that point
20   that I started to try to find John Kookogey.
21   Q.   Prior to going down and meeting with Mr. Kookogey
22   and looking at whatever documents he had in his file, do
23   you know how it is that you would have come across the
24   Exhibit 2, which is the timber deed from Fisher & Young,
25   Inc. to Fisher & Young Hardwoods, Inc.?
```

36

```
 1   this was -- is this a schedule of all the other properties
 2   that were sold in the -- that Matson acquired by merger in
 3   the deal?
 4   A.   Yeah.  I don't remember seeing this deed, unless
 5   Q.   I don't know.  This deed purports to be between
 6   Fisher & Young, Inc. and Fisher & Young Hardwoods, Inc. and
 7   lists a number of properties.  One property does not list a
 8   description for the Clough Farm.
 9        My only question was since I got that from Matson
10   whether or not there would be another timber deed from now
11   in the chain Fisher & Young Hardwoods, Inc. to either
12   Matson Hardwoods or somebody else in the chain of title?
13   A.   There is no deed from into Matson Hardwoods,
14   Inc., that I'm aware of.  That was all done through the
15   articles of merger.  We didn't need a deed because we were
16   acquiring anything that Fisher & Young Hardwoods, Inc. had.
17   We acquired that because we got the articles of merger and
18   there wasn't a need to have any deeds that wasn't in fact
19   the deed for the property.
20   Q.   If I understand your testimony correctly, you
21   didn't review any deeds for any of the properties or any of
22   the titles to any of the properties at the time of the
23   merger?
24   A.   Not that I remember.  I don't think I reviewed
25   any deeds.
```

37

```
 1    Q.   Now, subsequent to the merger, did you prepare
 2  any deeds reflecting a transfer of ownership from Fisher &
 3  Young Hardwoods, Inc. to either Matson Hardwoods or Matson
 4  Lumber Company or anybody else?
 5    A.   No.
 6    Q.   After the merger, did you perform a title search
 7  or review a title search or abstract regarding any of the
 8  properties acquired by Matson Hardwoods from Fisher & Young
 9  Hardwoods, Inc.?
10    A.   No.
11    Q.   It's my understanding, then, that you didn't have
12  any role or participation in the McChesney trial, correct?
13    A.   Correct.
14    Q.   After that trial was concluded, did Mr. Kookogey
15  return to Matson the trial documents from that case?
16    A.   I really don't have any knowledge of McChesney or
17  what was done.  I had very little contact with
18  Mr. Kookogey.
19    Q.   There was a title search done on the Carlisle
20  property/Clough Farm by Matson Lumber Company or Fisher &
21  Young, I guess it would have been Fisher & Young at that
22  time, by Mr. Tom Pierce.
23       Have you ever seen or reviewed that title search or
24  abstract that was performed by Mr. Pierce for the McChesney
25  litigation?
```

38

```
 1    A.   No.  I have never heard of Mr. Piece, either,
 2  that I know of.
 3    Q.   Okay.
 4                 (Deposition Exhibits No. 4, No. 5, No. 6
 5  and No. 7 were marked for identification.)
 6  BY MR. FRYLING:
 7    Q.   Mr. Dennison, I'm going to hand you four items
 8  that I have marked Exhibits 4, 5, 6 and 7 and ask you if
 9  you can identify those documents?
10              MR. GING:  Can you read the exhibit number
11  when you identify them.
12    A.   Exhibit No. 4 is a letter from me dated
13  August 10, 1993.  It's a letter of enclosure to Len where
14  I'm enclosing a deed from B & B Hardwoods and Pennsylvania
15  Hardwoods, Inc.
16    Q.   I'm not going to ask a lot of questions about
17  them, but if you could just identify them for the record.
18    A.   Exhibit 5 is a letter of enclosure from me to Len
19  from the timber sales agreement from Robert Matson, Joan
20  and Becky Matson and Barb Conti to Matson Hardwoods, Inc.,
21  dated September 1st, 1993.
22              MR. GING:  Hold on, John.  What's the date
23  of the letter?
24              THE WITNESS:  April 18, 1994.
25    A.   The next one is a deed dated, Exhibit 6,
```

39

1  December 29, 1989 from Matson Lumber Company to Matson

2  Industries, Inc.

3      The next one is Exhibit No. 7. It's a deed from

4  Matson Industries, Inc. to B & B Hardwoods, Co. for various

5  tracts of land.

6  Q.  Did you draft the deeds that are represented in

7  those exhibits?

8  A.  Yes.

9  Q.  And do those deeds address, either in whole or in

10  part, the Clough Farm?

11  A.  I don't know.

12  Q.  What would be the purpose of those deeds?

13  A.  I don't remember. I don't even remember. I saw

14  one of these deeds when I was -- I forget whether Bob

15  showed it to me or not. I have absolutely no recollection

16  of these deeds, doing them or why they were done.

17  Q.  Okay. I would take it from your answer, then,

18  that -- Well, I won't take anything.

19  Did you perform a title search or title abstract of

20  the properties contained within those deeds prior to

21  drafting those deeds?

22  A.  No. I can tell you that I was instructed to do

23  these deeds, and I simply did them.

24  Q.  Okay. I didn't know whether you would have done

25  a search or not. That's all I'm trying to find out.

40

1  A.  No. I'm just trying to say that's why I don't

2  have any recollection of them. I think the accountant or

3  somebody said, Do these deeds. So, I simply did them. I

4  don't have -- I just do them.

5  Q.  Now, in 1995, Mr. Carlisle brought a claim in the

6  United States District Court against Matson resulting from

7  some timber activities that Matson was performing on the

8  Carlisle Farm. Are you familiar with that litigation?

9  A.  Yes.

10  Q.  Did you have any role or participation in that

11  litigation?

12  A.  No.

13  Q.  It's my understanding that during that litigation

14  Matson was represented by Attorney Chester Fossee?

15  A.  Correct.

16  Q.  Did you select and retain Attorney Fossee on

17  behalf of Matson Lumber Company?

18  A.  No.

19  Q.  Did you have any contact with Attorney Fossee

20  regarding that litigation?

21  A.  The only thing I remember is that he had done

22  work -- Talking about other attorneys doing work, now it's

23  coming back to me a little bit.

24  Chester Fossee had been involved in some litigation in

25  the early 1980s between Bob and Jim.

41

1  Q.  I'm sorry, when you say Bob and Jim --

2  A.  Bob and Jim Matson.

3  Q.  Okay.

4  A.  And he also, I think, did work for Hartford

5  Insurance Company, and I can remember working out some sort

6  of agreement that Chet would be paid half by Matson Lumber

7  and half by Hartford. That's all I remember.

8  Q.  Okay. Did you have any contact during the

9  pendency of the 1995 court litigation with Attorney

10  Kokogey?

11  A.  No.

12  Q.  Who did Attorney Fossee contact at Matson -- let

13  me back up. Did Attorney Fossee contact Matson Lumber

14  Company and inquire about information or documents

15  regarding Matson's title to the Clough Farm?

16  A.  Not to my knowledge.

17  When you say title, you're talking about the

18  present -- let me rephrase that.

19  He definitely would have had the agreement of sale

20  between Fisher & Young and Carlisle. He definitely -- I

21  know he had that.

22  Q.  Okay.

23  A.  And I know he had the deed.

24  Q.  Okay.

25  A.  But other than that, I don't think that he had,

42

1  to my knowledge, that he had any other information.

2  Q.  So, he never contacted you specifically as

3  counsel for Matson and requested any information or

4  documents establishing Matson's right, title or interest in

5  the timber and trees on the Clough Farm?

6  A.  Except for the agreement in the deed, which I

7  knew he had copies of both of those.

8  Q.  Okay, so, he did ask you specifically for those?

9  A.  No, he didn't ask me for those, but I remember

10  him trying to figure out which was the right agreement

11  because there was something about he wanted to make sure he

12  had the right agreement because there was -- I don't know

13  whether there were pages missing or something. I just

14  remember something about that.

15  Q.  Okay.

16  A.  Or during the trial, he had to make certain that

17  he had the right agreement.

18  (Deposition Exhibits No. 8 and No. 9 were

19  marked for identification.)

20  MR. FRYLING: I thought I had extra copies

21  of these, but I don't.

22  MR. GING: Can we get copies made?

23  THE WITNESS: Yes. There is a copier right

24  out there.

25  MR. GING: Is there another page to 8?

43

1      MR. FRYLING: That's all that was in the

2  box.

3      MR. GING: From our box?

4      MR. FRYLING: Yes. All of these documents

5  are from that box.

6      MR. GING: Was Kookogey's file in that box?

7      MR. FRYLING: No.

8      MR. GING: Are you sure?

9      MR. FRYLING: (Nodded head affirmatively.)

10  There was nothing identifying as Kookogey --

11      MR. GING: It had a bunch of yellow pieces

12  of paper, like old-fashioned carbons.

13      MR. FRYLING: No.

14      MR. GING: Are you sure?

15      MR. FRYLING: Positive.

16      MR. GING: Let's go off the record for a

17  second.

18      (A discussion was had off the record.)

19  BY MR. FRYLING:

20    Q.  Mr. Dennison, we are back on the record. I will

21  hand you what we have marked as Exhibit 8 and Exhibit 9,

22  and I will represent to you that these were documents that

23  I received from Matson.

24      Exhibit 8 appears to be dated May 5 of 1995 addressed

25  to Mr. Fossee, and it does not appear to have a signature

---

44

1  on it, but I'm just wondering if you have seen at least the

2  first page of that document before?

3    A.  Not that I recall.

4    Q.  All right. I have also got Exhibit 9, which

5  appears to be a June 13, 1995 correspondence -- or copy of

6  correspondence to Attorney Fossee from Mr. Domenick. Have

7  you seen a copy of that document before?

8    A.  Not that I recall.

9    Q.  Do you know if Attorney Fossee would have

10  contacted Len Domenick at Matson directly with regard to

11  information concerning Matson's ownership interest in the

12  timber tracts of the Clough Farm?

13    A.  He -- I do not recall ever having to furnish

14  information to Chet Fossee. He didn't go through me to get

15  information from Matson Lumber.

16      For him to get information from Matson Lumber, he

17  would normally go through Len.

18    Q.  Okay.

19    A.  That's the protocol for anybody to get

20  information from Matson Lumber.

21    Q.  If any counsel representing Matson needed

22  information, they would contact Mr. Domenick?

23    A.  Or they would be referred to him.

24    Q.  Or they would be referred to him?

25    A.  Normally.

45

1  Q. Did Attorney Fossee, during that 1995 litigation,

2  ever contact you specifically with regard to questions that

3  he may have had regarding Matson's title interest in the

4  timber on the Clough Farm?

5  A. Not that I recall.

6  Q. As you recall, the only contact you may have had

7  was Attorney Fossee confirming whether or not he had the

8  correct documents as far as the agreement and deed?

9  A. I think, just thinking out loud now, I talked to

10  him, I think, when he was first retained just to firm all

11  that up, and I think after the decision came in, he

12  obviously -- Mr. Matson was concerned about the decision

13  and talked to me about that, and I think I talked to

14  Mr. Fossee about the decision, and that's where maybe we

15  were talking about the agreement of sale and he wanted me

16  to look at something. He wanted to make sure I had the

17  right agreement. I think that was afterwards, after the

18  trial.

19  Q. Okay.

20  A. I don't remember talking to him really much. I

21  may have, but it wasn't like a steady ongoing thing or

22  anything during the pendency of the case.

23  Q. All right. With regard to the Carlisle/Clough

24  Farm, have you, at any time prior to today, done a title

25  search or title abstract on that property with regard

---

46

1  specifically to the timber and trees?

2  A. No.

3  (Deposition Exhibit No. 10 was marked for

4  identification.)

5  BY MR. FRYLING:

6  Q. Mr. Dennison, I'm going to show you what I have

7  marked as Exhibit No. 10 and ask you if you can identify

8  that document?

9  A. Do you want me to identify that for the record?

10  Q. Yes.

11  A. This is a letter to Robert Matson from John

12  Kookogey regarding the Clough Farm.

13  Q. Can you tell us when that's dated?

14  A. October 30, 1987.

15  Q. All right. It appears, from just a quick review

16  of that letter, that Mr. Matson had some questions to

17  Attorney Kookogey regarding what right or interest Matson

18  had in the Carlisle/Clough Farm, and that appears to be

19  Attorney Kookogey's response back to Mr. Matson, as

20  president of Matson Lumber Company, with at least Attorney

21  Kookogey's written understanding of the agreement that's

22  attached to that letter, correct?

23  A. That's correct.

24  Q. All right. That letter is dated October of 1987.

25  Did you have any conversation or were you asked by

47

1    Mr. Matson to look into any issues regarding the title to

2    the timber on the Clough Farm for Matson Lumber Company?

3        A.    I don't recall that I was really asked any

4    questions about the Clough Farm.

5        Q.    Okay.

6        A.    Ever.    Because Mr. Kookogey had drafted the

7    agreement and was more familiar with it, was familiar with

8    it, and I wasn't.

9        Q.    Okay.

10       A.    I see that that looks like Len's handwriting

11   where he sent me a copy of this letter.    I noticed that.

12       Q.    Again, that would be Len Domenick?

13       A.    Yes.

14            (A discussion was had off the record.)

15            (Deposition Exhibit No. 11 was marked for

16   identification.)

17   BY MR. FRILING:

18       Q.    I'm handing you what is marked as Deposition

19   Exhibit No. 11, and that is titled list of exhibits, and at

20   the bottom of the page, first page, appears to be 10 and

21   then it goes on through page 15.    That is the index to the

22   exhibit list, which I'm going to hand to you, which is a

23   multi-page exhibit that has the actual exhibits attached to

24   this list in the corresponding order.

25            This appears to be a copy of the list of exhibits that

48

1    was prepared by Attorney Fossee for the 1995 litigation

2    between Carlisle and Matson, and, in fact, exhibits that

3    were admitted during the course of the trial of that case.

4            My question to you is with regard to the various

5    leases and deeds to the Clough Farm that are listed on this

6    exhibit, would you have provided those documents to

7    Mr. Fossee for this exhibit list?

8        A.    Not that I remember.    Again, I do not remember

9    having any direct involvement in the 1995 case.

10       Q.    Who, as Matson's corporate designee, who from

11   Matson Lumber Company would have provided these documents

12   to Attorney Fossee for use at the trial?

13       A.    Well, again, Len would be the vocal person.

14   Whether Len would get this information himself and/or have

15   other people get it for him, that's what I would expect.

16       Q.    Would you expect, also, that these are documents

17   that would have been in possession of Matson Lumber Company

18   at or about the time of the 1995 Federal Court trial?

19       A.    Well, I don't know that because, see, Fossee

20   was -- John Kookogey was a witness in that case, so how

21   much of these exhibits he actually got directly from

22   Kookogey and what he got from Len, I have no idea.

23       Q.    Okay.

24       A.    But I can't imagine that Len had any of these

25   letters from Kookogey to David Eardley.    I mean, I don't

49

1   know. You would have to ask Len if he had those. I don't
2   know.
3      Q.  Okay. So, these documents either came from
4   Matson or they came from Attorney Kookogey, who was a
5   witness in the trial for Matson Lumber Company?
6      A.  Unless Chet Fossee got them from some other
7   source that I'm not aware of. You would have to ask him.
8      Q.  All right. This list of documents includes a
9   copy of the deed between Marion C. Kinkead and Fisher &
10   Young, Inc. dated 3/27/69 designated as Exhibit No. 2 on
11   the first page; is that correct?
12      A.  Yeah. Let me look through this, though.
13   Yeah, I don't -- the only thing that I would say about
14   this list is that I do not -- unless some of these letters
15   were in that file that Kookogey gave me that he had, I
16   don't recognize any of these letters, and I cannot say
17   where they came from or any of these exhibits came from,
18   whether they came from Chet Fossee, John Kookogey or Matson
19   Lumber Company. I have no knowledge of where he got those.
20      Q.  My question with regard to this exhibit is it
21   appears that Exhibit No. 2 is a copy of the deed between
22   Marion C. Kinkead and Fisher & Young, Inc., 3/27/69, and
23   Exhibit No. 3 would be Article of Agreement between Marion
24   C. Kinkead and Fisher & Young, Inc. dated 4/1/68.
25      A.  Yes, I see that.

50

1      Q.  If this package of documents is, in fact, a true
2   and correct copy of the exhibit listing exhibits that
3   Mr. Fossee had at the time of trial, these documents would
4   have been in Matson's possession then prior to the
5   beginning of that 1997, I guess, was the actual year of
6   that trial date, correct?
7      A.  They would have been in Chet Fossee's possession.
8   Whether they were in Matson Lumber Company's possession, I
9   have no knowledge.
10      Q.  Okay. Did you review the pleadings in that 1995
11   federal litigation?
12      A.  I think I would have reviewed the initial
13   Complaint when it came in, and then there was a discussion
14   about who was going to be retained to defend the case, but
15   beyond that, I don't have any knowledge of reviewing any of
16   the pleadings or anything in that case --
17      Q.  Were you aware --
18      A.  -- until after it was over, of course.
19      Q.  Were you aware that Mr. Fossee was filing a
20   counterclaim at that time?
21      A.  I knew that he had filed a counterclaim, but when
22   that was or whether that was after the lawsuit, after the
23   verdict, I have no idea.
24      Q.  So, you weren't asked to review or approve that
25   counterclaim on behalf of Matson?

51

1    A.    Right.  I have no knowledge of that.

2    Q.    Who from Matson Lumber Company would have done

3    that, approved of the filing of the counterclaim and

4    reviewed it?

5    A.    I don't know.  Whoever signed the verification.

6    Q.    Do you know why that counterclaim was withdrawn

7    prior to trial?

8    A.    No.

9    Q.    My understanding is that you are counsel of

10   record in litigation pending in Warren County, Pennsylvania

11   in a claim brought by Albert T. Carlisle versus Matson

12   Lumber Company and Matson Hardwoods, correct?

13   A.    Right.

14   Q.    And just for the record, two other claims that

15   have been filed in Warren County by Matson Lumber Company

16   against Mr. Carlisle and various other individual

17   defendants, are you counsel of record in either of those

18   cases?

19   A.    No.

20   Q.    Do you know what the basis of those claims in

21   those cases are?

22   A.    Yes.

23   Q.    Tell me what your understanding is.

24   A.    Without actually looking at the pleadings --

25   Q.    That's okay, as you sit here today.

52

1    A.    Well, I know that Carlisle went out and cut trees

2    that belong to Matson.

3    Q.    And what is the basis of your understanding that

4    those trees belong to Matson?

5    A.    The 1995 Federal District Court decision.

6    Q.    Is there anything else, other than that 1995

7    Federal Court litigation, and I presume that's the verdict

8    that you're talking about?

9    A.    Yes.

10   Q.    Anything other than the 1995 verdict on which you

11   base the statement that that timber belonged to or belongs

12   to Matson Lumber Company?

13   A.    Well, I think the decision and the quiet title

14   action that confirmed the Federal District Court decision,

15   Judge Millin's decision on summary judgement action that

16   confirmed the 1995 Court decision, and to the extent that

17   it's relevant, any rights that Matson obtained through the

18   Squatriti deed.

19   Q.    Okay.  Have you, for today, reviewed and

20   familiarized yourself with all of the deeds that purport to

21   relate to the interest in the timber and trees on the

22   Carlisle Farm for purposes of today's deposition?

23   A.    No.  You mean, did I go back through -- I have

24   never done a title search.

25   Q.    Have you ever reviewed the source of title

53

 1   through deeds or other recorded instruments pertaining to
 2   the ownership of the timber and trees on the Carlisle or
 3   Clough Farm?
 4       A.   When Kookogey gave me his file, there were a
 5   bunch of old deeds in it.  I never really reviewed them.  I
 6   think there was an abstract of title in there.  I didn't
 7   look at it really, never reviewed it.
 8       Q.   Okay.  Is there anyone at Matson Lumber Company
 9   who can answer the question of what, by virtue of what
10   deeds or recorded instruments Matson Lumber Company claims
11   title or rights or interests in the timber and trees on the
12   Clough Farm?
13       A.   Yes.
14       Q.   Who would that person be?
15       A.   Bob Ging.
16       Q.   I'm talking about an employee of Matson.
17       A.   Well, I think that there are so many court
18   decisions and facets to this.  This is not simply the
19   ability to look at a deed and say, yes, you own this house
20   because you have a deed for it.
21            I mean, there are so many factors involved in the
22   Court's decisions that it really calls for a legal
23   conclusion and not a factual one.
24       Q.   I understand that.  I guess the Notice of
25   Deposition was specifically addressed to deeds and

54

 1   agreements that would have been recorded granting any type
 2   of right, title or interest in the timber and trees on the
 3   Carlisle Farm, and that's the basis of my question.
 4            Who is the Matson representative, if anybody, and
 5   maybe the answer is nobody, that can address that issue?
 6       A.   Well, the 1995 Federal District Court decision,
 7   with all of the other decisions, are built on -- had as its
 8   basis the agreement between Fisher & Young and Mr. Carlisle
 9   dated May of 1969.
10            MR. FRYLING:  Okay, let's go off the record
11   for a second.
12            (A discussion was had off the record.)
13            (Deposition Exhibit No. 12, No. 13 and No.
14   14 were marked for identification.)
15            (A short recess was taken.)
16   BY MR. FRYLING:
17       Q.   Before we took a quick break, we were talking
18   about the 1995 litigation and the basis of that verdict
19   being -- or the subject of that litigation being the
20   articles of agreement and the deed between Fisher & Young
21   and Albert T. Carlisle, correct?
22       A.   Correct.
23       Q.   And did you have an opportunity to review the
24   deed and the articles of agreement between Fisher & Young
25   and Albert T. Carlisle?

## 55

```
 1   A.   Yes.
 2   Q.   And I believe in the articles of agreement and in
 3   the deed from Fisher & Young to Albert T. Carlisle the
 4   timber and trees on the Carlisle property had been
 5   excepted and reserved onto Fisher & Young. Is that your
 6   understanding as well?
 7   A.   That is correct.
 8   Q.   Is it your understanding that the deed from
 9   Albert T. Carlisle to Fisher & Young, Inc. is the source
10   deed for Fisher & Young -- the source deed granting Fisher
11   & Young, Inc. the interest in the timber and trees on the
12   Carlisle Farm?
13          MR. GING:  The question was is it your
14   belief that the deed from Carlisle to Fisher & Young was
15   the source deed?
16   Q.   I'm sorry, is it your understanding, in the 1995
17   litigation, based on the deed from Fisher & Young to
18   Carlisle that that deed was the source deed by which Fisher
19   & Young, Inc. acquired the rights to the timber to the
20   Clough/Carlisle Farm?
21   A.   Yes, together with the agreement of sale.
22   Q.   Okay.  What interest did you know or do you know
23   what interest Fisher & Young, Inc. had acquired from Marion
24   Kinkead regarding the timber and trees to the
25   Carlisle/Clough Farm?
```

## 56

```
 1   A.   In what time period?
 2   Q.   When Mrs. Kinkead sold whatever interest she held
 3   in the property to Fisher & Young.
 4   A.   Okay, are you talking about back in '86 or '95 or
 5
 6   Q.   The 1968.
 7   A.   Okay, are you asking me like today presently?
 8   Q.   Okay, not at any particular time period -- okay,
 9   can you state the question again?
10   Q.   We were talking about the 1995 litigation.
11   A.   Right.
12   Q.   And we are talking about that litigation being
13   based on the deed between Fisher & Young, Inc. and
14   Carlisle?
15   A.   Right.
16   Q.   And my question was, is it your understanding or
17   your belief that that deed was the source deed by which
18   Fisher & Young acquired rights to the timber on the Clough
19   Farm?
20
21          MR. GING:  I'm going to object to the form
22   of the question.  It's asking for a legal conclusion and an
23   opinion, but you can answer it, if you can.
24   A.   My basis for saying that Matson owns the timber
25   on the Clough Farm is based upon the certificate of title
```

57

1 that John Kookogey gave, plus a review of the articles of

2 agreement and the deed from Fisher & Young to Albert

3 Carlisle.

4 That's really the basis of my belief because I have

5 never done a title search.

6 Q. I'm going to show you, I guess in reverse order,

7 Exhibit 14, which is an article of agreement, dated April

8 1, 1968 between Marion C. Kinkead and Fisher & Young, Inc.,

9 and then Exhibit 12 appears to be the subsequent deed

10 relating to that article of agreement. The deed is dated

11 April 20 -- I'm sorry, that's not correct.

12 What I have handed you appears to be an article of

13 agreement between Marion C. Kinkead and Fisher & Young.

14 A. Yes, Marion Kinkead and Fisher & Young, yes.

15 Q. That's dated April 1st, 1968?

16 A. This is for 25,000.

17 Q. Does that article of agreement include in its

18 sale any timber and trees to the Carlisle property?

19 A. This does not include the trees, the timber and

20 trees.

21 Q. Okay. Would you agree that if Fisher & Young,

22 Inc. had not acquired rights to the timber and trees to the

23 Clough Farm from Mrs. Kinkead that they would not be in a

24 position to transfer any interest in the timber and trees

25 to Bert Carlisle at the time they sold it to him?

58

1 MR. GING: I am going to object to the form of

2 the question as asking him to speculate, asking for a legal

3 conclusion and asking for an opinion.

4 You may answer the question, if you can.

5 A. Okay, again, my basis to believe that Matson owns

6 the timber and trees is based upon John Kookogey's

7 certificate of title and the article of agreement and deed

8 from Fisher & Young, Inc. to Albert Carlisle. I have not

9 done an independent title search.

10 Q. As far as you know, no one on behalf of Matson

11 Lumber Company or Matson Hardwoods has done an independent

12 title search on the property other than what may have --

13 other than what they may have received from the McChesney

14 litigation?

15 A. I know that I never did a title search for Matson

16 Lumber Company or Matson Hardwoods, Inc. on the Clough

17 Farm.

18 Q. As a corporate designee, for purposes of today's

19 deposition, did you inquire as to anyone from Matson Lumber

20 Company whether they had requested or had performed a title

21 search or a title abstract on the Clough Farm?

22 A. I would be the person that would recommend that

23 ---

24 Q. Okay.

25 A. -- on behalf of the corporation, normally. So, I

59

1  would say, no.

2     Q.  I guess my question was more specific. For

3  purposes of today's deposition, did you make any inquiry to

4  any Matson representative or employee as to whether they

5  had ever, not using you or independently of you, ever

6  requested or secured a title search or title abstract on

7  the Clough Farm?

8     A.  I didn't ask anybody that.

9        MR. GING:  I have made that inquiry, and I

10 can represent to you, as counsel, that if it would be done,

11 John would be the one that would do it and that no such

12 request had ever been made of anybody else.

13    Q.  My understanding, so I can complete this line of

14 thought, is that that is true even as of today?

15    A.  Correct.

16    Q.  Have you ever seen the document that is marked as

17 Exhibit, I believe it's 14?

18    A.  Yes.

19    Q.  When is the first time that you would have seen

20 that document?

21    A.  It would have been in 2003.

22    Q.  What would be the circumstances by which you

23 reviewed that document?

24    A.  Either Lauri Sekerak sent me this or a copy of it

25 was in John Kootoqey's file. I'm not sure the recorded

60

1  copy was in his file, though. I have seen this because I

2  remember this for $25,000. This was for the land itself.

3  I definitely remember seeing this.

4     Q.  I will show you what we have marked as Exhibit

5  13, and I will represent to you that that appears to be a

6  copy of the article of agreement between Marion C. Kinkad

7  and Fisher & Young, Inc., also dated in April, I believe,

8  of 1968.

9        Have you ever seen a copy of that document before?

10    A.  Yes.

11       MR. GING:  Just for the record, it's the

12 front page of the article of agreement.

13    A.  Yes.

14    Q.  What were the circumstances by which you saw or

15 reviewed that document?

16    A.  When I went over and met with John Kootogey in

17 May of 2003, he gave me this file, and I think this was in

18 it.

19    Q.  Do you know if you had a copy of the article of

20 agreement that contained more pages other than what you see

21 there?

22    A.  I don't recall that. Whatever is in the file,

23 that's what I found.

24    Q.  Do you recall ever seeing a copy of article of

25 agreement that's marked as Exhibit 13 that bears any

61

1    recording stamp by any recorder of deeds?

2    A.    I recognize this.    I don't know if this has ever

3    been recorded or not.

4    Q.    And the exhibit that you're holding that's

5    Exhibit 13, does that purport to be an article of agreement

6    between Marion C. Kinkead and Fisher & Young regarding

7    timber and trees on the Clough Farm?

8    A.    Yes.

9    Q.    All right.    And does that document purport to

10   give Fisher & Young, Inc. the right to timber

11   Mrs. Kinkead's property for a period of time up to until

12   April 1, 1978?

13   A.    Yes.

14   Q.    Are you aware or have you ever seen, up until

15   today, any other document purporting to transfer any rights

16   whatsoever between Marion C. Kinkead and Fisher & Young,

17   Inc. for an interest in timber on the Clough Farm other

18   than the documents that you have in your hand, one for the

19   land and one for the timber?

20   A.    The last deed in the chain of title.

21   Q.    I will show you what I have marked as Exhibit No.

22   12 and ask you if you can identify that document?

23   A.    Yes.    This is the deed that Lauri Sekerak sent to

24   me in 2003.

25   Q.    Can you identify that deed, the date and who it

62

1    is between?

2    A.    From Marion C. Kinkead to Fisher & Young, Inc.,

3    and it's dated April 20, 1973.

4    Q.    Does that deed appear to have been recorded?

5    A.    Yes.

6    Q.    Does it have the date of recording on it?

7    A.    Yes.    It's April 23, 1973.

8    Q.    So, it appears, then, that a timber deed was

9    created between Marion C. Kinkead and Fisher & Young, Inc.

10   in 1973 and was recorded in 1973, correct?

11   A.    Correct.

12   Q.    Do you know if that deed was created and recorded

13   before or after Mr. Carlisle purchased the land from Fisher

14   & Young, Inc.?

15   A.    He purchased the land in 1969.

16   Q.    So that deed would have been created and filed

17   after Mr. Carlisle purchased --

18        MR. GING:    Excuse me, I object to the form

19   of the question in terms of created.    I don't think that we

20   have established the basis for Mr. Dennison knowing the

21   deed was actually created.

22        You can answer the question.

23   A.    The deed is dated April 20, 1973.    It's notarized

24   on April 20, 1973.    It has an official seal on it, and it

25   appears to be recorded on April 23, 1973.

63

1    Q.  Okay.  Again, the deed that you're holding in

2  your hand, if I'm correct, grants or purports to grant

3  Fisher & Young, Inc. the rights to timber the timber and

4  trees on the Kinkead land up until April 1st of 1978,

5  correct?

6    A.  That's what it says.

7    Q.  Okay.  You indicated that that was, I believe

8  your words was the last deed of record?

9    A.  Yes, that is what Lauri Sekerak sent to me.

10    Q.  When did you contact Ms. Sekerak?

11    A.  It was in late 2002 or early 2003.

12    Q.  And as I understand it, your request to her

13  originally was a copy of the timber deed between Fisher &

14  Young, Inc. and Fisher & Young Hardwoods, Inc. which he

15  returned to you was actually the document that you are

16  holding in your hand, 1973, between Marion C. Kinkead and

17  Fisher & Young, Inc.?

18    A.  That's what I recall.

19    Q.  When you obtained that deed, did you then review

20  it?

21    A.  Yes.

22    Q.  And did you contact anybody at Matson Lumber

23  Company regarding that deed?

24    A.  I don't know that -- I don't know that I

25  contacted anybody from Matson Lumber Company.  I cannot

64

1  recall specifically doing that.

2    Q.  Okay.  There is attached to the Notice of

3  Deposition today Exhibit A, which is a copy of a quit claim

4  between Dora Squatriti, who is the executrix of the estate

5  of Marion C. Kinkead and Matson and, again, dated May 6 of

6  2003.  Have you seen that document before?

7    A.  Yes.

8    Q.  And did you create that document?

9    A.  I prepared it.

10    Q.  What were the circumstances by which that

11  document was prepared?

12    A.  After Lauri Sekerak sent this deed to me, as I

13  said before, I assumed that the deed was somewhere between

14  Fisher & Young and Fisher & Young Hardwoods, Inc.  So,

15  that's why I started looking through the file, and when I

16  looked at the certificate of title, it mentioned that John

17  Kookogey had had some deeds.  So, on that basis, I

18  contacted him.

19    Q.  Okay.

20    A.  Then, I went over on May 6 and met with him at

21  his old office, and we sat in his conference room and I

22  asked him if he had the deeds that are recited in his

23  certificate of title, and he didn't know.  So, we sat down,

24  and one of the first or second files we opened up, there

25  were all these deeds sitting in there.  One of the deeds

65

1    was the Fisher & Young to Fisher & Young Hardwoods, Inc.
2    deed.
3        I can't -- I wish we could find it, and I'm sure we
4    will, but I looked at that deed and I didn't think that it
5    said what I thought it should say.
6    Q.   I'm sorry, what was that?
7    A.   I can't remember, but it didn't -- because, see,
8    this deed terminated in 1978.
9    Q.   Correct.
10   A.   Okay.  So, this is one of these deals where maybe
11   something seems to be not right, but once you put it under
12   the microscope, everything gets resolved and you realize it
13   was okay after all.  That's what I expected.
14        Okay.
15   Q.   Because Mr. Kookogey and I talked about the
16   original deal, and looking at the file, they had split this
17   transaction into two parts to avoid paying the transfer
18   tax, which is what everybody does because there's that
19   specific exemption in the Realty Transfer Tax Act that you
20   can exempt out timber as long as the cutting takes place
21   within an immediately ascertainable date.
22   A.   I'm sorry, is the reason for that that if there
23   is an ascertainable date timber is considered, at least by
24   the taxing authorities, to be personalty as opposed to
25   realty and, therefore, no transfer tax would be due on the

66

1    transfer in the interest of real property?
2            MR. GING:  I am going to object to the form
3    of the question.  It's asking Mr. Dennison to give an
4    opinion as to how the realty transfer tax bureau thinks and
5    opines about these transactions, but if you can answer the
6    question ...
7    A.   I know, based upon the exemption -- or based upon
8    that provision of the statute, if you set up the
9    transaction that way, the timber is exempt.
10   Q.   Okay.
11   A.   So, that's what everybody that transfers real
12   estate and timber up here does, take advantage of that
13   exemption.
14   Q.   Okay.
15   A.   So, that's what Mr. Kookogey and I talked about,
16   and that was the reason why this was split into different
17   categories.
18        They did it through an article of agreement, I think,
19   because to make certain that she was going to get all her
20   money before she transferred the timber.
21        So, when I looked at the deed, I realized that it
22   didn't cure the problem with the timber going back to her
23   in 1978.  The Fisher & Young -- excuse me, the Fisher &
24   Young and Fisher & Young, Hardwoods, Inc. didn't help at
25   all.

67

1  So, in looking at this deed, I said to him because I

2  went back and when I looked at it before, I said to him, I

3  said, Well, this right to cut the timber and everything

4  terminates on April 1st, 1978, and at that time, all the

5  rights should cease and that the remaining timber shall

6  vest in the grantor, who was Mrs. Kinkead, her heirs and

7  assigns.

8  He said to me, I never noticed that before, that's a

9  mistake.

10  So, read literally, then, in other words, it should

11  have vested back into Fisher & Young. So, on that basis, I

12  went to Warren County to look up if Marion Kinkead had died

13  because I didn't know anything about her.

14  So, when I got to the courthouse, I asked for Lauri

15  Sekerak because I'm not familiar with -- I mean, I can

16  figure it out, but it's easier to have an abstractor help

17  you. So, she happened to be in the courthouse, and I said,

18  Lauri, can you help me look up the name of an individual

19  Marion Kinkead? So, she said she would help me get the

20  estate papers out.

21  So, I looked at the will, and Dora Squatriti was the

22  only beneficiary, and she was also the executor, and so

23  then, I went to the telephone directory, looked under

24  Squatriti, saw her name -- or his name. I can't remember

25  who it was. Squatriti was such an unusual name, and I

68

1  asked somebody how far away she lived, and it was only a

2  couple blocks away, so I called her. I guess that's when I

3  called her on the phone. I think someone even knew her in

4  the courthouse.

5  So, anyway, I got on the phone and I called her and I

6  explained who I was, that I represented Matson Lumber, and

7  I asked if I could come and see her. And she said that her

8  husband was infirmed (phonetic), something to that effect,

9  and that I could come in like two-and-a-half hours.

10  So, I messed around, waited around for about

11  two-and-a-half hours. I then went to her house and sat at

12  the kitchen table with her, explained who I was, who I

13  represented, a little bit about the company and the fact

14  that the timber on the Clough Farm, on the basis of this

15  deed, has reverted to her mother. And she said, That's not

16  right, my mother sold the timber to Fisher & Young.

17  And I said, Would you be willing to sign a quit claim

18  deed? And she said, Yes. She said that she would only --

19  she didn't want anything for it because my mother sold it

20  to Fisher & Young. She said, I just don't want to have to

21  pay my attorney a lot of money to review all of these

22  things. I said to her that I'm sure that Matson Lumber

23  Company would pay any legal fees or other costs that you

24  would have in association with getting the quit claim deed,

25  and she gave me the name of her attorney, and so I left.

69

1   Q.   The name of her attorney was Attorney Mark
2   Turbessi?
3   A.   Correct.
4          (Deposition Exhibit No. 15 was marked for
5   identification.)
6   Q.   I'm going to show you what I marked as Exhibit
7   15, which is a letter on your letterhead dated May 8, 2003
8   to Mr. Turbessi and ask if you can identify that?
9   A.   Right.  This is what Mrs. Squatriti wanted me to
10  write to Mr. Turbessi and sort of relate the same thing
11  that I told her and send the quit claim deed to him, and
12  that's what I did.
13  Q.   At this time, I take it based on your testimony
14  that you have given so far, you did not, at that time,
15  request Mrs. Sekerak, or anyone else, to perform a title
16  search on the Clough Farm to see if maybe there were any
17  other deeds out there dealing with this property, correct?
18  A.   She was quite emphatic that her mother sold the
19  timber and trees on the Clough Farm to Fisher & Young, Inc.
20  Q.   I understand.  All I'm asking is whether at that
21  time, as a result of your reviewing that 1973 timber deed,
22  whether that caused you, at that time, to ask Ms. Sekerak
23  or any other abstractor to perform a title search on the
24  property to see if, perhaps, there were other deeds out
25  there in this chain of title?

70

1   A.   No, I didn't ask to do a title search at that
2   point.
3   Q.   Was it your understanding, after reviewing that
4   1973 deed, that there was a break in the chain of title
5   from 1978 until the present time with regard to the timber
6   interest in this property by virtue of that 1973 deed?
7          MR. GING:  Excuse me.  I will object that
8   you're asking for a legal opinion and conclusion of law.
9          You can answer the question, if you can, John.
10  A.   There was a mistake that resulted in a technical
11  break of the chain of title.  The easiest way to correct
12  that was to get a quit claim deed from Dora Squatriti, as
13  executrix and as an individual.  That would solve the
14  problem because, again, based upon Mr. Kookogey's original
15  certificate of title, which he issued not realizing that he
16  had made this mistake, once that was corrected, then that
17  would solve whatever title problems there were purely with
18  the chain of title itself.
19  Q.   Is it your understanding or your testimony that
20  the certificate of title given by Mr. Kookogey has some
21  legal effect over the deeds that are recorded of record
22  with regard to the property?
23  A.   It's on the basis that Mr. Kookogey was a
24  competent attorney who issued a title certificate.
25  But for this error, there was no reason for anyone to

71

```
1    do anything else, especially in view of the fact that the
2    whole issue had been litigated anyway in the 1995 case and
3    then in the 1998 case that was filed in Warren County.
4         Q.   Okay.  Did you have a discussion with
5    Mr. Kookogey at the time that he acknowledged this mistake
6    was made about the impact or effect of the deed being filed
7    in 19373 after Mr. Carlisle had already purchased the
8    property from Fisher & Young?
9         A.   No.  I sent him a copy of this May 8 letter that
10   I sent to Turbessi, just to bring him up to date about what
11   was going on.
12        Q.   Did you raise any questions with regard to
13   Mr. Kookogey about whether or not the recording statute
14   would void that 1973 timber deed that was filed after
15   Mr. Carlisle purchased the property subject to
16   Mr. Carlisle?
17        A.   Did we discuss that?
18        Q.   Yes.
19        A.   No.
20        Q.   And it was your thought, then, as counsel for
21   Matson, that if a quit claim deed was acquired from the
22   estate of Kinkead that that would somehow cure the defect
23   that Mr. Kookogey acknowledged existed in the 1973 timber
24   deed; is that correct?
25        A.   Correct.
```

72

```
1         Q.   And can you tell me how a subsequently acquired
2    quit claim deed would cure the defect of the 1973 timber
3    deed?
4         A.   Because the original article of agreement was for
5    the complete sale of the Clough Farm.  The only reason it
6    was split in two agreements was to avoid the transfer of
7    taxes.  So, therefore, but for that mistake, there wouldn't
8    have been a title problem.
9         Q.   We have identified at least what purports to be
10   the first page of the article of agreement for the transfer
11   of timber to Fisher & Young from Mrs. Kinkead.  I believe
12   that the language of the article of agreement give Fisher &
13   Young or transfer to Fisher & Young the right to own timber
14   until April 1st, 1978, correct?
15        A.   Right.  That's what you normally do whenever you
16   do this.  You have to have a date certain, and then at that
17   point, you then structure your agreements so that the
18   timber rights then vest to whomever you sold the so called
19   surface to.
20        Q.   It appears, then, that the articles of agreement
21   suffer the same defect that the 1973 timber deed suffered,
22   and that there was no reversionary interest into Fisher &
23   Young; is that correct?
24        A.   No.  I think they set it up that way because the
25   sale of the surface for $25,000 was unconditional.
```

73

1    Q.    Correct.  There were no -- Well, I'm sorry.  I
2  don't mean to -- When you say unconditional, there were no
3  --
4    A.    Reversionary rights.
5    Q.    There was no grant of timber interest at all in
6  the article of agreement for the sale of the land, correct?
7    A.    Right.  That's why I referred to it just
8  generally as the surface.
9    Q.    Okay.
10    A.    So there is an unconditional sale of surface, and
11  then to avoid paying the transfer taxes, you have to have a
12  date certain by which the timber can be cut, and that was
13  1978.  And then at that point, the rights cease and then
14  the interest would then go back to Fisher & Young, Inc.
15    Q.    Okay.
16    A.    Even though it's the same, same entity that has
17  the surface and also has the timber rights and when that
18  terminates, even if it goes into that same entity, it's
19  still exempt from transfer taxes.
20    Q.    The articles of agreement for the sale of the
21  timber does not have language in it vesting any
22  reversionary interest into Fisher & Young, Inc., correct?
23    A.    It does on or after date of all rights -- Okay,
24  wait a minute.
25         Okay, the way this was set up was in 1978, Fisher &

74

1  Young was supposed to be the owner of the surface.
2    Q.    I'm sorry, 19 ...
3    A.    '78.
4    Q.    '68?
5    A.    1978.
6    Q.    In 1978?
7    A.    Right.  So, when their right to cut the timber
8  ceased, then it would have reverted to them anyway because
9  they were the owner of the surface.
10    Q.    As long as they were the owner of the surface in
11  1978, correct?
12    A.    Right.
13    Q.    I understand.
14    A.    That's in 1968.  That's the way they set this up,
15  that supposedly Fisher & Young was going to be the owner of
16  the surface in 1978.
17    Q.    Okay.  As I understand it, the articles of
18  agreement for the sale of the real estate then or the land
19  were recorded -- the articles of agreement for the timber
20  was unrecorded?
21    A.    Again, that makes it really slick or whatever
22  because this thing -- nobody records the timber deeds or
23  the agreements regarding the agreement for the sale of the
24  timber or the timber deed itself.  You don't record that
25  because it sort of terminates on its own and then the

75

1  surface owner and the timber get reunited.

2      Q.   How do you address the situation where there is a

3  subsequent purchaser who is without notice of the

4  unrecorded agreements?

5              MR. GING:  Again, I am going to object to

6  the form of the question as asking for a legal opinion.

7      A.   Well, I guess in this particular case, Carlisle

8  never got the timber because they were specifically

9  excepted and reserved in his deed, and he also took the

10  property subject to the terms in the agreement of sale.

11  So, he never, in all the world, the one person that we

12  know who didn't own the trees and timber were Carlisle

13  because they were specifically excepted and reserved.

14      Q.   On the assumption that Fisher & Young had

15  acquired all right, title and interest in the timber from

16  Kinkead, correct?

17      A.   Yes, that she had the full right, that she owned

18  the title to the surface and the timber.

19      Q.   And that she had granted to Fisher & Young the

20  full right in both the surface and the timber?

21      A.   That's what she contracted to do.

22      Q.   Okay.  As it turns out, at least upon your review

23  of the documents, there was a problem because the

24  reversionary interest was not to the owner of the land,

25  whoever that may have been in 1978, but was, in fact, to

76

1  Mrs. Kinkead and her heirs, correct?

2      A.   Correct, because he made a mistake on this back

3  here (indicating).

4      Q.   At the time that you contacted Ms. Sekerak and

5  Mrs. Squatriti, did you review the records at the Warren

6  County Courthouse to see if, in fact, any reversionary

7  interest in the timber and trees had ever been claimed or

8  recorded by the estate in the estate filings?

9      A.   My mind set was that this was 100 percent a

10  mistake.  That's not something that would have even entered

11  my mind.

12      Q.   Okay.  I guess my question is, if you're getting

13  a deed from the estate, did you check to see if the estate

14  listed the interest that you're acquiring as an asset of

15  the estate?

16      A.   That's not something that I would have thought to

17  do.

18      Q.   Okay.  So, as I understand it, you prepared the

19  quit claim deed?

20      A.   Yes.

21      Q.   And then that quit claim deed apparently was

22  executed around May 6 of 2003?

23      A.   I think that's the date.  I think that's when I

24  actually saw Mr. Kookogey, and I think that's the date of

25  it.  I don't know when.  It took a while.

77

1   I had to contact Mr. Turbessi because it didn't come
2   back right away, so I called him on the phone. He said
3   that everything is okay. He said, Oh, by the way,
4   Mr. Carlisle or representatives of Mr. Carlisle had
5   contacted Mrs. Squartiti or him, I can't remember which --
6   no, I guess they contacted her and had agreed to pay money
7   to acquire a quit claim deed, but I specifically remember
8   him saying she would not sell "them" the property, she
9   didn't like them.
10      Q.   Okay.
11      A.   And I always wondered who she said "them" because
12   it was Albert Carlisle, and I didn't know if it was anyone
13   else or not who she was referring to.
14      Q.   As I understand it, that deed was subsequently
15   recorded more than six months after the date it was
16   executed; is that correct?
17      A.   I don't know.  Is that how long it was?  It took
18   a while to get it back from her.
19      Q.   Okay.
20      A.   Okay.  It took a while to get it back from her,
21   and then there was question whether I need a transfer tax.
22   I had to go through that rigmarole with the transfer tax
23   people.
24      Q.   Okay.  This also occurred in 2002, 2003?
25      A.   This whole thing started with the conversation

78

1   that I had with Peter Crems in late 2002 or early 2003.
2      Q.   Okay.  It's my understanding, then, at least
3   based on what I have seen and based on your testimony, that
4   in 1995 when the Federal Court litigation was commenced and
5   in 1997 when the Federal Court litigation was going to
6   trial, the 1973 timber deed would have been filed as of
7   record with the Warren County Courthouse and would appear
8   in the chain of title for the Clough Farm; is that correct?  I
9   believe that's a true statement.
10      A.   Yes, I believe that's in file of record.  I
11      Q.   It would also be my understanding that at the
12   time of the 1995 litigation, when that case went to trial,
13   Matson Lumber Company was at least in possession of the
14   original articles of agreement between Marion C. Kinkad
15   and Fisher & Young, Inc. for the transfer of the land dated
16   April 1, 1968, based on the list of exhibits that was
17   prepared by Mr. Fossee?
18      A.   Yeah.  I mean, that appears on the list of
19   exhibits.  When he got that, I have no idea.
20      Q.   That's the same articles of agreement that we
21   discussed whereby all the timber and trees are excepted and
22   reserved on to Marion C. Kinkad?
23      A.   That's -- they are both dated April 1st, 1968.  I
24   don't know whether that's the one for the surface and one
25   for the --

79

1     Q.   It's the one for the land as a consideration of

2   $25,000, I believe?

3     A.   Yeah, that's the one for the land. That's the

4   exhibit number -- is that Exhibit No. 3?

5     Q.   Yes.

6     A.   Okay, whatever. You have the list there.

7     Q.   Okay. It's the deed dated 27th day of March

8   1969, Marion C. Kinkead and Fisher & Young, consideration

9   of $25,000 for the land excepting and reserving from that

10  conveyance all of the timber and trees on the property?

11     A.   Can you say that again? I was thinking something

12  else.

13     Q.   The exhibit is a copy of the deed that was

14  recorded April 22, 1969, but it's dated the 27th of March

15  1968 between Mrs. Kinkead and Fisher & Young, Inc. -- I'm

16  sorry '69?

17     A.   Uh-huh. (Affirmative.)

18     Q.   -- between Mrs. Kinkead and Fisher & Young, the

19  consideration of $25,000, and it's the transfer of what you

20  called the land?

21     A.   Right, the surface.

22     Q.   The surface, which excepts and reserves from the

23  surface then all the timber and trees on the property?

24     A.   Uh-huh. (Affirmative.)

25     Q.   And you don't recall Mr. Fossee ever

80

1   raising an issue with either yourself or Matson Lumber

2   Company about where is a deed or written document that

3   actually transfers an interest of timber to Fisher & Young,

4   Inc. at the time of the 1997 trial?

5     A.   Right. The first time that there was ever an

6   issue regarding the title to the timber was after I

7   received that phone call from Peter Crems. That was the

8   first time this was ever an issue.

9     Q.   Okay. As far as you're aware, the chain of title

10  for the Carlisle property has remained the same from 1995

11  until the recording of this quit claim deed that was

12  secured by Matson Lumber Company from Dora Squatriti and

13  subsequently recorded in 2004?

14     A.   Okay, based upon my conversation with Dora

15  Squatriti, I know for a fact that she didn't transfer --

16  didn't make a transfer of any interest in the Clough Farm

17  trees because she told me that her mother had sold those to

18  Fisher & Young, so there was no reason for me to check

19  anything else.

20     Q.   Okay. In Exhibit No. 15, which is your May 8th

21  letter to Attorney Turbessi, the third paragraph states,

22  "In order to avoid paying the transfer taxes, the timber

23  was sold to Fisher & Young, Inc. by an unrecorded Article

24  of Agreement for $100,000."

25  Was that a conclusion that you drew, or was that

81

1  something that was told to you by somebody else?

2      A.    That's what Mr. Kookogey and I discussed, and I

3  could tell by even the material that I got from

4  Mr. Kookogey that that's what they intended to do because I

5  think the original article of agreement wasn't split. And

6  I think Kookogey, as I recall, must have said something to

7  the other attorney and said, let's split them.

8      Q.    Okay.    Now, we've identified what you believe to

9  be were two problems that arose resulting from the 1973

10 timber deed.    The first one we talked about was the fact

11 that the reversionary interest was not into Fisher & Young

12 or even the owner of the land for that matter, but

13 Mrs. Kinkead.

14      The second problem that you set forth in your letter

15 deals with the diameter of the timber.    I was just

16 wondering if you can tell us what that is about.

17      A.    I haven't looked at this in so long.

18      Now, the timber deed, I don't remember.    That must

19 have the Fisher & Young to Fisher & Young Hardwoods, Inc.

20 timber deed.    The timber dated -- okay, that's the '73.

21      Okay.    Yeah.    The deed for the -- the deed for the

22 timber -- the deed for the surface, where is it?    From

23 Marion Kinkead, it excepts and reserves all the trees.

24 This is it.    It excepts and reserves all the trees,

25 excepting and reserving from all the timber and trees

82

1  standing and down.

2      So, she reserved all the timber and trees, but then

3  this deed would have only transferred all the timber and

4  trees measuring twelve inches one foot above the ground

5  back.    So, it was not right that way, either.

6      Q.    So, there were two issues that you were concerned

7  with:    The 1973 timber deed, the first one being

8  reversionary interest and the second one being the original

9  agreement, except and reserve to Kinkead all timber and

10 trees and she only granted the right to Fisher & Young an

11 interest in trees 12 inches in diameter and above.

12      A.    Yeah, because a lot of times, to avoid paying the

13 transfer taxes, you are dealing with merchantable timber,

14 timber that can be cut.    That would be 12 inches and up.

15 That's why -- but they didn't -- somebody -- they didn't do

16 that quite right.

17      Q.    As I understand it, then, other than this Fisher

18 & Young to Fisher & Young Hardwoods deed, which we can't

19 seem to locate right at the moment, which I understand was

20 unrecorded anyway?

21      A.    Right.

22      Q.    Are you aware of any other deeds purporting to

23 transfer an interest to anybody from anybody any interest

24 in the timber and trees on the Clough/Carlisle Farm other

25 than what we have looked at today, and recognizing there

83

1 may be an unrecorded deed from Fisher & Young to Fisher &
2 Young Hardwoods?
3 A. Nothing except the real old deeds that were in
4 John Kookogey's file, copies of some real old deeds.
5 Q. Further back in the chain of title?
6 A. Yes.
7 Q. So, as I understand it, then, based on the
8 documents that we have at the time, at least as far as we
9 know, Marion Kinkead was the last owner of both the land
10 and timber?
11 MR. GING: I will object to the question for
12 asking for a legal opinion and conclusion.
13 You can answer it, if you can.
14 Q. Based on the articles of agreement that she
15 signed with Fisher & Young, I guess we'll use those
16 documents as the basis of that, if she didn't own the
17 timber, I guess we can go further back.
18 A. No. To me, as an attorney, Fisher & Young owned
19 everything. That's what Marion Kinkead sold; that's what
20 Fisher & Young purchased.
21 Q. I understand what your testimony is. I'm just
22 trying to, with regard to the documents that we are aware
23 of or that have come to light, Mrs. Kinkead, by virtue of
24 two different agreements, transferred whatever interest she
25 owned in the farm to Fisher & Young?

84

1 A. Right.
2 Q. For the sake of today's argument, based on what
3 we know, she purportedly owned the timber. We can go back
4 and look at the deeds to confirm that. And maybe she
5 didn't own the timber at the time she sold, but she
6 purported at the time to own both the timber and the land
7 and to sell that to Fisher & Young?
8 A. Yes.
9 Q. It was done in two transactions?
10 A. Right.
11 Q. The only transaction that was recorded of record
12 and put on notice was the sale of the land to Fisher &
13 Young, correct?
14 A. Well, again, when you speak in terms of the other
15 person that was interested in this would have been Albert
16 Carlisle, that he took this property under subject to an
17 exception and reservation for all the timber.
18 Q. I understand. Fisher & Young excepting and
19 reserved whatever interest Fisher & Young, Inc. had in the
20 timber at the time they sold the property to Carlisle?
21 A. They excepted and reserved their ownership of the
22 timber when they sold the property to Carlisle.
23 Q. And their ownership can be defined only by the
24 agreement with which they take title to it, correct?
25 A. No. That's a pretty narrow way of saying it, so

85

```
 1    I cannot really agree with that.
 2    Q.   Okay.  It's your testimony, your understanding
 3    that despite what the written agreements were and what may
 4    or may not have been recorded, Fisher & Young purchased
 5    more than what these documents would indicate they actually
 6    got?
 7         We have already acknowledged that there was a mistake
 8    in the deed that was made.
 9    A.   See, to me, I don't see that mistake as being so
10    critical as to defeat Fisher & Young's right, title and
11    interest to the timber because it was a technical mistake
12    because all the documents indicate that they simply did
13    this to avoid paying the transfer of taxes and that both
14    the seller and the buyer -- the seller wanted to sell
15    everything she owned and the buyer wanted to acquire
16    everything that she owned, and that's what all the
17    documents say.
18         So, because of that one little mistake, to me, doesn't
19    -- shouldn't create some huge problem to deny ownership of
20    the property, of the timber.
21    Q.   If Mr. Carlisle is searching the title in order
22    to buy the property from Fisher & Young, the only agreement
23    that we are aware of that's of record is the deed between
24    Mrs. Kinkead to Fisher & Young for $25,000 for the land,
25    correct?
```

86

```
 1    A.   Say that again.
 2    Q.   We are only aware of, in 1970 when Mr. Carlisle
 3    purchases the land from Fisher & Young, that the only deed
 4    that is of record is the deed dated March 27th, 1969
 5    between --
 6    A.   Right.
 7    Q.   -- Kinkead and Fisher & Young?
 8    A.   Right.
 9    Q.   So, when the title is being searched, the only
10    title -- the deed that's going to be of record at that time
11    is the deed for the land, correct?
12    A.   Right.
13    Q.   And this deed, I think we have already
14    established excepts and reserves all of the timber and
15    trees from the land to Mrs. Kinkead, correct?
16    A.   Yes.
17    Q.   Okay.  So, if you would go, then, and look at the
18    deed from Carlisle to Fisher & Young and you're doing a
19    title search --
20    A.   Carlisle to Fisher & Young?
21    Q.   I'm sorry, from Fisher & Young to Carlisle, the
22    deed, the first deed in your chain of title going backwards
23    then is going to be, at least as far as we know from the
24    records, this deed between Kinkead and Fisher & Young?
25    A.   That would be the first deed, right, going
```

87

1  backwards.
2      Q.   The deed to the land then excepts and reserves
3  the timber and trees from Kinkead to Fisher & Young and
4  then the deed from Fisher & Young to Carlisle excepts and
5  reserves the timber and trees, correct?
6      A.   The deed from Fisher & Young to Carlisle excepts
7  and reserves the timber and trees.
8      Q.   All right.  And in reviewing whatever documents
9  are of record, just being that deed, Fisher & Young, at
10  least based on the recorded deeds had no interest in the
11  timber and trees by recorded instrument by which they could
12  transfer them to Mr. Carlisle?
13          MR. GING:  I am going to object to the form of
14  the question as being argumentative and asking for a legal
15  opinion.
16          You may answer the question.
17      A.   There -- that is a statement of fact.  The only
18  thing of record would have been that deed with that
19  exception of reservation on it, but, of course, you have to
20  go beyond that and find out where the trees are -- in whose
21  name the trees are vested.
22      Q.   And to do that, you would search the title.  That
23  is a matter of public record to put the public on notice
24  all interests that have been transferred are required to be
25  in writing, transfer property and record it, correct?

88

1      A.   No.  In the transfer of land, the title search
2  comes at the very end.  It's the discussions between the
3  purported seller and the owner -- or the purchaser come
4  first and the seller tells the owner, I own everything.
5      Q.   Okay.
6      A.   And then it's up to the buyer to conduct a title
7  search to determine whether or not the seller is really
8  telling the truth.
9      Q.   Based on the title search that could have been
10  done in this case, the title search would have revealed
11  that, in fact, Fisher & Young didn't own the timber?
12          MR. GING:  Excuse me.  I am going to object
13  to the question as being speculative, argumentative and
14  asking for a legal opinion.
15          You can answer the question, if you can.
16      A.   Mr. Carlisle didn't buy this property in a
17  vacuum.  He had ongoing discussions with the purported
18  owner, which was Fisher & Young, Inc.  He knew --
19      Q.   I'm sorry --
20          MR. GING:  Let him finish his answer.
21      A.   Yeah.  He knew that Fisher & Young owned the
22  trees.
23      Q.   The basis -- were you present representing either
24  Fisher & Young or Mr. Carlisle at the time of the purchase?
25      A.   No, but I read the Federal District Court

89

1  transcript.

2  Q.  So, any knowledge that you have or purport to

3  have of what occurred between the sale between Fisher &

4  Young and Mr. Carlisle is based solely on what you have

5  read in a court document?

6  A.  Right, and common sense is that when he bought

7  this property, he wanted to know who owned from heaven to

8  hell, and he is going to find that out.

9  When he and his attorneys couldn't establish of record

10  who owned the timber, then they would have asked Fisher &

11  Young. Where is your deed for the timber?

12  So, I don't know what discussions took place among the

13  attorneys, but, obviously, since he didn't buy the timber

14  by virtue of the agreement of sale and the exception and

15  reservation of this deed, he knew he didn't own the timber.

16  Now, how he came about that realization and how he

17  came to know that Fisher & Young was the owner, based upon

18  his testimony, I have no idea because you're right.  I

19  wasn't there.

20  Q.  I'm just trying to establish what documents are

21  of record.

22  As far as we know, as of the time that Mr. Carlisle

23  purchased the property, the only documents of record is the

24  deed between Kinkead and Fisher & Young for the land?

25  A.  Yeah.  The records in the courthouse speak for

90

1  themselves.

2  Q.  And the next deed then would be between Fisher &

3  Young and Carlisle?

4       MR. GING:  Jim, we are starting to go over

5  this again.  It's repetitive.

6       MR. FRYLING:  Objection noted.

7  A.  Which deed are you talking about?

8  Q.  The deed between Fisher & Young to Carlisle.

9  A.  You mean the Fisher & Young and Carlisle, okay,

10  because you have the deed from Marion Kinkead to Fisher &

11  Young, Inc. for the land, and then, you have the deed onto

12  Mr. Carlisle and the agreement of sale in May of 1969.

13  Q.  Correct.

14  A.  Correct.

15  Q.  Are you aware of any other deeds dealing with

16  either the land or the timber that had been recorded as of

17  that date?

18  A.  No.

19  Q.  The next deed that we have then would be after

20  acquired 1973 timber date, correct?

21  A.  Correct.

22  Q.  And then until the quit claim deed was filed,

23  there are no other deeds filed in-between those two dates,

24  as far as we can --

25  A.  Not to my knowledge.

91

1          MR. GING:  Excuse me.  I'm going to object

2    to the question as being argumentative, especially in light

3    of the discussion that we had of other deeds earlier in the

4    deposition, specifically Exhibit 6, Exhibit 7, and I

5    believe there was one other deed that was recorded that you

6    had discussed with Mr. Dennison.  To the extent that it's

7    argumentative now, I will make that objection.

8          You can answer the question.

9          A.    Yeah, we are talking about between Carlisle and

10   Kinkead.

11         Q.    We are talking about deeds in the chain of title

12   that appear of record in the chain of title for the

13   Carlisle/Clough Farm.

14         A.    Well, there are a lot of -- I mean, you're right,

15   we have identified other deeds that I did in 1993, so there

16   is other deeds that impact this property.

17         Q.    Do you know, and maybe you can't because you

18   haven't done a title search, do you know whether or not

19   those deeds appear in the chain of title for the Clough

20   Farm?

21         In other words, if an abstract would be requested to

22   search the title from typically the beginning of time or

23   the land warrants until today whether those other deeds

24   that we have marked 6, 7 and 8 whether those deeds would

25   appear in the chain of title?

92

1          A.    They should.  It's been recorded.

2          MR. FRYLING:  Okay, that's all I have.

3                          EXAMINATION

4    BY MS. COCO:

5          Q.    Mr. Dennison, Mr. Fryling had asked you a

6    question that you answered with respect to a conversation

7    that Mrs. Squatriti told you that Carlisle or a

8    representative of Carlisle contacted her about the land,

9    correct?

10         A.    Mark Turbessi told me about that.

11         Q.    Do you know when that conversation between

12   Mr. Carlisle or his representatives and Mrs. Squatriti

13   occurred?

14         A.    It was after I contacted Mrs. Squatriti.

15         Q.    Just refresh my memory.  When was that?

16         A.    That was in May.  I think that was on May 6,

17   2003.  So, it was in-between that time and the time

18   Mrs. Squatriti signed the deed because when I spoke to her,

19   no one else had contacted her as of May 6, 2003 about the

20   property.

21         Q.    Okay.  To the best of your knowledge, a

22   reformation action has never been filed regarding any of

23   these documents; is that correct?

24         A.    Not to my knowledge.

93

```
1   Q.   When Mr. Fryling --
2        MR. FRYLING:  I'm sorry, I wasn't clear on
3   that question.  By anyone, or about somebody specific?
4        MS. COCO:  By anyone.
5   A.   When you say reformation, there are all these
6   quiet title actions and all these other things going on,
7   but I don't know when you say reformation --
8   Q.   We have talked about several lawsuits that have
9   been filed between Mr. Carlisle and Matson and Matson and
10  Mr. Carlisle, but has there ever been a specific
11  reformation action to correct any of the mistakes in any of
12  the documents or alleged mistakes?
13  A.   Well, I guess the 1995 Court action.  None that
14  we haven't talked about.
15  Q.   Okay.  And Mr. Flying asked you about the 1973
16  deed of record, or deed that was filed of record, and he
17  said it would have been filed in the 1995 litigation and it
18  would have been filed during the 1998 litigation?
19  A.   You mean it was recorded of record?
20  Q.   Recorded of record at that time.
21  A.   Right, because it was recorded in 1973, I think.
22  Q.   And that would be true -- his question would be
23  true with respect to any of the litigation, the McChesney
24  litigation or anything, that deed would have been filed of
25  record at that time from 1973 --
```

94

```
1   A.   Right, yes, because that was all in the '80s.
2        MS. COCO:  That's all I have.
3
4                       EXAMINATION
5   BY MR. GING:
6   Q.   Mr. Dennison, did Mrs. Squatriti's lawyer give
7   you any explanation as to why Mr. Carlisle or his
8   representatives were trying to buy something he already
9   believed he owned, that is, the timber on the property?
10       MR. FRYLING:  I will object to the form of
11  the question.  He hasn't testified as to -- that he has any
12  knowledge as to why Mr. Carlisle may or may not have
13  contacted him.
14       MR. GING:  Well, that's what I'm asking him.
15       MR. FRYLING:  The question was in the form
16  of why he would buy something he doesn't already own, and I
17  object to the form of the question.  He hasn't testified
18  that any of that was discussed.
19       MR. GING:  Okay.
20       THE WITNESS:  Okay, repeat your question
21  then.
22  BY MR. GING:
23  Q.   Did Mrs. Squatriti's lawyer offer any explanation
24  as to why Mr. Carlisle or his representatives were trying
25  to buy something Mr. Carlisle claimed he already owned?
```

95

```
        MR. FRYLING:  Again, object to the form of

 1
 2   the question.
 3        A.   I think I talked to him about the fact that
 4   Mr. Carlisle -- I knew that Mr. Carlisle had done a title
 5   search on this property, based upon what Lauri Sekerak told
 6   me -- or someone had told me that, and I think that Mark
 7   Turbessi and I talked about that because he said somebody
 8   from Carlisle had contacted Mrs. Squatriti, and I think I
 9   said, I'm not surprised or something like that.  But beyond
10   that, I don't have any recollection.
11        Q.   All right.  Is there anything that you're aware
12   of that would have prohibited Mr. Carlisle from inquiring
13   into the status of the timber ownership in 1969 when he
14   bought the property?
15        A.   That's the first thing that happens generally
16   between the seller and the buyer, you discuss what you're
17   buying.
18             MR. FRYLING:  I object based on the answer
19   calls for speculation as to what Mr. Carlisle did or didn't
20   do in 1969.
21   BY MR. GING:
22        Q.   Is there still a Matson Hardwoods?
23        A.   No.
24        Q.   And Amy may have asked this question, but is
25   there anything that you are aware of, that precluded Mr.
```

96

```
 1   Carlisle from doing a title search during the McChesney
 2   litigation?
 3        A.   No.
 4        Q.   Now, the McChesney litigation, I believe
 5   according to the questions Mr. Fryling had asked you,
 6   occurred in 1986, is that correct, in or about?
 7        A.   That's what he said.
 8        Q.   Is there any reason Mr. Kokogey could not have
 9   found the 1973 Kinkead/Fisher & Young deed in 1986?
10        A.   No.
11        Q.   Have you ever been made aware of any timber deed
12   from Fisher & Young to Carlisle?
13        A.   No.
14        Q.   Have you ever been aware or made aware, in any
15   context whatsoever, of Mr. Carlisle paying anyone any money
16   for timber on the Clough Farm?
17        A.   No.
18        Q.   Now, I'm going to show you a copy of Exhibit 5.
19   Before I do, the articles of merger with Matson Hardwoods
20   and Fisher & Young Hardwoods were recorded; is that
21   correct?
22        A.   Yes.
23        Q.   I'm going to show you Exhibit 5, which is a
24   timber sales agreement, and who were the parties to that
25   agreement?
```

97

1    A.    Exhibit 5, sellers were Robert D. Matson, Joan M.

2    Matson, Becky J. Matson and Barbara A. Conti.

3    Q.    And who was the buyer?

4    A.    Matson Hardwoods, Inc.

5    Q.    Was that for the timber on the Clough Farm?

6    A.    If you can agree on what that description

7    consists of between counsel because I'm not ...

8    Q.    If you look at the witnesseth clause ...

9    A.    It does say the Clough Farm, so, yes.

10   Q.    That document was recorded; is that correct?

11   A.    Right.

12   Q.    I'm going to show you Exhibit 6, which is a deed

13   between Matson Lumber Company and Matson Industries and ask

14   if this deed was recorded?

15   A.    Yes.

16   Q.    Is that a timber deed?

17   A.    Yes.

18   Q.    And does the deed identify what timber property

19   was conveyed or what timber was conveyed?

20   A.    It has the Clough Farm.

21   Q.    What was the date of that recording?

22   A.    December 29, 1989.

23   Q.    I'm going to show you Exhibit 7 and ask who the

24   parties to Exhibit 7 were?

25   A.    Matson Industries, Inc. is the grantor and B & B

98

1    Hardwoods Co. is grantee.

2    Q.    Was that a conveyance of timber?

3    A.    Yes.

4    Q.    What property was that conveyance on?

5    A.    The Clough Farm.

6    Q.    Was that recorded?

7    A.    Yes.

8    Q.    I'm going to show you a copy of Exhibit 10, which

9    was Mr. Kookogey's letter to Robert Matson dated

10   October 30, 1987. And in that letter, Attorney Kookogey

11   indicated, "the ownership of the timber and the rights and

12   duties set forth in the agreement are in perpetuity and in

13   general are not in violation of the rule against

14   perpetuities with one possible exception, that being the

15   option of Carlisle to purchase the timber if Matson should

16   sell or change management."

17   Do you agree with that statement?

18   A.    Yes.

19   Q.    Is it your understanding that the agreement

20   between Mrs. Kinkead and Fisher & Young created an interest

21   in Fisher & Young in the timber in perpetuity?

22   A.    Yes.

23   Q.    Is that your understanding, based on your review

24   of all the documents, of what the understanding of the

25   parties was?

99

1      A.  Based upon my review of the documents, review of

2  Mr. Kookogey's file, discussions with Mr. Kookogey and

3  discussions with Mrs. Squatriti.

4          MR. FRYLING:  I object to form of the

5  question.  The objection is that the issue -- the timber

6  interest and perpetuity to Matson Lumber Company has

7  already been litigated, and Mr. Ging will point out

8  re-litigation of that issue as required by res judicata by

9  the 1995 Court litigation.

10          MR. GING:  Are you willing to stipulate that

11  Matson owns all the timber that was on the property in

12  1969?

13          MR. FRYLING:  We are willing to stipulate

14  that Matson didn't own anything as of April 1st, 1978.

15          MR. GING:  No further questions.

16          MR. FRYLING:  I have one follow-up.

17

18                    EXAMINATION

19  BY MR. FRYLING:

20      Q.  All of the deeds that Mr. Ging asked you about,

21  these are the deeds purportedly to be an interest in the

22  timber on the Clough Farm between various Matson entities.

23      As I read it, I will refer back to the source deed as

24  being the deed between Fisher & Young, Inc. and Albert T.

25  Carlisle; is that correct?

100

1      A.  Well, I'm looking at this one.  This one refers

2  back to the deed from Robert Matson to B & B, so this is --

3  this one really doesn't have -- they don't really have --

4  they all relate back to different deeds.  They speak for

5  themselves.

6      Q.  I guess my question is, these deeds that we are

7  talking about here either identified a prior deed that you

8  created for one of the Matson entities as its prior deed in

9  title ultimately back to the deed between Fisher & Young

10  and Albert Carlisle?

11      A.  Well, right, but that just refers back to the

12  exception and reservation.

13      Q.  Okay.  So, it doesn't refer, if I understand

14  then, it does not refer to any deed by which any other deed

15  of what we have already identified that grants Fisher &

16  Young any interest in the timber and trees other than the

17  documents we have already talked about, correct?

18      A.  You asked me what these deeds refer back to, and

19  they refer back to other deeds in the chain of title.

20      Q.  I don't know -- I don't see any of them to refer

21  specifically to the exception and reservation in the deed

22  from Fisher & Young to Carlisle.

23      Q.  Okay.  So, there is no reference in these

24  documents then back to the original deed by which Fisher &

25  Young acquired any interest in the timber and trees; is

101

1    that correct?

2        A.    Right, but, you wouldn't see that.  Here, it says

3    parcel of land which Marion Kinkead conveyed to Fisher &

4    Young.

5        Generally you just go back one deed, and since Matson

6    Lumber or Matson Hardwoods acquired this property,

7    technically when you're conveying property, the first thing

8    that you would see in the chain of title might be a

9    reference to the articles of merger, you know, being the

10   same tract of land vested in Matson Hardwoods by this

11   article of merger, and then, somebody would go behind that

12   deed and then behind that deed.  You usually only go back

13   one deed.  I mean, normally.

14       MR. FRYLING:  That's all I have.

15       MS. COCO:  Never mind.

16

17       (At approximately 3:14 p.m. the deposition

18   was concluded.  Signature was not waived.)

19

20           *    *    *

21

22

23

24

25

---

102

1        I, the undersigned, JOHN C. DENNISON, do hereby

2    certify that I have read the foregoing deposition, and to

3    the best of my knowledge, said deposition is true and

4    accurate, with the exception of the corrections, if any,

5    listed below.

6    PAGE    LINE              CORRECTION AND REASON FOR CHANGE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   DATE: _____        SIGNED: _____

25

COMMONWEALTH OF PENNSYLVANIA )
                             ) SS
COUNTY OF JEFFERSON          )

CERTIFICATE

I, Stephanie Myers, a Notary Public in and for the Commonwealth of Pennsylvania do hereby certify that the deponent, **JOHN C. DENNISON**, having been duly sworn to testify to the truth, the whole truth and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and reduced to typewriting by computer and constitutes a true record of the testimony given by said witness.

I further certify that the inspection, reading and signing of said deposition was not waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 21st day of March 2006.

_____
STEPHANIE MYERS - COURT REPORTER


Stephanie Myers, Notary Public
Court Reporter

103