IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff        :
                                     :
            VS.                      :        NO. 04-25 ERIE
                                     :
                                     :
BARTONY, HARE & EDSON; SCOTT M.      :
HARE, ESQUIRE; HENRY E. BARTONY,     :
JR., ESQUIRE; and JOHN JOY V.        :
EDSON, ESQUIRE, Defendants           :

RESPONSE TO MOVANT'S
STATEMENT OF UNDISPUTED FACTS

Plaintiff, by and through his counsel, ANDREW J. CONNER, ESQUIRE of

CONNER RILEY & FRYLING, 17 West Tenth Street, P.O. Box 860, Erie, Pennsylvania

16512-0860, per FRCP 56(e), answers Defendants' Statement of Undisputed Facts

alleging as follows:

1.      Admitted in part and disputed in part. There are two "underlying" actions.

One is the federal declaratory judgment action filed at Civil Action #95-0376, hereinafter

"federal action". The second "underlying" action was also filed June 24, 1998 against

Matson in the Court of Common Pleas of Warren County, Pennsylvania at Action No.

353 C.D. 1998, hereinafter "Warren action". The second underlying action, and/or the

Warren action, was caused to be filed by the Defendant, Scott Hare, on June 23, 1998,

sending a Praecipe for Writ of Summons along with a phone call and letter on that date

to Lainard Bush instructing that it be filed by Plaintiff to recover damages against

Matson in the Warren action not recovered in the first underlying federal action. See

attached June 23, 1998 letter with the Praecipe for Writ of Summons and Amended

Complaint containing trespass and conversion counts which were the same as Counts V and VII of the original Complaint in the federal action but withdrawn prior to the December 19, 1997 verdict (Krembs, p. 35, line 20 through p. 37, line 20). See attached January 30, 2002 Opinion of the Court of Common Pleas granting Matson Summary Judgment on the refiled trespass and conversion claims, made reference to above, for any Matson conduct occurring prior to the December 19, 1997 verdict in the first action.

2.    Admitted as to the first underlying action, but disputed as to the second underlying action. The Amended Complaint in the second underlying action contained trespass and conversion counts which were originally Counts V and VII in the first underlying action. See attached Amended Complaint in Warren action.

3.    Admitted as to the first underlying action, but disputed as to the second underlying action. The Amended Complaint in the second underlying action contained trespass and conversion counts which were originally Counts V and VII in the first underlying action. See attached Amended Complaint in Warren action.

4.    Admitted in part and disputed in part. The trespass (Count V) and conversion (Count VII) claims were voluntarily dismissed from the federal action by the Defendant, Scott Hare, without Plaintiff's consent (Carlisle, p. 40, lines 11-20; p. 42, lines 11-13; p. 43, line 20 through p. 44, line 15; p. 44, lines 19-23). Both before and after the December 19, 1997 verdict in the federal action, Scott Hare made the following representations with respect to the trespass and conversion counts dismissed from the federal action, which he advised Carlisle could be refiled by Hare in the Warren action:

-2-

(a)     Carlisle had "won" the first action and this allowed Carlisle to file a second action against Matson to recover damages not awarded by the December 19, 1997 verdict (Hall, p. 86, line 25 through p. 87, line 4); after the December 19, 1997 verdict in the federal action, Hare advised Carlisle he had won, indicating ". . . I don't understand why you're so unhappy, we won. . . this is a first step and sets the stage for what is to come. . ." (Bush, p. 19, lines 22-24). While the federal action was limited in scope, the Warren action against Matson would allow Carlisle the opportunity to obtain a satisfactory damage award from Matson's pre-December 19, 1997 conduct (Bush, p. 20, lines 2-9);

(b)     Carlisle's federal and Warren actions against Matson had a "$5 million" settlement demand value (Hare Exhibit #23, p. 6 of the attached "mediation statement of Appellee, Albert T. Carlisle"). In the federal action, Carlisle was awarded $110,000, but the Warren action would provide the means to allow Carlisle to obtain a "home run damage award" against Matson (Hare I, p. 209, lines 16-25);

(c)     There was no legal impediment preventing Carlisle from filing the Warren action against Matson for any claim within the ten Counts of the federal action which had not been resolved by the December 19, 1997 verdict, providing Carlisle filed the Hare prepared Praecipe for Writ of Summons within one year after the December 19, 1997 federal action verdict (Hare I, p. 185, lines 10-23 and p. 187, line 6 through p. 188, line 13);

(d)     By filing Warren action against Matson, Carlisle could make a claim for every Count or cause of action in the federal action not resolved by the December 19, 1997 jury verdict (Hare I, p. 187, lines 12-24);

(e)     Carlisle's second action filed on June 23, 1998 in Warren County was timely and not subject to any statute of limitations defense regarding Matson's conduct occurring within two years before the March 15, 1995 filing date for the federal action, nor subject to the bar of res judicata if the refiled Counts or claims had not been actually resolved by the December 19, 1997 jury verdict (Hare I, p. 181, line 16 through p. 183, line 12, p. 185, lines 10-23; Hare II, p. 13, line 15 through p. 15, line 8; p. 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6; p. 57, lines 3-21);

(f)     Carlisle's Matson claims could be divided into two separate lawsuits (Bush Deposition, p. 41, line 3 through p. 44, line 19). The first lawsuit or the federal action would relate to liability (Bush, p. 41, lines 16-25). The second, or Warren, action would present Carlisle's damage claim against Matson (Bush, p. 42, lines 1-7);

(g)     In a January, 1998 meeting in Ashtabula, Ohio, Hare represented that the damages Carlisle could recover from Matson in the Warren action included property damage and damages for Matson's tree cutting (Bush, p. 47, line 15 through p. 48, line 2). The Warren action involved a damage claim for ". . . cutting of trees and property damage" not pursued in the federal action (Bush, p. 49, lines 10-22);

(h)     Prior to the federal action, Hare represented he would check the property records at the Warren County Court House (Bush, p. 31, line 17 through p. 32, line 18). As there were a lot of "questions surrounding. . . the history of ownership. . . one of the things he (Hare) would be doing was going to the Warren County Court House and going through all those records so all those questions could be answered. Those involved titles. . ." (Bush, p. 32, lines 10-15).

5.     Disputed. Scott Hare represented that the two dismissed Counts, made reference to above, could be refiled in the Warren action and, providing the refiled action was filed in Warren within one year of December 19, 1997, Carlisle could make a recovery of all damages from Matson he could have recovered in either the trespass or conversion Counts in the first underlying action, including all of Matson's timbering between March 15, 1993 and March 15, 1995. See representations made by Hare, set forth above in Paragraphs 4(f) through 4(h) of this Answer, all of which are incorporated herein by reference. Also, see statements made by Hare that Carlisle, by refiling the Warren action within one year of the dismissal of the December, 1997 trespass and conversion counts, would be allowed to claim and recover damages against Matson for their 1993-1995 timbering activities (Hare II, p. 13, line 5 through p. 15, line 8; page 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6). If the decision to dismiss "those claims" was a strategic decision, it was conduct by Hare which was below the standard of care. See Judge Millin's January 30, 2002 Opinion and Affidavit and reports of Will J. Schaaf, Esquire, attached.

6.     Admitted in part and disputed in part. The first underlying action was tried to verdict on December 19, 1997. The refiled trespass and conversion Counts, which Hare recommended Carlisle file on June 23, 1998 and which were part of the second underlying action, were effectively dismissed from the Warren action by the Warren Court on January 30, 2002 (Opinion attached).

7.     Admitted as to the first underlying action.

8.     Admitted in part and disputed in part. It is admitted that a jury awarded Carlisle $110,000 in damages, but the jury also awarded Matson an ownership interest in the "1969" trees, an ownership interest Matson never had prior to this verdict. See report and affidavit of Christine H. McClure, Esquire.

9.     Admitted in part and disputed in part. On June 15, 1998, Hare unilaterally withdrew from representing Carlisle during Matson's appeal to the Third Circuit in the federal action and Carlisle obtained replacement counsel for that appeal. Hare continued to represent Carlisle in the Warren action through June 23, 1998, when he made the June 23, 1998 phone call to Lainard Bush and prepared and sent the letter and Praecipe for Writ of Summons to start the second action in Warren County which Hare had previously discussed with Carlisle. See Hare Exhibits #24 and #25 and Hare's February, 1999 bill ($260.00) for preparing that Praecipe for Writ of Summons (Hare Exhibit #54; Hare I, p. 176, line 13 through p. 179, line 5; Bush, p. 40, lines 1-22; p. 44, line 15 through p. 46, line 3).

10.     Admitted in part and disputed in part. The federal action arose out of Matson's timbering the 1,239.6 acres of the "Clough Farm" and the identity of the owner of the $3.6 million of timber Matson removed from the Clough Farm between 1988 and 1995. In 1970, Carlisle acquired title to the Clough Farm property, including the timber on that property which, in 1970 or thereafter, would be considered "personalty", rather than "realty" under the controlling Pennsylvania law. After Fisher & Young's timber rights on the Clough Farm expired on April 1, 1978, the timber attached to the soil became the property of Carlisle by 1988 as a matter of law (Kookogey, p. 43, lines 2-4; p. 65, lines 15-20; p. 67, line 20 through p. 68, line 2). See reports and affidavits of Will

J. Schaaf, Esquire and Christine H. McClure, Esquire; Saltonstall v. Little, 90 Pa. 422, 425 (1879) ("It was a reservation of the timber for 12 years and no longer. After that time, the remaining trees passed with the grant of the soil to which it (the timber) was attached"). In Saltonstall, supra, 90 Pa. at 425, the Court held "it was a reservation of the timber for 12 years and no longer. At that time, the trees remaining passed with the grant of the soil to which they were attached." At the end of the 12 years, the party who was the owner of the soil in Saltonstall, supra was "Veazie", a party similarly situated as Carlisle here, who the Court in Saltonstall, supra deemed was the owner of the timber.

11.   Admitted in part and disputed in part. The legal effect of the Deed was that Carlisle purchased the real estate and any timber on the property which remained attached to the Clough Farm property and would be considered "personalty" under Pennsylvania law as of April 1, 1978 and thereafter. See Answer to Paragraph 10, which is incorporated herein by reference.

12.   Admitted in part and disputed in part. The Answers to Paragraph 10 and 11 are incorporated herein by reference. Even though Plaintiff exercised reasonable diligence to ascertain the identity of the owner of the Clough Farm timber, neither Fisher & Young nor their legal counsel thereafter ever disclosed to Carlisle the existence of an April 1, 1973 Kinkead to Fisher & Young timber Deed for the same timber, made reference to in Hare Exhibit #44, which was recorded on April 20, 1973, which provided that on April 1, 1978, all Clough Farm timber rights reverted to the grantor (Kinkead) on April 1, 1978 (Hare Exhibit #44; Carlisle, p. 75, lines 7-13; p. 77, line 3; p. 127, lines 8-14; Kookogey, p. 147, lines 7-12; p. 180, line 8 through p. 181, line 5).

13.    Admitted in part and disputed in part. The Answer to Paragraph 12 is incorporated herein by reference. In further answer to these allegations, Hare knew Carlisle had certain goals in retaining Hare to bring action against Matson and pay Hare the $45,000 to $72,000 fee requested by Hare in 1994, including the following:

(a)    Carlisle's purpose of claiming against Matson in the federal action was "he wanted the timber company to be off the property" (Hare I, p. 52, lines 9-22);

(b)    He consulted Hare in 1994 because ". . . I thought they (Matson) had stolen some of my property. . . trees. . . I wanted to get rid of them (Matson) from the farm. . . I felt they (Matson) no longer belonged there. . ." (Carlisle, p. 35, line 24 through p. 36, line 5);

(c)    Carlisle's goal was to keep Matson off the Clough Farm (Hare II, p. 64, line 24 through -. 65, line 5);

(d)    Carlisle wanted to "explore the assertion that all the timber on the property (Clough Farm) should have been conveyed to (Bert Carlisle). . . any timber harvested (by Matson) constituted money damages to (Carlisle)" (Hare I, p. 72, lines 15-23);

(e)    Hare's responsibility to Carlisle in the federal action included determining what timber Carlisle owned and what timber Matson owned (Hare I, p. 91, lines 9-15);

(f)    Hare assumed the responsibility of conducting the required fact investigation to support the claims made in the federal action (Hare I, p. 93, line 12 through p 94, line 12);

(g)    Hare knew that Matson took 4 to 7 million board feet or $3.6 million worth of timber off the Clough Farm from 1988 through 1994 (Hare I, p. 118, line 4 through p. 119, line 15); and

(h)    Hare knew part of the 4 to 7 million board feet, or $3.6 million worth, of timber Matson cut and removed from the Clough Farm timber occurred between 1993 through 1995, and/or within two years of the filing date of the federal action (Hare I, p. 117, lines 7-12).

14.    Admitted in part and disputed in part.  The McChesney lawsuit was a boundary dispute which also involved some timbering by McChesney (Carlisle, p. 21, lines 15-23).

15.    Admitted in part and disputed in part.  It is admitted there was an agreement between counsel representing Plaintiff and counsel representing Fisher & Young Hardwoods, Inc., but the agreement was only with respect to the McChesney boundary dispute litigation.  Further, the agreement between counsel in the McChesney boundary dispute  was based on the non-disclosure by Fisher & Young that the Clough Farm timber rights terminated April 1, 1978, as recited in detail in Answer to Paragraph 12, incorporated herein by reference.  In further answer, Fisher & Young Hardwoods was the correct name of the successor in interest to Fisher & Young as of 1985, and Fisher & Young Hardwoods never became the successor in interest to Fisher & Young's Clough Farm timber rights.  Unknown to Carlisle, the 1973 Fisher & Young deed to American Hardwoods, which thereafter became Fisher & Young Hardwoods, applicable to the Clough Farm timber was never recorded in Warren County and, even if recorded, their Clough Farm timber rights expired April 1, 1978 (Dennison, p. 64, line 20 through

p. 65, line 5; Sekerak, p. 28, line 4 through p. 29, line 4; Kookogey, p. 43, lines 2-4; p. 65, lines 15-20; p. 67, line 20 through p. 68, line 2; p. 76, lines 15-24).

16.    Admitted in part and disputed in part. Plaintiff's Answers to Paragraphs 12 and 15 are incorporated herein by reference. Lauri Sekerak performed no title search with respect to the "McChesney" claim (Sekerak, p. 23, lines 6-16). Lauri Sekerak confirms the April 1, 1968 Kinkead to Fisher & Young timber Articles of Agreement were never recorded in Warren County (Sekerak, p. 27, lines 14-25). Lauri Sekerak confirms that between the date of Carlisle's January 9, 1970 property Deed (Hare Exhibit #45) and 2002, there was only one timber Deed recorded in Warren applicable to the 1,239.6 acre Clough Farm which was the April 1, 1973 Kinkead to Fisher & Young timber Deed, which terminated Fisher & Young's Clough Farm timber rights on April 1, 1978 (Sekerak, p. 28, line 4 through p. 29, line 4; Kookogey, p. 43, lines 2-4; p. 65, lines 15-20; p. 67, line 20 through p. 68, line 2; p. 76, lines 15-24); see Answer to Paragraph 12, which is incorporated herein by reference. The only other recorded deed for this property and timber after 2002 is the May, 2003 Kinkead Estate to Matson quit-claim timber deed which conveyed no timber rights to Matson (Sekerak, p. 29, lines 6-15; report and affidavit of Christine H. McClure, Esquire).

17.    Disputed. See Answers to Paragraphs 12, 15 and 16, which are incorporated herein by reference.

18.    Disputed. See Answers to Paragraphs 12, 15 and 16, which are incorporated herein by reference. After 1970, Carlisle attempted to ascertain the identity of the owner of the Clough Farm timber rights from Fisher & Young and/or their counsel. The 1973 timber deed from Kinkead to Fisher & Young, either inadvertently or

intentionally, was never disclosed to Carlisle (Kookogey, p. 147, lines 7-12; p. 180, line 8 through p. 181, line 5). In 1994 through 1997, Hare told Carlisle he would check the Warren County property records to obtain the relevant title documents in the Warren County Court House (Bush, p. 31, line 17 through p. 32, line 18; p. 32, lines 10-15; Carlisle, p. 83, lines 2-5).

19.    Disputed. See Answers to Paragraph 12, 15, 16 and 18, which are incorporated herein by reference; see, specifically, Paragraph 10(d)(iii) (Hare concedes Carlisle wanted to "explore the assertion that all the timber on the property (Clough Farm) should have been conveyed to (Bert Carlisle). . . any timber harvested (by Matson) constituted money damages to (Carlisle)" (Hare I, p. 72, lines 15-23).

20.    Admitted in part and disputed in part. It is admitted that Plaintiff was unhappy with the jury verdict. However, Hare thereafter and prior to June 23, 1998, made the representations and statements to Carlisle or repeated the pre-December 19, 1997 representations and statements set forth in detail in Paragraphs 4(a) through 4(h) of this Answer. Those paragraphs and statements are incorporated herein by reference and were relied upon by Carlisle up and until the Warren Court dismissed the trespass and conversion Counts on January 30, 2002 with respect to any of Matson's conduct, which provided the basis for the trespass and conversion claims occurring prior to the December 19, 1997 verdict in the federal action (Carlisle, p. 65, lines 9-16, 20; p. 61, lines 8-12, p. 72, lines 8-9, p. 73, lines 15-16).

21.    Admitted in part and disputed in part. Hare caused Plaintiff to file the Warren action on June 24, 1998 for all the reasons set forth in Answers to Paragraphs 1 and 4(a) through 4(h) of this Answer, which are incorporated herein by reference

(Hare I, p. 176, line 13 through p. 179, line 5; Bush, p. 40, lines 1-22; p. 44, line 15 through p. 46, line 3).

22.    Disputed. Hare was the initial counsel in the Warren action for all the reasons set forth in Answers to Paragraphs 1 and 21, which are incorporated herein by reference. The refiled trespass and conversion claim contained in the Amended Complaint in the Warren action were previously Count V (trespass) and Count VII (conversion) in the federal action (see attached Amended Complaint). Those two Counts were believed to be timely preserved in the Amended Complaint filed in the Warren action by Krembs so as to allow Carlisle to make claim against Matson for its March 15, 1993 through March 15, 1995 timbering and related conduct (Krembs, p. 33, lines 4-16).

23.    Admitted in part and disputed in part. The purpose of the "Warren action" was to litigate the "issues that Hare had voluntarily dismissed prior to trial. . ." from the federal action (Krembs, p. 15, line 24 through p. 17, line 3). Krembs not performing a title search of the Clough Farm with respect to the Warren action was based on the "assumption" that Hare, as part of his professional services provided Carlisle in the federal action, had previously performed a title search (Krembs, p. 20, line 21 through p. 21, line 3). Krembs testified that performing a title search by legal counsel, similarly situated as Hare, was the customary practice in real estate disputes similar to the federal action (Krembs, p. 37, line 3 through p. 39, line 13).

24.    Admitted. The January 30, 2002 Order by the Warren Court is an interlocutory order.

-12-

25.    Admitted in part and disputed in part.  The Warren Court granting partial Summary Judgment to Matson on January 30, 2002 has effectively precluded Carlisle from making any recovery on the refiled trespass and conversion claims which derived from the federal action.  Both claims were refiled based on the representations of Hare, described in detail in Paragraphs 4(a) through 4(h) of this Answer, that Carlisle could recover for Matson's conduct causing trespass and conversion damages occurring prior to the December 19, 1997 verdict and between 1993 and 1995.  See recitals of Hare's deposition testimony in Answer to Paragraph 5, incorporated herein by reference.  Considering that Matson, between December 19, 1997 and January 30, 2002, only briefly reentered the property for a very short time in 1998, the substantial or "home run" type damage claim (Hare I, p. 209, lines 16-25) represented by Hare to be available to Carlisle related to Matson's 1993 through 1995 conduct ". . . in cutting of trees and property damage" not pursued in the federal action which was dismissed for the first time from the Warren action by the Warren Court on January 30, 2002 (Bush, p. 47, line 15 through p. 48, line 2: p. 49, lines 10-22).  Carlisle, from what Hare told him, had the understanding that he could refile the trespass and conversion claims in the Warren action which Hare voluntarily dismissed from the federal action and which the Warren Court, on January 30, 2002, effectively dismissed from the Warren action by granting Matson's Motion for Partial Summary Judgment on the trespass and conversion Courts in the Warren action (Carlisle, p 95, lines 5-10).

26.    Disputed.  Matson, as the successor in interest to Fisher & Young and/or Fisher & Young Hardwoods, is held to have the knowledge of Fisher & Young and their legal counsel.  That knowledge includes the knowledge that Fisher & Young's counsel

prepared both the 1968 unrecorded Kinkead to Fisher & Young timber Articles of
Agreement and the related 1973 timber Deed (Kookogey, p. 18, lines 4-13). It also
includes the knowledge that the property and the timber were separated, with the latter
being transferred only for five years, and not more, to avoid payment of the transfer tax
(Dennison Exhibit #15; Kookogey, p. 23, lines 5-6, p. 23, line 24 through p. 24, line 7, p.
43, lines 2-4, p. 64, lines 12-23, p. 65, lines 5-17). It includes the knowledge that Fisher
& Young's timber rights on the Clough Farm expired April 1, 1978 (Kookogey, p. 64,
lines 18-19). Chester Fossee, Matson's counsel during the pendency of the federal
action and prior to the December 19, 1997 verdict, had possession of the unrecorded
April 1, 1968 Kinkead to Fisher & Young "timber" Articles of Agreement, made
reference to above (Fossee Exhibit #3-3). Those April 1, 1968 unrecorded Articles of
Agreement contained the following language:

> "All of the timber and trees standing and down measuring
> twelve (12) inches or more in diameter, one (1) foot from the
> ground, on the premises here and after described; with the
> right to enter on said premises and to cut, skid, pile and
> remove the same, subject to the terms of this agreement,
> <u>until April 1, 1978, on and after which date all the rights
> hereunder shall revert to the owner of the land</u>". (emphasis
> provided)

(Fossee, p. 51, line 6 through p. 54, line 6; Dennison, p. 50, lines 1-7; Fossee Exhibit
#3-3).

27.    Disputed. Kinkead and Fisher & Young had the specific intent to transfer
the Clough Farm timber to Fisher & Young as "personalty" for a time period not longer
than 10 years. There was no "mutual mistake" because, after ten years, both Kinkead
and Fisher & Young intended that ownership of the timber would revert back to the

owner of the land, Carlisle or Kinkead (grantor), so as to avoid the transfer tax on the $100,000 payment made for the transfer of the timber because, in Pennsylvania, the transfer of timber rights for a period of time of 10 years or less classifies the timber transfer one of personalty, not realty (Kookogey, p. 23, lines 5-6, p. 23, line 24 through p. 24, line 7, p. 43, lines 2-4, p. 64, lines 20-23, p. 65, lines 5-17).

28.     Disputed.  Answers to Paragraphs 26 and 27 are incorporated herein by reference.

29.     Disputed.  The 2003 Quit-Claim Deed was signed by Doris Squatriti.

30.     Disputed.  The Kinkead to Fisher & Young 1973 timber deed terminated Fisher & Young's timber rights on April 1, 1978 (Kookogey, p. 43, lines 2-4; p. 61, lines 5-22; p. 64, lines 18-19). This April 1, 1978 termination of timber rights when both Kinkead and Fisher & Young intended the transfer of timber rights to be considered "personalty" was consistent with the Pennsylvania law. Saltonstall v. Little, 90 Pa. 422 (1879) (it was a reservation of the timber for 12 years and no longer. After that time, the trees remaining passed with the grant of the soil to which it (the timber) was attached), and the intention of Kinkead and Fisher & Young to avoid payment of the transfer tax if the timber was realty (Kookogey, p. 65, lines 15-20; p. 67, lines 5-17; p. 76, lines 15-24). See Saltonstall, supra. The intent of the parties to the Kinkead to Fisher & Young transaction was that the Clough Farm timber rights were "personalty" in 1978. On and after April 1, 1978, the timber on the Clough Farm became part of the 1,239.6 acres of land owned by Carlisle to which the timber was attached, as a matter of fact and law. Saltonstall, supra; reports of Schaaf and McClure.

31.     Admitted.

32.    Admitted.

33.    Admitted.

34.    Admitted in part and disputed in part. It is admitted that this action was filed on January 27, 1994 and less than 2 year after the Warren Court, on January 30, 2002, granted Matson Partial Summary Judgment on the trespass and conversion counts in the Amended Complaint in the Warren action, which Hare voluntarily dismissed from the federal action and told Carlisle, per Paragraph 4(a) through 4(h), could be successfully refiled in a second action against Matson with the Praecipe for Writ of Summons he sent Lainard Bush on June 23, 1998 with instructions to file (Bush, p. 19, lines 22-24; Bush, p. 20, lines 2-9).

35.    Disputed. In addition to the negligent acts described in Paragraph 35, Hare:

(a)    Voluntarily dismissed Counts V (trespass) and VII (conversion) from the federal action without Carlisle's consent prior to the December 19, 1997 verdict, when he knew, or should have known, that Matson had zero timber rights on the Clough Farm and was a trespasser, not a licensee, and believing those two Counts could be effectively refiled in a subsequent Warren action against Matson (Hare I, p. 185, lines 10-23; p. 186, lines 1-6; p. 187, lines 12-20); Carlisle, p. 42, lines 11-13; p. 148, lines 10-25; Bush, p. 42, lines 1-7; p. 49, lines 10-22);

(b)    Failed to request Matson to properly respond to Paragraph 4 of his Request for Production of Documents served on Matson after Matson either intentionally or inadvertently failed to identify and provide copies of the documents evidencing their Clough Farm timber deed or other documents evidencing their

-16-

ownership of the Clough Farm timber (Hare I, p. 107, lines 4-16; Fossee, p. 45, lines 9-13; p. 45, line 24 through p. 46, line 11; p. 46, line 25 through p. 47, line 8; Hare Exhibits #46 and #47);

        (c)     Represented to Carlisle that the major damage claims, not presented or resolved by the jury in the federal action could be refiled in a second action against Matson in the Warren action after the December, 1997 verdict, providing the refiled Warren action was filed within one year of the December 19, 1997 verdict to comply with the "saving statute" provisions of 42 Pa.C.S.A. 5535(a)(1) (see the record references and exhibits identified in Paragraphs 1(a) through (h) of this Answer, expert reports and FRCP 56(e) Affidavit of Will J. Schaaf, Esquire, expert report and FRCP 56(e) Affidavit of Christine H. McClure, Esquire, both of which attached, and Paragraphs 13(b) and 15 of Plaintiff's Amended Complaint);

        (d)     Concluded that Matson, while timbering the Clough Farm between 1988 and 1994 and taking the 4-7 million board feet of timber having a value of $3.6 million, was acting as a "licensee" and not as a "trespasser" without ever obtaining or reading any documents which convey timber ownership rights in the Clough Farm to Matson and/or their alleged predecessor in interest, Fisher & Young or Fisher & Young Hardwoods, without obtaining or reading the available title documents at the Warren County Court House that terminated Fisher & Young's Clough Farm timber rights on April 1, 1978, even though he knew those documents had to exist and had to be properly recorded in the Warren County Court House to be effective (Hare I, p. 62, lines 19-21; p. 86, lines 10-11; p. 87, lines 4-6, p. 117, lines 7-22; Sekerak, p. 28, line 4

through p. 29, line 4; Sekerak Exhibit #9; Hall's May, 1997 report; Hare Exhibit #15;
Schaaf and McClure reports);

   (e) Failed to know, prior to the December 19, 1997 verdict in the
federal action, that Matson had no timber deed to it or any predecessor in interest
which gave it any legal right to be on the Clough Farm and/or any right to conduct any
timbering operation whatsoever on that property (Sekerak, p. 28, line 14 through p. 29,
line 5; Schaaf and McClure reports);

   (f) As a consequence of allegations in (f), above, failed to know that
prior to the December 19, 1997 verdict in the federal action, Matson had no past or
future ownership rights in the "1969" timber (Sekerak, p. 28, line 14 through p. 29, line
5; Schaaf and McClure reports);

   (g) Failed to know that, by allowing the claims which remained in the
federal action prior to the December 19, 1997 verdict and after the trespass (Count V)
and conversion (Count VII) counts were withdrawn by Hare, the December 19, 1997
verdict Hare was requesting for Carlisle would cause Matson to be granted ownership
rights in the "1969 timber", made reference to in Paragraphs 8(a) and (b) of this
Answer, even though Matson, in fact, had no such ownership rights in that "1969"
timber (McClure report);

   (h) Failed to conduct, prior to the December 19, 1997 verdict, the
necessary fact and legal investigation to provide the investigative and legal services to
Carlisle which Hare agreed to undertake and perform (see Paragraphs 11(d)(v), (vii)
and (xiii) of this Answer) to help Carlisle achieve the goals communicated to Hare (see
Paragraphs 11(d)(I) through (iv) of this Answer);

(i)     Concluded that Hare Exhibit #5 (Fisher & Young's May 28, 1969 property Agreement of Sale to Carlisle recorded January 20, 1970 with timber reservation) represented the document which "conveyed" timber rights to Fisher & Young in Clough Farm timber and, specifically, the "1969 timber" when he knew, or should have known, it conveyed no timber rights to Fisher & Young (Kookogey, p. 64, lines 18-19; p. 81, line 18 through p. 82, line 9; Hare I, p. 78, lines 11-18; Sekerak, p. 28, line 14 through p. 29, line 5; Schaaf and McClure reports);

(j)     Concluding and basing his recommendation to Carlisle that the trespass (Count V) and conversion (Count VII) counts of the federal action could be withdrawn and thereafter timely refiled in the Warren action within one year after the December 19, 1997 verdict, so as to allow Carlisle to timely claim and recover all damages in the Warren action he could have recovered in the federal action on those counts, when he knew, or should have known, that the Pennsylvania law interpreting the "saving statute", 42 Pa.C.S.A. 5535, only permits this if the first action is filed in a Pennsylvania state court and not first filed in a U.S. District Court (Hare I, p. 185, lines 10-23; p. 187, lines 12-20; Hare 22, p. 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6; Maxwell Downs v. Philadelphia, 638 A.2d 473, 476-77 (Cmmwlth. Ct. 1994); Schaaf report);

(k)     Concluding and basing his recommendation to Carlisle, discussed in (k), above, that the refiled trespass (Count V) and conversion (Count VII) claims from the federal action, because they were dismissed prior to the December 19, 1997 verdict, would not be subject to a res judicata defense raised by Matson in the Warren

action (Hare I, p. 185, lines 10-23: p. 186, lines 1-6; p. 221, lines 21-24; Judge Millin's January 30, 2002 Opinion);

(l)     Failing to know, during the pendency of the federal action and prior to the December 19, 1997 verdict, that Fisher & Young never conveyed by recorded deed to American Hardwoods (which thereafter by a name change became Fisher & Young Hardwoods) timber rights in the Clough Farm and, as a consequence of that gap in timber title and that Fisher & Young's timber rights expired April 1, 1978, Matson was not a successor in interest to any timber rights on the Clough Farm (Hare I, p. 119, line 19 through p. 120, line 6; p. 221, lines 21-24; Dennison, p. 64, line 19 through p. 65, line 8; Sekerak, p. 28, line 14 through p. 29, line 5; McClure report);

(m)     Failing, prior to acting to withdraw the trespass (Count V) and conversion (Count VII) claims from the federal action prior to the December 19, 1997 verdict, to obtain Carlisle's knowledgeable agreement and consent to the withdrawal of those counts (Carlisle, p 40, lines 11-16; p. 42, lines 9-13; p. 43, line 20 through p. 44, line 15; p. 44, lines 19-23; Bush, p. 51, line 6 through p. 52, line 3; Hall, p. 71, lines 15-19).

36.     Admitted in part and disputed in part. Carlisle makes claim for (a) the timber cut and converted by Matson in 1993-1994 or $312,000 (Carlisle, p. 98, lines 11-14; affidavit and October 25, 2005 report of James Hall); (b) the timber cut and converted by Matson in 1994-1995 or $125,097.26 (Carlisle, p. 99, lines 15-20; affidavit and October 25, 2005 report of James Hall); (c) the timber cut and converted by Matson in 2005-2006 or at least $100,00 to $200,000, or more (affidavit and May 26, 2006 supplemental report of James Hall); (d) property damage for Matson's trespass and

-20-

property damages caused by Matson cutting and removing the timber, described above; (e) treble damages per 42 Pa.C.S.A. 8311 for cutting and timber conversions, described above; (f) the value of the remaining "1969" trees, which continue to remain on the Clough Farm after the recent 2005-2006 timbering; (g) the $311,60 to $369,500 "reduction in value" to the 779 acres of real estate where the commercial timber is located on the Clough Farm as a consequence of Matson having the indeterminate right to the 1969 timber (see attached Affidavit and report of Edward Sekerak); and (h)causing a "cloud" on Carlisle's title in not effectively requesting the Court in the first underlying action to terminate Matson's right as a trespasser to reenter the Clough Farm for any reason after the December 19, 1997 verdict in the federal action, which cloud continues through the present date, preventing Carlisle from being able to sell the 779 acres of commercial timber property containing the remaining "1969" trees (Carlisle, p. 71, lines 16-19; p. 112, lines 7-15; p. 115, line 17 through p. 116, line 2).

     37.    Disputed. The damages for the 1993 through 1995 conversion of Carlisle's timber by Matson ($437,960) and the property damage caused by Matson's 1993 through 1995 trespass on Carlisle's property, although available to Hare, was never proven in the federal action. Those two claims were withdrawn by Hare on the representations by Hare to Carlisle that they could be refiled in the second underlying action in Warren County. Therefore, the $437,960 of timber cut and removed by Matson from Clough Farm, the Plaintiff's property, was never proven or claimed by Hare in the federal action. See Answers to Paragraphs 5 and 36, incorporated herein by reference. Damages from the current "cloud on Carlisle's title" to the estimated 779 acres of commercial timber out of the total 1,239.6 acres were never presented in the

Warren action (Carlisle, p. 48, lines 15-16). Conversion and trespass damages for Matson's 2005 through 2006 timbering activities during which Matson cut and removed another $100,000 to $200,000, or more, of timber off the Clough Farm, which was not the property of Matson prior to the December 19, 1997 verdict but, rather, the property of Carlisle, was never presented in the Warren action because Matson cut and removed that timber between November, 2005 and March, 2006 (see May, 1997, October, 2005 and May, 2006 reports and affidavits of James Hall; Carlisle, p. 69, line 10 through p. 70, line 2), and the damages resulting from the $311,600 to $389,500 decline in value of the 779 acres of the real estate where the commercial timber was located, discussed in Paragraph 37(g), could not have been, and was not presented, in the federal action.

Respectfully submitted,

CONNER RILEY & FRYLING

BY: _____

ANDREW J. CONNER, ESQUIRE
ATTORNEY FOR PLAINTIFF
17 West Tenth Street
Erie, Pennsylvania 16501
(814) 453-3343

DATED: June 15, 2006.

-22-

# Bartony Hare & Edson
### Attorneys at Law

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone 412/338-8632
Facsimile  412/338-6611

June 23, 1998

**VIA OVERNIGHT EXPRESS**

Mr. Lainard Bush
Rd # 1  Box 9
Spring Creek, PA  16436



Re:  <u>Additional Lawsuit against Matson</u>

Dear Lainard:

I have prepared the enclosed Praecipe for Writ of Summons for filing with the Prothonotary's Office in the Court of Common Pleas of Warren County.  The filing of this Praecipe will initiate a new lawsuit on Bert's behalf against Matson, and toll the running of any statute of limitations.

Please sign the Praecipe on Bert's behalf and take it to the court house for filing.  The filing fee is $60.50.  You can tell the clerk that Bert will arrange for service at a later date, so there is no need for them to deliver the praecipe to the sheriff.

If you have any questions, please call.

Very truly yours,

Scott Michael Hare

/SMH

Enclosures

IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

**ALBERT T. CARLISLE,**

       Plaintiff,

    v.

**MATSON LUMBER CO.** and
**MATSON HARDWOODS, INC.,**

       Defendants.

CIVIL DIVISION

NO. _____

CODE:

**PRAECIPE FOR
WRIT OF SUMMONS**

Filed on behalf of
Plaintiff

Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH 44004

Tel: 440-964-2131

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,         )
                            )
              Plaintiff,    )
                            )
      v.                    )        No. _____
                            )
MATSON LUMBER CO. and       )
MATSON HARDWOODS, INC.,     )
                            )
              Defendants.   )


### PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

        Kindly issue a Writ of Summons in Civil Action
against the within-named Defendants.




                                 Albert T. Carlisle
                                 1210 Oak Drive
                                 Ashtabula, OH  44004

                                 Tel: 440-964-2131

Date:      June 23, 1998



IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,

    Plaintiff,

    v.

MATSON LUMBER CO. and
MATSON HARDWOODS, INC.,

    Defendants.

CIVIL DIVISION

NO. _____ 000353

TYPE:

PRAECIPE FOR
WRIT OF SUMMONS

Filed on behalf of
Plaintiff

Albert T. Carlisle
1216 Oak Drive
Ashtabula, OH 44004

Tel: 440-964-2131





Plaintiff's Appendix
000483

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,

      Plaintiff,

      v.

No. 000353

MATSON LUMBER CO. and
MATSON HARDWOODS, INC.,

      Defendants.

## PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

      Kindly issue a Writ of Summons in Civil Action

against the within-named Defendants.

Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH 44004

Tel: 440-964-2137

Date:    June 23, 1998

RECEIVED

Plaintiff's Appendix
000484

COURT OF COMMON PLEAS OF WARRANTY COUNTY,
PENNSYLVANIA

ALBERT T. CARLISLE                          CIVIL ACTION - LAW

            Plaintiff,                 Number 353 - 1998 C.D.

   vs.                                  Type of Case:  Civil Division

MATSON LUMBER COMPANY and                   Type of Pleading:  Amended
MATSON HARDWOODS, INC.                      Complaint

            Defendants.

Filed on behalf of:  Plaintiff,
Albert T. Carlisle

Counsel of Record for this Party:

Elizabeth Ziegler (PA No. 80573)
Law Offices of Henry Borger
301 Market Street
Warren, Pennsylvania  16365
(814) 723-5030

Faith Strawley (PA No: 69050)
Peter J. Krembs (OH No: 0024871)
HERMANN, CAHN & SCHNEIDER
1301 East Ninth Street, Suite 500
Cleveland, Ohio  44114
(216) 781-5515

IN THE COURT OF COMMON PLEAS
WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE           )     CASE NO. 353-1998 C.D.
                             )
          Plaintiff,         )
                             )
     -v-                     )
                             )
MATSON LUMBER COMPANY        )     AMENDED COMPLAINT
                             )
     and                     )
                             )
MATSON HARDWOODS, INC.       )
                             )
          Defendants.        )

NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims
set forth in the following pages, you must take action within twenty (20) days
after this Complaint and Notice are served, by entering a written appearance
personally or by attorney and filing in writing with the court your defenses
or objections to the claims set forth against you. You are warned that if you
fail to do so the case may proceed without you and a judgment may be entered
against you by the court without further notice for any money claimed in the
Complaint or for any other claim or relief requested by the plaintiff. You may
lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE
A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW
TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

          PENNSYLVANIA LAWYER REFERRAL SERVICES
          Pennsylvania Bar Association
          100 South Street
          Harrisburg, PA 17108            Phone (800) 692-7375

          NORTHWESTERN LEGAL SERVICES
          Warren, Pennsylvania 16365      Phone (814) 726-2530

---

1

Paragraphs marked with an asterisk (*) are amendments to
the original Complaint.

Now comes Plaintiff, Albert T. Carlisle, by and through counsel, and for his Amended Complaint, states as follows:

I.    INTRODUCTION

1.    Plaintiff Albert T. Carlisle is an individual residing in Ashtabula, Ohio.

2.    Defendant Matson Lumber Company ("Matson Lumber") is a corporation organized and existing pursuant to the laws of the Commonwealth of Pennsylvania. Its principal place of business is in Brookville, Pennsylvania.

3.    Defendant Matson Hardwoods, Inc. ("Matson Hardwoods") is a corporation under the laws of the Commonwealth of Pennsylvania. Its principal place of business is located in Brookville, Pennsylvania. Hereinafter Defendants may be referred to collectively as "Matson".

4.    Matson is the successor in interest to Fisher and Young, Inc. with respect to an Agreement of Sale upon which this action is, in part, based.

5.    Plaintiff Albert Carlisle owns a parcel of land consisting of approximately 1,239.6 acres located in Spring Creek Township, Warren County, Pennsylvania. This property is known as the "Clough Farm". Carlisle owns this property in fee simple, subject only to certain limited timber rights held by Matson.

6.    The Clough Farm is centrally located between Pittsburgh, Cleveland and Buffalo and is within a few miles of 9200 acres of state game land. The landscape and natural

2

resources of the Clough Farm include two class A trout streams, Spring Creek and Brokenstraw Creek. Carlisle purchased the subject property from Fisher and Young, Inc., a Pennsylvania corporation, now dissolved, by written agreement of sale dated May 28, 1969. A copy of the Agreement of Sale is attached hereto as Exhibit A.

7.   The sale was recorded by a general warranty deed dated January 9, 1970. A copy of this deed is attached hereto as Exhibit B.

8.   The deed and Agreement of Sale were filed on January 19, 1970 at Warren County Deed Book 361, Page 13 and January 20, 1970 at Warren County Deed Book 361, Page 32, respectively.

9.   The Agreement of Sale conveys to Carlisle all of the land and premises described therein except that it reserves in Fisher and Young, Inc., "all of the timber and trees, standing and fallen, situate on the premises above described," subject to certain additional limiting provisions, as set forth throughout the Agreement of Sale.

10.   Paragraph 6 of the Agreement of Sale provides as follows:

> ... Seller shall confine the cutting of saw timber to those trees which measure 16" or more in diameter at 1 ft. Above the ground and shall confine its logging operations to the season from November 1 to March 31 each year. However, smaller trees may be removed, as in thinning, or in pest or fire control, whenever or wherever good forestry practice so dictates.

3

11. On or about May 4, 1973, American Hardwood Industries, Inc. purchased the assets of Fisher and Young, Inc., including its timber rights at the Clough Farm. This transaction created an entity known as Fisher and Young Hardwoods, Inc. which thereafter owned the timber rights.

12. On or about December 18, 1986, Matson Hardwoods acquired Fisher and Young Hardwoods, Inc. and the timber rights, by merger. Thereafter, Matson Hardwoods undertook timber harvesting operations on the Clough Farm pursuant to the terms of the Agreement of Sale.

13. On December 30, 1994, effective January 1, 1995, Matson Hardwoods merged into Matson Lumber. Pursuant to the Articles of Merger, all assets of Matson Hardwoods, Inc. became the assets of Matson Lumber Company.

14. As a result of the transactions set forth above, Matson is the successor in interest of Fisher and Young, Inc. with respect to the May 28, 1969 Agreement of Sale and January 9, 1970 deed. Matson is thereby bound in the same manner as was Fisher and Young, Inc.

15. On December 18, 1997, in an action captioned <u>Albert T. Carlisle v. Matson Lumber Company, et al.</u>, being Case No. 95-0376 in the United States District Court for the Western District of Pennsylvania, a declaratory judgment was rendered in favor of Albert T. Carlisle on, <u>inter alia</u>, the following issue:

> "The jury finds the parties intended to grant seller [Matson] the right to harvest only the timber that then existed on the property in 1969."

4

The transcript of the jury's verdict is attached hereto as Exhibit "C."

16.  On June 24, 1998, Plaintiff caused a Writ of Summons to be filed with the Prothonotary's office in the Court of Common Pleas of Warren County, Pennsylvania as to each defendant. On November 2, 1998, the Court of Common Pleas of Warren County reissued the Writ of Summons.

## COUNT ONE

### (Trespass)

17.  Plaintiff incorporates Paragraphs 1 through 16 as though fully rewritten herein.

18.  After acquiring the timber rights from Fisher and Young Hardwoods, Inc. on or about December 18, 1986, Matson Hardwoods began logging operations on the Clough Farm. None of Matson Hardwoods' predecessors under the Agreement of Sale had ever conducted any logging operations on the farm.

*19. The aforesaid logging operations first took place during the time period of December 18, 1986 through March 31, 1987. Thereafter, said logging operations took place annually beginning on or about November 1 and ending on or about March 31st of the following year.

*20. Matson has conducted its timber harvesting operations on the Clough Farm in a manner that is, at a minimum, negligent, careless, reckless and inconsistent with prudent practice in the forestry industry.

5

21. Matson's practices have caused unnecessary damage to Carlisle's property including but not limited to damage to the Clough Farm streams, wetlands and adjoining landscape.

*22. By way of illustration, and not limitation, of Matson's tortious conduct, Matson caused extensive topsoil to wash into Spring Creek, has placed skid trails in and through the Clough Farm streams and has violated state regulations regarding stream crossing, wetland encroachment and erosion control. These practices impair the recreational value of the Clough Farm, and consequently its potential for economic development, because they threaten to extinguish the fragile trout population residing in the streams and otherwise diminish the aesthetic value of the property. Further, Matson has damaged standing trees in the process of removing cut trees from the property and, in addition, Matson has conducted the harvest so negligently so as to destroy much of the regenarative characteristics of the forest. As a result of its negligent, careless and reckless and forestry practices, including those identified herein, Matson has received citations and fines from the Pennsylvania Fish and Boat Commission.

23. Further, Matson's negligence has directly and proximately caused damage to many of the remaining trees on the subject property.

24. As a direct and proximate result of Matson's trespasses set forth herein, Carlisle has suffered and continues to suffer monetary damages and other damages for which he is

entitled to compensation.  In addition, Matson's negligence has severely and permanently impaired the commercial value of Clough Farm, both as a perpetual source of timber and as a recreational facility.

*25. In the alternative, Matson's conduct complained of was outrageous, intentional, willful, reckless, careless, grossly negligent and beyond the bounds of reasonable and acceptable conduct because, although Matson knew or should have known that its harvesting operations on the Clough Farm were inconsistent with prudent practice in the forestry industry and were causing the aforesaid damages, Matson continued to conduct said operations, and Carlisle is therefore entitled to receive an award of punitive damages.

*WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, in an amount in excess of $10,000, along with punitive damages, delay damages, interest, costs and all other relief that this Court deems just.

## COUNT TWO
### (Breach of Contract)

26. Plaintiff incorporates Paragraphs 1 through 25 as though fully rewritten herein.

27. The Agreement of Sale between the parties specifies that seller accepts and reserves from the property:

> All of the timber and trees, standing and fallen, situate on the premises above-described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the

7

same, constructing roadways and skidways, and piling yards for such purposes . . .

*28. Pursuant to the declaratory judgment of the United States District Court for the Western District of Pennsylvania, set forth above, the above language limits Defendants' timber rights to only those trees which were in existence at the time of the execution of the Agreement of Sale, to-wit:  May 28, 1969. Paragraph 6 of the Agreement of Sale, quoted above, further limits Defendants' timber rights to only those trees which were 16" diameter or greater in diameter and at one foot above the ground on the date of sale.

29.  Notwithstanding the above provision of the Agreement of Sale, Matson, beginning in 1986, has harvested trees outside the scope of the reservation of timber rights, i.e. trees which have come into existence since 1969 and so were not subject to the exception and reservation set forth above.

*30. The aforesaid harvesting operations first took place during the time period of December 18, 1986 through March 31, 1987.   Thereafter, said harvesting operations took place annually beginning on or about November 1 and ending on or about March 31st of the following year.

*31. The damages suffered by Plaintiff, as described above, were the direct and proximate result of Matson's breach of the Agreement of Sale, as aforesaid.

*WHEREFORE,  Plaintiff  demands  judgment  against Defendants, jointly and severally, in an amount in excess of

8

$10,000, along with delay damages, interest, costs and all other relief that this Court deems just.

### COUNT THREE
(Indemnity)

32.  Plaintiff incorporates Paragraphs 1 through 31 as though fully set forth herein.

33.  Paragraph 11 of the Agreement of Sale provides that the parties agreed as follows:

> That the seller [Matson] shall indemnify the buyer [Carlisle] and hold it harmless from any loss, claim or cause of action arising out of the seller's logging operation and timber management; and/or from the acts of its agents, employees or contractors; and the seller shall maintain $100,000-$300,000 liability insurance against personal injury and $50,000 property damage as security for protection against claims of buyer or third parties arising out of the said operations and management.

34.  By virtue of the above provision, Matson, as successor in interest to Fisher and Young, Inc. is bound to indemnify Carlisle for all damages caused by the acts of its employees, agent and contractors on the Clough Farm property.

*WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of $10,000, along with delay damages, interest, costs and all other relief that this Court deems just.

**COUNT FOUR**
(Conversion)

*35. Plaintiff incorporates Paragraphs 1 through 34 as though fully set forth herein.

*36. By harvesting and removing timber in breach of the parties' Agreement of Sale or otherwise outside the scope of its rights under that agreement, as set forth above, Matson wrongfully converted such timber to its own use and benefit in violation of Carlisle's ownership and property rights therein.

*37. The aforesaid conversions of timber first took place during the time period of December 18, 1986 through March 31, 1987. Thereafter, said conversions of timber took place annually beginning on or about November 1 and ending on or about March 31st of the following year.

*38. As a direct and proximate result of Matson's wrongful conversion, Carlisle has suffered monetary damages in an amount equal to the value of the timber wrongfully converted, for which he is entitled to receive compensation herein.

*39. Matson's conduct complained of herein was intentional, willful, reckless, careless, grossly negligent and beyond the bounds of reasonable and acceptable conduct. In the alternative, Matson's conduct was, at a minimum, negligent. Carlisle is therefore entitled to receive an award of damages pursuant to 42 Pa.C.S. Section 9311.

*WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of

$10,000, along with damages pursuant to Section 8311, delay damages, interest, costs and all other relief that this Court deems just.

Respectfully submitted,

Elizabeth Ziegler (80573)
Law Offices of Henry Borger
301 Market Street
Warren, Pennsylvania 16365
(814) 723-5030

Faith Strawley (PA Id. No.: 69050)
Peter J. Krembs (OH Id. No.:0024871)
HERMANN, CAHN & SCHNEIDER
1301 East Ninth Street, Suite 500
Cleveland, Ohio 44114
(216) 781-5515

Attorneys for Plaintiff
Albert T. Carlisle

11

## VERIFICATION

The undersigned, having read the attached pleading, verifies that the within pleading is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel and not of signor. Signor verifies that he has read the within pleading and that it is true and correct to the best of signer's knowledge, information and belief. To the extent that the contents of the pleading are that of counsel, verifier has relied upon counsel in taking this verification. This verification is made subject to the penalties of 18 Pa. R.C.P. §4904 relating to unsworn falsification to authorities.

_____
Albert T. Carlisle

Dated: January 6, 1999

## AGREEMENT OF SALE

FISHER & YOUNG, INC ., a Pennsylvania Corporation with principal place of business, R. D. 2, Titusville, Oil Creek Township, Crawford County, Pennsylvania, hereinafter called the Seller, A N D ALBERT T. CARLISLE, of 6229 Hiram Avenue, Ashtabula, Ohio, hereinafter called the Buyer.

WITNESSETH: that the said Seller, in consideration of the covenants and agreements hereinafter contained, on the part of the said Buyer to be kept and performed, has agreed and does hereby agree to sell and convey unto the said Buyer, his heirs successors or assigns, all the land and premises hereinafter mentioned and fully described, for the sum of ONE HUNDRED THOUSAND ($100,000.00) Dollars, to be paid as follows:  the sum of $1,000 paid herewith to the Seller, receipt of which is hereby acknowledged, the balance of $99,000 to be paid upon execution of this agreement to The Pennsylvania Bank and Trust Company, as escrow agent for the parties hereto, said sum to be paid by the escrow agent to the Seller upon delivery to Buyer of a general warranty deed of conveyance for the premises herein described, with evidence of clear/title in the form of a policy of title insurance issued by a responsibility title company, subject to the exception set forth and provided for in this agreement.

The said premises are described as follows:

1.  All that certain tract of land situate in Spring Creek Township, Warren County and State of Pennsylvania, bounded and described as follows:  BEGINNING at the northeast corner, a hemlock tree; thence south one hundred thirty-six (136) rods to a post; thence by land formerly owned by W. A. Irvine west to the corner of land formerly owned by Francis Bates; thence by land of said Bates one hundred thirty-six (136) rods to a post; thence by land of said W. A. Irvine east to the place of beginning, containing sixty-four (64) acres one hundred fifty-five (155) rods of land, more or less.

2.  ALSO, ALL that certain other piece or parcel of land situate in the Township, County and State aforesaid, bounded and described as follows:

EXHIBIT

A

BEGINNING at a post and stones in the northwest corner of the lot hereby conveyed; thence east one hundred sixty-nine (169) rods to a post; thence south one hundred one (101) rods to a post; thence east forty-nine and one-tenth (49.1) rods to a post; thence south one hundred ten and seven tenths (110.7) rods to a post; thence west one hundred sixty-six (166) rods to a post; thence north sixty-two and seven-tenths (62.7) rods to a post; thence west fifty-three and seven-tenths (53.7) rods to a post; thence north one hundred forty-nine (149) rods to a post and stones, the place of beginning, containing two hundred thirty-seven (237) acres of land, more or less, and being part of Tract Number Three hundred sixty-three (363) as designated on the general map of Warren County.

3.   ALSO, ALL that certain other piece or parcel of land situate in the Township, County and State aforesaid, bounded and described as follows: BEGINNING at the northwest corner of said piece of land at a post, thence in a southerly direction along the Morton Hill Road to the southwest corner of said piece of land; thence north eighty-eight and three-fourths (88 3/4) degrees east one hundred thirty-four and six-tenths (134.6) rods to a hemlock; thence north one and one-fourth (1 1/4) degrees east one hundred thirty one and four tenths (131.4) rods to a post; thence south eighty-nine and three-fourths (89-3/4) degrees west one hundred and thirty-four and six-tenths (134.6) rods to a post, the place of beginning; containing about one hundred and five (105) acres, be the same more or less.

4.   ALSO, ALL that certain piece or parcel of land situate in the Township, County and State aforesaid, being the homestead farm formerly of G. W. Nichol and described in the three following several deeds, to-wit: from Frank E. Bates and wife to C. W. Nichols, bearing date the twenty-first day of March, A.D. 1890, and recorded in said Recorder's Office in Deed Book 68, page 84, as commencing at a post in the south line of said property; thence by lands of Smith south eighty-eight and three-fourths (88-3/4) degrees west fifty-five and five-tenths (55.5) perches to a post; thence by the same north one and one-fourth (1-1/4) degrees west to the state road, supposed to be about one hundred and forty-five (145) rods, more or less; thence eastwardly along the center of said road to the northwest corner of land deeded by Francis Bates to L. L. Bates; and thence south one and one-fourth (1-1/4) degrees east along said L. L. Bates' land to a post, the place of beginning, be the same more or less, supposed to contain about fifty-four or fifty-five acres of land out of Tract Number Three hundred and three (303).

5.   ALSO, One other piece or parcel of land described as being the east half of sixty-three (63) acres of land deeded from George Yeager to Francis Bates on the Fifth day of July, 1850, and recorded in said Recorder's Office on the Third day of July, 1851, off of Tracts Numbers Three hundred and four (304) and Three hundred sixty-three (363).

6.   ALSO, as described in the deed from L. L. Bates and wife to said C. W. Nichols, bearing date the Twenty-first day of February, 1886, as commencing in the center of the State Road and the center of the Morton Hill Road at the junction of those two roads; thence by land of Cordelia Leonard and W. A. Irvine south one and one-fourth (1-1/4) degrees east one hundred eighty-five and one-half (185-1/2) rods to a beech, the southeast corner of the Francis Bates home farm; thence south eighty-eight and three-fourths (88-3/4) degrees west along the south line of said home farm fifty-one (51) rods to a post; thence

- 2 -

north one and one-fourth (1-1/4) degrees west to the State Road; and thence eastwardly along the center of said road to the center of said Morton Hill Road the place of beginning, supposed to contain about fifty-three (53) acres of land, be the same more or less.

7. ALSO, ALL that certain piece or parcel of land situate in the Township County and State aforesaid, bounded and described as follows: On the north a land above described, on the east by land of F. E. Bates, on the south by land formerly of C. W. Nichols, and on the west by land of M. Smith, containing about thirty-one and one-half (31-1/2) acres of land, more or less; and also so much of the land described in the deed from S. D. L. Newbold to the said C. W. Nichols, bearing date the Twenty-second day of March, 1888, and recorded in said Recorder's Office in Deed Book 64, page 136, as lies west of the Morton Hill Road, and adjoining the lands herein above described.

8. ALSO, ALL that certain piece or parcel of land situate in the Township of Spring Creek, County of Warren and State of Pennsylvania, bounded and described as follows: On the south by lands owned by W. A. Irvine's heirs; on the west by the Morton Hill Road and land formerly owned by George Bates; on the north by land formerly owned by Mrs. Eliza Wood; and on the east by the station road and land formerly owned by Lewis Stoddard, containing sixty-eigh (68) acres and fifty-nine (59) rods of land, be the same more or less, out of Tract Number Three hundred four (304).

9. ALSO, ALL that certain piece or parcel of land situate in the Township of Spring Creek, County of Warren and State of Pennsylvania, bounded and described as follows: On the north by land of Whiteley; on the east by land formerly of Greeley; on the south by lands formerly owned by W. A. Irvine; and on the west by lands conveyed to C. W. Nichols by F. J. Jones and wife, and a public road leading to Spring Creek R. R. Station and lands of Stoddard, containing forty-four (44) acres of land, more or less.

10. ALSO, ALL that certain piece of land situate in the Township, County and State aforesaid, bounded and described as follows: On the north by land of Tom Forbes; on the east by land formerly of W. A. Irvine and L. S. Clough; on the south by land formerly of William Morton, now L. S. Clough, containing forty-five (45) acres, more or less.

11. ALSO, ALL that certain piece or parcel of land situate in the Township County and State aforesaid, being part of Tract Three hundred ten (310) as described on the map of Warren County, Pennsylvania, as follows: BEGINNING in the center of the State Road at a point where the same crosses the Tract line between the land formerly of Sarah D. I. Newbold and that of L. Greeley; then south one (1) degree forty-five (45) minutes east eighty-eight (88) rods to a post the southwest corner of Tract Number Three hundred ten (310); thence north eighty-eight (88) degrees forty-five (45) minutes east along the southerly line of Tract Number Three hundred ten (310) eighty-one (81) rods to a post in said Tract line; thence north two (2) degrees west one hundred nine and one-half (109-1/2) rods to a post in the center of the State Road; thence along the center of said road westerly eighty-four and three-tenths (84.3) rods to the place of beginning, containing fifty (50) acres of land, more or less.

12. ALSO, ALL that certain piece or parcel of land situate in said Townshi

-3-

County and State, bounded and described as follows: BEGINNING at a point in the center of the State Road, at the northeast corner of land heretofore conveyed by S. S. Wead, and running thence south two (2) degrees east one hundred twelve and six-tenths (112.6) rods to a post at the southeast corner of the said Wead's land, and in the south line of Tract Number Three hundred ten (310); thence north eighty-eight and three-fourths (88-3/4) degrees east three hundred fifty (350) rods to the western bank of the Big Brokenstraw Cree at low water mark; thence northwesterly along the western bank of the Big Brokenstraw Creek at low water mark to the center of the State Road; thence southwesterly along the center of the said State Road to the place of beginning. The same containing two hundred fourteen (214) acres and one hundred four (104) perches of land, be the same more or less, and being a part of Tract Number Three hundred ten (310). The land herein conveyed to include all the land lying west of the Big Brokenstraw Creek belonging to Mrs. S. D. I. Newbold in Tract Number Three hundred ten (310). Also, all islands in that part of Brokenstraw Creek which lie east of the foregoing described land.

13. ALSO, ALL that certain land situate in the aforesaid Township, County and State, conveyed to L. S. Clough by Dan A. Geiger and Jessie L. Geiger, his wife, by deed bearing date the First day of October, 1906, and recorded in the Recorder's Office of Warren County in Deed Book 105, page 260, said land being bounded and described as follows: BEGINNING at the northwest corner of Tract Number Three hundred thirteen (313): thence extending along the north line of said tract due east ninety-one and nine-tenths (91.9) perches to the corner of land formerly of E. Jackson; thence along the same due south one hundred thirty-five (135) perches to the southwest corner of said Jackson land; thence due west ninety-four (94) perches to the west line of said tract; thence along said line due north one hundred thirty-five (135) perches to the place of beginning, containing seventy-eight (78) acres and forty-one (41) perch more or less, being the northwest corner of Tract Number Three hundred thirteen (313).

14. ALSO, ALL that certain piece or parcel of land situate in Spring Creek Township, Warren County, State of Pennsylvania, as conveyed to L. S. Clough by J. V. Kinyon by deed bearing date the Thirtieth day of March, 1911, and recorded in the Recorder's Office of Warren County in Deed Book 114, page 397, said land being bounded and described as follows: It being fifty-one (51) acres and eighteen (18) perches from the southeast side of Tract Number Three hundred four (304) bounded as follows: On the north by lands formerly of Miles and Watts; on the east by the eastern line of said tract; on the south by the southern line of said tract; on the west by lands formerly of Yager and Miles and Watts.

15. ALSO, ALL that certain piece or parcel of land situate in Spring Creek Township, Warren County, State of Pennsylvania, bounded and described as follows: BEGINNING at the northwest corner of the whole tract Number Three hundred fourteen (314): thence south by the west line of the tract one hundred fifty-nine (159) rods to a post, thence east fifty-three (53) rods and eight (8) links to a post; thence north by the residue of the tract one hundred fifty-nine (159) rods to a post in the north line of the tract; thence west along the north line of the tract fifty-three (53) rods and eight (8) links to the place of beginning. Containing fifty (50) acres of land and allowance.

16. ALSO, ALL that certain piece or parcel of land situate in Spring Creek

Township, Warren County, State of Pennsylvania, bounded and described as follows: BEGINNING at the northwest corner of the tract conveyed at a post; thence by land formerly of Sager east fifty and seven-tenths (50.7) perches to lands formerly of Jackson; thence by land formerly of Jackson south two hundred one (201) perches to land formerly of Irvine; thence by land formerly of Irvine west fifty and seven-tenths (50.7) perches to a post; thence by lands formerly of Irvine and lands formerly of Yager north two hundred one (201) perches to the place of beginning, containing sixty (60) acres of land, be the same more or less, being part of Warrant Number Three hundred sixty-three (363).

There being erected upon said premises a large two-story frame dwelling house, two large barns and other buildings.

SUBJECT to the right of way for an electric line granted unto Pennsylvania Electric Company by Instrument dated October 15, 1957 and entered in the Recorder's Office of Warren County in Deed Book 291, page 460, on January 11, 1958.

SUBJECT to the right of way for an electric line granted unto Pennsylvania Electric Company by instrument dated November 29, 1957 and entered in said Recorder's Office in Deed Book 292, page 140 on January 31, 1958.

EXCEPTING AND RESERVING, that portion of the above described premises which was conveyed by Robert M. Kinkead and Marion C. Kinkead, his wife, to Charles A. Williams and Mary Helen Williams, husband and wife, by deed dated June 6, 1958 and entered in said Recorder's Office in Deed Book 294, page 475.

BEING the same parcels of land which Marion C. Kinkead, widow, by deed dated March 27, 1969, recorded in the Recorder's Office of Warren County in Deed Book 357, Page 349, conveyed to Fisher & Young, Inc., Seller herein.

This conveyance is made subject to a certain agreement of lease dated February 1, 1962 with the individual members of the Clough Farm Club as joint tenants, as amended, with reference to the stream bed of Spring Creek and 25feet inland from the normal banks of said creek on each side thereof, with right of entry to and from the same, but all rights of the Lessor in and to said agreement are hereby assigned and conveyed to the Buyer.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto herein set forth below, SUBJECT, however, to right of Buyer to use for its own purposes all trees fallen for more than one year and all tree-tops remaining after logging operations.

-5-



The parties, in consideration of the mutual covenants herein contained, agree further as follows:

1.     That the cost of Pennsylvania and local transfer stamps on the deed, and the deed preparation fee shall be borne by the Seller; the fees for the preparation of this agreement and fire insurance premium shall be allocated equally between the Buyer and Seller.

2.     That the real estate taxes shall be prorated as of the date of closing, i.e., upon delivery of the said deed to Buyer.

3.     That possession shall be given to Buyer upon the date of closing.

4.     That Seller shall reimburse to Buyer each year a prorata share of real estate taxes based on the value of the timber situated thereon and reserved by Seller; or in the alternative, the Seller Buyer shall apply to the County assessor for a separate assessment of timber and other real property.

5.     That Seller shall assign all of its right, title and interest in and to Buyer to the Clough Farm Club fishing agreement and the existing Soil Bank Agreement with the United States Department of Agriculture (and the annual payments or rentals shall be prorated as of date of closing.)

6.     That Seller shall confine the cutting of saw timber to those trees which measure 16" or more in diameter at 1 ft. above the ground and shall confine its logging operations to the season from November 1 to March 1, each year. However, smaller trees may be removed, as in thinning, or in post or fire control, whenever or wherever good forestry practice so dictates.

7.     That the Seller is hereby granted unobstructed access over all of the lands hereby conveyed for purposes of its operations, including but not limited to thinning, timber cruising, planting, growth studies, post and fire control, cutting, skidding, piling and removing timber, and is further granted upon 120 days notice in writing to Buyer, the right to construct such roads as

deems reasonably necessary for its operations, without com-
pensation, or discount, or allowance to Buyer for any portion
of said premises so taken or withhold.  However, the Seller, its
successors or assigns, shall not construct a portable saw mill
on premises during term of this agreement.

8.  That the Buyer is hereby granted the right to select
and use dam sites and to flood areas of the premises not to
exceed the maximum of two 10-acre lakes in the forestry area
and/or one 20-acre lake to service camp sites 1 and 2 so desig-
nated on the map attached hereto and marked Exhibit A and made
a part hereof with normal program areas adjacent thereto.
Provided, however, that Buyer shall, 120 days prior to the
flooding of any such area, give written notice thereof to the
Seller; and the Seller shall thereupon and within 120 days of
receipt of such notice cut/and remove from the site for said
area to be flooded all timber (except tops and limbs) at no
expense to Buyer.  The Buyer is further granted the right to
select and use a winter sports area consisting of approximately
200 feet in width and 1000 feet in length, to be located on the
East side of Jackson Hill Road and more particularly on the
West slope of Jackson Hill, subject to the same terms and
conditions as set forth above.

9.  That the Buyer is hereby granted the right to construct
such buildings and roads as it shall deem reasonably desirable
and necessary for its use and development of said premises;
provided, however, that it shall give 120 days written notice
thereof to Seller and Seller shall within 120 days of receipt
of said notice cut and remove from said area all timber (except
tops and limbs) at no expense to Buyer.

10.  That the Seller shall within one year after closing of
this transaction conspicuously mark the outside boundary lines
in the forested area.

11. That the Seller shall indemnify the Buyer and hold it harmless from any loss, claim or cause of action arising out of the Seller's logging operations and timber management; and/or from the acts of its agents, employees or contractors; and the Seller shall maintain $100,000 - $300,000 liability insurance against personal injury and $50,000 property damage as security for protection against claims of Buyer or third parties arising out of the said operations and management.

12. That, all reservations and exceptions above set forth, to the contrary notwithstanding, any and all trees planted by Buyer shall always remain the property of Buyer.

13. That, in the event of a taking of the premises or any portion thereof by governmental agency through its powers of condemnation, it is mutually agreed by the parties hereto that an equitable prorata division of the proceeds shall be made between them on the basis of the value of the timber and the value of other real estate so condemned. Seller's interest however, shall not exceed one-fifth of the proceeds received.

14. That the cost of obtaining the title insurance above set forth shall be borne by the Seller.

15. Excluded,

16.    a)   That in the event the Seller shall desire to sell, transfer or assign the timber reserved on the premises above described, Seller shall give Buyer written notice thereof and hereby grants to Buyer the option for thirty days following the posting of said notice by Seller to Buyer of purchasing said timber at the price offered therefor by a bona fide prospective third party purchaser, transferor or assignor.

b)   Should the present management and/or ownership of Seller change, Buyer shall be so advised by Seller in writing and shall have a thirty day option to purchase the timber rights at a price to be mutually agreed upon, or in failure thereof, by arbitration (each side to choose one of the arbitrators and the two arbitrators to select a third). The arbitrators shall establish the price which shall be binding without appeal of the parties.

COMMONWEALTH OF PENNSYLVANIA   :
                               :  SS.
COUNTY OF CRAWFORD             :

On this, the          day of          1969, before me,
the undersigned officer, personally appeared Philip H. Cochran,
who acknowledged himself to be the President of FISHER & YOUNG,
INC., a corporation, and that he as such President, being author
ized to do so, executed the foregoing instrument for the purpose
therein contained by signing the name of the corporation by
himself as President.

In witness whereof, I hereunto set my hand and official sea

_____
Notary Public

STATE OF OHIO,
COUNTY OF ASHTABULA,

On this, the          day of          , 1969, before me,
the undersigned, Albert T. Carlisle, executed the foregoing
instrument for the purposes therein contained by acknowledging
same to be his free act and deed.

In Witness Whereof, I hereunto set my hand and official
seal.

_____
Notary Public

17.  It is further agreed and stipulated by and between
the parties hereto that a map designating the forestry areas
which shall be subject to cutting by the Seller and also
designating those areas belonging solely to the Buyer, wherein
the Seller agrees that there will be no cutting, shall be
attached hereto and made a part hereof as though fully set
forth herein and marked Exhibit A as previously mentioned.

18.  All covenants and agreements herein contained shall
extend to and be obligatory upon the successors and assigns
of the respective parties.

IN WITNESS WHEREOF, the said parties to this agreement have
hereunto set their hands and seals the 28th day of May, 1969.

FISHER & YOUNG, INC.

ATTEST:
_____                    _____
                                                    President
_____
    Secretary

                                             _____
                                                Albert T. Carlisle

ATTEST:

_____
    Secretary

# This Deed, FILED AND ENTERED
JAN 1 0 1970

Made the          Ninth          day of          January,          JAN 1 0 1970

in the year nineteen hundred and seventy (1970),

Between    FISHER & YOUNG, INC., a Pennsylvania Corporation with principal place of business R. D. 2, Titusville, Oil Creek Township, Crawford County, Pennsylvania, Grantor,

A N D

ALBERT T. CARLISLE, of Ashtabula, Ohio, Grantee,

**Witnesseth,** That in consideration of ONE HUNDRED THOUSAND ($100,000.00) - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - Dollars,

in hand paid, the receipt whereof is hereby acknowledged, the said grantor         does    hereby grant and convey, sell and confirm unto the said grantee, its **successors** heirs and assigns,

All those certain pieces or parcels of land situate in Spring Creek Township, Warren County and State of Pennsylvania, bounded and described as follows:

1.      BEGINNING at the northeast corner, a hemlock tree; thence south one hundred thirty-six (136) rods to a post; thence by land formerly owned by W. A. Irvine west to the corner of land formerly owned by Francis Bates; thence by land of said Bates one hundred thirty-six (136) rods to a post; thence by land of said W. A. Irvine east to the place of beginning, containing one hundred sixty-four (164) Acres one hundred fifty-five (155) rods of land, more or less.

2.      BEGINNING at a post and stones in the northwest corner of the lot hereby conveyed; thence east one hundred sixty-nine (169) rods to a post; thence south one hundred one (101) rods to a post; thence east forty-nine and one-tenth (49.1) rods to a post; thence south one hundred ten and seven-tenths (110.7) rods to a post; thence west one hundred sixty-six (166) rods to a post; thence north sixty-two and seven-tenths (62.7) rods to a post; thence west fifty-three and seven-tenths (53.7) rods to a post; thence north one hundred forty-nine (149) rods to a post and stones, the place of beginning, containing two hundred thirty-seven (237) acres of land, more or less, and being part of Tract Number Three hundred sixty-three (363) as designated on the general map of Warren County.

3.      BEGINNING at the northwest corner of said piece of land at a post, thence in a southerly direction along the Morton Hill Road to the southwest corner of said piece of land; thence north eighty-eight and three-fourths (88-3/4) degrees east one hundred thirty-four and six-tenths (134.6) rods to a hemlock; thence north one and one-fourth (1-1/4) degrees east one hundred thirty-one and four-tenths (131.4) rods to a post; thence south eighty-nine and three-fourths (89-3/4) degrees west one hundred and thirty-four and six-tenths (134.6) rods to a post, the place of beginning; containing about one hundred and five (105) acres, be the same more or less.

4.      ALSO, ALL that certain piece or parcel of land situate in the Township, County and State aforesaid, being the homestead farm formerly of G. W. Nichols, and described in the three following several deeds, to-wit: from Frank E. Bates

NOX 361nu 13

Δ-15

EXHIBIT

B

BOOK 361 PAGE 14

and wife to C. W. Nichols, bearing date the twenty-first day of March, A. D. 1890, and recorded in said Recorder's Office in Deed Book 68, page 81, as commencing at a post in the south line of said property; thence by lands of Smith south eighty-eight and three-fourths (88-3/4) degrees west fifty-five and five-tenths (55.5) perches to a post; thence by the same north one and one-fourth (1-1/4) degrees west to the state road, supposed to be about one hundred and forty-five (145) rods, more or less; thence eastwardly along the center of said road to the northwest corner of land deeded by Francis Bates to L. L. Bates; and thence south one and one-fourth (1-1/4) degrees east along said L. L. Bates land to a post, the place of beginning, be the same more or less, supposed to contain about fifty-four or fifty-five acres of land out of Tract Number Three hundred and three (303).

5.   ALSO, One other piece or parcel of land described as being the east half of sixty-three (63) acres of land deeded from George Yeager to Francis Bates on the Fifth day of July, 1850, and recorded in said Recorder's Office on the Third day of July, 1851, off of Tracts Numbers Three hundred and four (304) and Three hundred sixty-three (363).

6.   ALSO, as described in the deed from L. L. Bates and wife to said C. W. Nichols, bearing date the Twenty-first day of February, 1886, as commencing in the center of the State Road and the center of the Morton Hill Road at the junction of those two roads; thence by land of Cordelia Leonard and W. A. Irvine south one and one-fourth (1-1/4) degrees east one hundred eighty-five and one-half (185-1/2) rods to a beach, the northeast corner of the Francis Bates home farm; thence south eighty-eight and three-fourths (88-3/4) degrees west along the south line of said home farm fifty-one (51) rods to a post; thence north one and one-fourth (1-1/4) degrees west to the State Road; and thence eastwardly along the center of said road to the center of said Morton Hill Road, the place of beginning, supposed to contain about fifty-three (53) acres of land, be the same more or less.

7.   On the north by land above described, on the east by land of F. E. Bates, on the south by land formerly of C. W. Nichols, and on the west by land of M. Smith, containing about thirty-one and one-half (31-1/2) acres of land, more or less; and also so much of the land described in the deed from S. D. I. Newbold to the said C. W. Nichols, bearing date the Twenty-second day of March, 1888, and recorded in said Recorder's Office in Deed Book 44, page 116, as lies west of the Morton Hill Road, and adjoining the lands herein above described.

8.   On the south by lands owned by W. A. Irvine's heirs; on the west by the Morton Hill Road and land formerly owned by George Bates; on the north by land formerly owned by Mrs. Eliza Wood; and on the east by the station road and land formerly owned by Lewis Stoddard, containing sixty-eight (68) acres and fifty-nine (59) rods of land, be the same more or less, out of Tract Number Three hundred four (304).

9.   On the north by land of Whiteley; on the east by land formerly of Grenlee; on the south by lands formerly owned by W. A. Irvine; and on the west by lands conveyed to C. W. Nichols by F. E. Jones and wife, and a public road leading to Spring Creek R. R. Station and lands of Stoddard, containing forty-four (44) acres of land, more or less.

10.   On the north by land of Tom Forbes; on the east by land formerly of W. A. Irvine and L. S. Clough; on the south by land formerly of William Morton, now L. S. Clough, containing forty-five (45) acres, more or less.

11.   Part of Tract Three hundred ten (310) is described on the map of Warren County, Pennsylvania, as follows:  BEGINNING in the center of the State Road at a point where the same crosses the Tract line between the land formerly of Sarah D. I. Newbold and that of L. Greeley; thence south one (1)

degree forty-five (45) minutes east eighty-eight (88) rods to a post; the southwest corner of Tract Number Three hundred ten (310); thence north eighty-eight (88) degrees forty-five (45) minutes east along the southerly line of Tract Number Three hundred ten (310), eighty-one (81) rods to a post in said Tract line; thence north two (2) degrees west one hundred nine and one-half (109-1/2) rods to a post in the center of the State Road; thence along the center of said road westerly eighty-four and three-tenths (84.3) rods to the place of beginning, containing fifty (50) acres of land, more or less.

12.    BEGINNING at a point in the center of the State Road, at the northeast corner of land heretofore conveyed by S. S. Weed, and running thence south two (2) degrees east one hundred twelve and six-tenths (112.6) rods to a post at the southeast corner of the said Weed's land, and in the south line of Tract Number Three hundred ten (310); thence north eighty-eight and three-fourths (88-3/4) degrees east three hundred fifty (350) rods to the western bank of the Big Brokenstraw Creek at low water mark; thence northwesterly along the western bank of the Big Brokenstraw Creek at low water mark to the center of the State Road; thence southwesterly along the center of the said State Road to the place of beginning. The same containing two hundred fourteen (214) acres and one hundred four (104) perches of land, be the same more or less, and being a part of Tract Number Three hundred ten (310). The land herein conveyed to include all the land lying west of the Big Brokenstraw Creek belonging to Mrs. S. D. L. Newbold in Tract Number Three hundred ten (310). Also, all islands in that part of Brokenstraw Creek which lie east of the foregoing described land.

13.    BEGINNING at the northwest corner of Tract Number Three hundred thirteen (313); thence extending along the north line of said tract due east ninety-one and nine-tenths (91.9) perches to the corner of land formerly of E. Jackson; thence along the same due south one hundred thirty-five (135) perches to the southwest corner of said Jackson's land; thence due west ninety-four (94) perches to the west line of said tract; thence along said line due north one hundred thirty-five (135) perches to the place of beginning, containing seventy-eight (78) acres and forty-one (41) perches, more or less, being the northwest corner of Tract Number Three hundred thirteen (313). Being land conveyed to S. Clough by Dan A. Gelper and wife by deed dated October 1, 1905 and recorded in Deed Book 105, page 260.

14.    On the north by lands formerly of Miles and Watts; on the east by the eastern line of the tract; on the south by the southern line of said tract; on the west by lands formerly of Yeager and Miles and Watts.   Being 51 acres 16 perches from the south-east side of Tract Number Three hundred Four (304), and conveyed to L. S. Clough by deed of J. V. Kinyon dated March 30, 1911 and recorded in Deed Book 116, page 187.

15.    BEGINNING at the northwest corner of the whole tract Number Three hundred fourteen (314); thence south by the west line of the tract one hundred fifty-nine (159) rods to a post; thence east fifty-three (53) rods and eight (8?) links to a post; thence north by the residue of the tract one hundred fifty-nine (159) rods to a post in the north line of the tract; thence west along the north line of the tract fifty-three (53) rods and eight (8) links to the place of beginning. Containing fifty (50) acres of land and allowance.

16.    BEGINNING at the northwest corner of the tract conveyed at a post; thence by land formerly of Sagar east fifty and seven-tenths (50.7) perches to lands formerly of Jackson; thence by land formerly of Jackson south two hundred one (201) perches to land formerly of Irvine; thence by land formerly of Irvine west fifty and seven-tenths (50.7) perches to a post; thence by lands formerly of Irvine and lands formerly of Yager north two hundred one (201) perches to the place of beginning, containing sixty (60) acres of land, be the same more or less, being part of Warrant Number Three hundred sixty-three (363).                     BOOK 361 PAGE 15

SUBJECT to the right of way for an electric line granted unto Pennsylvania Electric Company by Instrument dated October 15, 1957 and entered in the Recorder's Office of Warren County in Deed Book 29?, page 469, on January 11, 1958.

SUBJECT to the right of way for an electric line granted unto Pennsylvania Electric Company by instrument dated November 29, 1957 and entered in said Recorder's Office in Deed Book 291, page 140 on January 11, 1958.

EXCEPTING and RESERVING that portion of the above described premises which was conveyed by Robert M. Kinkead and Marion C. Kinkead, his wife, to Charles A. Williams and Mary Helen Williams, husband and wife, by deed dated June 6, 1958 and entered in said Recorder's Office in Deed Book 294, page 475.

BEING the same parcels of land which Marion C. Kinkead, widow, by deed dated March 27, 1969, recorded in the Recorder's Office of Warren County in Deed Book 357, Page 349, conveyed to Fisher & Young, Inc., Grantor herein.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto herein set forth below, SUBJECT, however, to right of Buyer to use for its own purposes all trees fallen for more than one year and all tree tops remaining after logging operations.

TOGETHER with such rights and subject to such conditions and terms as contained in agreement between the parties hereto dated May 28, 1969, incorporated herewith by reference and made a part hereof.

This deed of conveyance was executed, acknowledged and delivered pursuant to the authority of the Grantor by Resolution of its Board of Directors duly adopted at a special meeting held on November 3, 1969, after due and proper notice thereof in accordance with the By-laws of said corporation.

State of
County of                  } SS:

On this, the        day of                    19      , before me the undersigned officer, personally appeared

known to me (or satisfactorily proven) to be the person   whose name     subscribed to the within instrument, and acknowledged that   he   executed the same for the purpose therein contained.
IN WITNESS WHEREOF, I have hereunto set my hand and                        seal.

My Commission Expires:

State of PENNSYLVANIA
County of CRAWFORD      } SS:

On this, the 9th day of January,    1973, before me,   a notary Public, the undersigned officer, personally appeared Philip H. Cochran, who acknowledged himself to be the President of Fisher & Young, Inc., a corporation, and that he as such President, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as President.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

My Commission Expires:

And the said grantor will          General          Warrant and Forever Defend the property
hereby conveyed.                                     caused this instrument to be executed by its
                                                     duly authorized officers and its corporate seal
In Witness Whereof,    said grantor       has        hereunto...
affixed hereto, the
day and year first above written.

                                          FISHER & YOUNG, INC.

_____           By: _____ [SEAL]
                                                        President

_____           _____ [SEAL]

_____           _____ [SEAL]

_____           _____ [SEAL]

_____           _____ [SEAL]


                        Certificate of Residence

We do hereby certify, that the precise residence of the grantee herein is as follows:
C/o Lawrence Young, Esq. Stephan Sil Nason,  Ashtabula, Ohio, U.S.A.

                        JACK, KOOKOGEY & FORSSELL

                        By: _____
                              Attorney's, ...

Common
County
On this
the unde

known to me (or satisfactorily proven) to be the person    whose name    subscribed to the with-
in instrument, and acknowledged that    executed the same for the purpose therein contained.
     IN WITNESS WHEREOF, I have hereunto set my hand and                    seal.

                                                           My Commission Expires

Commonwealth of Pennsylvania
County
On this
the unde

known to me (or satisfactorily proven) to be the person    whose name    subscribed to the with-
in instrument, and acknowledged that    executed the same for the purpose therein contained.
     IN WITNESS WHEREOF, I have hereunto set my hand and                    seal.

                        BOOK 361 PAGE 17   My Commission Expires

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    .. ........  ..

4    ALBERT CARLISLE,
              Plaintiff

                                        CA 95-376
5

     vs.
6

7    MATSON LUMBER,
              Defendant

8    --------------------

9

                         PROCEEDINGS
10      Transcript of Verdict commencing on December 18, 1997,
     United States District Court, Pittsburgh, Pennsylvania, before
11   Honorable Gary Lancaster, District Judge.

12   APPEARANCES:

13   For the Plaintiff:       Scott Hare, Esq.

14   For the Defendant:       Chester Fossee, Esq.

15

16                           Reported by:
                             William E. Weber, RMR
17                           Official Court Reporter
                             1027A, U.S. Courthouse
18                           Pittsburgh, Pa. 15219
                             (412)261-2446

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer aided transcription.

EXHIBIT

C

2

THE COURT:  You are the foreperson?

JUROR NO. 4:  Yes, Your Honor.

THE COURT:  Have you reached a verdict?

JUROR NO. 4:  Correct, Your Honor.

THE COURT:  Publish the verdict, Mr. Palus.

MR. PALUS:  Now this 18th day of December, 1997, the jury empaneled in civil action 95-376 Albert T. Carlisle, plaintiff, versus Matson Lumber Company and Matson Hardwood, Inc., defendants returns the following verdict and findings:

One.  The jury finds the parties intended to grant seller the right to harvest only the timber that then existed on the property in 1969.

Two.  The jury finds that the parties intended to require the seller to give Mr. Carlisle 120 days notice each time they constructed a new road in perpetuity.

Three.  The jury finds that the parties intended a no-cut zone along the banks of the waterways on the property including Spring Creek and Tom's Run.

Four.  The jury finds that the width of the no-cut zone on either side of the creek is 100 feet.

Five.  The jury finds that the Matson Lumber Company did harvest trees in the no-cut zone.

Six.  With regard to the amount of damages, the jury awards Mr. Carlisle $110,000.

THE COURT:  Mr. Palus, poll the jury

3

1          MR. PALUS:  Juror number one, please stand.  Sir,
2     was the verdict I just read your verdict?
3          JUROR NO. 1:  Yes.
4          MR. PALUS:  Was it freely and voluntarily made?
5          JUROR NO. 1:  Yes.
6          MR. PALUS:  Juror number two, please stand.  Ma'am,
7     was the verdict I read your verdict?
8          JUROR NO. 2:  Yes.
9          MR. PALUS:  Was it freely and voluntarily made?
10         JUROR NO. 2:  Yes.
11         MR. PALUS:  Juror number three, stand.  Was the
12    verdict I just read your verdict?
13         JUROR NO. 3:  Yes.
14         MR. PALUS:  Was it freely and voluntarily made?
15         JUROR NO. 3:  Yes.
16         MR. PALUS:  Juror number four, please stand.  Ma'am
17    was the verdict I just read jury verdict?
18         JUROR NO. 4:  Yes.
19         MR. PALUS:  Was it freely and voluntarily made?
20         JUROR NO. 4:  Yes.
21         MR. PALUS:  Juror number five, stand, was the
22    verdict I just read your verdict?
23         JUROR NO. 5:  Yes, sir.
24         MR. PALUS:  Was it freely and voluntarily made?
25         JUROR NO. 5:  Yes, sir.

4

1    MR. PALUS:  Thank you.  Juror number six, please
2  stand.  Was the verdict I just read your verdict?
3    JUROR NO. 6:  Yes, it was.
4    MR. PALUS:  Was it freely and voluntarily made?
5    JUROR NO. 6:  Yes.
6    MR. PALUS:  Thank you.  Juror number seven, please
7  stand.  Was the verdict I just read your verdict?
8    JUROR NO. 7:  Yes, sir.
9    MR. PALUS:  Was it freely and voluntarily made?
10    JUROR NO. 7:  Yes, sir.
11    MR. PALUS:  Thank you, be seated.  The jury has been
12  poled.
13    THE COURT:  With that we will close the record.
14
15
16                    * * * * *
17
18    I certify that the foregoing is a correct transcript
19  from the record of proceedings in the above-entitled matter.
20
21
22
23                    William E. Weber, RDR
                       Official Court Reporter
24
25

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - -

ALBERT CARLISLE,
                    Plaintiff

                                        CA 95-376

vs.

MATSON LUMBER,
                    Defendant

- - - - - - - - - - - - - - - - - -

PROCEEDINGS

    Transcript of Verdict commencing on December 18, 1997,
United States District Court, Pittsburgh, Pennsylvania, before
Honorable Gary Lancaster, District Judge.

APPEARANCES:

For the Plaintiff:          Scott Hare, Esq.

For the Defendant:          Chester Fossee. Esq.


                            Reported by:
                            William E. Weber, RMR
                            Official Court Reporter
                            1027A, U.S. Courthouse
                            Pittsburgh, Pa. 15219
                            (412)261-2446


Proceedings recorded by mechanical stenography.  Transcript
produced by computer aided transcription.

2

1    THE COURT:  You are the foreperson?

2    JUROR NO. 4:  Yes, Your Honor.

3    THE COURT:  Have you reached a verdict?

4    JUROR NO. 4:  Correct, Your Honor.

5    THE COURT:  Publish the verdict, Mr. Palus.

6    MR. PALUS:  Now this 18th day of December, 1997, the

7    jury empaneled in civil action 95-376 Albert T. Carlisle,

8    plaintiff, versus Matson Lumber Company and Matson Hardwood,

9    Inc., defendants returns the following verdict and findings:

10   One.  The jury finds the parties intended to grant

11   seller the right to harvest only the timber that then existed

12   on the property in 1969.

13   Two.  The jury finds that the parties intended to

14   require the seller to give Mr. Carlisle 120 days notice each

15   time they constructed a new road in perpetuity.

16   Three.  The jury finds that the parties intended a

17   no cut zone along the banks of the waterways on the property

18   including Spring Creek and Tom's Run.

19   Four.  The jury finds that the width of the no-cut

20   zone on either side of the creek is 100 feet.

21   Five.  The jury finds that the Matson Lumber Company

22   did harvest trees in the no-cut zone.

23   Six.  With regard to the amount of damages, the jury

24   awards Mr. Carlisle $110,000.

25   THE COURT:  Mr. Palus, poll the jury.

3

1          MR. PALUS:  Juror number one, please stand.  Sir,
2    was the verdict I just read your verdict?
3          JUROR NO. 1:  Yes.
4          MR. PALUS:  Was it freely and voluntarily made?
5          JUROR NO. 1:  Yes.
6          MR. PALUS:  Juror number two, please stand.  Ma'am,
7    was the verdict I read your verdict?
8          JUROR NO. 2:  Yes.
9          MR. PALUS:  Was it freely and voluntarily made?
10          JUROR NO. 2:  Yes.
11          MR. PALUS:  Juror number three, stand.  Was the
12    verdict I just read your verdict?
13          JUROR NO. 3:  Yes.
14          MR. PALUS:  Was it freely and voluntarily made?
15          JUROR NO. 3:  Yes.
16          MR. PALUS:  Juror number four, please stand.  Ma'am
17    was the verdict I just read jury verdict?
18          JUROR NO. 4:  Yes.
19          MR. PALUS:  Was it freely and voluntarily made?
20          JUROR NO. 4:  Yes.
21          MR. PALUS:  Juror number five, stand, was the
22    verdict I just read your verdict?
23          JUROR NO. 5:  Yes, sir.
24          MR. PALUS:  Was it freely and voluntarily made?
25          JUROR NO. 5:  Yes, sir.

4

1        MR. PALUS:  Thank you.  Juror number six, please

2   stand.  Was the verdict I just read your verdict?

3        JUROR NO. 6:  Yes, it was.

4        MR. PALUS:  Was it freely and voluntarily made?

5        JUROR NO. 6:  Yes.

6        MR. PALUS:  Thank you. Juror number seven, please

7   stand.  Was the verdict I just read your verdict?

8        JUROR NO. 7:  Yes, sir.

9        MR. PALUS:  Was it freely and voluntarily made?

10       JUROR NO. 7:  Yes, sir.

11       MR  PALUS:  Thank you, be seated.  The jury has been

12  poled.

13       THE COURT:  With that we will close the record.

14

15

16                    * * * * *

17

18       I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20

21

22

23                    William B. Weber, RDR
                      Official Court Reporter

24

25

COURT OF COMMON PLEAS OF WARRANTY COUNTY,
PENNSYLVANIA

ALBERT T. CARLISLE

                    Plaintiff,

        vs.

MATSON LUMBER COMPANY and
MATSON HARDWOODS, INC.

                    Defendants.

CIVIL ACTION — LAW

Number 353 - 1998 C.D.

Type of Case:  Civil Division

Type of Pleading:  Certificate of
Service

Filed on behalf of:  Plaintiff,
Albert T. Carlisle

Counsel of Record for this Party:

Elizabeth Ziegler (PA No. 80573)
Law Offices of Henry Borger
301 Market Street
Warren, Pennsylvania  16365
(814) 723-5030

Faith Strawley (PA No: 69050)
Peter J. Krembs (OH No: 0024871)
HERMANN, CAHN & SCHNEIDER
1301 East Ninth Street, Suite 500
Cleveland, Ohio  44114
(216) 781-5515

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Amended Complaint and Jury Demand were served on the 7th day of January, 1999, by United States, First Class, Postage Prepaid, addressed to the following:

C. Peter Hitson
20 Stanwix Street, 4th Floor
Pittsburgh, PA  15222

Elizabeth Ziegler
Law Offices of Henry Borger
300 Market Street
Warren, PA  16365

John C. Dennison, II
Dennison Dennison & Harper
293 Main Street
Brookville, PA  15825

Faith Strawley (PA Id. No. 69050)
Peter J. Krembs (OH Id. No.:0024871)
HERMANN, CAHN & SCHNEIDER
1301 East Ninth Street, Suite 500
Cleveland, Ohio  44114
(216) 781-5515

COURT OF COMMON PLEAS OF WARRANTY COUNTY,
PENNSYLVANIA

| | |
|---|---|
| ALBERT T. CARLISLE | CIVIL ACTION - LAW |
| Plaintiff, | Number 353 - 1998 C.D. |
| vs. | Type of Case:  Civil Division |
| MATSON LUMBER COMPANY and MATSON HARDWOODS, INC. | Type of Pleading:  Jury Demand |
| Defendants. | |

Filed on behalf of:  Plaintiff,
Albert T. Carlisle

Counsel of Record for this Party:

Elizabeth Ziegler (PA No. 80573)
Law Offices of Henry Borger
301 Market Street
Warren, Pennsylvania  16365
(814) 723-5030

Faith Strawley (PA No: 69050)
Peter J. Krembs (OH No: 0024871)
HERMANN, CAHY & SCHNEIDER
1301 East Ninth Street, Suite 500
Cleveland, Ohio  44114
(216) 781-5515

## JURY DEMAND

Plaintiff hereby demands a trial by jury of the maximum number permitted by law.

Respectfully submitted,

*Elizabeth Ziegler*

Elizabeth Ziegler (89173)
Law Offices of Henry Borger
301 Market Street
Warren, Pennsylvania  16365
(814) 723-5030

*Faith Strawley*

Faith Strawley (PA Id. No. 69050)
Peter J. Krembs (OH Id. No.:0024871)
HERMANN, CAHN & SCHNEIDER

Attorneys for Plaintiff
Albert T. Carlisle

F&T\CARLISLE\COMPLT.AND

12

IN THE COURT OF COMMON PLEAS
OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
CIVIL

ALBERT T. CARLISLE,

       Plaintiff                    No. 353 of 1998

       v.

MATSON LUMBER COMPANY and
MATSON HARDWOODS, INC.,

       Defendants



## MEMORANDUM OPINION

       This case is presently before the Court for resolution on numerous cross motions for partial summary judgment. Each motion has been thoroughly argued and briefed.

       Plaintiff Albert Carlisle, an Ohio resident, owns a tract of land in Spring Creek Township, Warren County, Pennsylvania, consisting of approximately 1200 acres, often referred to as the Clough Farm. Defendants Matson Hardwoods, Inc. and Matson Lumber are successors-in-interest to Fisher & Young Lumber Co., a lumber company that sold the property to Plaintiff. Both Matson defendants are hereinafter collectively referred to as Matson.

       Plaintiff purchased this property in 1969 for $100,000 for the purpose of enabling the Boy Scouts of America to build an adventure camp, although that purpose was not realized. In the May 28, 1969 agreement of sale, the seller of the property, a lumber company named Fisher & Young, Inc., reserved timber rights to the property:

       EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto herein set forth below. SUBJECT, however, to right of Buyer (Carlisle) to use for its own purposes all trees fallen for more than one year and all treetops remaining after logging operations.

1

This language was also included in the deed dated January 9, 1970, and ultimately filed in the Recorder's Office of Warren County. Despite the reservation of timber rights to the property, Matson's predecessor in interest, Fisher and Young, did not conduct logging operations on the Clough Farm. However, commencing on November 18, 1988 and continuing until March 21, 1998, Matson logged portions of Plaintiff's property.

Plaintiff brought suit against Defendants on March 13, 1995 in federal district court ✗ on the basis of diversity jurisdiction. *Albert T. Carlisle v. Matson Lumber Company and Matson Hardwoods Inc.*, No. 95-0376 (W.D. Pa. 1995). In that action, Plaintiff pleaded ten counts, sounding in breach of contract, trespass, and requesting a declaratory judgment on the scope of Matson's timber rights under the agreement of sale.[1]

Before submission to the jury, Plaintiff, by prior trial counsel, orally withdrew his conversion claim, Defendants' Exhibit 7, and by written stipulation dismissed his trespass claim. Defendants' Exhibit 6. The federal jury verdict consisted of six findings:

> The jury finds the parties intended to grant seller the right to harvest only the timber that then existed on the property in 1969.
> The jury finds that the parties intended to require the seller to give Mr. Carlisle 120 days notice each time they constructed a new road in perpetuity.
> The jury finds that the parties intended a no-cut zone along the banks of the waterways on the property including Spring Creek and Thom's Run.
> The jury finds that the width of the no-cut zone on either side of the creek is 100 feet.
> The jury finds that the Matson Lumber Company did harvest trees in the no-cut zone.

---

[1] The Complaint pleaded the following: Count I, Breach of Contract, averred that Defendants had failed to abide by a purchase option provision of the agreement of sale; Count II, Breach of Contract, demanded damages for the same; Count III, Breach of Contract, averred that Defendants had harvested timber from "no-cut" zones set aside by the agreement of sale; Count IV, Breach of Contract, averred that Defendants violated the agreement of sale by harvesting outside the November through March season set forth in the agreement and without providing notice required for building of access roads; Count V, Trespass, averred harvesting was done in a negligent fashion; Count VI, requested an accounting or constructive trust for harvesting done outside the scope of rights reserved in the agreement of sale; Count VII, Conversion, sought damages for harvesting outside the scope of rights reserved in the agreement of sale; Count VIII, requested a declaratory judgment regarding the scope of Defendants' timber rights under the agreement; and the same, in Count IX, regarding the contents of the exclusionary map; and in Count X, sought preliminary and permanent injunctions.

With regard to the amount of damages, the jury awards Mr. Carlisle $110,000.

Plaintiff's Exhibit 5; *see also* Defendant's Exhibit 2 (containing the findings that the jury rejected, including a construction of the agreement that would have found an intention to grant seller a right to all timber that will ever grow on the property in perpetuity).

Matson appealed the judgment, and the Court of Appeals for the Third Circuit affirmed the District Court in an unpublished Memorandum Opinion addressing four allegations of error below. The appellate court concurred with the district court's determination that the agreement was ambiguous as to whether "the Seller's retained timber rights were in perpetuity, or were restricted to those trees existing on the property at the time the Agreement was executed." *Carlisle v. Matson Lumber Co.*, No. 98-3035, slip. op. at 3 (3d Cir. Mar. 16, 1999). The Court of Appeals affirmed the district court's decision to submit that question of fact to the jury.[2]

Plaintiff filed his complaint, with jury trial demand, on November 24, 1998, averring that on December 18, 1997, the jury in the federal district court action returned a verdict that the parties "intended to grant seller [Matson] the right to harvest only the timber that then existed on the property in 1969." ¶15. In his amended complaint, Plaintiff pleaded four counts: Count 1 sounding in trespass, for negligent, careless and reckless logging dating from December 18, 1986; Count 2, sounding in breach of contract, for harvesting trees outside the scope of the agreement of sale under the reservation clause as interpreted by the jury in the federal case combined with paragraph 6 of the Agreement; Count 3, indemnity, averring that under ¶11 of the Agreement, Defendants agreed to indemnify Plaintiff; Count 4, conversion.

Defendant preliminarily objected to the amended complaint. By Order dated March 23, 1999, this Court denied Defendants' preliminary objections. Pertinent to this discussion was this Court's rejection of Defendants' *lis pendens* argument finding that the

---

[2] The Court of Appeals also affirmed several other rulings of the district court: excluding the map delineating "no-cut" zones as it had not been produced in discovery; permitting Plaintiff to revise his damages claim downwards on the eve of trial after granting Defendant's motion for partial summary judgment; and finding Defendants waived their objection to the district court's decision not to voir dire the jurors concerning their possible bias against lumber companies.

3

pleadings in the two actions did not demonstrate that "the rights asserted and the relief sought" were identical.

> The federal complaint sought primarily equitable relief in the form of declaratory judgment . . . injunctive relief . . . , specific performance of a right of first refusal . . . , and accounting and constructive trust . . . . The Plaintiff voluntarily dismissed a trespass claim. . . . Monetary damages were sought based upon the specific performance claim and for a breach of contract and conversion claims based upon the harvesting of trees from an agreed "no-cut" zone. . . . The instant complaint seeks monetary damages for breach of contract and conversion based upon contract rights determined by the federal court in response to the Plaintiff's request for declaratory judgment. . . . reinstates the trepass claim which the Plaintiff earlier dismissed without prejudice, . . . , and seeks to enforce the indemnification clause of the contract. . . . . The Defendants'-Second Preliminary Objection is without merit and is denied.

Memorandum Opinion at 3 (citations omitted).

In their answer and new matter, Defendants averred that the parties litigated or could have litigated all issues set forth in the Complaint in the federal court case, whose decision is now "final and binding" upon the parties. ¶40. Defendants pleaded, *inter alia*, that Plaintiff's case is barred by the doctrines of res judicata, collateral estoppel and/or bar, ¶41. Plaintiff responded that his "causes of action could not be asserted until such a time as the rights of the parties were determined by the Court and jury in the prior federal action." Plaintiff's Answer to New Matter at ¶46.

We take up Defendants' motions for partial summary judgment initially. Defendants have made three overlapping motions for partial summary judgment. First, they assert that *res judicata*, collateral estoppel, merger and bar preclude the relitigation of any claims arising after December 17, 1997, the date of the close of evidence in the federal case. Thus Defendants move for partial summary judgment on Counts 1 through 4 for all damages sustained prior to December 17, 1997. Second, Defendants move for summary judgment on Counts 2, 3 and 4 of the amended complaint, averring that the doctrines of *res judicata*, collateral estoppel, bar and/or merger preclude "any damages for trees which were smaller than 16 inches in diameter at one foot above the ground on May 28, 1969." Third, Defendants seek summary judgment on the aspects of Plaintiff's

trespass (Count 1) and conversion (Count 4) counts occurring more than two years prior to the filing of Plaintiff's complaint upon statute of limitations grounds.

Before delving further into the facts of this case, we turn to the standards by which we evaluate a motion for summary judgment under Pennsylvania Rule of Civil Procedure 1035.2. After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law.

> (1) Whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would provide the issues to be submitted to a jury.

Pa. R.C.P. 1035.2. Courts are further instructed that

> A proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury.

*McCarthy v. Dan Lepore & Sons, Co., Inc.*, 724 A.2d 938 (Pa. Super. 1998), (citing Pa. R.C.P. 1035.2 *Note*). The nonmoving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the nonmoving party. *Ertel v. Patriot-News Co.*, 674 A.2d 1038 (1996), *cert. denied*, -- U.S.--, 117 S. Ct. 512 (1996). If the nonmoving party fails to come forward with sufficient evidence to establish or contest a material issue to the case, the moving party is entitled to judgment as a matter of law. *Id.* As with all summary judgment cases, the Court must examine the record in the light most favorable to the nonmoving party and resolve all doubts against the moving party as to the existence of a triable issue. *Id.*; *McCarthy v. Dan Lepore & Sons*, 724 A.2d at 940.

We turn first to Defendants' motions. Defendants' second motion for partial summary judgment seeks to preclude Plaintiff from litigating his claims in breach of contract, indemnity and conversion (Counts 2, 3 and 4) for trees that were present upon the property in 1969 but measured less than 16" in diameter at a height of one foot from the ground. Defendants ground this motion upon an interpretation of the verdict rendered by the jury in the federal district court case. That jury was called upon to determine the scope of the provision in the agreement between Plaintiff and Defendants' predecessor in interest that excepted and reserved timber rights to the seller. Defendants contend that the prior jury verdict established that Matson owns all of the trees that were in existence in 1969, regardless of their size at that time. Plaintiff interprets the verdict to have established that Matson owns only *timber* that existed in 1969 and defines timber as trees that are at least 16 inches in diameter at a height of one foot from the ground. In support of his position, Plaintiff refers to paragraph 6 of the agreement of sale that contains a limitation that "[s]eller shall confine the cutting of saw timber to those trees which measure 16" or more in diameter at 1 ft. above the ground. . ." Plaintiff suggests that the dictionary definitions of *tree* and *timber* differ and *saw timber* is an industry term used to denote trees of sufficient size from which to cut logs. The difficulty with Plaintiff's present position is that it contrasts markedly with the position Plaintiff advanced in the district court case and therefore could not have formed a basis for the jury's verdict in that case.

The application of *res judicata* requires four elements:

1) identity of issues;
2) identity of causes of action;
3) identity of persons and parties to the action; and
4) identity of the quality or capacity of the parties being sued.

*Philadelphia Electric Co. v. Borough of Lansdale*, 424 A.2d 514, 519 (Pa. Super 1981). Further, the Supreme Court of Pennsylvania has explained:

> *Res judicata*, or claim preclusion, is a doctrine by which a former adjudication bars a later action on all or part of the claim which was the subject of the first action. Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). *Res judicata* applies not only to claims actually litigated, but also

6

to claims which could have been litigated during the first proceeding if they were part of the same cause of action. *Id.*

*Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995). "[T]he purpose of this doctrine is to relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, prevent inconsistent decisions, and encourage reliance on adjudications. *Id.* at 315.

> Where the same cause of action is involved, a plaintiff's cause of action is merged in a final judgment if he wins, or barred by it if he loses. The scope of the merger or bar includes not only matters litigated but also matters that should have been litigated. *McCarthy v. Township of McCandless*, . . . 300 A.2d 815, 819 (Pa. Commw. 1973). See also: *Restatement, Second, Judgments* §§18, 19. Thus, a judgment is final not only as to damages actually claimed but also as to damages that might have been claimed. *Daniels v. State Farm Mutual Automobile Insurance Co.*, . . . 451 A.2d 684, 686 (Pa. Super. 1982); *Bardo v. Commonwealth, Dep't of Public Welfare*, . . . 397 A.2d at 1307. The doctrine of res judicata serves to expedite the consideration of individual cases, to establish the certainty and finality of court judgments and to protect a party from vexatious litigation. *Exner v. Exner*, . . . 407 A.2d 1342, 1344 (Pa. Super. 1979).

*Branoff v. Fitzpatrick*, 460 A.2d 330, 335 (Pa. Super. 1983) (parallel citations omitted).

A review of the pleadings, pretrial motions, and trial record in the federal district court case reveals that the Plaintiff did not distinguish between *trees* and *timber* for purposes of construing the reservation clause in the agreement of sale. Rather, Plaintiff differentiated between existing on the land in 1969 and sprouting of trees subsequent to 1969. *See, e.g.*, Plaintiff's Pretrial Narrative Statement, Joint Exhibit Tab No. 11 at 9 ("Carlisle has suffered the following damages: loss of the value of all trees wrongfully harvested and removed by Matson (whether in no-cut zones, *sprouted after May 28, 1969*, or in any other way outside Matson's harvest rights) . . .") (emphasis added); Plaintiff's Motion for Summary Judgment, Joint Exhibit Tab 13 at 2-3 ("The 1969 Agreement of Sale conveys to Carlisle all of the land . . . except that it reserves in the timber company . . . 'all of the timber and trees, standing and fallen, situate on the premises above described.' . . . The Agreement of Sale does not refer in any fashion *to future trees* or a perpetual harvest right.") (emphasis added); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at Joint Exhibit Tab 17 at 3 ("Matson contends that the contract phrase 'all of the timber and trees, standing and

fallen, situate on the premises above described,' unambiguously means that it has a perpetual right to harvest all trees that shall ever grow on Carlisle's property. In so doing, Matson struggles to overcome the plain language of the contract itself. Briefly put, trees are 'standing and fallen' *only if they are actually in existence.*") (emphasis added); Report and Recommendation of Magistrate Sensinich, Joint Exhibit Tab 19 at 24 ("Plaintiff alleges that the phrase *"standing and fallen"* in the timber rights reservation clause *means that the timber company was limited to harvesting those trees that were planted and already in existence in 1969* when the agreement of sale was signed") (emphasis added); Affidavit of Plaintiff, quoted in Report and Recommendation of Magistrate Sensinich, Joint Exhibit Tab 19 at 24 ("I would not have signed the Agreement of Sale if it had given Fisher & Young ownership of all trees that would ever grow on my property, as opposed to just those trees then in existence.") *See also* Plaintiff's document entitled "Contract Interpretation Questions for Jury", Joint Exhibit Tab 39; Testimony of Plaintiff, Joint Exhibit 44 at 80:22-23 ("They have the right to cut trees that were standing or fallen in 1969"). The distinction between trees greater than or less than 16 inches in diameter at one foot above the ground did not surface in the prior case, and in fact Plaintiff consistently maintained in the federal court action that the reservation of timber rights covered all trees in existence on May 28, 1969.

Plaintiff is barred now from litigating an issue that was not pressed in the prior trial in federal court. Plaintiff may litigate any claims he may have for damages arising from Defendants' logging of trees that have sprouted since May 28, 1969.

Defendants have also moved for partial summary judgment on all counts for any evidence accruing before the date of the close of evidence in the federal trial, December 17, 1997, citing comment e to section 27 of the Restatement (Second) of Judgments:

> A given claim may find support in theories or grounds arising from both state and federal law. When the plaintiff brings an action on the claim in a court, either state or federal, in which there is no jurisdictional obstacle to his advancing both theories or grounds, but he presents only one of them, and judgment is entered with respect to it, he may not maintain a second action in which he tenders the other theory or ground. If however, the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground (or, having jurisdiction, would clearly have declined to exercise it as a matter of discretion), then a second action in a

competent court presenting the omitted theory or ground should be held not
precluded.

Restatement (Second) of Judgments §27, comment e. *See McArdle v. Tronetti*,
627 A.2d 1219, 1223 (Pa. Super.), *alloc. den.* 641 A.2d 587 (Pa. 1993), (applying section
27 and determining that because a federal court declined to consider claims later raised in
state court, the Court of Common Pleas could entertain those claims).

Plaintiff's present claims could all have been advanced in the federal district court
case. His position that the declaratory judgment relief sought in that case was a
prerequisite to this action contrasts markedly with the position advanced in that litigation.
In point of fact, Plaintiff pleaded ten counts in that action, some identical to the counts
pleaded herein. The record in the federal case does not suggest that Plaintiff sought only
a declaratory judgment as prerequisite to a subsequent action for damages.

Defendants' remaining motion for summary judgment on statute of limitations
grounds is mooted by the resolution of their other motions. Any remaining claims that
Plaintiff has for logging operations since December 17, 1997 for the cutting of trees that
have sprouted since May 28, 1969 are clearly not subject to a statute of limitations
defense in this action, which was effectively filed in November 1998.

Plaintiff moved for partial summary judgment on Count 2, breach of contract, and
Count 4, conversion of his Amended Complaint, presenting in support Defendants'
harvest records and his expert's report. Plaintiff's motion is denied for two reasons.
First, it rests upon an interpretation of the verdict in the federal district court case that this
Court has squarely rejected, *supra*. Moreover, to the extent that his motion relies upon
the testimony of his expert, the Plaintiff urges that this Court take judicial notice of facts
concerning tree growth and the counting of tree rings. Tree maturation is not a subject
upon which this Court could take judicial notice, and is one that is beyond the ken of the
average lay person, requiring the testimony of an expert witness. For the foregoing
reasons, the Court enters the following Order:

IN THE COURT OF COMMON PLEAS
OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
CIVIL

ALBERT T. CARLISLE,

       Plaintiff

       v.

MATSON LUMBER COMPANY and
MATSON HARDWOODS, INC.,

       Defendants

No. 353 of 1998

### ORDER

AND NOW, this 30th day of January, 2002, the Plaintiff's motion for partial summary judgment is denied and the Defendants' motions for partial summary judgment are granted as follows:

All claims for damages arising from the harvesting of any trees and timber standing situate on the Clough Farm on May 28, 1969, are dismissed with prejudice; and

All claims arising prior to December 17, 1997, are dismissed with prejudice.

BY THE COURT

Paul H. Millin, P.J.

JAN 31, 2002
RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff )
)
VS. )    NO. 04-25 ERIE
)
)
BARTONY, HARE & EDSON; SCOTT M. )
HARE, ESQUIRE; HENRY E. BARTONY, )
JR., ESQUIRE; and JOHN JOY V. )
EDSON, ESQUIRE, Defendants )

### AFFIDAVIT OF JAMES HALL

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF ERIE )

James Hall, being first duly sworn according to law, deposes and states the following:

1.    My name is James Hall. I have been engaged in the practice of forester and management forester since 1963 on both public and private lands.

2.    I have been employed as a professional consulting forester since 1993.

3.    I have been engaged by Albert T. Carlisle since 1996 to perform timber appraisals and to develop a plan of good forest management for the Carlisle Farm.

4.    I have personal knowledge of the Carlisle Farm including its location in Spring Creek Township, Warren County, Pennsylvania, its geography, topography, acreage and makeup consisting of forest, fields and wetlands.

5.    The Carlisle Farm is comprised of approximately 1,239.6 acres of land. Of the total acreage, approximately 779 acres are commercial forest land.

6.    I have personal knowledge of the verdict rendered in Carlisle v. Matson Lumber Company, et al. at 178 F.3d 1278 (3rd Cir. 1999) as I testified as an expert witness in that matter.

I have also reviewed the jury's verdict which found that Matson did not have a perpetual right to harvest timber on the "Clough" farm.

7.      The jury determined that Matson had the right to harvest only timber existing on the "Clough" farm as of May 18, 1969. The jury did not affix a date by which Matson must remove the timber before its rights expire.

8.      It is the custom of the commercial forest industry in Pennsylvania that where a timber agreement, such as the one at issue, provides for the sale of timber standing on a date certain, the grantee has a reasonable time to remove the timber if no other expiration date is provided.

9.      It is my opinion to a reasonable degree of professional certainty that Matson could have and should have removed the timber in existence on May 18, 1969 within five (5) years or on or before May 18, 1974.

10.     I have considered the species of timber involved, the number of acres, the geography and topography "Clough" Farm as well as the limited harvest season of September to May in arriving at my opinion.

11.     The values of the remaining timber subject to harvest by Matson based on 425 plots taken on the Carlisle Farm between 1997 and 2002 was $947,304.83 according to the Pa. Woodland Timber Market Report 4th quarter 2001. This does not take into account the timber removed by Matson in the 2005-2006 harvest which I have preliminarily estimated as $100,000.00 to 200,000.00 or more.

James Hall

James Hall

Commonwealth of Pennsylvania )
County of Erie ) SS

    On this, the 14th day of June, 2006 before me, personally appeared James Hall, the same person described in and who executed the within affidavit and she acknowledged to me that she voluntarily executed this affidavit.

Notary Public

M<del>COMMONWEALTH OF PENNSYLVANIA</del>
NOTARIAL SEAL
JAMES RYAN FRYLING, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON NOV. 18, 2007

# James Holt, Consulting Forester

89 S. Main St. -- Rukaoti, PA 16345
Phone 614-757-4486 ~ Fax 866-506-7474
management plans - appraisals - timber sales

## QUALIFICATIONS

I have practiced good forest management since September 1963 on both public and private land. I have constantly taken and taught courses on forestry related subjects in order to keep my skills current.

My strongest assests are a dedication to good forestry practices and integrity in dealing with landowners.

## WORK HISTORY

**1963-1966**  *Service Forester, Commonwealth of Pennsylvania*
I worked with private landowners to get good forestry practices on their land. This involved writing management plans, marking timber, planting trees and all other related activities.

**1966-1968**  *Management Forester, Commonwealth of Pennsylvania*
I worked on State Forest Land writing management plans, conducting timber sales, providing recreational opportunities and all other related activities.

**1968-1993**  *Assistant District Forester, Commonwealth of Pennsylvania*
I was responsible for all forest management work on both public and private land conducted by the Pa. Bureau of Forestry in Erie, Crawford, Forest, Warren and Venango counties. I was also responsible for forest fire prevention and control; Gypsy Moth spraying; snowmobile program; and other related activities.

**1993-Present**  *Consulting Forester, Self employed*
I work for private landowners helping them reach their goals..

## EDUCATION

**1959-1963**  Bachelor of Science in Forest Management    Penn State University

### ADDITIONAL COURSEWORK AND TRAINING

Law Enforcement
Labor Relations
Prescribed Fire Management
Wildlife Habitat Management

Watershed Management


Effects of Soils and geology on Planning and Development
Allegheny Hardwood Silviculture
Fire Business Management
Wetland Delineation
Soil and Erosion Control Workshop


Member of:  Pa. Forestry Association
            ~~Pa. Deer Forest Committee~~
            Northwest Pa. Woodland Owners Association

**James Hall**
CONSULTING FORESTER

R.D #1 Box 1102 · Russell Pennsylvania 16345 · (814) 757-4488

May 2, 1997

Scott Michael Hare, Esquire
Bartony Hare & Edson
Law & Finance Building Suite 1801
429 Fourth Avenue
Pittsburgh, PA  15219

Re:  Clough Farm/Matson Lumber Co.

Dear Mr. Hare:

I have been engaged by Albert T. Carlisle to assess the condition and history of the timber stands and associated land on the Clough Farm, determine the value of the standing timber at various times in its history, assess the forestry practices employed by Matson Lumber Company and Matson Hardwoods (collectively "Matson") on the farm, and determine and define the damages to Mr. Carlisle caused by Matson. Further, I have been requested to assess the meaning of certain provisions contained in the Agreement of Sale between Mr. Carlisle and the original seller. Finally, I have been requested to evaluate the damage claims asserted by Matson in its counterclaims against Mr. Carlisle.

This letter describes my methodology, and reports my findings and conclusions as of this date. I offer all of the opinions expressed herein within a reasonable degree of scientific certainty.

## Description of the Property

The property in question, known as Clough Farm, is located in Spring Creek Township, Warren County, Pennsylvania. The property encompasses about 1239.6 acres. Of the total acreage, approximately 778 acres are commercial forest land.

This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine, and various other species. Based on the evidence of residual stumps and some uncut areas, I have concluded that this property was once a

majestic example of the excellent timber that this area of Pennsylvania can produce. Through good forest management, under the guidance of a professional forester, this area could have been and should still be a highly productive, healthy and profitable forest. As I will detail below, because of Matson's forestry practices, it is not.

## Methodology

In order to provide a complete and accurate assessment of the 779 acres of commercial forest land on the farm, I used the following techniques.

A.   General overview and boundary line check.

B.   Typed the timber:   Divided the area into homogenous stands using ground surveys and aerial photography.

C.   Took over 120 random plots using two techniques.

    1.   Plotless cruising with a 10 factor prism.
    2.   1/20 acre plots.

D.   Collected data regarding:

    1.   Species
    2.   Quality
    3.   D.B.H. (Diameter Breast High)
    4.   Merchantable Height
    5.   Number of trees
    6.   Damage to residual trees
    7.   Density

E.   Referred as needed to the following materials:

    1.   Sylvah (NSFS) Research Lab
    2.   Penn State volume tables
    3.   PA Bureau of Forestry volume factors
    4.   USDA-Forest Service research paper NE-373
    5.   USDA-FS Agricultural handbook 355
    6.   USDA-FS General technical report NE-96
    7.   USDA-FS Research paper NE-143
    8.   Timber Management Guide-Ben Roach
    9.   Forest Reference Manual-J.M. Francis
    10.  USDA-FS Agriculture Information Bulletin 419
    11.  USDA-FS Agriculture Information Bulletin 405
    12.  USDA-FS Research Paper NE-127
    13.  USDA-FS Agriculture Handbook 678

14. NY State Dept. of Environmental Conservation Stumpage Price Reports—1982 to 1997
15. Penn State University—Timber Market Reports 1984-1997
16. USDA-FS Actual Bids on Timber Sales
17. Timber Sale Data collected by James Hall
18. Data supplied by Norman Sunderland, Consultant Forester
19. 1968, 1987, 1988 and 1989 Aerial Photography
20. Harvesting data supplied by Matson Lumber Company for November 1988 through April 1995
21. Agreement of sale—Fisher & Young, Seller and Albert T. Carlisle, Buyer dated September 30, 1969
22. Plaintiff's pre-trial narrative dated March 22, 1996
23. Defendant's pre-trial narrative dated April 11, 1996
24. Meyer's *Forest Mensuration*

## Significant Provisions of Agreement of Sale

During my career in the forestry industry, I have been involved in negotiating, drafting, monitoring and enforcing countless contracts governing timber rights. As a result, I am intimately familiar with the terminology and usage of the timber industry, and I am thereby able to interpret the Agreement of Sale between Mr. Carlisle and Fisher & Young to explain the meaning it has in the timber industry.

I have been asked to interpret the following provisions of the Agreement of Sale: (i) the final paragraph on page 5; (ii) paragraph 15.A. on page 8; (iii) paragraph 15.B. on page 8; and (iv) paragraph 16 on pages 8 and 9.

(i) Final Paragraph on page 5.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto set forth below, SUBJECT, however, to the right of

Buyer to use for its own purposes all trees fallen
for more than one year and all tree-tops remaining
after logging operations.

This provision very clearly reserves only those
trees already actually existing on the date of the
Agreement. This provision does not reserve any rights in
any trees germinating after September 30, 1969, which are
the property of Mr. Carlisle and must be respected as such.

It is possible to reserve an ownership interest in
future trees, as well as existing trees, and parties
sometimes agree to do so. However, such an ownership
interest is always specifically identified. Furthermore, it
is easy to reserve a future interest using language like
this: "all trees now on this property, and all trees that
ever grow on this property at any time in the future, are
the property of the timber company." Such simple language
clearly and plainly reserves not only trees then in
existence, but all trees forever. The Agreement of Sale
between Mr. Carlisle and Fisher & Young does no such thing,
and anyone experienced in the forestry industry would
understand the paragraph quoted above to retain ownership
only in the trees that are actually existing on the date of
the Agreement.

(ii) Paragraph 15.A. on page 6.

15.A.    That in the event the Seller shall
desire to sell, transfer or assign the timber
reserved on the premises above described, Seller
shall give Buyer written notice thereof and hereby
grants the Buyer the option for thirty days
following the posting of said notice by Seller to
Buyer of purchasing said timber at the price
offered therefore by a bona fide prospective third
party purchaser, transferor or assignor.

This provision refers to the timber itself, as
opposed to the "timber rights" (see paragraph 15.B. below).
Each and every time the Seller plans to sell, transfer or
assign timber (in any quantity, including individual trees),
it must give Mr. Carlisle a 30-day written notice, and the
option to buy the specified trees at the price offered by
the third party.

The business of a commercial timber company like
Matson is to cut timber and sell the resulting logs to
third-party purchasers. Such a company demonstrates a

"desire to sell, transfer or assign the timber reserved on the premises" by cutting the timber. Accordingly, Matson is required to notify Mr. Carlisle in writing each time it desires to cut timber to effectuate a sale, transfer or assignment of such timber, thereby allowing Mr. Carlisle to exercise his thirty-day option to purchase the timber. Had Matson honored this obligation, Mr. Carlisle would have been able to purchase any or all such timber (that is, individual trees) prior to its being cut. (Once cut, timber becomes logs: "timber" means standing merchantable trees. Upon being cut, therefore, the timber is transferred, in violation of the Agreement.)

Paragraph 15.A. would also apply, obviously, in the event Matson desired to sell, transfer or assign all of the timber. Once again, it would be required to give written notice to Mr. Carlisle and allow him thirty days to exercise his option to purchase such timber.

(iii)    Paragraph 15.B. on page 8.

15.B.    Should the present management and/or ownership of Seller change, Buyer shall be so advised by Seller in writing and shall have an thirty day option to purchase the timber rights at a price to be mutually agreed upon, or in failure thereof, by arbitration (each side to choose one of the arbitrators and the two arbitrators to select a third). The arbitrators shall establish the price which shall be binding without appeal of the parties.

Unlike 15.A., which refers to "timber" (trees), 15.B. refers to "timber rights." These are two entirely different terms with different meanings, and there is a reason for these two separate sections in paragraph 15.

In particular, under paragraph 15.B. the Seller is obligated to notify Mr. Carlisle in writing of any change in management and/or ownership of the Seller, whereupon Mr. Carlisle has 30 days to purchase the timber rights. This notice and option enable Mr. Carlisle to keep unwanted timber companies, subsequent to the original seller, off the property altogether by acquiring the remaining timber rights.

(iv) Paragraph 16 on pages 8 and 9.

It is further agreed and stipulated by and between the parties hereto that a map designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting, shall be attached hereto and made a part hereof as though fully set forth herein and marked Exhibit A as previously mentioned.

It appears that the map described in the Agreement of Sale cannot be found, although various witnesses testify that it once existed. As a professional forest manager, I can confirm that it would be ordinary industry practice to protect certain valuable resources on the property. Typically, any stream that has a breeding trout population is given a 100-foot buffer. Such a strip was probable on the Clough Farm along Spring Creek, Brokenstraw Creek, Tom's Run and its tributaries and the Greeley. There would also typically be a 100-foot buffer around any buildings, and an exclusion of swamp, wetlands, and areas used for pasture and/or agriculture.

## Conclusions

A.  Matson's Cutting Practices.

Matson Lumber Company's cutting practices show absolutely no concern for the forest as a renewable resource that should be managed to promote the continuing production of quality timber. Matson has left the average basal area of acceptable growing stock below 30 square feet, which is far below any accepted management guidelines. Damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded, and have reduced commercial value or no commercial value at all, because of sprouting from over harvesting. Skidding across and in streams is frequently evident. Excessive and unnecessary roads were built. Matson made poor use of the trees they felled, and abandoned valuable cut material to decay.

The following examples demonstrate some of the ways in which Matson was reckless in its timber practices and caused unnecessary damage on the Clough Farm:

1.    Trees removed right up to banks of Spring Creek.  Cutting along streams has been no different than anywhere else.

2.    No Respect for residual trees.  Felling damage, skidding damage, dozer damage, chainsaw damage is evident everywhere.

3.    Wasteful logging practice.  Many logs and even entire trees were cut and left in woods.  (This volume is not reflected in the damages calculations below, even though Mr. Carlisle has lost such abandoned trees.)

4.    No respect for streams and springs.  Many tops were left in water courses.  Skidder crossed and in some instances skidded logs in stream bed.

5.    There is no evidence of any sound forest management plans being used by Matson.  Stands with a high B.A. and excellent growing stock have been reduced to poor quality stands with less than 30 B.A. of acceptable growing stock.  This is so far below any graph that it is off the page.

In short (and undermining its claim that it has perpetual harvest rights on the Clough Farm), it is apparent that Matson has tried to get as much good timber from the farm as fast as possible, without regard to any damage it was causing to the timber stands or their future reproductive capacity.


B.    Damages to Carlisle.

Between November 1988 and April 1995, based on log receipts supplied by Matson, Matson and/or its agents removed 4,263,678 board feet Doyle rule from the Clough Farm.  Converted to International ¼-inch rule, this figure equals 7,125,234 board feet.  This figure does not include the logs left in the woods due to wasteful utilization practices.

The value of this timber, accounting for volume and species, based on the average value of stumpage in northwestern Pennsylvania published in the Penn State University "Timber Market Report" for the fourth quarter of 1996, is $1,891,265.00.  However, the trees removed by Matson were not average trees (the basis of the Penn State report), but very high quality trees.  The value of the Clough Farm timber removed by Matson, using timber prices

for high quality timber stumpage based on the Timber Market Report and actual timber sold in the area, is $3,655,060.40.

Because this timber was wantonly removed with no consideration for Mr. Carlisle's rights, Mr. Carlisle's damages for unlawfully removed timber (3 times stumpage value) are $10,965,181.20.

Additionally, Mr. Carlisle has endured damage to residual trees still standing of 34.4%, resulting in a loss of $584,268 times 3 = $1,752,804.

Furthermore, if this property has been properly managed with the original stand as a base, a perpetual harvest income would be realized by Mr. Carlisle. A modest 6.4% annual growth would yield $110,442.72 per year for at least thirty years, yielding a total loss of $3,313,281.60 based on today's values. This figure does not even account for the normal increase in stumpage values, ingrowth of small trees into sawtimber, quality increases (grade 1 into veneer), improved species composition, value of trees less than 11.5 DBH, or corrective work.

The total loss suffered by Mr. Carlisle as a result of Matson's violations of the Agreement of Sale and its improper harvesting methods is $16,031,266.80:

| | |
|---|---|
| $10,965,181.20 | Timber unlawfully removed |
| 1,752,804.00 | Damage to timber left standing |
| 3,313,281.60 | Lost future value |
| **$16,031,266.80** | Total |

C.   Matson's Damage Claims.

1.   Tree Stands

I have located a total of ten tree stands on the Clough Farm (one more than Matson alleges). Most of these stands were placed in trees with no commercial value, or were placed without the use of nails, so as not to damage the trees, or were erected before 1969. I have taken photographs of the trees at issue and have measured the trees. Of these, the only tree with any value damaged since 1969 is one 12" DBH Black Cherry (Volume 94 Bd. Ft. Int. ¼"), with a value of $84.60 assuming a grade 1 log.

Page 8

2.   Signs on trees

Roadside trees and field edge trees do not produce quality lumber, because of excessive limbs and damage to boles and root systems from road maintenance equipment. Thus, Matson's claim that 96 trees "can no longer be used for veneer resulting in a loss of $16,500.00" because of perimeter signs is nonsense. These trees never had any veneer potential, and never would.

Some of the perimeter trees exhibit nails. However, the nails are grown over, demonstrating that they have been there more than two years (probably at least fifteen or twenty years), and were therefore already there when Matson acquired the timber rights. All signs posted recently were put up with staples that do not penetrate through the bark, and therefore do not cause any damage.

In short, I did not find any damage to any trees from any posting of signs that would have resulted in any veneer log being down-graded. Matson's total loss from all sign posting is exactly $0.00.

3.   Roads

Matson has not demonstrated any actual repair costs in support of this claim. Usually road damage, such as rutting, from off-road vehicles is inexpensive to repair.

Thank you for the opportunity to undertake this interesting study. Please call me if I can provide any additional information.

Respectfully,

James Hall
Consulting Forester

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,                         )
                                            )
          Plaintiff                         )
                                            )
          v.                                )
                                            )          No. C.A. 04-284 Erie
MATSON LUMBER COMPANY,                      )          Judge Lancaster
MATSON HARDWOODS, INC.,                     )
DORA M. SQUATRITI, individually and         )
as EXECUTRIX OF THE ESTATE OF               )
MARION C. KINKEAD,                          )
                                            )
          Defendants                        )

## AFFIDAVIT OF JAMES HALL

Before me, the undersigned Notary Public, this day, personally appeared James Hall, Consulting Forester, 69 South Main Street, Russell, Pennsylvania 16345, known to me, who being duly sworn according to law, deposes and says that based upon his own personal knowledge, the following statements are true and correct to the best of his knowledge, information and belief:

1.   I have been engaged by Albert T. Carlisle, Plaintiff in the above captioned matter to appraise the timber and trees which have come into existence since May 18, 1969 on the Carlisle Farm located in Spring Creek Township, Warren County, Pennsylvania.

2.   The Carlisle Farm encompasses approximately 1239.6 acres of land. Of the total acreage, approximately 779 acres are commercial forest land.

3.   This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine and various other species.

4. Through good forest management, under the guidance of a professional forester, this area can be a highly productive, healthy and profitable forest.

5. In order to render an complete and accurate assessment of value of the timber and trees which have come into existence since May 28, 1969, I used performed the following:

    A. General overview and boundary line check.

    B. Typed the timber.

    C. Took random plots using the following technique(s):

        1. 44 1/10th Acre plots

    D. Collected data regarding:

        1. Species of trees.

        2. Quality of trees.

        3. Quantity of trees.

        4. Diameter Breast High

    E. Referred as needed to the following materials.

        1. Silvah Growth Projection   Exhibit 1

        2. PA Woodlands Timber Market Report - Values 2nd Qtr 2005

        3. Compound Interest Formula.

## OPINION OF VALUE

6. I have considered an area of 650 acres of forested land excluding the timber located in waterways.

7. It is my opinion to a reasonable degree of certainty that the present value of the timber and trees on the Carlisle property which have come into existence since May 28, 1969 is

$ 388,050.00.

8. It is my opinion to a reasonable degree of certainty that the future value of the timber and trees on the Carlisle property which have come into existence since May 28, 1969 is $ 3,506,100.00.

James Hall

Subscribed and sworn to before me this 22nd day of August, 2005

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JAMES RYAN FRYLING, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON NOV. 18, 2007

SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.

```
OWNER/AGENCY      -- carlisle            DATE TALLIED:       JUL/   5
FOREST/PROPERTY   --                     DATE PRINTED:   19/AUG/2005
COUNTY/DISTRICT   -- spring creek        FILE: C:\SILVAHV5\sample2.SIL
COMPT - STAND     --                     DEFAULT: SILVAH.DEF
ACRES             --       1.00             TYPE:    ALLEGHENY HARDWOOD
STAND AGE         --    20                  SIZE:    SMALL POLE
SITE              -- UNKNOWN                DENSITY: 50 TO 80 %
sapling evaluation
```

OVERSTORY CRUISE INFORMATION
-------------------------------

Overstory data is from an individual tree tally fixed plot cruise,
using a  .010 acre plot, and with trees tallied by
1 inch dbh classes, heights, and pulp & cull grades only.

Overstory data based on    44. plots;
     0. additional plots needed to reach 15 % of the mean;
    32. additional plots needed to reach 10 % of the mean.

Mean basal area is   48. plus or minus    6. square feet per acre
at 90 % confidence ( 13. % of mean).


UNDERSTORY CRUISE INFORMATION
-------------------------------

Data on advance regeneration, site limits, and understory was not collected.

Page   2
SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.

FOREST/PROPERTY --                    DATE PRINTED:   19/AUG/2005
COMPT - STAND    --                   FILE: C:\SILVAHV5\sample2.SIL


SIMULATED STAND DEVELOPMENT

| YRS | NO. TREES | BASAL AREA | REL DEN | DIA MER | % CAP | % M&B | % OAK | TOT CDS | PULP CDS | MBF | $ | NET GROWTH | MORT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1150 | 48 | 54 | 8.0 | 35 | 40 | 0 | 3 | 3 | .0 | 6 | | |
| | | | | | | | | | | | | 2.67 | .11 |
| 5 | 1107 | 62 | 63 | 8.5 | 36 | 39 | 0 | 5 | 4 | .3 | 33 | | |
| | | | | | | | | | | | | 2.82 | .13 |
| 10 | 1064 | 76 | 72 | 8.8 | 37 | 37 | 0 | 8 | 6 | .7 | 83 | | |
| | | | | | | | | | | | | 2.93 | .14 |
| 15 | 1022 | 90 | 80 | 9.4 | 39 | 36 | 0 | 11 | 9 | 1.2 | 197 | | |
| | | | | | | | | | | | | 2.51 | .59 |
| 20 | 879 | 103 | 85 | 10.1 | 39 | 35 | 0 | 14 | 12 | 1.8 | 397 | | |
| | | | | | | | | | | | | 2.60 | .46 |
| 25 | 792 | 116 | 90 | 10.9 | 41 | 34 | 0 | 18 | 14 | 2.8 | 731 | | |
| | | | | | | | | | | | | 2.62 | .42 |
| 30 | 726 | 129 | 96 | 11.6 | 42 | 33 | 0 | 22 | 16 | 4.1 | 1281 | | |
| | | | | | | | | | | | | 2.20 | .80 |
| 35 | 613 | 140 | 99 | 12.4 | 43 | 32 | 0 | 25 | 17 | 5.6 | 2093 | | |
| | | | | | | | | | | | | 2.02 | .79 |
| 40 | 532 | 150 | 102 | 13.2 | 44 | 31 | 0 | 29 | 19 | 7.2 | 3058 | | |
| | | | | | | | | | | | | 1.81 | .83 |
| 45 | 469 | 159 | 105 | 14.0 | 45 | 31 | 0 | 32 | 20 | 8.7 | 4155 | | |
| | | | | | | | | | | | | 1.59 | .88 |
| 50 | 418 | 167 | 107 | 14.7 | 45 | 30 | 0 | 35 | 20 | 10.2 | 5394 | | |

*597/Acre

Compound Interest 4.5%

EXHIBIT

I

SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.

FOREST/PROPERTY --                      DATE PRINTED:   19/AUG/2005
COMPT - STAND    --                     FILE: C:\SILVAHV5\sample2.SIL

### SIMULATED PRODUCT YIELD

| YRS | DATE | TOTAL CORDS | PULP CORDS | MBF SAW | $ TOTAL |
|-----|------|-------------|------------|---------|---------|
| **INITIAL STAND** | | | | | |
| 0 | 5 | 2.8 | 2.8 | .0 | 6. |
| **FINAL STAND** | | | | | |
| 50 | 55 | 34.9 | 20.4 | 10.2 | 5394. |
| **TOTAL YIELD** | | 34.9 | 20.4 | 10.2 | 5394. |

May 26, 2006

James R. Fryling, Esquire
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

    RE:  Albert T. Carlisle v. Bartony Hare & Edson, et al
        U.S. District Court for the Western District of PA
        No. 04-025 Erie

Dear Mr. Fryling:

    Please accept this letter as my response to your request for a supplemental report regarding the Matson timber cutting on the 1,239 acre Clough, now Carlisle, Farm in the 2005-2006 timber cutting season starting in November, 2005 and being completed in March, 2006. This reports supplements my May, 1997 report to Scott Hare in the case of Carlisle against Matson and my October, 2005 report to you summarizing the $437,960 of timber taken in the 1993-1995 timber cutting seasons.

    From my personal observation and past experience in walking the Carlisle Farm, reviewing Matson's past timber records and previous timber sales from timber removed from the Clough Farm, I can provide the following additional information and opinions not contained in my previous reports:

    1.    Between November, 2005 and March, 2006, Matson was on the property with several timber cutters and two skidders.

    2.    Attached as Exhibit "A" is a schematic diagram of the Carlisle Farm identifying timber stands #1-16 and fields F17-F24.

    3.    During the 2005-2006 cutting in timber stands, described in #1, Matson cut timber Stands #2 (26 acres), #7 (27 acres), #8 (13 acres), #9 (14 acres), #10 (60 acres), #15 (249 acres), and possibly more. The acreage is the total estimated acreage of the stands, not the area of timber cut.

4.   Stand #2 contained high quality cherry, red oak, sugar
     maple, red maple and other quality timber.

5.   Stands #7 and #8 contained high quality cherry, ash and
     red maple.

6.   Stand #9 contained high quality cherry, red maple and
     red oak.

7.   Stand #10 contained high quality cherry, sugar maple
     and red oak.

8.   Stand #15 contained high quality cherry, ash, red oak,
     sugar maple, red maple, yellow poplar and miscellaneous
     species of timber, such as white oak, black oak and
     other oak.

9.   The acreage covered by the stands, referred to in #3,
     above, total 389 acres.

10.  The highest quality and most valuable timber taken in
     the 2005-2006 timbering was the high quality cherry cut
     during that time period was in stands #2, #7, #8 and
     #15.

11.  One high quality cherry tree had a market value of no
     less than $11,000 to $12,500 because of its value as
     "veneer", as the black cherry on the Carlisle Farm is
     one of the highest quality cherry in the world.

12.  It is common knowledge that Warren, Potter and McKean
     Counties have the highest quality black cherry in the
     United States and the world, and that part of the
     Carlisle Farm in the Spring Creek area is considered
     the best quality cherry in these three counties.

13.  From stands #2 and #15, it is believed Matson took 100
     to 200, if not more, black cherry trees in the 2005-
     2006 timber season, made reference to above, each
     having a minimum value of $2,000 or more.

Based on the above facts and my personal knowledge and experience in working the Carlisle Farm acreage and my 40 or more years of forestry work experience in Pennsylvania, New York and Ohio, I conclude that Matson removed at least $100,000 to $200,000 of timber in the 2005-2006 timber season.  If you would provide Matson's 2005-2006 timbering records, I will be able to provide a more complete report regarding the value of the 2005-2006 Matson timbering of the Clough Farm.

Respectfully,

James Hall

James Hall



Carlisle Farm

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff     :
                                     :
             VS.                    :     NO. 04-25 ERIE
                                       :
BARTONY, HARE & EDSON; SCOTT M. :
HARE, ESQUIRE; HENRY E. BARTONY, :
JR., ESQUIRE; and JOHN JOY V.      :
EDSON, ESQUIRE, Defendants     :

A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:
                              :SS:
COUNTY OF ERIE                   :

       CHRISTINE H. McCLURE, ESQUIRE, being first duly sworn according to law,

deposes and states as follows:

       1.      My name is Christine H. McClure. I am a lawyer and partner in the Law

Firm of McClure & Miller, 717 State Street, Suite 701, Erie, Pennsylvania 16501.

       2.      I was admitted to the Pennsylvania Bar in 1976. I attended Chatham

College (B.A., 1973), Villanova University (J.D., 1976). I am a member of the Erie

County (President, 2002), Pennsylvania and American Bar Associations, Erie County

Bar Foundation (President, 1994 through present). My legal practice includes general

civil litigation with an emphasis on real estate, estate administration and planning and

municipal law. Attached hereto is a copy of my C.V.

       3.      From the time of my admission to practice law in 1976 through the present

date, I have been actively involved in representing clients in real estate transactions

including performing, requesting, reviewing and providing professional legal opinions

based on title searches. I am also familiar with the standard of care required by legal

counsel in representing clients, similarly situated as Albert T. Carlisle, in the timber

litigation involved in the federal declaratory judgment action filed in the U.S. District

Court for the Western District of Pennsylvania and the necessity of that counsel to

obtain a title search and/or, at the very least, to examine the title documents filed in the

Recorder of Deeds Office to ascertain the record owner of the timber.

4.    Attached is the report dated June 13, 2006 I have prepared regarding my

opinions in the above matter.

5.    I hold and am prepared to express the opinions contained in these four

reports to a reasonable degree of professional certainty.

_Christine H. McClure._

CHRISTINE H. McCLURE, ESQUIRE

Sworn to and subscribed before me

this ___ day of June, 2006

_____

Notary Public

-2-

**CHRISTINE HALL McCLURE**
717 State Street, Suite 701
Erie, PA 16501
(814) 453-3681

Professional Experience:

1973 – Present

McClure & Miller LLP
Partner in law firm engaged in general civil practice with an emphasis on real estate, estate administration and planning and municipal law

Education:

B.A. Chatham College
Pittsburgh, Pennsylvania
B.A. in History 1973
Phi Beta Kappa 1972

J.D. Villanova School of Law 1976 (cum laude)
Villanova, Pennsylvania

Legal Activities:

Pennsylvania Bar Association
Board of Governors
1999-2002

House of Delegates
1993-present

Pennsylvania Bar Foundation
Vice President
2005-present

Erie County Bar Association
President 2002
Board of Directors 2000-2003
Board of Directors 1992-1994

Erie County Bar Foundation
President 1994-present

Community Activities:

Penn Attorneys Title Insurance Co.
Board of Directors
2002-2003

Penn Attorneys Title Insurance Co.
Advisory Board
2003-2006

Brevillier Village Foundation, Inc.
Board of Directors
2003-2006

Arts Council of Erie
Board of Directors
2003-present

Chatham College
Board of Trustees
1999-2002

Professional Organizations:
Member:                     American Bar Association
                            Pennsylvania Bar Association
                            Erie County Bar Association
                            Pennsylvania School Boards Association
                            Pennsylvania State Association of Township Solicitors
                            Pennsylvania State Association of Borough Solicitors
                            NSBA Council of School Attorneys


Admissions:                 Supreme Court of Pennsylvania 1976
                            U.S. Court of Appeals, Third Circuit 1980
                            U.S. Supreme Court 1981

# McCLURE & MILLER LLP
### ATTORNEYS AT LAW
717 STATE STREET, SUITE 701
ERIE PENNSYLVANIA 16501

Daniel L. R. Miller
Eugene J. Brew
Edward P. Wittmann
Christine Hall McClure
Jeffrey J. Cole
David J. Rhodes

Telephone (814) 453-3681
FAX (814) 454-1554
E-mail: cmcclure@mcclure-miller.com
Herbert J. Johnson Jr. (of counsel)
Harvey D. McClure (of counsel)

June 13, 2006

Andrew J. Conner, Esquire
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

RE:    **Carlisle v. Hare**
       **Title to Timber on 1,239 acre Clough Farm, Warren County, PA**

Dear Mr. Conner:

This letter is my response to your request for me to provide a report regarding the above and issues involved in this matter including (1) the status of the title to the timber on the Clough Farm in Warren County in the 1988 through 1995 time period and thereafter through the present; (2) whether the standard of care for legal counsel representing Carlisle in the federal declaratory judgment action, #95-0376, required the performance of a title search, or its equivalent, of the title to the Clough Farm timber; (3) relevant information which would have been provided to counsel from a title search, or its equivalent, in a trial of the trespass and conversion Counts of the federal declaratory judgment action; (4) the resulting consequences of not performing a title search, made reference to above; and (5) whether the 1973 Kinkead to Fisher & Young timber deed was in Carlisle's chain of title or whether

Carlisle is held to have had "constructive knowledge" of that timber deed after its April 20, 1973

filing and recording in the Office of the Warren County, Pennsylvania, Recorder of Deeds Office.

I.   **DOCUMENTS, DEPOSITIONS TRANSCRIPTS OR EXCERPTS**:

I have reviewed the following documents:

1.   Fisher & Young to Carlisle Articles of Agreement dated May 28, 1969 and recorded January 20, 1970 in Book 361 at Page 32 regarding property sale to Carlisle;

2.   Deed dated January 9, 1970 and recorded January 19, 1970 in Deed Book 361 at Page 13 from Fisher & Young to Carlisle;

3.   Abstract of Carlisle title to the Kinkead property, above;

4.   November 3, 2004 Hare Memorandum to Carlisle regarding "Pennsylvania Farm Timber Rights";

5.   Hare's November, 1994 billing for professional services he would provide regarding his representation of Carlisle;

6.   Deed dated March 27, 1969 and recorded April 22, 1969 from Kinkead to Fisher & Young;

7.   April 1, 1968 Kinkead to Fisher & Young unrecorded timber Articles of Agreement for the Clough Farm having the following conveyancing language "All of the timber and trees standing and down measuring twelve (12) inches or more in diameter, one (1) foot from the ground, on the premises...until April 1, 1978, on or after which date all rights hereunder shall revert to the owner of the land.";

-2-

8.     Deed dated April 20, 1973 and recorded April 23, 1973 in Book 376 at Page 939 from Kinkead to Fisher & Young, Inc. deed having the following language "together with right of entry on and over said premises for the purpose of cutting, skidding, piling and removing said timber until April 1, 1978, on or after which date all rights hereunder shall cease and determine, and all remaining timber and trees vest without notice in the Grantor, her heirs and assigns";

9.     May 6, 2003 Squatriti to Matson quit-claim deed;

10.    Excerpts of Lainard Bush's February 3, 2006 deposition;

11.    Excerpts of Albert Carlisle's January 23, 2006 deposition;

12.    Excerpts of John Dennison's February 9, 2006 deposition;

13.    Excerpts of James Hall's February 3, 2006 deposition;

14.    Excerpts of Scott Hare's September 1, 2005 deposition;

15.    Excerpts of John Kookogey's August 16, 2005 deposition;

16.    Excerpts of Lauri Sekerak's February 28, 2006 deposition;

17.    Federal declaratory judgment action Complaint (#95-0376);

18.    December 19, 1997 FRCP 41 Dismissal of Counts V (trespass) and VII (conversion) prior to verdict;

19.    Transcript regarding withdrawal of the conversion Count prior to verdict; and

20.    Original Rule 34 Request for Matson's documents regarding Matson's title to the Clough Farm timber and Matson's Response to Paragraph #4;

21.    Reports of forestry expert, James Hall;

22.    December 19, 1997 verdict slip in case of Carlisle v. Matson Lumber Co., Civil Action 95-376;

23.    Opinion of U.S. District Court of Appeals for the Third Circuit dated March 16, 1999;

24.    Copies of 42 Pa C.S.A. 8311 "damages for conversion of timber";

25.    21 P.S. §357 "constructive notice"; 21 P.S. §521, 522, 523; 21 P.S. §351;

26.    Opinion of the United States Court of Appeals for the Third Circuit filed June 2, 2006.

## II.   DISCUSSION:

On January 9, 1970, Albert T. Carlisle, by deed recorded January 19, 1970, purchased the 1,239 acre Clough Farm in Springcreek Township, Warren County, Pennsylvania from Fisher & Young, Inc. for $100,000.00. Carlisle's deed from Fisher & Young had a reservation for standing Clough Farm timber which provided, in part, "Excepting and reserving from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, ...SUBJECT, however, to right of Buyer to use for its own purposes all trees fallen for more than one year and all tree tops remaining after logging operations. Together with such rights and subject to such conditions and terms as contained in agreement between the parties dated May 28, 1969, incorporated hereby reference and made a part hereof." Neither this reservation nor the same or similar reservation in the incorporated Articles of Agreement identified the owner of the Clough Farm timber rights on the 1,239 acres, more than half of which had standing timber.

On March 2, 1969 Marion Kinkead, by deed recorded April 22, 1969, had conveyed for $25,000.00 the same Clough Farm property, as described in the January 9, 1970 Fisher & Young to

Carlisle deed. That deed had a reservation for standing timber which provided as follows "Excepting and reserving from out of this conveyance all of the timber and trees, standing and down, situate on the premises above described, with appurtenant rights, as set forth in agreement for the sale of said premises made between the parties hereto on April 1, 1968 and recorded in Deed Book 352 at Page 1135, in fulfillment of which agreement this conveyance is made". Whereas the Carlisle timber reservation did not identify the Clough Farm timber owner, the Fisher & Young timber reservation did identify Kinkead as the owner of the Clough Farm timber as of April 1, 1968.

On April 1, 1968, Kinkead and Fisher & Young entered into separate Articles of Agreement which provided that for $100,000, Kinkead would transfer to Fisher & Young the Clough Farm timber rights for 10 years, or until April 1, 1978. This Agreement had the following language "All of the timber and trees standing and down measuring twelve (12) inches or more in diameter, one (1) foot from the ground, on the premises here and after described; with the right to enter in said premises and to cut, skid, pile and remove the same, subject to the terms of this agreement, until April 1, 1978, on and after which date all the rights hereunder shall revert to the owner of the land". This Agreement was intentionally not recorded. Before Fisher & Young could exercise the Clough Farm timber rights, it was obligated to pay Kinkead $100,000. This was not done by Fisher & Young until March/April, 1973. At that time, Fisher & Young was making a sale of timber assets to American Hardwoods, which eventually became Fisher & Young Hardwoods. To convey the Clough Farm timber rights to American Hardwoods, Fisher & Young had to pay Kinkead the $100,000 required by the April 1, 1968 timber Articles of Agreement, which transaction was completed by April, 1973.

After Fisher & Young paid Kinkead the $100,000, Kinkead, by an April 20, 1973 timber deed, transferred to Fisher & Young the Clough Farm timber rights, but only until April 1, 1978. That timber Deed, recorded April 23, 1973 had the following language "Together with the right of

-5-

entry on and over said premises for the purpose of cutting, skidding, piling and removing said timber until April 1, 1978, on and after which date all rights hereunder shall cease and determine, and all remaining timber and trees vest without notice in the Grantor, her heirs and assigns". No other property or timber Deed was recorded in Warren County until June 9, 2004, when a quit-claim Deed from Dora M. Squatriti to Matson Lumber Company was recorded. Although Fisher & Young did convey other timber property to American Hardwoods by deed recorded in Warren County, no deed from Fisher & Young to American Hardwoods for the Clough Farm timber was recorded in Warren County.

In 1968 counsel representing Kinkead and Fisher & Young split the Clough Farm property and its timber into separate agreements. The transfer of timber rights to Fisher & Young were limited to ten years, or until April 1, 1978, to avoid either Kinkead or Fisher & Young being obligated to pay the 1% realty transfer tax on the $100,000 consideration. By limiting the transfer of timber rights to 10 years or less and returning the timber rights to the grantor or owner of the property after that time period, no transfer tax was required because the transfer of timber rights for 10 years or less was considered a transfer of personalty, not realty. As a consequence, as of April 1, 1978 Fisher & Young, Fisher & Young Hardwoods and Matson had no Clough Farm timber rights, as those rights belonged either to Kinkead or Carlisle by operation of law.

In 1986, Fisher & Young Hardwoods purported to sell timber rights to Matson. As a consequence of there being no recorded deed from Fisher & Young to Fisher & Young Hardwoods and a consequence of the April 1, 1978 reverter of timber rights in the 1973 Kinkead to Fisher & Young timber Deed, Fisher & Young Hardwoods had no Clough Farm timber rights to sell to Matson. Nonetheless, Attorney John Kookogey, in a Certificate of Title dated December 19, 1986 to Matson, represented that Matson had vested title to certain lands subject to "the timber on the Clough Farm in

Springcreek Township, Warren County, Pennsylvania, the deed for which is being held in escrow as security for payment of the debt of Fisher & Young Hardwoods to Fisher & Young, Inc. and timber on all parcels, the deeds for which are being held in escrow as security pending full payment by Hardwoods of its 1973 obligation to Fisher & Young, Inc.".

In 1988, without conducting any title search on the Clough Farm, Matson commenced timbering the Clough Farm. Matson's timbering operations on the Clough Farm were preceded by a June 30, 1988 letter which stated that "Matson Hardwoods, Inc. is by merger the successor in interest to Fisher & Young Hardwoods, Inc." and that "Fisher & Young Hardwoods, Inc. was the successor to Fisher & Young, Inc." From 1988 through 1994, Matson cut and removed 4 to 7 million board feet worth $3.6 million from the Clough Farm. In November, 1994, Carlisle contacted Scott Hare for legal advice regarding Matson's continuing timber activities on his 1,239 acre farm.

Hare, in 1994 and 1995, knew or could have known, the following as to Carlisle's goals in seeking legal counsel to make a claim against Matson:

1.    There was a requisite undertaking by Hare and a responsibility upon Hare, considering the scope of the duties and responsibilities he assumed in representing Carlisle in his action against Matson to have performed a title search of the Clough Farm property and/or, at the very least, ascertained and discovered the documents which conveyed the Clough Farm timber to Matson so he could properly represent Carlisle with regard to the claims set forth in the 10 Counts in the federal declaratory judgment action as follows:

(a)    the purpose of Carlisle's claim against Matson in the federal declaratory judgment action was "he wanted the timber company to be off his property" and "he wanted his property to be free of timbering operations" (Hare I, p. 52, lines 9-22);

-7-

(b)     Carlisle's goal was to keep Matson off the Clough Farm (Hare I, p. 64, line 24 through p. 65, line 5);

(c)     Carlisle wanted to "explore the assertion that all the timber on the property (Clough Farm) should have been conveyed to (Bert Carlisle) . . . any timber harvested (by Matson) constituted money damages to (Carlisle)" (Hare I, p. 72, lines 17-23);

(d)     Part of Hare's responsibility to Carlisle in the federal declaratory judgment action was to determine what timber Carlisle owned and what timber Matson owned (Hare I, p. 91, lines 9-15);

(e)     Hare assumed the responsibility of conducting the required fact investigation to support the claims made in the federal declaratory judgment action (Hare I, p. 93, line 12 through p. 94, line 16);

(f)     Hare knew that Matson took 4 to 7 million board feet or $3.6 million worth of timber off the Clough Farm from 1998 through 2004 (Hare I, p. 118, line 4 through p. 119, line 15); and

(g)     Hare could have known if he asked James Hall that $438,454 or more of timber was taken off the Clough Farm, referred to above, by Matson from 1993 through 1995, and/or within two years of the filing date of the federal declaratory judgment action.

No formal retention agreement or letter was prepared defining Hare's responsibilities in representing Carlisle or, if one was prepared, it cannot be located or produced. Hare prepared a November, 1994 memo to Carlisle outlining a broad range of claims Carlisle had against Matson and proposed a budget of $45,000 to $72,000 to process this litigation, which was informally agreed to by Carlisle. On March 13, 1995, Hare filed and served a 10 Count Complaint against Matson. Those 10 Counts consisted of (I) Breach of Contract (Purchase Option – Action for Specific

Enforcement); (II) Breach of Contract (Purchase Option – Action for Damages); (III) Breach of Contract (Harvesting Timber Outside Scope of Rights); (IV) Breach of Contract (Violations of Restrictions in Agreement of Sale); (V) Trespass; (VI) Accounting/Constructive Trust (Harvesting Timber Outside Scope of Rights); (VII) Conversion (Harvesting Timber Outside Scope of Rights); (VIII) Declaratory Judgment Regarding Scope of Matson's Rights; (IX) Declaratory Judgment Regarding Contents of Exclusionary Map and (X) Preliminary and Permanent Injunctions.

From 1995 through 1997, the parties engaged in discovery and prepared for a jury trial. That trial resulted in a verdict in favor of Carlisle for $110,00 for timber taken by Matson in a "no-cut zone" and established that Matson had a right to trees located on the property in 1969 and that these tree rights did not exist in perpetuity. Prior to trial and not resolved by the December 19, 1997 verdict, Hare withdrew, dismissed or took an FRCP 41 dismissal of Count V - Trespass and Count VII Conversion of that action.

At no time prior to the December 19, 1997 verdict did Hare read or review documents which conveyed Clough Farm timber from Kinkead to Fisher & Young, previously discussed. He knew or believed Matson's Clough Farm timber rights were derived from Fisher & Young Hardwoods and Fisher & Young, but those documents were never read or obtained by Hare. At no time during the November, 1994 through December, 1997 time period did Hare (1) inspect the property records in the Warren County Court House, (2) request another professional to do this, or (3) request that a title search of the Clough Farm property be conducted. If he had done any of these, he would have known (1) the timber rights of Fisher & Young and, therefore, Matson expired April 1, 1978, (2) Fisher & Young never conveyed its timber by Deed to Fisher & Young Hardwoods, (3) the Clough Farm timber rights, after April 1, 1978, belonged to Kinkead and, with some legal research, became the property of Carlisle no later than 1988, and (4) Matson, in 1988 and after, through the 1997 trial, was

on the Clough Farm timbering (1988 through 1994) as a trespasser and converter, not a licensee, as Hare believed (Hare, p. 86, line 9-13).

Hare's knowledge of the status of the title to the Clough Farm timber, his knowledge as to the location of the Clough Farm timber title documents and rationale for not performing or requesting a title search be conducted while he represented Carlisle from 1994 through June 23, 1988, when he recommended Carlisle file a Praecipe for Writ of Summons to initiate a second action against Matson in Warren County include the following:

(1)    Carlisle had "won" the first action and this allowed Carlisle to file a second action against Matson to recover damages not awarded by the December 19, 1997 verdict (Hall, p. 86, line 16 through p. 87, line 4); after the December 19, 1997 verdict in the federal declaratory judgment action, Hare advised Carlisle he had won, indicating". . . I don't understand why you're so unhappy, we won. . . this is a first step and sets the stage for what is to come. . ." (Bush, p. 19, lines 22-24). Hare represented that while the federal declaratory judgment action was limited in scope, the second lawsuit against Matson would allow Carlisle the opportunity to obtain a satisfactory damage award from Matson's pre-December 19, 1997 conduct (Bush, p. 20, lines 2-9);

(2)    Carlisle's second action against Matson had a "$5 million" settlement value (Hare Exhibit "23" p. 5-6; Hare I, p. 208, line 12 through p. 209, line 3); the second action filed in Warren County would provide the means to allow Carlisle to obtain a "home run damage award" against Matson (Hare I, p. 209, lines 16-25);

(3)    There was no legal impediment preventing Carlisle from filing the second action against Matson in Warren County for any claim within the ten Counts of the federal declaratory judgment action which had not been resolved by the December 19, 1997

-10-

verdict, providing Carlisle filed the Hare prepared Praecipe for Writ of Summons within one year after the December 19, 1997 federal declaratory judgment action verdict (Hare I, p. 185, lines 10-23 and p. 187, lines 12-20; Hare II, p. 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6);

(4)     By filing the second action against Matson, Carlisle could make a claim for every Count or cause of action in the federal declaratory judgment action not resolved by the December 19, 1997 jury verdict (Hare I, p. 185, lines 10-23 and p. 186; Hare I, p. 187, line 6 through p. 187, line 24);

(5)     Carlisle's second action filed on June 23, 1998 in Warren County was timely and not subject to any statute of limitations defense regarding Matson's conduct occurring within two years prior to the March 15, 1995 filing date for the federal declaratory judgment action nor subject to the bar of res judicata if the refiled Counts or claims had not been actually resolved by the December 19, 1997 jury verdict (Hare I, p. 155, line 21 through p. 156, line 5; p. 185, lines 10-23; Hare II, p. 13, line 15 through p. 15, line 3);

(6)     Carlisle's claims against Matson could be divided into two separate lawsuits (Bush Deposition, p. 41, line 3 through p. 44, line 19). The first lawsuit on the federal declaratory judgment action would relate to liability (Bush, p. 41, lines 23-25). The second lawsuit filed in Warren County would present Carlisle's damage claim against Matson (Bush, p. 42, lines 1-7); between December 19, 1997 and June 23, 1998, the value of the dismissed claims to be refiled in Warren were "about $5 million" (Carlisle, p. 153, line 21 through p. 154, line 3; p. 154, lines 20-25);

-11-

(7)    In a January, 1998 meeting in Ashtabula, Ohio, Hare represented that the damages
       Carlisle could recover in the second action included property damage and damages for
       Matson's tree cutting (Bush, p. 47, line 15 through p. 48, line 2). The second lawsuit
       would involve a damage claim for ". . . cutting of trees and property damage" not
       pursued in the federal declaratory judgment action (Bush, p. 49, lines 10-22);

(8)    Hare, prior to the federal declaratory judgment action, represented that he would check
       the property records at the Warren County Court House (Bush, p. 31, line 17 through
       p. 32, line 18). As there were a lot of "questions surrounding. . . the history of
       ownership. . . one of the things he (Hare) would be doing was going to the Warren
       County Court House and going through all those records so all those questions could
       be answered. Those involved titles. . ." (Bush, p. 32, lines 10-15).

By not performing a title search, foreseeable adverse consequences resulted. As a
consequence of not determining the owner of the Clough Farm timber from 1988 through 1994 and
not performing a title search of the Clough Farm, Hare's dismissal of the trespass and conversion
claims also dismissed other claims which Hare knew, or should have known, Carlisle had against
Matson. These were prima facie claims against Matson in which Matson, as the successor to Fisher &
Young, whose rights expired April 1, 1978, had no defense. James Hall, the forestry expert, was
provided Matson's timbering records obtained in discovery and, if asked, could have advised Hare
that in 1993 through 1995, Matson took 811,508 board feet worth $438,454, the ownership of which
was not vested in Matson but in Carlisle because by 1993 through 1995, the title to the Clough Farm
timber had become Carlisle's as the owner of the 1,239 acres to which that timber was attached before
it was cut. Furthermore, the forestry expert has also opined that at a minimum, Matson removed at

least $100,000 to $200,000 of timber in the 2005-2006 timber season, consisting of high quality cherry, red oak, sugar maple, red maple, ash, white oak, black oak and other oak.

As part of his undertaking and agreement to represent Carlisle in the 1995 federal declaratory judgment action and file the 10 Count Complaint, per his November, 1994 memo, and also representing Carlisle with respect to filing the second action in Warren County in which Hare intended to file and process up and until June 23, 1998 when he withdrew from representing Carlisle for non-payment of $15,768.45, (which was paid in 1999), Hare knew the following:

1.  Hare had no prior title search experience as a lawyer (Hare I, p.23, lines 1-19);

2.  Hare never saw the document which conveyed Clough Farm timber rights to Fisher & Young (Hare I, p. 62, lines 19-21);

3.  Hare doesn't know whether Fisher & Young ever paid for these timber rights (Hare I, p. 63, lines 21 through p. 64, line 3);

4.  Hare knew that if Fisher & Young had Clough Farm timber rights, they would be set forth in a document recorded in the Warren County Court House (Hare I, p. 78, lines 11-18);

5.  Hare was never aware of the Kinkead to Fisher & Young timber deed which conveyed Clough Farm timber rights to Kinkead to Fisher & Young (Hare I, p. 134, lines 2-9);

6.  Hare knew a Lauri Sekerak did title searches in Warren and had her phone number (Hare I, p. 98, line 5 through p. 99, line 6; Hare Exhibit #11 and Hare Exhibit #10);

7.  Hare thought Hare Exhibit #5 (Fisher & Young to Carlisle Agreement of Sale of property) (Hare I, p. 78, lines 17-18) constituted document which conveyed Fisher & Young timber rights in Clough Farm timber.

The undertaking and agreement to represent Carlisle against Matson to allow for the recovery of the type of monetary damages Hare represented was available to Carlisle mandated that Hare, prior to the 1997 resolution of the federal declaratory judgment action, perform or cause to be performed a title search of the Clough Farm property to determine whether Matson had any Clough Farm timber rights between 1988 and the December 19, 1997 verdict and, if Matson had rights, what rights it had either to the timber or to be on the Clough Farm property, other than as a trespasser. The failure to comply with the standard of care in performing that title search and otherwise doing the equivalent and determining the owner of the Clough Farm timber between 1988 and 1994, caused Carlisle actual damages and the consequences described in the opinion section of this report.

Carlisle's chain of title to the Clough Farm terminated with his January 9, 1970 property Deed. The 1973 Kinkead to Fisher & Young timber Deed, being recorded 3 years and 3 months after Carlisle's Deed was recorded, is not in his chain of title. Pennsylvania statutory law would consider the 1973 timber Deed an "after" recorded deed and void as to Carlisle. See 21 P.S. 351, 521 and 522. For the same reason Carlisle is not considered to have "constructive knowledge" of that after recorded deed. See 21 P.S. 351 which provides that any deed "shall be adjudged fraudulent and void as to any subsequent bona fide purchaser...without actual or constructive notice unless such deed...shall be recorded...before the recording of the deed...under which the subsequent purchaser...shall claim." See also 21 P.S. §357, which provides that recordation has the legal effect of giving constructive notice to subsecuent purchasers of the granting of such rights and/or privileges.

-14-

III.    **OPINIONS:**

Based upon the above described documents that I reviewed, the discussion set forth above, and my thirty years of professional experience with title searching and reviewing title searches, I have and can express the following opinions to a reasonable degree of professional certainty:

1.    Title to the Clough Farm timber from 1978 through present.

On and after April 1, 1978, neither Fisher & Young nor its successors, including Matson, had title to the Clough Farm timber. Those timber rights terminated under the April 20, 1973 Kinkead to Fisher & Young timber deed on April 1, 1978 on and after all timber rights of Fisher & Young "ceased and determined." Between April 1, 1973 and June 20, 2003, when the Squatriti to Matson quit-claim deed was filed, there had been no other timber deed filed and/or recorded which modified the effect of the April 1, 1978 termination of Fisher & Young's timber rights, referred to above. As a consequence Matson, while conducting its 1988 through 1995 timbering operations on the Clough Farm, was a trespasser, not a licensee, as Hare believed. After April 1, 1978, the Clough Farm timber rights reverted to the "Grantor" in the April 20, 1973 deed, which was Kinkead or her estate, not in perpetuity but only for a reasonable period of time. This is because the timber rights conveyed to Fisher & Young, Inc. on April 20, 1973 were "personalty" and not "realty" to avoid the payment of the Pennsylvania realty transfer tax. A reasonable period of time for these timber rights to have been considered the personal property of Kinkead after April 1, 1978 would have been no greater than 10 years, or until April 1, 1988. See Saltonstall v. Little, 90 Pa. 422 (1879); Havens v. Pearson, 334 Pa. 570, 6 A.2d 84 (1939); Strunk v. Morris Run Coal Company, 271 Pa. 148, 114 A. 519 (1921); Bennett v. Vinton Lumber Company, 28 Pa. Super. 495 (1905); Boults v. Mitchell, 15 Pa. 371 (1851). After April 1, 1988, they would have been considered realty and attached to the Carlisle real estate and his property as the owner of the real estate.

-15-

The June 20, 2003 Squatriti to Matson quit-claim deed failed to convey any timber rights to Matson for the reason that all timber rights in Kinkead, predecessor to Squatriti, had long expired and she had no timber rights left to convey. This is confirmed in the Inventory and Valuation Form filed in the Estate of Marion C. Kinkead. The Inventory lists no reversionary interest for the timber on the Clough Farm. If a reversionary interest existed in the Estate of Marion C. Kinkead, it should have been listed for purposes of the inventory and computation of the Pennsylvania inheritance tax.

Furthermore, after Fisher & Young, Inc. acquired the timber deed from Marion C. Kinkead by deed dated April 20, 1973, no subsequent timber deed was executed or recorded from Fisher & Young, Inc. to Fisher and Young Hardwoods, Inc. Therefore, when in December of 1986 Matson Hardwoods acquired Fisher and Young Hardwoods, Inc. by merger, Fisher & Young Hardwoods, Inc. had no legal title to the Clough Farm timber to convey to Matson Hardwoods.

2. Duty to perform a title search and ascertain identity of owner of the Clough Farm timber from 1988 through 1995.

In 1994, Hare, in effect, represented to Carlisle that he would represent him and advance essentially any claim Carlisle had against Matson for its 1988 through 1995 Clough Farm timbering operations available to Carlisle under the controlling law (see Hare's November, 1994 memorandum to Carlisle). Between the date of that 1994 memorandum and the December 19, 1997 verdict, Hare's level of knowledge regarding the ownership of the Clough Farm timber was the following: (1) did not know the identity of the owner of the Clough Farm timber; (b) did not know the document which conveyed timber rights to Fisher & Young, American, Fisher & Young Hardwoods or Matson; (c) knew those timber rights were filed in the Warren County Court House; (d) had never been in the Court House; (e) knew in May, 1997, based on a report from James Hall, that between 1988 and

1997, Matson had cut and removed in excess of 7 million board feet of Clough Farm timber, having a market value in excess of $3.6 million.

Hare, rather than perform or have performed a title search, relied solely on the documents provided him by his client, Carlisle. In such circumstances, and given Carlisle's goals, a prudent attorney would not rely on his/her client to provide all the relevant or controlling instruments. The client may have possession of a recorded document without realizing its significance. Furthermore, Matson was claiming rights derived from other parties which should alert a prudent lawyer that there may have been instruments recorded in the Warren County Courthouse which Carlisle did not and could not be aware of. None of these facts could be established without a title search.

Considering Carlisle's goals, the purposes he hoped to achieve and Hare's agreement and undertaking to advance those goals in the claims against Matson as described in Hare's November, 1994 memorandum to Carlisle, the standard of professional legal care required Hare to perform a title search of the Clough Farm property or, if he was not able, to request a professional title searcher in Warren County to perform that title search. The performance of a title search to identify the owner of any of the timber on the Clough Farm was required by the controlling standard of care for all the reasons set forth in this report.

3.   Consequences of Hare not performing a title search prior to December 19, 1997 verdict.

The immediate consequence of Hare not performing a title search prior to December 19, 1997 was that Hare, prior to the December 19, 1997 verdict, did not know Matson's status on the Clough Farm between 1988 and 1995 when conducting its timbering operations and thereafter between 1995 through the December 19, 1997 verdict and thereafter would be classified as a trespasser and not a

licensee. As a trespasser, Matson would have had no right to be on the Clough Farm at any time on and after 1988 through the present date. Knowing Matson was a trespasser and not a licensee, Hare should have realized, under the controlling law, that the Clough Farm timber, no later than 1993, had become the property of Carlisle. Had a title search been performed, Hare would have known in December, 1997 when he voluntarily dismissed the trespass (Count V) and conversion (Count VII) claims in the federal declaratory judgment action that he was dismissing two Carlisle claims to which Matson did not have the documentary evidence to refute trespass status.

In the federal court action discovery process, Hare requested "all documents reflecting or relating in any way to any transaction whereby you [Matson] purport to have acquired rights to harvest timber on the Clough Farm." (Hare deposition Exhibit 46). Matson replied that "the deed and the agreement are attached to the Complaint." Hare should have known, or from a title search would have known, that this response was not correct.

The failure to perform the title search of the Clough Farm, for the reasons stated above, led to Hare dismissing Counts V and VII. If a title search had been performed and that evidence had been presented in the federal declaratory judgment action, Carlisle would have been entitled to recover for the 1993 through 1995 conversion of his timber by Matson ($437,960), Carlisle would have obtained an adjudication that Matson was a trespasser permanently precluded from re-entry onto the Clough Farm after the December 19, 1997 verdict; Matson would have been precluded from re-entering the Clough Farm after December 19, 1997 through the present date and precluded from cutting and removing the timber taken in the 2005-2006 year as per the Hall report dated May 26, 2006. But for the lack of a title search, Matson would not have obtained the 1969 timber after December 19, 1997 and therefore would not have performed the 2004-2005 timber cutting as defined and valued in the Hall report. As a consequence of the title search not being performed, Matson secured a verdict

giving Matson indeterminate rights to the 1969 timber now and in the future. This is a right Matson would not have obtained had Hare properly understood the status of the title to the timber prior to the December 19, 1997 verdict.

    4.    <u>Lack of Carlisle's constructive knowledge of the 1973 timber deed from Kinkead to Fisher & Young, Inc.</u>

Albert Carlisle's abstract of title at the time he purchased the Clough Farm on January 9, 1970 did not include the April 20, 1973 deed from Kinkead to Fisher & Young, Inc. for the timber. The Kinkead to Fisher & Young deed was recorded April 23, 1973 in Deed Book 376 at Page 939, three years after Albert Carlisle obtained title to the land.

Albert Carlisle cannot be charged with constructive notice of the recordation of that Kinkead to Fisher & Young, Inc. timber deed. Recording the timber deed did, pursuant to 21 P.S. §357, would provide constructive notice to <u>subsequent</u> purchasers, mortgagors and judgment creditors of the granting of such rights and/or privileges. Albert Carlisle had already completed his transaction three years previously. Conveyancing law does not require an owner to continually check and re-check the status of his/her title once the conveyance is complete.

Sincerely yours,

McClure & Miller LLP

By: _Christine Hall McClure_
Christine Hall McClure, Esq.

CHM/llk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff            :
                                         :
            VS.                          :      NO. 04-25 ERIE
                                         :
BARTONY, HARE & EDSON; SCOTT M.          :
HARE, ESQUIRE; HENRY E. BARTONY,         :
JR., ESQUIRE; and JOHN JOY V.            :
EDSON, ESQUIRE, Defendants               :

A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:
                                  :SS:
COUNTY OF ERIE                    :

     WILL J. SCHAAF, ESQUIRE, being first duly sworn according to law, deposes and states as follows:

     1.    My name is Will J. Schaaf. I am a lawyer and partner in the Law Firm of Marsh Spaeder Bauer Spaeder & Schaaf, 300 State Street, Suite 300, Erie, Pennsylvania 16507.

     2.    I was admitted to the Pennsylvania Bar in 1949. I attended Edinboro State College (B.S., 1942), Cornell University (LL.B. 1948), Phi Delta Phi; Order of the Coif. Co-Editor-In-Chief, Cornell Law quarterly (1946-48). I am a member of the Erie County (President, 1973), Pennsylvania and American Bar Associations and a Fellow of the American College of Trial Lawyers. I was a Captain in the U.S. Army Air Force from 1942 through 1945. My legal practice includes personal injury law, medical malpractice defense law and insurance law.

3.      From the time of my admission to practice law in 1949 through the present date, I have been actively involved in representing clients in real estate transactions including performing, requesting, reviewing and providing professional legal opinions based on title searches.  I am also familiar with the standard of care required by legal counsel in representing clients, similarly situated as Albert T. Carlisle, in the timber litigation involved in the federal declaratory judgment action filed in the U.S. District Court for the Western District of Pennsylvania and the necessity of that counsel to obtain a title search and/or, at the very least, to examine the title documents filed in the Recorder of Deeds Office to ascertain the record owner of the timber.

4.      Attached are the four reports (dated March 24, 2004, April 15, 2004, August 24, 2004 and June 13, 2006) I have prepared regarding my opinions in the above matter.

5.      I hold and am prepared to express the opinions contained in these four reports to a reasonable degree of professional certainty.

WILL J. SCHAAF, ESQUIRE

Sworn to and subscribed before me

this 13ᵗʰ day of June. 2006

Notary Public

NOTARIAL SEAL
JOHN B. FESSLER, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON MARCH 7, 2010

2



WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS M. LENT
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.

**MARSH**
**SPAEDER**
**BAUR**
**SPAEDER**
**& SCHAAF**
ATTORNEYS AT LAW
LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

March 24, 2004

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked me for an opinion on the merit of the malpractice claims asserted against Bartony, Hare & Edson, et al. as C.A. 04-25 Erie.

I have reviewed the deeds from Marion C. Kinkead (hereinafter "Kinkead") to Fisher & Young, Inc., the Fisher & Young, Inc. deed to Albert T. Carlisle (hereinafter "Carlisle"), the pleadings in the United States District Court for the Western District of Pennsylvania and in the Court of Common Pleas of Warren County.

I am convinced that unhappily there was conduct below the standard of care on the part of the attorneys representing Albert T. Carlisle consisting of the following:

1.     **Failure to Examine the Title of the Premises.** This would have revealed that Matson Lumber Co. and Matson Hardwoods, Inc. (hereinafter "Matson"), the successors in title to the rights of Fisher & Young, Inc., had after April 1, 1978 <u>absolutely no rights whatsoever</u> and were mere trespassers on the lands of Carlisle. An examination of title would have demonstrated that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there was recorded an Article of Agreement from Kinkead to Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above-described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP
March 24, 2004
Page 2

Agreement specifically provided that it terminated April 1, 1978 and the statement is that "all the rights hereunder shall revert to the owner of the land." It is my opinion to a reasonable degree of legal certainty that the failure to conduct a title exam of the premises to determine the relative rights of the parties involved in the litigation is conduct that fell below the appropriate standard of care.

      2.    **The Dropping of the Trespass Count**. In my opinion, it was also below the standard of care to have withdrawn the trespass count. Carlisle from April 1, 1978 had a trespasser on his land with no more rights to cut timber than the man on the street. In the course of cutting, the expert, James Hall, was prepared to testify that "damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded and have reduced commercial value or no commercial value at all." Excessive and unnecessary roads were built. Matson made poor use of the trees they felled and abandoned valuable cut material to decay. Thus, he then gives five examples of the reckless conduct of Matson which would be encompassed in the trespass claim: (1) trees removed up to the banks of spring creek (admittedly, that was covered in the federal case); (2) no respect for residual trees, felling damage, skidding damage, dozer damage and chainsaw damage is evidence everywhere; (3) wasteful logging practice; (4) no respect for trees and springs; (5) no evidence of any sound forest management plans. Although the trespass claim was withdrawn pursuant to Federal Rule of Civil Procedure 41(a) without prejudice, the effort of voluntarily withdrawing the claims after the running of the statute of limitations effectively barred Carlisle's ability to re-file the trespass claims.

      The voluntary withdrawal of the claims without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care.

      Under the trespass count which was dropped, the damage to the property by installation of roads and landings was approximately $126,000.00 and the damage to the streambanks was approximately $100,000.00.

              Very truly yours,

              **MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP**

              By _____
                       Will J. Schaaf

WJS/jc



MARSH
SPAEDER
BAUR
SPAEDER
& SCHAAF
ATTORNEYS AT LAW

LIMITED LIABILITY PARTNERSHIP

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS M. LENT
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

April 15, 2004

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked me for an opinion on the merits of the malpractice claims asserted against Bartony Hare & Edson, et al. at C.A. 04-25 Erie.

I have reviewed the deeds from Marion C. Kinkead (hereinafter "Kinkead") to Fisher & Young, Inc., the Fisher & Young, Inc. deed to Albert T. Carlisle (hereinafter "Carlisle"), the pleadings in the United States District Court for the Western District of Pennsylvania and in the Court of Common Pleas of Warren County.

I am convinced that, unhappily, there was conduct below the standard of care on the part of the attorneys representing Albert T. Carlisle consisting of the following:

1.    **Failure to Examine the Title of the Premises**. This would have revealed that Matson Lumber Company and Matson Hardwoods, Inc. (hereinafter "Matson"), the successors in title to the rights of Fisher & Young, Inc., had after April 1, 1978 <u>absolutely no rights whatsoever</u> and were mere trespassers on the lands of Carlisle. An examination of title would have demonstrated that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there was recorded an Article of Agreement from Kinkead to Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above-described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP
April 15, 2004
Page 2

Agreement specifically provided that it terminated April 1, 1978 and the statement is that "all the rights hereunder shall revert to the owner of the land." It is my opinion to a reasonable degree of legal certainty that the failure to conduct a title exam of the premises to determine the relative rights of the parties involved in the litigation is conduct that fell below the appropriate standard of care.

    2.    **The Dropping of the Trespass Count**.  In my opinion, it was also below the standard of care to have withdrawn the trespass count. Carlisle from April 1, 1978 had a trespasser on his land with no more rights to cut timber than the man on the street. In the course of cutting, the expert, James Hall, was prepared to testify that "damages from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded and have reduced commercial value or no commercial value at all." Excessive and unnecessary roads were built. Matson made poor use of the trees they felled and abandoned valuable cut material to decay. Thus, he then gives five examples of the reckless conduct of Matson which would be encompassed in the trespass claim: (1) trees removed up to the banks of spring creek (admittedly, that was covered in the federal case); (2) no respect for residual trees, felling damage, skidding damage, dozer damage and chainsaw damage is evidence everywhere; (3) wasteful logging practice; (4) no respect for trees and springs; (5) no evidence of any sound forest management plans. Although the trespass claim was withdrawn pursuant to Federal Rule of Civil Procedure 41(a) without prejudice, the effect of voluntarily withdrawing the claims after the running of the statute of limitations effectively barred Carlisle's ability to re-file the trespass claims.

    The voluntary withdrawal of the claims without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care.

    If the relevant proof that Matson, on and after April 1, 1978, was on the property as a trespasser had been offered into evidence in the federal action and the withdrawn trespass claim had been pursued to verdict, there was a substantial probability that Carlisle would have made a recovery for damages in the federal action for injury to his property. In addition, his counsel's failure to protect the statute of limitations foreclosed Carlisle from making a recovery of the property damages caused by Matson as a trespasser on this property prior to the March, 1995 filing, and subjected Carlisle to new and additional defenses in any subsequently filed action that otherwise were unavailable to Matson in the federal litigation.

                    Very truly yours,

                    **MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP**

                    By _____
                             Will J. Schaaf

WJS/jc



**MARSH
SPAEDER
BAUR
SPAEDER
& SCHAAF**
ATTORNEYS AT LAW

LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX (814) 456-1112

www.marshspaeder.com

August 24, 2004

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS M. LENT
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked for an opinion regarding whether Matson Lumber Company and Matson Hardwoods, Inc. (herein after "Matson") has any rights in the timber on the Clough Farm owned by Albert T. Carlisle.

I have reviewed the relevant deeds from Marion C. Kinkead (herein after "Kinkead") to Fisher & Young, Inc.; the Fisher & Young, Inc. deed to Albert T. Carlisle, the pleadings in the United States District Court for the Western District of Pennsylvania in the action of <u>Carlisle v. Matson</u>, No. 95-0376 E, and in the Court for Common Pleas of Warren County.

An examination of the title of the premises reveals that Matson Lumber Company and Matson Hardwoods, Inc., the successors in title to the rights of Fisher & Young, Inc. had after April 1, 1978 <u>absolutely no rights whatsoever</u> in any timber and trees and Matson was a trespasser on the lands of Carlisle.

The title examination reveals that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there is recorded an Article of Agreement from Kinkead to Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that Agreement specifically provided that it terminated on April 1, 1978 with the statement "all the rights hereunder shall revert to the owner of the land." A confirmatory Timber Deed dated April 20, 1973 from Kinkead to Fisher & Young, Inc. again recited that all timber rights terminated on April 1, 1978.

I have also reviewed the Quit Claim Deed from Dora M. Squatriti, individually and as Executrix under the Last Will and Testament of Marion C. Kinkead to Matson dated May 6, 2003 and recorded in the Recorder of Deeds office of Warren County, Pennsylvania on June 9, 2004. Whatever rights Matson obtained from Dora M. Squatriti commenced on June 9, 2004. However, the residual timber rights; not being exercised between 1978 and 2004 expired; prior to the date of this quit claim deed because of the failure to exercise those rights in a reasonable time.

It is my opinion to a reasonable degree of legal certainty that the examination of the title records at the Warren County Courthouse reveals that "Matson" has no rights and had no rights from 1978, in any timber or trees on the Clough Farm.

Very truly yours,

MARSH SPAEDER BAUR SPAEDER & SCHAAF

By_____
    Will J. Schaaf



**MARSH
SPAEDER
BAUR
SPAEDER
& SCHAAF**

ATTORNEYS AT LAW

LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
MICHAEL G. NELSON
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.
DONALD F. FESSLER, JR.

KURT L. SUNDBERG
JOSEPH B. SPERO
ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

June 13, 2006

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P. O. Box 860
Erie, PA 16512-0860

> **Re:** **Albert T. Carlisle v. Bartony Hare & Edson, et al.**
> **U.S. District Court for the Western District of Pennsylvania 04-25 Erie**

Dear Messrs. Conner and Fryling:

You have asked me for a supplemental report and opinion in the above case concerning the voluntary dismissal for the conversion claim in Count VIII of the 1995 action of <u>Carlisle v. Matson</u> and other issues not addressed in my three previous reports regarding Carlisle's claim made reference to above.

### Conversion Claim

As with the trespass count, in my opinion, to a reasonable degree of certainty, it was below the standard of care for Bartony Hare & Edson, et al. to have withdrawn the conversion claim. Because Matson was a mere trespasser without any ownership interest in the timber or trees, any cutting and removing of the trees was a conversion of Carlisle's property by Matson. A claim for conversion could properly be maintained by Carlisle anytime Matson cut and removed timber under either a statutory claim for conversion and a common-law claim for conversion. Conversion under Pennsylvania law is the deprivation of another's chattel, or other interference therewith, without the owner's consent and without lawful justification. <u>Stevenson v. Economy Bank of Ambridge</u>, 413 Pa. 442, 197 A.2d 721 (1964).

After April 17, 1994, Carlisle could properly maintain the statutory claim for damages in actions for conversion of timber under 42 Pa.C.S.A. § 8311.

**Marsh Spaeder Baur Spaeder & Schaaf, LLP**
Andrew J. Conner, Esq. and James R. Fryling, Esq.
June 13, 2006
Page 2


Plaintiff's expert, James Hall, could have been prepared to testify at trial that the value of the timber converted by Matson Lumber Company from March, 1993 until trial was valued at $438,454, representing the fair market value of the timber converted. (Exhibit 1.)

The voluntary withdrawal of the conversion claim without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care. If the relevant proof that Matson, on and after April 1, 1978, was on the property as a trespasser and that Carlisle was the owner of the timber had been offered into evidence and the 1995 federal action and the withdrawing conversion claim had been pursued to verdict, there was a substantial probability that Carlisle would have made a recovery for damages in the federal action for conversion of his timber. In addition, his counsel's failure to protect the statute of limitations foreclose Carlisle from enjoining Matson from further cutting and subjected Carlisle to new and additional defenses in any subsequently filed action that otherwise were unavailable to Matson in the federal litigation.

### Title and Chain of Title Questions

In the course of my practice, I have reviewed and certified title to thousands of real estate titles. A purchaser's "chain of title" includes only those records of title which have been duly recorded in the appropriate office of the county in which the property is situate. A deed recorded after the purchaser takes title is not part of his chain of title as it was not known nor could it be known by a review of the county records. If the purchaser does not have actual notice of an unrecorded deed, that deed is void and fraudulent as by virtue of statute. See 21 Pa.C.S.A. § 521, 21 P.S. § 351, 357.

A purchaser can only have constructive notice of a prior recorded instrument. 21 P.S. § 357 (constructive notice as a result of recordation); 21 P.S. § 522 (deeds to be recorded; effect; evidence)("...deeds)(timber)...recorded...in the county where such land is located...and when so recorded are notice to subsequent purchasers..."); 21 P.S. § 357 (constructive notice as a result of recordation).

In this matter, the 1973 Timber Deed from Marion C. Kinkead to Fisher & Young, Inc. does not and could not appear in Carlisle's "chain of title" because it was neither created nor recorded until April 1, 1973, three years after Carlisle purchased the property on January 9, 1970 when his chain of title ended. There has been no determination as of this date to which I am aware of that Carlisle ever had "actual notice" of the unrecorded articles of agreement between Marion C. Kinkead and Fisher & Young, Inc. regarding the timber prior to January 9, 1970 when he purchased his property. I have reviewed the Lauri Sekerak title abstract for the Carlisle Farm (Exhibit 2). The

**Marsh Spaeder Baur Spaeder & Schaaf, LLP**
Andrew J. Conner, Esq. and James R. Fryling, Esq.
June 13, 2006
Page 3

Carlisle chain of title contains no timber deeds out of the property prior to Carlisle's purchase.

Very truly yours,

**MARSH SPAEDER BAUR SPAEDER & SCHAAF,** LLP

By _____
Will J. Schaaf

WJS:kc
enclosures

1/15/2004

| Species | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Red Oak | 93,770 | 484.22 | $ 45,405.31 | 107,613 | 648.94 | $ 69,834.38 | 233,174 | 796.62 | $ 185,751.07 |
| White Oak | 4,322 | 337.96 | $ 1,460.66 | 1,535 | 343.64 | $ 527.49 | 3,532 | 357.84 | $ 1,369.20 |
| Other Oak | 195 | 367.78 | $ 72.08 | 792 | 323.76 | $ 23.31 | 1956 | 364.94 | $ 430.37 |
| Bk.Cherry | 108,736 | 717.10 | $ 77,974.58 | 43,334 | 1012.46 | $ 43,873.94 | 49,300 | 1341.90 | $ 66,155.67 |
| Ash | 159,859 | 286.84 | $ 45,853.96 | 71,223 | 347.90 | $ 24,778.48 | 43,401 | 407.54 | $ 17,687.64 |
| Sugar Mapl. | 70,142 | 147.68 | $ 10,358.57 | 41,841 | 252.76 | $ 11,007.44 | 52,843 | 318.08 | $ 16,808.30 |
| Red Maple | 73,006 | 97.98 | $ 7,153.13 | 43,549 | 167.56 | $ 7,297.07 | 55,000 | 200.22 | $ 11,012.10 |
| Tulip Poplar | 52,801 | 85.20 | $ 4,498.64 | 51,354 | 134.90 | $ 6,927.65 | 56,419 | 161.88 | $ 9,456.77 |
| Birch | 1,110 | 55.38 | $ 61.47 | 504 | 80.94 | $ 40.79 | 532 | 83.72 | $ 49.86 |
| Beech | 60,632 | 55.38 | $ 3,357.80 | 21,345 | 80.94 | $ 1,727.66 | 19,602 | 83.72 | $ 1,837.10 |
| Gum | 222 | 55.38 | $ 12.29 | | | | | | |
| Basswood | 13,448 | 55.38 | $ 744.75 | 15,558 | 80.94 | $ 1,259.34 | 14,801 | 93.72 | $ 1,387.15 |
| Hickory | 1,227 | 55.38 | $ 67.95 | 891 | 80.94 | $ 55.93 | 373 | 93.72 | $ 34.96 |
| White Pine | | | | | | | 2,869 | 61.06 | $ 175.18 |
| Hemlock | 6690 | 49.7 | $ 332.49 | 2796 | 56.8 | $ 158.81 | 2090 | 61.06 | $ 127.61 |
| Misc. | 810 | 55.38 | $ 44.86 | 13,264 | 80.94 | $ 1,073.58 | 1,854 | 93.72 | $ 173.76 |
| Total | 646,971 | | $ 197,398.54 | 415,400 | | $ 168,586.87 | 539,746 | | $ 312,456.74 |



EXHIBIT
"1"

| Species | Volume MBF | $/MBF | $ Value |
|---|---|---|---|
| Red Oak | 32,977 | $ 670.24 | $ 25,453.70 |
| White Oak | 3,886 | $ 352.16 | $ 1,369.20 |
| Other Oak | 1347 | $ 319.50 | $ 430.37 |
| Blk.Cherry | 48,833 | $ 165.64 | $ 58,506.25 |
| Ash | 33,286 | $ 447.30 | $ 14,868.83 |
| Sugar Mapl. | 43,993 | $ 318.08 | $ 13,993.29 |
| Red Maple | 45,789 | $ 191.70 | $ 2,859.01 |
| Tulip Poplar | 14,914 | $ 231.46 | $ 3,451.89 |
| Birch | 1,092 | $ 109.34 | $ 119.40 |
| Beech | 26,060 | $ 109.34 | $ 2,849.40 |
| Gum | 106 | $ 109.34 | $ 11.59 |
| Basswood | 10,725 | $ 109.34 | $ 1,172.67 |
| Hickory | 5,897 | $ 109.34 | $ 644.78 |
| White Pine | 930 | $ 76.68 | $ 71.31 |
| Hemlock | 737 | $ 76.68 | $ 56.51 |
| Misc. | 1,088 | $ 109.34 | $ 118.96 |
| Total | 271,762 | | $ 125,997.26 |

1/15/2004



EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYLVANIA

ALBERT T. CARLISLE, Plaintiff   :
              :
   VS.         :   NO. 04-25 ERIE
              :
BARTONY, HARE & EDSON; SCOTT M. :
HARE, ESQUIRE; HENRY E. BARTONY, :
JR., ESQUIRE; and JOHN JOY V.  :
EDSON, ESQUIRE, Defendants   :

## A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:
           : SS:
COUNTY OF ERIE      :

   EDWARD SEKERAK, being first duly sworn according to law, deposes and states as follows:

   1.  My name is Edward Sekerak.  I am a real estate appraiser and the principal of Sekerak Realty, maintaining a professional office at 1050 East Columbus Avenue, Corry, Pennsylvania.

   2.  Attached hereto as Exhibit "A" is a summary of my professional credentials to act in the capacity of a real estate agent and real estate appraiser.

   3.  Attached hereto as Exhibit "B" is a copy of my June 14, 2006, letter setting forth opinions regarding the reduction in market value of a portion of the Clough Farm owned by Albert T. Carlisle in Spring Township, Warren County, Pennsylvania, adversely impacted by Matson Lumber's claim to "1969" timber.

                   _____
                   EDWARD SEKERAK

Sworn to and subscribed before me
this 14th day of June, 2006

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Buffy M. Dunham, Notary Public
City of Warren, Warren County
My Commission Expires Nov. 20, 2007
Member Pennsylvania Association of Notaries

EDWARD G. SEKERAK

---

**Sekerak Realty**
**Certified General Appraiser**
**1050 E. Columbus Avenue - Corry, PA 16407**
**(814) 664-3054 - FAX 664-3648**

## REAL ESTATE EXPERIENCE

1990 - Present    *SEKERAK REALTY*, Corry Pennsylvania.
                  Edward G. Sekerak, Broker-Owner

1984 - 1990       *SIMMONS REALTY*, Corry Pennsylvania.
                  Sales Person, Associate Broker

## APPRAISAL EDUCATION

2001   Appraising Manufactured Housing – Appraisal Institute Course
2000   Reassessment Procedures – Appraisal Institute Course
1999   FHA Exam Prep and Guidelines – Appraisal Institute Course
1997   Raw Land Conversion to Sub-division – Appraisal Institute Course
1994   Dairy Facility Valuation, Rochester MN - Sponsored by ASFMRA
1994   A-5, Administrative Review of Appraisals, Hagerstown MD - Sponsored by ASFMRA
1994   A-12, Uniform Standards of Professional Appraisal Practice - Sponsored by ASFMRA
1994   A-12, ASFMRA Code of Ethics, Hudson NY - Sponsored by ASFMRA
1994   Understanding Limited Appraisals & Appraisal Reporting Options - Appraisal Institute Course
1993   FIRREA Seminar, Pittsburgh PA
1993   Mandatory Continuing Education - Polley Associates
1993   New Uniform Residential Appraisal Report - Appraisal Institute
1992   Appraisal reporting of Complex Residential Properties - Appraisal Institute
1992   Uniform Standard of Professional Appraisal Practice, Part B - Appraisal Institute
1991   Commercial, Industrial Real Estate Cost Approach - Marshall & Swift.
1991   Uniform Standard of Professional Appraisal Practice, Part A - Appraisal Institute
1990   SREA 102, Applied Residential Property Valuation - Society of Real Estate Appraisers
1989   SREA, Professional Practice Seminar - Society of Real Estate Appraisers, Cleveland OH
1988   Uniform Real Estate Appraisal Report Seminar - American Association of Certified Appraisers
1987   Real Estate Appraising I - Polley Associates

## REAL ESTATE EDUCATION

1993   Fair Housing and Sales, M.C.E. Erie PA - Polley Associates
1989   Real Estate Investment - Pennsylvania State University
1989   Real Estate Property Management - Polley Associates
1988   Real Estate Law I - Polley Associates
1988   Real Estate Sales - Polley Associates
1987   Real Estate Finance - Mercyhurst College

## REAL ESTATE LICENSES

1994   Certified General Appraiser – New York State #: 46000021363
1992   Certified General Appraiser - Pennsylvania #: GA-000624-L
1990   Real Estate Broker's License Issued
1989   Real Estate Associate Broker License Issued
1984   Real Estate Salesperson License Issued

Edward G. Sekerak
Page 2

## PROFESSIONAL ORGANIZATIONS

Candidate Member, Appraisal Institute
Member, The Foundation of Real Estate Appraisers

Member, Pennsylvania Appraisal Council
Member, American Society of Farm
   Managers & Rural Appraisers

## MISCELLANEOUS

2001  Appointed to Columbus Township Sewer Authority (Vice Chairman)
2000  Appointed to Warren County Board of Assessment & Revision of Taxes
1999  Elected President of Corry Area Chamber of Commerce
1998  Appointed to VA Fee Appraiser Panel in Western Pennsylvania
1990  Appointed to Warren County Prison Site Advisory Committee
1988  Appointed to Columbus Township Planning Commission
1988  GRI Designation Received, PA Realtors Institute

## OTHER EXPERIENCE

1983 – 2000          *SEKERAK LIVESTOCK*, Corry PA
                     Assist with the management of a 500 acre family farm. Dairy Cattle buyer
                     in Eastern US and Canada.

1981 - 1985          *RONALD J. GILLIGAN*, Pennsylvania Furnace PA
                     Apprentice Auctioneer/Auctioneer.
                     Livestock, farm and estate auction sales.

## OTHER EDUCATION

1987  Pennsylvania State University, Principles of Gas Well Drilling
1983  Graduated Pennsylvania State University, B.S./Animal Production
1980  Mendenhall's School of Auctioneering, High Point NC

## CLIENTS SERVED

National City Bank
First National Bank
Lenders Service Inc.

PNC Bank
Northwest Savings Bank
Several Attorney's (divorce, bankruptcy & condemnation)

## EXPERIENCE

Commercial, Residential, Farm and Land Appraisals in Pennsylvania, New York and West Virginia.

Edward G. Sekerak
Sekerak Realty
1050 E. Columbus Avenue
Corry, PA 16407

June 14, 2006

Andrew J. Conner, Esquire
Conner Riley & Fryling
17 West Tenth Street
P. O. Box 860
Erie, PA 16512-0860

RE:  Carlisle (Clough Farm)
CY-6-853 & CY-6-853-1

Dear Mr. Conner:

This letter is in response to your request for a preliminary report from me regarding the
valuation of the impact on the acreage of the "Clough Farm" which is the commercial
timber acreage where the trees which are considered the "1969 trees" are located. I have
reviewed the May 26, 2006, report of James Hall, the forester, which describes the timber
on that property and the attached map of the entire property. You have advised that as of
the present date, Matson Lumber Company has the right in the future to return to the
"Clough Farm" to remove the pre-1969 or 1969 timber at any time in the foreseeable
future. Along with the right, I reasonably assume that the right to remove timber includes
the right to enter on and over the subject property for the purpose of cutting, skidding,
piling and removing said timber uninterrupted.

I am personally familiar with the "Clough Farm." It is located in western Warren County
and is close to my home and office. In the past, I have been on the subject property and
have recently viewed subject property from roadside. In addition, I have reviewed
current Warren County tax assessment records including the agricultural use value soil
tally computation, USGS topographical maps, aerial photos and the Soil Survey of
Warren County produced by USDA. As a consequence of my 23 years of real estate
sales and appraisal experience, I am familiar with sales of property similar to the
described 779 acres of commercial timberland and have completed appraisal reports for
several clients of similar or comparable timberland. My customary practice is to provide
a land appraisal report exclusive of the value of the marketable timber and rely or have
the client rely on a separate timber appraisal for the value of marketable or standing
timber. I am also familiar with past sales of comparable properties to the Pennsylvania
Game Commission and private owners of acreage similar to the 779 acres of commercial
timberland for the *Highest and Best* Use being hunting rights or recreational use. It is my
opinion that the value of the 779 acres of commercial timberland on the "Clough Farm"
exclusive of the value of the marketable timber is in the range of $800 to $1,000 per acre.
This results in a fair market value of the 779 acres in the range of $623,200 to $779,000.
Considering Matson Lumber now has the indeterminate right to return to the property and

remove the remaining "1969 timber," it significantly limits the use of this property. The *Highest and Best Use* of this acreage is for recreational or hunting rights. Previous land sales indicate the range of value for this type of acreage is $400 to $500 per acre exclusive of the value of the remaining "1969 timber." This results in a market value of the 779 acres at the present time of $311,600 to $389,500.

Based on the above, Matson Lumber having the indeterminate right to remove the "1969 timber" has caused a reduction in value of $311,600 to $389,500. As part of this preliminary review, I have not attempted to estimate the adverse impact, if any, on the remaining acreage of the "Clough Farm" including the open fields or buildings on the approximately 460 remaining acres.

The opinions expressed in this preliminary review are being expressed to a reasonable degree of professional certainty. This letter is not intended to be in itself an appraisal report. The intent of this letter is to convey the preliminary findings per your request. I currently retain within my files the previously noted information sources (ie. Maps, aerial photos, tax assessment record cards, etc.). Also, please note that I have relied upon previous sales data contained in similar appraisal reports of similar properties and general sales data retained within my office. When and if you require a formal and complete appraisal report, please advise.

Very truly yours,

Edward G. Sekerak
State Certified General Appraiser
Pennsylvania #GA-000624-L
New York #460000040335

EGS:pas

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff          )
                                       )
          VS.                          )     NO. 04-25 ERIE
                                       )
                                       )
BARTONY, HARE & EDSON; SCOTT M.        )
HARE, ESQUIRE; HENRY E. BARTONY,       )
JR., ESQUIRE; and JOHN JOY V.          )
EDSON, ESQUIRE, Defendants             )

### AFFIDAVIT OF LAURI L. SEKERAK

COMMONWEALTH OF PENNSYLVANIA          )
COUNTY OF WARREN                      )

        Lauri L. Sekerak, being first duly sworn according to law, deposes and states the

following:

        1.      My name is Lauri L. Sekerak. I am and have been in the business of

performing title searches and abstracts of title to real property located in Warren County,

Pennsylvania since 1985.

        2.      The name of my business is REM Abstract Services.

        3.      I have personal knowledge of the Albert T. Carlisle parcel of land located in

Spring Creek Township, Warren County, Pennsylvania.

        4.      I have prepared a title search and abstract of the Carlisle Farm. A copy of

which is attached to my deposition transcript in this case of February 26, 2006 as Exhibit

#8.

5.    Had I been asked to perform a title search and prepare a title abstract of the

Carlisle Farm, formerly known as the "Clough" farm in or about 1995, the cost of the title

search and abstract of title would be in the range of $75.00-$100.00.

_____
Lauri L. Sekerak


Commonwealth of Pennsylvania    )
County of Warren    )    SS


On this, the 14th day of June, 2006 before me, personally appeared Lauri L.
Sekerak, the same person described in and who executed the within affidavit and she
acknowledged to me that she voluntarily executed this affidavit.


_____
Notary Public

_____
My Commission Expires

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Buffy M. Dunham, Notary Public
City of Warren    Warren County
My Commission Expires Nov. 20, 2007
Member, Pennsylvania Association of Notaries