IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff          :
                                       :
          VS.                          :       NO.  04-25 ERIE
                                       :
                                       :
BARTONY, HARE & EDSON; SCOTT M. :
HARE, ESQUIRE; HENRY E. BARTONY, :
JR., ESQUIRE; and JOHN JOY V.           :
EDSON, ESQUIRE, Defendants             :

PLAINTIFF'S ANSWER/RESPONSE
PER FRCP 56(e) TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Plaintiff, by his counsel, ANDREW J. CONNER, ESQUIRE of CONNER RILEY &

FRYLING, 17 West Tenth Street, P.O. Box 860, Erie, Pennsylvania 16512-0860, per

FRCP 56(e), answers and responds to Defendants' May 1, 2006 Motion for Summary

Judgment, alleging as follows:

1.       Paragraph 1 of Defendants' Motion is denied.  This is a state law claim

arising out of Scott Hare's representation of the Plaintiff, Albert T. Carlisle, and legal

advice regarding two separate but related actions.  The first was the federal declaratory

judgment action in the U.S. District Court for the Western District of Pennsylvania at

Civil Action No. 95-03676 (W.D. Pa.), hereinafter referred to as the "federal action".  A

verdict on December 19, 1997 was returned in that action.  The second was the state

action filed in Warren County, Pennsylvania, captioned Carlisle v. Matson, Civil Action

No. 353 C.D. 1996, hereinafter referred to as the Warren action.  No verdict has been

returned in the Warren action, as it remains in the pre-trial stage, but the Warren Court

on January 30, 2002 granted Matson Partial Summary Judgment on two counts of that

action which were previously included in the federal action. Scott Hare prepared the Praecipe for Writ of Summons for the second, or Warren, action and recommended, on June 23, 1998 and prior thereto, that Carlisle file it against Matson to recover damages not recovered in the federal action. See Hare Exhibits #24 and #25. In conjunction with and/or prior to Carlisle filing this second action, Hare made the following representations:

(a)    Carlisle had "won" the first action and this allowed Carlisle to file a second action against Matson to recover damages not awarded by the December 19, 1997 verdict (Hall, p. 86, line 25 through p. 87, line 4); after the December 19, 1997 verdict in the federal action, Hare advised Carlisle he had won, indicating ". . . I don't understand why you're so unhappy, we won. . . this is a first step and sets the stage for what is to come. . ." (Bush, p. 19, lines 22-24). Hare represented that while the federal action was limited in scope, the second lawsuit against Matson would allow Carlisle the opportunity to obtain a satisfactory damage award from Matson's pre-December 19, 1997 conduct (Bush, p. 20, lines 2-9);

(b)    Carlisle's second action against Matson had a "$5 million" settlement value (Hare Exhibit #23, p. 6); the second action filed in Warren County would provide the means to allow Carlisle to obtain a "home run damage award" against Matson (Hare I, p. 209, lines 16-25);

(c)    There was no legal impediment preventing Carlisle from filing the second action against Matson in Warren County for any claim within the ten Counts of the federal action which had not been resolved by the December 19, 1997 verdict, providing Carlisle filed the Hare prepared Praecipe for Writ of Summons within one year

after the December 19, 1997 federal action verdict (Hare I, p. 185, lines 10-23 and p. 187, lines 12-20; Hare II, p. 16, line 10 through p. 17, lines 4-9; p. 20, line 13 through p. 22, line 6);

        (d)    By filing the second action against Matson, Carlisle could make a claim for every Count or cause of action in the federal action not resolved by the December 19, 1997 jury verdict (Hare I, p. 187, lines 12-20);

        (e)    Carlisle's second action filed on June 23, 1998 in Warren County was timely and not subject to any statute of limitations defense regarding Matson's conduct that had occurred within two years prior to the March 15, 1995 filing date for the federal action, nor was it subject to the bar of res judicata if the refiled Counts or claims had not been actually resolved by the December 19, 1997 jury verdict (Hare I, p. 185, lines 10-23; p. 186. lines 1-6);

        (f)    Carlisle's Matson claims could be divided into two separate lawsuits (Bush Deposition, p. 41, line 3 through p. 44, line 19).  The first lawsuit on the federal action related to Matson's liability (Bush, p. 41, lines 15-25). The second lawsuit filed in Warren County would present Carlisle's damage claims against Matson (Bush, p. 42, lines 1-7);

        (g)    In a January, 1998 meeting in Ashtabula, Ohio, Hare represented that the damages Carlisle could recover in the second, or Warren, action included property damage and damages for Matson's tree cutting (Bush, p. 47, line 15 through p. 48, line 2).  The second lawsuit would involve a damage claim for ". . . cutting of trees and property damage" not pursued in the federal action (Bush, p. 49, lines 10-22);

(h)    Hare, prior to the federal action, represented that he would check the property records at the Warren County Court House (Bush, p. 31, line 17 through p. 32, line 18). As there were a lot of "questions surrounding. . . the history of ownership. . . one of the things he (Hare) would be doing was going to the Warren County Court House and going through all those records so all those questions could be answered. Those involved titles. . ." (Bush, p. 32, lines 6-15).

2.    Paragraphs 2 of Defendants' Motion is admitted.

3.    Paragraph 3 of Defendants' Motion is denied. There are two underlying actions, not one. The first underlying action was the federal action. The second underlying action was the Warren action which Hare recommended and caused Carlisle to file on June 24, 1998, made reference to in Paragraph 1(a) through (h), above.

4.    Paragraph 4 of Defendants' Motion is denied. The federal action was a 10 Count declaratory judgment action which included, but was not limited to, breach of contract, constructive trust, trespass and conversion claims. After the original Praecipe for Writ of Summons was filed at Hare's direction on June 24, 1998, the Warren action resulted in a four Count Amended Complaint against Matson including, in substance, the same trespass and conversion claims, which were pled in the federal action and not resolved by the December 19, 1997 jury verdict in that action. These were, in effect, two Counts out of the federal action, made reference to above, which were refiled and incorporated into the second action. See the statements made by Defendant, Hare, and record references set forth in Paragraphs 1(a) through (h) and the Exhibits referred to in those Paragraphs (see Amended Complaint in Warren action).

5.      Paragraph 5 of Defendants' Motion is admitted in part and denied in part.
It is admitted that Carlisle was awarded $110,000 by the December 19, 1997 jury award
for the value of timber Matson cut in the "no cut" zone, defined by the Fisher & Young
to Carlisle Articles of Agreement.  It is admitted that the jury found Matson had "non-
perpetual" rights to trees in existence on the 1,239.6 acre Clough Farm in 1969 or
before, rather than "perpetual" rights to that timber.  However, the December 19, 1997
verdict caused Carlisle substantially more actual harm than benefit because Matson
had zero timber rights to the timber on the Clough Farm between 1988 and 1997 and
prior to the December 19, 1997 verdict.  But for that verdict and but for Hare
withdrawing the trespass (Count V) and conversion (Count VII) claims and failing to do
a title search revealing that Matson had zero timber rights on the Clough Farm at any
time either before or after the December 19, 1997 verdict, other than as a consequence
of that verdict, Carlisle was deprived of (a) the value of the timber ($437,960) taken by
Matson in 1993-1995; (b) the value of the timber taken by Matson in 2005-2006
(estimated to $100,000 to $200,000, or more); (c) Matson being granted non-perpetual
rights in the 1969 timber as of and after December 19, 1997 through the present, some
of which continue to remain attached to the 1,239.6 acres at the present time, despite
the recent timbering, described above, which timber, but for the December 19, 1997
verdict, belonged to Carlisle, as a matter of law.  But for the federal action being tried
to verdict without a title search being conducted; and (d) Carlisle has been effectively
deprived of any judicial remedy based on the res judicata effect being given to the
December 19, 1997 verdict by both the Court of Common Pleas of Warren County, by
virtue of its January 30, 2000 decision granting Matson Partial Summary Judgment, and

May 9, 2005 decision of the U.S. District Court for the Western District of Pennsylvania in <u>Carlisle v. Matson</u> in the quiet title proceedings at No. 04-284E, which was affirmed by the Third Circuit Court of Appeals on June 2, 2006, affirmed by Order of the Third Circuit dated June 8, 2006.

6.    Paragraph 6 of Defendants' Motion is denied.  On June 15, 1998, Hare advised Carlisle he was withdrawing from his representation of Carlisle in the federal action and representing Carlisle in Matson's appeal to the Third Circuit in that action because Carlisle had not paid Hare's last interim bill.  As a consequence, Carlisle retained separate replacement counsel from Cleveland, Ohio to represent him in Matson's appeal to the Third Circuit from the December 19, 1997 jury verdict in the federal action.  However, Hare continued to represent Carlisle after June 15, 1998 regarding the Warren action through June 24, 1998 and prior to Peter Krembs of Cleveland, Ohio agreeing to act as Carlisle's counsel in the Warren action (Krembs, p. 9, line 19 through p. 10, line 17; p. 40, lines 6-12; Hare's June 23, 1998 letter and Praecipe for Writ of Summons (Exhibits #23 and #24), Hare's February 7, 1999 bill ($260.00) for the June 23, 1998 professional services (Exhibit #54; Bush, p. 47, lines 3-14; p. 45 through p. 46, line 3; p. 52, lines 12-16).

7.    Paragraph 7 of Defendants' Motion is denied.  In addition to the negligent acts described in Paragraph 7, Hare:

(a)    Voluntarily dismissed Counts V (trespass) and VII (conversion) from the federal action without Carlisle's consent prior to the December 19, 1997 verdict, when he knew, or should have known, that Matson had zero timber rights on the Clough Farm and was a trespasser, not a licensee, and believing those two Counts

could be effectively refiled in a subsequent Warren action against Matson (Hare I, p. 185, lines 10-23; p. 186, lines 1-8; p. 187, lines 12-20); Carlisle, p. 42, lines 11-13; p. 148, lines 10-25; Bush, p. 42, lines 1-7; p. 49, lines 10-22);

(b)    Failed to request Matson to properly respond to Paragraph 4 of his Request for Production of Documents served on Matson after Matson either intentionally or inadvertently failed to identify and provide copies of the documents evidencing their Clough Farm timber deed or other documents evidencing their ownership of the Clough Farm timber (Hare I, p. 107, lines 4-16; Fossee, p. 45, lines 9-13; p. 45, line 24 through p. 46, line 11; p. 46, line 25 through p. 47, line 8; Hare Exhibits #46 and #47);

(c)    Represented to Carlisle that the major damage claims, not presented or resolved by the jury in the federal action could be refiled in a second action against Matson in the Warren action after the December, 1997 verdict, providing the refiled Warren action was filed within one year of the December 19, 1997 verdict to comply with the "saving statute" provisions of 42 Pa.C.S.A. 5535(a)(1) (see the record references and exhibits identified in Paragraphs 1(a) through (h) of this Answer and expert reports and FRCP 56(e) Affidavits of Will J. Schaaf, Esquire Christine H. McClure, Esquire (attached) and Paragraphs 13(b) and 15 of Plaintiff's Amended Complaint);

(d)    Concluded that Matson, while timbering the Clough Farm between 1988 and 1994 and taking the 4-7 million board feet of timber having a value of $3.6 million, was acting as a "licensee" and not as a "trespasser" without ever obtaining or reading any documents which convey timber ownership rights in the Clough Farm to

Matson and/or their alleged predecessor in interest, Fisher & Young or Fisher & Young

Hardwoods, without obtaining or reading the available title documents at the Warren

County Court House that terminated Fisher & Young's Clough Farm timber rights on

April 1, 1978, even though he knew those documents had to exist and had to be

properly recorded in the Warren County Court House to be effective (Hare I, p. 62,

lines 19-21; p. 86, lines 10-11; p. 87, lines 4-6, p. 117, lines 7-22; Sekerak, p. 28, line 4

through p. 29, line 4; Sekerak Exhibit #9; Hall's May, 1997 report; Hare Exhibit #15;

Schaaf and McClure reports);

      (e)    Failed to know, prior to the December 19, 1997 verdict in the

federal action, that Matson had no timber deed to it or any predecessor in interest

which gave it any legal right to be on the Clough Farm and/or any right to conduct any

timbering operation whatsoever on that property (Sekerak, p. 28, line 14 through p. 29,

line 5; Schaaf and McClure reports);

      (f)    As a consequence of allegations in (f), above, failed to know that

prior to the December 19, 1997 verdict in the federal action, Matson had no past or

future ownership rights in the "1969" timber (Sekerak, p. 28, line 14 through p. 29, line

5; Schaaf and McClure reports);

      (g)    Failed to know that, by allowing the claims which remained in the

federal action prior to the December 19, 1997 verdict and after the trespass (Count V)

and conversion (Count VII) counts were withdrawn by Hare, the December 19, 1997

verdict Hare was requesting for Carlisle would cause Matson to be granted ownership

rights in the "1969 timber", made reference to in Paragraphs 8(a) and (b) of this Answer, even though Matson, in fact, had no such ownership rights in that "1969" timber (McClure report);

(h)     Failed to conduct, prior to the December 19, 1997 verdict, the necessary fact and legal investigation to provide the investigative and legal services to Carlisle which Hare agreed to undertake and perform (see Paragraphs 11(d)(v), (vii) and (xiii) of this Answer) to help Carlisle achieve the goals communicated to Hare (see Paragraphs 11(d)(I) through (iv) of this Answer);

(I)     Concluded that Hare Exhibit #5 (Fisher & Young's May 28, 1969 property Agreement of Sale to Carlisle recorded January 20, 1970 with timber reservation) represented the document which "conveyed" timber rights to Fisher & Young in Clough Farm timber and, specifically, the "1969 timber" when he knew, or should have known, it conveyed no timber rights to Fisher & Young (Kookogey, p 64, lines 18-19; p. 81, line 16 through p. 82, line 9; Hare I, p. 78, lines 11-18; Sekerak, p. 28, line 14 through p. 29, line 5; Schaaf and McClure reports);

(j)     Concluding and basing his recommendation to Carlisle that the trespass (Count V) and conversion (Count VII) counts of the federal action could be withdrawn and thereafter timely refiled in the Warren action within one year after the December 19, 1997 verdict, so as to allow Carlisle to timely claim and recover all damages in the Warren action he could have recovered in the federal action on those counts, when he knew, or should have known, that the Pennsylvania law interpreting the "saving statute", 42 Pa.C.S.A. 5535, only permits this if the first action is filed in a Pennsylvania state court and not first filed in a U.S. District Court (Hare I, p. 185, lines

10-23; p. 187, lines 12-20; Hare 22, p. 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6; Maxwell Downs v. Philadelphia, 638 A.2d 473, 476-77 (Cmmwlth. Ct. 1994); Schaaf report);

        (k)    Concluding and basing his recommendation to Carlisle, discussed in (k), above, that the refiled trespass (Count V) and conversion (Count VII) claims from the federal action, because they were dismissed prior to the December 19, 1997 verdict, would not be subject to a res judicata defense raised by Matson in the Warren action (Hare I, p. 185, lines 10-23; p. 186, lines 1-6; p. 221, lines 21-24; Judge Millin's January 30, 2002 Opinion);

        (l)    Failing to know, during the pendency of the federal action and prior to the December 19, 1997 verdict, that Fisher & Young never conveyed by recorded deed to American Hardwoods (which thereafter by a name change became Fisher & Young Hardwoods) timber rights in the Clough Farm and, as a consequence of that gap in timber title and that Fisher & Young's timber rights expired April 1, 1978, Matson was not a successor in interest to any timber rights on the Clough Farm (Hare I, p. 119, line 19 through p. 120, line 6; p. 221, lines 21-24; Dennison, p. 64, line 19 through p. 65, line 8; Sekerak, p. 28, line 14 through p. 29, line 5; McClure report);

        (m)    Failing, prior to acting to withdraw the trespass (Count V) and conversion (Count VII) claims from the federal action prior to the December 19, 1997 verdict, to obtain Carlisle's knowledgeable agreement and consent to the withdrawal of those counts (Carlisle, p 40, lines 11-16; p. 42, lines 9-13; p. 43, line 20 through p. 44, line 15; p. 44, lines 19-23; Bush, p. 51, line 6 through p. 52, line 3; Hall, p. 71, lines 15-19); see Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58 (Pa. 1989); comment (e), §22,

Restatement (Third) of the Law, "The Law Governing Lawyers" which provides, in part,

". . . lawyers cannot settle a claim without client authority, they cannot enter a stipulation

of consent judgment that will similarly foreclose client rights"; Reutzel v. Douglas, 582

Pa. 149, 870 A.2d 787, 798-90 (Pa. 2005).

     8.     Paragraph 8 of Defendants' Motion for Summary Judgment sets forth an

incomplete statement of what the record evidence establishes as Plaintiff's current, past

and future actual harm, economic loss and damages caused by Hare's negligent

conduct, some or all of which harm and damages has recently been incurred Plaintiff,

since Plaintiff answered Defendants' Interrogatory #6(d). The additional actual harm,

economic loss and damages include:

     (a)     Matson's removal, between November, 2005 and March, 2006, of

an additional $100,000 to $200,000, or more, of "1969" timber from the 779 acres of

commercial timber acreage out of the total 1,239.6 acres of the Clough Farm (see

James Hall's affidavit and supplemental May 26, 2006 report);

     (b)     Loss of the residual remaining value of the "1969" trees on those

779 acres which Matson was given control over as a consequence of the December 19,

1997 verdict, even though they had no ownership rights prior thereto and, as a conse-

quence of the December 19, 1997 verdict, being given res judicata effect, precluding

Plaintiff from establishing, now and/or in the future, his ownership to the "1969" trees

(see James Hall's affidavit and supplemental May 26, 2006 report);

     (c)     Permanent diminution in the residual value of the 779 acres of

commercial timber property, described in James Hall's affidavit and supplemental May

26, 2006 report, for any reasonable alternative use as a consequence of Matson having

an indeterminate right in the future to return to the 779 acres and remove the "1969" trees;

      (d)    The "Cloud on title" effect on Plaintiff's 779 acres, described in (c) and caused by (b) and (c), which effectively precludes Plaintiff from being able to sell the 779 acres of the commercial timber property to any buyer because of the diminution in value (James Hall's supplemental May 26, 2006 report and affidavit; McClure report; Carlisle, p. 70, lines 1-2; p. 71, lines 15-20; p. 111, line 20 through p. 112, line 10; p. 115, line 21 through p. 116, line 2; Judge Millin's January 30, 2002 Opinion; Judge Lancaster's May 9, 2005 Opinion, <u>affm'd. per curiam</u> by the third Circuit, June 2, 2006.

    9.    Paragraph 9 of Defendant's Motion is denied. See Paragraph 8 of this Answer, which is incorporated herein by reference. In further answer, the damages resulting from the cloud on the title and damages resulting from the Matson 2005-2006 timber cutting of "1969" timber on Carlisle's property, estimated to be at least $100,00 to $200,000, or more, could not have been recovered in the federal action. A substantial portion of the trespass and conversion damages which were initially claimed in the federal action as a consequence of the conduct and representations of Hare, made reference to in Paragraphs 1(a) through (h), were withheld from presentation in the federal action so they could be refiled and presented in the second, or Warren, action, which Hare represented was available to Carlisle, made reference to above (Bush, p. 47, line 15 through p. 48, line2; p. 49, lines 10-22) (see reports and affidavits of James Hall).

10.    Paragraphs 10, 11 and 12 all state legal principles regarding the standard of review to be followed by the Court in resolving a Motion for Summary Judgment. The statements in Paragraphs 10, 11 and 12 are not a complete statement of the controlling standard of review. Additional legal precepts which are relevant to the Court's standard of review of Defendants' Motion for Summary Judgment include Ideal Dairy Farms, Inc. V. John Labatt, Ltd., 90 F.3d 737, 743 (3rd Cir. 1996) ("the moving party bears burden of proving that no issue of material fact is in dispute"); Wetzel v. Tucker, 139 F.3d 380, 383, n. 3 (3rd Cir. 1998) (the non-moving party is given the benefit of all reasonable inferences" from the record facts); Schroeder v. Commonwealth Department of Transportation, 551 Pa. 243, 710 A.2d 23, 25, n. 9 (1988) (". . . a court cannot, upon the oral statement of a witness of a non-moving party, grant summary judgment").

11.    Paragraph 13 of Defendants' Motion for Summary Judgment is denied for all the reasons set forth in this Response, the record, Brief and controlling law. There are genuine issues of fact as to whether Plaintiff's claims are time barred, whether Plaintiff can prove factual causation between Defendants' negligent acts and his resulting damages, described in Paragraph 41 of this Answer, and whether either the Defendants' undertaking and/or the standard of care, or both, required Defendants, in the exercise of reasonable professional care,  to conduct a title search or, at least, learn the identity of the Clough farm timber while representing Carlisle in the federal action prior to the December 19, 1997 verdict in the federal action for the following reasons:

(a)    Carlisle's claims against Hare did not "accrue" or were not discoverable until January 30, 2002, and/or were subject to the doctrine of equitable estoppel (Carlisle, p. 65, lines 9-16 and 20-22);

(b)    Hare's assurances and representations, enumerated in Paragraphs 1(a) through (h) created an equitable tolling of the statute of limitations until the claims, which Hare recommenced Carlisle file in June, 1998 in Warren County, were dismissed by Judge Millin of Warren County, Pennsylvania on January 30, 2002 (see Judge Millin's Opinion, attached);

(c)    The required factual causation between Hare's conduct and the resulting actual harm and damages claimed in this action can be proven by the preponderance of the evidence to meet both the "but for" or "substantial factor" standard required by the controlling law (see reports of Schaaf and McClure);

(d)    There was the requisite undertaking by Hare and a responsibility upon Hare, considering the scope of the duties and responsibilities he assumed in representing Carlisle in this action against Matson, to have performed a title search of the Clough Farm property to determine the identity of the owner of the Clough Farm timber between 1988 and 1997 and/or, at the very least, ascertained and discovered the documents, if any, which conveyed the Clough Farm timber to Matson and/or Fisher & Young so he could properly represent Carlisle with regard to the claims set forth in the 10 Counts in the federal action; see reports of Schaaf and McClure and the following testimony:

(i)    Carlisle's purpose of claiming against Matson in the federal action was "he wanted his property to be free of timbering operations" (Hare I, p. 52, lines 9-22);

-14-

(ii)     Reason why I consulted (Scott Hare) ". . . I thought they (Matson) had stolen some property. . . trees. . . I wanted to get rid of them from the farm. . . I thought they no longer belonged there" (Carlisle, p. 35, line 24 through p. 36, line 5);

(iii)     Carlisle's goal was to keep Matson off the Clough Farm (Hare I, p. 59, lines 9-12; Hare II, p. 64, line24 through p. 65, line 5);

(iv)     Carlisle wanted to "explore the assertion that all the timber on the property (Clough Farm) should have been conveyed to (Bert Carlisle). . . <u>any</u> timber harvested (by Matson) constituted money damages to (Carlisle)" (Hare I, p. 72, lines 17-23);

(v)     Part of Hare's responsibility to Carlisle in the federal action was to determine what timber Carlisle owned and what timber Matson owned when Matson cut timber on this property (Hare I, p. 91, lines 9-15);

(vi)     Hare assumed the responsibility of conducting the required fact investigation to support the claims made in the federal action (Hare I, p. 93, line 12 through p. 94, line 12);

(vii)     By May of 1997, Hare knew that Matson took 4 to 7 million board feet or $3.6 million worth of timber off the Clough Farm from 1998 through 2004 (Hare I, p. 118, line 4 through p. 119, line 15); and

(viii)     Hare knew from Matson's timber records produced in discovery in the federal action that between 1988 through 1994 Matson cut and removed $3.6 million of timber from the Clough Farm and could have known that

$437,960 was taken between March 13, 1993 and March 13, 1995 (Hare I, p. 117, lines 7-22; May, 1997 report of James Hall; Hare Exhibit #15).

   (ix) Knew that if Fisher & Young and, therefore, Matson, had any Clough Farm timber rights, those rights would be set forth in a document recorded in the Warren County Court House (Hare I, p. 78, lines 11-18);

   (x) Hare never saw the document, described in (ix), which conveyed Clough Farm timber rights to Fisher & Young (Hare I, p. 62, lines 19-21);

   (xi) Hare never saw or was aware of the April 1, 1973 Kinkead to Fisher & Young timber deed for the Clough Farm which terminated Fisher & Young and, therefore, Matson's Clough Farm timber rights as Fisher & Young's alleged successor in interest on April 1, 1978 (Hare I, p. 134, lines 2-9);

   (xii) Hare was never aware that the Warren County records in the Warren County Recorder of Deeds Office indicated the only timber deed giving Fisher & Young any Clough Farm timber rights was the one made reference to in (xi) and that there was no other timber deed recorded there after April 1, 1978 and the December 19, 1997 verdict in the federal action (Hare I, p. 134, lines 2-9; Sekerak, p. 28, line 1 through p. 29, line 33);

   (xiii) Concluded that Hare Exhibit #5 (Fisher & Young May 28, 1969 Agreement of Sale of property recorded January 20, 1970 with timber reservation) represented the document which conveyed to Fisher & Young timber rights in the Clough Farm (Hare I, p. 78, lines 11-18).

 12. Paragraph 14 of Defendants' Motion for Summary Judgment is admitted in part and denied in part.  It is admitted that the case law cited in Paragraph 14

-16-

represents some, but not all, of the legal precepts applicable to this claim. In addition to and/or in modification of the alleged elements of a legal malpractice claim, the following additional legal precepts apply here because of the facts recited in Paragraphs 1(a) through 1(h) of this Answer:

(a)     A fiduciary relationship existed between Hare and Carlisle from 1994 through June 24, 1998; see Littleton v. Kincaid, 179 F.2d 848, 857 (4th Cir. 1949) (relationship between lawyer and client fiduciary); Capital Care Corp. v. Hunt, 2004 Pa. Super. 64, 847 A.2d 75, 84 (Pa. Super. 1984) (". . . attorney who undertakes representing client owes duty of competency and highest duty of honesty, fidelity. . ."); Hyman Companies, Inc. v. Brozost, 119 F. Supp. 2d 499, 505 (E.D. Pa. 2000) ( counsel "owed fiduciary duty to plaintiff. . . breach of fiduciary duty. . . actionable under Pennsylvania law");

(b)     When acting as a "fiduciary", Hare negligently represented to Carlisle that the trespass and conversion counts pled in the federal action, dismissed by Hare, could be timely refiled in the Warren action after the federal action was resolved by verdict, and Hare recommended and instructed Carlisle to file a Praecipe for Writ of Summons on June 23, 1998 to commence the Warren action; see testimony cited in Paragraphs 1(a) through 1(h) of the within Answer, incorporated herein by reference;

(c)     When a fiduciary makes a negligent misrepresentation to a client and/or a party who is owed a fiduciary duty that party relies upon the negligent misrepresentation and thereafter incurs damages or harm, the client may recover against the fiduciary for consequential damages resulting from the reliance. See Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 287 (Pa.

2005) (Section 552, Restatement (Second) of Torts adopted as the law of Pennsylvania); Hyman Companies, Inc., supra, 119 F. Supp. 2d at 505; Gibbs v. Ernst, 538 Pa 193, 647 A.2d 882, 890-91 (Pa. 1994) (negligent misrepresentation a recognized cause of action against professional who has "duty to tell the truth" to client); see Paragraph 15 of Plaintiff's May 4, 2004 Amended Complaint in the within action, which sets forth a prima facie claim per §552, Restatement (Second) of Torts.

13.    Paragraph 15 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. It is admitted that 42 Pa.C.S.A. 5524 sets forth the applicable statute of limitations for professional negligence claims. The controlling Pennsylvania case law interpreting 42 Pa.C.s.A. 5524 provides the following additional legal premises:

(a)    When there is an underlying action, such as the second, or Warren, action here, commenced at the direction and recommendation of Hare acting as Carlisle's legal counsel, there is no "accrual" for causes of action arising out of that second action until the trial Court dismisses some or part of that action which did not occur here until January 30, 2002; see Brown v. Abramson, 545 F. Supp. 227, 228 (E.D. Pa. 1982) ("until the underlying action is decided adversary to the plaintiff, the cause against the former attorney is speculative"); Boerger v. Levin, 812 F. Supp. 564, 565-66 (E.D. Pa. 1993) ("until the client's claim is adversely resolved by the court, the client has not incurred actual harm or loss");

(b)    The "discovery rule" applies to legal malpractice cases; see Bailey v. Tucker, 621 A.2d 108, 115 (Pa. 1993) (". . . statutory period commences at the time the harm is suffered or, if appropriate, at the time the alleged malpractice is

-18-

discovered"); <u>Robbins & Seventko Orthopedic Surgeons, Inc. v. Giesenberger</u>, 874 A.2d 244, 248-49 (Pa. Super. 1996) (negligent act occurred in 1976 but resulting harm to trigger running of statute of limitations did not occur until 1983 and claims filed after 1985 are too late); <u>Fiorentino v. Rapoport</u>, 693 A.2d 208, 1997 Pa. Super. LEXIS 572 (1997) (in a legal malpractice case, ". . . the occurrence rule is used to determine when the statute of limitations begins to run. . . the statutory period commences when the harm is suffered or, if appropriate, at the time an alleged malpractice is discovered);

(c)    "Equitable tolling" is a doctrine separate and apart from the discovery rule and extends the commencement of the running of the statute of limitations beyond the date of the "occurrence" of the negligent act; <u>see</u> <u>Drelles v. the Manufacturers Life Insurance Co.</u>, 2005 Pa. Super. 241, 881 A.2d 822, 839-41 (2005); <u>Sweitlowich v. County of Berks</u>, 610 F.2d 1157, 1162 (3rd Cir. 1979) (". . . unintentional deception will suffice and its effect upon the plaintiff. . . which controls"); <u>Bohous v. Beloff</u>, 950 F.2d 919, 925-26 (3rd Cir. 1991) (unintentional concealment which causes a plaintiff to be mislead from discovery of his injury tolls the statute of limitations);

(d)    The doctrine of equitable tolling applies when a fiduciary, such as the Defendant, Hare, makes the representations enumerated in Paragraphs 1(a) through 1(h) of this Answer apply to extend the commencement of the running of the statute of limitations until it becomes known to a party, similarly situated as Carlisle, that the fiduciary's advice and representations were "improper", false or incorrect.  <u>See</u> <u>Drelles</u>, <u>supra</u>, 881 A.2d at 839-41.

14.     Paragraph 16 of Defendants' Motion for Summary Judgment is denied. The Answer set forth in Paragraph 12 is incorporated herein as if set forth in full. When the negligent acts and the resulting harm occurs on different dates is "discovered" by Plaintiff on a later date, the statute of limitations, for all the reasons set forth in the previous Paragraph of this Answer, starts to run on the latter date. The case law set forth in Paragraph 16 is either more favorable to the Plaintiff than the Defendant or distinguishable on their facts. As an example, the Court in Robbins, supra, 674 A.2d at 248 applied the "discovery rule" and not the "occurrence rule", found that the negligence occurred in 1976 and 1977, but the harm was discovered in 1983 and held the statute of limitations started to run in 1983, not 1976. As another example, Glennbrook Leasing Co. v. Beausang, 839 A.2d 437, 443-44 (Pa. Super. 2003) (statute of limitations starts to run in November, 1994 when client threatens law firm in letter of possible malpractice claim and client does not file claim against law firm until December 6, 2000), is distinguishable for several reasons: (a) Carlisle never, orally or in writing, advised Hare of a possible malpractice claim before Complaint was filed within 2 years of Carlisle knowing of resulting harm from Hare's conduct of dismissing the trespass and conversion claims in the federal action and representing to Carlisle that they could be refiled in the Warren action; and (b) the law firm in Glennbrook, supra did not make the type of representations which Hare made to Carlisle enumerated in Paragraphs 1(a) through 1(h) of this Answer, which were relied upon by Carlisle in proceeding forward with the Warren action against Matson (Carlisle, p. 72, lines 8-9; p. 73, lines 15-16; p. 95, lines 5-10). Likewise, Harsco Corp. v. Kerkam, Stowell, Kondracki & Clarke, P.C., 961 F. Supp. 104, 106 (M.D. Pa. 1997) (statute of limitations starts to run when client

-20-

had notice of law firm's conduct, i.e., "Rule 50(a)(2) violation and the resulting injury",

causing plaintiff harm in past litigation and claim filed more than 2 years later), is

distinguishable because (a) there was not a second underlying action initiated by the

law firm in Harsco, supra as was done here after any alleged harm resulting from the

December 19, 1997 verdict; (b) there wasn't the affirmative representations made to the

client in Harsco, supra that were made by Hare to Carlisle here set forth in detail in

Paragraphs 1(a) through (h) of this Answer to the effect that whatever had not been

recovered in the federal action was recoverable in the Warren action the law firm was

initiating; and (c) there wasn't the evidence of detrimental reliance on the

representations, made reference to above, by Harsco as was done by Carlisle here.

Likewise, Garcia v. Community Legal Service Corp., 524 A.2d 980 (Pa. Super. 1987) (".

. . Garcia. . . not reasonably aware her claim was barred under the Court of Common

Pleas so ruled in October, 1981" and claim filed more than 2 years later), is either more

favorable to Carlisle's position than Hare's position and/or distinguishable on its facts. It

is more favorable to Carlisle's position than Hare's position here because it does not

apply the occurrence rule as defined by Hare in his Brief but, rather, applies a discovery

rule. See the Court's discussion in Garcia, supra, 524 A.2d at 985, citing and following

the equitable discovery rule explained in Pocono International Raceway, Inc. v. Pocono

Produce, Inc., 503 Pa. 80, 85, 468 A.2d 468, 471 (1983), being applicable to legal

malpractice claims. Garcia, supra is distinguishable from Carlisle's claim because the

October 5, 1981 date in Garcia, supra established by a ruling from an adverse ruling of

a Court of Common Pleas is equivalent to the January 30, 2002 Order from the Warren

Court here granting Matson Partial Summary Judgment and, whereas, Garcia filed her

claim more than 2 years after that adverse October, 1981 order, Carlisle filed his claim less than 2 years from the equivalent date that triggered the running of the statute of limitations in <u>Garcia</u>, <u>supra</u>. Applying the Court's analysis in <u>Garcia</u>, <u>supra</u>, Carlisle's claim is timely. The remaining authorities cited in Paragraph 16 of Defendants' Motion are distinguishable on the facts because (a) none involve two underlying actions as exist here; (b) none involve the representations made by the lawyer acting in a fiduciary capacity to the client regarding what could be achieved in the second underlying action (see Paragraphs 1(a) through 1(h) for these assurances); (c) none involved the type of representations, made reference to in (b), between the first underlying action and the second underlying action filed or caused to be filed by defendant's lawyer as to what could be realized by the client in the second action as a consequence of the lawyer voluntarily dismissing claims in the first action without the client's consent; and (d) these authorities were all decided prior to <u>Fine</u>, <u>supra</u>, <u>Drelles</u>, <u>supra</u> and <u>Bilt-Rite</u>, <u>supra</u> discussed in the Answer to the previous Paragraph of this Answer were similar types of assurances or representations made by professionals which were deemed relevant to delay the start of the statute of limitation time period in professional negligence claims and/or actionable per §552, Restatement (Second) of Torts.

15.    Paragraph 17 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. The Answers set forth in Paragraphs 14, 15 and 16 are incorporated herein as if set forth in full.

16.    Paragraph 18 of Defendants' Motion for Summary Judgment is denied. Plaintiff was not aware of his alleged harm at the time of the December 19, 1997 verdict because of the numerous assurances and affirmative representations made by Hare to

-22-

Carlisle, both before and after the December 19, 1997 verdict up and through June 23, 1998. These assurances and representations set forth in Paragraphs 1(a) through (h) of this Answer are incorporated herein as if set forth in full. Until the Warren County Court acted on January 30, 2002, holding that Carlisle was barred from making a recovery on either his refiled trespass or conversion claims (Counts V and VII of his federal action), which were dismissed out of that action and not resolved by the December 19, 1997 verdict, no reasonable amount of investigation by Carlisle could have caused him to know of the resulting harm and damages caused by Hare's negligent conduct, described in the previous Paragraphs of this Answer (Carlisle, p. 61, lines 8-12; p. 72, line 8-9; p. 73, lines 14-18; Hall, p. 88, lines 2-7).

17.    Paragraph 19 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. It is admitted that Carlisle did not recover damages for "trespass" and "conversion" in the federal action as a consequence of Hare, without Plaintiff's consent, withdrawing Counts V and VII of the federal action. However, Hare made the assurances set forth in Paragraphs 1(a) through 1(h) of this Answer, which are incorporated herein as if set forth in full. As a consequence, Carlisle was led to believe, up and until the Warren Court granted Partial Summary Judgment on January 30, 2002, that the damages he could have recovered in trespass and conversion claims withdrawn from the federal action could be refiled and thereafter recovered in the Warren action (Carlisle, p. 65, lines 9-22; p. 67, lines 1-6; p. 154, lines 4-8; Bush, p. 49, lines 13-14; p. 53, lines 7-11; p. 55, lines 15-24).

18.    Paragraph 20 of Defendants' Motion for Summary Judgment is denied. Carlisle had neither actual nor constructive knowledge of the 1973 Kinkead to Fisher &

Young timber Deed until it was first made known to him after 2002 (Carlisle, p. 75, lines 17-23; p. 76, lines 2-17); see 21 Pa.C.S.A. 357 (constructive notice as result of recordation); 21 P.S. 521 and 522 specifically apply to timber deeds. Per 21 Pa.C.S.A.375, 522. Carlisle is to have constructive knowledge of title recordings prior, but not subsequent, to the January 9, 1970 date when his property Deed was recorded. By statute, Carlisle is not charged with actual or constructive knowledge of property timber or title documents applicable to his property recorded after or subsequent to the date he obtained record title to this property. See, specifically, 21 P.S. 521, 21 P.S. 522 (". . . deeds (timber). . . when so recorded shall be notice to subsequent purchasers. . .") (emphasis provided). 21 P.S. 357 is the same ("the legal effect of the recording of such agreements should be given constructive notice to subsequent purchaser. . ."). Further, the after recorded 1973 Kinkead to Fisher & Young timber Deed was not in Carlisle's "chain of title" (see Sekerak transcript, p. 23, line 17 through p. 24, line 6) ("Q. . . and the chain of title for the surface, would that include timber deeds for the timber? A. No." (Sekerak, p. 24, lines 4-6). See Pittsburgh Coal & Coke, Inc., 404 Pa. Super. 298, 590 A.2d 790, 795 (1991), rev'd. on other grounds, 622 A.2d 284 (1993) (". . . tracing one's title ownership to property back to its date of origination, e.g., land grant date up to the time of closing - euphemistically referred to as 'chain of title', Black's Law Dictionary, 290. . ."); Eltman v. Harvey, 93 Misc. 2d 634, 403 N.Y. 2d 428 (N.Y. 1978) ("the chain of title to real property is the succession of deed or other instruments to which title is traced back to. . ."). From the 1890s to 2002, there were only two timber deeds out of the Clough Farm, the first in 1934 and the second in 1973 (Sekerak, p. 28, line 4 through p. 29, line 4). The 1973 timber Deed (Hare Exhibit #44)

was preceded by the unrecorded 1968 Articles of Agreement between Kinkead and

Fisher & Young (Hare Exhibit #43), contained the following language:

> "Together with right of entry on and over said premises for
> the purpose of cutting, skidding, piling and removing said
> timber until April 1, 1978, on and after which date all rights
> hereunder shall cease and determine, and all remaining
> timber and trees vest without notice in the Grantor, her heirs
> and assigns".

There was also a subsequent deed between Fisher & Young and American Hardwoods,

purportedly conveying the same timber rights to that entity.  The deed to American

Hardwoods was never recorded in Warren County (Sekerak, p. 28, line 14 through p.

29, line 3; Dennison, p. 64, line 19 through p. 65 line 8).  The holding in Weik v. Estate

of Margaret Brown, 794 A.2d 907 (Pa. Super. 2002) is distinguishable because the

plaintiff in Weik, supra was not a property owner who held record title to the property at

the time the title document was recorded and, therefore, not entitled to the benefit of 21

P.S. 522, 522 and 351; whereas, Carlisle was the titled owner of the Clough Farm since

January, 1970, and the 1973 timber deed is considered an "after recorded deed", not in

Carlisle's chain of title (Sekerak, p. 24, lines 4-6).  It is considered a "fraudulent

conveyance".  See 21 Pa.C.S.A. 351; Eltman, supra; Walsh v. East Pikeland Township,

2003 Pa. Commw. LEXIS 542, 829 A.2d 1219, 1222-23 (Pa. Commw. 2003) (restrictive

covenant filed of record after property owner's deed is void); Carnegie Natural Gas Co.

v. Braddock, 142 Pa. Cmwlth. 383, 597 A.2d 285, 288 (1991) ("the burden of proving

notice (actual or constructive) is upon party asserting unrecorded rights in the

property").  The burden of proving that Carlisle had actual or constructive knowledge of

the after recorded 1973 Kinkead to Fisher & Young timber deed in these proceedings is

on Hare, as he is asserting a defense which Matson may have asserted in the first underlying action if Hare had discovered the after recorded 1973 timber deed or if Matson had produced it as part of the discovery proceedings.

19.     Paragraph 21 of Defendants' Motion for Summary Judgment is denied. The allegations in Paragraphs 1(a) through 1(h), 5, 15 and 18 of this Answer are incorporated herein by reference.  In further answer, considering Carlisle's property deed was recorded on January 9, 1970 and the Kinkead to Fisher & Young timber deed was recorded April 20, 1973, Carlisle, under the controlling law, is considered a bona fide purchaser of the timber under the controlling law categorizing this timber as "personalty" as to Fisher & Young or Matson who claims the rights for Matson (Kookogey, p. 65, lines 8-20; p. 67, line 18 through p. 68, line 2; p. 76, line 15 through p. 77, line 2).  See Lesnick v. Chartiers Natural Gas Co., 2005 Pa. Super. 436, 889 A.2d 1282, 1285 (2005) ("Lesnicks are bona fide purchasers subject to the. . . recorded documents but are innocent of knowledge of the alleged 1948 termination of gas rights"); Saltonstall v. Little, 90 Pa. 422, 485 (1879) ("It was a reservation of the timber for 12 years and no longer after that time the trees remaining passed with the grant of the soil to which it (the timber) was attached").

20.     Paragraph 22 of Defendants' Motion for Summary Judgment is denied. Carlisle specifically told Hare the recitals set forth in Paragraphs 11(d)(I) through (xiii), which are incorporated herein by reference and are contradictory to the assertions in Paragraph 22.

21.     Paragraph 23 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. Carlisle was led to believe Matson had timber rights as an

alleged successor in interest to Fisher & Young. However, the 1973 Kinkead to Fisher & Young timber Deed is not in Carlisle's chain of title (Sekerak Exhibit #9 represents Carlisle's chain of title; Sekerak, p. 24, lines 4-6). Eltman, supra ("the chain of title to real property is the succession of deed or other instruments to which title is traced back to. . ."). The 1973 Kinkead to Fisher & Young timber Deed is considered an after recorded and void Deed per 21 P.S. 351 ("failure to record conveyance") and one Carlisle did not have constructive knowledge of; see 21 P.S. 357 ("constructive knowledge" applies to recordings prior to Carlisle's deed and not subsequently recorded deeds); 21 P.S. 522 (recording of timber deeds are "notice to subsequent purchaser"). See Pittsburgh Coal & Coke, Inc. v. Cuteri, 404 Pa. Super. 298, 309, 590 A.2d 790 (Pa. Super. 1991) (relying on 7 Am.Jur. 2d, "Attorneys at Law", §207, ". . . land-grant date up to the time of closing - euphemistically referred to as 'chain of title'."). The "closing" here was January 9, 1970, when the Fisher & Young to Carlisle property Deed was recorded. Sekerak Exhibit #9 represents Carlisle's title abstract and his chain of title. His chain of title ends with the recording of his January 9, 1970 property deed and does not include the April, 1973 timber deed (Sekerak, p. 23, line 17 through p. 24, line 6, "Q. . . and the chain of title for the surface, would that include timber deeds for the timber? A. No."). Between the 1890s and 2002, there were only two timber deeds applicable to the Clough Farm, one in 1934 and the other the 1973 Kinkead to Fisher & Young timber deed (Sekerak, p. 28, line 14 through p. 29, line 3).

22.    Paragraph 24 of Defendants' Motion for Summary Judgment is denied. Matson first entered the Clough Farm to cut timber in 1988 and after. When Carlisle first requested Hare to provide legal help regarding Matson's presence on the Clough

Farm, Carlisle was of the belief that Matson had no timber rights on the Clough Farm or, if they did, they had expired as of 1994. See, specifically, Carlisle's assertions to Hare in Paragraphs 11(d)(I) through (iv) of this Answer, which are incorporated herein by reference and indicate that Carlisle went to Hare in 1994 because he believed Matson had "stolen property" (timber) and "I felt they (Matson) no longer belonged there" (Carlisle, p. 35, line 24 through p. 36, line 5).

23.    Paragraph 25 of Defendants' Motion for Summary Judgment is denied. The controlling legal precepts applicable to this action are misstated from the authorities recited in that Paragraph; see, for example, Robbins, supra, 674 A.2d at 248-49 ((the negligent act of legal counsel occurred in 1977 and the Court held that the discovery rule applied and the resulting harm could not have been discovered until 1983) and Bailey, supra (". . . the rule in this Commonwealth is that the statutory period commences at the time the harm is suffered or, if appropriate, at the time the alleged malpractice is discovered"), and/or are correctly stated in Paragraph 24 of this Answer. The remaining authorities, i.e., More v. McComsey 459 A.2d 841, 844 (Pa. 1983); More v. Juvelan. 92 Pa. 484, 490 (Pa. 1980) and Saferstein v. Paul, Mardinly, Durham, James, Flandrew & Rodger, P.C. 1997 WL 102521 (E.D. Pa. 1977), are all distinguishable on their facts for the same reasons recited in Paragraph 14 of this Answer in response to Paragraph 16 of Defendants' Motion for Summary Judgment, which distinctions are incorporated herein by reference.

24.    Paragraph 25 of Defendants' Motion for Summary Judgment is denied. The statute of limitations for professional negligence claims commences when the resulting harm occurs from a prior negligent act. Several months or years may elapse

between the date when the negligent act occurred and when a plaintiff first incurred

and/or discovered the resulting harm for purposes of commencement of the statute of

limitations. Fine v. Checcio, 582 Pa. 253, 870 A.2d 850 (2005) ("the (statute of

limitations) does not begin to run until the injured party discovers, or reasonably should

discover, that he has been injured and his injury was caused by another's conduct. . .

discovery rule always applies to toll the statute of limitations if at the time the injury

occurs, the injury or its causes is either known or reasonably knowable"); Drelles,

supra, 881 A.2d at 839-41 ("the purpose of the rule (discovery rule) is to exclude from

consideration the period of time during which the party has not suffered an immediately

ascertainable injury. . . so that he has essentially the same rights as those who have

suffered an immediately ascertainable injury. . . when the discovery rule applies, the

statute of limitations does not commence to run at the instant the right to institute suit

arose"); Bailey, supra, 621 A.2d at 115 (1993) (". . . the rule in this Commonwealth is

that the statutory period commences at the time the harm is suffered or, if appropriate,

at the time the alleged malpractice is discovered"); Fiorentino v. Rapoport, 693 A.2d

208 (1997) (in a legal malpractice claim "under the Pennsylvania occurrence rule, the

statutory period commences when the harm is suffered or, if appropriate, at the time an

alleged malpractice is discovered"). The Warren Court's grant of Partial Summary

Judgment and, in effect, dismissing the refiled trespass and conversion claims was

Carlisle's first notice that he had been harmed by Hare's conduct (Carlisle, p. 61, lines

8-12; p. 72, lines 8-9; p. 74, lines 4-18).

     25.    Paragraph 26 of Defendants' Motion for Summary Judgment is denied.

Answers to Paragraphs 1(a) through 1(h), 12,13, 23 and 24 are incorporated herein by

reference. See Brown v. Abramson, 545 F. Supp. 227, 228 (E.D. Pa. 1982) ("until the underlying action is decided adversary to the plaintiff, the cause against the former attorney is speculative"); Boerger v. Levin, 812 F. Supp. 564, 565-66 (E.D. Pa. 1993) ("until the client's claim is adversely resolved by the court, the client has not incurred actual harm or loss"). The doctrine of equitable tolling applies when a fiduciary, such as the Defendant, Hare, makes the representations enumerated in Paragraphs 1(a) through 1(h) of this Answer to extend the commencement of the running of the statute of limitations until the fiduciary's representations were "improper", false or incorrect and became known to a party, similarly situated as Carlisle. See Drelles, supra, 881 A.2d at 839-41.

26.    Paragraph 27 of Defendants' Motion for Summary Judgment is denied. The Answer to the previous Paragraph is incorporated hereby reference. The law of Indiana stated in Estate of Spry v. Beaty, 2004 WL 396287 (Ind. App., March 4, 2004), does not accurately state the Pennsylvania law. The Pennsylvania law is accurately stated in Paragraphs 23, 24 and 25 of this Answer, which are incorporated herein by reference.

27.    Paragraph 28 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 23, 24 and 25 are incorporated herein by reference. The authorities cited in Paragraph 28 are distinguishable from the present case because:

(a)    There were not the assurances and representations made by the professional to the client before and after negligent acts were committed of the type which were made to the Plaintiff by the Defendants here and discussed in Paragraphs 1(a) through 1(h) of this Answer;

(b)    There was nothing equivalent to the second, Warren, action here;

(c)    There was not the evidence of detrimental reliance by the client on the assurances and representations made by the professional;

(d)    They did not include claims for negligent misrepresentation per §522, Restatement (Second) of Torts; Bilt-Rite, supra, 866 A.2d at 287;

(e)    They were decided before Fine, supra and Drelles, supra, and the statements of law in those decisions recited in Paragraph 24 of this Answer.

28.    Paragraph 29 of Defendants' Motion for Summary Judgment is denied. Paragraphs 1(a) through 1(h), 23, 24 and 25 of this Answer set forth the relevant facts and controlling law as to why the statute of limitations regarding the two underlying claims discussed in Paragraph 1 did not commence to run on the date of the December 19, 1997 verdict but, rather, commenced to run until January 30, 2002, when the Warren Court first acted to dismiss or limit Carlisle's refiled trespass and conversion claims in the Warren action.

29.    Paragraph 30 of Defendants' Motion for Summary Judgment is denied. If Hare conducted a title search and established the identity of the owner of the Clough Farm timber for the 1988 through 1997 time period, as was required by the standard of care in prosecuting the federal action for Carlisle between 1994 and the December 19, 1997 verdict or if he had specifically requested Matson to provide its record evidence of timber title for timber of the Clough Farm, and if he had done the basic legal research regarding timber rights in Pennsylvania and dismissal of federal court claims, per 42 Pa.C.S.A. 5535(a)(1), he would have known prior to the December 19, 1997 verdict the following:

(a)     On April 1, 1978, Fisher & Young's timber rights and, therefore, Matson's timber rights, expired as a matter of law;

(b)     Matson was a "trespasser" on the Clough Farm from 1993 through 1995 when removing in excess of $437,960 of timber, not a "licensee", as Hare believed (Hare I, p. 86, line 21 through p. 86, line 13);

(c)     Carlisle, as the owner of the underlying property to which the timber was attached in 1978, when Fisher & Young's timber rights terminated on April 1, 1978, owned the timber between 1993 and 1995 as a matter of Pennsylvania law; see Saltonstall v. Little, 90 Pa. 422, 425 (1879) ("It was a reservation of the timber for 12 year and no longer.  After that time, the remaining trees passed with the grant of the soil to which it (the timber) was attached").  In Saltonstall, supra, the Court held that after the 12 year timber reservation expired, the timber became the property of "Veazie".  Veazie was the landowner to which the timber was attached, and/or the party similarly situated as Carlisle, who purchased the land but did not pay a separate consideration for the timber (Kookogey, p. 65, lines 8-20; p. 67, line 18 through p. 68, line 2; p. 76, line 15 through p. 77, line 2; reports Schaaf and McClure);

(d)     Carlisle's conversion claim, Count VII in the federal action, allowed for recovery for the 1993 through 1995 cutting ($437,960) (reports and affidavits of Will J. Schaaf, Esquire and Christine H. McClure);

(e)     If Hare had done the legal search required by the standard of care before he dismissed Counts V (trespass) and VII (conversion), he would have realized that both Counts could not be refiled in a second action and that Carlisle could not

-32-

recover for any of Matson's conduct occurring two years prior to March 15, 1995, as he represented because:

(i)     The saving statute, 42 Pa.C.S.A. 5535(a)(1), does not apply to civil actions refiled from federal court to state court; see Maxwell Downs, Inc. v. City of Philadelphia, 162 Pa. Commw. 300, 638 A.2d 473, 476 (Commw. Ct. 1994) (refiled action originally filed in federal court not entitled to "stay" provided by 42 Pa.C.S.A. 5535(b);

(ii)    The state court would likely grant summary judgment to Matson for those two refiled Counts from the federal action either because they were barred by the statute of limitations and/or res judicata, or both (see the January 30, 2002 Opinion).

30)     Paragraph 31 of Defendants' Motion for Summary Judgment is denied. See Meyers v. Robert Lewis Seigle, P.C., 751 A.2d 1182, 1186 (Pa. Super. 2000) is distinguishable. In Meyers, supra, plaintiff could not prove in the underlying action there the relationship between the product defect and the cause of the accident. Here, Plaintiff can prove he incurred the actual harm and damages resulting from the Defendants' failure to do a title search and determine the identity of the Clough Farm timber and the dismissal of the trespass and conversion counts and thereafter, the affirmative negligent misrepresentations Hare made to Carlisle, described in detail in Paragraphs 1(a) through 1(h) of this Answer. Assuming the "but for" causation standard applies, the evidence here satisfies that standard because if Hare had not acted negligently, he would have known the following:

(a)    Matson was a trespasser on the Clough Farm at all times on and before 1993 through 1995 and the present date (see Mcclure report);

(b)    Matson never had title to the Clough Farm timber at any time after April 1, 1978 and/or between 1988, when they first started timbering the Clough Farm, through the December 19, 1997 verdict in the federal action (Sekerak, p. 27, lines 14-25; p. 28, line 4 through p. 29, line 3);

(c)    As of the time Matson was a trespasser, Matson took in excess of $437,960 worth of timber within 2 years prior to March 13, 1995, or the date of the Complaint in the federal action was filed; as a matter of fact and law, for the reasons set forth herein, that timber was Carlisle's property, "but for" the failure of Hare to determine the record title owner of the Clough Farm timber by a title search or by checking the available relevant Warren County property records and the controlling law, he was not aware of this during the pendency of either underlying action; and

(d)    Carlisle could have obtained, through judicial relief in the December 19, 1997 verdict, a dollar verdict for Matson cutting and removing the timber, described in (a), above; and

(e)    An order excluding Matson, a trespasser, from returning to the Clough Farm after that verdict through the present date which would have precluded Matson from timbering that property in the 2005-2006 time period to take another $100,000 to $200,000, or more, of "1969" timber and prevented the present cloud on Carlisle's title (see reports of Schaaf and McClure).

31.    Paragraph 32 of Defendants' Motion for Summary Judgment is denied. The available causation proof recited in Paragraphs 28 and 29 satisfies either or both

the "but for' or "substantial factor" standard as defined by the Pennsylvania law. The "but for" causation standard is considered the equivalent to the "substantial factor" standard under Pennsylvania law. See Takach v. B.M. Root Co., 279 Pa. Super. 167, 171, 420 A.2d 1084 (1980) ("the two standards are not significantly different").

32.     Paragraph 33 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. It is admitted the case law recited therein sets forth some of the principles governing the relevant causation standard. The controlling law allows for meeting that standard by expert testimony set forth in the reports of Will J. Schaaf, Esquire and Christine H. McClure, Esquire. See Williams v. Bashman, 457 F. Supp. 322, 327 (E.D. Pa. 1978) (factual causation established with proof that by the preponderance of evidence if defendant lawyer had acted in compliance with standard of care, client would have prevailed in the underlying action); Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3rd Cir. 1988) (factual causation to support verdict in a legal malpractice claim may be proven by expert testimony).

33.     Paragraph 34 of Defendants' Motion for Summary Judgment is denied for all the reasons set forth in Paragraphs 29, 30 and 31 of this Answer and the reports and affidavits of Will J. Schaaf, Esquire, Esquire and Christine H. McClure, which establish that the Defendants' conduct was not only "incorrect", but below the prevailing standard of care applicable to the conduct of legal counsel, similarly situated as Hare, in repre-senting clients similarly situated as Carlisle with regard to the claims defined in Hare's November 3, 1994 memo to Carlisle regarding "Pennsylvania Farm Timber Rights" (Exhibit #8) and the claims pled in the ten Count Complaint filed in the federal action.

The case authority cited in Paragraph 33 of Defendants' Motion for Summary Judgment i.e., Kituskie v. Corbman, 714 A.2d 1027, 1030 (Pa. 1998), is not applicable here because it deals with the "collectibility issue" and/or which party has the burden of proving that any judgment which could have been recovered was "collectible". It places the burden on the defendant to prove that any judgment not obtained in the underlying action was not collectible. Kituskie, supra, 714 A.2d at 1032 (". . . we adopt the minority position and hold that a defendant lawyer in a legal malpractice action should plead and prove the affirmative defense that the underlying case was not collectible by the preponderance of the evidence"). Here, Carlisle's claims for trespass and conversion pled in the federal action, then withdrawn by Hare and repled in the Warren action, were collectible within Kituskie, supra. Matson had two $10 million insurance policies to cover the claims in the federal action (Hare Exhibit #18).

34.    Paragraph 35 of Defendants' Motion for Summary Judgment is denied. The decision to dismiss the trespass and conversion claims from the federal action, believing they could be refiled in the Warren action, may have been a "strategic decision" by Hare, but it was also a decision which was below the standard of care for all the reasons set forth in Paragraphs 29 and 30 of this Answer, which are incorporated herein by reference.

35.    Paragraph 36 of Defendants' Motion for Summary Judgment is denied. If the Defendants' "strategic" decisions here in:

(a)    Not performing a title search of the Clough Farm property to ascertain the identity of the owner of the Clough Farm timber between 1994 and December 19, 1997;

(b)     Withdrawing the trespass and conversion claims (Counts V and VII) in the federal action without first obtaining Plaintiff's consent;

(c)     Representing that both these Counts could be timely refiled in Warren County on June 23 1998; and

(d)     Making the additional representations, set forth in Paragraphs 1(a) through 1(h), are "strategic decisions", they were also acts which were below the standard of professional care and actionable under the controlling law. See Stephenson v. Chislett, Inc., 98 F. Supp. 252, 255 (W.D. Pa. 1951), affm'd., 344 U.S. 167, 97 L.Ed. 186 (duty of attorney to evaluate available evidence and properly advise client what can or cannot be "legally proved in either a civil or criminal action"). The timber title information establishing that Matson never have any ownership rights in the Clough Farm timber, particularly between 1993 and 1995, for all reasons previously stated in this Answer, was "available evidence" to Hare which he negligently failed to obtain. Stephenson, supra, 95 F. Supp. at 255; reports of Schaaf and McClure.

36.     Paragraph 37 of Defendants' Motion for Summary Judgment is denied. Answer to Paragraphs 32, 33, 34 and 35 is incorporated herein by reference.

37.     Paragraph 38 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 28, 29, 32, 33 and 34 are incorporated herein by reference. As the 1973 timber Deed conveyed the Kinkead timber on the "Clough Farm" as "personal" property, and not "real property", to allow both Kinkead and Fisher & Young to avoid the Pennsylvania real estate taxes required by Pennsylvania law (Kookogey, p. 42, line 23 through p. 43, line 4; p. 65, lines 15-20; p. 67, line 18 through p. 68, lines 2; p. 76, line 15 through p. 77, line 3). On April 1, 1978, the timber rights eventually reverted and

vested in Carlisle, as a matter of law, as of and before the 1993-1995 Matson timbering, which was within two years prior to the filing of the federal action was all recoverable in the federal action, resulting in the December 19, 1997 verdict. See Saltonstall v. Little, 1879 LEXIS 271, 90 Pa. 422, 425 (1879) ("it was a reservation of the timber for 12 years and no longer after that time the trees remaining passed with the grant of the soil to which it (the timber) was attached") and reports of Schaaf and McClure.

38.     Paragraph 39 of Defendants' Motion for Summary Judgment is denied. Paragraphs 28, 29, 32, 33 and 34 of this Answer are incorporated herein by reference. See reports of Schaaf and McClure and May 26, 2006 supplemental report of James Hall.

39.     Paragraph 40 of Defendants' Motion for Summary Judgment is denied. Paragraphs 37 and 38 of this Answer are incorporated herein by reference.

40.     Paragraph 41 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 28, 29, 32, 33 and 34 are incorporated herein by reference.  If the contents of the 1973 Kinkead to Fisher & Young timber Deed had been known by Hare, he would have known:

       (a)     Matson had zero timber rights after April 1, 1978;

       (b)     Matson was a trespasser on the Clough Farm, not a licensee; and

       (c)     Per Paragraph 28(c), with the appropriate legal research, the Clough Farm timber rights being personalty by 1993 had passed to Carlisle, as a matter of Pennsylvania law, as the owner of the property; Saltonstall, supra.  A reservation of timber rights by the grantor is not perpetual.  The reversionary interest must be exercised in a reasonable time.  Five years was reasonable for Kinkead and her heirs to

exercise the reversionary interest. See report of James Hall. Their failure to exercise the interest resulted in a lapse of the reservation, which is reflected in the Estate's failure to include "Clough" Farm timber rights in the Estate assets. <u>Saltonstall</u>, <u>supra</u>. Thus, by 1988, it was beyond question that the timber had reverted to the owner of the soil by operation of law. See Schaaf and McClure reports.

41.    Paragraph 42 of Defendants' Motion for Summary Judgment is denied. As a consequence of Defendant's conduct and the controlling law, described in Answer to Paragraph 34, Carlisle can prove:

(a)    The actual loss of $437,960 of timber removed in 1993 through 1995 by Matson, which timber belonged to Carlisle as a matter of law;

(b)    The actual loss of $100,000 to $200,000, or more, of "1969" timber removed in 2005 through 2006 by Matson; and

(c)    Treble damages for the timber removal, discussed above, per 42 Pa.C.S.A. 8322;

(d)    Damages to real estate and streams on the 1,239 acres caused by Matson's 1993 through 1995 trespass in cutting and removing this timber;

(e)    Allowing Matson to establish ownership to the "1969" trees on the entire 1,239.6 acre Clough Farm when Matson had no ownership rights to any of the Clough Farm timber;

(f)    The actual loss resulting from the "cloud" on Carlisle's related title to the 779 acres of commercial timber property which contains the remaining "1969" trees (Carlisle, p. 70, lines 1-2; p. 71, lines 16-19; p. 111, line 2 through p. 112, line 15;

p. 115, lines 21 through p. 116, line 2; see Sekerak and McClure reports; affidavit of May 26, 2006 supplemental report of James Hall).

42.    Paragraph 43 of Defendants' Motion for Summary Judgment is denied. Plaintiff's past and future harm resulting from Defendants' conduct below the standard of care, for all the reasons discussed in Answers to Paragraphs 28 and 40, is not speculative, but actual harm and damages.

43.    Paragraph 44 of Defendants' Motion for Summary Judgment is denied. The information as to Plaintiff's damages, set forth in Paragraphs 28 and 40, establish the "actual loss" requirements.

44.    Paragraph 45 of Defendants' Motion for Summary Judgment is admitted in part and denied in part. It is admitted that proof of "speculative harm", alone, does not satisfy the requirements of proving "actual loss". However, the information recited in Paragraphs 28 and 40 establish actual loss and not speculative harm. Mariscotti v. Tinari, 335 Pa. Super. 599, 485 A.2d 56, 57-58 (Pa. Super. 1984), is distinguishable. The "lost" marital settlement in Mariscotti, supra, was dependent on numerous contingencies, none of which were present here. As an example, if Matson's status as a trespasser on the Clough Farm had been established in the federal action, Carlisle would have been entitled to a directed verdict that Matson was a trespasser. See Lubecki v. Omega Logging, Inc., 674 F. Supp. 501 (W.D. Pa. 1987).

45.    Paragraph 46 of Defendants' Motion for Summary Judgment is denied. See Paragraphs 11(d)(I) through (xii) of this Answer and the specific record references set forth therein. There was a specific undertaking on and between 1994 and 1998 in

representing Carlisle to achieve for Carlisle the following goals by filing the federal action:

(a)    To permanently exclude Matson from the Clough Farm and all present and future timber operations;

(b)    To recover all monetary damages for Carlisle for Matson's removal of Carlisle's timber which he owned by title and/or as a matter of law;

(c)    To recover all property damage caused by Matson's timbering operation; and

(d)    To preclude Matson from reentering his property after the December 19, 1997 verdict. Answer to Paragraph 13 is incorporated herein by reference (Hare Exhibits #8 and #9; Carlisle, p. 35, line 24 through p. 35, line 5) (the reason why I consulted (Scott Hare) ". . . I thought they (Matson) had stolen some of my property. . . trees. . . I wanted to get rid of them from the farm. . . I thought they no longer belonged there"). Carlisle, from 1994 through 1999, paid Hare in excess of $46,000 ($46,244.56) for Hare's undertaking, described above (Hare I, p. 194, lines 12-17). Pittsburgh Coal & Coke, Inc., supra, is distinguishable on its facts. The defendant lawyer in Pittsburgh Coal & Coke, Inc., supra, was specifically requested to do a "lien" search by the client, and no more. The scope of Hare's undertaking here was defined by Carlisle's goals in retaining Hare and Hare's knowledge regarding the location of available evidence to achieve Carlisle's goals, which are recited in Paragraphs 11(d)(l) through (xiii), and Hare assuming the responsibility to determine what timber on the Clough Farm was owned by Matson and what timber was owned by Carlisle, as recited in Answer to Paragraph 11(d)(iv) and the standard of care evidence set forth in the

-41-

reports of Schaaf and McClure. In <u>Pittsburgh Coal & Coke, Inc.</u>, <u>supra</u>, there was no standard of care evidence supporting the requirement to perform a full title search in addition to legal counsel then only performing a "lien" search; whereas, there is standard of care evidence here that a title search was required by Hare to properly represent a party, similarly situated as Carlisle, from 1994 through the December 19, 1997 verdict, and the scope of Hare's undertaking to achieve Carlisle's goals set forth in Paragraph 11(d)(I) through (xiii) imposed a duty upon Hare to ascertain the identity of the owner of the Clough Farm timber, which required a title search.

46.    Paragraph 47 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 1(a) through 1(h) and 35 are incorporated herein by reference. See reports of Schaaf and McClure. Performing a title search on the Clough Farm and/or performing its equivalent by ascertaining how and when Matson acquired title to the Clough Farm timber and whether it had title to the Clough Farm timber between 1988 and 1995 were within the oral retainer agreement between Carlisle and Hare and part of Hare's undertaking. See Answer to Paragraph 10(d) where the scope of Hare's undertaking is described, which is incorporated herein by reference.

47.    Paragraph 48 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 28, 29 and 40, incorporated herein by reference, set forth the record evidence establishing the proof of causation required by the controlling law.

48.    Paragraph 49 of Defendants' Motion for Summary Judgment is denied. There was an "undertaking" by Hare in his representation of Carlisle which, for all the reasons set forth in Answers to Paragraphs 10(d) (I) through (viii), 21, 29 and 45, required Hare to perform a title search and/or its equivalent to ascertain when and how

-42-

Matson acquired ownership to the timber rights on the Clough Farm and whether it had timber rights on the Clough Farm, at the very least, during the 1993 through 1995 time period/ Circumstances which obligated Hare, as part of his undertaking to Carlisle, to perform a title search of the Clough Farm to determine the identity of the owner of the Clough Farm timber from 1988 through 1997 included:

(a)    Hare had no prior title search experience as a lawyer (Hare I, p. 23, lines 1-19);

(b)    Hare never saw the document which conveyed Clough Farm timber rights to Fisher & Young (Hare I, p. 62, lines 19-21);

(c)    Hare doesn't know whether Fisher & Young ever paid for these timber rights (Hare I, p. 63, lines 21 through p. 64, line 3);

(d)    Hare knew that if Fisher & Young had Clough Farm timber rights, they would be set forth in a document recorded in the Warren County Court House (Hare I, p. 78, lines 11-18);

(e)    Hare never aware of Kinkead to Fisher & Young timber deed which conveyed Clough Farm timber rights to Kinkead to Fisher & Young (Hare I, p. 134, lines 2-9);

(f)    Hare knew a Lauri Sekerak did title searches in Warren and had her phone number (Hare I, p. 98, line 5 through p. 99, line 6; Hare Exhibit #11);

(g)    Hare thought Hare Exhibit #5 (Fisher & Young to Carlisle Agreement of Sale of property) constituted document which conveyed Fisher & Young timber rights in Clough Farm timber (Hare I, p. 78, lines 11-18) :

    (h)    Hare knew, from Matson's timber records produced in discovery in the federal action, that between 1998 and 1994, Matson cut and removed $3.6 million of timber from the Clough Farm and could have known that $437,960 was taken between March 13, 1993 and March 13, 1995 (Hare I, p. 117, lines 7-22; May, 1997 report of James Hall; Hare Exhibit #15);

    (I)    Hare knew that if Fisher & Young was a trespasser and not a licensee, as Hare believed (Hare I, p. 85, line 27 through p. 86, line 13), "this distinction would have any impact on Carlisle damage claims because Carlisle would have additional rights":

    (1)    If Matson a trespasser and not a licensee, Carlisle had additional rights against Matson (Hare I, p. 87, line 24 through p. 88, line 10);

    (2)    If Matson a trespasser, it increased chances of removing Matson from Clough Farm (p. 88, lines 1-10); and

    (3)    If Matson a trespasser, it would enlarge Carlisle's claim for damages (p. 89, line 23 through p. 90, line 1).

49.    Paragraph 50 of Defendants' Motion for Summary Judgment is denied. Answers to Paragraphs 10, 21, 29 and 45 are incorporated herein by reference.

50.    Paragraph 51 of Defendants' Motion for Summary Judgment is denied. For all the reasons, record references and exhibits, referred to in Paragraphs 1 through 48 of this Answer, there are genuine issues of material fact on all issues raised by Defendants' Motion for Summary Judgment which, under the controlling law, precludes the grant of Summary Judgment.

Respectfully submitted,

CONNER RILEY & FRYLING

BY _____
ANDREW J. CONNER, ESQUIRE
ATTORNEY FOR PLAINTIFF
17 West Tenth Street
Erie, Pennsylvania 16501
(814) 453-3343

DATED: June 15, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff )
)
VS. )    NO. 04-25 ERIE
)
)
BARTONY, HARE & EDSON; SCOTT M. )
HARE, ESQUIRE; HENRY E. BARTONY, )
JR., ESQUIRE; and JOHN JOY V. )
EDSON, ESQUIRE, Defendants )

### AFFIDAVIT OF JAMES HALL

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF ERIE )

James Hall, being first duly sworn according to law, deposes and states the following:

1.    My name is James Hall. I have been engaged in the practice of forester and management forester since 1963 on both public and private lands.

2.    I have been employed as a professional consulting forester since 1993.

3.    I have been engaged by Albert T. Carlisle since 1996 to perform timber appraisals and to develop a plan of good forest management for the Carlisle Farm.

4.    I have personal knowledge of the Carlisle Farm including its location in Spring Creek Township, Warren County, Pennsylvania, its geography, topography, acreage and makeup consisting of forest, fields and wetlands.

5.    The Carlisle Farm is comprised of approximately 1,239.6 acres of land. Of the total acreage, approximately 779 acres are commercial forest land.

6.    I have personal knowledge of the verdict rendered in Carlisle v. Matson Lumber Company, et al. at 178 F.3d 1278 (3rd Cir. 1999) as I testified as an expert witness in that matter.

I have also reviewed the jury's verdict which found that Matson did not have a perpetual right to harvest timber on the "Clough" farm.

7.     The jury determined that Matson had the right to harvest only timber existing on the "Clough" farm as of May 18, 1969. The jury did not affix a date by which Matson must remove the timber before its rights expire.

8.     It is the custom of the commercial forest industry in Pennsylvania that where a timber agreement, such as the one at issue, provides for the sale of timber standing on a date certain, the grantee has a reasonable time to remove the timber if no other expiration date is provided.

9.     It is my opinion to a reasonable degree of professional certainty that Matson could have and should have removed the timber in existence on May 18, 1969 within five (5) years or on or before May 18, 1974.

10.    I have considered the species of timber involved, the number of acres, the geography and topography "Clough" Farm as well as the limited harvest season of September to May in arriving at my opinion.

11.    The values of the remaining timber subject to harvest by Matson based on 425 plots taken on the Carlisle Farm between 1997 and 2002 was $947,204.88 according to the Pa. Woodland Timber Market Report 4th quarter 2001. This does not take into account the timber removed by Matson in the 2005-2006 harvest which I have preliminarily estimated as $100,000.00 to 200,000.00 or more.

_James Hall_

James Hall

Commonwealth of Pennsylvania      )
County of Erie                    )          SS

    On this, the *14th* day of June, 2006 before me, personally appeared James Hall, the same person described in and who executed the within affidavit and she acknowledged to me that she voluntarily executed this affidavit.

Notary Public

M

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JAMES RYAN FRYLING, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON NOV. 18, 2007

## James Hall, Consulting Forester

89 S. Main St. ~ Russell, PA 16345
Phone 814-757-4488 ~ Fax 866-506-7474
management plans - appraisals - timber sales

### QUALIFICATIONS

I have practiced good forest management since September 1963 on both public and private land.  I have constantly taken and taught courses on forestry related subjects in order to keep my skills current.

My strongest assests are a dedication to good forestry practices and integrity in dealing with landowners.

### WORK HISTORY

1963-1966   *Service Forester,  Commonwealth of Pennsylvania*
   I worked with private landowners to get good forestry practices on their land.  This involved writing management plans, marking timber, planting trees and all other related activities.

1966-1968   *Management Forester,  Commonwealth of Pennsylvania*
I worked on State Forest Land writing management plans, conducting timber sales, providing recreational opportunities and all other related activities.

1968-1993   *Assistant District Forester,  Commonwealth of Pennsylvania*
I was responsible for all forest management work  on both public and private land conducted by the Pa. Bureau of Forestry in Erie, Crawford,  Forest,  Warren and Venango counties.  I was also responsible for forest fire prevention and control; Gypsy Moth spraying; snowmobile program; and other related activities.

1993-Present   *Consulting Forester,  Self employed*
   I work for private landowners helping them reach their goals..

### EDUCATION

1959-1963   Bachelor of Science in Forest Management    Penn State University

### ADDITIONAL COURSEWORK AND TRAINING

Law Enforcement
Labor Relations
Prescribed Fire Management
Wildlife Habitat Management

Watershed Management

Effects of Soils and geology on Planning and Development
Allegheny Hardwood Silviculture
Fire Business Management
Wetland Delineation
Soil and Erosion Control Workshop

Member of:  Pa. Forestry Association
~~Pa. Deer Forest Committee~~
Northwest Pa. Woodland Owners Association



**James Hall**
CONSULTING FORESTER
R.D. #1, Box 1102 · Russell, Pennsylvania 16345 · (814) 757-4488

May 2, 1997

Scott Michael Hare, Esquire
Bartony Hare & Edson
Law & Finance Building Suite 1801
429 Fourth Avenue
Pittsburgh, PA  15219

Re:  Clough Farm/Matson Lumber Co.

Dear Mr. Hare:

I have been engaged by Albert T. Carlisle to assess the condition and history of the timber stands and associated land on the Clough Farm, determine the value of the standing timber at various times in its history, assess the forestry practices employed by Matson Lumber Company and Matson Hardwoods (collectively "Matson") on the farm, and determine and define the damages to Mr. Carlisle caused by Matson.  Further, I have been requested to assess the meaning of certain provisions contained in the Agreement of Sale between Mr. Carlisle and the original seller.  Finally, I have been requested to evaluate the damage claims asserted by Matson in its counterclaims against Mr. Carlisle.

This letter describes my methodology, and reports my findings and conclusions as of this date.  I offer all of the opinions expressed herein within a reasonable degree of scientific certainty.

## Description of the Property

The property in question, known as Clough Farm, is located in Spring Creek Township, Warren County, Pennsylvania.  The property encompasses about 1239.6 acres.  Of the total acreage, approximately 779 acres are commercial forest land.

This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine, and various other species.  Based on the evidence of residual stumps and some uncut areas, I have concluded that this property was once a

majestic example of the excellent timber that this area of Pennsylvania can produce. Through good forest management, under the guidance of a professional forester, this area could have been and should still be a highly productive, healthy and profitable forest. As I will detail below, because of Matson's forestry practices, it is not.

## Methodology

In order to provide a complete and accurate assessment of the 779 acres of commercial forest land on the farm, I used the following techniques.

A. General overview and boundary line check.

B. Typed the timber: Divided the area into homogenous stands using ground surveys and aerial photography.

C. Took over 120 random plots using two techniques.

    1. Plotless cruising with a 10 factor prism.
    2. 1/20 acre plots.

D. Collected data regarding:

    1. Species
    2. Quality
    3. D.B.H. (Diameter Breast High)
    4. Merchantable Height
    5. Number of trees
    6. Damage to residual trees
    7. Density

E. Referred as needed to the following materials:

    1. Sylvah (NSFS) Research Lab
    2. Penn State volume tables
    3. PA Bureau of Forestry volume factors
    4. USDA-Forest Service research paper NE-373
    5. USDA-FS Agricultural handbook 355
    6. USDA-FS General technical report NE-96
    7. USDA-FS Research paper NE-143
    8. Timber Management Guide-Ben Roach
    9. Forest Reference Manual-J.M. Francis
    10. USDA-FS Agriculture Information Bulletin 419
    11. USDA-FS Agriculture Information Bulletin 405
    12. USDA-FS Research Paper NE-127
    13. USDA-FS Agriculture Handbook 678

14.  NY State Dept. of Environmental Conservation Stumpage Price Reports—1982 to 1997
15.  Penn State University—Timber Market Reports 1984-1997
16.  USDA-FS Actual Bids on Timber Sales
17.  Timber Sale Data collected by James Hall
18.  Data supplied by Norman Sunderland, Consultant Forester
19.  1968, 1987, 1988 and 1989 Aerial Photography
20.  Harvesting data supplied by Matson Lumber Company for November 1989 through April 1995
21.  Agreement of sale—Fisher & Young, Seller and Albert T. Carlisle, Buyer dated September 30, 1969
22.  Plaintiff's pre-trial narrative dated March 22, 1996
23.  Defendant's pre-trial narrative dated April 11, 1996
24.  Meyer's *Forest Mensuration*

## Significant Provisions of Agreement of Sale

During my career in the forestry industry, I have been involved in negotiating, drafting, monitoring and enforcing countless contracts governing timber rights. As a result, I am intimately familiar with the terminology and usage of the timber industry, and I am thereby able to interpret the Agreement of Sale between Mr. Carlisle and Fisher & Young to explain the meaning it has in the timber industry.

I have been asked to interpret the following provisions of the Agreement of Sale: (i) the final paragraph on page 5; (ii) paragraph 15.A. on page 8; (iii) paragraph 15.B. on page 8; and (iv) paragraph 16 on pages 8 and 9.

(i)  Final Paragraph on page 5.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto set forth below. SUBJECT, however, to the right of

Buyer to use for its own purposes all trees fallen
for more than one year and all tree-tops remaining
after logging operations.

This provision very clearly reserves _only_ those
trees already actually existing on the date of the
Agreement.   This provision does not reserve any rights in
any trees germinating after September 30, 1969, which are
the property of Mr. Carlisle and must be respected as such.

It is possible to reserve an ownership interest in
future trees, as well as existing trees, and parties
sometimes agree to do so.   However, such an ownership
interest is always specifically identified.   Furthermore, it
is easy to reserve a future interest using language like
this: "all trees now on this property, and all trees that
ever grow on this property at any time in the future, are
the property of the timber company."   Such simple language
clearly and plainly reserves not only trees then in
existence, but all trees forever.   The Agreement of Sale
between Mr. Carlisle and Fisher & Young does no such thing,
and anyone experienced in the forestry industry would
understand the paragraph quoted above to retain ownership
only in the trees that are actually existing on the date of
the Agreement.

(ii) Paragraph 15.A. or page 8.

15.A.     That in the event the Seller shall
desire to sell, transfer or assign the timber
reserved on the premises above described, Seller
shall give Buyer written notice thereof and hereby
grants the Buyer the option for thirty days
following the posting of said notice by Seller to
Buyer of purchasing said timber at the price
offered therefore by a bona fide prospective third
party purchaser, transferer or assignor.

This provision refers to the timber itself, as
opposed to the "timber rights" (see paragraph 15.B. below).
Each and every time the Seller plans to sell, transfer or
assign timber (in any quantity, including individual trees),
it must give Mr. Carlisle a 30-day written notice, and the
option to buy the specified trees at the price offered by
the third party.

The business of a commercial timber company like
Matson is to cut timber and sell the resulting logs to
third-party purchasers.   Such a company demonstrates a

"desire to sell, transfer or assign the timber reserved on the premises" by cutting the timber. Accordingly, Matson is required to notify Mr. Carlisle in writing each time it desires to cut timber to effectuate a sale, transfer or assignment of such timber, thereby allowing Mr. Carlisle to exercise his thirty-day option to purchase the timber. Had Matson honored this obligation, Mr. Carlisle would have been able to purchase any or all such timber (that is, individual trees) prior to its being cut. (Once cut, timber becomes logs; "timber" means standing merchantable trees. Upon being cut, therefore, the timber is transferred, in violation of the Agreement.)

Paragraph 15.A. would also apply, obviously, in the event Matson desired to sell, transfer or assign all of the timber. Once again, it would be required to give written notice to Mr. Carlisle and allow him thirty days to exercise his option to purchase such timber.

(iii)    Paragraph 15.B. on page 8.

15.B.    Should the present management and/or ownership of Seller change, Buyer shall be so advised by Seller in writing and shall have an thirty day option to purchase the timber rights at a price to be mutually agreed upon, or in failure thereof, by arbitration (each side to choose one of the arbitrators and the two arbitrators to select a third). The arbitrators shall establish the price which shall be binding without appeal of the parties.

Unlike 15.A., which refers to "timber" (trees), 15.B. refers to "timber rights." These are two entirely different terms with different meanings, and there is a reason for these two separate sections in paragraph 15.

In particular, under paragraph 15.B. the Seller is obligated to notify Mr. Carlisle in writing of any change in management and/or ownership of the Seller, whereupon Mr. Carlisle has 30 days to purchase the timber rights. This notice and option enable Mr. Carlisle to keep unwanted timber companies, subsequent to the original seller, off the property altogether by acquiring the remaining timber rights.

(iv) Paragraph 16 on pages 8 and 9.

It is further agreed and stipulated by and between the parties hereto that a map designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting, shall be attached hereto and made a part hereof as though fully set forth herein and marked Exhibit A as previously mentioned.

It appears that the map described in the Agreement of Sale cannot be found, although various witnesses testify that it once existed. As a professional forest manager, I can confirm that it would be ordinary industry practice to protect certain valuable resources on the property. Typically, any stream that has a breeding trout population is given a 100-foot buffer. Such a strip was probable on the Clough Farm along Spring Creek, Brokenstraw Creek, Tom's Run and its tributaries and the Greeley. There would also typically be a 100-foot buffer around any buildings, and an exclusion of swamp, wetlands, and areas used for pasture and/or agriculture.

## Conclusions

A.   Matson's Cutting Practices.

Matson Lumber Company's cutting practices show absolutely no concern for the forest as a renewable resource that should be managed to promote the continuing production of quality timber. Matson has left the average basal area of acceptable growing stock below 30 square feet, which is far below any accepted management guidelines. Damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded, and have reduced commercial value or no commercial value at all, because of sprouting from over harvesting. Skidding across and in streams is frequently evident. Excessive and unnecessary roads were built. Matson made poor use of the trees they felled, and abandoned valuable cut material to decay.

The following examples demonstrate some of the ways in which Matson was reckless in its timber practices and caused unnecessary damage on the Clough Farm:

1.    Trees removed right up to banks of Spring Creek.  Cutting along streams has been no different than anywhere else.

2.    No Respect for residual trees.  Felling damage, skidding damage, dozer damage, chainsaw damage is evident everywhere.

3.    Wasteful logging practice.  Many logs and even entire trees were cut and left in woods.  (This volume is not reflected in the damages calculations below, even though Mr. Carlisle has lost such abandoned trees.)

4.    No respect for streams and springs.  Many tops were left in water courses.  Skidder crossed and in some instances skidded logs in stream bed.

5.    There is no evidence of any sound forest management plans being used by Matson.  Stands with a high B.A. and excellent growing stock have been reduced to poor quality stands with less than 30 B.A. of acceptable growing stock.  This is so far below any graph that it is off the page.

In short (and undermining its claim that it has perpetual harvest rights on the Clough Farm), it is apparent that Matson has tried to get as much good timber from the farm as fast as possible, without regard to any damage it was causing to the timber stands or their future reproductive capacity.

3.    Damages to Carlisle.

Between November 1988 and April 1996, based on log receipts supplied by Matson, Matson and/or its agents removed 4,203,678 board feet Doyle rule from the Clough Farm.  Converted to International ¼-inch rule, this figure equals 7,125,234 board feet.  This figure does not include the logs left in the woods due to wasteful utilization practices.

The value of this timber, accounting for volume and species, based on the average value of stumpage in northwestern Pennsylvania published in the Penn State University "Timber Market Report" for the fourth quarter of 1996, is $1,891,265.00.  However, the trees removed by Matson were not average trees (the basis of the Penn State report), but very high quality trees.  The value of the Clough Farm timber removed by Matson, using timber prices

Page 7

for high quality timber stumpage based on the Timber Market Report and actual timber sold in the area, is $3,655,060.40.

Because this timber was wantonly removed with no consideration for Mr. Carlisle's rights, Mr. Carlisle's damages for unlawfully removed timber (3 times stumpage value) are $10,965,181.20.

Additionally, Mr. Carlisle has endured damage to residual trees still standing of 34.4%, resulting in a loss of $584,268 times 3 = $1,752,804.

Furthermore, if this property has been properly managed with the original stand as a base, a perpetual harvest income would be realized by Mr. Carlisle. A modest 6.4% annual growth would yield $110,442.72 per year for at least thirty years, yielding a total loss of $3,313,281.60 based on today's values. This figure does not even account for the normal increase in stumpage values, ingrowth of small trees into sawtimber, quality increases (grade 1 into veneer), improved species composition, value of trees less than 11.5 DBH, or corrective work.

The total loss suffered by Mr. Carlisle as a result of Matson's violations of the Agreement of Sale and its improper harvesting methods is $16,031,266.80:

| | |
|---|---|
| $10,965,181.20 | Timber unlawfully removed |
| 1,752,804.00 | Damage to timber left standing |
| 3,313,281.60 | Lost future value |
| **$16,031,266.80** | Total |

C.   Matson's Damage Claims.

   1.   Tree Stands

I have located a total of ten tree stands on the Clough Farm (one more than Matson alleges). Most of these stands were placed in trees with no commercial value, or were placed without the use of nails, so as not to damage the trees, or were erected before 1969. I have taken photographs of the trees at issue and have measured the trees. Of these, the only tree with any value damaged since 1969 is one 12" DBH Black Cherry (Volume 94 Bd. Ft. Int. ¼"), with a value of $84.60 assuming a grade 1 log.

2.    Signs on trees

Roadside trees and field edge trees do not produce quality lumber, because of excessive limbs and damage to boles and root systems from road maintenance equipment. Thus, Matson's claim that 96 trees "can no longer be used for veneer resulting in a loss of $16,500.00" because of perimeter signs is nonsense. These trees never had any veneer potential, and never would.

Some of the perimeter trees exhibit nails. However, the nails are grown over, demonstrating that they have been there more than two years (probably at least fifteen or twenty years), and were therefore already there when Matson acquired the timber rights. All signs posted recently were put up with staples that do not penetrate through the bark, and therefore do not cause any damage.

In short, I did not find any damage to any trees from any posting of signs that would have resulted in any veneer log being down-graded. Matson's total loss from all sign posting is exactly $0.00.

3.    Roads

Matson has not demonstrated any actual repair costs in support of this claim. Usually road damage, such as rutting, from off-road vehicles is inexpensive to repair.

Thank you for the opportunity to undertake this interesting study. Please call me if I can provide any additional information.

Respectfully,

James Hall
Consulting Forester

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,                          )
                                             )
              Plaintiff                      )
                                             )
        v.                                   )
                                             )       No. C.A. 04-284 Erie
MATSON LUMBER COMPANY,                       )       Judge Lancaster
MATSON HARDWOODS, INC.,                      )
DORA M. SQUATRITI, individually and          )
as EXECUTRIX OF THE ESTATE OF                )
MARION C. KINKEAD,                           )
                                             )
              Defendants                     )

## AFFIDAVIT OF JAMES HALL

Before me, the undersigned Notary Public, this day, personally appeared James Hall, Consulting Forester, 69 South Main Street, Russell, Pennsylvania 16345, known to me, who being duly sworn according to law, deposes and says that based upon his own personal knowledge, the following statements are true and correct to the best of his knowledge, information and belief:

1. I have been engaged by Albert T. Carlisle, Plaintiff in the above captioned matter to appraise the timber and trees which have come into existence since May 18, 1969 on the Carlisle Farm located in Spring Creek Township, Warren County, Pennsylvania.

2. The Carlisle Farm encompasses approximately 1239.6 acres of land. Of the total acreage, approximately 779 acres are commercial forest land.

3. This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine and various other species.

4. Through good forest management, under the guidance of a professional forester, this area can be a highly productive, healthy and profitable forest.

5. In order to render an complete and accurate assessment of value of the timber and trees which have come into existence since May 28, 1969, I used performed the following:

    A. General overview and boundary line check.

    B. Typed the timber

    C. Took random plots using the following technique(s):

        1. 44 1/10th Acre plots

    D. Collected data regarding:

        1. Species of trees.

        2. Quality of trees.

        3. Quantity of trees.

        4. Diameter Breast High

    E. Referred as needed to the following materials.

        1. Silvah Growth Projection   Exhibit 1

        2. PA Woodlands Timber Market Report - Values 2nd Qtr 2005

        3. Compound Interest Formula.

<u>OPINION OF VALUE</u>

6. I have considered an area of 650 acres of forested land excluding the timber located in waterways.

7. It is my opinion to a reasonable degree of certainty that the present value of the timber and trees on the Carlisle property which have come into existence since May 28, 1969 is

$ 388,050.00.

8.  It is my opinion to a reasonable degree of certainty that the future value of the timber

and trees on the Carlisle property which have come into existence since May 28, 1969 is

$ 3,506,100.00.

James Hall

Subscribed and sworn to before me
this 22nd day of August, 2005

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JAMES RYAN FRYLING, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON NOV. 18, 2007

```
       SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
     STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
    DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.
```

```
OWNER/AGENCY       -- carlisle          DATE TALLIED:      JUL/   5
FOREST/PROPERTY --                      DATE PRINTED:   39/AUG/2005
COUNTY/DISTRICT -- spring creek         FILE: C:\SILVAHV5\sample2.SIL
COMPT - STAND   --                      DEFAULT: SILVAH.DEF
ACRES           --     1.00               TYPE:     ALLEGHENY HARDWOOD
STAND AGE       --   20                    SIZE:     SMALL POLE
SITE            -- UNKNOWN                 DENSITY:  50 TO 80 %
sapling evaluation
```

OVERSTORY CRUISE INFORMATION
----------------------------

Overstory data is from an individual tree tally fixed plot cruise,
using a   .010 acre plot, and with trees tallied by
1 inch dbh classes, heights, and pulp & cull grades only.

Overstory data based on   44. plots;
     0. additional plots needed to reach 15 % of the mean;
    32. additional plots needed to reach 10 % of the mean.

Mean basal area is   48. plus or minus   6. square feet per acre
at 90 % confidence ( 13. % of mean).

UNDERSTORY CRUISE INFORMATION
-----------------------------

Data on advance regeneration, site limits, and understory was not collected.

SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.

FOREST/PROPERTY --                          DATE PRINTED:   19/AUG/2005
COMPT - STAND    --                         FILE: C:\SILVAHV5\sample2.SIL

SIMULATED STAND DEVELOPMENT
---------------------------

| YRS | NO. TREES | BASAL AREA | REL DEN | DIA MER | % CAP | % M&B | % OAK | TOT CDS | PULP CDS | MBF | $ | NET GROWTH | MORT |
|-----|-----------|------------|---------|---------|-------|-------|-------|---------|----------|-----|-----|------------|------|
| 0 | 1150 | 48 | 54 | 8.0 | 35 | 40 | 0 | 3 | 3 | .0 | 6 | | |
| | | | | | | | | | | | | 2.67 | .11 |
| 5 | 1107 | 62 | 63 | 8.5 | 36 | 39 | 0 | 5 | 4 | .3 | 33 | | |
| | | | | | | | | | | | | 2.82 | .13 |
| 10 | 1064 | 76 | 72 | 8.8 | 37 | 37 | 0 | 8 | 6 | .7 | 83 | | |
| | | | | | | | | | | | | 2.93 | .14 |
| 15 | 1022 | 90 | 80 | 9.4 | 39 | 36 | 0 | 11 | 9 | 1.2 | 197 | | |
| | | | | | | | | | | | | 2.51 | .59 |
| 20 | 879 | 103 | 85 | 10.1 | 39 | 35 | 0 | 14 | 12 | 1.8 | 397 | | |
| | | | | | | | | | | | | 2.60 | .46 |
| 25 | 792 | 116 | 90 | 10.9 | 41 | 34 | 0 | 18 | 14 | 2.8 | 731 | | |
| | | | | | | | | | | | | 2.62 | .42 |
| 30 | 726 | 129 | 96 | 11.6 | 42 | 33 | 0 | 22 | 16 | 4.1 | 1281 | | |
| | | | | | | | | | | | | 2.20 | .80 |
| 35 | 613 | 140 | 99 | 12.4 | 43 | 32 | 0 | 25 | 17 | 5.6 | 2093 | | |
| | | | | | | | | | | | | 2.02 | .79 |
| 40 | 532 | 150 | 102 | 13.2 | 44 | 31 | 0 | 29 | 19 | 7.2 | 3058 | | |
| | | | | | | | | | | | | 1.81 | .93 |
| 45 | 469 | 159 | 105 | 14.0 | 45 | 31 | 0 | 32 | 20 | 8.7 | 4155 | | |
| | | | | | | | | | | | | 1.59 | .88 |
| 50 | 418 | 167 | 107 | 14.7 | 45 | 30 | 0 | 35 | 20 | 10.2 | 5394 | | |

*$97/Acre*

*Compound Interest 4.5%*

EXHIBIT
1

Page   3

SILVAH -- SILVICULTURE OF ALLEGHENY HARDWOODS - V5.00
STAND SUMMARY, PRESCRIPTION, AND MANAGEMENT SIMULATOR PROGRAM
DEVELOPED BY THE NORTHEASTERN FOREST EXPERIMENT STATION, IRVINE, PA.

FOREST/PROPERTY --                    DATE PRINTED:   19/AUG/2005
COMPT - STAND   --                    FILE: C:\SILVAHV5\sample2.SIL


SIMULATED PRODUCT YIELD
- - - - - - - - - - - - - - - - - - - - - - -

| YRS | DATE | TOTAL CORDS | PULP CORDS | MBF SAW | $ TOTAL |
|-----|------|-------------|------------|---------|---------|
| INITIAL STAND | | | | | |
| 0 | 5 | 2.8 | 2.8 | .0 | 6. |
| FINAL STAND | | | | | |
| 50 | 55 | 34.9 | 20.4 | 10.2 | 5394. |
| TOTAL YIELD | | 34.9 | 20.4 | 10.2 | 5394. |

May 26, 2006

James R. Fryling, Esquire
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

    RE:   Albert T. Carlisle v. Barzony Hare & Edson, et al
           U.S. District Court for the Western District of PA
           No. 04-025 Erie

Dear Mr. Fryling:

    Please accept this letter as my response to your request for
a supplemental report regarding the Matson timber cutting on the
1,239 acre Clough, now Carlisle, Farm in the 2005-2006 timber
cutting season starting in November, 2005 and being completed in
March, 2006. This reports supplements my May, 1997 report to
Scott Hare in the case of Carlisle against Matson and my October,
2005 report to you summarizing the $437,960 of timber taken in
the 1993-1995 timber cutting seasons.

    From my personal observation and past experience in walking
the Carlisle Farm, reviewing Matson's past timber records and
previous timber sales from timber removed from the Clough Farm, I
can provide the following additional information and opinions not
contained in my previous reports:

    1.    Between November, 2005 and March, 2006, Matson was on
          the property with several timber cutters and two
          skidders.

    2.    Attached as Exhibit "A" is a schematic diagram of the
          Carlisle Farm identifying timber stands #1-16 and
          fields F17-F24.

    3.    During the 2005-2006 cutting in timber stands,
          described in #1, Matson cut timber Stands #2 (26
          acres), #7 (27 acres), #8 (13 acres), #9 (14 acres),
          #10 (60 acres), #15 (249 acres), and possibly more.
          The acreage is the total estimated acreage of the
          stands, not the area of timber cut.

4.  Stand #2 contained high quality cherry, red oak, sugar
    maple, red maple and other quality timber.

5.  Stands #7 and #8 contained high quality cherry, ash and
    red maple.

6.  Stand #9 contained high quality cherry, red maple and
    red oak.

7.  Stand #10 contained high quality cherry, sugar maple
    and red oak.

8.  Stand #15 contained high quality cherry, ash, red oak,
    sugar maple, red maple, yellow poplar and miscellaneous
    species of timber, such as white oak, black oak and
    other oak.

9.  The acreage covered by the stands, referred to in #3,
    above, total 389 acres.

10. The highest quality and most valuable timber taken in
    the 2005-2006 timbering was the high quality cherry cut
    during that time period was in stands #2, #7, #8 and
    #15.

11. One high quality cherry tree had a market value of no
    less than $11,000 to $12,500 because of its value as
    "veneer", as the black cherry on the Carlisle Farm is
    one of the highest quality cherry in the world.

12. It is common knowledge that Warren, Potter and McKean
    Counties have the highest quality black cherry in the
    United States and the world, and that part of the
    Carlisle Farm in the Spring Creek area is considered
    the best quality cherry in these three counties.

13. From stands #2 and #15, it is believed Matson took 100
    to 200, if not more, black cherry trees in the 2005-
    2006 timber season, made reference to above, each
    having a minimum value of $2,000 or more.

Based on the above facts and my personal knowledge and experience in working the Carlisle Farm acreage and my 40 or more years of forestry work experience in Pennsylvania, New York and Ohio, I conclude that Matson removed at least $100,000 to $200,000 of timber in the 2005-2006 timber season. If you would provide Matson's 2005-2006 timbering records, I will be able to provide a more complete report regarding the value of the 2005-2006 Matson timbering of the Clough Farm.

Respectfully,

James Hall

James Hall



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff          :
                                       :
            VS.                        :      NO. 04-25 ERIE
                                       :
BARTONY, HARE & EDSON; SCOTT M.  :
HARE, ESQUIRE; HENRY E. BARTONY,  :
JR., ESQUIRE; and JOHN JOY V.          :
EDSON, ESQUIRE, Defendants             :

A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:
                                  :SS:
COUNTY OF ERIE                    :

        CHRISTINE H. McCLURE, ESQUIRE, being first duly sworn according to law,

deposes and states as follows:

        1.      My name is Christine H. McClure.  I am a lawyer and partner in the Law

Firm of McClure & Miller, 717 State Street, Suite 701, Erie, Pennsylvania 16501.

        2.      I was admitted to the Pennsylvania Bar in 1976.  I attended Chatham

College (B.A., 1973), Villanova University (J.D., 1976).  I am a member of the Erie

County (President, 2002), Pennsylvania and American Bar Associations, Erie County

Bar Foundation (President, 1994 through present).  My legal practice includes general

civil litigation with an emphasis on real estate, estate administration and planning and

municipal law.  Attached hereto is a copy of my C.V.

        3.      From the time of my admission to practice law in 1976 through the present

date, I have been actively involved in representing clients in real estate transactions

including performing, requesting, reviewing and providing professional legal opinions

based on title searches.  I am also familiar with the standard of care required by legal

counsel in representing clients, similarly situated as Albert T. Carlisle, in the timber

litigation involved in the federal declaratory judgment action filed in the U.S. District

Court for the Western District of Pennsylvania and the necessity of that counsel to

obtain a title search and/or, at the very least, to examine the title documents filed in the

Recorder of Deeds Office to ascertain the record owner of the timber.

     4.     Attached is the report dated June 13, 2006 I have prepared regarding my

opinions in the above matter.

     5.     I hold and am prepared to express the opinions contained in these four

reports to a reasonable degree of professional certainty.

 

                                                  CHRISTINE H. McCLURE, ESQUIRE

Sworn to and subscribed before me

this ___ __ day of June, 2006

_____

Notary Public

# CHRISTINE HALL McCLURE
717 State Street, Suite 701
Erie, PA 16501
(814) 453 3681

Professional Experience:

1973 – Present
McClure & Miller LLP
Partner in law firm engaged in general civil practice with an emphasis on real estate, estate administration and planning and municipal law

Education:
B.A. Chatham College
Pittsburgh, Pennsylvania
B.A. in History 1973
Phi Beta Kappa 1972

J.D. Villanova School of Law 1976 (cum laude)
Villanova, Pennsylvania

Legal Activities:
Pennsylvania Bar Association
Board of Governors
1999-2002

House of Delegates
1993-present

Pennsylvania Bar Foundation
Vice President
2005-present

Erie County Bar Association
President 2002
Board of Directors 2000-2003
Board of Directors 1992-1994

Erie County Bar Foundation
President 1994-present

Community Activities:
Penn Attorneys Title Insurance Co.
Board of Directors
2002-2003

Penn Attorneys Title Insurance Co.
Advisory Board
2003-2006

Brevillier Village Foundation, Inc.
Board of Directors
2003-2006

Arts Council of Erie
Board of Directors
2003-present

Chatham College
Board of Trustees
1999-2002

Professional Organizations:
Member:                          American Bar Association
                                 Pennsylvania Bar Association
                                 Erie County Bar Association
                                 Pennsylvania School Boards Association
                                 Pennsylvania State Association of Township Solicitors
                                 Pennsylvania State Association of Borough Solicitors
                                 NSBA Council of School Attorneys

Admissions:                      Supreme Court of Pennsylvania 1976
                                 U.S. Court of Appeals, Third Circuit 1980
                                 U.S. Supreme Court 1981

**MCCLURE & MILLER LLP**
ATTORNEYS AT LAW
707 STATE STREET, SUITE 701
ERIE, PENNSYLVANIA 16501

Daniel L. R. Miller
Eugene J Brew
Edward P. Witteman
Christine Hall McClure
Jeffrey T. Cole
David J. Rhodes

Telephone (814) 453-3681
FAX (814) 454-1554
E-mail: mmcclure@mcclure-miller.com
Herbert J. Johnson, Jr. (of counsel)
Harvey D. McClure (of counsel)

June 13, 2006

Andrew J. Conner, Esquire
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

RE:    Carlisle v. Hare
       Title to Timber on 1,239 acre Clough Farm, Warren County, PA

Dear Mr. Conner:

This letter is my response to your request for me to provide a report regarding the above and

issues involved in this matter including (1) the status of the title to the timber on the Clough Farm in

Warren County in the 1988 through 1995 time period and thereafter through the present; (2) whether

the standard of care for legal counsel representing Carlisle in the federal declaratory judgment action,

#95-0376, required the performance of a title search, or its equivalent, of the title to the Clough Farm

timber; (3) relevant information which would have been provided to counsel from a title search, or its

equivalent, in a trial of the trespass and conversion Counts of the federal declaratory judgment action;

(4) the resulting consequences of not performing a title search, made reference to above; and (5)

whether the 1973 Kinkead to Fisher & Young timber deed was in Carlisle's chain of title or whether

-1-

Carlisle is held to have had "constructive knowledge" of that timber deed after its April 20, 1973 filing and recording in the Office of the Warren County, Pennsylvania, Recorder of Deeds Office.

I.    **DOCUMENTS, DEPOSITIONS TRANSCRIPTS OR EXCERPTS:**

I have reviewed the following documents:

1.    Fisher & Young to Carlisle Articles of Agreement dated May 28, 1969 and recorded January 20, 1970 in Book 361 at Page 32 regarding property sale to Carlisle;

2.    Deed dated January 9, 1970 and recorded January 19, 1970 in Deed Book 361 at Page 13 from Fisher & Young to Carlisle;

3.    Abstract of Carlisle title to the Kinkead property, above;

4.    November 3, 2004 Hare Memorandum to Carlisle regarding "Pennsylvania Farm Timber Rights";

5.    Hare's November, 1994 billing for professional services he would provide regarding his representation of Carlisle;

6.    Deed dated March 27, 1969 and recorded April 22, 1969 from Kinkead to Fisher & Young;

7.    April 1, 1968 Kinkead to Fisher & Young unrecorded timber Articles of Agreement for the Clough Farm having the following conveyancing language "All of the timber and trees standing and down measuring twelve (12) inches or more in diameter, one (1) foot from the ground, on the premises...until April 1, 1978, on or after which date all rights hereunder shall revert to the owner of the land.";

8.  Deed dated April 20, 1973 and recorded April 23, 1973 in Book 376 at Page 939 from Kinkead to Fisher & Young, Inc. deed having the following language "together with right of entry on and over said premises for the purpose of cutting, skidding, piling and removing said timber until April 1, 1978, on or after which date all rights hereunder shall cease and determine, and all remaining timber and trees vest without notice in the Grantor, her heirs and assigns";

9.  May 6, 2003 Squatriti to Matson quit-claim deed;

10.  Excerpts of Lainard Bush's February 3, 2006 deposition;

11.  Excerpts of Albert Carlisle's January 23, 2006 deposition;

12.  Excerpts of John Dennison's February 9, 2006 deposition;

13.  Excerpts of James Hall's February 3, 2006 deposition;

14.  Excerpts of Scott Hare's September 1, 2005 deposition;

15.  Excerpts of John Kookogey's August 16, 2005 deposition;

16.  Excerpts of Lauri Sekerak's February 28, 2006 deposition;

17.  Federal declaratory judgment action Complaint (#95-0376);

18.  December 19, 1997 FRCP 41 Dismissal of Counts V (trespass) and VII (conversion) prior to verdict;

19.  Transcript regarding withdrawal of the conversion Count prior to verdict; and

20.  Original Rule 34 Request for Matson's documents regarding Matson's title to the Clough Farm timber and Matson's Response to Paragraph #4;

21.  Reports of forestry expert, James Hall;

22.    December 19, 1997 verdict slip in case of Carlisle v. Matson Lumber Co.,
       Civil Action 95-376;

23.    Opinion of U.S. District Court of Appeals for the Third Circuit dated
       March 16, 1999;

24.    Copies of 42 Pa C.S.A. 8311 "damages for conversion of timber";

25.    21 P.S. §357 "constructive notice"; 21 P.S. §521, 522, 523; 21 P.S. §351;

26.    Opinion of the United States Court of Appeals for the Third Circuit filed
       June 2, 2006.


## II.    DISCUSSION:

On January 9, 1970, Albert T. Carlisle, by deed recorded January 19, 1970, purchased the
1,239 acre Clough Farm in Springcreek Township, Warren County, Pennsylvania from Fisher &
Young, Inc. for $100,000.00. Carlisle's deed from Fisher & Young had a reservation for standing
Clough Farm timber which provided, in part, "Excepting and reserving from and out of this
conveyance, all of the timber and trees, standing and fallen, situate on the premises above described,
...SUBJECT, however, to right of Buyer to use for its own purposes all trees fallen for more than one
year and all tree tops remaining after logging operations. Together with such rights and subject to
such conditions and terms as contained in agreement between the parties dated May 28, 1969,
incorporated hereby reference and made a part hereof." Neither this reservation nor the same or
similar reservation in the incorporated Articles of Agreement identified the owner of the Clough Farm
timber rights on the 1,239 acres, more than half of which had standing timber.

On March 2, 1969 Marion Kinkead, by deed recorded April 22, 1969, had conveyed for
$25,000.00 the same Clough Farm property, as described in the January 9, 1970 Fisher & Young to

-4-

Carlisle deed. That deed had a reservation for standing timber which provided as follows "Excepting and reserving from out of this conveyance all of the timber and trees, standing and down, situate on the premises above described, with appurtenant rights, as set forth in agreement for the sale of said premises made between the parties hereto on April 1, 1968 and recorded in Deed Book 352 at Page 1135, in fulfillment of which agreement this conveyance is made".  Whereas the Carlisle timber reservation did not identify the Clough Farm timber owner, the Fisher & Young timber reservation did identify Kinkead as the owner of the Clough Farm timber as of April 1, 1968.

On April 1, 1968, Kinkead and Fisher & Young entered into separate Articles of Agreement which provided that for $100,000, Kinkead would transfer to Fisher & Young the Clough Farm timber rights for 10 years, or until April 1, 1978. This Agreement had the following language "All of the timber and trees standing and down measuring twelve (12) inches or more in diameter, one (1) foot from the ground, on the premises here and after described; with the right to enter in said premises and to cut, skid, pile and remove the same, subject to the terms of this agreement, until April 1, 1978, on and after which date all the rights hereunder shall revert to the owner of the land". This Agreement was intentionally not recorded. Before Fisher & Young could exercise the Clough Farm timber rights, it was obligated to pay Kinkead $100,000. This was not done by Fisher & Young until March/April, 1973.  At that time, Fisher & Young was making a sale of timber assets to American Hardwoods, which eventually became Fisher & Young Hardwoods. To convey the Clough Farm timber rights to American Hardwoods, Fisher & Young had to pay Kinkead the $100,000 required by the April 1, 1968 timber Articles of Agreement, which transaction was completed by April, 1973.

After Fisher & Young paid Kinkead the $100,000, Kinkead, by an April 20, 1973 timber deed, transferred to Fisher & Young the Clough Farm timber rights, but only until April 1, 1978. That timber Deed, recorded April 23, 1973 had the following language "Together with the right of

entry on and over said premises for the purpose of cutting, skidding, piling and removing said timber until April 1, 1978, on and after which date all rights hereunder shall cease and determine, and all remaining timber and trees vest without notice in the Grantor, her heirs and assigns". No other property or timber Deed was recorded in Warren County until June 9, 2004, when a quit-claim Deed from Dora M. Squatriti to Matson Lumber Company was recorded. Although Fisher & Young did convey other timber property to American Hardwoods by deed recorded in Warren County, no deed from Fisher & Young to American Hardwoods for the Clough Farm timber was recorded in Warren County.

In 1968 counsel representing Kinkead and Fisher & Young split the Clough Farm property and its timber into separate agreements. The transfer of timber rights to Fisher & Young were limited to ten years, or until April 1, 1978, to avoid either Kinkead or Fisher & Young being obligated to pay the 1% realty transfer tax on the $100,000 consideration. By limiting the transfer of timber rights to 10 years or less and returning the timber rights to the grantor or owner of the property after that time period, no transfer tax was required because the transfer of timber rights for 10 years or less was considered a transfer of personalty, not realty. As a consequence, as of April 1, 1978 Fisher & Young, Fisher & Young Hardwoods and Matson had no Clough Farm timber rights, as those rights belonged either to Kinkead or Carlisle by operation of law.

In 1986, Fisher & Young Hardwoods purported to sell timber rights to Matson. As a consequence of there being no recorded deed from Fisher & Young to Fisher & Young Hardwoods and a consequence of the April 1, 1978 reverter of timber rights in the 1973 Kinkead to Fisher & Young timber Deed, Fisher & Young Hardwoods had no Clough Farm timber rights to sell to Matson. Nonetheless, Attorney John Kookogey, in a Certificate of Title dated December 19, 1986 to Matson, represented that Matson had vested title to certain lands subject to "the timber on the Clough Farm in

Springcreek Township, Warren County, Pennsylvania, the deed for which is being held in escrow as security for payment of the debt of Fisher & Young Hardwoods to Fisher & Young, Inc. and timber on all parcels, the deeds for which are being held in escrow as security pending full payment by Hardwoods of its 1973 obligation to Fisher & Young, Inc.".

In 1988, without conducting any title search on the Clough Farm, Matson commenced timbering the Clough Farm. Matson's timbering operations on the Clough Farm were preceded by a June 30, 1988 letter which stated that "Matson Hardwoods, Inc. is by merger the successor in interest to Fisher & Young Hardwoods, Inc." and that "Fisher & Young Hardwoods, Inc. was the successor to Fisher & Young, Inc." From 1988 through 1994, Matson cut and removed 4 to 7 million board feet worth $3.6 million from the Clough Farm. In November, 1994, Carlisle contacted Scott Hare for legal advice regarding Matson's continuing timber activities on his 1,239 acre farm.

Hare, in 1994 and 1995, knew or could have known, the following as to Carlisle's goals in seeking legal counsel to make a claim against Matson:

1.     There was a requisite undertaking by Hare and a responsibility upon Hare, considering the scope of the duties and responsibilities he assumed in representing Carlisle in his action against Matson to have performed a title search of the Clough Farm property and/or, at the very least, ascertained and discovered the documents which conveyed the Clough Farm timber to Matson so he could properly represent Carlisle with regard to the claims set forth in the 10 Counts in the federal declaratory judgment action as follows:

(a)     the purpose of Carlisle's claim against Matson in the federal declaratory judgment action was "he wanted the timber company to be off his property" and "he wanted his property to be free of timbering operations" (Hare I, p. 52, lines 9-22);

(b)     Carlisle's goal was to keep Matson off the Clough Farm (Hare I, p. 64, line 24 through p. 65, line 5);

(c)     Carlisle wanted to "explore the assertion that all the timber on the property (Clough Farm) should have been conveyed to (Bert Carlisle) . . . any timber harvested (by Matson) constituted money damages to (Carlisle)" (Hare I, p. 72, lines 17-23);

(d)     Part of Hare's responsibility to Carlisle in the federal declaratory judgment action was to determine what timber Carlisle owned and what timber Matson owned (Hare I, p. 91, lines 9-15);

(e)     Hare assumed the responsibility of conducting the required fact investigation to support the claims made in the federal declaratory judgment action (Hare I, p. 93, line 22 through p. 94, line 16);

(f)     Hare knew that Matson took 4 to 7 million board feet or $3.6 million worth of timber off the Clough Farm from 1998 through 2004 (Hare I, p. 118, line 4 through p. 119, line 15); and

(g)     Hare could have known if he asked James Hall that $438,454 or more of timber was taken off the Clough Farm, referred to above, by Matson from 1993 through 1995, and/or within two years of the filing date of the federal declaratory judgment action.

No formal retention agreement or letter was prepared defining Hare's responsibilities in representing Carlisle or, if one was prepared, it cannot be located or produced. Hare prepared a November, 1994 memo to Carlisle outlining a broad range of claims Carlisle had against Matson and proposed a budget of $45,000 to $72,000 to process this litigation, which was informally agreed to by Carlisle. On March 13, 1995, Hare filed and served a 10 Count Complaint against Matson. Those 10 Counts consisted of (I) Breach of Contract (Purchase Option – Action for Specific

Enforcement); (II) Breach of Contract (Purchase Option – Action for Damages); (III) Breach of Contract (Harvesting Timber Outside Scope of Rights); (IV) Breach of Contract (Violations of Restrictions in Agreement of Sale); (V) Trespass; (VI) Accounting/Constructive Trust (Harvesting Timber Outside Scope of Rights); (VII) Conversion (Harvesting Timber Outside Scope of Rights); (VIII) Declaratory Judgment Regarding Scope of Matson's Rights; (IX) Declaratory Judgment Regarding Contents of Exclusionary Map and (X) Preliminary and Permanent Injunctions.

From 1995 through 1997, the parties engaged in discovery and prepared for a jury trial. That trial resulted in a verdict in favor of Carlisle for $110,00 for timber taken by Matson in a "no-cut zone" and established that Matson had a right to trees located on the property in 1969 and that these tree rights did not exist in perpetuity. Prior to trial and not resolved by the December 19, 1997 verdict, Hare withdrew, dismissed or took an FRCP 41 dismissal of Count V - Trespass and Count VII – Conversion of that action.

At no time prior to the December 19, 1997 verdict did Hare read or review documents which conveyed Clough Farm timber from Kinkead to Fisher & Young, previously discussed. He knew or believed Matson's Clough Farm timber rights were derived from Fisher & Young Hardwoods and Fisher & Young, but those documents were never read or obtained by Hare. At no time during the November, 1994 through December, 1997 time period did Hare (1) inspect the property records in the Warren County Court House, (2) request another professional to do this, or (3) request that a title search of the Clough Farm property be conducted. If he had done any of these, he would have known (1) the timber rights of Fisher & Young and, therefore, Matson expired April 1, 1978, (2) Fisher & Young never conveyed its timber by Deed to Fisher & Young Hardwoods, (3) the Clough Farm timber rights, after April 1, 1978, belonged to Kinkead and, with some legal research, became the property of Carlisle no later than 1988, and (4) Matson, in 1988 and after, through the 1997 trial, was

on the Clough Farm timbering (1988 through 1994) as a trespasser and converter, not a licensee, as Hare believed (Hare, p. 86, line 9-13).

Hare's knowledge of the status of the title to the Clough Farm timber, his knowledge as to the location of the Clough Farm timber title documents and rationale for not performing or requesting a title search be conducted while he represented Carlisle from 1994 through June 23, 1988, when he recommended Carlisle file a Praecipe for Writ of Summons to initiate a second action against Matson in Warren County include the following:

(1)     Carlisle had "won" the first action and this allowed Carlisle to file a second action against Matson to recover damages not awarded by the December 19, 1997 verdict (Hall, p. 86, line 16 through p. 87, line 4); after the December 19, 1997 verdict in the federal declaratory judgment action, Hare advised Carlisle he had won, indicating ". . . I don't understand why you're so unhappy, we won. . . this is a first step and sets the stage for what is to come. . ." (Bush, p. 19, lines 22-24).  Hare represented that while the federal declaratory judgment action was limited in scope, the second lawsuit against Matson would allow Carlisle the opportunity to obtain a satisfactory damage award from Matson's pre-December 19, 1997 conduct (Bush, p. 20, lines 2-9);

(2)     Carlisle's second action against Matson had a "$5 million" settlement value (Hare Exhibit "23" p. 5-6; Hare I, p. 208, line 12 through p. 209, line 3); the second action filed in Warren County would provide the means to allow Carlisle to obtain a "home run damage award" against Matson (Hare I, p. 209, lines 16-25);

(3)     There was no legal impediment preventing Carlisle from filing the second action against Matson in Warren County for any claim within the ten Counts of the federal declaratory judgment action which had not been resolved by the December 19, 1997

verdict, providing Carlisle filed the Hare prepared Praecipe for Writ of Summons within one year after the December 19, 1997 federal declaratory judgment action verdict (Hare I, p. 185, lines 10-23 and p. 187, lines 12-20; Hare II, p. 16, line 10 through p. 17, line 9; p. 20, line 13 through p. 22, line 6);

(4)    By filing the second action against Matson, Carlisle could make a claim for every Count or cause of action in the federal declaratory judgment action not resolved by the December 19, 1997 jury verdict (Hare I, p. 185, lines 10-23 and p. 186; Hare I, p. 187, line 6 through p. 187, line 24);

(5)    Carlisle's second action filed on June 23, 1998 in Warren County was timely and not subject to any statute of limitations defense regarding Matson's conduct occurring within two years prior to the March 15, 1995 filing date for the federal declaratory judgment action nor subject to the bar of res judicata if the refiled Counts or claims had not been actually resolved by the December 19, 1997 jury verdict (Hare I, p. 155, line 21 through p. 156, line 5; p. 185, lines 10-23; Hare II, p. 13, line 15 through p. 15, line 3);

(6)    Carlisle's claims against Matson could be divided into two separate lawsuits (Bush Deposition, p. 41, line 3 through p. 44, line 19). The first lawsuit on the federal declaratory judgment action would relate to liability (Bush, p. 41, lines 23-25). The second lawsuit filed in Warren County would present Carlisle's damage claim against Matson (Bush, p. 42, lines 1-7); between December 19, 1997 and June 23, 1998, the value of the dismissed claims to be refiled in Warren were "about $5 million" (Carlisle, p. 153, line 21 through p. 154, line 3; p. 154, lines 20-25);

(7)     In a January, 1998 meeting in Ashtabula, Ohio, Hare represented that the damages
        Carlisle could recover in the second action included property damage and damages for
        Matson's tree cutting (Bush, p. 47, line 15 through p. 48, line 2).  The second lawsuit
        would involve a damage claim for ". . . cutting of trees and property damage" not
        pursued in the federal declaratory judgment action (Bush, p. 49, lines 10-22);

(8)     Hare, prior to the federal declaratory judgment action, represented that he would check
        the property records at the Warren County Court House (Bush, p. 31, line 17 through
        p. 32, line 18).  As there were a lot of "questions surrounding. . . the history of
        ownership. . . one of the things he (Hare) would be doing was going to the Warren
        County Court House and going through all those records so all those questions could
        be answered.  Those involved titles. . ." (Bush, p. 32, lines 10-15).

By not performing a title search, foreseeable adverse consequences resulted.  As a
consequence of not determining the owner of the Clough Farm timber from 1988 through 1994 and
not performing a title search of the Clough Farm, Hare's dismissal of the trespass and conversion
claims also dismissed other claims which Hare knew, or should have known, Carlisle had against
Matson.  These were prima facie claims against Matson in which Matson, as the successor to Fisher &
Young, whose rights expired April 1, 1978, had no defense.  James Hall, the forestry expert, was
provided Matson's timbering records obtained in discovery and, if asked, could have advised Hare
that in 1993 through 1995, Matson took 811,508 board feet worth $438,454, the ownership of which
was not vested in Matson but in Carlisle because by 1993 through 1995, the title to the Clough Farm
timber had become Carlisle's as the owner of the 1,239 acres to which that timber was attached before
it was cut.  Furthermore, the forestry expert has also opined that at a minimum, Matson removed at

least $100,000 to $200,000 of timber in the 2005-2006 timber season, consisting of high quality cherry, red oak, sugar maple, red maple, ash, white oak, black oak and other oak.

As part of his undertaking and agreement to represent Carlisle in the 1995 federal declaratory judgment action and file the 10 Count Complaint, per his November, 1994 memo, and also representing Carlisle with respect to filing the second action in Warren County in which Hare intended to file and process up and until June 23, 1998 when he withdrew from representing Carlisle for non-payment of $15,768.45, (which was paid in 1999), Hare knew the following:

1.   Hare had no prior title search experience as a lawyer (Hare I, p.23, lines 1-19);

2.   Hare never saw the document which conveyed Clough Farm timber rights to Fisher & Young (Hare I, p. 62, lines 19-21);

3.   Hare doesn't know whether Fisher & Young ever paid for these timber rights (Hare I, p. 63, lines 21 through p. 64, line 3);

4.   Hare knew that if Fisher & Young had Clough Farm timber rights, they would be set forth in a document recorded in the Warren County Court House (Hare I, p. 78, lines 11-18);

5.   Hare was never aware of the Kinkead to Fisher & Young timber deed which conveyed Clough Farm timber rights to Kinkead to Fisher & Young (Hare I, p. 134, lines 2-9);

6.   Hare knew a Lauri Sekerak did title searches in Warren and had her phone number (Hare I, p. 98, line 5 through p. 99, line 6; Hare Exhibit #11 and Hare Exhibit #10);

7.   Hare thought Hare Exhibit #5 (Fisher & Young to Carlisle Agreement of Sale of property) (Hare I, p. 78, lines 17-18) constituted document which conveyed Fisher & Young timber rights in Clough Farm timber.

The undertaking and agreement to represent Carlisle against Matson to allow for the recovery of the type of monetary damages Hare represented was available to Carlisle mandated that Hare, prior to the 1997 resolution of the federal declaratory judgment action, perform or cause to be performed a title search of the Clough Farm property to determine whether Matson had any Clough Farm timber rights between 1988 and the December 19, 1997 verdict and, if Matson had rights, what rights it had either to the timber or to be on the Clough Farm property, other than as a trespasser. The failure to comply with the standard of care in performing that title search and otherwise doing the equivalent and determining the owner of the Clough Farm timber between 1988 and 1994, caused Carlisle actual damages and the consequences described in the opinion section of this report.

Carlisle's chain of title to the Clough Farm terminated with his January 9, 1970 property Deed. The 1973 Kinkead to Fisher & Young timber Deed, being recorded 3 years and 3 months after Carlisle's Deed was recorded, is not in his chain of title. Pennsylvania statutory law would consider the 1973 timber Deed an "after" recorded deed and void as to Carlisle. See 21 P.S. 351, 521 and 522. For the same reason Carlisle is not considered to have "constructive knowledge" of that after recorded deed. See 21 P.S. 351 which provides that any deed "shall be adjudged fraudulent and void as to any subsequent bona fide purchaser...without actual or constructive notice unless such deed...shall be recorded...before the recording of the deed...under which the subsequent purchaser...shall claim." See also 21 P.S. §357, which provides that recordation has the legal effect of giving constructive notice to subsequent purchasers of the granting of such rights and/or privileges.

### III.    **OPINIONS:**

Based upon the above described documents that I reviewed, the discussion set forth above, and my thirty years of professional experience with title searching and reviewing title searches, I have and can express the following opinions to a reasonable degree of professional certainty:

1.     Title to the Clough Farm timber from 1978 through present.

On and after April 1, 1978, neither Fisher & Young nor its successors, including Matson, had title to the Clough Farm timber. Those timber rights terminated under the April 20, 1973 Kinkead to Fisher & Young timber deed on April 1, 1978 on and after all timber rights of Fisher & Young "ceased and determined." Between April 1, 1973 and June 20, 2003, when the Squatriti to Matson quit-claim deed was filed, there had been no other timber deed filed and/or recorded which modified the effect of the April 1, 1978 termination of Fisher & Young's timber rights, referred to above. As a consequence Matson, while conducting its 1988 through 1995 timbering operations on the Clough Farm, was a trespasser, not a licensee, as Hare believed. After April 1, 1978, the Clough Farm timber rights reverted to the "Grantor" in the April 20, 1973 deed, which was Kinkead or her estate, not in perpetuity but only for a reasonable period of time. This is because the timber rights conveyed to Fisher & Young, Inc. on April 20, 1973 were "personalty" and not "realty" to avoid the payment of the Pennsylvania realty transfer tax. A reasonable period of time for these timber rights to have been considered the personal property of Kinkead after April 1, 1978 would have been no greater than 10 years, or until April 1, 1988. See Saltonstall v. Little, 90 Pa. 422 (1879); Havens v. Pearson, 334 Pa. 570, 6 A.2d 84 (1939); Strunk v. Morris Run Coal Company, 271 Pa. 148, 114 A. 519 (1921); Bennett v. Vinton Lumber Company, 28 Pa. Super. 495 (1905); Boults v. Mitchell, 15 Pa. 371 (1851). After April 1, 1988, they would have been considered realty and attached to the Carlisle real estate and his property as the owner of the real estate.

The June 20, 2003 Squatriti to Matson quit-claim deed failed to convey any timber rights to Matson for the reason that all timber rights in Kinkead, predecessor to Squatriti, had long expired and she had no timber rights left to convey. This is confirmed in the Inventory and Valuation Form filed in the Estate of Marion C. Kinkead. The Inventory lists no reversionary interest for the timber on the Clough Farm. If a reversionary interest existed in the Estate of Marion C. Kinkead, it should have been listed for purposes of the inventory and computation of the Pennsylvania inheritance tax.

Furthermore, after Fisher & Young, Inc. acquired the timber deed from Marion C. Kinkead by deed dated April 20, 1973, no subsequent timber deed was executed or recorded from Fisher & Young, Inc. to Fisher and Young Hardwoods, Inc. Therefore, when in December of 1986 Matson Hardwoods acquired Fisher and Young Hardwoods, Inc. by merger, Fisher & Young Hardwoods, Inc. had no legal title to the Clough Farm timber to convey to Matson Hardwoods.

2.    Duty to perform a title search and ascertain identity of owner of the Clough Farm timber from 1988 through 1995.

In 1994, Hare, in effect, represented to Carlisle that he would represent him and advance essentially any claim Carlisle had against Matson for its 1988 through 1995 Clough Farm timbering operations available to Carlisle under the controlling law (see Hare's November, 1994 memorandum to Carlisle). Between the date of that 1994 memorandum and the December 19, 1997 verdict, Hare's level of knowledge regarding the ownership of the Clough Farm timber was the following: (1) did not know the identity of the owner of the Clough Farm timber; (b) did not know the document which conveyed timber rights to Fisher & Young, American, Fisher & Young Hardwoods or Matson; (c) knew those timber rights were filed in the Warren County Court House; (d) had never been in the Court House; (e) knew in May, 1997, based on a report from James Hall, that between 1988 and

1997, Matson had cut and removed in excess of 7 million board feet of Clough Farm timber, having a market value in excess of $3.6 million.

Hare, rather than perform or have performed a title search, relied solely on the documents provided him by his client, Carlisle. In such circumstances, and given Carlisle's goals, a prudent attorney would not rely on his/her client to provide all the relevant or controlling instruments. The client may have possession of a recorded document without realizing its significance. Furthermore, Matson was claiming rights derived from other parties which should alert a prudent lawyer that there may have been instruments recorded in the Warren County Courthouse which Carlisle did not and could not be aware of. None of these facts could be established without a title search.

Considering Carlisle's goals, the purposes he hoped to achieve and Hare's agreement and undertaking to advance those goals in the claims against Matson as described in Hare's November, 1994 memorandum to Carlisle, the standard of professional legal care required Hare to perform a title search of the Clough Farm property or, if he was not able, to request a professional title searcher in Warren County to perform that title search. The performance of a title search to identify the owner of any of the timber on the Clough Farm was required by the controlling standard of care for all the reasons set forth in this report.

3.   Consequences of Hare not performing a title search prior to December 19, 1997 verdict.

The immediate consequence of Hare not performing a title search prior to December 19, 1997 was that Hare, prior to the December 19, 1997 verdict, did not know Matson's status on the Clough Farm between 1988 and 1995 when conducting its timbering operations and thereafter between 1995 through the December 19, 1997 verdict and thereafter would be classified as a trespasser and not a

licensee. As a trespasser, Matson would have had no right to be on the Clough Farm at any time on and after 1988 through the present date. Knowing Matson was a trespasser and not a licensee, Hare should have realized, under the controlling law, that the Clough Farm timber, no later than 1993, had become the property of Carlisle. Had a title search been performed, Hare would have known in December, 1997 when he voluntarily dismissed the trespass (Count V) and conversion (Count VII) claims in the federal declaratory judgment action that he was dismissing two Carlisle claims to which Matson did not have the documentary evidence to refute trespass status.

In the federal court action discovery process, Hare requested "all documents reflecting or relating in any way to any transaction whereby you [Matson] purport to have acquired rights to harvest timber on the Clough Farm." (Hare deposition Exhibit 46). Matson replied that "the deed and the agreement are attached to the Complaint." Hare should have known, or from a title search would have known, that this response was not correct.

The failure to perform the title search of the Clough Farm, for the reasons stated above, led to Hare dismissing Counts V and VII. If a title search had been performed and that evidence had been presented in the federal declaratory judgment action, Carlisle would have been entitled to recover for the 1993 through 1995 conversion of his timber by Matson ($437,960), Carlisle would have obtained an adjudication that Matson was a trespasser permanently precluded from re-entry onto the Clough Farm after the December 19, 1997 verdict; Matson would have been precluded from re-entering the Clough Farm after December 19, 1997 through the present date and precluded from cutting and removing the timber taken in the 2005-2006 year as per the Hall report dated May 26, 2006. But for the lack of a title search, Matson would not have obtained the 1969 timber after December 19, 1997 and therefore would not have performed the 2004-2005 timber cutting as defined and valued in the Hall report. As a consequence of the title search not being performed, Matson secured a verdict

giving Matson indeterminate rights to the 1969 timber now and in the future. This is a right Matson would not have obtained had Hare properly understood the status of the title to the timber prior to the December 19, 1997 verdict.

4. Lack of Carlisle's constructive knowledge of the 1973 timber deed from Kinkead to Fisher & Young, Inc.

Albert Carlisle's abstract of title at the time he purchased the Clough Farm on January 9, 1970 did not include the April 20, 1973 deed from Kinkead to Fisher & Young, Inc. for the timber. The Kinkead to Fisher & Young deed was recorded April 23, 1973 in Deed Book 376 at Page 939, three years after Albert Carlisle obtained title to the land.

Albert Carlisle cannot be charged with constructive notice of the recordation of that Kinkead to Fisher & Young, Inc. timber deed. Recording the timber deed did, pursuant to 21 P.S. §357, would provide constructive notice to subsequent purchasers, mortgagors and judgment creditors of the granting of such rights and/or privileges. Albert Carlisle had already completed his transaction three years previously. Conveyancing law does not require an owner to continually check and re-check the status of his/her title once the conveyance is complete.

Sincerely yours,

McClure & Miller LLP

By: *Christine Hall McClure*
Christine Hall McClure, Esq.

CHM/llk

Karen Couse - Carlisel-HareSchaafAff.wpd                                                                    Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff                :

                    VS.                       :        NO. 04-25 ERIE

BARTONY, HARE & EDSON; SCOTT M. :
HARE, ESQUIRE; HENRY E. BARTONY. :
JR., ESQUIRE; and JOHN JOY V.                 :
EDSON, ESQUIRE, Defendants                    :

A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:
                                              :SS:
COUNTY OF ERIE                                :

     WILL J. SCHAAF, ESQUIRE, being first duly sworn according to law, deposes
and states as follows:

     1.     My name is Will J. Schaaf. I am a lawyer and partner in the Law Firm of
Marsh Spaeder Bauer Spaeder & Schaaf, 300 State Street, Suite 300, Erie,
Pennsylvania 16507.

     2.     I was admitted to the Pennsylvania Bar in 1949. I attended Edinboro
State College (B.S., 1942), Cornell University (LL.B. 1948), Phi Delta Phi; Order of the
Coif. Co-Editor-in-Chief, Cornell Law quarterly (1946-48). I am a member of the Erie
County (President, 1973), Pennsylvania and American Bar Associations and a Fellow of
the American College of Trial Lawyers. I was a Captain in the U.S. Army Air Force from
1942 through 1945. My legal practice includes personal injury law, medical malpractice
defense law and insurance law.

3.      From the time of my admission to practice law in 1949 through the present

date, I have been actively involved in representing clients in real estate transactions

including performing, requesting, reviewing and providing professional legal opinions

based on title searches.  I am also familiar with the standard of care required by legal

counsel in representing clients, similarly situated as Albert T. Carlisle, in the timber

litigation involved in the federal declaratory judgment action filed in the U.S. District

Court for the Western District of Pennsylvania and the necessity of that counsel to

obtain a title search and/or, at the very least, to examine the title documents filed in the

Recorder of Deeds Office to ascertain the record owner of the timber.

4.      Attached are the four reports (dated March 24, 2004, April 15, 2004,

August 24, 2004 and June 13, 2006) I have prepared regarding my opinions in the

above matter.

5.      I hold and am prepared to express the opinions contained in these four

reports to a reasonable degree of professional certainty.

WILL J. SCHAAF, ESQUIRE

Sworn to and subscribed before me

this _13th_ day of June, 2006

Notary Public

NOTARIAL SEAL
JOHN B. FESSLER, NOTARY PUBLIC
ERIE, ERIE COUNTY, PENNA.
MY COMMISSION EXPIRES ON MARCH 7, 2010

2



**MARSH**
**SPAEDER**
**BAUR**
**SPAEDER**
**& SCHAAF**
ATTORNEYS AT LAW
LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS M. LENT
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

March 24, 2004

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked me for an opinion on the merit of the malpractice claims asserted against Bartony, Hare & Edson, et al. as C.A. 04-25 Erie.

I have reviewed the deeds from Marion C. Kinkead (hereinafter "Kinkead") to Fisher & Young, Inc., the Fisher & Young, Inc. deed to Albert T. Carlisle (hereinafter "Carlisle"), the pleadings in the United States District Court for the Western District of Pennsylvania and in the Court of Common Pleas of Warren County.

I am convinced that unhappily there was conduct below the standard of care on the part of the attorneys representing Albert T. Carlisle consisting of the following:

1.    **Failure to Examine the Title of the Premises.** This would have revealed that Matson Lumber Co. and Matson Hardwoods, Inc. (hereinafter "Matson"), the successors in title to the rights of Fisher & Young, Inc., had after April 1, 1978 <u>absolutely no rights whatsoever</u> and were mere trespassers on the lands of Carlisle. An examination of title would have demonstrated that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there was recorded an Article of Agreement from Kinkead to Matson and Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above-described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP
March 24, 2004
Page 2

Agreement specifically provided that it terminated April 1, 1978 and the statement is that "all the rights hereunder shall revert to the owner of the land." It is my opinion to a reasonable degree of legal certainty that the failure to conduct a title exam of the premises to determine the relative rights of the parties involved in the litigation is conduct that fell below the appropriate standard of care.

2.     **The Dropping of the Trespass Count.**  In my opinion, it was also below the standard of care to have withdrawn the trespass count. Carlisle from April 1, 1978 had a trespasser on his land with no more rights to cut timber than the man on the street. In the course of cutting, the expert, James Hall, was prepared to testify that "damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded and have reduced commercial value or no commercial value at all." Excessive and unnecessary roads were built. Matson made poor use of the trees they felled and abandoned valuable cut material to decay. Thus, he then gives five examples of the reckless conduct of Matson which would be encompassed in the trespass claim: (1) trees removed up to the banks of spring creek (admittedly, that was covered in the federal case); (2) no respect for residual trees, felling damage, skidding damage, dozer damage and chainsaw damage is evidence everywhere; (3) wasteful logging practice; (4) no respect for trees and springs; (5) no evidence of any sound forest management plans. Although the trespass claim was withdrawn pursuant to Federal Rule of Civil Procedure 41(a) without prejudice, the effort of voluntarily withdrawing the claims after the running of the statute of limitations effectively barred Carlisle's ability to re-file the trespass claims.

The voluntary withdrawal of the claims without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care.

Under the trespass count which was dropped, the damage to the property by installation of roads and landings was approximately $126,000.00 and the damage to the streambanks was approximately $100,000.00.

Very truly yours,

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP

By_____   Will J. Schaaf

WJS/jc



**MARSH SPAEDER BAUR SPAEDER & SCHAAF**

ATTORNEYS AT LAW

LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS M. LENT
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

April 15, 2004

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked me for an opinion on the merits of the malpractice claims asserted against Bartony Hare & Edson, et al. at C.A. 04-25 Erie.

I have reviewed the deeds from Marion C. Kinkead (hereinafter "Kinkead") to Fisher & Young, Inc., the Fisher & Young, Inc. deed to Albert T. Carlisle (hereinafter "Carlisle"), the pleadings in the United States District Court for the Western District of Pennsylvania and in the Court of Common Pleas of Warren County.

I am convinced that, unhappily, there was conduct below the standard of care on the part of the attorneys representing Albert T. Carlisle consisting of the following:

1.    **Failure to Examine the Title of the Premises.**  This would have revealed that Matson Lumber Company and Matson Hardwoods, Inc. (hereinafter "Matson"), the successors in title to the rights of Fisher & Young, Inc., had after April 1, 1978 <u>absolutely no rights whatsoever</u> and were mere trespassers on the lands of Carlisle. An examination of title would have demonstrated that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there was recorded an Article of Agreement from Kinkead to Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above-described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP
April 15, 2004
Page 2

Agreement specifically provided that it terminated April 1, 1978 and the statement is that "all the rights hereunder shall revert to the owner of the land." It is my opinion to a reasonable degree of legal certainty that the failure to conduct a title exam of the premises to determine the relative rights of the parties involved in the litigation is conduct that fell below the appropriate standard of care.

2.     **The Dropping of the Trespass Count.** In my opinion, it was also below the standard of care to have withdrawn the trespass count. Carlisle from April 1, 1978 had a trespasser on his land with no more rights to cut timber than the man on the street. In the course of cutting, the expert, James Hall, was prepared to testify that "damages from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded and have reduced commercial value or no commercial value at all." Excessive and unnecessary roads were built. Matson made poor use of the trees they felled and abandoned valuable cut material to decay. Thus, he then gives five examples of the reckless conduct of Matson which would be encompassed in the trespass claim: (1) trees removed up to the banks of spring creek (admittedly, that was covered in the federal case); (2) no respect for residual trees, felling damage, skidding damage, dozer damage and chainsaw damage is evidence everywhere; (3) wasteful logging practice; (4) no respect for trees and springs; (5) no evidence of any sound forest management plans. Although the trespass claim was withdrawn pursuant to Federal Rule of Civil Procedure 41(a) without prejudice, the effect of voluntarily withdrawing the claims after the running of the statute of limitations effectively barred Carlisle's ability to re-file the trespass claims.

The voluntary withdrawal of the claims without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care.

If the relevant proof that Matson, on and after April 1, 1978, was on the property as a trespasser had been offered into evidence in the federal action and the withdrawn trespass claim had been pursued to verdict, there was a substantial probability that Carlisle would have made a recovery for damages in the federal action for injury to his property. In addition, his counsel's failure to protect the statute of limitations foreclosed Carlisle from making a recovery of the property damages caused by Matson as a trespasser on this property prior to the March, 1995 filing, and subjected Carlisle to new and additional defenses in any subsequently filed action that otherwise were unavailable to Matson in the federal litigation.

Very truly yours,

MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP

By _____
                Will J. Schaaf

WJS/jc



MARSH
SPAEDER
BAUR
SPAEDER
& SCHAAF
ATTORNEYS AT LAW

LIMITED LIABILITY PARTNERSHIP

WILL J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
THOMAS W. LENT
JOHN B. FESSLER
JEFFREY C. SCIBETTA
EUGENE C. SUNDBERG, JR.

DONALD F. FESSLER, JR.
KURT L. SUNDBERG

ANTHONY R. HIMES
ANDREW M. SCHMIDT

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

August 24, 2004

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Dear Messrs. Conner and Fryling:

You have asked for an opinion regarding whether Matson Lumber Company and Matson Hardwoods, Inc. (herein after "Matson") has any rights in the timber on the Clough Farm owned by Albert T. Carlisle.

I have reviewed the relevant deeds from Marion C. Kinkead (herein after "Kinkead") to Fisher & Young, Inc.; the Fisher & Young, Inc. deed to Albert T. Carlisle, the pleadings in the United States District Court for the Western District of Pennsylvania in the action of <u>Carlisle v. Matson</u>, No. 95-0376 E, and in the Court for Common Pleas of Warren County.

An examination of the title of the premises reveals that Matson Lumber Company and Matson Hardwoods, Inc., the successors in title to the rights of Fisher & Young, Inc. had after April 1, 1978 <u>absolutely no rights whatsoever</u> in any timber and trees and Matson was a trespasser on the lands of Carlisle.

The title examination reveals that in Warren County Deed Book 352, Page 1135, dated April 1, 1968, there is recorded an Article of Agreement from Kinkead to Fisher & Young, Inc. "excepting and reserving from and out of this conveyance all of the timber and trees standing and down situate on the premises above described with a full right of entry for the purpose of cutting, skidding, piling and removing the same and for constructing roadways and skidways, sawmills and piling yards for such purposes." Next, we see Articles of Agreement dated April 1, 1968 conveying all timber and trees standing and down measuring 12" or more in diameter one foot from the ground with right of entry, etc. However, that Agreement specifically provided that it terminated on April 1, 1978 with the statement "all the rights hereunder shall revert to the owner of the land." A confirmatory Timber Deed dated April 20, 1973 from Kinkead to Fisher & Young, Inc. again recited that all timber rights terminated on April 1, 1978.

I have also reviewed the Quit Claim Deed from Dora M. Squatriti, individually and as Executrix under the Last Will and Testament of Marion C. Kinkead to Matson dated May 6, 2003 and recorded in the Recorder of Deeds office of Warren County, Pennsylvania on June 9, 2004. Whatever rights Matson obtained from Dora M. Squatriti commenced on June 9, 2004. However, the residual timber rights; not being exercised between 1978 and 2004 expired; prior to the date of this quit claim deed because of the failure to exercise those rights in a reasonable time.

It is my opinion to a reasonable degree of legal certainty that the examination of the title records at the Warren County Courthouse reveals that "Matson" has no rights and had no rights from 1978, in any timber or trees on the Clough Farm.

Very truly yours,

MARSH SPAEDER BAUR SPAEDER & SCHAAF

By _____

Will J. Schaaf



WILI J. SCHAAF
RITCHIE T. MARSH
WILLIAM J. SCHAAF
JAMES E. MARSH, JR.
JOHN P. EPPINGER
THOMAS E. KUHN
MICHAEL G. NELSON
JOHN B. FESSLER
JEFFREY D. SCIBETTA
EUGENE C. SUNDBERG, JR.
DONALD F. FESSLER, JR.

MARSH
SPAEDER
BAUR
SPAEDER
& SCHAAF
ATTORNEYS AT LAW
LIMITED LIABILITY PARTNERSHIP

SUITE 300, 300 STATE STREET
ERIE, PA 16507
(814) 456-5301
FAX: (814) 456-1112

www.marshspaeder.com

KURT L. SUNDBERG
JOSEPH B. SPERO
ANTHONY R. HIMES
ANDREW M. SCHMIDT

RITCHIE T. MARSH (1870-1947)
JAMES E. MARSH (1908-1988)
ROBERT N. SPAEDER (1915-1993)
JOHN A. SPAEDER (1902-1994)
BYRON A. BAUR (1906-2002)

June 13, 2006

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P. O. Box 860
Erie, PA 16512-0860

Re:    Albert T. Carlisle v. Bartony Hare & Edson, et al.
       U.S. District Court for the Western District of Pennsylvania 04-25 Erie

Dear Messrs. Conner and Fryling:

You have asked me for a supplemental report and opinion in the above case concerning the voluntary dismissal for the conversion claim in Count VIII of the 1995 action of <u>Carlisle v. Matson</u> and other issues not addressed in my three previous reports regarding Carlisle's claim made reference to above.

### Conversion Claim

As with the trespass count, in my opinion, to a reasonable degree of certainty, it was below the standard of care for Bartony Hare & Edson, et al. to have withdrawn the conversion claim. Because Matson was a mere trespasser without any ownership interest in the timber or trees, any cutting and removing of the trees was a conversion of Carlisle's property by Matson. A claim for conversion could properly be maintained by Carlisle anytime Matson cut and removed timber under either a statutory claim for conversion and a common-law claim for conversion. Conversion under Pennsylvania law is the deprivation of another's chattel, or other interference therewith, without the owner's consent and without lawful justification. <u>Stevenson v. Economy Bank of Ambridge</u>, 413 Pa. 442, 197 A.2d 721 (1964).

After April 17, 1994, Carlisle could properly maintain the statutory claim for damages in actions for conversion of timber under 42 Pa.C.S.A. § 8311.

**Marsh Spaeder Baur Spaeder & Schaaf, LLP**
Andrew J. Conner, Esq. and James R. Fryling, Esq.
June 13, 2006
Page 2

Plaintiff's expert, James Hall, could have been prepared to testify at trial that the value of the timber converted by Matson Lumber Company from March, 1993 until trial was valued at $438,454, representing the fair market value of the timber converted. (Exhibit 1.)

The voluntary withdrawal of the conversion claim without having protected the statute of limitations to first preserve those claims was conduct that fell below the appropriate standard of care. If the relevant proof that Matson, on and after April 1, 1978, was on the property as a trespasser and that Carlisle was the owner of the timber had been offered into evidence and the 1995 federal action and the withdrawing conversion claim had been pursued to verdict, there was a substantial probability that Carlisle would have made a recovery for damages in the federal action for conversion of his timber. In addition, his counsel's failure to protect the statute of limitations foreclose Carlisle from enjoining Matson from further cutting and subjected Carlisle to new and additional defenses in any subsequently filed action that otherwise were unavailable to Matson in the federal litigation.

<u>Title and Chain of Title Questions</u>

In the course of my practice, I have reviewed and certified title to thousands of real estate titles. A purchaser's "chain of title" includes only those records of title which have been duly recorded in the appropriate office of the county in which the property is situate. A deed recorded after the purchaser takes title is not part of his chain of title as it was not known nor could it be known by a review of the county records. If the purchaser does not have actual notice of an unrecorded deed, that deed is void and fraudulent as by virtue of statute. See 21 Pa.C.S.A. § 521, 21 P.S. § 351, 357.

A purchaser can only have constructive notice of a <u>prior</u> recorded instrument. 21 P.S. § 357 (constructive notice as a result of recordation); 21 P.S. § 522 (deeds to be recorded; effect; evidence)("...deeds)(timber)...recorded...in the county where such land is located...and when so recorded are notice to subsequent purchasers..."); 21 P.S. § 357 (constructive notice as a result of recordation).

In this matter, the 1973 Timber Deed from Marion C. Kinkead to Fisher & Young, Inc. does not and could not appear in Carlisle's "chain of title" because it was neither created nor recorded until April 1, 1973, three years after Carlisle purchased the property on January 9, 1970 when his chain of title ended. There has been no determination as of this date to which I am aware of that Carlisle ever had "actual notice" of the unrecorded articles of agreement between Marion C. Kinkead and Fisher & Young, Inc. regarding the timber prior to January 9, 1970 when he purchased his property. I have reviewed the Lauri Sekerak title abstract for the Carlisle Farm (Exhibit 2). The

**Marsh Spaeder Baur Spaeder & Schaaf, LLP**
Andrew J. Conner, Esq. and James R. Fryling, Esq.
June 13, 2006
Page 3


Carlisle chain of title contains no timber deeds out of the property prior to Carlisle's purchase.

     Very truly yours,

     **MARSH SPAEDER BAUR SPAEDER & SCHAAF, LLP**


   By                            
       Will J. Schaaf

WJS:kc
enclosures

1/15/2004

| Species | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Red Oak | 93,770 | 484.22 | $ 45,405.31 | 107,613 | 648.94 | $ 69,834.36 | 233,174 | 795.62 | $ 185,751.07 |
| White Oak | 4,322 | 337.96 | $ 1,460.66 | 1,535 | 343.64 | $ 527.49 | 3,532 | 367.84 | $ 1,369.20 |
| Other Oak | 196 | 367.76 | $ 72.06 | 792 | 323.76 | $ 23.31 | 1956 | 364.94 | $ 430.37 |
| Blk Cherry | 108,738 | 717.10 | $ 77,974.58 | 43,334 | 1012.46 | $ 43,873.94 | 49,300 | 1341.90 | $ 66,155.67 |
| Ash | 159,859 | 286.84 | $ 45,853.96 | 71,223 | 347.90 | $ 24,778.48 | 43,401 | 407.54 | $ 17,687.64 |
| Sugar Mapl. | 70,142 | 147.68 | $ 10,358.57 | 41,841 | 252.78 | $ 11,907.44 | 52,843 | 318.06 | $ 16,808.30 |
| Red Maple | 73,006 | 97.86 | $ 7,153.13 | 43,549 | 167.56 | $ 7,297.07 | 55,000 | 200.22 | $ 11,012.10 |
| Tulip Poplar | 52,801 | 85.20 | $ 4,498.64 | 51,354 | 134.90 | $ 6,827.65 | 58,419 | 161.88 | $ 9,456.77 |
| Birch | 1,110 | 55.38 | $ 61.47 | 504 | 80.94 | $ 40.79 | 532 | 93.72 | $ 49.86 |
| Beech | 60,632 | 55.38 | $ 3,357.80 | 21,345 | 80.94 | $ 1,727.86 | 18,602 | 93.72 | $ 1,837.10 |
| Gum | 222 | 55.38 | 12.29 | | | | | | |
| Basswood | 13,448 | 55.38 | 744.75 | 15,559 | 80.94 | 1,259.34 | 14,801 | 93.72 | 1,357.15 |
| Hickory | 1,227 | 55.38 | 67.95 | 691 | 80.94 | 55.93 | 373 | 93.72 | 34.96 |
| White Pine | | | | | | | 2,869 | 61.06 | 175.18 |
| Hemlock | 6600 | 49.7 | 332.49 | 2798 | 56.8 | 158.81 | 2090 | 61.06 | 127.61 |
| Misc. | 810 | 55.38 | 44.86 | 13,284 | 80.94 | 1,073.58 | 1,854 | 93.72 | 173.76 |
| Total | 646,971 | | $ 197,398.54 | 415,400 | | $ 168,588.87 | 539,746 | | $ 312,456.74 |



EXHIBIT "1"

1/15/2004

| Species | | | |
|---|---|---|---|
| Red Oak | 32,977 | $ 670.24 | $ 25,453.70 |
| White Oak | 3,888 | 352.16 | $ 1,369.20 |
| Other Oak | 1347 | 319.50 | $ 430.37 |
| Blk.Cherry | 48,833 | 1195.64 | $ 58,506.25 |
| Ash | 33,286 | 447.30 | $ 14,888.83 |
| Sugar Mapl. | 43,993 | 318.08 | $ 13,993.29 |
| Red Maple | 45,789 | 191.70 | $ 2,859.01 |
| Tulip Poplar | 14,914 | 231.48 | $ 3,451.99 |
| Birch | 1,092 | 109.34 | $ 119.40 |
| Beech | 26,060 | 109.34 | $ 2,849.40 |
| Gum | 106 | 109.34 | $ 11.59 |
| Basswood | 10,725 | 109.34 | $ 1,172.67 |
| Hickory | 5,897 | 109.34 | $ 644.78 |
| White Pine | 930 | 76.68 | $ 71.31 |
| Hemlock | 737 | 76.68 | $ 56.51 |
| Misc. | 1,088 | 109.34 | $ 118.98 |
| Total | 271,762 | | $ 125,997.26 |

EXHIBIT

" 2 "

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYLVANIA

ALBERT T. CARLISLE, Plaintiff       :

                          :

VS.                    :      NO. 04-25 ERIE

                          :

BARTONY, HARE & EDSON; SCOTT M. :
HARE, ESQUIRE; HENRY E. BARTONY, :
JR., ESQUIRE; and JOHN JOY V.      :
EDSON, ESQUIRE, Defendants       :

### A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA:

                          : SS:

COUNTY OF ERIE                 :

     EDWARD SEKERAK, being first duly sworn according to law, deposes and states as follows:

     1. My name is Edward Sekerak. I am a real estate appraiser and the principal of Sekerak Realty, maintaining a professional office at 1050 East Columbus Avenue, Corry, Pennsylvania.

     2. Attached hereto as Exhibit "A" is a summary of my professional credentials to act in the capacity of a real estate agent and real estate appraiser.

     3. Attached hereto as Exhibit "B" is a copy of my June 14, 2006, letter setting forth opinions regarding the reduction in market value of a portion of the Clough Farm owned by Albert T. Carlisle in Spring Township, Warren County, Pennsylvania, adversely impacted by Matson Lumber's claim to "1969" timber.

                                       _____
                                       EDWARD SEKERAK

Sworn to and subscribed before me
this 14th day of June, 2006

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Buffy M. Dunham, Notary Public
City of Warren, Warren County
My Commission Expires Nov. 20, 2007

Member, Pennsylvania Association of Notaries

### EDWARD G. SEKERAK

---

**Sekerak Realty**
**Certified General Appraiser**
**1050 E. Columbus Avenue - Corry, PA 16407**
**(814) 664-3054 - FAX 664-3648**

## REAL ESTATE EXPERIENCE

1990 - Present    *SEKERAK REALTY*, Corry Pennsylvania.
Edward G. Sekerak, Broker-Owner

1984 - 1990    *SIMMONS REALTY*, Corry Pennsylvania.
Sales Person, Associate Broker

## APPRAISAL EDUCATION

2001  Appraising Manufactured Housing – Appraisal Institute Course
2000  Reassessment Procedures – Appraisal Institute Course
1999  FHA Exam Prep and Guidelines – Appraisal Institute Course
1997  Raw Land Conversion to Sub-division – Appraisal Institute Course
1994  Dairy Facility Valuation, Rochester MN - Sponsored by ASFMRA
1994  A-5, Administrative Review of Appraisals, Hagerstown MD - Sponsored by ASFMRA
1994  A-12, Uniform Standards of Professional Appraisal Practice - Sponsored by ASFMRA
1994  A-12, ASFMRA Code of Ethics, Hudson NY - Sponsored by ASFMRA
1994  Understanding Limited Appraisals & Appraisal Reporting Options - Appraisal Institute Course
1993  FIRREA Seminar, Pittsburgh PA
1993  Mandatory Continuing Education - Polley Associates
1993  New Uniform Residential Appraisal Report - Appraisal Institute
1992  Appraisal reporting of Complex Residential Properties - Appraisal Institute
1992  Uniform Standard of Professional Appraisal Practice, Part B - Appraisal Institute
1991  Commercial, Industrial Real Estate Cost Approach - Marshall & Swift.
1991  Uniform Standard of Professional Appraisal Practice, Part A - Appraisal Institute
1990  SREA 102, Applied Residential Property Valuation - Society of Real Estate Appraisers
1989  SREA, Professional Practice Seminar - Society of Real Estate Appraisers, Cleveland OH
1988  Uniform Real Estate Appraisal Report Seminar – American Association of Certified Appraisers
1987  Real Estate Appraising I - Polley Associates

## REAL ESTATE EDUCATION
1993  Fair Housing and Sales, M.C.E. Erie PA - Polley Associates
1989  Real Estate Investment - Pennsylvania State University
1989  Real Estate Property Management - Polley Associates
1988  Real Estate Law I - Polley Associates
1988  Real Estate Sales - Polley Associates
1987  Real Estate Finance - Mercyhurst College

## REAL ESTATE LICENSES
1994  Certified General Appraiser - New York State #: 46000021363
1992  Certified General Appraiser - Pennsylvania #: GA-000624-L
1990  Real Estate Broker's License Issued
1989  Real Estate Associate Broker License Issued
1984  Real Estate Salesperson License Issued

Edward G. Sekerak
Page 2

## PROFESSIONAL ORGANIZATIONS

Candidate Member, Appraisal Institute
Member, The Foundation of Real Estate Appraisers

Member, Pennsylvania Appraisal Council
Member, American Society of Farm
    Managers & Rural Appraisers

## MISCELLANEOUS

2001  Appointed to Columbus Township Sewer Authority (Vice Chairman)
2000  Appointed to Warren County Board of Assessment & Revision of Taxes
1999  Elected President of Corry Area Chamber of Commerce
1998  Appointed to VA Fee Appraiser Panel in Western Pennsylvania
1990  Appointed to Warren County Prison Site Advisory Committee
1988  Appointed to Columbus Township Planning Commission
1988  GRI Designation Received, PA Realtors Institute

## OTHER EXPERIENCE

1983 – 2000        *SEKERAK LIVESTOCK*, Corry PA
                    Assist with the management of a 500 acre family farm. Dairy Cattle buyer
                    in Eastern US and Canada.

1981 – 1985         *RONALD J. GILLIGAN*, Pennsylvania Furnace PA
                    Apprentice Auctioneer/Auctioneer.
                    Livestock, farm and estate auction sales.

## OTHER EDUCATION

1987  Pennsylvania State University, Principles of Gas Well Drilling
1983  Graduated Pennsylvania State University, B.S./Animal Production
1980  Mendenhall's School of Auctioneering, High Point NC

## CLIENTS SERVED

National City Bank
First National Bank
Lenders Service Inc.

PNC Bank
Northwest Savings Bank
Several Attorney's (divorce, bankruptcy & condemnation)

## EXPERIENCE

Commercial, Residential, Farm and Land Appraisals in Pennsylvania, New York and West Virginia.

Edward G. Sekerak

Sekerak Realty
1050 E. Columbus Avenue
Corry, PA 16407

June 14, 2006

Andrew J Conner, Esquire
Conner Riley & Fryling
17 West Tenth Street
P. O. Box 860
Erie, PA 16512-0860

**RE:  Carlisle (Clough Farm)**
**CY-6-853 & CY-6-853-1**

Dear Mr. Conner:

This letter is in response to your request for a preliminary report from me regarding the valuation of the impact on the acreage of the "Clough Farm" which is the commercial timber acreage where the trees which are considered the "1969 trees" are located.  I have reviewed the May 26, 2006, report of James Hall, the forester, which describes the timber on that property and the attached map of the entire property.  You have advised that as of the present date, Matson Lumber Company has the right in the future to return to the "Clough Farm" to remove the pre-1969 or 1969 timber at any time in the foreseeable future.  Along with the right, I reasonably assume that the right to remove timber includes the right to enter on and over the subject property for the purpose of cutting, skidding, piling and removing said timber uninterrupted.

I am personally familiar with the "Clough Farm."  It is located in western Warren County and is close to my home and office.  In the past, I have been on the subject property and have recently viewed subject property from roadside.  In addition, I have reviewed current Warren County tax assessment records including the agricultural use value soil tally computation, USGS topographical maps, aerial photos and the Soil Survey of Warren County produced by USDA.  As a consequence of my 23 years of real estate sales and appraisal experience, I am familiar with sales of property similar to the described 779 acres of commercial timberland and have completed appraisal reports for several clients of similar or comparable timberland.  My customary practice is to provide a land appraisal report exclusive of the value of the marketable timber and rely or have the client rely on a separate timber appraisal for the value of marketable or standing timber.  I am also familiar with past sales of comparable properties to the Pennsylvania Game Commission and private owners of acreage similar to the 779 acres of commercial timberland for the *Highest and Best* Use being hunting rights or recreational use.  It is my opinion that the value of the 779 acres of commercial timberland on the "Clough Farm" exclusive of the value of the marketable timber is in the range of $800 to $1,000 per acre.  This results in a fair market value of the 779 acres in the range of $623,200 to $779,000.  Considering Matson Lumber now has the indeterminate right to return to the property and

remove the remaining "1969 timber," it significantly limits the use of this property. The *Highest and Best Use* of this acreage is for recreational or hunting rights. Previous land sales indicate the range of value for this type of acreage is $400 to $500 per acre exclusive of the value of the remaining "1969 timber." This results in a market value of the 779 acres at the present time of $311,600 to $389,500.

Based on the above, Matson Lumber having the indeterminate right to remove the "1969 timber" has caused a reduction in value of $311,600 to $389,500. As part of this preliminary review, I have not attempted to estimate the adverse impact, if any, on the remaining acreage of the "Clough Farm" including the open fields or buildings on the approximately 460 remaining acres.

The opinions expressed in this preliminary review are being expressed to a reasonable degree of professional certainty. This letter is not intended to be in itself an appraisal report  The intent of this letter is to convey the preliminary findings per your request. I currently retain within my files the previously noted information sources (ie. Maps, aerial photos, tax assessment record cards, etc.). Also, please note that I have relied upon previous sales data contained in similar appraisal reports of similar properties and general sales data retained within my office. When and if you require a formal and complete appraisal report, please advise.

Very truly yours,

Edward G. Sekerak
State Certified General Appraiser
Pennsylvania #GA-000624-L
New York #460000040335

EGS:pas

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff        )
                                     )
        VS.                          )    NO. 04-25 ERIE
                                     )
                                     )
BARTONY, HARE & EDSON; SCOTT M.      )
HARE, ESQUIRE; HENRY E. BARTONY,     )
JR., ESQUIRE; and JOHN JOY V.        )
EDSON, ESQUIRE, Defendants           )

## AFFIDAVIT OF LAURI L. SEKERAK

COMMONWEALTH OF PENNSYLVANIA        )
COUNTY OF WARREN                     )

        Lauri L. Sekerak, being first duly sworn according to law, deposes and states the

following:

        1.      My name is Lauri L. Sekerak.  I am and have been in the business of

performing title searches and abstracts of title to real property located in Warren County,

Pennsylvania since 1985.

        2.      The name of my business is REM Abstract Services.

        3.      I have personal knowledge of the Albert T. Carlisle parcel of land located in

Spring Creek Township, Warren County, Pennsylvania.

        4.      I have prepared a title search and abstract of the Carlisle Farm.  A copy of

which is attached to my deposition transcript in this case of February 26, 2006 as Exhibit

#8.

5.    Had I been asked to perform a title search and prepare a title abstract of the Carlisle Farm, formerly known as the "Clough" farm in or about 1995, the cost of the title search and abstract of title would be in the range of $75.00-$100.00.

Lauri L. Sekerak

Commonwealth of Pennsylvania    )
County of Warren                )    SS

On this, the 14th day of June, 2006 before me, personally appeared Lauri L. Sekerak, the same person described in and who executed the within affidavit and she acknowledged to me that she voluntarily executed this affidavit.

Notary Public

_____
My Commission Expires

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Betty M. Durham, Notary Public
City of Warren, Warren County
My Commission Expires Nov. 20, 2007
Member, Pennsylvania Association of Notaries

From Sukolski Exh #10

IN THE COURT OF COMMON PLEAS
OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
CIVIL

ALBERT T. CARLISLE,

       Plaintiff

       v.

MATSON LUMBER COMPANY and
MATSON HARDWOODS, INC.,

       Defendants

No. 353 of 1998



## MEMORANDUM OPINION

     This case is presently before the Court for resolution on numerous cross motions for partial summary judgment. Each motion has been thoroughly argued and briefed.

     Plaintiff Albert Carlisle, an Ohio resident, owns a tract of land in Spring Creek Township, Warren County, Pennsylvania, consisting of approximately 1200 acres, often referred to as the Clough Farm. Defendants Matson Hardwoods, Inc. and Matson Lumber are successors-in-interest to Fisher & Young Lumber Co., a lumber company that sold the property to Plaintiff. Both Matson defendants are hereinafter collectively referred to as Matson.

     Plaintiff purchased this property in 1969 for $100,000 for the purpose of enabling the Boy Scouts of America to build an adventure camp, although that purpose was not realized. In the May 28, 1969 agreement of sale, the seller of the property, a lumber company named Fisher & Young, Inc., reserved timber rights to the property:

       EXCEPTING and RESERVING from and out of this conveyance, all of the
       timber and trees, standing and fallen, situate on the premises above
       described, with full right of ingress, egress and regress for purposes of
       cutting, skidding, piling and removing the same, constructing roadways and
       skidways, and piling yards for such purposes, being subject to other terms
       relative thereto herein set forth below. SUBJECT, however, to right of
       Buyer (Carlisle) to use for its own purposes all trees fallen for more than
       one year and all treetops remaining after logging operations.

1

This language was also included in the deed dated January 9, 1970, and ultimately filed in the Recorder's Office of Warren County. Despite the reservation of timber rights to the property, Matson's predecessor in interest, Fisher and Young, did not conduct logging operations on the Clough Farm. However, commencing on November 18, 1988 and continuing until March 21, 1998, Matson logged portions of Plaintiff's property.

Plaintiff brought suit against Defendants on March 13, 1995 in federal district court ✗ on the basis of diversity jurisdiction. *Albert T. Carlisle v. Matson Lumber Company and Matson Hardwoods Inc.*, No. 95-0376 (W.D. Pa. 1995). In that action, Plaintiff pleaded ten counts, sounding in breach of contract, trespass, and requesting a declaratory judgment on the scope of Matson's timber rights under the agreement of sale.[1]

Before submission to the jury, Plaintiff, by prior trial counsel, orally withdrew his conversion claim, Defendants' Exhibit 7, and by written stipulation dismissed his trespass claim. Defendants' Exhibit 6. The federal jury verdict consisted of six findings:

> The jury finds the parties intended to grant seller the right to harvest only the timber that then existed on the property in 1969.
> The jury finds that the parties intended to require the seller to give Mr. Carlisle 120 days notice each time they constructed a new road in perpetuity.
> The jury finds that the parties intended a no-cut zone along the banks of the waterways on the property including Spring Creek and Thom's Run.
> The jury finds that the width of the no-cut zone on either side of the creek is 100 feet.
> The jury finds that the Matson Lumber Company did harvest trees in the no-cut zone.

---

[1] The Complaint pleaded the following: Count I, Breach of Contract, averred that Defendants had failed to abide by a purchase option provision of the agreement of sale; Count II, Breach of Contract, demanded damages for the same; Count III, Breach of Contract, averred that Defendants had harvested timber from "no-cut" zones set aside by the agreement of sale; Count IV, Breach of Contract, averred that Defendants violated the agreement of sale by harvesting outside the November through March season set forth in the agreement and without providing notice required for building of access roads; Count V, Trespass, averred harvesting was done in a negligent fashion; Count VI, requested an accounting or constructive trust for harvesting done outside the scope of rights reserved in the agreement of sale; Count VII, Conversion, sought damages for harvesting outside the scope of rights reserved in the agreement of sale; Count VIII, requested a declaratory judgment regarding the scope of Defendants' timber rights under the agreement and the same, in Count IX, regarding the contents of the exclusionary map; and in Count X, sought preliminary and permanent injunctions

With regard to the amount of damages, the jury awards Mr. Carlisle
$110,000.

Plaintiff's Exhibit 5; *see also* Defendant's Exhibit 2 (containing the findings that the jury
rejected, including a construction of the agreement that would have found an intention to
grant seller a right to all timber that will ever grow on the property in perpetuity).

Matson appealed the judgment, and the Court of Appeals for the Third Circuit
affirmed the District Court in an unpublished Memorandum Opinion addressing four
allegations of error below. The appellate court concurred with the district court's
determination that the agreement was ambiguous as to whether "the Seller's retained
timber rights were in perpetuity, or were restricted to those trees existing on the property
at the time the Agreement was executed." *Carlisle v. Matson Lumber Co.*, No. 98-3035,
slip. op. at 3 (3d Cir. Mar. 16, 1999). The Court of Appeals affirmed the district court's
decision to submit that question of fact to the jury.[2]

Plaintiff filed his complaint, with jury trial demand, on November 24, 1998,
averring that on December 18, 1997, the jury in the federal district court action returned a
verdict that the parties "intended to grant seller [Matson] the right to harvest only the
timber that then existed on the property in 1969." ¶15. In his amended complaint,
Plaintiff pleaded four counts: Count 1 sounding in trespass, for negligent, careless and
reckless logging dating from December 18, 1986; Count 2, sounding in breach of
contract, for harvesting trees outside the scope of the agreement of sale under the
reservation clause as interpreted by the jury in the federal case combined with paragraph
6 of the Agreement; Count 3, indemnity, averring that under ¶11 of the Agreement,
Defendants agreed to indemnify Plaintiff; Count 4, conversion.

Defendant preliminarily objected to the amended complaint. By Order dated
March 23, 1999, this Court denied Defendants' preliminary objections. Pertinent to this
discussion was this Court's rejection of Defendants' *lis pendens* argument finding that the

---

[2] The Court of Appeals also affirmed several other rulings of the district court: excluding the map
delineating "no-cut" zones as it had not been produced in discovery; permitting Plaintiff to revise his
damages claim downwards on the eve of trial after granting Defendant's motion for partial summary
judgment; and finding Defendants waived their objection to the district court's decision not to voir dire the
jurors concerning their possible bias against lumber companies.

pleadings in the two actions did not demonstrate that "the rights asserted and the relief sought" were identical.

> The federal complaint sought primarily equitable relief in the form of declaratory judgment . . . injunctive relief . . . , specific performance of a right of first refusal . . . , and accounting and constructive trust . . . . The Plaintiff voluntarily dismissed a trespass claim. . . . Monetary damages were sought based upon the specific performance claim and for a breach of contract and conversion claims based upon the harvesting of trees from an agreed "no-cut" zone. . . . The instant complaint seeks monetary damages for breach of contract and conversion based upon contract rights determined by the federal court in response to the Plaintiff's request for declaratory judgment. . . . reinstates the trepass claim which the Plaintiff earlier dismissed without prejudice, . . . , and seeks to enforce the indemnification clause of the contract. . . . . The Defendants' Second Preliminary Objection is without merit and is denied.

Memorandum Opinion at 3 (citations omitted).

In their answer and new matter, Defendants averred that the parties litigated or could have litigated all issues set forth in the Complaint in the federal court case, whose decision is now "final and binding" upon the parties. ¶40. Defendants pleaded, *inter alia*, that Plaintiff's case is barred by the doctrines of res judicata, collateral estoppel and/or bar, ¶41. Plaintiff responded that his "causes of action could not be asserted until such a time as the rights of the parties were determined by the Court and jury in the prior federal action." Plaintiff's Answer to New Matter at ¶46.

We take up Defendants' motions for partial summary judgment initially. Defendants have made three overlapping motions for partial summary judgment. First, they assert that *res judicata*, collateral estoppel, merger and bar preclude the relitigation of any claims arising after December 17, 1997, the date of the close of evidence in the federal case. Thus Defendants move for partial summary judgment on Counts 1 through 4 for all damages sustained prior to December 17, 1997. Second, Defendants move for summary judgment on Counts 2, 3 and 4 of the amended complaint, averring that the doctrines of *res judicata*, collateral estoppel, bar and/or merger preclude "any damages for trees which were smaller than 16 inches in diameter at one foot above the ground on May 28, 1969." Third, Defendants seek summary judgment on the aspects of Plaintiff's

trespass (Count 1) and conversion (Count 4) counts occurring more than two years prior to the filing of Plaintiff's complaint upon statute of limitations grounds.

Before delving further into the facts of this case, we turn to the standards by which we evaluate a motion for summary judgment under Pennsylvania Rule of Civil Procedure 1035.2. After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law.

> (1) Whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would provide the issues to be submitted to a jury.

Pa. R.C.P. 1035.2. Courts are further instructed that

> A proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury.

*McCarthy v. Dan Lepore & Sons, Co., Inc.*, 724 A.2d 938 (Pa. Super. 1998), (citing Pa. R.C.P. 1035.2 *Note*). The nonmoving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the nonmoving party. *Ertel v. Patriot-News Co.*, 674 A.2d 1038 (1996), *cert. denied*, -- U.S.--, 117 S. Ct. 512 (1996). If the nonmoving party fails to come forward with sufficient evidence to establish or contest a material issue to the case, the moving party is entitled to judgment as a matter of law. *Id.* As with all summary judgment cases, the Court must examine the record in the light most favorable to the nonmoving party and resolve all doubts against the moving party as to the existence of a triable issue. *Id.*; *McCarthy v. Dan Lepore & Sons*, 724 A.2d at 940.

We turn first to Defendants' motions. Defendants' second motion for partial summary judgment seeks to preclude Plaintiff from litigating his claims in breach of contract, indemnity and conversion (Counts 2, 3 and 4) for trees that were present upon the property in 1969 but measured less than 16" in diameter at a height of one foot from the ground. Defendants ground this motion upon an interpretation of the verdict rendered by the jury in the federal district court case. That jury was called upon to determine the scope of the provision in the agreement between Plaintiff and Defendants' predecessor in interest that excepted and reserved timber rights to the seller. Defendants contend that the prior jury verdict established that Matson owns all of the trees that were in existence in 1969, regardless of their size at that time. Plaintiff interprets the verdict to have established that Matson owns only *timber* that existed in 1969 and defines timber as trees that are at least 16 inches in diameter at a height of one foot from the ground. In support of his position, Plaintiff refers to paragraph 6 of the agreement of sale that contains a limitation that "[s]eller shall confine the cutting of saw timber to those trees which measure 16" or more in diameter at 1 ft. above the ground. . ." Plaintiff suggests that the dictionary definitions of *tree* and *timber* differ and *saw timber* is an industry term used to denote trees of sufficient size from which to cut logs. The difficulty with Plaintiff's present position is that it contrasts markedly with the position Plaintiff advanced in the district court case and therefore could not have formed a basis for the jury's verdict in that case.

The application of *res judicata* requires four elements:

1) identity of issues;
2) identity of causes of action;
3) identity of persons and parties to the action; and
4) identity of the quality or capacity of the parties being sued.

*Philadelphia Electric Co. v. Borough of Lansdale*, 424 A.2d 514, 519 (Pa. Super 1981).

Further, the Supreme Court of Pennsylvania has explained:

> *Res judicata*, or claim preclusion, is a doctrine by which a former adjudication bars a later action on all or part of the claim which was the subject of the first action. Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). *Res judicata* applies not only to claims actually litigated, but also

6

to claims which could have been litigated during the first proceeding if they
were part of the same cause of action. *Id.*

*Balent v. City of Wilkes-Barre,* 669 A.2d 309, 313 (Pa. 1995). "[T]he purpose of this
doctrine is to relieve the parties of the cost and vexation of multiple lawsuits, conserve
judicial resources, prevent inconsistent decisions, and encourage reliance on
adjudications. *Id.* at 315.

> Where the same cause of action is involved, a plaintiff's cause of action is merged
> in a final judgment if he wins, or barred by it if he loses. The scope of the merger
> or bar includes not only matters litigated but also matters that should have been
> litigated. *McCarthy v. Township of McCandless,* . . . 300 A.2d 815, 819 (Pa.
> Commw. 1973). See also: *Restatement, Second, Judgments* §§18, 19 Thus, a
> judgment is final not only as to damages actually claimed but also as to damages
> that might have been claimed. *Daniels v. State Farm Mutual Automobile
> Insurance Co.,* . . . 451 A.2d 684, 686 (Pa. Super. 1982); *Bardo v.
> Commonwealth, Dep't of Public Welfare,* . . . 397 A.2d at 1307. The doctrine of
> res judicata serves to expedite the consideration of individual cases, to establish
> the certainty and finality of court judgments and to protect a party from vexatious
> litigation. *Exner v. Exner,* . . . 407 A.2d 1342, 1344 (Pa. Super. 1979).

*Branoff v. Fitzpatrick,* 460 A.2d 330, 335 (Pa. Super. 1983) (parallel citations omitted).

A review of the pleadings, pretrial motions, and trial record in the federal district
court case reveals that the Plaintiff did not distinguish between *trees* and *timber* for
purposes of construing the reservation clause in the agreement of sale. Rather, Plaintiff
differentiated between existing on the land in 1969 and sprouting of trees subsequent to
1969. *See, e.g.,* Plaintiff's Pretrial Narrative Statement, Joint Exhibit Tab No. 11 at 9
("Carlisle has suffered the following damages: loss of the value of all trees wrongfully
harvested and removed by Matson (whether in no-cut zones, *sprouted after May 28,
1969,* or in any other way outside Matson's harvest rights) . . .") (emphasis added);
Plaintiff's Motion for Summary Judgment, Joint Exhibit Tab 13 at 2-3 ("The 1969
Agreement of Sale conveys to Carlisle all of the land . . . except that it reserves in the
timber company . . . 'all of the timber and trees, standing and fallen, situate on the
premises above described.' . . . The Agreement of Sale does not refer in any fashion to
*future trees* or a perpetual harvest right.") (emphasis added); Plaintiff's Memorandum of
Law in Opposition to Defendant's Motion for Summary Judgment at Joint Exhibit Tab 17
at 3 ("Matson contends that the contract phrase 'all of the timber and trees, standing and

fallen, situate on the premises above described,' unambiguously means that it has a perpetual right to harvest all trees that shall ever grow on Carlisle's property. In so doing, Matson struggles to overcome the plain language of the contract itself. Briefly put, trees are 'standing and fallen' *only if they are actually in existence.*") (emphasis added); Report and Recommendation of Magistrate Sensinich, Joint Exhibit Tab 19 at 24 ("Plaintiff alleges that the phrase *"standing and fallen"* in the timber rights reservation clause *means that the timber company was limited to harvesting those trees that were planted and already in existence in 1969* when the agreement of sale was signed") (emphasis added); Affidavit of Plaintiff, quoted in Report and Recommendation of Magistrate Sensinich, Joint Exhibit Tab 19 at 24 ("I would not have signed the Agreement of Sale if it had given Fisher & Young ownership of all trees that would ever grow on my property, as opposed to just those trees then in existence.") *See also* Plaintiff's document entitled "Contract Interpretation Questions for Jury", Joint Exhibit Tab 39; Testimony of Plaintiff, Joint Exhibit 44 at 80:22-23 ("They have the right to cut trees that were standing or fallen in 1969"). The distinction between trees greater than or less than 16 inches in diameter at one foot above the ground did not surface in the prior case, and in fact Plaintiff consistently maintained in the federal court action that the reservation of timber rights covered all trees in existence on May 28, 1969.

Plaintiff is barred now from litigating an issue that was not pressed in the prior trial in federal court. Plaintiff may litigate any claims he may have for damages arising from Defendants' logging of trees that have sprouted since May 28, 1969.

Defendants have also moved for partial summary judgment on all counts for any evidence accruing before the date of the close of evidence in the federal trial, December 17, 1997, citing comment e to section 27 of the Restatement (Second) of Judgments:

> A given claim may find support in theories or grounds arising from both state and federal law. When the plaintiff brings an action on the claim in a court, either state or federal, in which there is no jurisdictional obstacle to his advancing both theories or grounds, but he presents only one of them, and judgment is entered with respect to it, he may not maintain a second action in which he tenders the other theory or ground. If however, the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground (or, having jurisdiction, would clearly have declined to exercise it as a matter of discretion), then a second action in a

8

competent court presenting the omitted theory or ground should be held not precluded.

Restatement (Second) of Judgments §27, comment e. *See McArdle v. Tronetti,* 627 A.2d 1219, 1223 (Pa. Super.), *alloc. den.* 641 A.2d 587 (Pa. 1993), (applying section 27 and determining that because a federal court declined to consider claims later raised in state court, the Court of Common Pleas could entertain those claims).

Plaintiff's present claims could all have been advanced in the federal district court case. His position that the declaratory judgment relief sought in that case was a prerequisite to this action contrasts markedly with the position advanced in that litigation. In point of fact, Plaintiff pleaded ten counts in that action, some identical to the counts pleaded herein. The record in the federal case does not suggest that Plaintiff sought only a declaratory judgment as prerequisite to a subsequent action for damages.

Defendants' remaining motion for summary judgment on statute of limitations grounds is mooted by the resolution of their other motions. Any remaining claims that Plaintiff has for logging operations since December 17, 1997 for the cutting of trees that have sprouted since May 28, 1969 are clearly not subject to a statute of limitations defense in this action, which was effectively filed in November 1998.

Plaintiff moved for partial summary judgment on Count 2, breach of contract, and Count 4, conversion of his Amended Complaint, presenting in support Defendants' harvest records and his expert's report. Plaintiff's motion is denied for two reasons. First, it rests upon an interpretation of the verdict in the federal district court case that this Court has squarely rejected, *supra.* Moreover, to the extent that his motion relies upon the testimony of his expert, the Plaintiff urges that this Court take judicial notice of facts concerning tree growth and the counting of tree rings. Tree maturation is not a subject upon which this Court could take judicial notice, and is one that is beyond the ken of the average lay person, requiring the testimony of an expert witness. For the foregoing reasons, the Court enters the following Order:

IN THE COURT OF COMMON PLEAS
OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
CIVIL

ALBERT T. CARLISLE,

      Plaintiff                          No. 353 of 1998

      v.

MATSON LUMBER COMPANY and
MATSON HARDWOODS, INC.,

      Defendants

## ORDER

AND NOW, this 30th day of January, 2002, the Plaintiff's motion for partial summary judgment is denied and the Defendants' motions for partial summary judgment are granted as follows:

All claims for damages arising from the harvesting of any trees and timber standing situate on the Clough Farm on May 28, 1969, are dismissed with prejudice; and

All claims arising prior to December 17, 1997, are dismissed with prejudice.

BY THE COURT

_Paul H. Millin_
Paul H. Millin, P.J.

RECEIVED
JAN 31, 2002

10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE                )
            Plaintiff,            )
                                  )
       v.                         )    Civil Action No. 04-284 (Erie)
                                  )
MATSON LUMBER COMPANY and         )
MATSON HARDWOODS, INC.            )
            Defendants.           )

MEMORANDUM ORDER

Gary L. Lancaster,                              May 9, 2005
District Judge.

        This is an action to quiet title. Plaintiff, Albert T.

Carlisle, alleges that defendants, Matson Lumber Company and

Matson Hardwoods, Inc. have asserted an interest adverse to his

in certain property located in Warren County, Pennsylvania,

commonly referred to as the Clough Farm. Plaintiff alleges that

this asserted interest, and in particular defendants' recording

of a quit claim deed on May 22, 2003, places a cloud on his title

to the land. The May 2003 quit claim deed states that defendants

own all timber located on the property. Plaintiff claims in this

case that he is the owner of the timber on Clough Farm. These

parties have been involved in litigation for nearly ten years

regarding the timber rights to this property. In a prior case

before this court, a jury found that defendants owned all the

timber located on the property when it was sold to plaintiff on

May 28, 1969.  There is no dispute that plaintiff owns the land itself.

Plaintiff seeks orders from this court: (1) stating that he owns the subject property in fee simple absolute and that defendants have no right to or interest in the property; (2) enjoining defendants from asserting any adverse claim to plaintiff's title to the property; (3) and declaring that the May 22, 2003 quit claim deed is null and void.

Both parties have filed motions for summary judgment. Defendants argue that the court should enter summary judgment in their favor because plaintiff's claims are barred by the doctrine of res judicata.  [Doc. No. 5].  Plaintiff claims that we should grant his motion for summary judgment because defendants have not filed a responsive pleading to the complaint.  [Doc. No. 10].

For the reasons set forth below, plaintiff's motion will be denied.  Defendants' motion will be granted in part, and denied in part.  As a result of these rulings, this court's subject matter jurisdiction over the remainder of this case is drawn into question.  Therefore, the court directs the parties to present evidence as to the amount in controversy on plaintiff's remaining claims for relief in accordance with the below rulings and attached order.

2

I.    BACKGROUND

This case involves a long-standing dispute over ownership of the timber rights to a 1,239 acre parcel of land in Warren County, Pennsylvania, commonly referred to as the Clough Farm. The land and the timber rights were at one time owned by Marion Kinkead. After that, the timber rights were held and transferred separate and apart from the land rights. In 1968 Ms. Kinkead sold the land to Fisher & Young, Inc., the predecessor in interest to defendants Matson Lumber Company and Matson Hardwoods, Inc. She later sold the timber rights to Fisher & Young. In 1969, Fisher & Young sold the land to plaintiff. Plaintiff did not purchase the timber rights.

There is some confusion as to when, and under what conditions, Ms. Kinkead transferred the timber rights to Fisher & Young.[1] In an unrecorded April 1, 1968 Article of Agreement, Ms. Kinkead sold the timber rights to Fisher & Young and stated that those rights would revert to the owner of the land as of

---

[1] As will be discussed below, contrary to plaintiff's assertions, the exact date and circumstances of the transfer of the timber rights is not relevant to this case because plaintiff's rights in the timber have already been determined by this court. Therefore, although the exact date of the transfer of the timber rights, and whether plaintiff was on notice of that transfer in his chain of title, could be relevant in an initial proceeding to establish rights to the timber, we will not be entertaining any such arguments in this case -- we have already issued a judgment on that exact issue in the first federal case.

3

April 1, 1978. In an April 20, 1973 timber deed, which was recorded, Ms. Kinkead transferred the timber rights to Fisher & Young and stated that those rights would automatically vest in her, or her heirs, as of April 1, 1978. Although this 1973 deed conflicts with the 1968 Article of Agreement, the deed specifically states that it is in fulfillment of the 1968 Agreement.

Then on May 6, 2003, Dora M. Squatriti, individually and as executrix under the last will and testament of Marion Kinkead issued a quit claim deed to Matson Lumber Company for all of the timber and trees standing and fallen on the Clough Farm, presumably on the basis that the timber rights had vested in Ms. Kinkead, and then Ms. Squatriti as her heir, on April 1, 1978, under either the 1968 Article of Agreement or the 1973 timber deed. Plaintiff claims that Matson's recording of that quit claim deed places a cloud on his title.

Plaintiff claims in this case that he is the sole owner of the timber on the Clough Farm. Plaintiff contends that defendants' "timber rights to the Clough Farm had terminated by operation of law" sometime before they started their timbering activities in the late 1980's, and that all of defendants' timber harvesting operations were undertaken as a trespasser. Complaint

4

at ¶ 19. Plaintiff argues in this case that he is either a bona fide purchaser, without notice of the unrecorded 1968 Article of Agreement, and therefore, obtained the timber rights when he bought the land in 1969, or that he now owns the timber rights that were to vest in Ms. Kinkead, or her heirs, under the 1973 timber deed, because Ms. Kinkead, and her estate, failed to assert any interest in the timber between 1978 and 2003.

In this case, plaintiff asks this court to determine all adverse claims to the real or personal property at issue in the case, to issue an order that defendants have no right, title or interest in the property "or any part thereof" and to enjoin defendants from asserting any adverse claim to plaintiff's title to said property. Complaint at ¶¶ 26.2, 26.3, and 26.4. Plaintiff also seeks an order declaring that Matson Lumber Company is barred from asserting any right, lien, title or interest in the property on the basis of the May 22, 2003 quit claim deed and cancelling the May 22, 2003 quit claim deed.

However, there is more to this case than just this case. This is not the first time these parties have appeared before this court claiming adverse interests in the Clough Farm timber. In 1997 we presided over a jury trial between these exact same parties regarding a dispute over who owned the timber rights to

the exact same property at issue in this case. Carlisle v. Matson, 96-376 (W.D. Pa.). The jury determined that defendants had the right to harvest all timber that was located on the property when plaintiff bought it from defendants in May of 1969. Defendants appealed that verdict to the Court of Appeals for the Third Circuit, which sustained the jury's determination.

Plaintiff also sued defendants in state court regarding ownership of these same timber rights. Carlisle v. Matson, 1998-353 (Ct. Com. Pl., Warren County). There has been no final judgment in that case. However, the court has granted defendants' motion for partial summary judgment on res judicata grounds. In particular, that court has ruled that plaintiff could not argue in the state case that defendants only had the right to harvest trees that were of a certain diameter as of 1969 because plaintiff made contrary arguments in the federal case, and never advanced such an argument, even in the alternative, during the prior federal case. In addition, the state court has found that any claims being asserted by plaintiff that arose before the close of evidence in the federal case "could have been advanced in the federal district court" and to the extent they were not, are now barred by res judicata.

II.    STANDARD OF REVIEW

Both parties have filed motions for summary judgment. Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e. the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth

7

AO 72A

of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 246-49. Under these standards, the non-moving party must do more than show there is "some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The non-moving party has the burden of producing evidence to establish each element of her claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec., 475 U.S. at 587 (citations omitted).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law because no reasonable jury could return a verdict in her favor.

8

AO 72A

III. DISCUSSION

A. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on the ground that plaintiff's claims are barred by the doctrine of res judicata. According to defendants, plaintiff cannot assert his claims in this case because he has already litigated the timber rights to this parcel of property in the prior federal court case. Plaintiff claims that this case is different from the previous federal court case, and therefore, is not barred by res judicata.

The court finds that plaintiff is correct, to some extent. To the extent that his current complaint seeks the interpretation and cancellation of the May 22, 2003 quit claim deed, his claims are not barred by the doctrine of res judicata. That deed did not exist until May of 2003, years after the prior federal case was closed. Plaintiff could not have brought claims to cancel, or interpret, that document in the previous federal case. However, to the extent plaintiff seeks a determination as to who owns the Clough Farm timber rights, his claims are barred by the doctrine of res judicata. The ownership of the timber on the Clough Farm was the exact issue addressed in the previous federal court case. The jury in that case determined that defendants own all trees that existed on the land at the time plaintiff bought

9

it in May of 1969. As a result of that ruling, by implication, plaintiff owns all trees that sprouted on that land after May of 1969.

### 1. Res Judicata - General Principles

Where there has been a final decision on the merits, the doctrine of res judicata, or claim preclusion, bars parties from relitigating issues that were or could have been raised in the prior action. Federated Dep't. Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981). In order for res judicata to apply, it is necessary that: 1) there be a final judgment on the merits; 2) the party against whom the bar is asserted is the same; and 3) the subsequent suit is based on the same cause of action. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984). Where these elements are present, plaintiff is precluded from relitigating not only those claims which were, in fact, previously brought, but also those that could have been brought. Avins v. Moll, 610 F. Supp. 308, 324-25 (E.D. Pa. 1984), aff'd, 774 F.2d 1150 (3d Cir. 1985). The purpose of this doctrine is to relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, prevent inconsistent decisions, and encourage reliance on adjudications. Montana v. United States, 440 U.S. 147, 153-54 (1979).

10

## 2. Res Judicata - Ownership of Clough Farm Timber

In this case all three elements are established as to part of plaintiff's case. It cannot be reasonably disputed that there was a final judgment in the first federal case and that all of the parties are the same. In addition, a careful review of the pleadings and contentions of the parties convinces us that some of the issues presented in both cases are the same, i.e., who owns the timber on Clough Farm.

While plaintiff claims that the first federal case merely sought an interpretation of a contract between him and defendants, that description does not tell the whole story. In his prior federal complaint, filed in 1995, plaintiff claimed that defendants' timber harvesting operations, which commenced in 1988, were violating the terms of the parties' agreement because defendants were cutting smaller trees than they were allowed under the agreement, building roads without notice, cutting in months that were to be "no-cut" months, and cutting outside the 'no-cut' zone. Plaintiff claimed that defendants' abuse of their timber rights was causing damage to plaintiff's land. Plaintiff also claimed that defendants had transferred the timber rights to related entities in violation of plaintiff's right of first refusal to purchase the timber rights. Therefore, the first federal case was about plaintiff's attempts to limit defendants'

11

timbering activities, if not eliminate them, and obtain damages for the harm that the operations were doing to plaintiff's land.

In the first federal case, plaintiff admitted that defendants had certain timber rights to the Clough Farm,[2] but sought redress for damages allegedly being caused because defendants were acting outside of those rights. In this case, plaintiff now attempts to argue that he is, and since either 1969 or 1978 always has been, the sole owner of the timber on the Clough Farm and that all of defendants' timber operations, which commenced in 1988 (years before the first federal case was filed), were in violation of plaintiff's exclusive ownership rights.

Although plaintiff bases his arguments regarding exclusive ownership in this case on the unrecorded 1968 Article of Agreement and the recorded 1973 timber deed, these are not newly discovered documents; they were available to plaintiff at the time of the prior federal court case and could have been asserted then. While we recognize that it is unclear whether plaintiff

_____

[2] By way of example, plaintiff's counsel in the first federal case stated in opening statements that "So, when Mr. Carlisle bought the property, he understood and accepted the fact that the timber company was keeping trees for itself and he expected there would come a day when they would come in, and cut down those trees, and sell the logs and carry on their business." In addition, plaintiff himself testified at the trial that he understood that defendants would continue cutting down trees on the land that they owned in 1969.

12

had actual notice of the unrecorded 1968 document during the first federal case, he, at least, had inquiry notice of it because it is explicitly referenced in the recorded 1973 timber deed. Plaintiff had actual knowledge of that 1973 timber deed because it was recorded in the chain of title.

When plaintiff sued defendants in 1995, alleging that their timbering activities were harming his land, plaintiff would reasonably be expected to examine the chain of title and bring forth any and all possible arguments he might have in order to curtail defendants' harmful timbering activities, including especially, removing defendants from his land entirely by claiming superior title and total ownership in the timber itself. Plaintiff not only failed to make this argument, even in the alternative, he admitted repeatedly that defendants had rights to the timber on the land. As evidence of plaintiff's sincere belief of that fact, plaintiff even faulted defendants in the first federal case for depriving him of the right of first refusal to buy the timber rights from defendants. Plaintiff, who is apparently not satisfied with the result of the first federal case, cannot completely reformulate his position in the hopes of a better result the second time around. Preventing the expense and vexation of multiple lawsuits over the same dispute is one of the reasons the doctrine of res judicata exists.

13

Furthermore, plaintiff is incorrect when he claims that these cases are different because this case is about the May 22, 2003 quit claim deed. Construction and cancellation of that deed is not the only relief sought in this case. Plaintiff also seeks an order stating that he owns all of the timber on the property, regardless of whether it existed before or after he bought the land in 1969, in direct conflict with the judgment issued in the first federal case. The risk of inconsistent judgments is another reason that the doctrine of res judicata exists.

Therefore, that portion of plaintiff's complaint seeking a ruling that plaintiff owns the timber on Clough Farm outright is a subsequent suit based on the same cause of action and is therefore barred by the doctrine of res judicata.

3. Res Judicata - Quit Claim Deed

Although we have ruled that plaintiff's newly asserted claims that he owns all timber on the land outright are barred by the doctrine of res judicata, that does not end the analysis. Plaintiff also seeks an interpretation of the May 22, 2003 quit claim deed and the cancellation thereof. Those claims for relief are not barred by the doctrine of res judicata. The quit claim deed did not exist while the previous federal case was pending. Although the 1969 Article of Agreement and the 1973 timber deed

14

AO 72A

did exist at the time of the first federal case, there was no way for plaintiff to predict, or reasonably expect, that Dora Squatriti would make a future transfer of the timber rights to defendants based on those documents, when neither she, nor her mother, had made any claim under those documents for more than fifteen years. Under the circumstances, plaintiff cannot be penalized for not bringing claims based on the May 22, 2003 quit claim deed in the prior federal case. Therefore, defendants' motion for summary judgment on these claims for relief is denied.

B.  Amount in Controversy

As a result of the above rulings, the only claims remaining in this case are those based on the May 22, 2003 quit claim deed, and the cloud that the deed may place on plaintiff's title. As set forth above, as a result of the judgment in the first federal case, plaintiff owns only the title to trees that sprouted on the subject property after he purchased the land in May of 1969. Plaintiff holds title to the land itself separate and apart from his title to the timber on the land. As detailed above, title to the land and title to the timber have been held and transferred separately for decades. Therefore, the timber deed recorded on May 22, 2003, has no effect on plaintiff's title to the land. Given the new, and limited, scope of the case, we must re-

15

AO 72A

evaluate our ability to exercise subject matter jurisdiction. The issue of jurisdiction is always open for determination by a federal court, and the court may raise the issue of jurisdiction on its own. In re Orthopedic "Bone Screw" Products Liability Litigation, 132 F.3d 152, 155 (3d Cir. 1997) (citing Underwood v. Maloney, 256 F.2d 334 (3d Cir. 1958)); see also, Packard v. Provident Nat. Bank, 994 F.2d 1039, 1046 (3d Cir. 1993).

When the parties are citizens of different states, a federal court will exercise jurisdiction over a case if the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). The party asserting jurisdiction bears the burden of showing that the case is properly before the federal court. Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004). It is well-settled that in an action for injunctive or declaratory relief "the amount in controversy is measured by the value of the object of the litigation." Hunt v. Washington State Apple Advertising Comm'r, 432 U.S. 333, 347 (1977); see also, Corestates Trust Fee Litigation v. Corestates Bank, N.A., 39 F.3d 61, 65 (3d Cir. 1994) (citation omitted) ("the measure of jurisdiction is the value of the right sought to be protected by injunctive relief").

16

In this case, the remaining claim is essentially for removal of the cloud that the May 22, 2003 quit claim deed places on plaintiff's timber rights. As a result of the first federal case, plaintiff's timber rights are limited to those trees that sprouted on the property after 1969. Based on the record before us, we have no information regarding the value of plaintiff's timber rights. Therefore, we cannot conduct a proper analysis of the jurisdictional amount in controversy without further evidence from the parties.

C.  Plaintiff's Motion for Summary Judgment

Plaintiff has moved for summary judgment on the ground that defendants have filed no responsive pleading to plaintiff's complaint. As an initial matter, the correct procedural device under these circumstances would be to seek entry of default. Fed. R. Civ. P. 55. As such, on that procedural basis alone, plaintiff's motion for summary judgment will be denied.

However, as a matter of substance, upon reading plaintiff's brief and his responsive concise statement, it is apparent that the actual ground for plaintiff's summary judgment motion is his argument that he owns the timber outright based on the 1968 Article of Agreement and/or the 1973 timber deed. As a procedural matter, plaintiff has not properly raised this issue

17

in his summary judgment motion. Regardless, as a matter of substance, we have already rejected this argument in ruling on defendants' motion for summary judgment. Plaintiff's claims that he is the rightful and exclusive owner of the timber on the Clough Farm are contrary to the judgment in the prior federal case. Under the doctrine of res judicata plaintiff's claims in this regard are barred.

IV.    CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted in part, and denied in part. Given our ruling on defendants' motion, we must re-examine the subject matter jurisdiction of this court over the remaining controversy. As such, the parties shall present evidence as to the value of all timber added to, or sprouted on, the property after May 1969 in accordance with the attached order. The appropriate order follows.

18

40 72A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE                    )
          Plaintiff,                  )
                                      )
     v.                               )    Civil Action No. 04-284(Erie)
                                      )
MATSON LUMBER COMPANY and             )
MATSON HARDWOODS, INC.                )
          Defendants.                 )

O R D E R

Therefore, this 9th day of May, 2005, IT IS HEREBY
ORDERED that defendants' motion for summary judgment [Doc. No. 6]
is GRANTED IN PART and DENIED IN PART.  Only those claims made by
plaintiff for interpretation and cancellation of the May 22, 2003
quit claim deed shall remain subject to possible adjudication by
this court.  All other claims are barred by the doctrine of res
judicata.

IT IS FURTHER ORDERED THAT a hearing on the jurisdictional
amount in controversy will be held on July 15, 2005 at 10
a.m. To the extent necessary, the parties are granted a
limited right to engage in discovery on the sole issue of the
jurisdictional amount in controversy until June 30, 2005.

19

AO 72A

IT IS FURTHER ORDERED that all other proceedings in this case are stayed pending the court's ruling on the issue of the jurisdictional amount in controversy.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment (Doc. No. 10) is DENIED.

BY THE COURT:

_____, J.

cc:   All Counsel of Record

20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,           )
            Plaintiff,         )
                              )
        v.                     )      Civil Action No. 04-284(Erie)
                              )
MATSON LUMBER COMPANY and      )
MATSON HARDWOODS, INC.,        )
            Defendants.        )

MEMORANDUM ORDER

Gary L. Lancaster,
District Judge.
                                        October 28, 2005

        Before the court is plaintiff's motion for
reconsideration [doc. no. 20] of our August 26, 2005 order. That
order rescheduled, for the second time upon defendants' motion,
a hearing on the jurisdictional amount in controversy. A hearing
on the jurisdictional amount in controversy was originally
scheduled by this court's May 9, 2005 memorandum order disposing
of the parties' cross motions for summary judgment. In the May
9, 2005 opinion, we found that the doctrine of res judicata
precluded much of the relief sought by plaintiff in this case.
Only plaintiff's claim to quiet title to his timber rights in the
post-1969 trees survived. Having no information regarding the
amount in controversy as to the one claim that plaintiff properly
brought before this court, we ordered an evidentiary hearing on
the amount in controversy.

In his motion for reconsideration, plaintiff argues that because this court determined that it had jurisdiction at the time the complaint was filed, the subsequent elimination of many of plaintiff's claims could not oust the court of jurisdiction. Defendants do not oppose the motion for reconsideration. However, this is not dispositive; parties cannot by stipulation, or otherwise, confer subject matter jurisdiction on the federal courts. Kaufman v. Liberty Mut. Ins. Co., 245 F.2d 918, 920 (3d Cir. 1957).

Plaintiff is correct that, as a general rule, the amount in controversy is determined as of the time the complaint is filed and that once a federal court finds that it has diversity jurisdiction subsequent events cannot divest the court of jurisdiction. There are, however, exceptions. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989); St. Paul Mercury Inden. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938). Courts have looked to post-filing events in reconsidering the amount in controversy under certain circumstances. See e.g. Hall v. Earthlink Network, Inc., 396 F.3d 500, 507 (2d Cir. 2005) (original allegation made in bad faith); State Farm Mut. Automobile Ins. Co. v. Powell, 87 F.3d 93 (3d Cir. 1996) (clarification of how many insurance policies were at issue).

2

The May 9, 2005 order reflects our determination that plaintiff acted unreasonably in attempting to invoke this court's jurisdiction by relying on clearly non-justiciable claims in order to satisfy the amount in controversy requirement. In our May 9, 2005 decision, we discussed several circumstances evidencing this unreasonableness: first, the majority of the claims were already actually litigated to verdict in this very court, or should have been because they dealt with the same issue of ownership of the Clough Farm timber; second, a state court had already rebuffed plaintiff's attempts to relitigate ownership of the Clough Farm timber based on the doctrine of res judicata due to the earlier federal court case; third, many of the allegations of the complaint directly contradicted evidence and arguments that plaintiff presented to this court during the prior federal court case; fourth, the case was not based on any new documents or evidence, other than the 2003 timber deed, which is the basis of the surviving quiet title action; and, fifth, the requested judgment would be contrary to the judgment entered by this court in the prior federal case.

We saw no possible argument that plaintiff thought it appropriate to return to this court attempting, again, to litigate ownership of the Clough Farm timber under those circumstances, and concluded that plaintiff had acted

3

unreasonably in attempting to invoke this court's jurisdiction. While we could have dismissed the entire case on this basis, we gave plaintiff an opportunity to demonstrate that the one valid claim regarding the 2003 timber deed, was, in fact, worth in excess of $75,000.

We held an evidentiary hearing on October 21, 2005 on the amount in controversy. James Hall presented testimony at the hearing on behalf of plaintiff. Mr. Hall also submitted an affidavit [doc. no. 23]. Mr. Hall was qualified as an expert and deemed capable of giving his opinion as to the value of the timber properly at issue in this case. Defendants cross examined Mr. Hall, but did not present evidence. Mr. Hall initially testified that the value of the post-1969 timber was $388,050. However, Mr. Hall later explained that he arrived at that number by projecting the potential value of the timber in question 50 years from now, and then determining what amount of money would have to be invested today to result in that same sum in 50 years. Mr. Hall testified, and provided documentation attached to his affidavit indicating, that the timber is presently worth approximately $4,200.

It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. <u>Red Cab Co.</u>, 303 U.S. at 288. In this action to

quiet title, we must calculate the amount in controversy based on the present value of the property right being injured, not the projected, possible, or investment value of the property right. Smith v. Adams, 130 U.S. 167, 175 (1889); Kelly v. Lehigh Nav. Coal Co., 151 F.2d 743, 746 (3d Cir. 1945).

As set forth above and in our May 9, 2005 decision, due to the verdict in the prior federal case, the only property right that plaintiff has at issue in this case is the timber rights to those trees that sprouted on Clough Farm after May of 1969. The only evidence presented as to the current value of that timber was Mr. Hall's testimony and documentation that the timber is now worth $4,200. Although plaintiff's expert predicted that those trees would be worth $3.5 million in 50 years, any number of factors could impact the value of the timber at issue 50 years from now, such as disease, forest fire, other natural disaster, or purposeful destruction. Plaintiff arrived at the $388,050 number by determining how much money a person would have to invest today to end up with $3.5 million in 50 years. We find that approach to be flawed.

We must determine the present value of the property right at issue. Smith v. Adams, 130 U.S. at 175; Kelly v. Lehigh Nav. Coal Co., 151 F.2d at 746; see also Perrin v. Tenneco Oil Co., 505 F.Supp. 23, 24 (W.D. Okla. 1980) (assessing value of action

5

to quiet title of a mineral interest in land as the increased cost of buying the land with the mineral interest versus without the mineral interest). Plaintiff failed to provide any evidence indicating what the right to the post-1955 timber might sell for on the open market today. Although it is possible that the current market value of the timber rights could be more than $4,200, we have no information setting any present market value or price for the timber rights. As such, it appears to a legal certainty that the amount in controversy is less than $75,000.

Therefore, this 28th day of October, 2005, IT IS HEREBY ORDERED that plaintiff's motion for reconsideration [doc. no. 20] is DENIED.

Having found that plaintiff has failed to meet the requirements to invoke this court's diversity jurisdiction, we do not have subject matter jurisdiction over this matter. As such, the case is dismissed. The Clerk of Court is directed to mark this matter closed.

BY THE COURT:

cc:    All Counsel of Record

6

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-5144

ALBERT T. CARLISLE,
Appellant

v.

MATSON LUMBER COMPANY; MATSON HARDWOODS, INC.

Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. Civil No. 04-cv-00284E)
District Judge: Hon. Gary L. Lancaster

Submitted Under Third Circuit LAR 34.1(a)
May 19, 2006

Before: RENDELL and VAN ANTWERPEN, Circuit Judges,
and ACKERMAN*, District Judge.

JUDGMENT

This cause came on to be heard on the record from the United States District Court

for the Western District of Pennsylvania and was submitted pursuant to Third Circuit

LAR 34.1(a) on May 18, 2006. On consideration whereof, it is now hereby

---

* Honorable Harold A. Ackerman, Senior District Judge for the District of New Jersey,
sitting by designation.

ORDERED and ADJUDGED by this Court that the Orders of the District Court entered on May 9, 2005 and October 28, 2005, be and the same are hereby AFFIRMED. All of the above in accordance with the opinion of this Court. Costs taxed against the Appellant.

ATTEST:

_/s/ Marcia M. Waldron_
Clerk

Dated: 2 June 2006

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-5144

ALBERT T. CARLISLE,
Appellant

v.

MATSON LUMBER COMPANY; MATSON HARDWOODS, INC.

Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. Civil No. 04-cv-00284E)
District Judge: Hon. Gary L. Lancaster

Submitted Under Third Circuit L.A.R. 34.1(a)
May 19, 2006

Before: RENDELL and VAN ANTWERPEN, Circuit Judges,
and ACKERMAN, District Judge[*]

(Filed: June 2, 2006)

OPINION OF THE COURT

---

[*]    The Honorable Harold A. Ackerman, Senior District Judge for the District of New
Jersey, sitting by designation.

ACKERMAN, District Judge.

Appellant Albert T. Carlisle ("Carlisle") is the record owner of real property formerly known as "Clough Farm." In 1968, the timber rights for the Clough Farm property were split from the ownership of the land, and transferred separately. Carlisle purchased the Clough Farm property (without any timber rights, which were explicitly excluded from the sale) in 1970. In 2004, Carlisle brought a diversity action against defendants Matson Lumber Company and Matson Hardwoods, Inc. (collectively, "Matson"), entities that claim ownership of certain rights to the timber on the Clough Farm. Carlisle's complaint sought, *inter alia*, a declaratory judgment asserting that Carlisle owns the Clough Farm property in fee simple absolute, effectively ousting Matson of any interest in the Clough Farm timber. Additionally, Carlisle's complaint sought to nullify a quitclaim deed issued in 2003 by a prior owner of the Clough Farm property, purporting to transfer all timber rights in the property to Matson ("the Quitclaim Deed").

Matson filed a motion for summary judgment, arguing, *inter alia*, that the bulk of Carlisle's present claims were barred by *res judicata*, pursuant to a prior litigation commenced by Carlisle in 1995 which resolved ownership of the Clough Farm timber rights as between Carlisle and Matson. The District Court agreed, and, following an evidentiary hearing to assess the value of the remaining claim regarding the Quitclaim Deed, dismissed that claim as insufficient to satisfy the amount in controversy requirement for diversity jurisdiction. Carlisle now appeals the District Court's grant of

2

summary judgment dismissing the bulk of his claims on *res judicata* grounds, and the District Court's decision on reconsideration dismissing the remaining claim for failure to satisfy the amount in controversy requirement.

I.

Prior to 1968, Clough Farm was owned by Marion Kinkead. In 1968, Kinkead entered into two agreements, both dated April 1, 1968, with Fisher & Young, Inc. ("Fisher & Young"), for the sale of all of the land and premises of Clough Farm, excluding the trees and timber on the property. The first agreement, which was subsequently recorded in the Office of the Recorder of Deeds, conveyed to Fisher & Young all of the land and premises, excepting trees and timber rights, which were reserved and retained by Marion Kinkead. The second agreement, which was never recorded, conveyed to Fisher & Young the right to cut and remove existing trees exceeding 12" in diameter until April 1, 1978 (the "1968 Unrecorded Agreement"). Pursuant to the 1968 Unrecorded Agreement, on April 1, 1978, the timber rights granted by the Agreement would expire and all timber rights would "revert to the owner of the land."

On January 9, 1970, Fisher & Young sold to Appellant Carlisle all of the Clough Farm land and premises, with the exception of the trees and timber rights. Three years later, on April 20, 1973, Kinkead conveyed to Fisher & Young by Timber Deed the rights to all timber and trees with trunks exceeding 12" in diameter. This Timber Deed

3

memorialized and explicitly referenced the prior 1968 Unrecorded Agreement between Kinkead and Fisher & Young, which first established Fisher & Young's right to harvest certain trees from the Clough Farm property. This Timber Deed was explicitly subject to the same conditions as the referenced 1968 Unrecorded Agreement. Thus, the Timber Deed was arguably subject to the same condition contained in the 1968 Unrecorded Agreement that the timber rights conveyed therein would terminate on April 1, 1978, and revert to the "owner of the land."

Despite an apparent reversionary interest in the timber on the Clough Farm property, it appears that Marion Kinkead and her estate never recognized rights to the Clough Farm timber inasmuch as the timber rights were not included in the filed inventory of the estate upon Marion Kinkead's death in 1988. However, in 2003, Kinkead's executrix issued a quitclaim deed transferring to Matson Lumber Company ("Matson Lumber"), the successor to Fisher & Young,[1] all of the trees and timber standing or fallen on the Clough Farm (the "Quitclaim Deed"). Presumably, the executrix's authority to make the Quitclaim Deed was premised on the theory that the Clough Farm timber rights had vested in Mrs. Kinkead on April 1, 1978, by virtue of the 1968 Unrecorded Agreement or the recorded 1973 Timber Deed.

In 1995 Carlisle commenced an action against Matson Lumber Company and Matson Hardwoods, Inc. (again, collectively, "Matson") in the United States District

---

[1]  Fisher & Young went through various corporate acquisitions and mergers, eventually emerging as Matson Lumber Company in 1995.

Court for the Western District of Pennsylvania ("*Carlisle I*", at No. 95-0376). That action asserted various breach of contract and trespass claims against Matson for alleged failure to abide by the terms of agreement of sale of the Clough Farm property. In that action, Carlisle conceded that Matson owned timber rights to the trees and timber on the Clough Farm property, but alleged that Matson was performing its cutting activities in violation of the agreement of sale. Nevertheless, that action also sought a declaratory judgment "setting forth the scope of Matson's timber rights under the agreement of sale, thus clarifying the parties' legal relations and respective rights." (App. at 93).

The action proceeded to a jury trial, and resulted in a jury verdict finding that the parties intended to grant Matson the right to harvest those trees that existed on the property in 1969. Matson, claiming rights to all timber, appealed to this Court, which affirmed the verdict, holding that the jury established that Matson did not have timber rights in perpetuity; rather, Matson's timber rights were limited to the harvest of only those trees in existence on the property in 1969. The assumption made by both the District Court and the Third Circuit in *Carlisle I* was that Carlisle had the right, under the agreement of sale, to harvest the trees planted or sprouted on the property after 1969.

Carlisle acquired new counsel and filed a subsequent action in Pennsylvania state court ("*Carlisle II*") which re-asserted certain claims that Carlisle had voluntarily withdrawn in *Carlisle I*. That action is still pending and has not reached final judgment. However, Matson moved for summary judgment dismissing certain of those claims, on the basis of *res judicata,* and was partially successful. (App. at 199-208.) In particular,

5

the state court ruled that plaintiff could not argue in the state case that Matson possessed only the right to harvest trees that were of a certain diameter as of 1969, because Carlisle had made contrary arguments in the federal action (*Carlisle I*), and had not advanced any such argument, even as an alternative, in that prior federal action. In addition, the state court found that any claims that arose before the close of evidence in the federal case "could have been advanced in federal district court" and to the extent they were not, they were now barred by *res judicata*.

Carlisle commenced the instant action on September 28, 2004, ostensibly to challenge the validity of the May 22, 2003 Quitclaim Deed issued by Mrs. Kinkead's executrix, purporting to grant the Clough Farm timber rights to Matson. The instant action sought: 1) declaratory relief stating that Carlisle owns the Clough Farm property in fee simple absolute, and that Matson has no right or interest in the property; 2) injunctive relief preventing Matson from asserting any claim to the Clough Farm property adverse to Carlisle's interest; and 3) a declaration that the May 22, 2003 Quitclaim Deed is null and void.

Matson filed a summary judgment motion seeking dismissal of Carlisle's complaint on the grounds that the claims therein are barred by the doctrine of *res judicata*.[2] The District Court granted Matson's motion in part in an Order dated May 9, 2005, dismissing the claims relating to the determination of ownership of the Clough

---

[2] Carlisle also sought summary judgment on a procedural point, which was not granted.

6

Farm property, with the exception of the claims relating to the 2003 Quitclaim Deed. Additionally, the District Court determined that, due to the dismissal of the bulk of plaintiff's claims, it was unclear whether the remaining claims regarding the Quitclaim Deed would satisfy the amount in controversy prerequisite to diversity jurisdiction. Accordingly, the District Court ordered the parties to participate in an evidentiary hearing to submit evidence regarding the value of the remaining claims to determine the valid amount in controversy. The evidence presented by Carlisle's valuation expert indicated that the post-1969 timber at issue under the Quitclaim Deed claims had a present value of approximately $4,200.

Carlisle filed a Motion for Reconsideration on September 29, 2005. The District Court denied the Motion for Reconsideration on October 28, 2005. As part of the Order denying the Motion for Reconsideration, the District Court held that it lacked jurisdiction over the only remaining claim in the action, the Quitclaim Deed claim, based on the evidence presented at the evidentiary hearing regarding the value of such claim. The District Court found that, because the bulk of Carlisle's claims were invalid as barred by *res judicata*, Carlisle had invoked diversity jurisdiction in bad faith, inflating its Complaint with non-justiciable claims in an effort to fulfill the amount in controversy requirement for diversity jurisdiction. Consequently, the District Court dismissed the action for lack of jurisdiction. Carlisle now brings this appeal, which we review pursuant to our authority under 28 U.S.C. § 1291.

7

## II.

Carlisle appeals the District Court's grant of summary judgment dismissing the bulk of the claims as barred by *res judicata*. We review a district court's grant of summary judgment de novo, using the same standard that governs the district court's review of a motion for summary judgment. *Mass. Sch. of Law v. ABA*, 107 F.3d 1026, 1032 (3d Cir. 1997).

In order for *res judicata* to apply, "it is necessary that: 1) there be a final judgment on the merits; 2) the party against whom the bar is asserted is the same; and 3) the subsequent suit is based upon the same cause of action." *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir. 1984). Significantly, where these elements are found, a plaintiff is barred from relitigating not only those claims which were, in fact, actually decided, but also those that the parties might have asserted, but did not, in the prior action. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990).

In this case, there is no dispute that the first two elements of the test for application of *res judicata* have been met: the existence of a final judgment and the identity of parties. However, Carlisle vigorously disputes whether this action is "based upon the same cause of action" as *Carlisle I*. Carlisle argues that this action is different from *Carlisle I* because the instant action is premised upon the 2003 Quitclaim Deed, which did not exist at the time *Carlisle I* was litigated, and thus, this action could not have been brought as part of *Carlisle I*. This argument is unavailing because the instant action seeks greater and more extensive relief than simply the nullification of the Quitclaim Deed.

Carlisle's main claim for relief is an order stating that he is the fee simple owner of all of the land and timber on the Clough Farm property. As a result, this action implicates the same issues and causes of action that were litigated to conclusion in *Carlisle I*, namely the ownership of the trees and timber on the Clough Farm property.

Carlisle argues that, to the extent that the claims in this action are premised on the operation of the 1968 Unrecorded Agreement and the 1973 Timber Deed, such claims could not have been brought in *Carlisle I* because Carlisle had no notice of the existence of either document at the time that action was filed. The District Court rejected such reasoning, concluding that while there is no evidence that Carlisle had any actual notice of the 1968 Unrecorded Agreement at the time of filing of *Carlisle I*, Carlisle had constructive notice of the 1973 Timber Deed as a matter of law, because that document was recorded in his chain of title.

We agree with the District Court's conclusion. As a matter of law, Carlisle had notice of the 1973 Timber Deed because it was recorded in his chain of title. Moreover, basic common sense dictates that Carlisle was on notice that his 1970 purchase of the Clough Farm land did not include any timber rights, as his agreement with Fisher & Young explicitly excepted any such timber rights. The notable exclusion of timber rights from his purchase should have spurred Carlisle, certainly by the time of filing of *Carlisle I*, to make inquiry as to the actual owner of the timber rights. Such inquiry would have led Carlisle to the recorded 1973 Timber Deed, which was in his chain of title. Additionally, because Carlisle had constructive notice of the 1973 Timber Deed, he can

9

properly be charged with inquiry notice of the 1968 Unrecorded Agreement, as that Agreement was explicitly referenced in the 1973 Timber Deed. Carlisle's constructive or inquiry notice of the 1968 Unrecorded Agreement and 1973 Timber Deed thus renders any claims stemming from these documents as barred by *res judicata*, as such claims could have and should have been brought in *Carlisle I*. *Avins v. Moll*, 610 F. Supp. at 324-25.

Carlisle also argues that the District Court erred in dismissing Carlisle's claim regarding the 2003 Quitclaim Deed as barred by the doctrine of *res judicata*. Carlisle misconstrues the District Court's decision. The District Court did not rule that the claim relating to the Quitclaim Deed was barred by *res judicata*. Rather, the District Court explicitly held that the claim regarding the validity of the Quitclaim Deed remained viable, but dismissed that claim for jurisdictional reasons discussed below. Accordingly, we find no error in the District Court's conclusion that the claims in this action relating to the question of ultimate ownership of the Clough Farm and its timber rights, including those claims premised on the 1968 Unrecorded Agreement and the 1973 Timber Deed, are barred by the doctrine of *res judicata* as claims that could have been brought in the prior action.

III.

With respect to the District Court's decision to dismiss Carlisle's remaining claims premised on the 2003 Quitclaim Deed for failure to satisfy the jurisdictional amount, we

10

exercise plenary review over questions of subject matter jurisdiction. *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1044 (3d Cir. 1993).

After dismissing the bulk of Carlisle's claims in this action as barred by *res judicata*, the District Court noted that its jurisdiction was questionable with respect to the remaining claim regarding the alleged cloud on Carlisle's title to the Clough Farm caused by the issuance of the 2003 Quitclaim Deed. The District Court found that the alleged cloud on title could only have an effect on Carlisle's ownership of timber that sprouted on the Clough Farm after 1969. In doing so, the District Court recognized that it was undisputed that Carlisle owned the Clough Farm land (as opposed to timber) outright, so the value of the land was not part of the calculus. Furthermore, the rights to pre-1969 timber had been adjudicated in *Carlisle I* in favor of Matson. Because there was no allegation in the Complaint or evidence before the court regarding the value of the post-1969 Clough Farm timber, the District Court had no basis for deciding whether the Quitclaim Deed claim satisfied the jurisdictional amount.

To resolve this issue, the District Court ordered an evidentiary hearing to assess the value of the post-1969 timber on the Clough Farm. That hearing resulted in testimony from Carlisle's expert that the present value of the timber was approximately $4,200.[3]  In

---

[3]  Carlisle's expert had originally submitted a future-value analysis of the post-1969 timber, valuing the timber at $3.5 million in 50 years, and an investment analysis premised on the amount of money that would have to be invested today to match the projected value of the timber in 50 years ($388,050). The District Court correctly rejected those valuations as irrelevant, because an analysis of the jurisdictional amount in controversy is limited to the present value of the property at issue at the time of the filing

11

light of this evidence that Carlisle's claims regarding the Quitclaim Deed fell far short of the jurisdictional threshold, the District Court determined that those claims could not satisfy the diversity jurisdiction amount in controversy, and would be dismissed without prejudice to their reassertion in a state forum. In so ruling, the District Court determined that Carlisle's original allegations in the Complaint as to the satisfaction of the amount in controversy were made in bad faith, as they were based upon Carlisle's unreasonable inclusion of claims that were previously adjudicated, and therefore barred by the doctrine of *res judicata*, as well as the 2003 Quitclaim Deed claim, which fell far short of the jurisdictional threshold.

We note that, as a general rule, the amount in controversy is determined as of the time the complaint is filed, and that once a federal court finds that it has diversity jurisdiction, subsequent events cannot divest the court of jurisdiction. *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989). However, as noted by the District Court, exceptions to this rule exist, which allow courts to look beyond the allegations of the complaint in situations where a plaintiff has claimed satisfaction of the jurisdictional amount in bad faith, or when subsequent events reveal that the amount actually in controversy at the time of filing was less than the threshold amount. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (hereinafter "*Red Cab*") (holding that "[t]he rule governing dismissal for want of jurisdiction in cases brought in the federal

---

of the Complaint, not the future value or the investment value of such property. *Kelly v. Lehigh Nav. Coal Co.*, 151 F.2d 743, 746 (3d Cir. 1945).

court is that . . . the sum claimed by the plaintiff controls *if the claim is apparently made in good faith*") (emphasis supplied); *id.* at 289 (holding that "if, from the proofs, the court is satisfied to a [legal] certainty that the plaintiff never was entitled to recover" the amount claimed for purposes of conferring jurisdiction, "the suit will be dismissed").

The District Court premised its finding of bad faith on the following evidence of Carlisle's unreasonableness in including "non-justiciable claims" in the Complaint in order to satisfy the amount in controversy requirement:

> [F]irst, the majority of the claims were already actually litigated to verdict in this very court, or should have been because they dealt with the same issue of ownership of the Clough Farm timber; second, a state court had already rebuffed plaintiff's attempt to relitigate ownership of the Clough Farm timber based on the doctrine of *res judicata* due to the earlier federal case; third, many of the allegations of the complaint directly contradicted evidence and arguments that plaintiff presented to this court during the prior federal court case; fourth, the case was not based on any new documents or evidence, other than the 2003 timber deed, which is the basis of the surviving quiet title action; and, fifth, the requested judgment would be contrary to the judgment entered by this court in the prior federal case.

(App. at 25.)

The District Court noted that it "could have dismissed the entire case" based on Carlisle's bad faith in reasserting previously-litigated claims, but gave Carlisle the opportunity to prove that his remaining claims regarding the Quitclaim Deed would satisfy the jurisdictional amount in controversy. Based on the evidence submitted at the hearing, Carlisle could not so prove. Carlisle's expert admitted that the post-1969 timber on the Clough Farm property had a present value of less than $5,000. Thus, the District

13

Court correctly concluded that it was "a legal certainty" that Carlisle was never entitled to recover an amount exceeding $75,000, despite the allegations of the Complaint.

Carlisle argues that the District Court's decision to dismiss the bulk of Carlisle's claims pursuant to the doctrine of *res judicata* was a "subsequent event" that may not be considered in analyzing original jurisdiction. However, the case law indicates otherwise. The District Court's determination regarding the validity of a plaintiff's claims *as of the time of filing of the complaint* is not a "subsequent event"; rather, it is the kind of determination that courts are explicitly permitted, if not encouraged, to rely upon when questioning the jurisdictional basis for a suit. In *State Farm Mutual Automobile Insurance Co. v. Powell*, 87 F.3d 93 (3d Cir. 1996), this Court considered the impact of the District Court's realization that, of three insurance policies claimed to be applicable in the Complaint, only two were actually valid. This Court deemed this discovery to constitute a post-filing "revelation" regarding the status and validity of the claims in the Complaint at the time of filing, and thus distinguished the revelation from a "subsequent event" that altered the amount of a plaintiff's potential recovery:

> It is true that a federal court's jurisdiction ordinarily depends upon "the facts as they exist when the complaint is filed," *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830, 104 L. Ed. 2d 893, 109 S. Ct. 2218 (1989), and thus subsequent events that reduce the amount in controversy below the statutory minimum do not require dismissal. *See Jones v. Knox Exploration Corp.*, 2 F.3d 181, 182-83 (6th Cir. 1993). However, "[a] distinction must be made ... between subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action." *Id.* at 183

14

(emphasis added).

*State Farm*, 87 F.3d at 97. Thus, this Court held that "the discovery that one of the original three policies was not in effect during Powell's accident should be considered a revelation that only two policies were at issue when the litigation was commenced, not a 'subsequent event.'" *Id.*

The Supreme Court in *Red Cab* has endorsed, if not explicitly mandated, the practice of considering post-filing revelations of the invalidity of claims at the time of filing when examining an action's jurisdictional basis:

> In a cause instituted in the federal court the plaintiff chooses his forum. He knows or should know whether his claim is within the statutory requirement as to amount. His good faith in choosing the federal forum is open to challenge not only by resort to the face of his complaint, but by the facts disclosed at trial, and if from either source it is clear that his claim never could have amounted to the sum necessary to give jurisdiction there is no injustice in dismissing the suit. Indeed, this is the court's duty under the Act of 1875.

*Red Cab*, 303 U.S. at 290.

In light of these precedents, the District Court committed no error in finding that Carlisle had inflated the value of his claims in this action by asserting non-justiciable claims in bad faith. Moreover, even without such a finding of bad faith, the District Court could have dismissed the action based upon the fact that the recognition of the invalidity of the bulk of Carlisle's Complaint under the *res judicata* doctrine served as a "revelation" that the Complaint asserted more damages than could be validly claimed, and the evidentiary hearing revealed that the actual amount in controversy at the time of the filing of the Complaint did

15

not meet the jurisdictional threshold. For the foregoing reasons, we will affirm the District Court's dismissal of the action.

*Cpt- See your request. -*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE, Plaintiff      :
                                   :
            VS.                    :   NO. 04-25 ERIE
                                   :
                                   :
BARTONY, HARE & EDSON; SCOTT M.    :
HARE, ESQUIRE; HENRY E. BARTONY,   :
JR., ESQUIRE; and JOHN JOY V.      :
EDSON, ESQUIRE, Defendants         :

AMENDED COMPLAINT

AND NOW comes the Plaintiff, ALBERT T. CARLISLE, by his

counsel, ANDREW J. CONNER, ESQUIRE, of CONNER RILEY & FRYLING, 17

West Tenth Street, P.O. Box 860, Erie, Pennsylvania 16512-0860,

and files this Amended Complaint against the above-named

Defendants, alleging as follows:

1.   Plaintiff, Albert T. Carlisle, hereinafter referred to

as "Carlisle", is an individual, resident and citizen of the

State of Ohio, having his principal place of residence, at all

material times to the events set forth in this Complaint, at 1210

Oak Drive, Ashtabula, Ohio 44004.

2.   Defendant, Bartony, Hare & Edson, hereinafter referred

to as the "Law Firm", was a law firm organized as a partnership

and/or a professional corporation engaged in the practice of law,

having its principal place of professional practice, at all

material times to the events set forth in this Complaint, at Law

& Finance Building, 429 Fourth Avenue, Suite 1801, Pittsburgh,

Pennsylvania 15219.

3)   Defendant, Bartony and Hare, is a law firm organized as a partnership and/or a professional corporation engaged in the practice of law, having its principal place of professional practice, at all material times to the events set forth in this Complaint, at Law & Finance Building, 429 Fourth Avenue, Suite 1801, Pittsburgh, Pennsylvania 15219.  The Law Firm of Bartony and Hare is the successor in interest to the Law Firm of Bartony, Hare & Edson, described in Paragraph 2 of this Complaint.

4)   Defendant, Scott M. Hare, Esquire, hereinafter referred to as 'Hare', is an individual and, between December, 1994 and 1998, a member of the Partnership of Bartony, Hare & Edson, having a principal place of business, at all material times to the events set forth in this Complaint, at Law & Finance Building, 429 Fourth Avenue, Suite 1801, Pittsburgh, Pennsylvania 15219.

5)   Defendant, John V. Edson, hereinafter referred to as 'Edson', is an individual and, between December, 1994 and 1998, a member of the Partnership of Bartony, Hare & Edson, having a principal place of business, at all material times to the events set forth in this Complaint, at Law & Finance Building, 429 Fourth Avenue, Suite 1801, Pittsburgh, Pennsylvania 15219, but now currently having a principal place of business at 400 Broad Street, Suite 106, Sewickley, Pennsylvania 15143.

6)   Defendant, Henry E. Bartony, Jr., hereinafter referred to as "Bartony", is an individual and, between December, 1994 and 1998, a member of the Partnership of Bartony, Hare & Edson,

2

having a principal place of business, at all material times to the events set forth in this Complaint, at Law & Finance Building, 429 Fourth Avenue, Suite 1801, Pittsburgh, Pennsylvania 15219.

7)  Jurisdiction for the claims alleged in this Complaint in this Court is based upon diversity of citizenship of the Plaintiff and Defendants, combined with the allegations that the damages claimed in this action exceed $75,000, exclusive of interest and costs, per 28 U.S.C.A. 1332, et al.

8)  Venue for this action in this Court is based on 28 U.S.C.A. 1391, with an allegation that the property, which is the subject matter of this action, involves about 1400 acres of undeveloped timber property located north of Interstate 80 in Warren County, Pennsylvania.

## COUNT ONE

## CARLISLE V. BARTONY, HARE & EDSON

9)  The allegations contained in the previous Paragraphs of this Complaint are incorporated into this Count by virtue of this Paragraph as if they had been set forth in full.

10)  The Defendant in this Count is the Law Firm, identified in Paragraph 2 of this Complaint.

11)  The Law Firm, through the conduct of its principals and employees acting for and on behalf of the Law Firm, between December, 1994 and 1998, was retained, agreed to act, and did undertake to act as legal counsel for Plaintiff, Carlisle, with respect to all claims Carlisle had against Matson Lumber Company

3

and Matson Hardwoods, Inc. of Brookville, Pennsylvania, hereinafter "Matson", as a consequence of Matson, each year between 1988 and 1997 doing the following:

(a)    Conducting an unauthorized timbering operation on Plaintiff's approximate 1400 acres of property, described in Paragraph 7 of this Complaint;

(b)    Converting timber on the subject property belonging to Carlisle to Matson's use without compensating Carlisle;

(c)    Negligently damaging the waterways and the property at or near the waterways on the subject property when conducting the timbering activities, described above;

10)    On behalf of Carlisle, the Law Firm, on March 13, 1995, filed a thirteen count declaratory judgment action against Matson in the United States District Court for the Western District of Pennsylvania, the caption of which was Albert Carlisle v. Matson Lumber Company and Matson Hardwoods, Inc. in the United States District Court for the Western District of Pennsylvania at Civil Action No. 95-0376.

11)    In December of 1997 during trial of the claims in the declaratory judgment action, made reference to above, the Law Firm, through the acts of its principals, and acting for and on behalf of the Law Firm:

(a)    Caused Counts V and VII of the federal declaratory judgment action, or the trespass and conversion counts of that

4

action, to be dismissed per F.R.C.P. 41(a)(1) without obtaining
the consent of the Plaintiff, Albert T. Carlisle;

    (b)  Represented to the Plaintiff, Albert T. Carlisle,
that any claim for damages recoverable for trespass and
conversion under the dismissed counts, made reference to in (a),
above, could be made by Carlisle against Matson in a subsequent
action against Matson after the federal declaratory judgment
action was resolved.

14)  At or prior to the dismissal of the negligent and
conversion counts, made reference to above, the Law Firm knew,
and/or should have known, the following:

    (a)  Matson had conducted an unauthorized timbering
operation on the Carlisle property each year starting in 1988 and
thereafter through 1998;

    (b)  Carlisle's witnesses were prepared to prove that
the unauthorized timbering operation, made reference to in
Paragraph 10 of this Complaint, had caused several hundred
thousand dollars belonging to Carlisle to be converted to
Matson's use;

    (c)  Any subsequent refiling of the negligence or
conversion claims would be subject to defenses including, but not
limited to, statute of limitations, res judicata and collateral
estoppel and these defenses were not available to Matson as a
defense in Civil Action No. 95-0376;

(d)  No timely protective action had been filed in any
other Pennsylvania court to preserve Carlisle's negligence and
conversion claims from the defenses, made reference to in (c),
above;

(e)  Carlisle's permission and consent had not been
obtained to dismiss the negligence and conversion claims, before
that was accomplished;

(f)  Carlisle had not been advised at any time prior to
the dismissal of the negligence and conversion claims that the
same claims should be filed against Matson in the Pennsylvania
Court having jurisdiction and venue of those claims to protect
those claims against the defenses, made reference to in (c),
above.

15) The Defendant Law Firm continued to represent the
Plaintiff until July 28, 1998 with respect to the disposition of
post-trial motions of Matson following Plaintiff's verdict
rendered in the declaratory judgment action regarding Matson's
timber cutting in the "no cut zone" and Plaintiff thereafter, in
reliance upon the representations of the Defendant Law Firm that
the trespass and conversion claims could be refiled in a
subsequent action with other counsel, filed a four Count
Complaint on November 11, 1998 against Matson in the Court of
Common Pleas of Warren County, Pennsylvania.  Two counts of that
Complaint were, in substance, the dismissed trespass and
conversion claims, and/or Counts V and VII, in the federal
declaratory judgment action complaint.

6

16)  Because the negligence and conversion claims had been dismissed on December 17, 1997 prior to the jury receiving the case from the Court for resolution, the jury was not instructed or permitted to resolve any issue regarding the negligence and conversion claims and award damages to Carlisle for either of those claims in the Federal District Court action.

17)  The United States Third Circuit Court of Appeals, in an Order dated March 16, 1999 in response to Matson's Appeal from the District Court, affirmed the District Court's denial of Matson's post-verdict motions requesting it be granted a new trial and judgment NOV.

18)  On November 24, 1998, Carlisle, with other counsel, filed a four count civil Complaint against Matson in the Court of Common Pleas of Warren County, Pennsylvania at Civil Action No. 353-1998 C.D.

19)  The four counts of the civil Complaint filed in the Court of Common Pleas of Warren County, Pennsylvania, made reference to above, consisted of the following:

(a)  Count One was a claim in trespass for negligent, careless and reckless logging dating from December 18, 1996;

(b)  Count Two was a claim for breach of contract for harvesting trees outside the scope of the Agreement of Sale;

(c)  Count Three was a claim for indemnity averring that under Paragraph 11 of the Agreement, Defendants agreed to indemnity Plaintiff;

7

(d) Count Four was a claim for conversion of Carlisle's timber dating from 1986.

20) Count One of the Warren County action, made reference to above, in substance, was the same negligence claim set forth in Count Five of the declaratory judgment action which was dismissed by the Law Firm pursuant to F.R.C.P. 41(a)(1), as described in the previous Paragraphs of this Complaint.

21) Count Four of the Warren County action, made reference to above, in substance, was the same conversion claim made in Count Seven of the declaratory judgment action, which was voluntarily dismissed by the Law Firm on or about December 18, 1997.

22) In response to Matson's Motion for Summary Judgment, the Court of Common Pleas of Warren County, Pennsylvania on January 30, 2002, granted Matson partial Summary Judgment on the negligence and conversion claims, and/or Count One of the Warren County Complaint, made reference to above.

23) The Warren County Court granted partial Summary Judgment on January 30, 2002 in favor of Matson, holding that Carlisle's negligence and conversion claims in the Warren County action were barred by the defenses of res judicata and collateral estoppel for any damages incurred by Carlisle and recoverable in those two Counts for Matson's conduct occurring at any time on or before December 18, 1997, or the date when the jury in the Federal District Court action returned its verdict, described in Paragraph 15 of this Complaint.

24)    The Warren County Court, in its January 20, 2002
Opinion and Order, held that as a consequence of its holding,
described in the previous Paragraph of this Complaint, it was
unnecessary for that Court to also rule that Matson's claims in
Counts One and Four of Carlisle's claims were also barred by the
two year statute of limitations defenses for any damages
recoverable under either Count occurring more than two years
prior to November 14, 1998, or the date of the filing of the
Warren County action.

25)    The Law Firm and its principals, agents and employees,
on and between 1994, the date of their first representation, and
1998, the date of their last representation of Carlisle,
negligently provided legal services for and on behalf of Carlisle
with respect to Carlisle's claims against Matson, described in
Paragraph 11 of this Complaint.  This negligence materially
increased the risk of and was a substantial factor in causing
Carlisle to incur the past and future damages made claim for in
this action.

26)    The negligent acts of the Law Firm include, but are not
limited to, the following:

(a)    Causing the negligence and conversion counts and
claims in the declaratory judgment action to be dismissed without
first obtaining Carlisle's consent;

(b)    Failing to properly and timely file the same
negligence and conversion claims on behalf of Carlisle in a
Pennsylvania Court of Common Pleas so as to preserve those claims

9

against defenses arising out of their dismissal in the Federal Court action;

(c)   Failing to present the underlying proof of damages in the declaratory judgment action which would support a recovery under the negligence and conversion claims pled in the declaratory judgment action in the Federal District Court action;

(d)   Failing to conduct a thorough and complete investigation and title search to determine the identity of the owner of the timber on Carlisle's 120-acre parcel of property for the relevant time period on an between 1986 and 1997;

(e)   Failing to properly and carefully research the controlling law regarding the ownership of the timber on the Carlisle property for the relevant time period on and between 1986 and 1997;

(f)   Failing to obtain copies of and properly interpret all the deeds, timber deeds, correspondence and documents relevant to the conveyance of the subject property and the ownership of this timber from Matson and Matson's predecessor in ownership, Fisher and Young, Marian Kinkaid and/or her estate;

(g)   Failing to know and/or research the controlling law regarding the potential adverse consequences to Carlisle of causing both Carlisle's negligence and conversion claims to be voluntarily dismissed;

(h)   Failing to properly and timely warn Carlisle, on or prior to December 18, 1997, of the probable adverse consequences to Carlisle of any dismissal of either the negligence or

19

conversion claim which were part of the Federal District Court
action.

27)    The negligent acts, described above, materially
increased the risk of and was a substantial factor in causing
Carlisle to incur the following damages:

(a)    The loss of the damages which could have been
proven to support a recovery under the negligence and conversion
claims of the declaratory judgment action in the Federal District
Court action for at least the consequences of Matson's timbering
operation on Carlisle's property which occurred on and between
March 13, 1993 and the date of verdict on December 18, 1997;

(b)    Failing to recover damages for the related and
collateral property damage to Carlisle's property and all the
streams and their banks on this property caused by Matson's
timbering operations, at least for the time period between March
13, 1993 and the date of the verdict on December 18, 1997;

(c)    Failing to recover damages generally for
Carlisle's unauthorized timbering operations and conversion of
Carlisle's timber which was owned by Carlisle and not by Matson.

WHEREFORE, Plaintiff requests damages from the Defendant,
BARTONY, HARE & EDSON, in an amount in excess of $75,000.00,
exclusive of interest and costs.

<u>COUNT TWO</u>

(CARLISLE V. BARTONY & HARE)

28)    The allegations contained in the previous Paragraphs of
this Complaint are incorporated into this Count by virtue of this

11

Paragraph as if they had been set forth in full.

29)    The Defendant in this Count is Bartony & Hare, identified in Paragraph 3 of this Complaint.

30)    Bartony & Hare is the successor in interest to the Law Firm of Bartony, Hare & Edson and, under the controlling law, assumed the liability for the negligent acts of the Law Firm, described in Count One of this Complaint.

WHEREFORE, Plaintiff requests damages from the Defendant, BARTONY & HARE, in an amount in excess of $75,000.00, exclusive of interest and costs.

### COUNT THREE

### CARLISLE V. HARE

31)    The allegations contained in the previous Paragraphs of this Complaint are incorporated into this Count by virtue of this Paragraph as if they had been set forth in full.

32)    The Defendant in this Count is Scott M. Hare, Esquire, previously identified.

33)    Defendant, Scott M. Hare, for the reasons set forth in Paragraphs 11 through 23, negligently provided legal services from December, 1994 through 1998, and his negligence materially increased the risk of, and was a substantial factor in, causing Carlisle the damages made claim for and described in Paragraph 24 of this Complaint.

WHEREFORE, Plaintiff requests damages from the Defendant, SCOTT M. HARE, in an amount in excess of $75,000.00, exclusive of interest and costs.

COUNT FOUR

CARLISLE V. EDSON

34) The Allegations contained in the previous Paragraphs of this Complaint are incorporated into this Count by virtue of this Paragraph as if they had been set forth in full.

35) The Defendant in this Count is John Joy V. Edson, Esquire, previously identified.

36) Defendant, John Joy V. Edson, as a consequence of his partnership and association with the law firm of Bartony, Hare & Edson, described in Paragraph 2 of this Complaint, is vicariously liable for the negligent acts of Defendant, Scott Hare, and the employees and agents of the law firm, described in Paragraphs 11 through 23 of this Complaint, all of which negligent acts materially increased the risk of, and were substantial factors in, causing the damages made claim for in Paragraph 24 of this Complaint.

WHEREFORE, Plaintiff requests damages from the Defendant, JOHN JOY V. EDSON, in an amount in excess of $75,000.00, exclusive of interest and costs.

COUNT FIVE

CARLISLE V. BARTONY

37) The allegations contained in the previous Paragraphs of this Complaint are incorporated into this Count by virtue of this Paragraph as if they had been set forth in full.

38) The Defendant in this Count is Henry R. Bartony, Jr., Esquire, previously identified.

13

99) Defendant, Henry E. Bartony, Jr., as a consequence of his partnership and association with the law firm of Bartony, Hare & Edson, described in Paragraph 2 of this Complaint, is vicariously liable for the negligent acts of Defendant, Scott Hare, and the employees and agents of the law firm, described in Paragraphs 11 through 23 of this Complaint, all of which negligent acts materially increased the risk of, and were substantial factors in, causing the damages made claim for in Paragraph 24 of this Complaint.

WHEREFORE, Plaintiff requests damages from the Defendant, HENRY E. BARTONY, JR., in an amount in excess of $75,000.00, exclusive of interest and costs.

JURY TRIAL DEMANDED.                   Respectfully submitted,

                                       CONNER RILEY & FRYLING

                                       BY _____
                                          ANDREW J. CONNER, ESQUIRE

                                       BY _____
                                          JAMES R. FRYLING, ESQUIRE
                                          ATTORNEYS FOR PLAINTIFF
                                          17 West Tenth Street
                                          P.O. Box 860
                                          Erie, PA  16512-0860
                                          (814) 453-5340

DATED: May 4, 2004.



                                 14

CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Amended Complaint was served upon David L. Haber, Esquire, 602 Law and Finance Building, 429 Fourth Avenue, Pittsburgh, Pennsylvania 15219-1503, this 4th day of May, 2004.

CONNER RILEY & FRYLING

BY _____
ANDREW C. CONNER, ESQUIRE
ATTORNEY FOR PLAINTIFF
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860
(814) 452-3343

DATED: May 4, 2004.