<u>LAINARD BUSH</u>

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

ALBERT CARLISLE        )
3                     )
        VS          ) C. A. No. 04-25 Erie
4                     )
BARTONY, HARE & EDSON;  )
5 SCOTT M. HARE, ESQUIRE   )
  HENRY E. BARTONY, JR.   )
6 ESQUIRE and JOHN JAY V.  )
  EDSON, ESQUIRE        )

7

8               TRANSCRIPT OF PROCEEDINGS

9     Of the depositions of LAINARD BUSH and JAMES HALL

10    taken on Friday, February 3, 2006 commencing at 10:00

11    a.m. at the offices of ANDREW J. CONNER, ESQUIRE, 23

12    West Tenth Street, Erie, Pennsylvania.

13

14 APPEARANCES:

15 ANDREW J. CONNER, ESQUIRE, 23 West Tenth Street, Erie,
   Pennsylvania (For the Plaintiff)
16
   JAMES FRYLING, ESQUIRE, 23 West Tenth Street, Erie,
17 Pennsylania (For the Plaintiff)

18 DAVID HABER, ESQUIRE, 602 Law & Finance Building, 429 Fourth
   Avenue, Pittsburgh, Pennsylvania (For the Defendant)

19

20

21

22

23

24

25

2

```
 1

 2                        I  N  D  E  X

 3

 4   Witness                        Examination by:

 5

 6                              Haber      Conner

 7   Lainard Bush              3/48/54     39/53

 8

 9   James Hall                   56          --

10

11                     E  X  H  I  B  I  T  S

12   Bush Deposition Exhibit 1                29
        (Deed of 1973)
13
     Bush Deposition Exhibit 2                40
14      (Praecipe for Writ of Summons)

15   Bush Deposition Exhibit 3                46
        (Write filed June of '98)
16
     Hall Deposition Exhibit 1                60
17      (Stipulation for dismissal 12/15/97)

18   Hall Deposition Exhibit 2                69
        (Damage Report by Hall)
19
     Hall Deposition Exhibit 3                74
20      (October 7, 2005 Report by Hall)

21

22

23

24

25
```

3

Lainard Bush

1           MR. CONNER:  Put the usual stipulation on,

2     reserve all objections.

3           MR. HABER:   It's agreed upon by counsel that

4     all objections except as to the form of the questions

5     are reserved.

6           MR. CONNER:  That's fine.

7           LAINARD E. BUSH, having been duly placed under oath,

8     was examined and testified as follows:

9                     DIRECT EXAMINATION

10   BY MR. HABER:

11           Q.     Would you state your full name?

12           A.     Lainard Edward Bush.

13           Q.     Mr. Bush, my name is David Haber.  I represent

14    the defendants in a lawsuit Mr. Carlisle has filed in the

15    united States District Court for the Western District of

16    Pennsylvania.

17           This morning I'm going to ask you some questions

18    regarding that matter, and ask you to follow a couple rules.

19           One is the court reporter sitting here is taking down

20    everything that's said and she can't take down the shrug of

21    the shoulders or a nod of the head, so I'd ask you to

22    verbalize your answers.

23           Also, please let me finish my question before you

24    begin your answer, because if we start talking at the same

25    time it's going to make it more difficult to take down your

19

Lainard Bush

1        Q.      Did he say anything in relation to the amount

2    of damages that were awarded?

3        A.      Yes.

4        Q.      Was he happy with the amount?  Dismayed with

5    the amount?

6        A.      He was dismayed with the amount.

7        Q.      What did he say?

8        A.      He was unhappy, he felt that although the --

9    essentially he won on the issues that went before the jury,

10   that overall he was unhappy and felt that really didn't

11   amount to much of a victory at all considering what he felt

12   Matson had gotten away with.  Basically that --

13       Q.      So he was dissatisfied with the amount of

14   money he got?

15       A.      Yes.

16       Q.      Do you know if he expressed that

17   dissatisfaction to Scott Hare on that day?

18       A.      He did express his dissatisfaction.

19       Q.      Do you recall what he said?

20       A.      This was right after the verdict, the same

21   day, I believe, and he expressed his dissatisfaction and I

22   just remember Scott saying I don't understand why you're so

23   unhappy, we won.  And, you know, this is a first step and

24   sets the stage for what is to come, basically.

25       Q.      Mr. Hare said that?

Plaintiff's Appendix
000004

20

Lainard Bush

1  A.  Yes, something to that effect.

2  Q.  Did you understand what he meant by that, or

3 did you have an understanding what he meant by that?

4  A.  I think I do, yes.

5  Q.  What was that?

6  A.  That although the trial was limited in its

7 scope, that it would be satisfied and he would have an

8 opportunity to get that satisfaction and the stage was set

9 for that.

10  Q.  During the course of the trial did Bert ever

11 express to you dissatisfaction with the type of damages Mr.

12 Hare was attempting to recover?

13  A.  Just repeat that one time.  I want to make

14 sure I'm clear.

15  Q.  I'll represent to you that --

16  A.  Because there's the judge -- what the judge

17 allowed and there's -- I mean, Scott had no choice.

18  Q.  The damages were limited to trees cut -- trees

19 removed in the no-cut zone.

20  A.  Right.

21  Q.  Did Mr. Carlisle indicate to you that he was

22 unhappy that Scott wasn't trying to recover damages for other

23 things that Matson may or may not have done on the property?

24  A.  I don't think -- no, because it was not -- he

25 wasn't setting the agenda.

31

Lainard Bush

1     Q.    Mr. Fryling and Mr. Conner?

2     A.    Yes.

3     Q.    Do you recall where that meeting took place?

4     A.    I believe it was here.

5     Q.    When you say here, at the attorneys' offices?

6     A.    Correct.

7     Q.    Do you know when that meeting took place?

8     A.    The exact date, no.

9     Q.    Do you have any way of determining what the

10   date was?

11     A.    It was after he retained their services, I

12   would just have to estimate.

13     Q.    After this do you recall Mr. Carlisle ever

14   contacting Mr. Hare to ask him whether he did a title search

15   or not?

16     A.    After when?

17     Q.    After you had this meeting with the lawyers?

18     A.    I don't recall Bert --

19     Q.    Do you recall any discussion ever between Mr.

20   Carlisle and Mr. Hare about a title search being done?

21     A.    Yes.

22     Q.    When was this?

23     A.    It would have been prior to the '97 court

24   case.

25     Q.    And where was this discussion at?

Plaintiff's Appendix
000006

32

Lainard Bush

1      A.     I believe it was at my house.

2      Q.     Your house?

3      A.     Yes.

4      Q.     And your house would have been on the farm?

5      A.     Yes.

6      Q.     And what was said?

7      A.     That was in the context of -- there were a lot

8  of -- it was the context of the original agreement Clause A,

9  B and the map, the no-cut zones.  There were a lot of

10  questions surrounding all of that which brought up the

11  history of ownership, and I remember at that time Scott

12  saying that he was going to -- that's one of the things he

13  would be doing was going to the Warren County Courthouse and

14  going through all those records, so that all those questions

15  could be answered.  Those involve titles so.

16      Q.     Did he say he was going to do a title search?

17      A.     I don't remember him specifically using those

18  words but just what I conveyed to you.

19      Q.     This meeting that you were at, was it at that

20  meeting there a discussion about bringing a lawsuit against

21  Mr. Hare?

22      A.     What meeting are you talking about?

23      Q.     The meeting you had where you were told about

24  this missing deed?

25      A.     Oh, you mean the meeting here?

34

Lainard Bush

1    property, prior to 1994?

2         A.    I don't recall any, no.

3         Q.    To your knowledge was -- to your knowledge was

4    a title search ever done on the property prior to 1994?

5         A.    To my knowledge, no.

6         Q.    You knew Mr. Carlisle when he bought this

7    property?

8         A.    Yes.

9         Q.    Did you have any discussions with him back in

10   the early 1990's regarding his purchase of the property?

11        A.    I'm sure we must have.

12        Q.    I know I'm testing your memory, it's thirty

13   some years ago.

14        A.    It would have been limited.  I mean, I knew

15   the basic circumstances about him purchasing the property but

16   the specifics, I didn't know that much.

17        Q.    You weren't involved in the purchase?

18        A.    No.

19        Q.    Did you ever meet with a Terry Warren who

20   represented Mr. Carlisle in the seventies?

21        A.    No.

22        Q.    You indicated that if Mr. Hare had done this

23   title search, he would have found this deed which would have

24   shown that Matson had no right in the timber; is that what

25   you said?

35

Lainard Bush

```
 1        A.      Wait.  What did you just say I said again?

 2        Q.      I think you testified that if Mr. -- based on

 3   discussions, if Mr. Hare had located this deed, or done a

 4   title search, he would have discovered that Matson had no

 5   rights in the timber.

 6        A.      Probably, yeah.

 7        Q.      Do you recall a discussion with Mr. Carlisle

 8   regarding who would have had the rights of the timber?

 9        A.      I don't -- to answer that question, I can't

10   separate Bert from who is representing him to answer that

11   question.

12        Q.      Were you present at meetings where it was

13   discussed who would have had rights in the timber if Matson

14   did not?

15        A.      There was speculation about that.

16        Q.      What was the speculation?

17        A.      It would have been the Kinkead heir or Bert

18   carlisle.

19        Q.      At that point was there any discussions about

20   contacting Miss Kinkead -- I guess you couldn't contact Miss

21   Kinkead, she was dead at the time, contacting her

22   representative regarding transferring of timbering rights to

23   Bert carlisle?

24        A.      I recall that there was.

25        Q.      To your knowledge did Mr. Carlisle ever
```

Plaintiff's Appendix
000009

41

Lainard Bush

1    in front of you --

2         A.        Um-hum.

3         Q.        -- you were asked about a meeting at Mr. --

4    apparently at the farm but not asked a lot of questions about

5    that meeting at the farm and that would have been the meeting

6    at the farm you made reference to that occurred prior to the

7    actual trial in 1997, which was a trial in Pittsburgh.

8         A.        Right.

9         Q.        Could you tell us what discussions, if any,

10   occurred in your presence, and statements made in that

11   meeting by Mr. Hare, that related to the filing of a second

12   lawsuit or a separation of the lawsuit that was pending in

13   federal court, that you can recall here today?

14        A.        This was prior to the '97 --

15        Q.        Right.

16        A.        It was at one of the meetings at my house.

17   What I recall is -- pretty clearly was that there was a

18   discussion about how big and complicated the case was that

19   Scott felt that it was a lot to put before a jury, and that

20   they might have a hard time following all the details and all

21   the information, and that there was a discussion at that time

22   that it would make more sense to simplify things for the jury

23   by breaking it up into two parts, and the first part would be

24   dealing more with the -- defining the problems that had arose

25   out of the original agreement.

42

Lainard Bush

1      Q.      And the second part was to relate to what?

2      A.      The second part was to relate to more the

3  damages.

4      Q.      And from those discussions was it your

5  understanding, in whole or in part, there was a contemplation

6  of filing a second lawsuit?

7      A.      Absolutely.

8      Q.      Was there a discussion then about the

9  possibility of filing a second lawsuit following --

10      A.      That was one of the times when, again, he

11  mentioned this seal that was on the agreement, and that, yes,

12  we could -- there was no time frame so we could divide it up,

13  first part this, second part the damages.

14      Q.      When you talk about first part, second  part,

15  in the context of two separate lawsuits?

16      A.      Right.

17      Q.      When you say he --

18      A.      Scott Hare.

19      Q.      Now, I want to go fast forward to the meeting

20  in Ashtabula that you indicated --

21      A.      Right.

22      Q.      -- occurred in Mr. Gabrich's office.

23      A.      Yes.

24      Q.      I think you have, I believe, indicated in

25  response to Mr. Haber that you don't have a great deal of

44

Lainard Bush

1      In any case, after that jury that was what was on my

2    mind still because he had done -- he'd done what he wanted

3    and he got the agreement that was ruled on in Bert's favor,

4    which was great and that set the stage to now go forward with

5    the damages, and that was what was foremost on my mind and I

6    didn't want him to lose sight of that picture, and wanted to

7    move forward on that and he just assured me that there was

8    plenty of time to do that, and again he referred to that

9    seal.

10     Q.    And was that part -- when you say he, was that

11   Mr. Hare?

12     A.    Mr. Hare.  The meeting after --

13     Q.    In Mr. Gabrish's office in Ashtabula?

14     A.    Yes.

15     Q.    From your discussions in that meeting did you

16   understand that Mr. Hare was going to move forward with the

17   filing of a second lawsuit that related to, what, the topic

18   of damages, generally?

19     A.    That was generally understood, yes.

20     Q.    Now I want to then go back to the document

21   I've showed you.  You get this letter apparently preceded by

22   a phone call.

23     A.    Yes.

24     Q.    And you eventually get a letter that's now

25   dated June 23rd with instructions, apparently to you, to

Lainard Bush

1    proceed forward with regards to getting this document filed

2    in the Warren County Courthouse.

3        A.    Right.

4        Q.    Did he indicate, in whole or in part now, in

5    June, in contrast to what he said in January, that there was

6    some urgency to get this document filed, and I'm talking

7    about the document that was attached to your attachment of

8    the June 23rd letter?

9        A.    There was a deadline, that's why he called me

10   the day before.  The day we were filing I thought was the

11   deadline.  There was a deadline, I know I was concerned about

12   that.

13       Q.    Was it your understanding, either in whole or

14   in part, from your discussions with Mr. Hare that the

15   deadline for filing this was June 24th, the following day?

16       A.    Yes.

17       Q.    Because I guess it was sent to you by

18   overnight express, was it not?

19       A.    Right.  Which was a little confusing to me.

20       Q.    So you would have received it then on the

21   24th; is that correct?

22       A.    Run that by me again.  You're throwing out

23   dates here, I want to make sure I'm clear.

24       Q.    The letter is dated June 23rd.

25       A.    Yes.

47

Lainard Bush

1   and that whatever he filed or -- I don't know if he wrote a
2   check out but it was adequate proof that it was filed.
3        Q.    And can you tell us with regards to your
4   understanding the effect of filing this second lawsuit with
5   respect to Bert's right to recover the damages that, for all
6   intents and purposes, Scott had outlined as being part of a
7   second claim, was it your understanding that the filing of
8   this second lawsuit, in a sense, protected or preserved
9   Bert's claim for damages that had been previously discussed
10   back in late January of '98 and previously discussed prior to
11   the trial at your home with Mr. Hare?
12        A.    I think specifically that's why we were doing
13   this and it was my understanding by doing this, then, we
14   would proceed with that second claim.
15        Q.    And that related to the damage claims?
16        A.    Yes.
17        Q.    Now, with regards to the damage claims, did
18   this include both damage to the property and damages
19   resulting from the tree cutting by Matson?
20        A.    Yes.
21        Q.    And was that indicated to you in your presence
22   by Scott Hare?
23        A.    When?
24        Q.    Back in the late January 1998?
25        A.    Oh, yeah, that was always-

48

Lainard Bush

1      Q.      Both components were discussed?

2      A.      Yes.  Sure.

3              MR. CONNER:  That's all the questions I have

4                      REDIRECT EXAMINATION

5  BY MR. HABER:

6      Q.      I'm a little confused now.  Mr. Carlisle was

7  dissatisfied with the damages you received in the federal

8  court verdict, correct?

9      A.      Yes.

10      Q.      What was his dissatisfaction, then?  If he

11  knew there was going to be a second lawsuit, what was his

12  dissatisfaction?

13      A.      His dissatisfaction was for the damages -- the

14  damages he received was for the no-cut zones, that figure was

15  for what they had cut in the no-cut zones and he was

16  dissatisfied with that amount because he felt that in no way

17  represented the actual damage to the no-cut zones on the

18  property which, in fact, it didn't, because the no-cut zones

19  were all waterways on the property, but the way -- the way

20  that -- the sequence of how that all occurred, receiving

21  those damages, Bert never ended up receiving damages for

22  everything they cut in all the waterways on the property,

23  only for two, and it was very low damage and he felt, in

24  general, everything that Matson had done this in no way was

25  satisfactory.

49

Lainard Bush

1    Q.    Was he dissatisfied in any other manner with

2    the damage award, other than he didn't think he got enough

3    for the no-cut zone?

4    A.    He was dissatisfied with the judge's decision

5    to throw out Clause A and B in the agreement.

6    Q.    You said you had this meeting prior to the

7    jury verdict in which you discussed a second lawsuit.

8    A.    We discussed, yeah, dividing it up and

9    breaking it into components, yeah.

10    Q.    What damages were going to not be part of the

11    second lawsuit?  Was there a discussion about what damages

12    were going to be part of the second lawsuit?

13    A.    My understanding would be damages for cutting

14    of trees and property damages, both those things.

15    Q.    So it was discussed at this meeting not

16    pursuing those type of damages in the first lawsuit?

17    A.    I don't know if that was specifically

18    discussed or not, but I think basically that was the gist of

19    it.

20    Q.    So the gist of it was we could pursue a second

21    lawsuit?

22    A.    Yeah.

23    Q.    Was there discussion about not pursuing some

24    damages in federal court?

25    A.    I don't recall that specifically.

52

Lainard Bush

1   lawsuit; do you remember discussing the legal effect of not

2   pursuing parts to the complaint?

3          A.       There was no discussion of it that I recall.

4          Q.       You said when you received what's been marked

5   as Exhibits 2 and 3 from Mr. Hare that there was a deadline.

6          A.       Yes.

7          Q.       Did Mr. Hare explain to you what effect --

8   what would happen if he didn't file it on that date?

9          A.       I don't think he explained it to me, no.

10         Q.       He told you it was a deadline.

11         A.       Yes.  I was confused about it.

12         Q.       You didn't know what the legal effect would be

13  if you didn't file on June 24th?

14         A.       As far as I knew -- he always talked about

15  that seal, and all of a sudden there was this deadline and I

16  was confused about that.

17         Q.       Do you know what the deadline was for?

18         A.       It was -- it was the filing so that we could

19  go forward with the remaining damages.

20         Q.       Did Mr. Hare explain to you what would happen

21  if you didn't file it that day?

22         A.       Not to me I don't think he did.  I knew it was

23  important but I don't think he explained that to me.

24         Q.       The meeting you had in 1998 in Ashtabula

25  following the verdict was there a discussion regarding what

CARLISLE

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
     ALBERT CARLISLE             )
 3                               )
            VS                   )
 4                               ) C.  A.  No.  04-25 Erie
                                 )
     BARTONY, HARE & EDSON;      )
 5   SCOTT M. HARE, ESQUIRE      )
     HENRY E. BARTONY,  JR.      )
 6   ESQUIRE and JOHN JAY V.     )
     EDSON, ESQUIRE              )

 7

 8                   TRANSCRIPT OF PROCEEDINGS

 9        Of the deposition of ALBERT CARLISLE taken on Monday,

10        January 23, 2006 commencing at 10:20 a.m. at the

11        offices of ANDREW J. CONNER, ESQUIRE, 23 West Tenth

12        Street, Erie, Pennsylvania.

13

14   APPEARANCES:

15   ANDREW J. CONNER, ESQUIRE, 23 West Tenth Street, Erie,
     Pennsylvania (For the Plaintiff)
16
     DAVID HABER, ESQUIRE, 602 Law & Finance Building, 429 Fourth
17   Avenue, Pittsburgh, Pennsylvania (For the Defendant)

18

19

20

21

22

23

24

25
</pre>

2

```
 1                    I  N  D  E  X

 2

 3   Witness                    Examination by:

 4

 5                          Haber      Conner

 6   Albert Carlisle          4/154       152

 7

 8                  E  X  H  I  B  I  T  S
```

```
 9   Carlisle Deposition Exhibit A              15
         (Deed of January 19,  1970)
10
     Carlisle Deposition Exhibit B              15
11       (Agreement of Sale of 1/20/70)

12   Carlisle Deposition Exhibit C              37
         (Complaint 3/13/95)
13
     Carlisle Deposition Exhibit D              40
14       (Stipulation for dismissal 12/15/97)

15   Carlisle Deposition Exhibit E              43
         (Excerpt of transcript from trial)
16
     Carlisle Deposition Exhibit F              46
17       (Timber no-cut zone by Hall)

18   Carlisle Deposition Exhibit G              59
         (Praecipe - June '98)
19
     Carlisle Deposition Exhibit H              75
20       (Deed of 4/20/73)

21   Carlisle Deposition Exhibit I             117
         (Quit Claim Deed - Squatriti to Matson)
22
     Carlisle Deposition Exhibit J             119
23       (Deed from Kinkead to Fisher & Young)

24   Carlisle Deposition Exhibit K             119
         (Articles of Agreement Fisher & Young and Kinkead)
25
```

3

```
1                        E  X  H  I  B  I  T  S

2    Carlisle Deposition Exhibit L                    121
         (Letter of 2/11/71)
3
     Carlisle Deposition Exhibit M                    125
4        (Letter 12/23/70 Warren to Kookogey)

5    Carlisle Deposition Exhibit N                    129
         (Letter of 4/28/70 Kookogey to Warren)
6
     Carlisle Deposition Exhibit O                    132
7        (Letter of 2/13/70 Warren to Kookogey)

8    Carlisle Deposition Exhibit P                    134
         (Letter of 3/27/73)
9
     Carlisle Deposition Exhibit Q                    136
10       (Request from Fisher & Young 3/15/73)

11   Carlisle Deposition Exhibit R                    138
         (Letter of Enders to Matson)
12
     Carlisle Deposition Exhibit S                    142
13       (Letter of Enders)

14   Carlisle Deposition Exhibit T                    146
         (Letter 6/30/88 Matson to Carlisle)
15
     Carlisle Deposition Exhibit U                    148
16       (Letter of 6/23/98 Hare to Bush)

17   Carlisle Deposition Exhibit V                    152
         (Letter of 4/28/99 Hare to Krembs)
18

19

20

21

22

23

24

25
```

5

ALBERT CARLISLE

1    answer.  You're going to be able to anticipate some of the

2    questions, but if you start talking before I'm done, the

3    court reporter is going to have trouble taking down what's

4    said.  So if you let me finish my question, I'll let you

5    finish your answer before I move to the next question.  Okay?

6         A.    Okay.

7         Q.    What is youR current address?

8         A.    1210 Oak Drive.

9         Q.    And where is that located?

10        A.    It's in Ashtabula, Ohio.

11        Q.    And do you reside there with anyone?

12        A.    No.

13        Q.    How long have you lived there?

14        A.    Thirty years probably.

15        Q.    Are you married?

16        A.    No, single.

17        Q.    Ever been married?

18        A.    No.

19        Q.    Any brothers or sisters?

20        A.    One sister.

21        Q.    And what's her name?

22        A.    Her name is Mary Betts, B-E-T-T-S, Trembley,

23    T-R-E-M-B-L-E-Y.

24        Q.    Where does she reside?

25        A.    She lives in Grand Junction, Colorado.

ALBERT CARLISLE

1    Q.    Where is that located?

2    A.    In Mentor, Ohio.

3    Q.    What was your position there?

4    A.    Instructor.

5    Q.    And when was that?

6    A.    Oh, late sixties, early seventies.

7    Q.    Can you tell me your educational background?

8    A.    Well, graduated from high school 1955.  I got

9    an AB degree from Oberlin College in 1959.  And I got an MBA

10   from Dartmouth College 1961.

11   Q.    After you got the MBA from Dartmouth in 1961,

12   did you attend any other schools?

13   A.    I went to the University of Virginia for one

14   year.

15   Q.    University of Virginia?

16   A.    Yes.

17   Q.    When was that?

18   A.    Well, that would have been in '61, '62.

19   Q.    What were you seeking?  Another degree at the

20   University of Virginia?

21   A.    I enrolled in the law school.  I completed one

22   year of law school.

23   Q.    And that was in '61?

24   A.    '61, um-hum.

25   Q.    Is there a reason you did not finish?

ALBERT CARLISLE

1    A.    Yes, um-hum.

2    Q.    What was the reason?

3    A.    Well, you can't -- it's a long reason.

4    Q.    Okay.

5    A.    I was called by the president of Lake Erie

6    College, who was a friend of mine, personal friend of mine,

7    his son was graduating from Yale and he wanted to know what I

8    thought of the University of Virginia Law School.  His son

9    was interested in going to law school.  We had lunch

10   together, and in the course of the lunch he asked me if I

11   ever thought I'd like to teach.  I said I have thought about

12   it.  He said:  I have an opening.  So I left law school and

13   went to teach at Lake Erie College.  That's exactly how it

14   happened.

15       Q.    Any further education after the University of

16   Virginia Law School for one year?

17       A.    No.

18       Q.    What did you teach at Mentor or Lake --

19       A.    At Lakeland. Basically I taught economics and

20   accounting.

21       Q.    This lawsuit concerns somewhat the Clough

22   farm.

23       A.    Um-hum.

24       Q.    And you know what I refer to as the Clough

25   farm?

ALBERT CARLISLE

1        A.      Yes.

2        Q.      You purchased the property in the early

3    seventies, correct?

4        A.      I guess so.  I never can remember exactly.  I

5    thought it was late sixties.

6        Q.      Late sixties, early seventies?

7        A.      Somewhere in that area --

8        Q.      That's when you recall purchasing it?

9        A.      Um-hum.

10       Q.      And when you purchased it, you purchased it by

11   yourself, correct, individually?

12       A.      Yes, I did.

13       Q.      How did you become interested in the Clough

14   farm?

15       A.      I became interested in the Clough farm because

16   I intended to buy some property for the Boy Scout Council of

17   Northeastern Ohio.

18       Q.      And it's my understanding that the Boy Scout

19   Council ultimately decided they weren't interested in

20   purchasing it.

21       A.      They -- I'll explain that exactly.  I had

22   bought the farm -- I had a farm in Ashtabula County, I bought

23   a second farm in Ashtabula County.  The neighbor to my farm

24   in Ashtabula County, the first farm, was active in the Boy

25   Scouts.  When he heard that I bought the second farm, he

ALBERT CARLISLE

1     A.    My plans were to turn it into -- the first I

2  thought I could run a farm operation with -- the farm is

3  eighty percent wooded.  So I thought I could run a small farm

4  operation with the tillable open land and then preserve the

5  wooded land as a nature preserve; that was the intent.  So we

6  hired -- when John Wood was there we had a herd of a hundred

7  Black Angus cows.

8     Q.    When you acquired the property, what did you

9  understand you were acquiring?  When I say that, were you

10  acquiring just the land?  Acquiring the land and the timber?

11  What was your understanding of what you were acquiring?

12     A.    We were acquiring a dream, really,  I guess.

13  We were acquiring a -- I really intended that was going to be

14  an area that the Boy Scouts could enjoy and make it as

15  natural an area as we could.  That's really what I intended.

16     Q.    Maybe my question wasn't clear.  When you

17  purchased the property, you purchased the property from

18  Fisher & Young?

19     A.    Right, yes, um-hum.

20     Q.    You purchased the land?

21     A.    Um-hum.

22     Q.    And also there was an agreement with Fisher

23  and Young --

24     A.    Right.

25     Q.    -- that they retain a certain interest --

ALBERT CARLISLE

1      A.      Um-hum.

2      Q.      -- certain interest of the timber?

3      A.      Right.

4      Q.      My question to you, what was your

5  understanding what you were purchasing?

6      A.      Certainly purchasing the land, and purchasing

7  the mineral rights, and at the time I thought purchasing most

8  of the timber.

9      Q.      So you agree that there was -- whatever the

10  agreement said, there was an agreement between you and Fisher

11  & Young that Fisher & Young retain certain rights in the

12  timber and you got certain rights in the Timber.

13          MR. CONNER:  I'm going to object to the form,

14          but go ahead and answer the question.  My

15          objection is on the record.  Go ahead.

16      A.      Well, certainly Fisher & Young had certain

17  restrictions that they had.  They never exercised them but

18  they had them.

19      Q.      I understand that, but it was your

20  understanding that you had certain rights in the timber?

21      A.      Right.  That was always vague, that's what I'm

22  trying to say.

23      Q.      I understand that.  I mean, that's why lawyers

24  get involved.

25      A.      Okay.

Plaintiff's Appendix
000026

ALBERT CARLISLE

1       Q.      I'm trying to get your understanding and not

2   too specific, but you understood that you were acquiring the

3   land.

4       A.      Right.

5       Q.      When you say mineral rights, you mean the

6   mineral rights under the land?

7       A.      Under the land.

8       Q.      And with regard to the timber, you had certain

9   rights and Fisher & Young had certain rights.

10      A.      That's right.

11      Q.      When you purchased this property from Fisher &

12  Young, were you represented by an attorney?

13      A.      Well, that is difficult -- the Boy Scouts were

14  represented by an attorney.

15      Q.      Who was that?

16      A.      His name, David Eardley.  E-A-R-D-L-E-Y.

17      Q.      Is he still alive?

18      A.      I think he is but I haven't seen him for a

19  while. I taught his father.  His father took a class from me

20  when I was teaching at the Lake Erie College.

21      Q.      Ultimately you're the one that purchased it?

22      A.      Yes.  When the Boy Scouts -- the Boy Scouts

23  did the preliminary work, and when they called me in, then I

24  asked an attorney that was a family attorney that also

25  advised me as to whether he thought it was -- to look over

ALBERT CARLISLE

1    the material.

2         Q.     Who was that?

3         A.     Terry Warren.

4         Q.     Is Mr. Warren still alive?

5         A.     Still alive, he's retired.  I'm sure David

6    Eardley is retired, too.

7         Q.     Do you know where Mr. Warren lives today?

8         A.     Well, yes, in a way.  He lives in Ashtabula

9    but he spends his winters in Arizona, I don't know where.

10        Q.     I'm going to show you what I marked as Exhibit

11   A, and is that the deed from Fisher & Young to you

12   transferring the Clough farm?

13        A.     I think it is.

14        Q.     And the purchase price you paid was a hundred

15   thousand dollars.

16        A.     Yes, it was.

17        Q.     Do you recall if you paid it in one lump sum,

18   over time?

19        A.     Two sums.

20        Q.     And the date of the deed is January 9, 1970,

21   correct?

22        A.     Yes, um-hum.

23        Q.     I'm going to show you what's been marked as

24   Exhibit B and ask you whether you recognize that document?

25        A.     Yes, I recognize it.

16

ALBERT CARLISLE

1      Q.      What is that?

2      A.      The Agreement of Sale between Fisher & Young

3   and myself.

4      Q.      And is that -- is it your understanding that

5   is the agreement that delineated or set forth the rights of

6   Fisher & Young and yourself and the timber?

7      A.      Yes.

8      Q.      And Mr. Warren represented you regarding the

9   negotiations?

10     A.      He reviewed them, um-hum.

11     Q.      And was Mr. Kookogey the attorney for Fisher &

12  Young?

13     A.      The attorney for Fisher & Young.

14     Q.      Other than Mr. Warren, did you have any other

15  lawyer look at this agreement before it was signed?

16     A.      Dave Eardley, but he was representing the Boy

17  Scouts, so.

18     Q.      To your knowledge, did anyone -- not a lawyer

19  -- review this document before you signed it?  Did you have

20  anyone else look at it, a friend, family?

21     A.      I don't think so.

22     Q.      Prior to this Agreement of Sale, which we've

23  marked as Exhibit B, had you ever purchased land or owned

24  land where timber -- the rights to timber was reserved in

25  someone else or given to someone else?

ALBERT CARLISLE

1      A.      No.

2      Q.      This is the first time you've ever done that?

3      A.      First time.

4      Q.      Do you recall whose idea it was or how it came

5  about that you purchased land -- purchased the land but some

6  rights of the timber were reserved in another party?

7      A.      That was done with the Boy Scouts; they had

8  done most of the bargaining before I got involved.

9      Q.      So most of the negotiation was done between

10  the Boy Scouts and Fisher & Young --

11      A.      That's right.

12      Q.      -- and when the Boy Scouts decided not to

13  purchase, you kind of stepped in and closed the deal?

14      A.      That's right.

15      Q.      Do you know who at the Boy Scouts was doing

16  most of the negotiations for them?

17      A.      I guess it was probably Mr. Eardley and the

18  scout executive at the time, whose name was Don King.

19      Q.      Don King.

20      A.      No relation to --

21      Q.      Not the boxing.

22      A.      No.  But a very, very nice man.

23      Q.      Do you know if he's still with the Boy Scouts?

24      A.      In fact, I think he's died.  When he retired

25  he moved out west somewhere.  I always liked Don.  But I

ALBERT CARLISLE

1      Q.      Maybe somewhere there was some talk at some

2    time of opening some type of hunting club or sporting club.

3      A.      We're always approached -- we were approached

4    last year by someone who wanted to convert the barns into a

5    hunting lodge and have a hunting or fishing camp there.

6      Q.      And you didn't do that?

7      A.      It's difficult to do at the minute.  I might

8    think of it.

9      Q.      Difficult to do with what?

10     A.      I think it's difficult to think about that at

11   the minute.

12     Q.      At any point in the, say, 35 years you've

13   owned the property has it ever been a hunting lodge or

14   sporting camp?

15     A.      Just for my friends.

16     Q.      Does Mr. Bush live there with anyone?

17     A.      No.

18     Q.      Would I be correct in 1995 is the first time

19   you contacted Mr. Hare relative to this property?

20     A.      Yes.

21             MR. CONNER:  1995?

22     Q.      Yes.

23             MR. CONNER:  No, it's '94.

24     Q.      '94, excuse me.  I apologize.

25     A.      That's probably right.

20

ALBERT CARLISLE

1    Q.    Prior to that time did you know Mr. Hare?

2    A.    Yes.

3    Q.    How did you know Mr. Hare?

4    A.    He was a very bright student in high school,

5    and I went to Oberlin College, so I interviewed students who

6    were bright with a possibility of suggesting that they go to

7    Oberlin College.  He did not go there, he went to Cornell

8    instead.  That's how I met him.

9    Q.    Did you stay in contact or he stay in contact

10   with you?

11   A.    We might have met -- I can't remember that.  I

12   mean, I liked Scott, I thought he was a very bright fellow.

13   I remember taking him to Allegheny College to a program.  But

14   once he went away to Cornell -- I was aware that he was

15   around because his mother worked at a bakery that I went to

16   and I would ask his mother about him.

17   Q.    Prior to -- it's my understanding that in the

18   1980's there was a lawsuit that you were involved in in

19   Warren County.

20   A.    Yes, that's right.

21   Q.    And it's my understanding that you and Fisher

22   & Young Hardwoods, Inc. were the plaintiffs.

23   A.    That's exactly right.

24   Q.    And the defendants, William McChesney and

25   Joyce McChesney?

ALBERT CARLISLE

1       A.      Yes.  McChesneys.

2       Q.      Who represented you in that lawsuit?

3       A.      An attorney from Warren named William Morgan.

4       Q.      And is this the same Attorney Morgan that's

5   now the judge in Warren?

6       A.      He's now Judge Morgan.

7       Q.      Prior to his representation of you in this

8   lawsuit had he ever represented you before?

9       A.      I knew him but I don't think that he had --

10  I'm sorry, I don't remember.  I knew Bill but I can't

11  remember.

12      Q.      Do you know how you knew him?

13      A.      I think I knew him -- I think he was a friend

14  of a friend, that's how I knew him.

15      Q.      Can you tell me what the lawsuit was about.

16      A.      Yes.  The McChesneys decided that our common

17  boundary was in dispute and they claimed ownership of certain

18  property.

19      Q.      Okay.  And your claim -- what was your claim

20  against the McChesneys?  What were you seeking from the

21  court?

22      A.      Relief from the trees that were mine that were

23  cut.

24      Q.      And Fisher & Young was also represented by a

25  separate attorney?

ALBERT CARLISLE

1    attorneys indicating how it was going to be resolved?

2         A.    No.  I mean, I might have, I don't remember.

3         Q.    Ultimately there was a verdict in favor of

4    both you and Fisher & Young?

5         A.    Yes, that's right.

6         Q.    If I remember, Fisher & Young recovered most

7    of the money?

8         A.    They recovered most of the money.

9         Q.    Was that because most of the trees were

10   determined to be Fisher & Young's?

11        A.    At that time that's the way it was, yes.

12        Q.    Did the -- were there any damages awarded for

13   -- other than for trees?

14        A.    You know, it's been so long, there might have

15   been some damage for aesthetics, but I don't remember that

16   anymore, there was an issue that came up.

17        Q.    To your knowledge did Mr. Morgan ever do a

18   title search while he was representing you in that property?

19        A.    I don't know.

20        Q.    You don't know?

21        A.    No.

22        Q.    He never advised you that he'd done a title

23   search?

24        A.    I never asked him.

25        Q.    You never asked him if he did one, or you

ALBERT CARLISLE

1    never asked him to do one?

2         A.     I never asked either one.

3         Q.     What's your -- what I've marked as Exhibit B

4    in front of you, did you give Mr. -- would you have given

5    Mr. Morgan a copy of Exhibit B?

6         A.     Sure, um-hum.  Mr. Morgan was -- well, okay.

7         Q.     Go ahead.

8         A.     That's enough.

9         Q.     Prior to the lawsuit that you instituted

10   against the McChesneys, and you retained Mr. Morgan, did you

11   have any other counsel that you utilized with any -- for any

12   matter relative to the Clough farm?  I know you had

13   Mr. Warren.

14        A.     Mr. Morgan.

15        Q.     And prior to hiring Mr. Morgan, did any other

16   attorney do work for you relative to the Clough farm?

17        A.     Wait, one time.  I think I did consult with

18   John Enders, an attorney in Erie.  I can't remember the

19   sequence of that.

20        Q.     And do you recall what you consulted

21   Mr. Enders for?

22        A.     I'm sure it had to do with the timber

23   controversy but I don't remember the exact reason.

24        Q.     Prior to your contacting Mr. Hare, did you

25   have any other lawsuits relative to the Clough farm, other

26

ALBERT CARLISLE

1    than the McChesney lawsuit?

2        A.    No.

3        Q.    Now, currently you're involved in several

4    lawsuits relative to the Clough farm.

5        A.    Too many.

6        Q.    Not counting the one we're here for today that

7    you filed against Mr. Hare, what other lawsuits are currently

8    pending relative to the Clough farm?

9        A.    Well, we have at least one in Warren County.

10    I don't know how many we have in Warren County, I think

11    three.  Two initiated by Matson Lumber Company; one by me,

12    and then we have an appeal that's going for the -- I'm not

13    sure which court it is anymore.

14        Q.    There's two suits that Matson Lumber has filed

15    against you and other defendants, I believe.

16        A.    Yes, that's right.

17        Q.    And who's representing you in those lawsuits?

18        A.    Jim Fryling.

19        Q.    And you have a lawsuit that you filed against

20    Matson Lumber that was filed back in 1998, around there,

21    right?

22        A.    Let's see.

23        Q.    That's in Warren County?

24        A.    In Warren County.  I don't think we filed -- I

25    don't remember when it was filed.  That would be around --

27

ALBERT CARLISLE

1          Q.      It was filed after the verdict in the federal

2     court action?

3          A.      After the verdict.

4          Q.      And that is still pending?

5          A.      That is still pending.

6          Q.      Do you know the status of that lawsuit at all,

7     sir?

8          A.      Not really.

9          Q.      And who's representing you in that lawsuit?

10         A.      Mr. Fryling and Mr. Conner.

11         Q.      Is Mr. Krembs from Ohio representing you in

12    that lawsuit?

13         A.      No, he's not.

14         Q.      Does he represent you at all today in

15    anything?

16         A.      Nothing.

17         Q.      You said there was also an appeal pending.  Is

18    that the appeal from the dismissal of the quiet title action

19    in federal court?

20         A.      Yes, um-hum.

21         Q.      And Mr. Fryling and Mr. Conner are again

22    representing you in that one?

23         A.      Yes, they are.

24         Q.      To your knowledge, has the quiet title action

25    been re-filed in state court?

ALBERT CARLISLE

1      A.      In state court?

2      Q.      It was dismissed in federal court.

3      A.      Right.

4      Q.      And my understanding, the judge dismissed it

5   because of the lack of jurisdiction.

6      A.      So it's being appealed, that's all I know.

7      Q.      You don't know whether it's been re-filed in

8   state court or not?

9      A.      I think the issue has been raised in Warren

10  County as well.

11     Q.      What caused you to see Mr. Hare -- contact Mr.

12  Hare relative to the Clough farm?  What was the problem you

13  were having?

14     A.      Actually it had nothing to do with the Clough

15  farm.  I was having a problem with my family company and had

16  heard that Scott was representing someone that I knew in

17  Ashtabula, so I called him and asked him to see me when he

18  came to Ashtabula to see another client.

19     Q.      Do you know who that person -- that other

20  person he was representing was?  Do you remember?

21     A.      No.  It was a friend of his father's who had

22  been injured in an accident in a factory.  I can't remember

23  the -- I didn't know the man, I don't know who he is.

24     Q.      So you contacted Scott relative to a problem

25  you were having with Carlisle Retail?

30

ALBERT CARLISLE

1       Q.      And by putting Mr. Wheeler on the board, that

2  was -- you were trying to get representation on the board?

3       A.      We, yeah.  This was when my father was still

4  alive, and he was really too old to represent us very well,

5  so we decided we should have somebody on the board so we got

6  Mr. Wheeler.

7       Q.      My understanding is that the company, your

8  father, and he had brothers that also owned it --

9       A.      Yes, he did.

10      Q.      So it's my understanding that the company

11 would have been started by your grandfather?

12      A.      Actually, further back than that.  It was

13 started in 1865.

14      Q.      I believe you indicated it's no longer in

15 existence.

16      A.      It's been merged.

17      Q.      When you met with -- you met with Mr. Hare in

18 Ashtabula?

19      A.      He came to see me.

20      Q.      Do you recall when that was?

21      A.      No, I don't remember, but he came to see me at

22 my house, I know that.

23      Q.      The lawsuit that was ultimately filed against

24 Matson was filed in March of 1995?

25      A.      '95.

ALBERT CARLISLE

1    Q.    How long before that would you say you first

2    met with Mr. Hare?

3    A.    Not a lot before that.  The thinking was we

4    were going to file it -- Matson -- the provisions were that

5    Matson had to stop cutting trees at the end of March, so we

6    decided to wait until March to file the lawsuit so they would

7    be gone from the property.

8    Q.    I guess --

9    A.    I think less than a year.

10    Q.    So sometime in 1994?

11    A.    Less than a year.

12    Q.    And when you say when he first came up to see

13    you it was to discuss the matter involving Carlisle

14    Retailers?

15    A.    That was the initial --

16    Q.    During that first meeting with him did the

17    subject of Matson Lumber come up?

18    A.    It must have.

19    Q.    Had you discussed the problems you were having

20    with Matson Lumber with any other attorney before you

21    discussed it with Mr. Hare?  When I say that, the two-year

22    period, and then we'll go back to --

23    A.    Again, with John Wheeler I had.

24    Q.    What was the problem that you were having with

25    Matson Lumber in 1994?

ALBERT CARLISLE

1        A.      Well, there was a difference in opinion as to

2    who owned what, and that was it.

3        Q.      Who at Matson Lumber -- was there a person at

4    Matson Lumber you were mainly dealing with?

5        A.      Bob Matson.  Robert Matson and his daughter

6    Becky.

7        Q.      Bob and Robert are two different people?

8        A.      No, I'm sorry.  Robert Matson was then the

9    president, and he had a daughter who was working there named

10   Becky Matson, and she's still there, I think.  Bob has died

11   but she was still there.  She's still there.

12       Q.      When you say a difference in opinion, you mean

13   a difference in opinion as to what rights you had in the

14   timber and what rights they had in the timber?

15       A.      Right.

16       Q.      And when you say a difference, that would have

17   been your interpretation under Exhibit B.

18              MR. CONNER:  Object to the form of the

19              question.  Go ahead.

20       Q.      Your interpretation of Exhibit B --

21              MR. CONNER:  Same objection.  Go ahead.

22       A.      Well, that -- that plus the first forester

23   that Matson had working for them when they began cutting

24   trees on the farm became a good friend named Norman

25   Sunderland, S-U-N-D-E-R-L-A-N-D.  And he let me know that he

33

ALBERT CARLISLE

1    thought things weren't just right.  So I was getting clues

2    from other people that something was wrong.

3         Q.      Did you ever discuss the problems you were

4    having with Matson Lumber with any other attorney from the

5    Pittsburgh area?

6         A.      No, not from Pittsburgh.  I didn't know

7    anybody.

8         Q.      Did you ever discuss with any other lawyer the

9    filing of a suit against Matson Lumber relative to --

10        A.      No.

11        Q.      So Mr. Hare was the only attorney you

12   discussed --

13        A.      That's right.

14        Q.      -- discussed with the filing of the suit?

15        A.      Um-hum.

16        Q.      When you met with Mr. Hare, did you provide

17   him a copy of Exhibit B?

18        A.      I did.

19        Q.      And did you tell him that Exhibit B was the

20   agreement between you and Fisher & Young relative to the

21   rights between the parties?

22               MR. CONNER:  Object to the form of the

23        question.  Go ahead.

24        A.      I can't remember what I told him.  It was a

25   document that I had.

34

ALBERT CARLISLE

1      Q.      That is the document you had?

2      A.      I had that.

3      Q.      You understood that Matson Lumber was the

4   successor to Fisher & Young?

5      A.      Yes, um-hum.

6      Q.      To your knowledge, did you provide Mr. Hare

7   with any other documents regarding the rights of timber on

8   the property?  Were there any other documents that you were

9   aware of at that time?

10      A.      He was going to go to the courthouse in Warren

11   and look up the deed which I didn't have.

12      Q.      The deed from?

13      A.      Fisher & Young.

14      Q.      From them to you?

15      A.      Yes.

16      Q.      And that's what we marked as Exhibit A?

17      A.      He said he would go to the courthouse and

18   check that.

19      Q.      Do you know if he ever did?

20      A.      Well, I thought he did.  I don't know for sure

21   if he did.

22      Q.      Did he ever provide you a copy of the Exhibit

23   A?  Mr. Hare ever provide a copy of Exhibit A?

24      A.      No.  I shouldn't say that.  Maybe he did, I

25   don't know.

35

ALBERT CARLISLE

1      Q.    Do you recall providing Mr. Hare any other
2  documents, other than what's been marked as Exhibit B, when
3  you first met with him in Ashtabula, Ohio?
4      A.    I doubt it.
5      Q.    Do you recall whether you advised him of the
6  lawsuit involving the McChesneys?
7      A.    Yes, I did.
8      Q.    You did?
9      A.    Certainly.
10     Q.    Did you have any documents from that lawsuit
11  that you could have provided him?
12     A.    No.  He was going to look those up at the
13  courthouse.
14     Q.    The McChesney lawsuit?
15     A.    Yes.
16     Q.    Do you recall if you ever signed a retainer
17  agreement with Mr. Hare?  Do you recall?
18     A.    I don't.
19     Q.    You don't recall?
20     A.    I don't recall.
21     Q.    You retained Mr. Hare to represent you with
22  regard to your problems with Matson Lumber, correct?
23     A.    That's right.
24     Q.    What were you looking for?  What was the
25  relief you wanted from this?   What did you want to happen?

ALBERT CARLISLE

1          A.      Several things.  I thought that they had

2   stolen some of my property.

3          Q.      When you say property, you mean trees?

4          A.      Trees.  And I wanted to get rid of them from

5   the farm.  They were -- I felt they no longer belonged there.

6          Q.      Why did you feel that?

7          A.      Well, variety of reasons.  I mean, I can't --

8   I wish I could tell you from what Mr. Sunderland told me; the

9   first forester Kurt Bower told me, I felt it was time they

10  had -- just better look into what they were doing.

11         Q.      To your recollection when did Matson Lumber

12  first start harvesting trees or lumbering on the property?

13         A.      I don't remember but it was in the mid

14  eighties, I think.

15         Q.      Was it after the lawsuit in Warren County

16  involving the --

17         A.      It was after that.

18         Q.      It was after that?

19         A.      The McChesneys.  Because while we were having

20  lunch -- well, it was just after that.  It was after that

21  lawsuit from McChesneys.

22         Q.      Had ended?

23         A.      Had ended.

24         Q.      And that's when Matson Lumber became involved.

25         A.      They appeared at the trial.

37

ALBERT CARLISLE

1      Q.      They appeared at the trial, what do you mean?

2      A.      Some representative from Matson Lumber Company

3   came to the trial between myself and McChesney.

4      Q.      So you think Matson Lumber became involved in

5   the property in the mid eighties?

6      A.      Must have been sometime in there.

7      Q.      When did they first start performing --

8      A.      They sent me a letter.

9      Q.      Let me stop you.  When did they first start

10  performing timber work on the property?

11     A.      I don't remember.

12     Q.      When did you first come to the conclusion that

13  they were a problem and you wanted to get rid of them or they

14  had stolen some of your timber?

15     A.      Well, again, as I said, after talking with

16  Mr. Sunderland and Mr. Bower, I began to -- I had an inkling

17  from Terry Warren, who represented me first, that there might

18  be some questions as to the ownership of the trees, so there

19  was all these things were bothering me.  I thought I better

20  look into it in a deeper way.

21     Q.      I'm going to show you what's been marked as

22  Exhibit C.

23     A.      Okay.

24     Q.      And is that the -- to your recollection is

25  that the copy of the complaint that was filed on your behalf

ALBERT CARLISLE

1   by Mr. Hare?

2        A.      I guess it is.

3        Q.      Did you review that complaint prior to it

4   being filed?

5        A.      Yes.

6        Q.      And you were satisfied with it?

7        A.      Well, I had confidence in Mr. Hare, so when

8   you say satisfied, I'm not a lawyer.

9        Q.      Did you request that Mr. Hare make any changes

10  to the complaint that he refused to do?

11       A.      No.  We did meet with Mr. Hare frequently, so

12  I just assumed that what he did was correct.

13       Q.      When you say we, who's we?

14       A.      Mr. Bush that I mentioned, and at that time I

15  had a forester consultant named Jim Hall.

16       Q.      When you say met, did you meet with Mr. Hare

17  prior to the filing of the lawsuit?

18       A.      Yes.  Oh, yes.

19       Q.      Prior to the filing of the lawsuit did you

20  ever meet with Mr. Edson?

21       A.      I can't remember when I met him.  I met with

22  him, of course.  He came to Ashtabula and we had lunch

23  together.

24       Q.      Did he come with Mr. Hare or did he come by

25  himself?

40

ALBERT CARLISLE

1      Q.      To your knowledge, did the defendants ever
2   make a settlement offer to you?
3      A.      No.
4      Q.      Never made one?
5      A.      You mean before the --
6      Q.      Verdict.
7      A.      No.
8      Q.      I'll show you what we've marked as Deposition
9   Exhibit D.  Have you ever seen that before?
10      A.      I guess I have, I don't remember it.
11      Q.      Do you recall discussions with Mr. Hare
12   relative to the dismissal of the trespass count in the
13   complaint?
14      A.      No.
15      Q.      You recall no discussion relative to that?
16      A.      No.
17      Q.      When did you first learn that trespass count
18   had been dismissed?
19      A.      I can't remember.  We learned it after the
20   completion of the trial but I don't remember when I learned
21   it.
22      Q.      After the completion of the trial.  When you
23   say we --
24      A.      I'm always referring to Lainard and Jim Hall.
25   We were a team so we --

ALBERT CARLISLE

1      Q.      How long after the verdict would you say you

2    learned it?

3      A.      I don't remember.

4      Q.      A month, two months, a year?

5      A.      I can't remember.

6      Q.      How did you learn it?

7      A.      I'm trying to remember.  If I remembered that,

8    I could tell you when.  I don't remember.  I honestly don't

9    remember how I learned it.  It may come to me later but I

10   don't remember it now.

11     Q.      Is it possible you learned it from another

12   attorney?

13     A.      Could be possible but I doubt it.

14     Q.      Is it possible Mr. Hare told you; you learned

15   it from Mr. Hare?

16     A.      At some point I learned it from Mr. Hare, I

17   don't remember when.

18     Q.      Would that have been prior to his ending his

19   representation of you?

20     A.      Yes.

21     Q.      And just so I understand, the verdict was

22   appealed by the defendants to the Third Circuit Court of

23   Appeals?

24     A.      That's right.

25     Q.      And another counsel represented you on appeal?

ALBERT CARLISLE

```
 1        A.      That's right.
 2        Q.      So you would have learned that the trespass
 3   count had been dismissed prior to the termination of the
 4   Third Circuit appeal, correct?
 5        A.      I'm sure I did, I just don't remember the
 6   circumstances.
 7        Q.      But you believe it's -- Mr. Bush and Mr.
 8   Lainard (sic) may have been there when you learned about it?
 9        A.      I think they probably were.  We were all
10   surprised, that's all I could say.
11        Q.      You were surprised that trespass count had
12   been dismissed?
13        A.      We were surprised we hadn't been consulted.
14        Q.      Prior to the trial you had meetings with Mr.
15   Hare to prepare for the same, correct?
16        A.      Many.
17        Q.      These meetings you had were Mr. Bush and Mr.
18   Lainard (sic)  at all of them?
19        A.      It's Mr. Bush and Mr. Hall.
20        Q.      Lainard Bush, sorry.  It's been a long drive
21   up.  Were they at the meetings as well?
22        A.      Always.
23        Q.      Now, there was an attorney, the name Michael
24   Bruzzese, B-R-U-Z-Z-E-S-E.  Do you know who that was?
25        A.      Was he involved in the mediation or something?
```

43

ALBERT CARLISLE

1      Q.      He's an attorney that assisted Mr. Hare during

2   the trial.

3      A.      All right.  He came in -- he came in, I think,

4   the afternoon before the trial as sort of a devil's advocate,

5   that's what he did.

6      Q.      To help prepare your testimony?

7      A.      To question us a little bit.  I wouldn't

8   remember his name but now you told me, that's who it was.

9      Q.      Do you recall you authorized Mr. Hare to bring

10  him in to help --

11     A.      It was his idea, I wouldn't know.

12     Q.      You knew it was happening?

13     A.      When it happened.  I didn't know it was going

14  to happen ahead of time.

15     Q.      You didn't?

16     A.      No.

17     Q.      How many times do you recall meeting this

18  attorney, Mr. Bruzzese?

19     A.      I don't remember more than once.

20     Q.      I'm going to represent to you that Exhibit E

21  is part of the transcript of the trial in front of Judge

22  Lancaster that was -- in which Mr. Hare was representing

23  you.

24     A.      Okay.

25     Q.      On page 76 of the transcript, I think it's

44

ALBERT CARLISLE

1    three, four pages into the exhibit, it's in the wrong order.

2    A.    Okay.

3    Q.    There's a discussion on page 76 regarding the

4    withdrawal of the conversion claim and I'd ask you to read

5    from line six down.

6    A.    (Witness complied.)  Okay.

7    Q.    That indicates that Mr. Hare was withdrawing

8    the conversion claim; do you agree with me?

9    A.    Apparently.  I'm not a lawyer but it may be.

10   Q.    Did Mr. Hare discuss with you the withdrawal

11   of the conversion claim prior to it being done?

12   A.    No.

13   Q.    Did you know the conversion claim was being

14   withdrawn during the course of the jury trial?

15   A.    No.

16   Q.    When did you first learn that the conversion

17   claim had been withdrawn?

18   A.    I wish I could tell you, but I don't --

19   Q.    Can we agree that you learned it around the

20   same time that you learned the trespass claim was withdrawn?

21   A.    Probably.

22   Q.    Prior to the termination of the appeal?

23   A.    Yes.

24   Q.    And, again, you don't remember how?

25   A.    I don't remember, no, it's sort of a blur.

47

ALBERT CARLISLE

1     Q.     But nobody can find the map?

2     A.     I saw it but I have no idea where it was.

3     Q.     You say you saw it back in the seventies?

4     A.     Never saw it again.

5     Q.     So one of the issues in the trial was what was

6     the width of the no-cut zone?

7     A.     That's right, and where was it.

8     Q.     And where was it.  And the jury resolved that

9     there was a no-cut zone.

10    A.     Yes.

11    Q.     And I think they resolved the width at a

12    hundred feet?

13    A.     Of either side.

14    Q.     Of the stream?

15    A.     Of the stream or wetlands.

16    Q.     Wetlands?

17    A.     Not wetlands, waterways.  I'm trying to think

18    of the exact word they used, waterways.

19    Q.     And it's your understanding that Mr. Hall

20    prepared Exhibit E like in the middle of the trial?

21    A.     In the middle of the night.

22    Q.     Were you dissatisfied with the verdict in the

23    federal court action?

24    A.     Yes.

25    Q.     In what way?

48

ALBERT CARLISLE

1       A.      In almost every way.  One was, of course, to

2   begin with, I would hope that Matson would be off the

3   property and in a sense what they got was a right to cut

4   trees for 50 more years.

5       Q.      Why do you say that?

6       A.      Because that's what they said.

7       Q.      The jury verdict didn't say that.

8       A.      The jury verdict said that Matson had the

9   right to cut trees that were existing in 1969.  Those trees

10  can grow a long time, so that was a disappointment, that they

11  could come back and cut trees.

12      The second thing is, the -- I was led to believe

13  there was going to be much more in damages for the trees that

14  Matson did cut.  So that was disappointment number two.

15      And it created a cloud on my title, that's still

16  there.  Aggravation and the cloud on the title.

17      Q.      So you were dissatisfied with the damage

18  result?

19      A.      Oh, yeah, sure.

20      Q.      And you were dissatisfied on the day the

21  verdict came in, you knew what the verdict was?

22      A.      We knew the verdict -- it was sort of a mixed

23  feeling because when the verdict was read there was some

24  degree of optimism because Matson didn't win any of those

25  particular points, but it was so vague that it left

49

ALBERT CARLISLE

1    everything still open.  Nothing really was settled.

2         Q.      I understand that, but you knew the damage

3    result when it was -- when the jury returned the verdict.

4         A.      I knew what the jury said about damage.

5         Q.      And you were dissatisfied on that date?

6         A.      Yeah, sure.

7         Q.      Did you express that dissatisfaction to Mr.

8    Hare?

9         A.      Probably not that day.

10        Q.      Did you subsequently express that

11   dissatisfaction to him?

12        A.      Sure.

13        Q.      And that was written or verbal?

14        A.      That would be verbal.

15        Q.      You said you were dissatisfied that Matson

16   Lumber would have the right to continue to harvest trees that

17   were standing in 1969, correct?

18        A.      Yes.

19        Q.      And it was your understanding that one of the

20   issues that you were seeking to resolve in the federal court

21   action was whether they could cut trees that were standing

22   prior to 1969?

23        A.      That was my understanding.  My hope was that

24   we would be able to -- they had cut a lot of trees.  My hope

25   was that that was the end, we could exclude them from the

50

ALBERT CARLISLE

1    property.

2        Q.    Were you seeking relief from the federal court

3    that they would not be permitted to cut trees that were

4    standing prior to 1969?

5        A.    I had hoped that was going to happen.

6        Q.    Based on your understanding is there a way to

7    tell today, 2005, if a tree was standing in 1969 or not

8    standing in 1969?

9        A.    They say there is.

10       Q.    Who is they?

11       A.    Matson would say there is.

12       Q.    I'm asking you based on your discussions with

13   your people do you think there's a way to determine that?

14             MR. CONNER:  Just for clarification, he's

15             asking you to repeat what Hall might have said or --

16       Q.    Or anyone else.

17       A.    Sure.  Jim Hall could make a measure of trees

18   that would be standing that -- in 1969.  Sure, Jim Hall could

19   give me a report on that.

20       Q.    Was there any other dissatisfaction you had

21   with the jury verdict, other than the fact that they could

22   continue to timber trees prior to 1969?

23       A.    Nothing -- unfortunately, nothing got resolved

24   with this -- very little got resolved with this jury verdict.

25   Everything was left open ended.  We're still fighting the

ALBERT CARLISLE

1       A.    I guess so.

2       Q.    Did you ever discuss with anybody filing an

3   appeal?

4       A.    Scott.

5       Q.    You did?

6       A.    Sure.

7       Q.    What was the discussion?

8       A.    I assumed if the case was appealed, the

9   verdict was appealed, he would represent me in the --

10      Q.    Who represented you in the appeal?

11      A.    An attorney out of Cleveland called Peter

12  Krembs.

13      Q.    Krems?

14      A.    Krembs, K-R-E-M-B-S.

15      Q.    B or V?

16      A.    B.

17      Q.    Prior to the verdict did Mr. Edson do any

18  work, to your knowledge, on the case?

19      A.    If he did, I don't know.

20      Q.    Why are you suing Mr. Edison?

21      A.    He's a partner.

22      Q.    Not because of any work he did, just because

23  he was a partner?

24      A.    He was involved certainly.

25      Q.    What did he do?

56

ALBERT CARLISLE

1      A.    I have no idea.  I have no idea.

2      Q.    You don't know of any specific work he did?

3  I mean, whether he wrote a brief or did something

4  specifically in the case, you're not aware of that?

5      A.    No.

6      Q.    Did you ever meet Mr. Bartony?

7      A.    Just once.

8      Q.    And was that in relation to some aspect of

9  this case or just socially?

10     A.    Just he was in the office and I met him that

11 way.

12     Q.    To your knowledge, did he do any work on the

13 case?

14     A.    I have no idea.  Scott relied on both of them,

15 so I have no idea, but specifically they might.

16     Q.    And you're also saying Mr. Bartony because

17 he's Mr. Hare's partner?

18     A.    Certainly.

19     Q.    When you say Scott relied upon them, in what

20 way do you --

21     A.    He mentioned to me that he would check with

22 one or the other, I don't remember -- I don't remember

23 specific details.

24     Q.    Without getting into details, would you agree

25 with me that there was a dispute regarding the amount of

ALBERT CARLISLE

1    money you owed Mr. Hare following the trial?

2        A.        Yes, um-hum.

3        Q.        Ultimately those fees were paid?

4        A.        Those fees were paid.

5        Q.        Out of the settlement?

6        A.        Yes, they were, um-hum.

7        Q.        As I understand, the verdict came down in

8    December of 1997, correct?

9        A.        That's right.

10       Q.        You said you talked to an Attorney Krems (sic)

11   who represented --

12       A.        Krembs.

13       Q.        Krembs who represented you on the appeal,

14   during the appeal?

15       A.        Yes, um-hum.

16       Q.        When did you first consult Mr. Krembs?

17       A.        I don't remember.  We had filed something in

18   Warren County -- we had filed something for the Warren County

19   case that Scott had prepared, I don't remember the legal term

20   for it.

21       Q.        Writ of Summons?

22       A.        I don't remember.

23       Q.        It's a piece of paper to start the lawsuit?

24       A.        A piece of paper, and then it became apparent

25   to me that Scott was not going to follow through on it.

ALBERT CARLISLE

1      Q.      And Scott expressed that, that he wasn't going

2  to continue to represent you because of the fee dispute.

3      A.      He said that.  I wasn't sure that that's

4  exactly what he meant but he did say that.  There was also --

5      Q.      Go ahead, there was also?

6      A.      Nothing.

7      Q.      But you contacted Mr. Krembs in 1998?

8      A.      I guess, probably.

9      Q.      The year following the verdict?

10      A.      Yeah, must have been.

11      Q.      Had he represented you prior to that?

12      A.      No, I never met him.

13      Q.      How did you get in contact with him?

14      A.      Steve Madewell.

15      Q.      Where does Steve Madewell reside?

16      A.      Well, I don't know.  He lives in, I think,

17  Painsville, but I'm not sure, Ohio.  He used to live in

18  Chardon, I think.

19      Q.      He's not a lawyer, correct?

20      A.      No, no, he's a -- he works for Lake County

21  Metro Parks.

22      Q.      And Lake County is in Ohio?

23      A.      Lake County, it's in the county right next to

24  Ashtabula, between Ashtabula and Geauga County is where it

25  is.  Can we take a five minute break?

ALBERT CARLISLE

1              MR. HABER:  Sure.

2  (Whereupon, a break was had.)

3  BY MR. HABER:

4        Q.      Let me show you what's been marked as Exhibit

5  G.  You had previously mentioned the document that had been

6  filed in the Warren County action.

7        A.      Yes.

8        Q.      And that's filed on your behalf, correct?

9        A.      Right, um-hum.

10        Q.      And when it was -- when you filed the

11  document, were you represented by Mr. Hare?

12        A.      Yes.

13        Q.      You believe he was still representing you as

14  of June 24th?

15        A.      Well, he was, sure.

16        Q.      Did he ever represent you in this Warren

17  County action?

18        A.      What do you mean?

19        Q.      Did he ever do anything for you on your behalf

20  in the Warren County action?

21        A.      I don't remember.  I'm sorry.

22        Q.      Do you know how this -- the Writ was filed and

23  Praecipe for Writ was filed in Warren County --

24        A.      Scott sent a letter to Lainard Bush because we

25  were running out of time because there was a time element and

ALBERT CARLISLE

1    Lainard and I took the letter over to the Warren County

2    courthouse.  That's how we did it.

3         Q.    Did you personally file with the Prothonotary?

4         A.    We left it there, yes.  Scott prepared it and

5    he told us we better do it that day.

6         Q.    At the time this was filed in Warren County --

7    when I say this, Exhibit G -- had you already talked to Mr.

8    Krembs?

9         A.    No, didn't know him.

10        Q.    When you first talked to Mr. Krembs did you

11   discuss with him Scott's representation in the federal court

12   action?

13        A.    I was dismayed to find out that Scott wasn't

14   going to represent me.

15        Q.    In the Warren County action?

16        A.    In the Warren County action.

17        Q.    Did you discuss with Mr. Krems --

18        A.    Krembs.

19        Q.    Krembs.  Did you discuss with Mr. Krembs

20   Scott's handling of the federal court action?

21        A.    I must have.

22        Q.    And to your knowledge did Mr. Krembs contact

23   Scott to discuss the things?  To your knowledge did Mr.

24   Krembs ever contact Scott?

25        A.    I don't know.

ALBERT CARLISLE

1     Q.    You can think of no reason that Mr. Krembs

2  would contact Scott other than regarding your matter?

3     A.    Not really.

4     Q.    Did you discuss with Mr. Krembs the dismissal

5  of the conversion or the dismissal of the trespass action in

6  the federal court action?

7     A.    I don't remember.

8     Q.    Did Mr. Krembs or Mr. -- did Mr. Krembs ever

9  tell you that what Scott had done was improper or wrong, that

10  he had given you wrong advice?

11     A.    I think we were relying on what Scott had

12  done.

13     Q.    I understand that.  When you went to talk to

14  Mr. Krembs, did you discuss what Scott had done may have been

15  improper?

16     A.    I don't think so, but I can't say for sure.

17     Q.    Did Scott ever tell you that -- discuss with

18  you the effect of the dismissal of the conversion or trespass

19  claim?

20     A.    I think we discussed it following the 1979

21  verdict.  He came home for Christmas.

22     MR. CONNER:  To Ashtabula?

23     A.    To Ashtabula, and we met with my accountant

24  and that may have been when I first heard it.

25     Q.    That it was dismissed?

Plaintiff's Appendix
000063

ALBERT CARLISLE

1      A.      But I'm not sure.

2      Q.      Did he discuss with you the effect of the

3  dismissal and whether you could re-file them in state court?

4      A.      Scott said we -- even in the trial which we

5  had in federal court, Scott announced before the other trial

6  we would probably be filing another suit -- lawsuit, so I

7  just assumed this was an ongoing process.

8      Q.      Did you have a discussion with him regarding

9  the effect of the dismissal of those counts in the federal

10 count action and whether they could be re-filed in state

11 court?

12     A.      I assumed.  We thought they could. I don't

13 remember.

14     Q.      When you say we, you mean Mr. Bush --

15     A.      Well, and this time my accountant was

16 involved, too.

17     Q.      What was his name?

18     A.      Robert Gabrich, G-A-B-R-I-C-H.

19     Q.      Did you ever discuss with Mr. Hare a statute

20 of limitations issue relative to the dismissal of these

21 claims in federal court?

22     A.      I don't remember.  I know that he was very

23 concerned about a filing date.  That was this.

24          MR. CONNER:  When you say this, you have to

25          refer to an exhibit.

ALBERT CARLISLE

1          A.      Exhibit G.  He sent an express letter to

2    Lainard so we could get it there in Warren and get it to the

3    courthouse.

4          Q.      Do you know what the term tolling the statute

5    of limitations means?

6          A.      No.

7          Q.      Did you ever discuss that with Mr. Hare

8    relative to the dismissal of the federal court claims?

9          A.      I don't remember.  I know what a statute -- I

10   don't know what the word tolling means.

11         Q.      To stop it from running.

12         A.      Okay, no, I don't think we ever did.  I don't

13   know.

14         Q.      In this lawsuit you're contending that Mr.

15   Hare was wrong in advising that the voluntary dismissal of

16   the two counts in federal court the statute of limitations

17   was tolled.  Do you understand that?

18         A.      Not really.

19         Q.      Did Mr. Krembs ever tell you that any advice

20   that Mr. Hare had given you was wrong?

21         A.      No.

22         Q.      Did Mr. Krembs ever criticize anything that

23   Mr. Hare had done?

24         A.      I don't recall that he did.

25         Q.      When did you first consider filing a lawsuit

ALBERT CARLISLE

1    against Mr. Hare?

2        A.      I guess we considered it when the judge in

3    Warren County -- and I think his name is Millin -- rejected

4    our claims.  I don't know what the word is.

5        Q.      The lawsuit's still pending?

6        A.      But he rejected the major part of it.

7        Q.      If I understand, the judge said you could

8    collect damages for what Matson did after the verdict but not

9    before the verdict in federal court.

10       A.      I guess.

11       Q.      Did you discuss with anyone prior to the date

12   the judge -- or the date you read the verdict, the decision

13   of the court, did you ever discuss with anybody bringing a

14   claim against Mr. Hare?

15       A.      No.

16       Q.      Does Mr. Krembs still represent you?

17       A.      No.

18       Q.      Did Mr. Krembs at all represent you in the

19   Warren County action?

20       A.      Yes.

21       Q.      Why did he cease representing you?

22       A.      Long story, I guess, but I felt I could do

23   better.

24       Q.      You were dissatisfied with his work?

25       A.      I was dissatisfied.

ALBERT CARLISLE

1      Q.      In what way were you dissatisfied?

2      A.      I don't know, I just was dissatisfied, I

3  guess.

4      Q.      Have you brought any claim against Mr. Krembs

5  for legal malpractice?

6      A.      No, I haven't.

7      Q.      Did you consider it?

8      A.      No.

9      Q.      After the judge rendered his decision in the

10  Warren County action, why did you then consider a lawsuit

11  against Mr. Hare?

12      A.      I began to realize that I had been damaged by

13  Mr. -- I relied on Mr. Hare and what I hoped was going to

14  happen didn't happen.

15      Q.      What way had you been damaged?

16      A.      My claims had disappeared.

17      Q.      And what claims had disappeared?

18      A.      I don't know the legal terms but they were

19  disappeared.

20      Q.      Are you referring to the claim that had been

21  voluntarily dismissed in the federal court action?

22      A.      Yes.

23      Q.      And prior to the decision of the judge in

24  Warren County had you discussed with anyone Mr. Hare's advice

25  relative to the dismissal of those claims?

66

ALBERT CARLISLE

1      A.      No.

2      Q.      When Mr. Hare first -- you discussed with Mr.

3  Hare was -- first raised the dismissal of those claims you

4  said it might have been the accountant, what was said?

5      A.      I really don't remember.  I remember being

6  very surprised.  As I said, the real surprise came during the

7  trial when Scott announced we probably would be seeking

8  another trial.  That certainly was far from what I had

9  intended but --

10     Q.      Did he -- he told you that -- he didn't

11 announce it --

12     A.      Sure, he announced it in the trial.

13     Q.      Who did he announce it to?

14     A.      Everybody in the courtroom.

15     Q.      The jury, too?

16     A.      Sure.

17     Q.      During what phase of the trial?

18     A.      It was toward the end of the trial.  There

19 were -- the trial went on several days, I'm going to say the

20 last day.

21     Q.      Was it during the -- what we refer to as the

22 closing argument to the jury? Do you know what I mean by

23 closing argument?

24     A.      Yes.  I don't remember anymore, I'd have to

25 look it up.

ALBERT CARLISLE

1      Q.      So the decision of the judge in the Warren

2  County action in -- I think it was in --

3              MR. CONNER:  January 30, 2002.

4      Q.      -- what made you first consider a lawsuit

5  against Mr. Hare?

6      A.      It triggered the response from me.

7      Q.      And at the time, in 2002, when the judge made

8  this decision, who was representing you?

9      A.      At that time it was Mr. Krembs.

10     Q.      And did you discuss the filing of the lawsuit

11 with Mr. Krembs?

12     A.      I don't remember.

13     Q.      Did Mr. Krembs still practice law in Ohio?

14     A.      I haven't seen him for about a year.  I assume

15 he does.

16     Q.      He's in Cleveland?

17     A.      He's in Cleveland, um-hum.

18     Q.      Earlier you had testified that you were

19 dissatisfied with the verdict in the federal court action,

20 the amount of the damages, you thought they should have been

21 more than a hundred and ten thousand dollars, correct?

22     A.      Right.

23     Q.      And that the other part of the verdict, called

24 the declaratory relief, the jury answered certain

25 questions --

ALBERT CARLISLE

1        A.        Right.

2        Q.        -- that it gave -- the answers weren't clear

3    that it resolved the problem, and it gave the right of Matson

4    to cut trees that were standing prior to 1969, correct?

5        A.        That's right.

6        Q.        Did you discuss that dissatisfaction -- your

7    dissatisfaction with the verdict with Mr. Krembs?

8                  MR. CONNER:   I think he already said no, but

9        go ahead.

10        A.        I doubt it.

11        Q.        Do you recall discussing this dissatisfaction

12    with anyone? Other than Mr. Bush and Mr. Hall?

13        A.        Those -- we rode together always to where we

14    were going, so it was certainly on the way back home we were

15    all let down a great deal.

16        Q.        You've been litigating this case in Warren

17    County, the one that was filed in 1998, for about seven years

18    now.

19        A.        Um-hum.

20        Q.        What's the purpose of the lawsuit?  What are

21    you trying to seek in that lawsuit?

22        A.        Well, we were trying to seek damages for --

23    I'm not good at this.  We were trying to seek damages for the

24    environment, environmental damages.  There are probably

25    others, I don't remember.

ALBERT CARLISLE

1       Q.      Were you seeking damages for Matson cutting

2  down trees?

3       A.      I think so.  I don't remember, isn't that

4  awful.

5       Q.      Have they cut trees since the verdict in the

6  federal court action?

7       A.      Of course, they started cutting trees -- the

8  trial in Pittsburgh ended in 1997, they came in and began

9  cutting trees in 1998, that's about a month afterwards.

10      Q.      So you're seeking damages for the trees that

11  Matson Lumber has cut down since the jury verdict in federal

12  court?

13          MR. CONNER:  I'm going to object to the

14          form of the question, because we all know the case

15          -- the claims are re-filed, so re-filed claims arise

16          out of the '95 declaratory judgment action as well as

17          the trees that are cut since '97.

18          MR. HABER: I'm not saying -- I didn't say

19          you're limited to that.  I said that's one of the

20          elements of damage.

21          MR. CONNER:  I didn't mean to interrupt.

22      Q.      One of the elements of damages you're seeking

23  in the Warren County action is trees that Matson Lumber cut

24  down since the date of the verdict.

25      A.      Right.

70

ALBERT CARLISLE

1      Q.      Are they still cutting trees now?

2      A.      As far as I know.

3              MR. CONNER:  I didn't mean to interrupt you,

4      Dave.

5              MR. HABER: No problem.

6      Q.      Prior to the judge's decision, in January

7      2002, did you understand that you were seeking to recover

8      damage for trees that were cut down prior to the date of the

9      jury verdict?

10     A.      Yes, um-hum.

11     Q.      And why did you think that?  Where did you get

12     that understanding?

13     A.      Well, I -- I don't remember.  I mean, I'm

14     trying to think we were concerned about certain years of tree

15     cutting.  That's all I --

16     Q.      Is it your understanding that because Mr. Hare

17     dismissed these claims, the conversion and the trespass

18     claims in federal court, that that hurt your ability to

19     recover damages?

20     A.      Oh, yes, it did.

21     Q.      So Mr. Hare's dismissal of these two counts,

22     the conversion and the trespass action has limited your right

23     to recover damages in the Warren County action?  Is that your

24     contention?

25     A.      I don't know; I have no idea.   I'm trying to

ALBERT CARLISLE

1    think that through.

2          Q.    Let me try to rephrase it.

3          A.    I don't understand.

4          Q.    You told me once you read the decision or got

5    the decision from the Warren County judge --

6          A.    Right.

7          Q.    -- that's when you first considered a lawsuit

8    against Mr. Hare.

9          A.    Yes.

10         Q.    What part of that decision made you consider a

11   lawsuit against Mr. Hare?

12         A.    Well, it was a multitude of things at that

13   point.  Nothing that I thought good had happened from that

14   1997 trial.  Nothing.

15         Q.    Well, can you be more specific than nothing?

16         A.    Yeah.  Matson is still cutting; they have a

17   claim to a lot of trees that I think probably weren't

18   their's; they put a cloud on my title because I -- it's an

19   ongoing title.  I don't know if there's anything else other

20   than that but --

21         Q.    Well, Matson Lumber had started cutting in

22   1998.

23         A.    Right.

24         Q.    And you knew that?

25         A.    Yes.

72

ALBERT CARLISLE

1    Q.    You didn't need the judge to tell you that in
2    2002.

3    A.    No.

4    Q.    So I want to focus on the decision of the
5    judge in 2002.  What about that decision made you consider a
6    lawsuit against Mr. Hare?

7    A.    I think -- I think I've answered it.  I think
8    that I felt dissatisfied.  I relied on Scott to get certain
9    things done that didn't happen, that they weren't done.  I
10   was still dealing with the same problems that I was dealing
11   with in 1995.

12   Q.    I understand that, but, you know, your
13   dissatisfaction, you said, was that you wanted Matson off the
14   property.

15   A.    Right.

16   Q.    Well, within a month, I think you told me, of
17   the jury verdict in the federal court they were back there
18   harvesting trees.

19   A.    Right there.

20   Q.    So you knew that in 1998.  Am I correct that
21   they harvested in 1999, 2000?

22   A.    No.  Just -- they just harvested in 1998.

23   Q.    When was the next time they harvested?

24   A.    Probably -- I'd have to ask Jim Hall.  But
25   several years later.

ALBERT CARLISLE

1      Q.      But did they harvest again prior to the

2  judge's decision in 2002?

3      A.      No.

4      Q.      We'll go back to my original question.  What

5  about the judge's decision in 2002 made you consider a

6  lawsuit against Scott Hare?

7      A.      Well, all of a sudden the judge ruled that

8  what I thought was the basis for the 1997 lawsuit, whatever

9  that was, the judge said didn't apply.  And I'm not good at

10 describing legal terms but he threw out basically everything

11 that I thought I had.

12     Q.      And you believed that was Scott's fault?

13     A.      It was.

14     Q.      Why was it his fault?

15     A.      Because I relied on him to do that, to get

16 that part done.

17     Q.      Get what part done?

18     A.      All the items we have gone through before.

19     Q.      You relied --

20     A.      Nothing changed is what I'm trying to say.

21     Q.      You're dissatisfied because the jury verdict

22 in 1997 didn't change anything?

23     A.      Things changed very little.

24     Q.      It got you a hundred and ten thousand dollars.

25     A.      Yeah.

ALBERT CARLISLE

1        Q.      During the course of the litigation in Warren

2   County would you get copies of the pleadings from your

3   lawyers?

4        A.      Yes.

5        Q.      And prior to the judge's decision in January

6   2002 were you aware that Matson Lumber had filed a motion to

7   dismiss part of the claim?

8        A.      Probably.  That's just standard.

9        Q.      Your lawyers kept you apprised of what was

10  going on.

11       A.      Sure. They filed that same kind of motion when

12  -- that we filed in 1995.

13       Q.      And the court denied it back then.

14       A.      Yeah.

15       Q.      The trial judge right before the --

16       A.      But there was a lot of dickering back and

17  forth as to what was going on before the trial.

18       Q.      But your lawyers kept you apprised of what was

19  going on?

20       A.      Yes.

21       Q.      I might have asked you this.  What is the

22  current status of the litigation in Warren County?

23       A.      On hold, I guess.

24       Q.      Do you know why it's on hold?

25       A.      No.

75

ALBERT CARLISLE

1     Q.    Have you been deposed in that action in Warren

2 County?

3     A.    Yes, um-hum.

4     Q.    Do you recall when you were deposed?

5     A.    I was deposed by John Dennison, I think his

6 name is, but that was several years ago.

7     Q.    Did any attorney other than Mr. Krems --

8     A.    Krembs.

9     Q.    I'm sorry.  Krembs represent you in the Warren

10 County action, other than your present counsel?

11    A.    Peter had an assistant, so.

12    Q.    But it would have been from his same office?

13    A.    From his firm, sure.

14    Q.    Was there any attorney in Warren County that

15 represented you?

16    A.    No.

17    Q.    I'm going to show you what's been marked as

18 Exhibit H and ask you whether you recognize that document?

19    A.    I don't.

20    Q.    Have you ever seen that document before?

21    A.    No.  No, I have not seen this.

22    Q.    You don't recall seeing this before?

23    A.    No, I don't.

24    Q.    This is a deed from Mary Kinkead to Fisher &

25 Young in 1973.

Plaintiff's Appendix
000077

ALBERT CARLISLE

```
 1        A.      Yes.

 2        Q.      That would have been after you purchased the

 3   property?

 4        A.      Right.

 5        Q.      And one of your contentions in this lawsuit is

 6   that Mr. Hare did not locate this deed.  Do you recall that

 7   -- asserting that?

 8        A.      Yes, um-hum.

 9        Q.      And I'm assuming that if you're asserting that

10   Mr. Hare should have located this, you saw this deed prior to

11   today?

12        A.      No.  I heard about it, I didn't see it.

13        Q.      When did you first learn about this deed?

14        A.      That I can't tell you.

15        Q.      Do you recall whom you first learned about it

16   from?

17        A.      Mr. Conner.

18              MR. CONNER:  Quickly, this is what I'll call

19           the timber deed, is it not, David?

20              MR. HABER:  Okay.

21              MR. CONNER:  I think it's the timber deed

22           conveyed in September.

23              MR. HABER:  Yes.

24   BY MR. HABER:

25        Q.      During the course of the time Mr. Hare was
```

ALBERT CARLISLE

1    representing you did you know about what we marked as Exhibit

2    H?

3         A.    No.

4         Q.    To your knowledge, has anyone told you that

5    they knew of the existence of Exhibit H during the time Mr.

6    Hare was representing you?

7         A.    My attorney, Terry Warren, had some concern

8    about the -- who owned the timber, and before he allowed me

9    to sign the agreement with Fisher & Young he had some

10   correspondence with them.  That's all I know.  They satisfied

11   him.

12        Q.    That was back in 1970?

13        A.    That was back in 1970.

14        Q.    We'll get to that later.  Have you leased any

15   part of the property to anyone?  Ever enter into a lease

16   agreement?

17        A.    No.  When I first got the property there was a

18   fishing club that had a lease on it.  They leased the fishing

19   rights to the stream, and, no, never had leased it.

20        Q.    That's a copy of the Answers to

21   Interrogatories that you served in this matter.  I want to go

22   over a few things with you.

23        A.    Okay.

24        Q.    If you turn to the second page, listed on

25   there are some names of some individuals.

ALBERT CARLISLE

1    action.  Do you recall a dismissal of the negligence count?

2    A.     I don't.

3    Q.     Is that a mistake, typo?

4         MR. CONNER:  The word negligence is probably

5    a miss -- either negligence or trespass, I think it's

6    really counts V and VII.

7         MR. HABER: I'm not misreading.  There was

8    never a negligence count in the declaratory

9    judgement.

10        MR. CONNER:  I don't think so.  Let's save some

11    time --

12        MR. HABER:  I thought it was just the

13    trespass and conversion claim.

14        MR. CONNER:  You're correct.  It's count --

15    let's just -- by talking about the numbers, I think

16    it's counts V and VII were the two counts that were

17    dismissed, and I think we can agree to that.

18        MR. HABER:  Right.  There was never a

19    negligence and you're not asserting any claim that we

20    dismiss the negligence count?

21    A.     Correct. V and VII.

22    Q.     Correct.

23        MR. CONNER:  Correct.  Save some time.

24    Q.     The next one says:  Defendants were negligent

25    in causing the trespass and conversion claims to be dismissed

82

ALBERT CARLISLE

1   without the plaintiff's consent.

2        So your position is that Scott Hare never discussed

3   with you the dismissal of those two counts?

4        A.    No.  He had a pretrial or a conversation with

5   the judge that we didn't know about.

6        Q.    Can you read A3?

7        A.    (Witness complied.)  Okay.

8        Q.    We can agree it should only refer to trespass

9   and conversion, but when did you come to the conclusion that

10  he had not timely filed the trespass and conversion claim in

11  the Pennsylvania court?

12       A.    I don't know.  I mean, I would have gotten

13  advice on that.

14       Q.    You would have gotten advice from an attorney?

15       A.    Sure.

16       Q.    You don't understand the statute --

17       A.    Not really.

18       Q.    -- statute of limitations.  Go to A4.

19       A.    Right.

20       Q.    Can you tell me what your understanding that

21  the defendants failed to do?

22       A.    Well, failed to conduct a title search on the

23  property.

24       Q.    And did you request Mr. Hare to do a title

25  search?

ALBERT CARLISLE

1      A.      I didn't specifically request it.

2      Q.      Did he ever say he was going to do a title

3  search?

4      A.      He said he was going to go to the courthouse

5  and check records, that's what he said.

6      Q.      And is it your position that if he had done a

7  title search, he would have found Exhibit H?

8      A.      Yes, um-hum.

9      Q.      And it's your position that Exhibit H cuts off

10 Matson's right to timber as of 1978?

11     A.      Yes.

12     Q.      What is your understanding that if Matson did

13 not own the timber rights as of 1978, who owned the timber?

14     A.      Either Mrs. Kinkead or I did.

15     Q.      Why do you say that? Why do you say Mrs.

16 Kinkead or yourself?

17     A.      I think there was one agreement that said that

18 the timber reverted to the owner of the property.  I think

19 there was another agreement that said the owner reverted to

20 Mrs. Kinkead.

21     Q.      Or reverted to the grantor?

22     A.      The grantor, correct.

23     Q.      And Exhibit H said it reverted to the grantor,

24 correct?

25     A.      I guess.  I didn't read it thoroughly but --

ALBERT CARLISLE

1    Q.    Go to page three of Exhibit H.

2    A.    Okay.  Whereabouts does it say that?

3    Q.    The next to last paragraph on page three.

4    A.    All right.  Right.

5    Q.    In Exhibit H -- did you ever discuss with

6   Mr. Warren whether he ever saw Exhibit H?

7    A.    No.

8    Q.    Did you ever ask him?

9    A.    No.

10    Q.    And Mr. Warren would have been the attorney

11   that was representing you in 1973?

12    A.    Let's see. 1973.  He was really more

13   representing me just when we bought the property.

14    Q.    Was somebody representing --

15    A.    I think he continued to advise me to some

16   extent in '73 but --

17    Q.    Do you know who prepared the document that we

18   marked as Exhibit H?

19    A.    No.  Doesn't really say somebody from --

20    Q.    So it's your position that Mr. Hare should

21   have discovered this document, Exhibit H?

22    A.    Sure.

23    Q.    Do you also believe that the attorney that

24   represented you in the prior lawsuit in Warren County should

25   have discovered Exhibit H?

ALBERT CARLISLE

```
 1        A.     Probably.

 2        Q.     Have you brought claim against him?

 3        A.     No.

 4        Q.     Have you considered bringing a claim against

 5   Mr. Morgan?

 6        A.     I think it's too late.

 7        Q.     Now Mr. Krems represented --

 8        A.     Krembs.

 9        Q.     I don't want to insult the man, I may get to

10   meet him.  Mr. Krembs represented you for some period in the

11   Warren County action?

12        A.     Right.

13        Q.     Did he do a title search?

14        A.     I doubt it.

15        Q.     Did he locate Exhibit H?

16        A.     I don't know.  I really don't know.

17        Q.     Did he ever advise you of Exhibit H?

18        A.     I know that he knew about it at some point,

19   but I don't know whether he found it or somebody found it.

20        Q.     Who first told you about Exhibit H?

21        A.     I think he did.

22        Q.     Mr. Krembs?

23        A.     But I think that was after he was working with

24   here, too.

25        Q.     When you say here --
```

ALBERT CARLISLE

1      A.     No.

2      Q.     So it's your position that if Mr. Hare had

3  located this Exhibit H, he would have been able to argue that

4  Matson had no right of any timer they cut down?

5      A.     We wouldn't be here.

6      Q.     Well --

7      A.     Probably.

8      Q.     You understand Matson's position is that it

9  reverted back to Mrs. Kinkead if this --

10     A.     Yes.

11     Q.     Would anything have prevented you, from 1973

12 to 2004, from doing a title search on your property?

13     A.     No.

14     Q.     Did you ever place the property up as

15 collateral for a loan?

16            MR. CONNER:  During what time period?

17     Q.     Since when he bought it until the present.

18     A.     Maybe for a couple of years I might have.

19     Q.     When was that?

20     A.     I don't remember.

21     Q.     Do you remember from whom you borrowed that

22 money?

23     A.     It was the bank, and I just put general, I

24 think.  But I'm not sure we put the -- I'm not sure.

25     Q.     Do you know which bank it was?

ALBERT CARLISLE

1    count but there is no negligence count that was ever in

2    there, correct?

3              MR. CONNER:  Correct. It should just read

4         trespass and conversion claims as opposed to a

5         negligence, trespass and conversion claims.

6              MR. HABER: You made me think a lot when you

7         sent this to me.

8         Q.    Now in relation to A5, what proof of damages

9    are you contending the defendants failed to present?

10        A.    There were a lot of -- there were a lot of

11   damages that we talked about which Scott just didn't present

12   any.

13        Q.    He didn't present them.  Did he discuss with

14   you why he wasn't presenting them?

15        A.    No.

16        Q.    Isn't it true that the judge kind of changed

17   the scope of the trial?

18        A.    That's right.  Of course we didn't know that.

19        Q.    We didn't know that?

20        A.    Well, I was always with Jim Hall and Lainard,

21   we kept waiting for these things to happen.

22        Q.    What damages did he not present evidence to

23   recover?

24        A.    Major damages.

25        Q.    Like what?

ALBERT CARLISLE

1        A.      Mud slides into the trout stream and siltation
2    of the trout stream.  I think we've got a report someplace.
3                MR. CONNER:  You're talking about the Jim Hall
4        report or another --
5        A.      I think there's another report that some
6    environmental group made.
7        Q.      Are you talking about the report of Daniel
8    Wallace from Wallace and Pincher?
9        A.      No, but that could be it.  Let me look what
10   page is that?
11       Q.      It says the subject is Spring Creek Land
12   Restoration.
13       A.      That probably sounds like --
14       Q.      Do you know when these things occurred, the
15   mud slide?  Do you know when this mud slide and infiltration
16   occurred?
17       A.      Yeah, it occurred basically just prior to the
18   1995 lawsuit.
19       Q.      Do you know what caused it?
20       A.      Poor timber practice.
21       Q.      And do you know if that has ever been
22   restored?
23       A.      It's not been restored.  Still working on it.
24       Q.      Any other proof of damages that he failed to
25   present -- Mr. Hare failed to present to the jury?

92

ALBERT CARLISLE

1     A.    No.

2     Q.    You told me you saw the map in the early

3 seventies and never saw it again.

4     A.    That's right, I saw it in the seventies.

5     Q.    So, what other damages did he not present to

6 the jury, damages for what?

7     A.    Well, that would -- that was certainly a basic

8 one; the trees that were cut that were -- probably shouldn't

9 have been cut.

10     Q.    These would be trees outside the no-cut zone?

11     A.    Yeah.

12     Q.    Under what theory was these trees that were

13 cut improperly cut?  Why were they improperly cut, in your

14 mind?

15     A.    Timing, I think, for me.

16     Q.    What do you mean timing?

17     A.    Age and when they should have been cut.

18     Q.    When you say age, you mean the trees were post

19 1969?

20     A.    They cut lots of trees -- there's a limit in

21 the deed agreement, whatever that thing is, there's a limit

22 of certain diameter, so they cut lots of trees that were

23 below that.

24     Q.    Is your claim -- part of your claim that is if

25 Mr. Hare discovered Exhibit H, the deed in 1973, he could

ALBERT CARLISLE

1  have argued that Matson had no right to cut any tree?

2          A.      Yes.

3          Q.      That was part of it?

4          A.      Sure.

5          Q.      Are you arguing that if he had discovered H,

6  you recovered damages for any tree that Matson cut down two

7  years prior to the lawsuit?

8          A.      I think so.

9          Q.      Assuming H does not exist, never existed,

10 nobody ever discovered it, and we're still relying on Exhibit

11 A, the contract, are there damages for trees that were cut

12 down that he did not present?

13         A.      Yes, that's what the point I'm trying to make,

14 even the deed, whatever that agreement of sales were, they

15 defined certain restrictions on timbering, none of which

16 Matson followed, and Scott decided not to bring those up, I

17 don't know why.

18         Q.      Did he discuss that with you?

19         A.      We discussed it a lot.

20         Q.      Did you disagree with his decision?

21         A.      He's the lawyer.

22         Q.      Did you and Scott come to a consensus of how

23 to present the damages to the jury?

24         A.      No, he came to them, it was his call.

25         Q.      He consulted you, he discussed it with you?

ALBERT CARLISLE

1       A.      We met -- as I said, we met often with Lainard

2   and Jim.  They weren't always happy either with what -- but

3   we weren't lawyers, we don't know.

4       Q.      So there were trees that were cut down and

5   damages weren't presented to the jury that you believe were

6   cut down in violation of Exhibit A?

7       A.      Absolutely.

8       Q.      Do you have an idea what that number would

9   have been?

10      A.      Jim Hall would know. There was damage to the

11  trees that were left.  Anyway, enough of that.

12      Q.      You say damage to the trees that were left,

13  you mean when Matson was timbering they damaged trees that

14  were still standing?

15      A.      Sure, lots of them.

16      Q.      Do you know when they did that?

17      A.      Every time they came in to cut.

18      Q.      And when did they first cut?

19      A.      I don't remember.  Jim Hall -- we have a

20  report of that.  '80 something.  '86 maybe.

21      Q.      Can you read A9 of that same page?

22      A.      Sure.

23      Q.      Do you understand what that means?

24      A.      Not exactly, but it means title search, I

25  suppose.

ALBERT CARLISLE

1           MR. CONNER:  A9?

2      A.     Oh, A9, I'm sorry.  Well, that's just what it

3  says we were -- we were not told ahead of time and we assumed

4  that we had certain claims which we found out we didn't have.

5      Q.     So your understanding was that you could

6  re-file the conversion and the trespass claim in state court,

7  correct?

8      A.     I guess.

9      Q.     Yes?

10      A.     Well, yes, I guess.

11      Q.     And when did you first learn that you weren't

12  able to fully litigate the trespass and conversion claims in

13  state court?

14      A.     I don't remember.

15      Q.     Did you ever discuss that issue with Mr.

16  Krembs?

17      A.     Probably, but I don't remember.

18      Q.     Do you recall ever seeing a letter from Mr.

19  Krembs talking about that issue?

20      A.     No.  But that doesn't mean that there wasn't

21  one.

22      Q.     Do you recall Mr. Krembs ever telling you that

23  he had talked to Mr. Hare about the effect of those

24  involuntary dismissals of the conversion and trespass claims?

25      A.     I'm sure they must have conversed.

ALBERT CARLISLE

1 Q. Did you believe that that document controlled

2 the --

3 A. I believe it was certainly an important

4 document.

5   MR. CONNER:  Go ahead and finish the answer.

6 A. As I said, Terry Warren had some question as

7 to who really owned the timber and so that question lingered

8 in my own mind.

9 Q. For twenty years?

10 A. For quite a while.

11 Q. And you never sought advice of any other

12 attorney relative to that?

13 A. Not really.  I assumed it would all come out

14 with this Scott -- when Scott took this on.

15 Q. Can you read A13?

16 A. Sure.

17 Q. Have you read A13?

18 A. Yes.

19 Q. You contend there that the defendants were

20 negligent in failing to know or realize that Rule 41 -- and

21 that Rule 41 refers to the Federal Rules of Civil Procedure

22 -- dismissal does not toll the statute of limitations.  Did

23 you ever discuss that, that issue right there, with Mr.

24 Krembs?

25 A. I don't remember discussing it with him.

98

ALBERT CARLISLE

1      Q.      Did you ever discuss with him the effect of a

2    Rule 41 dismissal?

3      A.      No.

4      Q.      I'd like you to turn to page nine of the

5    Answers to Interrogatories, and it says in the Answers to

6    Interrogatories you're seeking to recover two million nine

7    hundred and eighty-eight dollars -- two million nine hundred

8    and eighty-eight thousand eight hundred thirty-four dollars

9    and eighty cents in this action.

10     A.      Right.

11     Q.      As part of your damages is timber wrongfully

12   harvested by Matson in the years 1993 through 1994 in the

13   amount of three hundred and twelve thousand dollars?

14     A.      Yes.

15     Q.      Do you know how that number was calculated?

16     A.      Yes.  And I'm beginning to question that

17   figure.  That figure was provided to us by Matson Lumber

18   Company.

19     Q.      That is the amount of timber Matson Lumber

20   timbered in 1993 through --

21     A.      That's what they said.  They provided that

22   number to Jim Hall, our expert.

23     Q.      Is that all the timber they harvested?

24     A.      That's what they said.  We're beginning to

25   doubt that.

ALBERT CARLISLE

1      Q.      Is this -- so this number under your

2   understanding is based on the fact that Matson had a right --

3   under your understanding, had no right to harvest any timber

4   in 1993?

5      A.      Yes.

6      Q.      And in 1994 through 1995 that number of a

7   hundred and twenty-five thousand nine hundred and

8   ninety-seven dollars and twenty-six cents, is that also all

9   the timber that Matson took in those years?

10     A.      That's what they reported they took.

11     Q.      Have you done any independent study?

12     A.      No.  We wish we had.  We hadn't done any.

13     Q.      Is there a way to do that now?

14     A.      I don't know.  I'm going to find out.

15     Q.      So it's your contention that Mr. Hare should

16   have sought damages for every tree that Matson Lumber cut

17   down for the period two years prior to you filing the

18   lawsuit?

19     A.      Well, if he had done a title search, he would

20   have done that -- been able to do that.

21     Q.      That's your -- one of your claims in this

22   case?

23     A.      Yeah, um-hum.

24     Q.      Have you attempted to calculate what

25   additional damages he should have sought under the Articles

ALBERT CARLISLE

1      of Agreement, which we've marked as Exhibit A?

2          A.      That's a tough question.  We went through so

3      many figures when we met with Scott.  Scott was -- would come

4      to the farm and Lainard and Jim and myself.  We discussed all

5      kinds of figures, all kinds.  That's all I can tell you.  I

6      can't tell you specific numbers but --

7          Q.      And so it's your position that if Scott Hare

8      had learned about Exhibit H, he would have been able to set

9      forth a conversion claim on the timber of Matson Lumber for

10     two years prior to the statute --

11         A.      Prior?  Sure.

12         Q.      -- prior to the lawsuit?

13         A.      Lawsuit.

14         Q.      The next item of damages is value of timber

15     remaining to be harvested by Matson.  It's approximately nine

16     hundred and forty-seven thousand dollars.

17         A.      Correct.

18         Q.      Can you tell me what that represents?

19         A.      Okay, that represents a report that Jim Hall

20     prepared for us.  He went through the property and estimated

21     the trees that had sprouted before 1969, and that represents

22     that total -- what the value of those trees would be if they

23     were cut.

24         Q.      Can you explain that again?

25         A.      Well, Matson -- the way it is now Matson can

ALBERT CARLISLE

1    come in and cut any tree that sprouted 1969 or before, that

2    is what that figure is.

3         We went through and did a survey, a timber survey.

4         Q.    So these represent trees that are still

5    standing on the property --

6         A.    Still standing.

7         Q.    -- that sprouted prior to 1969?

8         A.    Right.

9         Q.    So, again, your position is, if Mr. Hare had

10   known about Exhibit H, he would have been able to argue that

11   Matson had rights in no timber?

12        A.    In no timber.

13        Q.    So the federal declaratory judgment action

14   allows Matson to cut trees prior to 1969.

15        A.    Right.

16        Q.    And if Exhibit H had been known, you could

17   have been able to argue to the contrary?

18        A.    Of course.

19        Q.    I think number four we've discussed and that

20   deals with the repair to the property damaged by the --

21        A.    Um-hum, sure.

22        Q.    Let me finish.  Damaged by their harvesting

23   practices?

24        A.    Right.

25        Q.    And that was damage you could have sought in

ALBERT CARLISLE

1    the federal court action regardless of whether you knew about

2    H or not?

3        A.      Right.

4        Q.      Because under the agreement they were required

5    to use good timbering practices, correct?

6        A.      Correct.

7        Q.      And do you know why that wasn't presented to

8    the jury, why Mr. Hare decided not to present that to the

9    jury?

10       A.      I don't.

11       Q.      You don't?

12       A.      We certainly talked about it.

13       Q.      Would Mr. Hall have been able to testify as to

14   that?

15       A.      Oh, yes.

16       Q.      The final element of damages is damage to

17   residual trees.  Can you tell me what that is?

18       A.      Certainly.  When Matson came in to cut trees,

19   they were very careless about how they did it and where they

20   did it, so we could walk through the woods and you could see

21   big trees that had been stripped by other trees falling down,

22   skid marks that would cause the interruption of the flow of

23   the sap.  In fact, Jim Hall's position is that Matson knew

24   and that they came in to get as much as they could before we

25   found out.

ALBERT CARLISLE

1     Q.     This damage to the residual trees, did you
2   know about it in 1995 and '96?
3     A.     We certainly knew some was going on, of
4   course.
5     Q.     And Mr. Hare did not seek that damage?
6     A.     He didn't.  He was -- he had other theories
7   which -- that was his prerogative.
8     Q.     But you knew in 1997 he wasn't seeking to
9   recover that damage when the case went to verdict?
10    A.     We did then.
11    Q.     You did then?
12    A.     Yeah.
13    Q.     And you knew he wasn't seeking to recover the
14  cost of repair to the real estate in 1997?
15    A.     We knew that he had his mind made up of what
16  he was going to pursue and that's the way it was going to be.
17    Q.     I understand that, but you knew the only
18  damages he was seeking at the time of the verdict was damages
19  for trees removed in the no-cut zone.
20    A.     Right.
21    Q.     And you knew, in 1997, that he had decided not
22  to seek damages to the residual trees?
23    A.     We didn't know until the time of the trial.
24    Q.     I understand that.  That's what I'm talking
25  about, the time of the trial.  And you knew he wasn't going

ALBERT CARLISLE

1    to present that?

2        A.      He didn't.  We did discover that but we didn't

3    know it at the beginning of the trial.

4        Q.      I understand that.  You knew that by the time

5    the verdict came in.

6        A.      Yes.

7        Q.      And you knew he wasn't seeking damages for

8    repairs to the real estate?

9        A.      Right.

10       Q.      In the value of the timber remaining to be

11   harvested, a little less than a million dollars, you could

12   not have sought recovery for that unless you knew about

13   Exhibit H; is that right?

14       A.      That's right.

15       Q.      In relation to damage number D, the

16   approximately four hundred and thirty-eight thousand dollars,

17   could you have sought recovery for that if you did not know

18   about Exhibit H?

19       A.      I would think so.

20       Q.      You could have sought all of it or just part

21   of it?

22       A.      All of it.

23       Q.      Why?

24       A.      Because they didn't own the trees; they cut

25   trees that did not belong to them.

ALBERT CARLISLE

1    deposition you reviewed, what was the subject?

2         A.    Just looked through them.

3         Q.    Do you recall what parts of the deposition,

4    what was discussed in those deposition transcripts?

5         A.    I could look at them and remember but I don't

6    remember.

7         Q.    I want to go back to the damages that were set

8    forth on page nine in the Answers to Interrogatories.

9         A.    Sure.

10        Q.    I don't think I was asking the questions very

11   clearly, so I'm going to try to summarize it.  I'm going to

12   start at the bottom, number five, damage to residual trees.

13        A.    Right.

14        Q.    You knew of that damage in 1997, correct?

15        A.    I think we -- some of it.  I'm not sure if --

16   when Jim Hall made that particular report but we certainly

17   knew there was damage to trees.

18        Q.    And you knew Scott Hare did not present that

19   to the jury?

20        A.    We knew that.

21        Q.    Because the only damages he presented to the

22   jury were for the damages of trees removed in the no-cut

23   zone?

24        A.    For the value of the trees removed, right.

25        Q.    In the no-cut zone?