ALBERT CARLISLE

1      A.      Right.

2      Q.      In regard to number four, cost of repairs to

3  real property caused by Matson's timbering operations, you

4  knew of that in 1997, correct?

5      A.      We did.  I'm not sure if we had an exact

6  figure but we knew, yes, that there had been damage done.

7      Q.      You told me, I think, that the mud slide had

8  occurred right before you filed the lawsuit?

9      A.      It occurred before we filed the lawsuit.

10  Scott had certainly seen it.

11      Q.      And you knew Scott didn't present damages

12  relative to that?

13      A.      Right.

14      Q.      Three, value of timber remaining to be

15  harvested by Matson.  If my recollection is correct that

16  dealt with trees that sprouted prior to 1969, correct?

17      A.      That's right.

18      Q.      And you knew after the verdict that Matson was

19  entitled to harvest trees that sprouted prior to 1969, based

20  on the verdict.

21      A.      Based on the verdict we knew that, yes.

22      Q.      And the timber that was wrongfully harvested

23  by Matson in D, on page nine, the four hundred and

24  thirty-eight thousand dollars --

25      A.      Um-hum.

ALBERT CARLISLE

1    an extremely fine Cherry tree that was there, veneer Cherry

2    tree, and he was afraid that might have been damaged.  So we

3    cut very small amount of trees.  Most of the trees were in a

4    right-of-way road.

5         Q.    Right-of-way for the state?

6         A.    For the state.

7         Q.    So they were cut mainly at the request of the

8    state?

9         A.    They wanted to, yeah.

10        Q.    And the Cherry tree you mentioned was cut so

11   it wouldn't be damaged?

12        A.    It was cut so it wouldn't lose its veneer

13   category, and it was in what we would say was a no-cut zone

14   anyway, so we felt absolutely right to cut it.  It was when

15   -- it was within a hundred feet of the waterway.

16        Q.    So the no-cut zone only applied to Matson and

17   could you cut --

18        A.    I could cut, yeah. Jim had been watching that

19   tree for a long time, he didn't want anybody to get it.

20        Q.    Are there any other damages you're seeking to

21   recover in this action against Mr. Hare and the other

22   defendants other than what's set forth in the answer on page

23   nine?

24             MR. CONNER:  I think you also mentioned the

25             cloud on the title.

ALBERT CARLISLE

1      A.      I did mention a cloud on the title.

2      Q.      That wouldn't be damages, would it?

3              MR. CONNER:  Well, damage, you can't market

4          the property.

5              MR.  HABER:  You didn't list that.  I guess

6          that would be a supplemental answer.

7      Q.      You're trying to sell the property?

8      A.      No, not at the minute, but I might try to sell

9   it.  And so I couldn't.  I mean, there's no way I could sell

10  it.

11     Q.      Because of the cloud on the title.  What cloud

12  on the title?  The quitclaim deed?

13     A.      That's part of it, but Matson could come and

14  cut these trees and they're not careful about following any

15  restrictions that might be in place.

16     Q.      You're in litigation with Matson regarding

17  what, if any, right they have to the trees on the property?

18     A.      That's right.

19     Q.      And Mr. Hare hasn't been your attorney since

20  1998, correct?

21     A.      I guess that's right.

22     Q.      And since 1998 are you any closer to resolving

23  the dispute with Matson Lumber than you were back in 1998?

24     A.      No.  But if we had resolved it correctly in

25  1997, we wouldn't be having this problem.

ALBERT CARLISLE

1 Q. And you believe because Mr. Hare's negligence

2 you didn't resolve the problem, correct?

3 A. I really do believe that.

4 Q. And that negligence is failure to find

5 document H?

6 A. Yes.

7 Q. And failure to present the damages to the

8 jury?  Proper damages.

9 A. Um-hum.

10 Q. Part of your claim in this case is that he

11 voluntarily dismissed the trespass and the conversion --

12 A. Right.

13 Q. -- case.  You didn't learn that until sometime

14 after the jury verdict.

15 A. That's right.

16 Q. But the only thing you knew at the time of the

17 jury verdict was you received what you believed to be

18 inadequate damages?

19 A. That's right.

20 Q. Without knowing H -- without knowing that

21 Exhibit H existed, do you believe Mr. Hare should have argued

22 that Matson Lumber had no right to trees that sprouted prior

23 to 1996?

24 A. I think he should have done a title search.

25 Q. I understand that.  But what I'm trying to --

ALBERT CARLISLE

1    I mean, when the case was litigated, I'm assuming nobody knew

2    that Exhibit H existed.

3        A.    Okay, nobody knew there were -- I can't go

4    into this but -- because I don't remember the figures --  but

5    Jim Hall and Lainard had all kinds of damages they thought we

6    -- Scott never brought them up.

7        Q.    I understand.  There were damages that you

8    believe Scott Hare should have presented that he didn't

9    present?

10       A.    Right.

11       Q.    That's one part of the case.  Damages was one

12   part.  The other part was declaratory relief regarding what

13   rights Matson had with regards to the lumber.

14       A.    Okay.

15       Q.    And my question to you is:  Do you believe

16   Scott should have argued to the jury or to the court that

17   Matson had no right to trees that sprouted prior to 1969 if

18   he didn't know about Exhibit H?

19       A.    I think there could have been reason for that.

20       Q.    Why?

21       A.    A variety of reasons.  One is that -- I'll

22   stop there.  I just think there are some reasons.

23       Q.    I need to know what those reasons are.

24       A.    Well, some people told me timber rights don't

25   last forever, that would be one, and Scott didn't want to

ALBERT CARLISLE

1    address that.

2        Q.      You knew that prior to -- at the time of the

3    --

4        A.      We didn't really know what Scott was going to

5    present, we really didn't.  It changed on a weekly -- we went

6    down to a meeting --

7        Q.      Go ahead, I'm sorry.  Go ahead.

8        A.      -- with Scott in October and he changed

9    everything that we had worked on.

10       Q.      But at the time of the verdict you knew Scott

11   wasn't arguing that Matson had no right to trees prior to

12   1969?

13       A.      We knew after -- we knew after the trial was

14   over.

15       Q.      At the time of the verdict?

16       A.      Sure, at the time of the verdict.

17       Q.      I guess I didn't follow up this.  About the

18   cloud on your title you have no intention presently to sell

19   the property?

20       A.      No.

21       Q.      And you believe that you can't sell the

22   property till your disagreements with Matson are resolved?

23       A.      Here's what I believe.  I believe that the

24   value of the property resides in the timber and the streams

25   that go through the property which is greatly affected by the

ALBERT CARLISLE

1    timber, and other than that, it's just farmland and there's

2    not much value in farmland in Spring Creek, Pennsylvania.

3        Q.      When you purchased the property in 1970 what

4    did you understand you were purchasing with regard to the

5    timber rights?

6        A.      I thought we were purchasing the property, I

7    thought that Matson -- Fisher & Young had the right to come

8    in and cut a few trees.  In fact, there was a whole series of

9    letters between Fisher & Young and myself as to when they

10   were going to come and cut the trees.  They didn't do it.  It

11   just kept getting worse and worse as time went on.  We

12   protected -- we thought we protected sites for the Boy Scouts

13   camping areas, we thought we were fairly careful, but, as

14   usual, there's always surprises.

15       Q.      When you say cut a few trees, what are you --

16       A.      We thought they could cut -- we thought they

17   did have some rights to cut trees.  We didn't know about H.

18       Q.      H didn't exist at the time you purchased the

19   property.

20       A.      Not the extent of the cutting that they did.

21       Q.      Did Fisher & Young do any cutting on the

22   property?

23       A.      Not at all.

24       Q.      After you purchased the property the first

25   cutting was done by Matson?

117

ALBERT CARLISLE

1    A.    Matson.

2    Q.    In the mid eighties?

3    A.    Yes.

4    Q.    So for approximately fifteen years no cutting

5  was done.

6    A.    No cutting.

7    Q.    When you purchased the property in 1970, did

8  anyone ever give you a value regarding the timber on the

9  property -- what the timber was worth on the property?

10    A.    Not really.  I'd say no.  I had no idea.

11    Q.    I'm showing you what's been marked as Exhibit

12  I, and that is a quitclaim deed from Dora Squatriti to Matson

13  Lumber Company.

14    A.    Right.

15    Q.    When did you first learn this?

16    A.    Well, what day did she sign it?

17    Q.    May 22, 2003.

18    A.    I learned about it sometime around maybe late

19  May, early June.

20    Q.    Of 2003?

21    A.    Right.

22    Q.    And how did you learn about it?

23    A.    I don't know who told me, somebody told me.

24    Q.    Excuse me.

25    A.    I don't know who told me, somebody told me.

ALBERT CARLISLE

1    She still has relatives in Warren and I think comes back to

2    visit.

3          Q.    When you first became interested -- or the Boy

4    Scouts and you became interested in purchasing this property,

5    did you have an understanding of how Fisher & Young acquired

6    the property?

7          A.    Vaguely, just a vague -- I'll tell you all I

8    know.  The Boy Scouts found the property, heard about it

9    through a trust officer in a bank somewhere in Warren County,

10   they heard it was for sale, they went over to talk to the

11   trust office and found out that Fisher & Young had just made

12   some arrangement with Mrs. Kinkead, so we were a little late.

13   But they found out through some trust office in a bank in

14   Warren County somewhere.

15         Q.    What I marked as Exhibit J is the deed from

16   Marian Kinkead to Fisher & Young.

17               MR. CONNER:  '69.

18         Q.    In 1969, correct?

19         A.    Okay.

20         Q.    Now, what I have marked as Exhibit K is the

21   Article of Agreement between Ms. Kinkead and Fisher & Young,

22   correct?

23         A.    Exhibit which?

24         Q.    K?

25         A.    K, right, um-hum.

120

ALBERT CARLISLE

1    Q.    Prior to you purchasing the property from
2  Fisher & Young, did you know the existence of J and K?
3    A.    No.
4    Q.    To your knowledge, did your attorney know the
5  existence of J and K?
6    A.    I think Terry Warren had some inkling.
7    Q.    Inkling of what?
8    A.    Well, I just know that he was concerned about
9  the timber rights, that's all I know, that he wasn't sure
10  that Fisher & Young completely had them.  I certainly
11  mentioned that to Scott several times.
12    Q.    That he -- he was concerned -- Terry Warren
13  was concerned that Fisher & Young did not have the timber
14  rights?
15    A.    Total control of them.
16    Q.    And I don't know what you mean total control.
17    A.    Well, I think they hadn't paid Mrs. Kinkead a
18  certain amount and their answer to Terry was we'd be foolish
19  not to pay because the value was there.  But I never saw that
20  correspondence, I just heard about it.
21    Q.    In Exhibit K it indicates that the eighty
22  thousand dollars will be paid in installments, correct?
23    A.    Um-hum.
24    Q.    Until it's paid off.  So when you went to
25  purchase the property in 1970, isn't it your understanding

ALBERT CARLISLE

1   that Fisher & Young had not fully paid Mrs. Kinkead for the

2   timber rights?

3         A.      It wasn't my understanding but I think that is

4   what worried Terry.

5         Q.      That would worry Terry.

6         A.      I'm sure it did.

7         Q.      Didn't Terry discuss that with you?

8         A.      No.  He said he had some concerns.

9         Q.      Can you read L -- read L to yourself?

10        A.      Sure.  I never saw this.  It says copy but I

11  don't remember ever seeing it.  That's interesting, I never

12  did see it.

13        Q.      Exhibit L is a letter from your attorney,

14  Mr. Warren --

15        A.      Um-hum.

16        Q.      -- to Mr. Kookogey, who was the attorney for

17  Fisher & Young, right?

18        A.      Right.

19        Q.      And you'll agree that you were cc'ed on the

20  letter?

21        A.      I do agree with that.

22        Q.      You don't recall --

23        A.      I don't recall seeing this letter.

24        Q.      And the date of the letter is February 11,

25  1971?

ALBERT CARLISLE

1      A.      Right.

2      Q.      That is after you purchased the property,

3   correct?

4      A.      Right, um-hum.

5      Q.      And does the letter not discuss a problem

6   regarding Fisher & Young's failure to complete the purchase

7   of timber rights --

8      A.      Sure it does.

9      Q.      Let me finish.  The failure to complete the

10   purchase of the timber rights from Mrs. Kinkead?

11      A.      Yes.

12      Q.      And wouldn't Exhibit H have been the

13   resolution of that problem regarding Fisher & Young's

14   purchase of the timber rights?

15      A.      Pardon.

16      Q.      Wouldn't Exhibit H, the deed in 1973, been the

17   resolution of how Fisher & Young secured the timber rights

18   from Mrs. Kinkead?

19          MR. CONNER:  Object to the form of the

20          question.  It asks for a legal conclusion.  Go ahead

21          answer the question.

22      A.      I still don't get it.

23      Q.      You recognize that there's a problem as set

24   forth in Exhibit L, that Fisher & Young has not completed

25   the purchase of the timber rights from Mrs. Kinkead.

ALBERT CARLISLE

1     A.     Um-hum.

2     Q.     How was that resolved?

3     A.     I don't know.

4     Q.     Wasn't it resolved by Exhibit H?

5     A.     Maybe, maybe not.  I don't know.

6     Q.     Are you aware of any other agreement

7  subsequent to this letter of February 11, 1971, between Mrs.

8  Kinkead and Fisher & Young relative to the timber rights?

9     A.     No.

10    Q.     Did Mr. Warren ever communicate to you how

11  this problem was going to be resolved regarding the failure

12  of Fisher & Young to fully pay off Mrs. Kinkead?

13    A.     It says here Fisher & Young will cut timber

14  and pay off Mrs. Kinkead.  That's what it says.  That looks

15  like Terry's handwriting.

16    Q.     But you will agree that as of February 11,

17  1971 your counsel was aware of a problem?

18    A.     He was aware of a problem.

19    Q.     And there is no other deed or agreement other

20  than Exhibit H that occurred after this letter?

21    A.     Well, I don't know.

22    Q.     You're not aware of any?

23    A.     I'm not aware of any.

24    Q.     That's what I'm saying.  Don't put the letter

25  away.

ALBERT CARLISLE

1          A.        I've got it right on top.

2          Q.        On the bottom of the first page, going onto

3     the top of the second page, it says:  I, referring to

4     Mr. Warren, had proposed to you that we work out some plan

5     concerning a terminable interest of the timber rights.

6          A.        Right.

7          Q.        Do you know what he means there?

8          A.        That's what -- we assumed there was a terminal

9     date.

10         Q.        So, as of 1971 you -- your counsel, had a

11    disagreement with Fisher & Young's counsel regarding when --

12    if the timber rights were terminated?

13         A.        We assumed there would be a terminal date,

14    right.

15         Q.        And what was that assumption based on?

16         A.        Common sense.  Timber rights aren't usually

17    given for -- I mean, they're given for a specific number of

18    years.  This wasn't.

19         Q.        And you had told me that you had never been

20    involved in this type of timber dealing before.

21         A.        No, never.

22         Q.        What was your basis of concluding that timber

23    rights are not usually given in perpetuity?

24         A.        I think Terry said it would be unusual for

25    them not to have a cut-off date.

ALBERT CARLISLE

1      Q.    Mr. Warren is a lawyer that dealt with timber

2  rights before?

3      A.    Oh, I don't know.  I have no idea.

4      Q.    But if you learned that, that timber rights

5  aren't usually given in perpetuity, that would have probably

6  been from Mr. Warren?

7      A.    Probably been from Mr. Warren.

8      Q.    As of 1971 did you know Mr. Hall?

9      A.    No.

10     Q.    When did you first meet Mr. Hall?

11     A.    I don't remember.  I met him -- I met him

12  through the museum of natural history in Cleveland.  He's

13  their appraiser.  And when they found out I needed an

14  appraiser, I met him so it was before 1995, I'm not sure what

15  year.  Maybe 1993, '94, something like that.

16     Q.    I'd like you to read that.

17     A.    Okay.

18     Q.    Is the letter dated December 23, 1970?

19     A.    Yes.

20     Q.    To Mr. Kookogey?

21     A.    Yes.

22     Q.    From Mr. Warren?

23     A.    Right.

24     Q.    And Mr. Philip Cochran is cc'ed.  Is he the

25  person from the Boy Scouts?

ALBERT CARLISLE

1      A.     No.  He was the president of Fisher & Young.

2      Q.     Okay.  This letter also discusses a problem

3  with Fisher & Young being able to convey the rights and the

4  timber, correct?

5      A.     Um-hum.

6      Q.     And in the first sentence of the letter it

7  relates to a defect that appears in the title?

8      A.     Right.

9      Q.     Guaranteed.  Is that defect the inability of

10  Fisher & Young to convey rights in the timber?

11     A.     Apparently.

12     Q.     And the reason that there was a defect was

13  because they had not completed their purchase --

14     A.     That's right.

15     Q.     -- from Mrs. Kinkead, correct?

16     A.     Right.

17     Q.     And you were aware of this when it was going

18  on?

19     A.     I wasn't aware of the details.  Terry told me

20  there was some problem.

21     Q.     There was a problem in the title?

22     A.     I wasn't sure what the problem was.

23     Q.     But you knew there was a problem relative to

24  Fisher & Young getting rights from Mrs. Kinkead.

25     A.     I just knew there was a problem revolving

ALBERT CARLISLE

1    around the timber rights.

2        Q.    In the middle of the second paragraph it

3    indicates that Mr. Warren was concerned about the underlying

4    agreement between Fisher & Young and Mrs. Kinkead.

5        A.    Right.

6        Q.    That would have been the timber agreement?

7        A.    Yes.

8        Q.    When you purchased the property, which was

9    earlier this year -- earlier in 1970 --

10        A.    Right, earlier.

11        Q.    -- were you aware of this agreement?

12        A.    (Nodded head.)

13        MR. CONNER:  You have to give a verbal answer.

14        A.    No.

15        Q.    And when Mr. Warren became aware of this

16    timber agreement between Mrs. Kinkead and Fisher & Young, did

17    he advise you of it?

18        A.    Indirectly.  I just -- again, he just told me

19    there was a problem.

20        Q.    There was a problem.  How do you -- what is

21    your understanding of how that problem was resolved?

22        A.    I didn't know.

23        Q.    You didn't know?

24        A.    I had confidence -- Terry was my friend and

25    neighbor, I had confidence that Terry would take care of

129

ALBERT CARLISLE

1      A.      I purchased it.

2      Q.      I may have asked you this question before but

3   I apologize.  Since you learned about Exhibit H --

4      A.      Right.

5      Q.      -- which is the 1973 deed, did you ever ask

6   Mr. Warren if he knew about the deed?

7      A.      I didn't.  As I said, he's retired, I saw him

8   -- my mother died this year, he came to the service.  I think

9   that's the last time I have seen him.

10     Q.      And I think I have asked you, you don't have

11  personal knowledge of who prepared Exhibit H.

12     A.      No.

13     Q.      Please read Exhibit N.

14     A.      Okay.  I tried to figure out who it was from.

15  Okay.

16     Q.      Do you recall ever seeing this letter?

17     A.      No, I never did.

18     Q.      And you'll agree this is a letter from

19  Mr. Kookogey to your attorney Mr. Warren.

20     A.      Yes.

21     Q.      And the date of the letter is April 28, 1970?

22     A.      Right.

23     Q.      And that's subsequent to your purchase of the

24  property.

25     A.      Right.

ALBERT CARLISLE

1   letting a good partner go in default and Terry felt that that

2   was a genuine statement.

3        Q.    Prior to you purchasing the property, did you

4   get any appraisal of the property?

5        A.    No.

6        Q.    How did you come to the amount of a hundred

7   thousand dollars?

8        A.    Boy Scouts did that.  I was a -- I was a

9   Johnny-come-lately.  The Boy Scouts had made the

10  arrangements.

11       Q.    And so the hundred thousand dollars that you

12  agreed to pay was more the number the Boy Scouts had agreed

13  to?

14       A.    It was the number.

15       Q.    I'm assuming the Boy Scouts, if they would

16  have purchased the property, they weren't purchasing it for

17  timber?

18       A.    Well --

19       Q.    Maybe I'm wrong.

20       A.    Yeah, I think you are.  Well, I don't want to

21  go into it, but they purchased another property, which I

22  don't want to go into, it has nothing to do with this

23  property, they did timber it.  They purchased property about

24  twenty miles away.

25       Q.    The fourth paragraph says Fisher & Young will

ALBERT CARLISLE

1    furnish Carlisle with an independent appraisal of the present

2    value of the timber which was estimated by Fisher & Young two

3    years ago to approximately a hundred thousand dollars.  Do

4    you recall ever receiving that appraisal?

5         A.    No.  This is the first I think I've ever seen

6    this.

7         Q.    I would ask that you read Exhibit O.

8         A.    (Witness complied.)  Okay.

9         Q.    Have you ever seen this letter before?

10        A.    No, I haven't.

11        Q.    This is a letter from your attorney to

12   Mr. Kookogey, correct?

13        A.    Yes, um-hum.

14        Q.    Dated February 13, 1970?

15        A.    Right.

16        Q.    It referenced that neither Mr. Carlisle or I

17   knew anything concerning the relationship between Fisher &

18   Young and Mrs. Kinkead, correct?  The end of the first

19   paragraph.

20        A.    Yeah.

21        Q.    And that refers to the timber agreement.

22        A.    Must have been, they didn't know at that time.

23        Q.    Do you know if that timber agreement was ever

24   filed in Warren County in the recorder of deeds?  Do you know

25   that?

133

ALBERT CARLISLE

1     A.     No.

2     Q.     Prior to your purchase of the property was a

3  title search done?

4           MR. CONNER:  If you know.

5     A.     I don't know.

6     Q.     I'm just asking.

7     A.     I don't know.  We got a title insurance

8  policy, I know we got that.

9     Q.     Do you know if Mr. Warren ever did a title

10  search?

11    A.     I don't know who would have done it.

12    Q.     There's handwriting on Exhibit O.

13    A.     Right.

14    Q.     Do you know whose handwriting that is?

15    A.     I'm guessing it's Terry's but I'm not sure.

16    Q.     You're not sure?

17    A.     No.

18    Q.     It's not yours?

19    A.     It's not mine.  We know it's not mine, no,

20  because it says signed by Burt.

21    Q.     What do you mean signed by Burt?

22    A.     It says:  Original agreement to our complaint

23  was signed by Burt.  So that means somebody other than Burt

24  signed that -- wrote that.

25    Q.     When you purchased the property you had no

ALBERT CARLISLE

1    idea about the timber agreements.

2         A.      No. I'm glad to see these.  I have never seen

3    these letters.

4         Q.      Exhibit P is a letter from Attorney Harry

5    Martin --

6         A.      Right.

7         Q.      -- to your attorney Mr. Warren --

8         A.      Yes.

9         Q.      -- dated March 27, 1973, correct?

10        A.      Yes, um-hum.

11        Q.      And it indicates that American Hardwood

12   Industries is purchasing the timber rights which Fisher &

13   Young reserved under its agreement with yourself, correct?

14        a.      Right.

15        Q.      And you've never seen this letter before?

16        A.      I saw this letter.

17        Q.      You did see this letter?

18        A.      Um-hum.

19        Q.      Did you do anything or you or your attorney do

20   anything in relation to this letter?

21        A.      Yes.

22        Q.      What did you do?

23        A.      We arranged to have a meeting with

24   Mr. Ascherman.

25        Q.      The man who was --

Plaintiff's Appendix
000122

ALBERT CARLISLE

1          A.          Herbert Ascherman.  Here it is on the second

2     page, second to the last paragraph.  Its principal Herbert S.

3     Ascherman and we came down and had dinner with him at the

4     Erie Club, as a matter of fact.

5          Q.          What was the purpose of the meeting?

6          A.          To discuss what his intentions were and

7     whether we could work out some kind of arrangement.

8          Q.          And at this time, in 1973, you understood that

9     the relationship -- the timber rights on the property were

10    controlled by your agreement with Fisher & Young?

11               MR. CONNER:  Object to the form of the

12          question, but go ahead, answer the question.

13         Q.          What was -- that was your understanding?

14               MR. CONNER:  Same objection.  Go ahead.

15         A.          Please give me that again.

16         Q.          As of the date of this letter, March 27, 1973,

17    did you understand that your rights in the timber and Fisher

18    & Young's rights in the timber were controlled by your

19    agreement with Fisher & Young?

20               MR. CONNER:  Same objection.

21         A.          I would guess that I did.

22         Q.          And that American Hardwood was purchasing

23    whatever rights Fisher & Young had under that agreement?

24         A.          Yes.  But there was a question there because

25    in that agreement that I had with Fisher & Young I was

ALBERT CARLISLE

1    supposed to have been given right of first refusal if they

2    were -- if the timber rights were ever sold.

3            Q.      Did that issue come about in 1973?

4            A.      One of the things we meet with Mr. Ascherman

5    about.

6            Q.      Did you want to exercise that agreement?

7            A.      We tried to work out an arrangement with him

8    so that basically we were going to divide the trees, but he

9    never cut any, so it didn't make any difference.

10           Q.      American Hardwood?

11           A.      American Hardwood never cut any trees.

12           Q.      The only person that cut any trees was Matson?

13           A.      Matson.

14           Q.      Have you seen Exhibit Q?

15           A.      Yes, I have seen this.

16           Q.      Exhibit Q is a request from Fisher & Young

17   regarding their decision to sell --

18           A.      Right.

19           Q.      -- timber rights in March of 1973?

20           A.      Right.

21           Q.      It makes reference to the agreement between

22   you and Fisher & Young dated May 25, 1969.

23           A.      Right.

24           Q.      Is that the date of your agreement with them?

25           A.      I think it is.

ALBERT CARLISLE

1    six years later.  I'm asking when you received this letter,

2    did you disagrees --

3            A.    I wasn't sure.

4            Q.    And you don't recall if you contacted counsel?

5            A.    I can't remember at the time.

6            Q.    There's a writing on the top of the letter.

7            A.    Yes.

8            Q.    Do you know who's writing that is?

9            A.    No, I don't.  I have no idea.

10           Q.    I'm showing you what's been marked as Exhibit

11   U.

12           A.    Yes.

13           Q.    And that is a letter from Mr. Hare to

14   Mr. Bush --

15           A.    Right.

16           Q.    -- dated June 23, 1998.

17           A.    Um-hum.

18           Q.    And a request that Mr. Bush file the praecipe

19   for writ of summons?

20           A.    Right.

21           Q.    Did you know this was happening?

22           A.    Yeah, I was there.

23           Q.    You were there when Mr. Bush went to the

24   courthouse?

25           A.    I went with him.

149

ALBERT CARLISLE

1        Q.        After this occurred, did Mr. Hare do any

2    further work for you?  Did he do anything further after he

3    forwarded to Mr. Bush this praecipe for writ of summons?

4        A.        I'm sure he did but I don't know exactly.

5        Q.        This was about six months after the jury

6    verdict.

7        A.        Yes.

8        Q.        Do you know if you had already contacted Mr.

9    Krembs?

10       A.        I don't remember but I don't think I had.

11                 MR. HABER: Give me five minutes, I think I'm

12       done.

13    (Whereupon, a break was had.)

14    BY MR. HABER:

15       Q.        When you had originally talked to Mr. Hare it

16    was about a family -- you had family problemS.

17       A.        I had two problems, one was a family problem.

18       Q.        Mr. Hare prepared a complaint that he proposed

19    filing against your family.

20       A.        Yes.

21       Q.        And you made a decision not to pursue.

22       A.        No, I wanted to file it.

23       Q.        Who didn't want to file it?

24       A.        He didn't file it.

25       Q.        He didn't want to file it --

152

ALBERT CARLISLE

1          MR. CONNER:  Sure.

2      Q.      I'm showing you what's been marked as Exhibit

3  V, it's a letter April 28th from Mr. Hare to Mr. Krembs.

4      A.      Right.

5      Q.      Correct?

6      A.      Yes.

7      Q.      Would Mr. Hare know of Mr. Krembs other than

8  if you told him?  Do you have any other reason why Mr. Hare

9  would be writing to him?

10     A.      No, he wouldn't.

11     Q.      Apparently you had contacted Mr. Krembs by

12  April 28th?

13     A.      I must have.

14     Q.      And the dispute -- there was a dispute at that

15  time regarding payment of the bill, correct?

16     A.      Yes.  And that -- yes, that's true.

17     Q.      Do you know if you had discussed anything else

18  with Mr. Krembs by April 28, 1999 other than the outstanding

19  bill?

20     A.      No, I don't remember.  I don't think -- I

21  can't remember.

22          MR. HABER:   I have no further questions.

23                  CROSS EXAMINATION

24  BY MR. CONNER:

25     Q.      Just a couple follow-up questions.  Mr.

ALBERT CARLISLE

1   Carlisle, you indicated, first of all, with regards to

2   Mr. Krembs, the lawyer that's on the letter that is addressed

3   in the last exhibit that you had -- he no longer represented

4   you.  Was that a mistake?

5        A.     I think that's a mistake.

6        Q.     Why don't you -- do you know if there's any

7   formal separation --

8        A.     There's been no formal separation.  I just

9   haven't seen him in the last couple weeks.

10       Q.     Second area of questions is, you were asked

11  some questions about the -- when you first became aware of

12  certain claims that were part of the declaratory judgment

13  action as to when they were dismissed by Scott Hare, and I

14  just want to call your attention to the time period after the

15  verdict in December of '97 and up until the time that this

16  summons was sent in the mail on June 23, 1998.  Was it

17  sometime during that six-month time period that you first

18  became aware that certain claims were dismissed out of the

19  original declaratory judgment action?

20       A.     Probably.

21       Q.     Now, during that time period I'm talking

22  about, that six-month time period in '98, can you tell us

23  whether or not on one or more occasions Scott Hare made

24  representations to you in the presence of others as to the

25  value -- dollar value of those dismissed claims that could be

ALBERT CARLISLE

1    re-filed in Warren County?

2         A.      He always held out a value of about five

3    million dollars.

4         Q.      And can you tell us whether or not the actual

5    order and opinion of Judge Mellon, which I think is dated

6    January 30 of 2002, was that your first notice that you could

7    not proceed with those re-filed claims?

8         A.      Yes.

9              MR. CONNER:  That's all the questions I have.

10                    REDIRECT  EXAMINATION

11   BY MR.  HABER:

12        Q.      You said Scott indicated to you that the

13   claims that had been voluntarily dismissed in federal court

14   had a value of five million dollars of potential value?

15        A.      Potential value.

16        Q.      And you said that was in the presence of

17   others?

18        A.      Yes.

19        Q.      Who else?

20        A.      Well, that came up even when we had the

21   mediation following the trial.  And that figure was used

22   during the mediation.

23        Q.      And who else was present?

24        A.      Lainard Bush, Jim Hall and probably at one

25   point my accountant heard that.

1

1                  IN THE COURT OF COMMON PLEAS
         OF THE 37TH JUDICIAL DISTRICT OF PENNSYLVANIA
2            WARREN COUNTY BRANCH- CIVIL ACTION

3                  -   -   -

4  MATSON LUMBER COMPANY,      )
                      )
5      Plaintiff,      )
                      )
6       vs.         )  No. A.D. 579 of 2005
                      )
7  ALBERT T. CARLISLE, JAMES  )
  HALL, JOHN MARTIN and DONALD )
8  F.(D.J.) HOLMES,       )
                      )
9      Defendants.     )
                      )
10

11          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

12  ALBERT T. CARLISLE,     )
                      )
13      Plaintiff,      )
                      )
14       vs.         )  No. 04-25 Erie
                      )
15  BARTONY, HARE & EDSON; SCOTT )
  M. HARE, ESQUIRE; HENRY E.  )
16  BARTONY, JR., ESQUIRE; and  )
  JOHN JOY V. EDSON, ESQUIRE,  )
17                      )
      Defendants.     )
18

19                  -   -   -

20         DEPOSITION OF JOHN C. DENNISON

21                  -   -   -

22

23  REPORTED BY:

24        STEPHANIE MYERS - COURT REPORTER
       P.O. BOX 1332, MEADVILLE, PA  16335
25            (814) 333-1545

Plaintiff's Appendix
000130

2

```
 1
 2                          DEPOSITION OF JOHN C. DENNISON, a witness
 3     herein, called by Albert T. Carlisle, for examination,
 4     taken pursuant to the Pennsylvania Rules of Civil
 5     Procedure, by and before Stephanie Myers, a Court Reporter
 6     and a Notary Public in and for the Commonwealth of
 7     Pennsylvania, at the law offices of Dennison & Dennison,
 8     293 Main Street, Brookville, Pennsylvania, on February 9,
 9     2006, at approximately 12:04 p.m.
10
11
12
13     COUNSEL PRESENT:

14     For the Albert T.          James R. Fryling, Esquire
       Carlisle:                  Conner, Riley & Fryling
15                                 Bell Telephone Building
                                   17 West Tenth Street
16                                 Erie, Pennsylvania  16512

17     For Matson:                Robert P. Ging, Esquire
                                   2095 Humbert Road
18                                 Confluence, Pennsylvania  15424

19     For Scott Hare:            Amy J. Coco, Esquire
                                   Weinheimer, Schadel & Haber
20                                 602 Law & Finance Building
                                   429 Fourth Avenue
21                                 Pittsburgh, Pennsylvania  15219

22

23     Also present:              Leonard Domenick

24

25
```

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000131

3

1                           —   —   —

2                         I N D E X

3                           —   —   —

4    WITNESS                                          PAGE

5
     JOHN C. DENNISON
6
     Examination
7      By Mr. Fryling   ............................   5, 99

8    Examination
       By Ms. Coco   ...............................      92
9
     Examination
10     By Mr. Ging ................................      94

11

12

13                          —   —   —

14                        E X H I B I T S

15                          —   —   —

16   NO.                                              PAGE

17
     1 - January 23, 1987 invoice .....................   23
18
     2 - Timber deed - April 1, 1973  .................   24
19
     3 - Kinkead/Fisher & Young deed - April 22, 1969 ..   27
20
     4 - August 10, 1993 correspondence ...............   38
21
     5 - April 18, 1994 correspondence  ...............   38
22
     6 - Deed - December 29, 1989  ....................   38
23
     7 - Deed - December 22, 1990  ....................   38
24

25


                 STEPHANIE MYERS - COURT REPORTER

                        (814) 333-1545



                         **Plaintiff's Appendix**
                              **000132**

4

```
 1                        -   -   -

 2                   E X H I B I T S

 3                        -   -   -

 4    NO.                                           PAGE

 5    ─────────────────────────────────────────────────

 6    8 -  May 5, 1995 correspondence  ..............   42

 7    9 -  June 13, 1995 correspondence .............   42

 8    10 - October 30, 1987 correspondence ..........   46

 9    11 - List of exhibits  ........................   47

10    12 - Deed - April 23, 1973 ....................   54

11    13 - Article of Agreement - April 1968  .......   54

12    14 - Article of Agreement - April 1, 1968 .....   54

13    15 - May 8, 2003 correspondence  ..............   69

14

15

16

17

18

19

20

21

22

23

24

25
```

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000133

5

```
 1                    P R O C E E D I N G S

 2                         -   -   -

 3

 4                         JOHN C. DENNISON, a witness

 5    herein, having been first duly sworn, was examined and

 6    testified as follows:

 7                         EXAMINATION

 8    BY MR. FRYLING:

 9         Q.   Good afternoon, Mr. Dennison.  My name is James

10    Fryling, and I represent Albert T. Carlisle.

11         We have noticed your deposition here today on two

12    different captions.  One is a case pending in the Court of

13    Common Pleas of the 37th Judicial District, Warren County,

14    Matson Lumber Company versus Albert T. Carlisle, James

15    Hall, John Martin and Donald F. (D.J.) Holmes, which has a

16    Docket No. 579 of 2005.

17         We have noticed it under caption of the case pending

18    in the United States District Court for the Western

19    District of Pennsylvania, Albert T. Carlisle, Plaintiff,

20    versus Bartony, Hare & Edson; Scott M. Hare, Esquire; Henry

21    E. Bartony, Jr., Esquire; and John Joy V. Edson, Esquire,

22    Defendants, at Docket No. 04-25, Erie.

23         We have noticed your deposition specifically for

24    today.  We have also noticed the deposition of a

25    representative of Matson Lumber Company pursuant to FRCP
```

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000134

6

1   30(b)(6) and Rule 4007.1(2(e) with regard to the areas of

2   inquiry that were listed in one through seven of that

3   Notice.

4        It is my understanding, from Attorney Ging, who

5   represents Matson Lumber Company in the Warren County

6   action, that you are being appointed or you're appearing

7   here today not only in the individual capacity, but also as

8   the corporate representative designated by Matson Lumber

9   Company for purposes of answering those questions; is that

10  correct?

11       A.   That's correct.

12       Q.   You have had an opportunity to review the Notice?

13       A.   Yes.

14            MR. GING:  For the record, Jim, we have the

15  original Notice that you had provided us, and it had

16  another caption on it.  We don't have the final Notice.  I

17  assume they are the same.

18            MR. FRYLING:  That was a draft of the

19  original Notice.

20            MR. GING:  Correct.

21            MR. FRYLING:  And, at your request, we

22  replaced the Warren County case caption of Carlisle versus

23  Matson Lumber Company with the Matson Lumber Company versus

24  Carlisle, Hall, Martin and Holmes.

25            MR. GING:  But in terms of the content, one

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000135

1    did you go high school?

2        A.    Brookville High School.

3        Q.    Your year of graduation?

4        A.    1970.

5        Q.    Where did you go to college?

6        A.    My first year, I went to the University of

7    Buffalo and transferred from there and I went to

8    Westminster College; I graduated in 1974.  I stayed on an

9    extra year and got my Master's in education.  I then worked

10   for a year at a correctional facility for juveniles and

11   then went to law school at Valparaiso University and

12   graduated in December of 1978.

13       Q.    What was your undergraduate degree in?

14       A.    History.

15       Q.    Upon graduation in 1978, did you sit for the bar

16   exam?

17       A.    Yes.

18       Q.    And you passed the bar exam?

19       A.    Yes.

20       Q.    And when did you begin practicing?

21       A.    Well, 1978, in December, I came back here, so I

22   took the bar exam in February of '79 and I passed.  I got

23   my notice, I think April 15th, 1979, and I started

24   practicing then.

25       Q.    You're currently with a practice now?

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

10

1    you have been in practice?

2        A.    Yes.

3        Q.    With regard to your real estate practice, is that

4    residential, commercial or both?

5        A.    Both.

6        Q.    All right.  Is it weighted more heavily towards

7    one or the other?

8        A.    I can't put a percentage, but I do a lot of

9    commercial real estate work, too, buying and selling

10   motels, timber land, businesses in general, and then, plus

11   we do a lot of residential work, too.

12       Q.    How long, or how many years would your practice

13   have involved commercial real estate deals involving timber

14   or timber lands?

15       A.    Since the early '80s.

16       Q.    In the course of your practice involving

17   commercial timber land, have you come to represent a

18   company known as Matson Hardwoods or Matson Lumber Company?

19       A.    Yes.

20       Q.    How long have you represented Matson?

21       A.    Since the early '80s.

22       Q.    Okay, that would be prior to 1985?

23       A.    Yes.

24       Q.    Do you have any relationship, formal relationship

25   with Matson Hardwoods or Matson Lumber Company other than

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000137

12

1       Q.   And just for the record, Robert Matson was an

2   officer or director of Matson Lumber Company or Matson

3   Hardwoods?

4       A.   He was the owner.

5       Q.   He was the owner, okay.

6       With regard to your being here today as designated by

7   Matson Lumber Company with regard to the items of inquiry

8   included in the Notice of Deposition, can you tell me what

9   investigation you undertook in order to prepare for your

10   deposition today as Matson's designated representative?

11       A.   The only thing I did was I reviewed the

12   Deposition Notice, and I did not look at anything else in

13   preparation for today's testimony.

14       Q.   Did you have any conversations or talk to any

15   employees of Matson Hardwoods or Matson Lumber Company?

16       A.   No.

17           MR. GING:  Just for clarification, you have

18   done other things dealing with this subject matter prior to

19   today; is that correct?

20           THE WITNESS:  Oh, yes, but in actual

21   preparation for this, I didn't review anything.

22   BY MR. FRYLING:

23       Q.   Okay, as I understand it, then, your firm began

24   doing legal work for Matson back in the early 1980s.  Do

25   you know whether your firm did all of Matson's work or

Plaintiff's Appendix
000138

20

1     A.    No.

2     Q.    And why not?

3     A.    We didn't have time.

4     Q.    And could you explain that?

5     A.    Well, this thing all came about very quickly, and

6     when we realized how many tracts of land were involved, my

7     father and I, and when they wanted to close, it simply did

8     not make any sense for us to do any of the title work.

9         Even though economically that would have been great,

10    we couldn't have gotten it done within that time frame to

11    get the closing done, and in the midst of all of this,

12    somehow we became aware that John Kookogey had searched

13    and/or was in a position to issue a title certificate on

14    all these properties.  So, it was on that basis that we

15    went to closing.

16    Q.    Did you contact Attorney Kookogey directly with

17    regard to inquiring about title to the properties?

18    A.    That's 20 years ago.  I can't remember exactly

19    who contacted whom or whatever.  I just remember my father

20    and I saying, We can't do this and then finding out that

21    Kookogey was willing to do it.  And we were then able to

22    close before the end of the year, which was the critical

23    part.

24    Q.    I take it, then, that Attorney Kookogey was in a

25    position to be able to provide, at least to your

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000139

21

1    satisfaction, the information necessary in order for the

2    merger to go through?

3        A.    Yes, as far as on all the titles to the real

4    estate.

5        Q.    Can you tell me what documents or information

6    Attorney Kookogey provided you with regard to the title for

7    the properties that were being acquired through the merger?

8        A.    He gave us a certificate of title.

9        Q.    Did he give you anything else other than a

10   certificate of title?

11       A.    Not to my knowledge, not that I can remember.

12       Q.    And what did the certificate of title include?

13   Do you know?

14       A.    I mean, it's of record.  If you show it to me ...

15       Q.    Let me see if I brought a copy with me.

16             MR. GING:  It was in our response to the

17   document in question.

18   BY MR. FRYLING:

19       Q.    Mr. Dennison, I'm going to show you a copy of

20   answer to Defendant Carlisle's request for production of

21   documents on behalf of Matson Lumber Company in the

22   Carlisle, Hall, Martin and Holmes case, and attached

23   thereto, the first document has an exhibit label on the

24   bottom of it of 64.

25       I'm going to show you that document and ask if you can

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000140

24

1    tax due on those.

2        Q.    Did Matson receive, as a result of the merger

3    from Fisher & Young, any type of deeds transferring either

4    the timber and/or the real estate for any of the properties

5    to Matson?

6        A.    Did they receive a deed?

7        Q.    Yeah.

8        A.    In '86?

9        Q.    Correct.

10        A.    No, not to my knowledge.

11            (Deposition Exhibit No. 2 was marked for

12    identification.)

13    BY MR. FRYLING:

14        Q.    Mr. Dennison, I'm going to hand you what was

15    marked as Exhibit No. 2 and ask if you can take a look at

16    that document for us, please.

17        A.    (Witness complied.)

18        Q.    Mr. Dennison, with regard to Exhibit 2, have you

19    seen that document before?

20        A.    Not to my knowledge.

21        Q.    All right.  This is a document that was provided

22    to us by counsel for Matson, Mr. Ging, in request -- or in

23    response to a subpoena that was issued to Matson Lumber

24    Company for copies of deeds relating to the properties that

25    they acquired from Fisher & Young.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000141

26

1    Fisher & Young Hardwoods, Inc.  Does that appear to be

2    correct?

3        A.    Yes, from Fisher & Young, Inc. and Fisher & Young

4    Hardwoods with a bunch of other grantors involved.

5        Q.    It's my understanding, from just kind of a

6    history, when Mr. Carlisle purchased the land that is known

7    as Clough Farm, he purchased from Fisher & Young, Inc., who

8    would be named as the grantor in that timber deed, correct?

9        A.    They are one of the grantors, yes.

10       Q.    And that ultimately Fisher & Young, Inc. became

11   American Hardwoods, which became Fisher & Young Hardwoods,

12   which ultimately was the company that merged with Matson.

13   Is that your understanding as well?

14       A.    That's what my understanding is.

15       Q.    This appears to be a timber deed, then, from

16   Fisher & Young, Inc. to Fisher & Young Hardwoods, Inc.

17   transferring presumably whatever properties and timber were

18   owned by Fisher & Young, Inc. at the time to Fisher & Young

19   Hardwoods, Inc.?

20       A.    Yes.

21       Q.    There is a similar type of deed that was created

22   from Fisher & Young Hardwoods, Inc. to Matson Lumber

23   Company -- or Matson Hardwoods?

24       A.    No.

25       Q.    It's my understanding that to the extent that

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000142

1    Matson Hardwoods acquired timber rights to the Clough Farm,

2    they would have acquired through the merger whatever

3    interest Fisher & Young Hardwoods held at the time; is that

4    correct?

5         A.    That's correct.

6         Q.    In reviewing this timber deed from Fisher &

7    Young, Inc. to Fisher & Young Hardwoods, Inc., it appears

8    that the only parcel that was transferred to Fisher &

9    Young, Inc. regarding the Clough Farm appears on page seven

10   of the exhibit.  And you can take a quick look.  I have

11   done it, and I couldn't find any other reference to Kinkead

12   or to the Clough Farm in that deed.

13              MR. GING:  I am going to object to the form

14   of the question, as it relates to the Clough Farm, but you

15   can answer the question.

16        A.    Can you restate that because, see, I don't know

17   -- I'm not familiar with this deed.  I'm not familiar,

18   without looking at the description, legal description for

19   the Clough Farm.

20        Q.    Okay.

21        A.    So, this don't really --

22              MR. FRYLING:  Let me mark this 3.

23              (Deposition Exhibit No. 3 was marked for

24   identification.)

25   BY MR. FRYLING:

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000143

28

1      Q.    I'm going to show you what we marked as Exhibit

2    3, which is a copy of a deed between Marion C. Kinkead and

3    Fisher & Young, Inc.

4        This deed is dated March 27, 1969, and you can take my

5    representation that this, to the extent that we know, is

6    the deed by which Mrs. Kinkead transferred the real

7    property to Fisher & Young, Inc.  That deed includes a

8    description of the real estate that was transferred by

9    Mrs. Kinkead to Fisher & Young.

10      A.    Okay.

11      Q.    Now, I believe that that legal description

12    includes 18 enumerated parcels of land.  It's my further

13    understanding that at the time that Mrs. Kinkead sold to

14    Fisher & Young, Inc. that one of those parcels had

15    previously been sold to a third party, so that one of the

16    parcels included within that description actually wasn't

17    owned by Mrs. Kinkead at the time that she sold it to

18    Fisher & Young.

19          MR. GING:  Before we go on -- I'm sorry, go

20    ahead.  I apologize.

21      Q.    It's my further understanding that in reviewing

22    the deed from Fisher & Young to Mr. Carlisle that one other

23    parcel of property that was acquired from Mrs. Kinkead was

24    not transferred to Mr. Carlisle.  So, the original Kinkead

25    deed lists 18 parcels, the deed to Fisher & Young was 17

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000144

1    parcels, the deed from Fisher & Young to Carlisle consisted

2    of 16 parcels.

3        Having said that, that's the original deed or copy of

4    the original deed from Mrs. Kinkead, and my question to you

5    is, does that legal description for the Carlisle Farm,

6    either in whole or in part, appear in the timber deed

7    between Fisher & Young, Inc. and Fisher & Young Hardwoods

8    that we have marked as Exhibit 2?

9        A.   Do you want me to compare the descriptions in

10    these two deeds?  Or can you tell me what ...

11        Q.   Well, I have reviewed this deed.  There is only

12    one county listed, a Spring Creek Township, and it's my

13    understanding that the Clough Farm was located in Spring

14    Creek Township, Warren County?

15        A.   Correct.

16        Q.   The only reference to Kinkead or to any property

17    that appears within the chain of title for the Kinkead

18    property, I will use Kinkead because she was the last

19    common owner, the only parcel that appears to be included

20    within this timber deed that's Exhibit 2 is a parcel number

21    16 containing 153 acres?

22        A.   If you're asking me if that's the only parcel in

23    Exhibit 2 that states Kinkead, you're correct.  As far as

24    Spring Creek Township, it says 153 acres.

25        Q.   Okay.  Are you aware of any timber deed between

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1          MR. FRYLING:  I did receive a number of

2     first pages of articles of agreement, but those were

3     between Kinkead and Fisher & Young.

4          I can purport that the only documents in my box that

5     has titled on it Fisher & Young, Inc. to Fisher & Young

6     Hardwoods, Inc. is represented by the timber deed that we

7     have marked as Exhibit 2, hence my question as to whether

8     there was another deed existing between Fisher & Young,

9     Inc. and Fisher & Young Hardwoods, Inc. addressing

10    specifically the Carlisle Farm, since this deed doesn't

11    appear to include that rather lengthy description.

12         A.   There was another deed.

13         Q.   I will follow up with a supplemental request, but

14    if you could --

15         A.   We have looked for it.  I asked Leonard for that.

16         Q.   Do you know whether or not that deed has been

17    recorded?

18         A.   It has not been recorded.

19         Q.   So, you believe that there is an unrecorded deed

20    between Fisher & Young, Inc. and Fisher & Young Hardwoods,

21    Inc. specifically for the Carlisle/Clough Farm?

22         A.   Yes.

23         Q.   Do you know why Exhibit 2 would have been

24    recorded but this other deed unrecorded?

25         A.   I have no idea.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1      Q.   And just so --

2      A.   When I said no idea, what happened in late 2002

3    or 2003, when Peter Crems called me for that deed, I looked

4    through my file and I found just the first page of that

5    deed.  And then, I thought, Well, it should be recorded.

6    So, I asked Lauri Sekerak to get me a copy of it.

7      Q.   We have had a couple of conferences over the

8    phone back and forth with regard to document requests and

9    whether there were documents and/or other documents.

10     It was my understanding, from prior conversation with

11   Attorney Ging and yourself, in response to that that there

12   was a 1973 timber deed that Peter Crems had inquired about

13   getting a copy of, and it was my understanding that in

14   response to that you had contacted Ms. Sekerak and asked

15   her to provide you with a copy of that deed.

16     Are you talking about the same deed?

17     A.   Right.  He called me and wanted to see the deed,

18   as I recall, from Fisher & Young to Fisher & Young

19   Hardwoods, and I thought that was sort of a curious -- I

20   thought, Well, why don't you just get a copy of it.

21     So, I remember thinking, Well, I will just get a copy

22   from Len, and I remember thinking that Len wouldn't have it

23   because we didn't have anything from -- Len wouldn't have

24   that because we didn't have anything regarding the chain of

25   title.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1      And the only thing that I could find was the first

2      page of that deed.  Somehow, we got that, I don't know how,

3      but then I asked -- Then I just sort of didn't look for it

4      anymore because I got busy on other things, and then Crems

5      called me again and wanted -- I'm trying to think of this.

6      He called me, and that's when I found the first page of

7      that deed and I sent him the first page of the deed.

8          I can't remember exactly what happened after that

9      except that I called Lauri Sekerak and I said, Get me the

10     deed between Fisher & Young and Fisher & Young Hardwoods,

11     Inc.

12         And then, in the mail, I got the deed that had Marion

13     Kinkead's name on it, and I looked at that deed and I

14     thought to myself, She must have misunderstood what I was

15     talking about because I had never heard of Marion Kinkead

16     before.  I thought we had just gotten our signals crossed,

17     and I'm not familiar with the legal description with the

18     Clough Farm, so I didn't look at it to see if it jived or

19     anything.  All I remember is seeing Kinkead and thinking

20     this must be some mistake.

21         So then some period of time went by, and then, Crems

22     called me again and said, I want to -- can you please send

23     me the deed between Fisher & Young and Fisher & Young

24     Hardwoods, Inc.  I think at that point I called Lauri

25     Sekerak, and I said, Lauri, I wanted you to send a deed

34

1   between Fisher & Young and Fisher & Young Hardwoods, Inc.

2   and you sent me this Kinkead deed.  And she said to me, she

3   said, Well that's the last deed of record.

4        So, then, I think I went through my file and I found

5   the first page of that Fisher & Young to Fisher & Young

6   Hardwoods, Inc. deed, but that's all I had.  And I remember

7   I sent it to Crems.

8        Q.   Okay.

9        A.   But then, I started to wonder, Well, why was that

10  the last -- why was that Kinkead deed the last deed of

11  record.

12       So then I think I went to -- figured out I went to the

13  certificate of title, and it said that Kookogey was holding

14  some deeds.  So, I tried to find Kookogey, and he was no

15  longer practicing, so I called an attorney over there that

16  I knew, and I said, Do you know where John Kookogey is?  He

17  said, He is retired, but sometimes he goes into the office

18  every once in a while with an attorney over there in

19  Titusville.

20       So, that's when I contacted John Kookogey and I said,

21  Do you have these deeds that you reference in your

22  certificate of title, and he didn't know, but he said, I

23  would be more than happy to go down to my old office, if

24  you can go over, and we can go through my files and we can

25  see if I have those deeds.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000148

```
 1          So, that's what I did.  I went over to his office, and

 2     he had several deeds, one of which was the original

 3     unrecorded deed from Fisher & Young to Fisher & Young

 4     Hardwoods, Inc.

 5          Q.   Did you make copies of those?

 6          A.   I brought them back to my office, and I gave them

 7     to Len.

 8          Q.   Tell me when this occurred.

 9          A.   This would have occurred in -- Let me see

10     something.  (Witness on computer.)  I think it would have

11     occurred in -- What was the date of the Squatriti deed?

12          Q.   May 6th of 2003.

13          A.   It would have been prior to that.  It would have

14     been March or April of 2003, in that range.

15          Q.   Okay.

16          A.   Because I got the call from Crems in December,

17     January, sometime in that time frame, and then there was a

18     delay.  And then, I called Lauri, and she told me that that

19     was the last deed of record, and it was after that point

20     that I started to try to find John Kookogey.

21          Q.   Prior to going down and meeting with Mr. Kookogey

22     and looking at whatever documents he had in his file, do

23     you know how it is that you would have come across the

24     Exhibit 2, which is the timber deed from Fisher & Young,

25     Inc. to Fisher & Young Hardwoods, Inc.?
```

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

38

1          A.    No.  I have never heard of Mr. Piece, either,

2     that I know of.

3          Q.    Okay.

4                (Deposition Exhibits No. 4, No. 5, No. 6

5     and No. 7 were marked for identification.)

6     BY MR. FRYLING:

7          Q.    Mr. Dennison, I'm going to hand you four items

8     that I have marked Exhibits 4, 5, 6 and 7 and ask you if

9     you can identify those documents?

10               MR. GING:  Can you read the exhibit number

11     when you identify them.

12          A.    Exhibit No. 4 is a letter from me dated

13     August 10, 1993.  It's a letter of enclosure to Len where

14     I'm enclosing a deed from B & B Hardwoods and Pennsylvania

15     Hardwoods, Inc.

16          Q.    I'm not going to ask a lot of questions about

17     them, but if you could just identify them for the record.

18          A.    Exhibit 5 is a letter of enclosure from me to Len

19     from the timber sales agreement from Robert Matson, Joan

20     and Becky Matson and Barb Conti to Matson Hardwoods, Inc.,

21     dated September 1st, 1993.

22               MR. GING:  Hold on, John.  What's the date

23     of the letter?

24               THE WITNESS:  April 18, 1994.

25          A.    The next one is a deed dated, Exhibit 6,

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000150

48

1   was prepared by Attorney Fossee for the 1995 litigation

2   between Carlisle and Matson, and, in fact, exhibits that

3   were admitted during the course of the trial of that case.

4       My question to you is with regard to the various

5   leases and deeds to the Clough Farm that are listed on this

6   exhibit, would you have provided those documents to

7   Mr. Fossee for this exhibit list?

8       A.   Not that I remember.  Again, I do not remember

9   having any direct involvement in the 1995 case.

10      Q.   Who, as Matson's corporate designee, who from

11  Matson Lumber Company would have provided these documents

12  to Attorney Fossee for use at the trial?

13      A.   Well, again, Len would be the vocal person.

14  Whether Len would get this information himself and/or have

15  other people get it for him, that's what I would expect.

16      Q.   Would you expect, also, that these are documents

17  that would have been in possession of Matson Lumber Company

18  at or about the time of the 1995 Federal Court trial?

19      A.   Well, I don't know that because, see, Fossee

20  was -- John Kookogey was a witness in that case, so how

21  much of these exhibits he actually got directly from

22  Kookogey and what he got from Len, I have no idea.

23      Q.   Okay.

24      A.   But I can't imagine that Len had any of these

25  letters from Kookogey to David Eardley.  I mean, I don't

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

49

1   know.  You would have to ask Len if he had those.  I don't

2   know.

3       Q.   Okay.  So, these documents either came from

4   Matson or they came from Attorney Kookogey, who was a

5   witness in the trial for Matson Lumber Company?

6       A.   Unless Chet Fossee got them from some other

7   source that I'm not aware of.  You would have to ask him.

8       Q.   All right.  This list of documents includes a

9   copy of the deed between Marion C. Kinkead and Fisher &

10  Young, Inc. dated 3/27/69 designated as Exhibit No. 2 on

11  the first page; is that correct?

12      A.   Yeah.  Let me look through this, though.

13      Yeah, I don't -- the only thing that I would say about

14  this list is that I do not -- unless some of these letters

15  were in that file that Kookogey gave me that he had, I

16  don't recognize any of these letters, and I cannot say

17  where they came from or any of these exhibits came from,

18  whether they came from Chet Fossee, John Kookogey or Matson

19  Lumber Company.  I have no knowledge of where he got those.

20      Q.   My question with regard to this exhibit is it

21  appears that Exhibit No. 2 is a copy of the deed between

22  Marion C. Kinkead and Fisher & Young, Inc., 3/27/69, and

23  Exhibit No. 3 would be Article of Agreement between Marion

24  C. Kinkead and Fisher & Young, Inc. dated 4/1/68.

25      A.   Yes, I see that.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

50

1      Q.    If this package of documents is, in fact, a true

2   and correct copy of the exhibit listing exhibits that

3   Mr. Fossee had at the time of trial, these documents would

4   have been in Matson's possession then prior to the

5   beginning of that 1997, I guess, was the actual year of

6   that trial date, correct?

7      A.    They would have been in Chet Fossee's possession.

8   Whether they were in Matson Lumber Company's possession, I

9   have no knowledge.

10      Q.    Okay.  Did you review the pleadings in that 1995

11   federal litigation?

12      A.    I think I would have reviewed the initial

13   Complaint when it came in, and then there was a discussion

14   about who was going to be retained to defend the case, but

15   beyond that, I don't have any knowledge of reviewing any of

16   the pleadings or anything in that case --

17      Q.    Were you aware --

18      A.    -- until after it was over, of course.

19      Q.    Were you aware that Mr. Fossee was filing a

20   counterclaim at that time?

21      A.    I knew that he had filed a counterclaim, but when

22   that was or whether that was after the lawsuit, after the

23   verdict, I have no idea.

24      Q.    So, you weren't asked to review or approve that

25   counterclaim on behalf of Matson?

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

57

1    that John Kookogey gave, plus a review of the articles of

2    agreement and the deed from Fisher & Young to Albert

3    Carlisle.

4        That's really the basis of my belief because I have

5    never done a title search.

6        Q.   I'm going to show you, I guess in reverse order,

7    Exhibit 14, which is an article of agreement, dated April

8    1, 1968 between Marion C. Kinkead and Fisher & Young, Inc.,

9    and then Exhibit 12 appears to be the subsequent deed

10    relating to that article of agreement.  The deed is dated

11    April 20 -- I'm sorry, that's not correct.

12        What I have handed you appears to be an article of

13    agreement between Marion C. Kinkead and Fisher & Young.

14        A.   Yes, Marion Kinkead and Fisher & Young, yes.

15        Q.   That's dated April 1st, 1968?

16        A.   This is for 25,000.

17        Q.   Does that article of agreement include in its

18    sale any timber and trees to the Carlisle property?

19        A.   This does not include the trees, the timber and

20    trees.

21        Q.   Okay.  Would you agree that if Fisher & Young,

22    Inc. had not acquired rights to the timber and trees to the

23    Clough Farm from Mrs. Kinkead that they would not be in a

24    position to transfer any interest in the timber and trees

25    to Bert Carlisle at the time they sold it to him?

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000154

1          MR. GING:  I am going object to the form of

2     the question as asking him to speculate, asking for a legal

3     conclusion and asking for an opinion.

4          You may answer the question, if you can.

5          A.   Okay, again, my basis to believe that Matson owns

6     the timber and trees is based upon John Kookogey's

7     certificate of title and the article of agreement and deed

8     from Fisher & Young, Inc. to Albert Carlisle.  I have not

9     done an independent title search.

10         Q.   As far as you know, no one on behalf of Matson

11    Lumber Company or Matson Hardwoods has done an independent

12    title search on the property other than what may have --

13    other than what they may have received from the McChesney

14    litigation?

15         A.   I know that I never did a title search for Matson

16    Lumber Company or Matson Hardwoods, Inc. on the Clough

17    Farm.

18         Q.   As a corporate designee, for purposes of today's

19    deposition, did you inquire as to anyone from Matson Lumber

20    Company whether they had requested or had performed a title

21    search or a title abstract on the Clough Farm?

22         A.   I would be the person that would recommend that

23    --

24         Q.   Okay.

25         A.   -- on behalf of the corporation, normally.  So, I

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

59

```
 1      would say, no.

 2           Q.   I guess my question was more specific.  For

 3      purposes of today's deposition, did you make any inquiry to

 4      any Matson representative or employee as to whether they

 5      had ever, not using you or independently of you, ever

 6      requested or secured a title search or title abstract on

 7      the Clough Farm?

 8           A.   I didn't ask anybody that.

 9                MR. GING:  I have made that inquiry, and I

10      can represent to you, as counsel, that if it would be done,

11      John would be the one that would do it and that no such

12      request had ever been made of anybody else.

13           Q.   My understanding, so I can complete this line of

14      thought, is that that is true even as of today?

15           A.   Correct.

16           Q.   Have you ever seen the document that is marked as

17      Exhibit, I believe it's 14?

18           A.   Yes.

19           Q.   When is the first time that you would have seen

20      that document?

21           A.   It would have been in 2003.

22           Q.   What would be the circumstances by which you

23      reviewed that document?

24           A.   Either Lauri Sekerak sent me this or a copy of it

25      was in John Kookogey's file.  I'm not sure the recorded
```

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1    recording stamp by any recorder of deeds?

2        A.    I recognize this.  I don't know if this has ever

3    been recorded or not.

4        Q.    And the exhibit that you're holding that's

5    Exhibit 13, does that purport to be an article of agreement

6    between Marion C. Kinkead and Fisher & Young regarding

7    timber and trees on the Clough Farm?

8        A.    Yes.

9        Q.    All right.  And does that document purport to

10    give Fisher & Young, Inc. the right to timber

11    Mrs. Kinkead's property for a period of time up to until

12    April 1, 1978?

13        A.    Yes.

14        Q.    Are you aware or have you ever seen, up until

15    today, any other document purporting to transfer any rights

16    whatsoever between Marion C. Kinkead and Fisher & Young,

17    Inc. for an interest in timber on the Clough Farm other

18    than the documents that you have in your hand, one for the

19    land and one for the timber?

20        A.    The last deed in the chain of title.

21        Q.    I will show you what I have marked as Exhibit No.

22    12 and ask you if you can identify that document?

23        A.    Yes.  This is the deed that Lauri Sekerak sent to

24    me in 2003.

25        Q.    Can you identify that deed, the date and who it

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

63

1      Q.    Okay.  Again, the deed that you're holding in

2  your hand, if I'm correct, grants or purports to grant

3  Fisher & Young, Inc. the rights to timber the timber and

4  trees on the Kinkead land up until April 1st of 1978,

5  correct?

6      A.    That's what it says.

7      Q.    Okay.  You indicated that that was, I believe

8  your words was the last deed of record?

9      A.    Yes, that is what Lauri Sekerak sent to me.

10     Q.    When did you contact Ms. Sekerak?

11     A.    It was in late 2002 or early 2003.

12     Q.    And as I understand it, your request to her

13 originally was a copy of the timber deed between Fisher &

14 Young, Inc. and Fisher & Young Hardwoods, Inc. which he

15 returned to you was actually the document that you are

16 holding in your hand, 1973, between Marion C. Kinkead and

17 Fisher & Young, Inc.?

18     A.    That's what I recall.

19     Q.    When you obtained that deed, did you then review

20 it?

21     A.    Yes.

22     Q.    And did you contact anybody at Matson Lumber

23 Company regarding that deed?

24     A.    I don't know that -- I don't know that I

25 contacted anybody from Matson Lumber Company.  I cannot

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000158

64

1    recall specifically doing that.

2        Q.   Okay.  There is attached to the Notice of

3    Deposition today Exhibit A, which is a copy of a quit claim

4    between Dora Squatriti, who is the executrix of the estate

5    of Marion C. Kinkead and Matson and, again, dated May 6 of

6    2003.  Have you seen that document before?

7        A.   Yes.

8        Q.   And did you create that document?

9        A.   I prepared it.

10       Q.   What were the circumstances by which that

11   document was prepared?

12       A.   After Lauri Sekerak sent this deed to me, as I

13   said before, I assumed that the deed was somewhere between

14   Fisher & Young and Fisher & Young Hardwoods, Inc.  So,

15   that's why I started looking through the file, and when I

16   looked at the certificate of title, it mentioned that John

17   Kookogey had had some deeds.  So, on that basis, I

18   contacted him.

19       Q.   Okay.

20       A.   Then, I went over on May 6 and met with him at

21   his old office, and we sat in his conference room and I

22   asked him if he had the deeds that are recited in his

23   certificate of title, and he didn't know.  So, we sat down,

24   and one of the first or second files we opened up, there

25   were all these deeds sitting in there.  One of the deeds

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000159

65

1    was the Fisher & Young to Fisher & Young Hardwoods, Inc.

2    deed.

3         I can't -- I wish we could find it, and I'm sure we

4    will, but I looked at that deed and I didn't think that it

5    said what I thought it should say.

6         Q.   I'm sorry, what was that?

7         A.   I can't remember, but it didn't -- because, see,

8    this deed terminated in 1978.

9         Q.   Correct.

10        A.   Okay.  So, this is one of these deals where maybe

11   something seems to be not right, but once you put it under

12   the microscope, everything gets resolved and you realize it

13   was okay after all.  That's what I expected.

14        Q.   Okay.

15        A.   Because Mr. Kookogey and I talked about the

16   original deal, and looking at the file, they had split this

17   transaction into two parts to avoid paying the transfer

18   tax, which is what everybody does because there's that

19   specific exemption in the Realty Transfer Tax Act that you

20   can exempt out timber as long as the cutting takes place

21   within an immediately ascertainable date.

22        Q.   I'm sorry, is the reason for that that if there

23   is an ascertainable date timber is considered, at least by

24   the taxing authorities, to be personality as opposed to

25   realty and, therefore, no transfer tax would be due on the

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000160

1    transfer in the interest of real property?

2              MR. GING:  I am going to object to the form

3    of the question.  It's asking Mr. Dennison to give an

4    opinion as to how the realty transfer tax bureau thinks and

5    opines about these transactions, but if you can answer the

6    question ...

7        A.   I know, based upon the exemption -- or based upon

8    that provision of the statute, if you set up the

9    transaction that way, the timber is exempt.

10       Q.   Okay.

11       A.   So, that's what everybody that transfers real

12   estate and timber up here does, take advantage of that

13   exemption.

14       Q.   Okay.

15       A.   So, that's what Mr. Kookogey and I talked about,

16   and that was the reason why this was split into different

17   categories.

18       They did it through an article of agreement, I think,

19   because to make certain that she was going to get all her

20   money before she transferred the timber.

21       So, when I looked at the deed, I realized that it

22   didn't cure the problem with the timber going back to her

23   in 1978.  The Fisher & Young -- excuse me, the Fisher &

24   Young and Fisher & Young, Hardwoods, Inc. didn't help at

25   all.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000161

1    So, in looking at this deed, I said to him because I

2    went back and when I looked at it before, I said to him, I

3    said, Well, this right to cut the timber and everything

4    terminates on April 1st, 1978, and at that time, all the

5    rights should cease and that the remaining timber shall

6    vest in the grantor, who was Mrs. Kinkead, her heirs and

7    assigns.

8    He said to me, I never noticed that before, that's a

9    mistake.

10    So, read literally, then, in other words, it should

11    have vested back into Fisher & Young.  So, on that basis, I

12    went to Warren County to look up if Marion Kinkead had died

13    because I didn't know anything about her.

14    So, when I got to the courthouse, I asked for Lauri

15    Sekerak because I'm not familiar with -- I mean, I can

16    figure it out, but it's easier to have an abstractor help

17    you.  So, she happened to be in the courthouse, and I said,

18    Lauri, can you help me look up the name of an individual

19    Marion Kinkead?  So, she said she would help me get the

20    estate papers out.

21    So, I looked at the will, and Dora Squatriti was the

22    only beneficiary, and she was also the executor, and so

23    then, I went to the telephone directory, looked under

24    Squatriti, saw her name -- or his name.  I can't remember

25    who it was.  Squatriti was such an unusual name, and I

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000162

69

1    Q.    The name of her attorney was Attorney Mark

2    Turbessi?

3    A.    Correct.

4              (Deposition Exhibit No. 15 was marked for

5    identification.)

6    Q.    I'm going to show you what I marked as Exhibit

7    15, which is a letter on your letterhead dated May 8, 2003

8    to Mr. Turbessi and ask if you can identify that?

9    A.    Right.  This is what Mrs. Squatriti wanted me to

10    write to Mr. Turbessi and sort of relate the same thing

11    that I told her and send the quit claim deed to him, and

12    that's what I did.

13    Q.    At this time, I take it based on your testimony

14    that you have given so far, you did not, at that time,

15    request Mrs. Sekerak, or anyone else, to perform a title

16    search on the Clough Farm to see if maybe there were any

17    other deeds out there dealing with this property, correct?

18    A.    She was quite emphatic that her mother sold the

19    timber and trees on the Clough Farm to Fisher & Young, Inc.

20    Q.    I understand.  All I'm asking is whether at that

21    time, as a result of your reviewing that 1973 timber deed,

22    whether that caused you, at that time, to ask Ms. Sekerak

23    or any other abstractor to perform a title search on the

24    property to see if, perhaps, there were other deeds out

25    there in this chain of title?

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1      A.   No, I didn't ask to do a title search at that

2   point.

3      Q.   Was it your understanding, after reviewing that

4   1973 deed, that there was a break in the chain of title

5   from 1978 until the present time with regard to the timber

6   interest in this property by virtue of that 1973 deed?

7           MR. GING:   Excuse me.   I will object that

8   you're asking for a legal opinion and conclusion of law.

9        You can answer the question, if you can, John.

10      A.   There was a mistake that resulted in a technical

11   break of the chain of title.   The easiest way to correct

12   that was to get a quit claim deed from Dora Squatriti, as

13   executrix and as an individual.   That would solve the

14   problem because, again, based upon Mr. Kookogey's original

15   certificate of title, which he issued not realizing that he

16   had made this mistake, once that was corrected, then that

17   would solve whatever title problems there were purely with

18   the chain of title itself.

19      Q.   Is it your understanding or your testimony that

20   the certificate of title given by Mr. Kookogey has some

21   legal effect over the deeds that are recorded of record

22   with regard to the property?

23      A.   It's on the basis that Mr. Kookogey was a

24   competent attorney who issued a title certificate.

25        But for this error, there was no reason for anyone to

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

72

1      Q.   And can you tell me how a subsequently acquired

2  quit claim deed would cure the defect of the 1973 timber

3  deed?

4      A.   Because the original article of agreement was for

5  the complete sale of the Clough Farm.  The only reason it

6  was split in two agreements was to avoid the transfer of

7  taxes.  So, therefore, but for that mistake, there wouldn't

8  have been a title problem.

9      Q.   We have identified at least what purports to be

10  the first page of the article of agreement for the transfer

11  of timber to Fisher & Young from Mrs. Kinkead.  I believe

12  that the language of the article of agreement give Fisher &

13  Young or transfer to Fisher & Young the right to own timber

14  until April 1st, 1978, correct?

15      A.   Right.  That's what you normally do whenever you

16  do this.  You have to have a date certain, and then at that

17  point, you then structure your agreements so that the

18  timber rights then vest to whomever you sold the so called

19  surface to.

20      Q.   It appears, then, that the articles of agreement

21  suffer the same defect that the 1973 timber deed suffered,

22  and that there was no reversionary interest into Fisher &

23  Young; is that correct?

24      A.   No.  I think they set it up that way because the

25  sale of the surface for $25,000 was unconditional.

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000165

73

1      Q.   Correct.  There were no -- Well, I'm sorry.  I

2  don't mean to -- When you say unconditional, there were no

3  --

4      A.   Reversionary rights.

5      Q.   There was no grant of timber interest at all in

6  the article of agreement for the sale of the land, correct?

7      A.   Right.  That's why I referred to it just

8  generally as the surface.

9      Q.   Okay.

10     A.   So there is an unconditional sale of surface, and

11  then to avoid paying the transfer taxes, you have to have a

12  date certain by which the timber can be cut, and that was

13  1978.  And then at that point, the rights cease and then

14  the interest would then go back to Fisher & Young, Inc.

15     Q.   Okay.

16     A.   Even though it's the same, same entity that has

17  the surface and also has the timber rights and when that

18  terminates, even if it goes into that same entity, it's

19  still exempt from transfer taxes.

20     Q.   The articles of agreement for the sale of the

21  timber does not have language in it vesting any

22  reversionary interest into Fisher & Young, Inc., correct?

23     A.   It does on or after date of all rights -- Okay,

24  wait a minute.

25     Okay, the way this was set up was in 1978, Fisher &

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000166

74

1     Young was supposed to be the owner of the surface.

2         Q.   I'm sorry, 19 ...

3         A.   '78.

4         Q.   '68?

5         A.   1978.

6         Q.   In 1978?

7         A.   Right.  So, when their right to cut the timber

8     ceased, then it would have reverted to them anyway because

9     they were the owner of the surface.

10        Q.   As long as they were the owner of the surface in

11    1978, correct?

12        A.   Right.

13        Q.   I understand.

14        A.   That's in 1968.  That's the way they set this up,

15    that supposedly Fisher & Young was going to be the owner of

16    the surface in 1978.

17        Q.   Okay.  As I understand it, the articles of

18    agreement for the sale of the real estate then or the land

19    were recorded -- the articles of agreement for the timber

20    was unrecorded?

21        A.   Again, that makes it really slick or whatever

22    because this thing -- nobody records the timber deeds or

23    the agreements regarding the agreement for the sale of the

24    timber or the timber deed itself.  You don't record that

25    because it sort of terminates on its own and then the

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000167

75

1  surface owner and the timber get reunited.

2      Q.   How do you address the situation where there is a

3  subsequent purchaser who is without notice of the

4  unrecorded agreements?

5          MR. GING:  Again, I am going to object to

6  the form of the question as asking for a legal opinion.

7      A.   Well, I guess in this particular case, Carlisle

8  never got the timber because they were specifically

9  excepted and reserved in his deed, and he also took the

10  property subject to the terms in the agreement of sale.

11      So, he never, in all the world, the one person that we

12  know who didn't own the trees and timber were Carlisle

13  because they were specifically excepted and reserved.

14      Q.   On the assumption that Fisher & Young had

15  acquired all right, title and interest in the timber from

16  Kinkead, correct?

17      A.   Yes, that she had the full right, that she owned

18  the title to the surface and the timber.

19      Q.   And that she had granted to Fisher & Young the

20  full right in both the surface and the timber?

21      A.   That's what she contracted to do.

22      Q.   Okay.  As it turns out, at least upon your review

23  of the documents, there was a problem because the

24  reversionary interest was not to the owner of the land,

25  whoever that may have been in 1978, but was, in fact, to

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000168

1    something that was told to you by somebody else?

2         A.    That's what Mr. Kookogey and I discussed, and I

3    could tell by even the material that I got from

4    Mr. Kookogey that that's what they intended to do because I

5    think the original article of agreement wasn't split.  And

6    I think Kookogey, as I recall, must have said something to

7    the other attorney and said, Let's split them.

8         Q.    Okay.  Now, we've identified what you believe to

9    be were two problems that arose resulting from the 1973

10   timber deed.  The first one we talked about was the fact

11   that the reversionary interest was not into Fisher & Young

12   or even the owner of the land for that matter, but

13   Mrs. Kinkead.

14        The second problem that you set forth in your letter

15   deals with the diameter of the timber.  I was just

16   wondering if you can tell us what that is about.

17        A.    I haven't looked at this in so long.

18        Now, the timber deed, I don't remember.  That must

19   have the Fisher & Young to Fisher & Young Hardwoods, Inc.

20   timber deed.  The timber dated -- okay, that's the '73.

21        Okay, yeah.  The deed for the -- the deed for the

22   timber -- the deed for the surface, where is it?  From

23   Marion Kinkead, it excepts and reserves all the trees.

24   This is it.  It excepts and reserves all the trees,

25   excepting and reserving from all the timber and trees

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

Plaintiff's Appendix
000169

82

1     standing and down.

2         So, she reserved all the timber and trees, but then

3     this deed would have only transferred all the timber and

4     trees measuring twelve inches one foot above the ground

5     back.  So, it was not right that way, either.

6         Q.  So, there were two issues that you were concerned

7     with:  The 1973 timber deed, the first one being

8     reversionary interest and the second one being the original

9     agreement, except and reserve to Kinkead all timber and

10    trees and she only granted the right to Fisher & Young an

11    interest in trees 12 inches in diameter and above.

12        A.  Yeah, because a lot of times, to avoid paying the

13    transfer taxes, you are dealing with merchantable timber,

14    timber that can be cut.  That would be 12 inches and up.

15    That's why -- but they didn't -- somebody -- they didn't do

16    that quite right.

17        Q.  As I understand it, then, other than this Fisher

18    & Young to Fisher & Young Hardwoods deed, which we can't

19    seem to locate right at the moment, which I understand was

20    unrecorded anyway?

21        A.  Right.

22        Q.  Are you aware of any other deeds purporting to

23    transfer an interest to anybody from anybody any interest

24    in the timber and trees on the Clough/Carlisle Farm other

25    than what we have looked at today, and recognizing there

STEPHANIE MYERS - COURT REPORTER

(814) 333-1545

1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                      - - -

4   ALBERT T. CARLISLE,                )
                                       )
5              Plaintiff,              )
                                       )
6        vs.                           )  No. 04-25 Erie
                                       )
7   BARTONY, HARE & EDSON; SCOTT M.    )
    HARE, ESQUIRE, HENRY E. BARTONY,   )
8   JR., ESQUIRE; and JOHN JOY V.      )
    EDSON, ESQUIRE,                    )
9                                      )
               Defendants.             )
10
                      - - -
11
            Deposition of JOHN JOY EDSON, ESQUIRE
12
               Wednesday, February 1, 2006
13
                      - - -
14
            The deposition of JOHN JOY EDSON, ESQUIRE, one
15  of the Defendants herein, called as a witness by the
    Plaintiff, pursuant to notice and the Federal Rules of
16  Civil Procedure pertaining to the taking of
    depositions, taken before me, the undersigned,
17  Teresa Constantini Berardi, a Notary Public in and for
    the Commonwealth of Pennsylvania, at the law offices
18  of John J. Edson, 400 Broad Street, Suite 106,
    Sewickley, Pennsylvania 15134, commencing at 1:58 p.m.
19  the day and date above set forth.

20                    - - -

21          COMPUTER-AIDED TRANSCRIPTION BY
              MORSE, GANTVERG & HODGE, INC.
22            PITTSBURGH, PENNSYLVANIA
                   412-281-0189
23
                      - - -
24

25

2

```
 1   APPEARANCES:

 2         On behalf of the Plaintiff:

 3             Conner Riley & Fryling:
               Andrew J. Conner, Esquire
 4             The Bell Telephone Building
               17 West Tenth Street
 5             PO Box 860
               Erie, Pennsylvania  16512-0869
 6

 7         On behalf of the Defendants:

 8             David L. Haber, Esquire
               602 Law & Finance Building
 9             429 Fourth Avenue
               Pittsburgh, Pennsylvania  15219-1503
10

11                        - - -

12                      I-N-D-E-X

     EXAMINATION BY:                          PAGE:
13   Mr. Conner                                 4

14                        - - -

15
     EDSON DEPOSITION EXHIBIT NOS.:            PAGE:
16   1 - Memo dated 11-3-94 to Mr. Hare from     25
         Mr. Carlisle
17   2 - Complaint and Jury Demand               27
     3 - Projected Litigation Budget,            29
18       Albert T. Carlisle Timber Matter
     4 - Letter dated 6-15-98 to Mr. Carlisle from   31
19       Mr. Hare
     5 - Letter dated 6-23-98 to Mr. Bush from   33
20       Mr. Hare with enclosures
     6 - Invoice dated 2-7-99                    36
21   7 - Undated one-page handwritten document  45
     8 - Letter dated 3-17-99 to Mr. Carlisle from   46
22       Mr. Edson

23                        - - -

24

25
```

3

1      MR. CONNER:  The record should reflect

2   that these are depositions taken pursuant to

3   the Federal Rules of Civil Procedure, that the

4   purposes of the depositions are for discovery

5   and use at trial, if necessary, that all

6   objections except as to the form of the

7   question are reserved until the time of trial.

8      MR. HABER:  That's fine.

9      MR. CONNER:  Okay.

10      Mr. Edson, I introduced myself.  My name

11   is Andy Conner.  I'll be asking you some

12   questions today.

13      If, by chance, I ask a question that you do

14   not hear or do not understand, please ask me to

15   repeat or restate the question because I want to

16   make sure you understand the question.

17      Is that understood?

18      THE WITNESS:  I will.

19      MR. HABER:  Do you want to swear the

20   witness?

21      MR. CONNER:  Yes.

22                - - -

23

24

25

Plaintiff's Appendix
000173

4

1                  JOHN J. EDSON, ESQUIRE

2  One of the Defendants herein, called as a witness by

3  the plaintiff, having been first duly sworn, as

4  hereinafter certified, was deposed and said as

5  follows:

6                        EXAMINATION

7  BY MR. CONNER:

8      Q    Could you state your full name for the

9  record, please?

10     A    John Joy Edson, V.

11     Q    And your professional occupation is?

12     A    I'm a lawyer.

13     Q    And what is your age?

14     A    44.

15     Q    And you reside where?

16     A    In Sewickley, Pennsylvania.

17     Q    Could you give us a residence address,

18  please?

19     A    Sure.

20          214 Centennial Avenue.

21     Q    That's in Sewickley; is that correct?

22     A    Yes.

23     Q    And do you have a professional address in

24  Sewickley?

25     A    400 Broad Street, Suite 106, Sewickley.

33

1    in the June, July or August 1998 time frame?

2        A    I'll be honest, I remember calling him at

3    one point and talking to him, but I can't remember the

4    substance, other than that he should -- he needs to

5    pay us.

6        Q    And with regards to his response, do you

7    recall what his response was?

8        A    He always had a litany of excuses.  I can't

9    remember.

10       Q    Let me then go to -- just keeping it in a

11   chronological order -- I'm going to show you what has

12   been marked as a --

13           MR. HABER:  5.

14       Q    -- 5.

15           MR. CONNER:  Thank you.

16           (Thereupon, Edson Deposition Exhibit No. 5

17       was marked for identification.)

18   BY MR. CONNER:

19       Q    Were you aware or did you become aware that

20   in June of '98, Scott was writing letters to Bert

21   and/or Lainard Bush with regards to the possibility of

22   filing a second action in Warren County, or was that

23   something not within your knowledge?

24       A    In Pennsylvania?

25       Q    Right.

34

1        A        I do remember that.

2        Q        What is your recollection, if any, as to

3   why Scott was preparing a precipe for a writ of

4   summons in civil action in June of 1998 to be filed in

5   Warren County?

6        A        I don't know, but I'll tell you what I do

7   know, so maybe you can --

8        Q        Sure.

9        A        I remember that there was another piece of

10  property, and my recollection was a similar issue

11  about timbering, and what a lumber company was

12  entitled to do at this property in Warren.

13               That's all.  I knew there was an issue.

14       Q        But beyond that, you would not be able to

15  give us the details?

16       A        No.

17       Q        Did Scott ask you because of your

18  experience to either research the issue of the

19  capability of filing a second action in Warren County,

20  or provide input with regards to whether or not such

21  an action could be filed in Warren County following

22  the dismissal of those actions without prejudice in

23  federal court?

24       A        No, I don't remember that.  That's pretty

25  specific.  No.

Plaintiff's Appendix
000176

35

1    Q    That's why I asked about your experience in

2  doing Rule 41 dismissals.

3          And accelerating things a little bit, one

4  or more of the claims that were to be covered by the

5  writ of summons had gone through a Rule 41 dismissal.

6    A    Okay.

7    Q    With that in mind, does that refresh your

8  recollection as to whether or not you did any research

9  on that issue?

10   A    No, I don't remember.

11   Q    With regards to the letter and precipe for

12 writ of summons that's attached to the June 23, 1998

13 letter, which I think is your Exhibit 5 --

14        MR. HABER:  5.

15   A    5.

16   Q    -- you don't have any recollection of that;

17 is that correct?

18   A    No.

19        MR. CONNER:  I didn't put an exhibit

20     sticker on it.  I have to do that.  Thanks.

21        MR. HABER:  Okay.

22 BY MR. CONNER:

23   Q    You would have been in the process of

24 leaving the firm, what, a year later, I guess?

25   A    Correct.

36

1     Q     That would have been July 1st of 1999?

2     A     Yes.

3     Q     So you would have remained with the Bartony

4   Hare & Edson firm all the way up until July of 1999;

5   is that correct?

6     A     Yeah, I believe it was July 1st.

7     Q     Okay.  I'm going to fast forward.  I have

8   some other documents I want to see if I can identify

9   here, too.

10          (Thereupon, Edson Deposition Exhibit No. 6

11       was marked for identification.)

12   BY MR. CONNER:

13     Q     I show you what has been marked as

14   Exhibit 6.  This is a billing document of February 7,

15   1999, at least that's what the date is.

16     A     Okay.

17     Q     Do you recognize it as a billing document

18   from Bartony Hare & Edson?

19     A     Yes.

20     Q     And I think I'm correct, it makes reference

21   to the billing for the work performed by the firm with

22   regards to the preparation of the precipe for the writ

23   of summons and letter sent to Lainard Bush, along with

24   a telephone conversation with Peter Krembs.

25          Do you see that there?

1      A      Yes.

2      Q      It looks like that event is on 6-23-98, and

3   it looks like there's two hours of professional

4   services being billed for $260, which adds to the

5   previous balance that comes down to a total, I think

6   of $17,343.88 due and owing.

7             It says this invoice was submitted to

8   Mr. Carlisle.

9             First of all, would you have had any duties

10  and responsibilities with regards to preparing the

11  invoice, itself?

12     A      No.

13     Q      Would you have any duties and

14  responsibilities with regards to sending the invoice

15  to the client?

16     A      No.

17     Q      Customarily, would the client receive a

18  letter with an invoice or just the invoice?

19             If you know.

20     A      I don't remember.

21             I believe it was just the invoice.

22     Q      Now, with regards to the professional

23  services on the document, I don't see that there's any

24  reference to who performed the professional services

25  on the document, but I take it, from what you've told

46

1  though.

2      Q      And the handwriting is Scott's?

3      A      I believe that's Scott's writing.

4      Q      Just out of curiosity, did you and/or Scott

5  do any, to your knowledge, financial background check

6  of Mr. Carlisle when he became delinquent in his

7  bills?

8      A      I don't remember that.

9      Q      Let me go to the last document.

10             (Thereupon, Edson Deposition Exhibit No. 8

11        was marked for identification.)

12  BY MR. CONNER:

13     Q      This has been identified as Exhibit 8, and

14  this is a March 17, 1999 letter.

15             Take a moment and look at that.

16     A      I've read it.

17     Q      That is your signature; is it not?

18     A      That's my signature.

19     Q      Does that refresh your recollection of

20  actually writing the letter or not?

21     A      I don't know if I wrote it.

22     Q      Let me then go to the conclusion.

23             We know in May a file payment was made,

24  that is, May of 1999.

25             Were you aware that eventually a final

1  payment was made by Mr. Carlisle and accepted by the

2  firm?

3      A      My recollection is that Bert finally did

4  pay us.

5      Q      So he paid you, and the final payment was

6  accepted by the firm as full payment, or was there

7  something --

8      A      I don't know whether it was accepted as

9  full payment, but I remember he paid.

10     Q      We know that from looking at the records,

11 and I'm just going to summarize a little bit.

12            There's about $45,000 or $46,000 of

13 billings for the timber case to Bartony, and there was

14 about six or seven thousand dollars in billings for

15 the CRI matter, and maybe another six or seven

16 thousand dollars to Celina Insurance Company because

17 Bert had a homeowner's policy and it was a

18 counterclaim, and those totals come out to somewhere

19 between 58, 59 or 60 thousand dollars in total.

20            Can you tell us quantitatively how much of

21 that billings would have been billings that were

22 performed by you?

23            Give us a percent, or can you tell me, was

24 it a thousand dollars, couple thousand dollars of your

25 billings that were involved in that?

Plaintiff's Appendix
000181

1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3                          - - -

ALBERT T. CARLISLE,                )
4                                  )
          Plaintiff,               )
5                                  )
     vs.                           ) No. 04-25 ERIE
6                                  )
BARTONY, HARE & EDSON; SCOTT M.    )
7 HARE, ESQUIRE; HENRY E. BARTONY, )
JR., ESQUIRE; and JOHN JOY V.      )
8 EDSON, ESQUIRE,                  )
                                   )
9          Defendants.             )

10                         - - -

11       Deposition of CHESTER FOSSEE, ESQUIRE

12          Monday, February 20, 2006

13                         - - -

14          The videotaped deposition of CHESTER FOSSEE,
     ESQUIRE, called as a witness by the Plaintiff,
15   pursuant to Notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
16   taken before me, the undersigned, Deborah L. Endler, a
     Notary Public in and for the Commonwealth of
17   Pennsylvania, at the offices of MHF Logistical
     Solutions, 800 Cranberry Woods Drive, Suite 450,
18   Cranberry Township, Pennsylvania, 16066, commencing at
     10:12 o'clock a.m., the day and date above set forth.
19

20                         - - -

21          COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
22              PITTSBURGH, PENNSYLVANIA
                    412-281-0189
23                         - - -

24

25

2

```
 1   APPEARANCES:

 2          On behalf of the Plaintiff:

 3              Conner Riley & Fryling:
                Andrew J. Conner, Esquire
 4              The Bell Telephone Building
                17 West Tenth Street
 5              Erie, Pennsylvania  16512

 6          On behalf of the Defendant:

 7              Weinheimer Schadel & Haber:
                David Haber, Esquire
 8              Law & Finance Building
                429 Fourth Avenue, Suite 602
 9              Pittsburgh, Pennsylvania  15219

10
     ALSO PRESENT:  Carrie Molitierno, Video Operator
11
                          - - -
12

13                        INDEX

14   EXAMINATION BY:                       PAGE:

15   Mr. Conner                              4
     Mr. Haber                              81
16   Mr. Conner                             83

17                        - - -

18

19

20

21

22

23

24

25
```

Plaintiff's Appendix
000183

3

```
 1              VIDEO OPERATOR:  This begins the deposition
 2       of Attorney Chester Fossi.  The time is
 3       10:12 a.m.  We are on the record.  The court
 4       reporter may now swear the witness.
 5              (Witness sworn.)
 6         MR. CONNER:  For the record, my name is
 7       Andy Conner, and I'm from the law firm of Conner
 8       Riley & Fryling in Erie, Pennsylvania and in
 9       these proceedings I represent the plaintiff,
10       Albert T. Carlisle.  David, you want to introduce
11       yourself?
12         MR. HABER:  My name is David Haber and I
13       represent the Defendants in this case.
14         MR. CONNER:  Let the record reflect that
15       these are depositions taken pursuant to notice,
16       pursuant to the Federal Rules of Civil Procedure.
17       The purposes of deposition are for discovery and
18       use at trial and all objections except as to the
19       form of the question are reserved.  Is there any
20       other stipulation that you request, Mr. Haber?
21         MR. HABER:  No.
22            CHESTER FOSSEE, ESQUIRE
23  called as a witness by the Plaintiff, having been
24  first duly sworn, as hereinafter certified, was
25  deposed and said as follows:
```

4

```
 1                    EXAMINATION
 2  BY MR. CONNER:
 3      Q     Mr. Fossi, you and I know each other.  My
 4  name is Andy Conner.  And I represent Mr. Carlisle in
 5  these proceedings.  I'll be asking some questions.  If
 6  by chance I ask a question you do not hear or
 7  understand, and/or if you want a document to refer to
 8  a document, I think we have all the documents here or
 9  most all the documents here you may need, please let
10  us know so we can either restate or rephrase the
11  question and/or provide the document that you would
12  require.  Okay?
13      A     That's fine.
14      Q     Okay.  Would you state your full name for
15  the record, please?
16      A     Chester S. Fossee.
17      Q     And Mr. Fossee your profession and
18  occupation is?
19      A     I'm an attorney.
20      Q     Just briefly by way of background how long
21  have you been an attorney?
22      A     About 38 years.
23      Q     Would I be correct, your career started
24  some time about 1967, 1968?
25      A     1967.
```

Plaintiff's Appendix
000185

9

```
 1  Allegheny County that I distinctly remember involved
 2  the sale of the timber and I can't even recall the
 3  details of it.
 4      Q    As a consequence of your involvement in
 5  that other litigation, were you familiar with the term
 6  timber deeds?
 7      A    I don't recall.
 8      Q    Okay.  Did you know as a consequence of
 9  that litigation as to whether or not for purposes of
10  conveying interest in timber, it was necessary to
11  convey it by way of a deed to be filed in the
12  courthouse?
13      A    Do not recall.
14      Q    Okay.  Let me then move forward again with
15  regards to the claim that's involved, and I've
16  identified it as Carlisle versus Matson.  It was filed
17  in the U.S. District Court for the Western District of
18  Pennsylvania.
19           (THEREUPON, Fossee Deposition Exhibit No. 1
20      was marked for identification.)
21      Q    We have just for purposes of keeping things
22  in chronological order in sequence, I have identified
23  as Exhibit 1 here a copy of the Complaint that was
24  filed by Mr. Hare on behalf of Mr. Carlisle in the
25  U.S. District Court for the Western District of
```

10

1  Pennsylvania.  Take a moment and look at that and tell

2  us whether you can identify that as the Complaint that

3  you became familiar with that had initiated this

4  litigation?

5      A    I don't have any recollection of it.  I

6  don't have anything to say it isn't.  But I certainly

7  can't say that I recognize it.

8      Q    Okay.  With regards to your involvement in

9  that litigation, eventually did an insurance company

10 contact you and advise you that one of its insureds,

11 Matson Lumber Company, Matson Hardwoods, Inc. had been

12 sued in U.S. District Court for the Western District

13 of Pennsylvania and were in need of defense on one of

14 their policies?

15     A    Not that I recall.

16     Q    How did you become involved in representing

17 Matson Lumber Company and Matson Hardwoods?

18     A    I had Matson Lumber Company as a direct

19 client.

20     Q    Okay.  So prior to the 1995, prior to this

21 litigation, had you been involved in representing

22 Matson?

23     A    Yes.

24     Q    Okay.  Could you just identify briefly what

25 your work was for them in general?  Was it litigation?

1    A    It was litigation predominantly, because
2 they needed a litigator for some corporate matters
3 that they had going on and I was trying a couple of
4 lawsuits in Brookville, Jefferson County and they
5 hired me after watching me perform.

6    Q    In Brookville, Pennsylvania?

7    A    Yes.

8    Q    Now, with regards to litigation in
9 Brookville, was that corporate litigation as opposed
10 to litigation involving timber rights?

11    A    Yes.

12    Q    And just briefly, over what time period had
13 you represented Matson prior to the 1995 time period?

14    A    Don't know. Would maybe estimate five,
15 seven years. Don't have any specific recollection of
16 when this all took place.

17    Q    So some time in the middle part of 1980s up
18 until the 1995 time period?

19    A    I'd say later part of the '80s, if it was
20 in the '80s.

21    Q    Brookville is the county seat for what
22 county?

23    A    Jefferson.

24    Q    So the litigation you were involved in was
25 involved in the Court of Common Pleas of Jefferson

16

1      A      No recollection.

2      Q      And do you have any recollection as to
3  whether or not you would have billed Matson for any
4  independent contractor doing the title search on this
5  property?

6      A      I don't have a single recollection.

7      Q      Okay.  Let's go forward a second --

8      A      I can tell you if it was done, I'd have
9  billed them.

10     Q      That's what I'm trying to -- in the
11  ordinary course of --

12     A      In the ordinary course of business I would
13  have billed somebody who performed services for me to
14  charge them.  But it's purely an assumption.

15     Q      There is an individual by the name of, I
16  may not pronounce her name correctly, I think it's
17  Lori Sackarack.  She is from Warren County who is a
18  title searcher for Warren County.  Did you ever have
19  any conversations with her that you can recall?

20     A      I have no recollection.

21     Q      Okay.  Did you ask anybody to search the
22  records of Warren County for purposes of trying to
23  identify the deeds recorded in the Recorder of Deeds
24  of Warren County?

25     A      I have no recollection.

21

1    deed that was apparently attached.

2        Q    Okay.  Now, prior to filing your Answer and

3    Counterclaim, Mr. Fossee, do you have a recollection

4    of having in your possession any deeds or conveyancing

5    documents from the Kinkead estate or Mrs. Kinkead to

6    Fisher & Young at the time that you filed this Answer?

7        A    Have no recollection of that.

8        Q    Okay.

9        A    I will say that the name Kinkead rings a

10   bell, but when I came into possession of any of those

11   documents, I have no idea.

12       Q    I'm going to show you what's been marked as

13   Exhibit 3.  Take a moment and take a look at Exhibit

14   3.  And by way of background, that compilation of

15   documents in its bracketed form was provided us by

16   Matson's counsel in response to a discovery request.

17       A    Who was that?

18       Q    That was Mr. Ging, I believe is that

19   correct?

20            MR. HABER:  Yes.

21       Q    And Mr. Dennison probably in that

22   production.

23       A    What about it?

24       Q    Can you identify the front page of that

25   document?

Plaintiff's Appendix
000190

22

1     A     Nope.

2     Q     Do you have any knowledge as to who

3  prepared the front page is entitled?

4     A     List of exhibits?

5     Q     Yes, sir.

6     A     Have no clue.

7           (THEREUPON, Fossee Deposition Exhibit No. 6

8     was marked for identification.)

9     Q     Let me then keep on going here for a

10  second.  Show you what's been marked as deposition

11  Exhibit 6 for these proceedings.  This was also

12  previously identified as Exhibit 62 in a prior

13  proceeding.  Take a look at this.  This purports to

14  be --

15           MR. HABER:  It's the '73 deed?

16           MR. CONNER:  Yes.

17     Q     Take a look, this documents purports to be

18  a deed dated April 20th, 1973.  Take a moment and take

19  a look at this document.  It's previously referred to

20  in the proceedings as the timber deed.

21     A     That's what it says.

22     Q     Okay.  And can you identify it, tell us

23  whether or not you can identify this document as being

24  the timber deed?

25     A     I have no recollection of that document

23

1   whatever.

2       Q       And with regards to your seeing this

3   document, would today be the first time you have ever

4   seen that document?

5       A       I can't say that.

6       Q       All right.  Can you tell us when it was the

7   first time you saw the document?

8       A       I have no recollection.  I could very well

9   have seen it.  I have no recollection of when I saw

10  it, under what circumstances I saw it or anything

11  else.

12      Q       Can you tell us whether or not during the

13  pendency of the proceedings between Mr. Carlisle and

14  Mr. Matson, which went from approximately 19, May of

15  1995 at least in the District Court, all the way up

16  until December of 1997, whether or not you would have

17  seen this timber deed which we have marked as Exhibit

18  6 to these proceedings?

19      A       May very well have.  I just don't have any

20  specific recollections.

21      Q       Okay.  With regards to the timber deed,

22  I'll call your attention to a, call your attention to

23  the second to the last paragraph on the third page

24  which is identified as deed book 376, page 941 and

25  just read to yourself, if you would.  And then I'd

26

1   the Clough Farm was a part of the transaction that

2   Matson paid Fisher & Young for.  I don't recall

3   anything that I was aware of that prevented Matson

4   from owning the timber.

5        Q    Let me just go forward a second.  Was it

6   your understanding that Matson's rights to the Clough

7   Farm timber derived from this acquisition of Fisher &

8   Young properties?

9        A    Yes.

10       Q    So whether or not Fisher & Young had rights

11  in the Clough Farm then was an issue that was involved

12  in the litigation between Mr. Carlisle and Mr. Matson,

13  is that correct?

14       A    Don't really recall that being an issue.

15       Q    Was it ever made an issue as you recall in

16  the proceedings between Mr. Matson and Mr. Carlisle?

17       A    I am not certain what was ever discussed

18  about that particular deed and what was argued on that

19  particular deed.  My recollection of the trial was

20  that it was based upon the agreement and deed between

21  Fisher & Young and Carlisle period.  But that's just

22  my recollection.

23       Q    Well, just for purposes of completing this

24  out, Fisher & Young would have acquired, if they did

25  acquire timber rights, they acquired it from some

27

1   other party, is that correct?

2        A     I believe they did.

3        Q     Okay.  So and the other party we have

4   previously identified is this Mrs. Kinkead, is that

5   correct?

6        A     I don't know that.  You have identified

7   Mrs. Kinkead.  I don't know specifically, because I

8   haven't read and compared.  I may have known at that

9   time, but I don't know now.

10       Q     Did you know who during the course of this

11  litigation, who Fisher & Young acquired their timber

12  rights from on this property?

13       A     I'm sure I knew the history of the property

14  at that time.

15       Q     And did they acquire the timber rights by

16  deed, that is did Fisher & Young acquire timber rights

17  by deed?

18       A     I would assume that.  Can I tell you that

19  that's what happened?  No.

20       Q     Well --

21       A     I just assume that's what occurred.  But

22  can I sit here and say yeah, I remember that's what

23  happened, no.

24       Q     Well, they would have to acquire it by

25  deed?

28

1      A      Well, obviously.

2      Q      And the deed would have to be recorded in

3   the Warren County Courthouse?

4      A      Well, no, only if they wanted to protect

5   themselves.  You don't have to record in order to

6   acquire.  You only have to record in order to protect.

7      Q      Well, there would be transfer taxes --

8      A      That's true.  But you don't have to record

9   to acquire.  You only have to record to protect.

10     Q      Showing you again this, going back to this

11  deed that is identified here as Deposition Exhibit 6

12  and looks like April 20, 1973 deed, can you tell us

13  whether or not you are aware of any other document

14  that conveyed timber rights from Fisher, from the

15  Kinkead estate to Fisher & Young other than that

16  document that has been identified here today?

17     A      I am unable to answer that question.  I

18  have no recollection.  I don't know whether there is

19  any other documentation out there or not.

20     Q      Did you conduct any type of investigation

21  yourself to try to locate the documents that Matson

22  would have as a consequence of its acquisition of

23  Fisher & Young that indicated the conveyancing of

24  timber rights to Fisher & Young for this property?

25     A      I went through with representatives of

29

1   Matson, their files regarding the Clough property.

2       Q      Did they produce that timber deed as a part

3   of that translation?

4       A      I have no recollection.

5              (THEREUPON, Fossee Deposition Exhibit No. 7

6       was marked for identification.)

7       Q      Take a look at Deposition Exhibit 7, a one

8   page document titled Article of Agreement.  It's April

9   1968 document, Mr. Fossee.  Do you have any

10  recollection of having that document in your file?

11      A      No.  Doesn't mean it wasn't there.  I just

12  have no recollection.

13      Q      Okay.  You have a document in front of you,

14  there is something typed at the bottom in dark print

15  if you could read that into the record, please?

16      A      It states "Until April 1, 1978 on and after

17  which all the rights hereunder shall revert to the

18  owner of the land."

19      Q      Okay.

20      A      That's what it says.

21      Q      Do you have any recollection of whether or

22  not that document was produced to Mr. Hare as part of

23  the discovery proceedings in this case?

24      A      It's my recollection that the owner of the

25  land that they would revert to was Fisher & Young, but

30

1  that's my recollection.  I can't figure out where that

2  comes from or why, but did I give this to Mr. Hare?  I

3  haven't got a clue.  I may very well have.  I have

4  absolutely no recollection.

5      Q      When you say this, this is Deposition

6  Exhibit 7.  Let's go back to deposition Exhibit 6 just

7  to complete the process.  What is your recollection,

8  if any, as to whether or not you would have provided

9  Deposition Exhibit 6 to Mr. Hare?

10          MR. HABER:  Object to the question.  I

11      think he has answered it about six times.

12      A      But I don't have problems answering it.  I

13  haven't got a clue.  I don't know what I did.  I may

14  very well have provided him with it.  I may not have.

15  I don't know.

16          (THEREUPON, Fossee Deposition Exhibit No. 8

17      was marked for identification.)

18      Q      Well, let me then go to, let's keep on

19  going with these documents.  I'm going to show you

20  what has been marked as Deposition Exhibit 8.  This

21  purports to be a letter of March 21, 1996.  I think

22  it's a letter from yourself and just take a scan of

23  that letter.  I might have some questions regarding

24  that letter.  That might simplify or expedite things.

25      A      Well, this letter certainly answers the

31

1  name of my firm at the time this all took place.

2      Q      Which was?

3      A      Which was just Reale & Fossee, PC.

4      Q      Okay.

5      A      Okay, I've read it.

6      Q      Now, does that refresh your recollection

7  that at some point in time after you filed your Answer

8  in these proceedings that you had a meeting with

9  Mr. Kookogey who is a lawyer who represented Fisher &

10  Young, then later represented Matson with regards to

11  Clough Farm matters?

12      A      No.  Because I remember that without

13  reading this letter.

14      Q      Okay.  So you knew that Mr. Kookogey was --

15      A      What it refreshes my recollection is that I

16  was reporting to Hartford Insurance Company that I had

17  forgotten.

18      Q      So that does refresh your recollection --

19      A      On that issue, it certainly does.  Also the

20  name of the law firm at that time is also refreshed.

21      Q      So Hartford was one of the insurance

22  carriers that --

23      A      I suppose so.  I certainly was writing to

24  their in-house counsel.

25      Q      Okay.  I just want to focus a second.  With

32

1  regards to Mr. Kookogey, you understood Mr. Kookogey

2  is an attorney that initially represented Fisher &

3  Young and then represented Matson in various matters?

4      A    I don't know how the representation of

5  Matson.  I do know that he was involved in the initial

6  transactions regarding the property.  He was, I used

7  him as a witness in the court case.  Mr. Kookogey was,

8  I believe, the one who did the title searching for the

9  purchase by Matson of the properties when they got it

10  from Fisher & Young.  Kookogey was involved in both

11  those transactions is my recollection

12      Q    So he would have been involved at least in

13  your understanding in the early part of the

14  transaction between '68, '69 and '70 transaction --

15      A    Yes.

16      Q    -- and then later in the 1985, '86

17  transactions between Matson and Fisher & Young?

18      A    That's my recollection.

19      Q    Okay.

20      A    I do know that -- well, I know he was

21  involved when Matson made its purchase from Fisher &

22  Young and he had been involved in the, in the Clough

23  Farm transaction between Fisher & Young and Carlisle.

24      Q    Now, your meeting with him, with

25  Mr. Kookogey occurred looks like some time in March of

Plaintiff's Appendix
000199