33

1  2000 -- or 1996, is that correct?

2      A      According to this document.  March 18th I

3  met with --

4      Q      And --

5      A      -- Mr. Kookogey.

6      Q      And it occurred in Titusville, did it not?

7      A      Traveled to Titusville and Segal, wherever

8  that is.

9      Q      It's a place in Pennsylvania.

10     A      I assumed.

11     Q      Well, first of all, did you meet in

12  Mr. Kookogey's office?

13     A      My recollection is we met in his office.

14     Q      And was he willing and did he provide

15  documents to you that related to these matters?

16     A      Yes.

17     Q      And the reason why I say that is in Exhibit

18  3, if you take a moment, take a look, just use this as

19  an example, there is a March 31, 1969 letter that's

20  identified as Defendant's Exhibit A3.  Would that be

21  the type of documents that were provided to you by

22  Mr. Kookogey as a consequence of that meeting?  Just

23  using that as an illustration.

24     A      I honestly don't know what I got from him.

25  Certainly it --

34

1    Q    Tell us generically what you got from him.

2    A    I have no clue.  I met with him, went over

3  things with him, saw his file, and my recollection is

4  he made his file available to me at that time.

5  Whether I took it with me at that time and I copied it

6  or whether he copied it and sent it to me, I don't

7  know.  But I did meet with him, I looked at documents,

8  I got copies of documents from Mr. Kookogey.

9    Q    Okay.  How long did the meeting last with

10  him, just your best estimate?

11   A    I don't have any idea.  Could have been an

12  hour, could have been three hours.  I don't honestly

13  remember.

14   Q    Anybody else present besides you and

15  Mr. Kookogey in the meeting?

16   A    I don't remember.

17   Q    Now, I just noticed on that document there

18  is an exhibit sticker?

19   A    Says Defendant's Exhibit A3.

20   Q    With regards to the exhibit sticker, can

21  you tell us whose office put the exhibit sticker on?

22   A    Well, if this document was one of the

23  documents introduced in the trial that I was the

24  counsel of, it would have been put on by my office.

25   Q    Okay.  Under your supervision, is that

35

1 correct?

2    A    Yes.  I don't think I stuck it on there and
3 wrote that, but yes.

4    Q    Was it your customary practice to use that
5 type of symbol as far as defense exhibits that you may
6 be offering at the time of trial?

7    A    Plaintiffs generally go with numbers.
8 Defendants go with letters.

9    Q    Do you have a recollection, it's customary
10 practice to exchange exhibits between the plaintiff's
11 counsel and defense counsel prior to trial?

12    A    Yes.

13    Q    And do you have a recollection as to
14 whether or not that occurred in this particular case?

15    A    Yes, it did.

16    Q    Okay.  So from my understanding if these
17 were marked, had exhibit stickers on them, they would
18 have been provided to counsel representing
19 Mr. Carlisle for his review certainly?

20    A    If this set of documents came from that
21 trial, they would have been marked by me and copies
22 would have been provided to Mr. Hare.

23    Q    Okay.  And you say this, so we are talking
24 about --

25    A    What's marked as Deposition Exhibit No. 3.

1              MR. HABER:  I'm going to object to the

2        form.  That document, if I recall, it doesn't

3        identify where the timber was removed and so

4        forth.  Are you asking him to reach a conclusion

5        whether they owned the timber that they removed

6        in 1993?

7              MR. CONNER:  I'm just asking --

8              MR. HABER:  I'm objecting to that question.

9        I don't think he is here for that purpose to give

10       his opinion as to who owned the timber or not.

11             MR. CONNER:  Well, I'm --

12       A    It's my belief this timber was owned by

13  Matson.  They were entitled to cut it and sell it.

14       Q    Okay.  Was it your understanding then there

15  was, there were deed documents that conveyed that

16  timber to Matson that gave it its right to take that

17  timber off that property?

18       A    There were deed documents to Matson from

19  Fisher & Young that gave them the right to take that

20  timber.

21       Q    And was it your understanding that Kinkead

22  had provided Fisher & Young with deed documents or

23  conveyance documents that gave Fisher & Young those

24  rights?

25       A    I can't tell you today what my

42

1  understanding of how Fisher & Young got the timber

2  that they sold to Matson.

3      Q    Is it your understanding that they had a

4  document, that is Fisher & Young had a document from

5  the owner of the timber, which has been identified on

6  the record as Mrs. Kinkead that gave them rights

7  beyond April 1, 1978 to take that timber?

8      A    That I can't really answer.  I can only say

9  that it was my understanding at that time that Matson

10  had the rights through Fisher & Young to take that.

11      Q    Okay.  So maybe to end the subject, it was

12  your understanding then at least during that time

13  period that you were involved that Fisher & Young had

14  rights beyond April 1, 1978 to take timber from that

15  property, as evidenced by some document?

16      A    Yes.

17      Q    And you cannot identify that document

18  today?

19      A    No.

20      Q    Was it also your understanding that that

21  document, if it existed, would have been recorded in a

22  courthouse such as Warren County?

23      A    I don't know what that is.  I have no clue.

24  I would assume like everybody else does that deeds are

25  recorded but I don't have any recollection of that.

Plaintiff's Appendix
000204

43

1       Q      Let me then go back a second.

2              (THEREUPON, Fossee Deposition Exhibit Nos.

3       10 and 11 were marked for identification.)

4       Q      I'm going to show you what has been marked

5    as Exhibit 10 for these proceedings.  It's identified

6    as Plaintiff's First Request for Production of

7    Documents.  It's dated March 13, 1995 and it purports

8    to be a response to it that's dated June 15, 1995.

9    Take a moment to take a look at that document.  I'd

10   like to ask you some questions about that.

11      A      Okay.

12      Q      Can you identify the document for the

13   record, please?

14      A      Document appears to be a request for

15   production of documents and a response thereto that I

16   signed.

17      Q      Am I correct on the dates, the document,

18   original document was served on apparently as part of

19   the Complaint in mid March of 1995?

20      A      Certificate of service indicates that it

21   was served the 13th of March by first class mail and

22   the date, my date of signature indicates that on the

23   16th day of June a true and correct copy of the

24   response was provided.

25      Q      Okay.  Now, at the time that you provided

44

1    your response with regards to the documents that have

2    been assembled together in Exhibit 3, would I be

3    correct that you did not have this particular

4    compilation of documents at the time you prepared that

5    response, is that correct?

6         A      I do not know what I had and what I didn't

7    have.

8         Q      Okay.

9         A      I would, under normal circumstances, you

10   rarely have everything that early in the case.

11        Q      Sure.

12        A      But I don't know what I had and what I

13   didn't.

14        Q      Let me see if we can go fast forward.  We

15   know that you filed your response about nine months

16   prior to your meeting with Mr. Kookogey, is that

17   correct?  Because your meeting with Mr. Kookogey

18   wasn't until March of 1996, I believe, according to

19   the letter we just identified here today.

20        A      Okay.  Your dates appear to be accurate.

21        Q      Okay.  So looks like your response was

22   prepared and filed prior to your meeting with

23   Mr. Kookogey and getting whatever documents

24   Mr. Kookogey had, is that correct?

25        A      Yes.

Plaintiff's Appendix
000206

48

1   related to Carlisle's interest in the property.

2       Q      Okay.  So --

3       A      That's what these relate to.

4       Q      So from your understanding in responding to

5   requests for 4, was it your understanding that you

6   were not being requested to identify or provide the

7   documents evidencing the transfer of ownership of the

8   timber to Fisher & Young?

9       A      I viewed it as how we got the documents,

10  how we got the timber rights.  We got the timber

11  rights from Fisher & Young.

12      Q      Matson got the rights, the timber rights

13  from Fisher & Young?

14      A      Correct.

15      Q      Okay.  Let me just keep on going for a

16  second.  Did you understand that this request was

17  broad enough to require you to produce the documents

18  that would have evidenced the transfer of timber

19  rights from the owner of the timber to Fisher & Young?

20      A      No.

21      Q      So if that request had specifically been

22  made, then you would have required further research on

23  your part to provide those documents, is that correct?

24      A      No.  What it would have required me is if I

25  had the documents, to produce them.

49

1    Q    Okay.

2    A    I don't have to, under the rules, go out

3 and look for documents.  I have to give them what I

4 have.

5    Q    Understood.  In other words, you would have

6 had to check with your client, Matson, to see whether

7 or not --

8    A    If they had anything, whatever they had, I

9 would have to provide under the rules.

10    Q    Okay.  So as I understand it then from your

11 perspective, a request was not broad enough as

12 indicated in that request to require you to go back to

13 Matson, say to Matson, I would like to see the

14 documents that you have that convey the timber rights

15 to Fisher & Young, is that correct?

16    A    That's right.  I was looking for the

17 documents.  That's why I put in the merger language

18 that it was, that's how we got it.  We got, we got

19 whatever rights that Fisher & Young had in that timber

20 from Fisher & Young in the merger documents.

21    Q    Now, at any time after these proceedings,

22 all the way up until, and I'm talking about at any

23 time after this was filed in May of 1995 up until the

24 trial in 1997, had you ever been requested in any

25 other, either formal discovery request or informal

58

1    Q    Okay.  And we know that that's the 1985 or

2  1986 transaction, is that correct?

3    A    That's correct.

4    Q    And can you tell us whether or not when you

5  prepared this Answer to this Interrogatory whether or

6  not you in fact had any documents that supported the

7  assertion that Fisher & Young Hardwoods, Inc. owned

8  the timber rights on the Clough Farm beyond the date

9  of April 1, 1978?

10    A    I honestly at this time do not know.  I

11  don't know whether I had the Article of Agreement that

12  sold them the property or not.

13    Q    Okay.  Let me then just keep on going here

14  with regards to some of these other documents we have.

15  We will have to take a break here.  Let me mark that

16  as the next exhibit if you would, please.

17          (THEREUPON, Fossee Deposition Exhibit No.

18      12 was marked for identification.)

19    Q    The date of the document purports to be

20  October 30, 1987 date, correct?

21    A    1987, yes.

22    Q    And is the letter from Mr. Kookogey, I

23  believe, to Robert Matson who was president of Matson

24  Lumber, is that correct?

25    A    That is correct.

62

1  before I saw it right here.

2       Q    The reason I ask and maybe I can save some

3  time, there is a reference in the bottom part of the

4  paragraph, the bottom last paragraph that goes over

5  into the next page, if you will, just maybe could read

6  that out loud.  Then I can ask you a question about

7  that.  Starts with the word timber agreement.

8       A    Uh-huh.  Okay, I read it.

9       Q    If you would read that into the record.

10      A    "The timber agreement was made separate

11  from the other real estate in --" excuse me.  "The

12  timber agreement was made separate from the other real

13  estate and in agreement form for two reasons, viz, to

14  provide for an installment sale for the seller and to

15  avoid payment of the 1 percent transfer stamps on the

16  portion of the whole consideration allocated to

17  timber."

18      Q    Okay.  And this letter purports to be

19  prepared by John S. Kookogey and it's a letter to

20  Mr. Warren who you understood was representing

21  Mr. Carlisle in that transaction, that is in the

22  Fisher & Young Carlisle transaction, Mr. Warren was

23  Mr. Carlisle's counsel and Mr. Kookogey was Fisher &

24  Young's counsel?

25      A    I don't have any recollection of who he

63

1   represented.

2      Q     Who, Mr. Warren?

3      A     Yeah.  I honestly didn't.

4      Q     Let's back up.

5      A     I'm sure I knew back then, but right now,

6   until you said that, I didn't have any recollection.

7      Q     But Mr. Kookogey represented Fisher & Young

8   in the transaction, is that right?

9      A     Yes, to my knowledge that's correct.

10      Q     Now, my question is having read that the

11   timber agreement was made separate from the other real

12   estate agreement form for two reasons, and they gave

13   you the two reasons, one because of the installment

14   sale for the seller -- Now, in the context of the word

15   seller, did you understand that that would be the

16   Kinkead estate?

17      A     That would be --

18            MR. HABER:  Kinkead estate?

19      Q     Or well Marion Kinkead, excuse me.

20      A     Yeah.

21      Q     Okay.  And with regards to the timber

22   agreement that's made reference to in that paragraph,

23   is it your testimony today that you do or do not have

24   any recollection of seeing the timber agreement that's

25   being referenced to in that letter?

64

1    A    I'm sure I saw the agreements that we just

2  looked at here, which I'm assuming that's what this

3  is.

4    Q    Okay.

5    A    I'm sure I saw it.

6    Q    Okay.  So in the context of that letter

7  then you did see that timber agreement, is that your

8  understanding?

9    A    Yeah.

10    Q    Now, that would have been at some point

11  between the time that you met with Mr. Kookogey and

12  the time that you would have received the Kookogey

13  documents if he mailed them to you, is that correct?

14    A    I don't have a clue.  I could have gotten

15  these from Matson.

16    Q    Okay.  Either way, it's your understanding

17  you did see that timber agreement, is that correct?

18    A    Yes.

19    Q    And with regards to the timber agreement,

20  you said you saw, make reference to in that letter,

21  would that timber agreement have been available to

22  Mr. Hare?

23         MR. HABER:  I'm going to object to the form

24    of the question.

25    A    I honestly don't know.  At some point it

65

1  was.

2     Q     Okay.  In other words, if he had asked you

3  for the timber agreement, you would have produced it

4  for him?

5     A     Well, he got all the documents contained in

6  here.

7     Q     All the documents contained in Exhibit 3,

8  is that correct?

9     A     Assuming that that's what I provided as the

10  documents I was utilizing in my case.

11     Q     Okay.  Now, let's back up the train a

12  second because I asked you, I had some documents here

13  that I wanted to identify.  I think that probably in

14  the sequence of events it will probably be easier if

15  we look at Deposition Exhibit 12 which we have already

16  looked at.  You have identified that document.  We

17  have Exhibits 13 and 14 to look at, I think a couple

18  other ones to look at.

19         Take a look at exhibit, let's start with

20  Exhibits 15 and 16.  I apologize for maybe marking two

21  exhibits unnecessarily, but Exhibit 15 purports to be

22  a certificate of title that's signed by Mr. Kookogey.

23         I also have a transmittal letter and this

24  purports to be a certificate of title from Fisher &

25  Young Hardwoods to Matson.  And then there is a cover

71

1      of the question.  You asked for his legal opinion

2      as to what is the effect of the verdict?

3              MR. CONNER:  I'm not asking for legal

4      opinion.  I'm just asking for his understanding

5      as to whether or not his understanding, the

6      effect of the jury verdict indicated that

7      Matson's rights were less than perpetual.

8              MR. HABER:  Well, that would ask for a

9      legal conclusion regarding what are the rights of

10     the parties on the verdict.  I'm going to object

11     to the question.  I don't think he is here to

12     answer that question.  But I'm not his counsel.

13     A       The verdict slip speaks for itself.  The

14     verdict slip says is that all the timber that existed

15     on the property in 1969 is, Matson has the right to

16     harvest forever.

17     Q       You are talking about timber that was in

18     existence as of 1969?

19     A       That's what the verdict slip says.

20     Q       Now, the reason why I ask you that

21     question, go to page 5 of your letter to December

22     23rd, 1997, I want to ask you a question about the

23     last sentence on that page that goes over into the

24     next page, if you will.  Take a moment, take a look at

25     it.  So I can understand the basis for that statement.

72

1    A    Okay.

2    Q    You have the letter.  And I don't have a

3  copy here.

4    A    You can read it.

5    Q    It says "As things stand now we can enter

6  the premises and cut so long as the trees continue to

7  stand that were standing in 1969."

8    A    That's what it says.

9    Q    Is that what it says?  Okay.  So with

10  regards to the, if you will, the trees that were

11  standing, that were standing in 1969 that had not been

12  cut by Matson, prior to this verdict, was it at least

13  your understanding that Matson could go back and get

14  those trees, is that correct?

15    A    Yes.

16    Q    Okay.  With regards to trees that came in

17  existence after 1969, was it your understanding, at

18  least from the jury verdict, that those belonged to

19  Carlisle?

20    A    According to the jury verdict.

21    Q    So the answer is yes?

22    A    Yes, according to the jury verdict.

23    Q    Okay.  With regards to the, if you will,

24  with regards to trees that were in existence in 1969

25  that had not been cut by Matson, did those exist

74

1   but in that 7 or 800 acres of forest land, is that

2   correct?

3       A    That would be my understanding.

4       Q    With regards to a quantification of the

5   trees that remained, that Matson had not yet taken as

6   of the jury verdict, did you have a sense as to board

7   feet or number of trees or a dollar amount of trees

8   that still remained on what I'll call the 1969 trees

9   that Matson had not taken?

10      A    I couldn't tell you how many board feet.  I

11  did visit the property and that's where I'm getting my

12  approximations of sizes of things as I was there.

13  Observed what had been taken, what was still standing.

14  There was a requirement that they had to be 12 or 14

15  inches in diameter before they could be cut.  Which

16  probably, you can tell when a tree has reached a

17  certain age based upon how big it is.

18          So determining what was in existence in '69

19  would probably be relatively easy, and I would assume

20  most of what would have been standing would have been

21  standing in '69 based upon the limitations of size of

22  trunk --

23      Q    Okay.

24      A    -- that they went to.  They also didn't

25  divide by that.  They took down trees that were much

1  larger than that and limited themselves to trees I

2  believe somewhere in the neighborhood of 16 inches

3  rather than going to take the ones that were 12.  As a

4  result, there would have been a considerable amount of

5  trees still standing in that forested area as of the

6  date of the trial.

7       Q     That's what I'm talking about.

8       A     And my view, when I was there, there were a

9  lot of trees that were of significant size still

10 standing on that property when I visited.

11      Q     What I'll call residual 1969 trees or --

12      A     Oh, yeah, they had to have been they were

13 of such size.

14      Q     And from your discussion with the foresters

15 of Matson, a dollar value, your rough estimate?  Are

16 we talking about 5 or $10,000 worth of lumber or are

17 we talking about something more significant than that?

18      A     Oh, it would be more significant than that.

19 How much, I don't know.  Because the verdict didn't

20 follow the documents.

21      Q     Okay.

22      A     The documents would have given Matson the

23 right to all of the timber in the forested area.  The

24 verdict for some strange reason comes up with a

25 different calculation and eliminated a substantial

JAMES HALL

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    ALBERT CARLISLE         )
 3                          )
             VS             ) C.  A.  No.  04-25 Erie
 4                          )
    BARTONY, HARE & EDSON;  )
 5  SCOTT M. HARE, ESQUIRE  )
    HENRY E. BARTONY,  JR.  )
 6  ESQUIRE and JOHN JAY V. )
    EDSON, ESQUIRE          )
 7

 8                TRANSCRIPT OF PROCEEDINGS

 9       Of the depositions of LAINARD BUSH and JAMES HALL

10       taken on Friday, February 3, 2006 commencing at 10:00

11       a.m. at the offices of ANDREW J. CONNER, ESQUIRE, 23

12       West Tenth Street, Erie, Pennsylvania.

13

14  APPEARANCES:

15  ANDREW J. CONNER, ESQUIRE, 23 West Tenth Street, Erie,
    Pennsylvania (For the Plaintiff)
16
    JAMES FRYLING, ESQUIRE, 23 West Tenth Street,  Erie,
17  Pennsylania  (For the Plaintiff)

18  DAVID HABER, ESQUIRE, 602 Law & Finance Building, 429 Fourth
    Avenue, Pittsburgh, Pennsylvania (For the Defendant)

19

20


21

22

23

24

25
```

2

```
 1
 2                        I  N  D  E  X
 3
 4    Witness                      Examination by:
 5
 6                              Haber      Conner
 7    Lainard Bush              3/48/54     39/53
 8
 9    James Hall                  56         --
10
11                    E  X  H  I  B  I  T  S
12    Bush Deposition Exhibit 1                29
         (Deed of 1973)
13
      Bush Deposition Exhibit 2                40
14       (Praecipe for Writ of Summons)
15    Bush Deposition Exhibit 3                46
         (Write filed June of '98)
16
      Hall Deposition Exhibit 1                60
17       (Stipulation for dismissal 12/15/97)
18    Hall Deposition Exhibit 2                69
         (Damage Report by Hall)
19
      Hall Deposition Exhibit 3                74
20       (October 7, 2005 Report by Hall)
21
22
23
24
25
```

56

                              James Hall
1    meetings?

2         A.     Yes.

3         Q.     And that was your understanding?

4         A.     Yes.

5         Q.     Was there any discussion in this meeting at

6    the farm prior to the jury trial what damages we were going

7    to take out of the trial?

8         A.     What damages we were going to take out of the

9    trial?

10        Q.     What damages you weren't going to seek at the

11   federal trial?

12        A.     There may have been, I don't recall

13   specifically.

14               MR. HABER: I have no further questions.

15               MR. CONNER:  That's all the questions we have.

16                    *       *       *

17        JAMES FRANCIS HALL, having been duly sworn, was

18   examined and testified as follows:

19                    DIRECT EXAMINATION

20   BY MR. HABER:

21        Q.     Would you state your full name?

22        A.     James Francis Hall.

23        Q.     Mr. Hall, you were present during the

24   deposition of Mr. Bush?

25        A.     Just moments ago, yes, I have.

58

James Hall

1          A.      '93.  I say that with a question.

2          Q.      What was your position with the Commonwealth?

3          A.      My last position was assistant district

4   forester for Northwestern Pennsylvania.

5          Q.      When did you first meet Mr. Carlisle?

6          A.      A meeting at Mr. Lainard Bush's house prior to

7   the Pittsburgh trial and that would have been probably '95,

8   but I couldn't give you a date on that for sure.

9          Q.      How were you contacted to serve as an expert

10  or help Mr. Carlisle in the federal trial?

11         A.      Mr. Carlisle called me.

12         Q.      Do you know how he learned about you?

13         A.      Through a man by the name of Jim Bissel who

14  works for the Cleveland Museum of Natural History.

15         Q.      Do you recall when this meeting occurred in

16  Mr. Bush's house?

17         A.      Not the exact date, no, sir.

18         Q.      But it was sometime -- do you recall the year?

19         A.      It was -- the trial was --

20         Q.      The trial was in December of 1997?

21         A.      Right.  It would have been more than a year

22  before that but I wouldn't want to give you a date without me

23  looking at my schedule.

24         Q.      Do you recall who was at this first meeting

25  when you first met Mr. Carlisle?

Plaintiff's Appendix
000221

70

James Hall

1       A.      They were based on records Matson provided,

2  yes.

3       Q.      You were present when Mr. Bush discussed a

4  meeting that occurred in 1997 at his house on the Clough Farm

5  regarding discussions about a potential second lawsuit?

6       A.      I was present at that meeting, yes.

7       Q.      Do you recall discussions about pursuing

8  damages in another lawsuit?

9       A.      This is my first meeting there this occurred.

10 What I recall was that Mr. Hare wanted to simplify the

11 lawsuit and wanted to break it down into two parts; one part

12 being contractual, the other part being damages.

13       He did not speak of a second lawsuit as such, because

14 -- it was just assumed, at least on my part.  Part of the

15 reason why we didn't go into measuring the stump diameters is

16 he didn't want to add more confusion to the jury, so we were

17 simplifying it to just the contract at that time.

18       Q.      Did he indicate to you that he wanted to -- or

19 do you recall him saying that he wanted to limit it to the

20 contract because there was a 20-year statute of limitations

21 on the contract and other claims might have a shorter statute

22 of limitations?

23       A.      I don't recall him talking about a statute of

24 limitations on the contract.  I remember him talking about a

25 seal that I got the impression meant that it was open forever

86

James Hall

1      Q.    And those lawsuits are both filed in Warren

2  County?

3      A.    Yes.

4      Q.    After the jury verdict did you ever attend a

5  meeting with Mr. Hare?

6      A.    Immediately after, yes, we did.

7      Q.    When you say immediately after --

8      A.    I mean we went out together afterwards and

9  discussed what happened and talked to the jury and had a

10  general confab between us on what happened and what didn't

11  happen, and what we expected to happen down the road, yes.

12      Q.    And this was on the day of the verdict?

13      A.    Yes.

14      Q.    And what was Mr. Carlisle's reaction to the

15  verdict?

16      A.    His first reaction to the verdict was the same

17  as mine, we were happy that we prevailed in all issues

18  brought forth.

19      He was disappointed that we didn't succeed in

20  bringing A and B forth, so he was looking forward to more and

21  that's what Scott had said to him right afterwards because he

22  knew Bert was disappointed.

23      Scott had said:  Bert, we've won, and I can remember

24  him saying that because we just had finished talking to the

25  jury outside and he says:  We won, Bert.  This sets the stage

87

James Hall

1   for the next step.

2       Q.      Did Mr. Hare indicate what the next step would

3   be?  What you could recover in the next step?

4       A.      No.

5       Q.      It was just this isn't over, we may file

6   another lawsuit.

7       A.      He didn't even say we may file another lawsuit

8   but when he said the next step, I assumed that, and it was

9   pretty clear that that's what was on his mind.

10      Q.      Was there any discussion about what would be

11  sought in the next lawsuit?

12      A.      He used the term damages all the time.

13      Q.      Anything specific about what type of damages?

14      A.      Not at that time specific that I'm aware of.

15      Q.      After this verdict, after this meeting on the

16  day of the verdict, did you ever have any further discussions

17  with Mr. Hare?

18      A.      No, I didn't.

19      Q.      You had discussions with Attorney Krembs

20  because he asked you to prepare a damage analysis, correct?

21      A.      Yes.

22      Q.      Did Mr. Krembs ever criticize what Scott Hare

23  had done?

24      A.      Not in my presence he never did.

25      Q.      Did Mr. Carlisle ever tell you that Mr. Krembs

88

James Hall

1    had criticized what Scott Hare had done?

2         A.     Not that I'm aware of. As far as I was

3    concerned and I thought that -- even though Mr. Krembs was

4    now involved, we were still going on Scott Hare's

5    recommendations and Scott Hare's actions before.

6         Q.     Why did you have that understanding?

7         A.     Because Mr. Krembs was an Ohio attorney.

8         Q.     Scott Hare never represented you, did he?

9         A.     No.

10        Q.     Who paid you for your expert services in the

11   federal court action?

12        A.     Mr. Carlisle.

13        Q.     Paid you directly?

14        A.     Yes.

15               MR. HABER: That's all the questions I have.

16               MR. FRYLING:  I don't have anything.

17               MR. CONNER:  We don't have any questions.

18        We'll attach the exhibits to the transcript.

19                        *        *        *

20   (Deposition concluded at 12:20 p.m.)

21

22

23

24

25

Plaintiff's Appendix
000225

HARE I

1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                        - - -

 4   ALBERT T. CARLISLE, PLAINTIFF,      )
                                         )
 5             Plaintiff,                )
                                         ) Civil Action
 6         vs.                           ) No. 04-25 ERIE
                                         )
 7   BARTONY, HARE & EDSON; SCOTT M.     )
     HARE, ESQUIRE; HENRY E. BARTONY,    )
 8   JR., ESQUIRE and JOHN JOY V. EDSON, )
     ESQUIRE, Defendants,                )
 9                                       )
               Defendants.               )
10
                        - - -
11
           Deposition of SCOTT M. HARE, ESQUIRE
12
           Thursday, September, 1, 2005
13
                        - - -
14
         The deposition of SCOTT M. HARE, ESQUIRE, one of
15   the defendants herein, called as a witness by the
     plaintiff, pursuant to notice and the Federal Rules of
16   Civil Procedure pertaining to the taking of
     depositions, taken before me, the undersigned, Jessica
17   L. Tapia, a Notary Public in and for the Commonwealth
     of Pennsylvania, at the offices of David L. Haber,
18   Esquire, 602 Law & Finance Building, 429 Fourth
     Avenue, Pittsburgh, Pennsylvania  15219-1503,
19   commencing at 10:02 o'clock a.m., the day and date
     above set forth.
20
                        - - -
21
           COMPUTER-AIDED TRANSCRIPTION BY
22          MORSE, GANTVERG & HODGE, INC.
             PITTSBURGH, PENNSYLVANIA
23               412-281-0189

24                      - - -

25
```

2

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3            Conner Riley & Fryling:
              Andrew J. Conner, Esquire
 4            James R. Fryling, Esquire
              17 West Tenth Street
 5            P.O. Box 860
              Erie, Pennsylvania  16512
 6
          On behalf of the Defendants:
 7
              Weinheimer, Schadel & Haber, P.C.:
 8            David L. Haber, Esquire
              602 Law & Finance Building
 9            429 Fourth Avenue
              Pittsburgh, Pennsylvania  15219-1503
10
                         - - -
11
     ALSO RECORDED VIA VIDEOTAPE
12
                         - - -
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiff's Appendix
000227

3

```
 1                    SCOTT M. HARE
 2  One of the defendants herein, called as a witness by
 3  the plaintiff, having been first duly sworn, as
 4  hereinafter certified, was deposed and said as
 5  follows:
 6            THE VIDEOGRAPHER:  This begins the
 7       deposition of Scott M. Hare, Esquire.  The time
 8       is 10:02 a.m.  The court reporter may now swear
 9       in the witness.
10            MR. CONNER:  For the record, my name is
11       Andy Conner and I represent Albert T. Carlisle as
12       a plaintiff.
13            Mr. Haber?
14            MR. HABER:  David Haber.  I represent the
15       defendant Scott M. Hare and the other defendants
16       named in the caption.
17            MR. CONNER:  Fine.
18                      EXAMINATION
19  BY MR. CONNER
20       Q    Good morning, Mr. Hare, I introduced
21  myself.
22            MR. CONNER:  I think the record should
23       reflect that these are the depositions taken
24       pursuant to notice, pursuant to the federal rules
25       of civil procedure, that all of the objections,
```

4

```
 1      except as to the form of the question, are

 2      reserved until the time of trial.

 3              Is there any other stipulations, Mr. Haber?

 4              MR. HABER:  No.

 5      Q    Mr. Hare, I introduced myself, my name is

 6   Andy Conner.  I'm going to be asking you some

 7   questions in these proceedings.  I'm sure from your

 8   legal experience, you are familiar with depositions,

 9   are you not?

10      A    I have attended and taken depositions, yes.

11      Q    Sure.  If, by chance, I ask a question that

12   you do not hear, or you do not understand, please, ask

13   me to repeat it or restate the question because I want

14   to make sure you hear the question and understand the

15   question.

16              Is that fair enough?

17      A    Sure.

18      Q    If, by chance, you need a document to refer

19   to and/or to answer the question, please, either ask

20   your counsel or ask us because I think we have a

21   complete copy of the file here, although we have not

22   marked all of those as exhibits, but the complete file

23   is available, so just ask us for the documents.

24      A    I will do that.

25      Q    Lastly, if you want to take a break at any
```

5

```
 1   time for any reason, please, let us know because we
 2   will be more than happy to accommodate you for that.
 3        A     Thank you.
 4        Q     Again, for the record, would you state your
 5   full name, please.
 6        A     It's Scott Michael Hare.
 7        Q     And your age, sir?
 8        A     37.
 9        Q     And your date of birth?
10        A     September 27th, 1966.
11        Q     And your profession and occupation is?
12        A     I'm an attorney, I practice law in the
13   Commonwealth of Pennsylvania.
14        Q     Where do you currently reside?
15        A     In Pittsburgh.
16        Q     Where in Pittsburgh?
17        A     In the Squirrel Hill Area.
18        Q     A suburb of Pittsburgh?
19        A     It's a neighborhood that's actually within
20   the city limits.
21        Q     And your professional address is what?
22        A     It's 1801 Law & Finance Building, and
23   that's at 429 Fourth Avenue, Pittsburgh.
24        Q     That's the building we are in?
25        A     The building we are in, that's correct, a
```

23

1      Q      I'm just asking about the experience that

2 you may have had in the '93, '94 time period while you

3 were with Bartony & Hare and prior to Mr. Carlisle,

4 what experience, if any, you had in either searching

5 titles or asking somebody else to search titles and/or

6 going to the recorder of deeds office to look at

7 deeds?

8      A      I can't recall either way.

9      Q      Okay.  Did you believe that you had the

10 expertise to do a title search?

11      A      Are you asking whether I believed in 1993

12 and '94 that I had the expertise to do a title search?

13      Q      Yes.

14      A      I don't know if I ever gave that any

15 thought.

16      Q      There was never an occasion that required

17 you to give any thought to that issue; is that

18 correct?

19      A      Certainly not that I recall.  Can I just

20 ask you to keep your hands down.  I can't see you.

21      Q      No problem.

22            How about with regards to going to the

23 recorder of deeds office to look for whether or not a

24 document was recorded in the recorder of deeds office;

25 had you ever done that prior to your representation of

52

1    in the initial meeting?

2        A      No.  I believe what I said was, "I'll

3    review these and we can talk further about whether

4    there's something that we might want to move forward

5    on."

6        Q      Did he indicate or outline to you any

7    result that he hoped to achieve?

8        A      Yes, he did.

9        Q      Tell me, in summary, what he outlined to

10   you as the result that he was hoping to achieve?

11       A      He wanted the timber company to be off the

12   property.

13       Q      And the timber company, was that identified

14   at that point in time as Matson?

15       A      Matson was the entity, as of that point,

16   that owned the timber rights.  I don't recall whether

17   Bert was able, at our first meeting, to identify that

18   name to me, although I suspect that he did.

19       Q      Okay.  And did he tell you why he wanted

20   them off the property?

21       A      He wanted his property to be free of

22   timbering operations.

23       Q      Okay.  Now, let me just --

24       A      He just wanted them to be gone.

25       Q      Let me see if we can do this in an orderly

56

1  you ask Bert whether or not there were any other

2  agreements that he was aware of that affected the

3  timber rights other than Exhibit 5, which was the

4  agreement of sale?

5      A    I did.  And I asked him, in fact, to give

6  me any documents that would relate to this in any

7  fashion.

8      Q    Was he aware of any other agreements that

9  affected the timber rights, other than the agreement

10 of sale?

11     A    I trust that any document that he was aware

12 of he gave to me.  As I said, he gave me a number of

13 documents.

14     Q    All right.  Did you ask him whether or not

15 a title search had been done on the property?

16     A    I don't recall if I asked that or not.

17     Q    Do you know whether or not a title search

18 has ever been done on the property?

19     A    I don't know if one has been done or not.

20     Q    Did you ever ask anybody whether or not a

21 title search had ever been done?

22     A    I don't recall if I asked that question or

23 not.

24     Q    Of anybody?

25     A    I don't recall.

58

1      Q      Did you ever ask him whether or not he

2  conducted a title search of the property?

3      A      I don't recall if I ever asked him that.

4      Q      That's fine.

5      A      I just don't recall.  I believe he

6  represented the seller in preparing this agreement of

7  sale.

8      Q      Did you ever ask Mr. Carlisle whether or

9  not there was title insurance issued to him in

10  association with the purchase of the property?

11      A      I don't recall if I asked that question or

12  not.

13      Q      And for purposes of completeness, did you

14  ever become aware of any at any time whether or not

15  title insurance was issued to that particular

16  property?

17      A      I don't recall ever asking that question or

18  knowing the answer to that.

19      Q      Okay.  And maybe again, for purposes of

20  completeness, you never contacted any title company

21  that you are familiar with to see whether or not there

22  was a title insurance policy issued to that property?

23      A      I don't believe I ever contacted any title

24  insurance company for that purpose.

25      Q      Let me then see if we can do this in an

61

1    among the documents that Bert gave to me.  I just

2    don't know for you.

3        Q    Were you able to ascertain when Fisher &

4    Young had acquired the timber rights?

5        A    That might be reflected in the 1969

6    agreement of sale.

7        Q    Why don't you take a look at that document,

8    the agreement of sale, and tell me where it indicates

9    when Fisher & Young acquired the timber rights to the

10   Clough Farm?

11       A    If you look at page 5 of the agreement of

12   sale, you'll see a paragraph beginning with the word

13   "BEING" in all capital letters, and this is after the

14   long description of the property.  "BEING the same

15   parcels of land with Marion C. Kinkead, widow, by deed

16   dated March 27, 1969 recorded in the recorder's office

17   of Warren County."

18            So that references a predecessor conveyance

19   or a prior conveyance.

20       Q    Okay.  Did you go look at that deed?

21       A    No, I don't believe so.  I don't believe I

22   have ever been in the recorder of deeds office in

23   Warren County.

24       Q    At any time during the representation of

25   Mr. Carlisle?

62

1    A    At any time, ever.

2    Q    Okay.  Had you ever requested anybody to

3  obtain a copy of that deed?

4    A    I don't recall.

5    Q    Did you have the expertise to obtain a copy

6  of that deed?

7    A    I don't know what you mean by "expertise."

8         If you're asking could I have obtained a

9  copy, I assume the answer is yes.

10   Q    Recognizing you never recall seeing a copy

11 of that deed at any time.

12   A    I don't recall.  I might have, but I don't

13 recall.

14   Q    Do you have any independent knowledge,

15 without seeing the deed, whether or not that conveyed

16 timber rights?

17   A    I don't know the answer to that.

18   Q    Let me then go back to the question then.

19        Did you ever see a document that conveyed,

20 to Fisher & Young, timber rights on the Clough Farm?

21   A    I don't know.

22   Q    Did you ever attempt to get a copy of that

23 document from any source?

24   A    I don't know.

25   Q    Do you know whether or not when you saw the

63

1  agreement of sale which was marked Exhibit 5 whether

2  or not that was likely a document that would have

3  conveyed timber rights to Fisher & Young?

4      A      According to Exhibit 5, there was a prior

5  deed that conveyed the property.  So I think that is

6  likely a document, but I don't know.

7      Q      So at least when you were initially talking

8  to Mr. Carlisle, do I understand that you at least had

9  knowledge that there may be a document or deed that

10  conveyed timber rights to Fisher & Young; is that

11  correct?

12      A      According to the agreement of sale, that

13  seems to be the case.

14      Q      And that would be a document separate and

15  apart from Exhibit 5; is that correct?

16      A      That's correct.

17      Q      And so maybe to complete the matter, you

18  have never seen that document at any time?

19      A      Again, I don't know whether I have or have

20  not.

21      Q      Can you tell us today, generally, what

22  Fisher & Young paid for the timber rights?

23      A      I have trouble answering that question,

24  because I don't know whether they paid something for

25  the timber rights separately from the consideration

64

1    for the real property.  I guess, more importantly, I

2    don't recall any amount that they paid, so I can't

3    answer that.

4         Q     You can't give us a date as to when they

5    acquired timber rights?

6         A     I believe they purchased this real property

7    by deed dated March 27th, 1969.

8         Q     So is it your understanding at that time

9    that it was likely that the 1969 transaction conveyed

10   to Fisher & Young the timber rights they had?

11        A     That's certainly what Exhibit 5 suggests.

12        Q     So that was the conclusion you drew from

13   looking at the agreement of sale that in that prior

14   deed from Kinkead to Fisher & Young, they conveyed

15   timber rights to Fisher & Young in that transaction?

16        A     I can't say that's the conclusion I drew

17   because I wasn't asked to examine that question.  I

18   can't say I drew any conclusion as to that question.

19        Q     Why wasn't that relevant to the issue that

20   Mr. Carlisle was asking you?

21        A     Mr. Carlisle asked me to assess and advise

22   him regarding his rights under the agreement of sale,

23   Exhibit 5.  That's what we attempted to do.

24        Q     I see.  You said that the goal of

25   Mr. Carlisle was to keep the timber company, which is

1  Matson, which derived its rights from Fisher and

2  Young --

3      A      Which became Matson, right.

4      Q      -- off his property?

5      A      That's correct.

6      Q      In the document identifying or conveying

7  the timber rights relevant as to whether Mr. Carlisle

8  could keep Matson Timber Company off the property or

9  not?

10     A      I'm not sure I can answer that question.

11 He asked us to examine his rights under the agreement

12 of sale.  And his objective in that regard was to get

13 the timber company off the property.  By the way, we

14 achieved that.

15     Q      Bottom line is that you are saying that he

16 defined what you were to look at, and that was this

17 particular agreement, Exhibit 5; is that correct?

18     A      He asked us to advise him, to examine and

19 advise him regarding his rights under this agreement

20 of sale.

21     Q      Only with respect to the agreement of

22 sale --

23     A      That's what he asked us to look at.

24     Q      -- and not generally?

25     A      I don't know whether there was a

68

1  BY MR. CONNER:

2     Q     I am showing you what has been marked as

3  Deposition Exhibit 8.

4           For purposes of the record, identify the

5  document, please.

6     A     This is a copy of a memorandum that I

7  prepared, addressed to Bert Carlisle, dated

8  November 3rd, 1994.

9           Incidentally, this document answers one of

10  your earlier questions, whether John Edson was with

11  our firm at the time we first began doing work for

12  Bert.  As you can see, this memo is on Bartony & Hare

13  letterhead and not Bartony Hare & Edson.  So

14  John Edson must have joined our firm after we had

15  already begun doing work for Bert.

16     Q     You prepared this document yourself; is

17  that correct?

18     A     That is correct.

19     Q     And the purpose of the document was what?

20     A     To provide a memorandum to Bert outlining

21  some of his rights under the agreement of sale.

22     Q     Now, let's just maybe, for purposes of

23  answering some of the other questions we talked about,

24  as of November of '94, did you an engagement letter in

25  effect or a fee agreement with Mr. Carlisle?

72

1  reasonable strategy?

2      A     Yes.

3      Q     Now, in addition to that, you had what a

4  belief, did you not, that he was entitled to mandatory

5  damages?

6      A     At this early stage, we had a belief that

7  he could assert claims for monetary damages.  Whether

8  he was entitled to monetary damages, of course, was a

9  fact yet to determine.

10     Q     And monetary damages, did that include

11 damage to his property and also included the value of

12 trees that were taken by Matson that belonged to

13 Mr. Carlisle as opposed to Matson?

14     A     It is overwhelmingly the latter issue.

15     Q     Taking trees that actually belonged to

16 Mr. Carlisle?

17     A     Bert had the sense and wanted to explore

18 the assertion that all of the timber on the property

19 should have been conveyed to him.  And indeed, as I

20 recall, that was the principal thrust of the Springer,

21 Bush & Perry memo.  So the concept was that any timber

22 that had been harvested had constituted money damages

23 to Bert.

24     Q     So he was making that assertion; is that

25 correct?

Plaintiff's Appendix
000241

73

1     A     That is right.

2     Q     And did you investigate whether or not some
3  or all of the timber that had been taken by Matson
4  during the 1986, 1994 period was taken in violation of
5  any other agreement other than the agreement of sale
6  that's identified here as Exhibit 5?

7     A     I'm sorry.  I don't understand the
8  question.

9     Q     Other than -- let me see if I can rephrase
10 it.  That was a convoluted question.

11          I think you indicated that the only
12 document that you were working with that represented
13 the agreement, that you were working with, is Exhibit
14 5; is that correct?

15    A     To my recollection.

16    Q     And with regards to any timber agreement
17 that Matson or Fisher & Young had, were you aware when
18 you were writing this memo there was a possibility
19 that Fisher & Young would have had a timber deed?

20    A     I can't recall.

21    Q     Do you know what a timber deed is?

22    A     A timber deed is a document that conveys
23 rights in timber as separate from the underlying
24 estate or the real property.

25    Q     Did you have a belief that there was a

74

1   timber deed that Fisher & Young had that you had not

2   seen?

3        A     I had no information or no suspicion to

4   that effect.

5        Q     From your research, did you have any

6   knowledge that timber in Pennsylvania may be

7   considered realty or may be considered personalty or

8   wasn't that part of your investigation?

9        A     Well, that, as such, was not a

10  particular -- a question we were examining as I

11  recall.

12       Q     Why not?

13       A     But I can tell you that I recall

14  essentially tracking down and reading any cases

15  relating to timber that I might have.

16             Now, I believe that there were -- with

17  respect to the realty/personalty dichotomy, I believe

18  I recall that there was a treatment for certain

19  purposes, maybe tax purposes, as personalty as

20  opposed to realty.  I can't recall for you now what we

21  may have learned in that regard.

22       Q     Did your research indicate that if it was

23  to be treated as personalty that it would be

24  conditional on the timber company taking the timber

25  off in a set period of time?

75

1      A      I don't recall anything to that effect.

2      Q      Okay.  And did you have independent

3   knowledge of that separate and apart from your

4   research that it would be considered personalty that

5   they had -- the timber company had to take the timber

6   off in a set period of time.

7      A      That was a notion that Bert had.  He -- it

8   was his view that under the agreement of sale, the

9   timber company was obligated within, what he termed, a

10  reasonable time, to take the timber.  The agreement of

11  sale doesn't impose any such limitations.

12     Q      Okay.  As a consequence of that, did that

13  cause you to think there may be other documents or

14  agreements that you had not seen that had defined the

15  timber company's right to this timber?

16     A      No.  As I read Exhibit 5, this is a clear

17  and comprehensive statement of what the rights were

18  under the agreement of sale.

19     Q      Is -- that document defines Fisher &

20  Young's timber rights on that property?

21     A      This document defines Fisher & Young's and

22  Bert Carlisle's respective rights on that property.

23     Q      And you are saying that that document is

24  the document that conveys the timber rights to Fisher

25  & Young?

76

1    A    No.  This document conveys real property to

2  Bert and retains to Fisher & Young rights in timber on

3  the real property, and collateral rights, for

4  instance, rights to harvest and remove the timber.

5    Q    How did you know, without looking beyond

6  that document, as to whether or not Fisher & Young had

7  any timber rights on the property?

8    A    Well, I believe that when I read the

9  agreement of sale, I understood it to be a lawful and

10  honest document with respect to the conveyance by

11  Fisher & Young to Bert Carlisle.

12    Q    Isn't there a possibility that some other

13  party, other than Fisher & Young, had timber rights at

14  that time period?

15    A    I'm sure there is always a possibility that

16  there could be some other claims.

17    Q    Did you disclose that to Mr. Carlisle, that

18  there was likely other documents that defined whether

19  or not the timber company, Fisher & Young or Matson,

20  had timber rights under the document that you were

21  reviewing?

22    A    I don't know that it was likely that there

23  were other documents.  And I don't recall whether I

24  had any such conversation with Mr. Carlisle.

25    Q    Did you -- did it cross your mind that it

1  might be reasonable to have a title search done on the

2  property at that time?

3      A    I don't think any consideration was given

4  to doing that.

5      Q    Why was no consideration given to a title

6  search?

7      A    Because I was asked to examine and assert

8  rights appearing under this agreement of sale.

9      Q    Would a title search likely have produced

10 relevant information as to whether or not Mr. Carlisle

11 could keep the timber company off the property?

12     A    It's impossible to answer that.  I don't

13 know.

14     Q    Okay.  If I understand it correctly, at

15 least as of the time of your representation of

16 Mr. Carlisle, A, you hadn't done a title search; is

17 that correct?

18     A    I don't believe so.

19     Q    And, B, do I understand that in your other

20 representations you had never asked say a title

21 searcher or a specialist to do a title search for you

22 in any other piece of litigation?

23     A    At any time?  I think there have been

24 occasions when we have had to have done a title

25 search.

Plaintiff's Appendix
000246

1    Q    And when you do a title search, you are
2  talking about doing a title search in Allegheny County
3  I assume?
4    A    That's all I recall, but I can't say that
5  there weren't others.
6    Q    And with regards to that title search, was
7  that done by yourself or was that someone else?
8    A    No.  In cases where I recall that a title
9  search was called for, we had a title company do the
10  search or an attorney that does that.
11    Q    Was it your understanding that if Fisher &
12  Young had timber rights on the property; that is,
13  enforceable timber rights that were passed on to
14  Matson, that those timber rights would have to be set
15  forth in a document that was recorded in the recorder
16  of deeds office?
17    A    Yes, that was my understanding.  And
18  Exhibit 5 is that document.
19    Q    Okay.  So you're saying that that is the
20  source document, the source document for at least from
21  your perspective, Fisher & Young's timber rights?
22    A    No.  Exhibit 5, the agreement of sale, is
23  the document that was incidentally recorded in the
24  recorder of deeds office, that accepts and reserves;
25  that is, retains to Fisher & Young the timber and

1  injunction; is that right?

2      A      I'm sorry.  Would you give me a page

3  number?

4      Q      Pages 9, 10, and 11 talk about preliminary

5  and permanent injunctions; is that correct?  Did I

6  read it correctly?

7      A      Those pages do discuss injunctive relief,

8  yes.

9      Q      Would I be correct that it was at least

10  your understanding that Fisher & Young had or Matson

11  had some timber rights on that property; is that

12  correct?

13      A      They had very definite timber rights.

14      Q      Nonetheless, you discussed the possibility

15  of getting a preliminary injunction and possibly a

16  permanent injunction.

17            In your mind, did you identify the status

18  of Matson either as an invitee or as trespasser on the

19  property?

20      A      I believe so, sure.

21      Q      In what capacity were they on that

22  property?

23      A      Well, Matson was the successor-in-interest

24  to Fisher & Young with respect to Fisher & Young's

25  rights under the agreement of sale which you have

86

1  marked as Exhibit 5.

2           We investigated the succession of entities

3  who held those rights, culminating in the Matson

4  entities.  I say that because there was actually two

5  Matson entities, Matson Hardwoods and Matson Lumber

6  Company.  And there was, at one point, a transfer of

7  interest from one to the other, which incidentally,

8  Bert was unaware of.  We actually discovered that.

9           So at the end of that chain of interest, if

10 you will, Matson was on the property as a licensee.  I

11 don't think invitee is the proper term.  As a licensee

12 with reference to the rights under the agreement of

13 sale.

14     Q     So Matson's rights were a derivative from

15 your analysis, from the succession in the agreement of

16 sale that has been marked as Exhibit 5; is that

17 correct?

18     A     The reservations of rights, that's correct.

19     Q     Was it your understanding that they still

20 had timber rights during the 1986 and 1994 agreement,

21 1986 1994 time period based on that agreement?

22     A     Yes, that was the understanding.

23     Q     Okay.  And if by chance --

24     A     Pardon me.  The scope of the rights was

25 very much in dispute.

Plaintiff's Appendix
000249

1    Q    I understand.  But, nonetheless, they had

2  rights; is that correct?

3    A    Correct.

4    Q    And because they had ongoing rights, they

5  would be considered a licensee?

6    A    Correct.

7    Q    If, by change, the rights, for whatever

8  reason, because of the effect of the other agreement

9  you may not have seen that have expired, there was a

10  chance they could have been a trespasser between the

11  1986, 1994 time frame?

12    A    I can't answer that question.

13    Q    You didn't see the other documents?

14    A    Not just that.  Your question presupposes a

15  whole universe of possibilities that I just can't -- I

16  can't give you a useful answer.

17    Q    Okay.  If they were -- just for full

18  purposes of this document and getting an injunction,

19  if they were a trespasser as opposed to a licensee,

20  that would affect your legal advice, would it not, in

21  regards to the recommendations with regards to

22  obtaining a permanent or preliminary injunction, would

23  it not?

24    A    Using your predicate, if they were a

25  trespasser, sure, that would bear on the question.

88

1    Q    That would enhance Mr. Carlisle's chances

2  of getting an injunction, would it not?

3    A    I think so.

4    Q    Okay.  And that was one of his goals, was

5  it not, to try to keep the timber company completely

6  off the property?

7    A    To remove them from the property, sure.

8    Q    And you were trying to find out any

9  possibility to do that, were you not?

10    A    Sure.

11    Q    Okay.  Now, let's go then to the claims for

12  monetary damages, which I believe are summarized in

13  paragraph 4, which are discussed on 11 and 12, pages

14  11 and 12, if you have the document in front of you.

15    A    Again, you recognize this is a preliminary

16  memo.  I had not even been to the property.  We

17  weren't purporting through this memo to give any final

18  or definitive statement of opinion or rights.  This is

19  some preliminary reflection, if you will.

20    Q    Understood.  And you are saying that he

21  was -- essentially, generally, he was entitled to seek

22  damages to compensate for any monetary losses he had

23  suffered; is that correct?

24    A    Sure.  You are reading from page 11,

25  correct.

89

1    Q    Let's just go down to trespass the
2  property, there is a Section A, that would be breach
3  of contracts.  And the contract that we're talking
4  about is the contract that would be represented by
5  Exhibit 5; right?
6    A    The agreement of sale, correct.
7    Q    But then in addition to that, he would also
8  have a claim for trespassing the property; correct?
9    A    Right, that's right.
10   Q    And again, the status of Matson
11 was critical, either a licensee or invitee or
12 trespasser, would be a critical issue with regards to
13 the claims for trespassing the property, would it not?
14   A    Well, in whatever it is, the extent to
15 which it contained itself within its scope of rights
16 or exceeded its scope of rights.
17   Q    Sure.  Right.  In other words, if it
18 confined itself within the -- or if it got outside its
19 rights as a licensee, that would mean that you would
20 be entitled to trespassing; is that correct?
21   A    Sure, for instance, the no cut zone which
22 became the basis for an award of damages.
23   Q    And conversely, if they didn't have any
24 rights at all, that would enlarge his claims of
25 damages, would it not?

90

1    A    It likely would, sure.

2         THE VIDEOGRAPHER:  We have five more

3    minutes.

4         MR. CONNER:  Just give me a little bit

5    more.

6  BY MR. CONNER:

7    Q    Lastly, there was a constructive trust

8  discussion, page 12, item C; is that correct?

9    A    That is correct.

10   Q    Maybe I can ask you a question.  It says

11 "In particular, to the extent Matson has received

12 revenues from harvesting timber in violation of your

13 rights, such revenues rightly belong to you and Matson

14 is merely a constructive trustee of such revenues on

15 your behalf."

16        What did you mean by that?

17   A    What I meant by that, again, this is sort

18 of brainstorming early in the case, and I'm suggesting

19 to Bert a number of possible claims and a number of

20 possible remedies that we might seek.  I'm sorry.  The

21 theory underlying the constructive paragraph is simply

22 that if Matson had converted timber in which he had

23 ownership interests, and got revenues from that

24 timber, that he has a claim to those funds.  Of

25 course, that is duplicative of the same claims

1  arising, the same damages arising under a breach of

2  contract claim.

3      Q     Okay.  And in summary, there was a -- you

4  were outlining to him, Mr. Carlisle, he may have a

5  right to the revenues that Matson receive from cutting

6  timber that was in effect Mr. Carlisle's timber,

7  between the 1986 and 1994 time period?

8      A     Right, that's the notion here on page 12.

9      Q     So one of your parts of the investigation

10  would be to determine as to what timber Mr. Carlisle

11  owned and what timber Matson owned during that time

12  period that was cut by Matson; is that correct?

13      A     Yes, as amended by the fact that there may

14  have been or we argued that there were changes in

15  ownership interest over time.

16      Q     Now, let me just go to the next document

17  and then we can take a break at the right time.

18            (Thereupon, Hare Deposition Exhibit No. 9

19      was marked for identification.)

20      Q     I am going to show you what's been marked

21  as Exhibit 9, and it's entitled Projected Litigation

22  Budget Albert T. Carlisle v. Timber Matter.

23            And first of all, can you identify the

24  document?

25      A     Yes.  I don't recall if Bert asked us to do

93

1    exclude that in this document.

2        Q    Okay.  So in recognizing -- first of all,

3    the document that is in front of you, would this be

4    considered your engagement letter?

5        A    Well, I would call this a projected

6    litigation budget.

7        Q    This is different than an engagement

8    letter?

9        A    This is -- when I described to you earlier

10   the form of my engagement letter, I was describing a

11   document other than Exhibit 9.

12       Q    Okay.  Fine.  And as part of your

13   pre-complaint work, in addition to researching the

14   law, you were going to try to do as careful research

15   as you could of the facts that related to

16   Mr. Carlisle's case?

17       A    One tries.

18       Q    Okay.  Can you tell me, as part of doing

19   your factual investigation, just in summary what you

20   did to investigate the facts?

21       A    Well, to a very great extent, I relied on

22   Bert to provide information to me and documents to me

23   keeping in mind he had owned this property for 25

24   years by the time he came to me.  He had been

25   represented by a number of attorneys in connection

94

1  with this property over that period of time.  And he

2  was my client, and more importantly, for purposes of

3  your question, was the person, the witness, if you

4  will, with the best access to the facts.  So I relied

5  very heavily on Bert to provide me with the

6  information we needed to have.

7        Q      What other sources of information did you

8  rely on?

9        A      I don't know.  There were a number of

10  people involved.  Bert's friend Lainard Bush, provided

11  a great deal of information.  Steve Madewell, as time

12  went on, was a source of information to me.

13        Q      Any other sources other than Bert?  Did you

14  ask any people what the sources of Fisher & Young's

15  timber rights were, do you recall?

16        A      I don't recall.

17        Q      Did you ever ask them as to whether or not

18  there was any document, separate and apart from

19  Exhibit 5, that conveyed to Fisher & Young timber

20  rights on this property?

21        A      I don't recall.

22        Q      Okay.  I'd like to take a break then.

23              THE VIDEOGRAPHER:  This ends tape 1.  The

24        time is 12:01 p.m.  We are off the record.

25              (Recess taken.)

1  reference on the top, "Remembers Matson map"; is that

2  correct?

3      A    On the left, "Remembers Matson map," it

4  says that, yes.

5      Q    And then below that, there's a reference to

6  a Laurie, I will spell it, S-e-k-e-r-a-k.

7           Who did you understand she was?

8      A    I don't recall.  I believe that she -- she

9  lives in the area, that is, Warren County.  She may

10 have been an employee of the county.  She may have

11 worked in the courthouse.  I'm not sure.

12     Q    She gives a phone number of 814-726-9750?

13     A    That's a number that I wrote.  I believe

14 her name and number were given to me and I believe I

15 called her.

16     Q    You did call her?

17     A    I believe.

18     Q    And if you go to the next exhibit, take a

19 look at Exhibit 11, if you will, if you could identify

20 that document?

21     A    I can.  This is a copy of notes of a phone

22 call that I made on March 31st, 1997.  A phone call

23 with Laurie Sekerak, and the notes of my conversation

24 with her.  Apparently she -- I guess she may be

25 affiliated with an entity called REM Abstract.

99

1    Q    Okay.  And she is identified as, "Does

2  title searches"?

3    A    That is what my notes say.

4    Q    And was it your understanding that she did

5  title searches in Warren County; is that correct?

6    A    I assume so.

7    Q    And that's what is identified there, that

8  she is in Warren County.

9         Would she be doing title searches in other

10 counties?

11   A    You're asking me to make, to draw a

12 conclusion.  It's a reasonable conclusion but I don't

13 know that as a factual matter.

14   Q    Did you ask her by chance whether or not

15 she had ever done a title search on that property?

16   A    I don't recall if I asked her that

17 question.  I believe that the purpose in my calling

18 her was to locate a copy of the map that is referenced

19 in other documents but that has seemed to be

20 misplaced.  No one had a copy of it.  I think the

21 purpose was in seeing whether she had or could find a

22 copy of the map.  We thought that maybe the map had

23 been recorded.  I think that's why I was speaking with

24 her.

25   Q    It looks like from that document, at least

1   in 1997 -- we are getting ahead of the time period, we

2   are getting out of sequence, we are a couple of years

3   ahead of time.  The reason why I was asking is, that

4   once she identified herself to you as somebody that

5   did title searches, why didn't you ask her to do a

6   title search?

7        A     Well, I think we have covered this.  There

8   did not seem to be any purpose or need in doing that.

9   This is a piece of property that Bert had purchased 25

10  or more years earlier.  He was represented by an

11  attorney.  I suppose I trusted that his attorney at

12  the time did whatever title search was necessary at

13  the time he bought the property.

14       Q     Okay.  But following up that for a second,

15  he bought the property in 1970?

16       A     1969.

17       Q     And wasn't there a chance and risk that

18  whatever timber rights Fisher & Young had acquired and

19  in a sense Matson was asserting were represented by

20  timber deeds and timber agreements that were filed

21  after the time period that Mr. Carlisle acquired the

22  property?

23            MR. HABER:  Do you understand that

24       question?

25            THE WITNESS:  No, I don't.

101

1  BY MR. CONNER:

2      Q      Was there a chance in this time period you
3  represented Mr. Carlisle that Matson was asserting
4  rights that Fisher & Young had on this property based
5  on deeds and agreements that were recorded some time
6  after the time period that Mr. Carlisle was deeded the
7  land?

8      A      There was no reason to believe or
9  understand or suspect or guess or postulate that that
10 might be the case.  Is it possible, sure.

11     Q      So you did not consider that a risk, at
12 least in representing Mr. Carlisle at that time;
13 right?

14     A      That was not an issue in consideration.

15     Q      Okay.  From your understanding of the
16 conveyance law in Pennsylvania, if Fisher & Young's
17 and hence Matson's rights --

18     A      I'm having trouble hearing you.

19            THE VIDEOGRAPHER:  Counsel, you need to
20     move your hand from the microphone.

21     Q      Okay.  Of your understanding of the
22 conveyance law in Pennsylvania as it pertained to deed
23 and timber rights, what was your understanding at that
24 time period as to whether or not Fisher & Young's or
25 Matson's rights were enforceable if they were recorded

105

1      A      A number of things.  In large measure,

2   count V is duplicative, it's a different legal theory

3   and a different legal action, but duplicative of other

4   claims appearing in the complaint.  The trespass count

5   in count V alleges that the defendants committed a

6   trespass by removing trees to which they had no

7   rights, by conducting operations on the property

8   outside the time periods when they are permitted to do

9   so, by timbering in a reckless fashion, a reckless,

10  careless and negligent fashion, which caused

11  unnecessary damage to the property, including damage

12  to the streams and land, cutting trees within the no

13  cut zone, which are trees outside the rights of the

14  agreement.  And I think those are all of the premises

15  giving rise to the trespass count.

16      Q      And in defining as to what extent that

17  there was trespass by Matson, do I understand that you

18  were relying on the section in Exhibit 5 which would

19  be the 1969 agreement of sale?

20      A      That and other terms within the agreement

21  of sale, correct.

22      Q      I'm talking about that document?

23      A      That's right.

24      Q      You were not relying on any other written

25  agreement that may have existed between any other

1      A      We can look at the request for production

2   that I served but I would hope that the answer to that

3   is yes.

4      Q      Okay.  And just for completeness, do you

5   have any recollection if they ever produced any

6   document that would be considered a timber deed?

7      A      I don't recall.

8      Q      Did you ever ask -- Mr. Fossee represented

9   Matson; is that correct?

10     A      Chet Fossee, correct.

11     Q      Did you ever ask Mr. Fossee, first of all,

12  whether or not he had any timber deeds to the

13  property?

14     A      I think that's the same question.

15     Q      I'm saying verbally.

16     A      I don't recall.

17     Q      Separate and apart from asking you about

18  the verbal request for timber deeds, did you ever ask

19  Mr. Fossee for the document or documents separate and

20  apart from what we have identified here as Exhibit 5

21  which had conveyed to Fisher & Young the timber rights

22  and prior ownership of timber rights?

23     A      I apologize.  Once again, your question

24  lost me.

25     Q      I'm just trying to find out if, in your

110

1    VI and count VII were essentially the same?  And I'm

2    just trying to find out what you're thinking was.

3        A    Subject to some fine tuning, yes.

4        Q    In count V, didn't you also include any

5    claims for damages from the property that were not

6    proper practices in harvesting that would not be

7    covered by the conversion count?

8        A    That's why I said earlier that the

9    conversion is duplicative in part of the claims under

10   count V.

11       Q    Okay.  Let's go to the next set of

12   exhibits.

13            Some time in the '95, '97 time period, you

14   would have taken a deposition of Mr. Matson; is that

15   correct?

16       A    I believe so.

17       Q    Just out of curiosity, in the deposition,

18   did you ask Mr. Matson, by chance, what document or

19   documents gave him timber rights that he was asserting

20   or exercising in the '98 -- 1986, 1994 time period?

21       A    I think the transcript would be the best

22   evidence of that.  I don't recall.

23       Q    You don't have any recollection of that?

24       A    I don't recall.

25       Q    You don't recall if he made a response to

113

```
 1      A      I don't recall.

 2      Q      Okay.  Now, at the time you filed the

 3  pre-trial narrative statements, do I understand you

 4  had not yet received the expert report from Tim Hall

 5  regarding recoverable monetary damages?

 6      A      That's correct.

 7      Q      In the interim, you had received a document

 8  from Matson identifying the timbers taken off the

 9  property in the discovery proceedings; is that

10  correct?

11      A      It assume so.  I believe we received, in

12  discovery, records identifying the value of timber and

13  probably a breakdown by timber species that Matson had

14  removed over time.

15              (Thereupon, Hare Deposition Exhibit No. 14

16      was marked for identification.)

17      Q      Take a look, if you would, at Exhibit 14,

18  if you will.  The exhibit sticker is inside.  Take a

19  look.  Can you possibly identify the document as the

20  document that you obtained in the discovery

21  proceedings?

22      A      It's not Bates numbered so I can't be sure

23  when or where this came from.  And it doesn't have any

24  reference, other than some references to the Clough

25  Farm.  So I can't be sure from the face of this
```

114

1  document who generated it.  But it looks like this may

2  have been -- it looks like this may be some records

3  from Matson lumber of their harvesting and perhaps

4  sales.

5       Q     Let me see if I can handle this.

6  Generally, did you obtain or request and obtain

7  documents from Matson Lumber Company to, in effect,

8  summarize the board feet of lumber taken off that

9  property from 1986 to 1994?

10      A     Sure.

11      Q     And does that at least appear to be the

12 type of document that contains that information?

13      A     It may be.  And I think there were some

14 other documents as well.

15      Q     Okay.  And do I understand that that

16 document would have been passed on to Mr. Hall, who

17 was a forester familiar with Warren County, so he

18 could use that and other information for purposes of

19 preparing the report?

20      A     Sure.  It would have been passed on to

21 Mr. Hall and Mr. Carlisle and perhaps others.  Again,

22 I just can't testify that Exhibit 14 is a Matson

23 document.

24      Q     That's fair enough.

25            (Thereupon, Hare Deposition Exhibit No.15

1    Q    And you would have sent a copy of this to

2  Mr. Carlisle on May 7th; is that correct?

3    A    Yes, that's what the May 7th cover letter

4  is.

5    Q    It says, "I'm delighted to enclose a copy

6  of our supplemental pre-trial narrative statement";

7  correct?

8    A    Correct.

9    Q    Now, I just want to go to a couple of

10  recitals in the document.

11    A    I'm sorry, which document, the expert

12  report?

13    Q    You have the narrative in front of you, do

14  you not?  Let's just talk about the narrative and we

15  will go back to the report for a second.

16    A    So focusing on the supplemental pre-trial,

17  is that what you are saying?

18    Q    Page 2, where it says "Damages."

19    A    Very well.

20    Q    It says, "Carlisle has suffered the

21  following damages," and you talk about loss of value

22  of all trees wrongfully harvested and removed by

23  Matson in the amount of $3,313,281; is that correct?

24    A    Correct.

25    Q    And then it says, "trebled equals

117

1  $10,965,181.20."

2      A      Correct.

3      Q      Now, with regards to the $3,655,060.40,

4  that number would be derived from the Hall report; is

5  that correct?

6      A      That's right.

7      Q      Your understanding -- and maybe we can just

8  round it off.  Was is your understanding that Matson,

9  in a sense, had taken $3.6 million of timber from the

10  1986 to 1994 time period?

11      A      I believe that is what Jim Hall calculated

12  the figure to be.

13      Q      And did you know the basis upon which he

14  calculated that figure?

15      A      Sure.  The basis was the harvest records

16  that we obtained in discovery from Matson Lumber

17  company, which reflected board feet and volumes of

18  timber that had been removed, as I recall, broken down

19  by species.  That, together with the prevailing market

20  price for those various pieces of timber at the time

21  they were harvested, enabled Jim Hall to calculated

22  this figure.

23      Q      And just for purposes of completeness, this

24  would be the value of all of the timber that was

25  taken; is that correct?

118

1     A     That's -- as I recall, that is what this

2  figure represents, namely all of the timber wherever

3  located on Bert's property.

4     Q     And in Mr. Hall's report, he identified the

5  amount of board feet that were actually taken between

6  4 million and 7 million board feet, does it not?

7     A     Okay.

8     Q     You might want to take a look at that?

9     A     Are you asking me --

10     Q     Is your recollection that his report

11  identified the total amount of board feet?

12     A     I don't have a recollection.  I will look

13  here to see if it says that.

14     Q     If you go to page 7, there is a reference

15  to board feet.

16     A     I see 4.2 million board feet.

17     Q     Either under the Doyle rule that was

18  something in excess of 4 million board feet, and under

19  the International one-quarter inch rule, somewhere in

20  excess of 7 million board feet?

21     A     That what Jim says, correct.

22     Q     Now, when you get the report from Hall, was

23  this essentially what you expected as far as the

24  dollar amounts of timber taken?

25     A     What I expected when?

119

1    Q    In a sense, when you filed the complaint.

2    A    No, sir.  When I filed the complaint, I had

3  no idea what the dollar amount would be.  We had not

4  taken discovery.

5    Q    I understand that.

6        From your expectations, did you, in fact,

7  think that the number would be less than that number,

8  higher than that?

9    A    I had no expectation.

10   Q    Okay.  Now, the number here of total board

11  feet taken results in a calculation at least by Hall

12  there's a least 3.6 million of lumber taken between

13  '86 and '94; is that correct -- as you previously

14  indicated?

15   A    Right.  I believe that is his conclusion.

16   Q    Did the magnitude of that number, at least

17  in the time period we're talking about, May of '97,

18  cause you to think that it might be prudent to go back

19  and have someone do a title search of that property

20  for purposes of trying to confirm one way or the other

21  as to whether Matson had any right to that amount of

22  timber?

23   A    No, sir.  If the number had been $3.00 or

24  $300 billion, I would not have been drawn to that

25  conclusion that you suggest.

122

1     A     Go back to your question again.

2     Q     I'm just trying to understand what -- after

3  you received the Hall report, now that you received

4  the Hall report, it looks like the first report you

5  had regarding the damages, that is, the dollar amount

6  of damages that Mr. Carlisle had incurred.

7     A     The $3.6 million figure would form the

8  basis for a damage claim under count V and VI and VII,

9  together, with other counts in the complaint.

10    Q     Understood.  So the report gave you, for

11  the first time, a monetary value that you could

12  connect to each one of those counts; correct?

13    A     That's correct.  And other counts in the

14  complaint.

15    Q     Understood.  With regards to the trespass

16  count, you pointed out in an answer to a previous

17  question I asked, there is a claim for damages also to

18  the property which would relate to Matson's failure to

19  comply with industry practices regarding timber; is

20  that correct?

21    A     Yes.

22    Q     There was an additional claim for damages?

23    A     Yes.

24    Q     In the trespass count, but they are not

25  necessarily in counts V and VI --

123

```
 1      A      That's correct.

 2      Q      -- for obvious reasons?

 3             For purposes of completing that subject

 4  matter, did you have any type of damage report that

 5  summarized the damages that would be recoverable

 6  against Matson in a federal declaratory judgment

 7  action for the failure of Matson to comply with

 8  industry practices?

 9      A      Yes.

10      Q      Okay.  Where was that?

11      A      That's Exhibit 15.

12      Q      Okay.  That would also would be the Hall

13  report, but that would be the damages that were

14  recoverable from the conduct that were separate and

15  apart from the $3.6 million?

16      A      Right.  He quantifies $1.7 million in

17  damages as a result of the damage of timber left

18  standing.  And that is a consequence of what we allege

19  to be careless, negligent or reckless timber

20  harvesting outside the best practices that were

21  standard in the industry.

22      Q      That was an additional quantity of damages

23  that could be recovered in count V but not recovered

24  in count VI or count VII by definition?

25      A      I'm not sure whether the measure of damages
```

124

1   is necessarily excluded under count VII.  I'd have to

2   think through that again.  I think one could assert --

3   I think one could potentially assert a conversion

4   claim with respect to those damages too.  I just can't

5   recall right now.

6       Q       With regards to damages that were done that

7   could be categorized as erosion damages, I'm talking

8   about -- these would be damages not to timber but to

9   the property itself --

10      A       Right.

11      Q       -- in your investigation, did that indicate

12  that Mr. Carlisle had a claim for such damages?

13      A       We had asserted that in the complaint,

14  query, was, what, if anything, that would constitute

15  in terms of quantified damages.

16      Q       All right.  Was there any witness that was

17  prepared?

18      A       Pardon me?

19      Q       Was there any witnesses you retained that

20  were prepared to testify with regards to those

21  possible damages?

22      A       That was a large part of the focus of

23  Steve Madewell's review.

24      Q       And Steve Madewell is who?

25      A       Steve Madewell was another consulting

126

1  the contract and the claims we assert in the

2  complaint, those were direct damages that we believe

3  were recoverable.  The sorts of damages that you are

4  talking about were much less concrete, and there was a

5  real question whether they could even be recovered

6  much less quantified.

7      Q     Now, with regards to the complaint that you

8  filed, I believe as set forth, in ten counts if

9  I counted correctly, looking at page 21, at the last

10 count, without identifying each count by name or

11 reference, can you tell us whether or not there was

12 any action for quiet title that would have been within

13 those ten counts?

14     A     I don't think so because I don't think this

15 is a quiet title action.  This is an action to

16 determine rights under the agreement of sale.  And

17 indeed, that was the focus specifically of the counts

18 for declaratory relief.

19     Q     And just for purposes of completeness, why

20 was no quiet title action taken?

21     A     Because I was neither asked to assert a

22 quiet title claim, nor was there any reason to believe

23 that quiet title action was appropriate or advisable

24 or called for.

25     Q     And from your research and knowledge of the

127

1    law, can a quiet title action be brought to quiet the

2    title to standing timber?

3        A    I believe that is probably true.

4        Q    Okay.  And by way of -- just, again, for

5    purposes of completeness, would I understand that from

6    the time that you were at Reed Smith, you had never

7    been involved in a quiet title action?

8        A    While I was at Reed Smith?

9        Q    Yes.

10       A    I don't recall.

11       Q    At the time that you were with Mr. Bartony

12   and yourself up until the time you started to

13   represent Mr. Carlisle, I take it you had never been

14   involved in a quiet title action?

15       A    None that I can recall, but I can't be

16   sure.

17       Q    I take it that the subject of a quiet title

18   action was never part of your discussions with

19   Mr. Carlisle?

20       A    That's correct.

21       Q    Let me then move forward with regards to a

22   couple other matters, so we can talk about the trial,

23   and end the pre-trial matters.

24        I notice that Jack Kookogey's name is in the

25   agreement of sale which is Exhibit 5.  I think you

128

1   pointed out that Jack Kookogey's name is on the

2   document.

3           You recognize Jack Kookogey is a lawyer, at

4   least you thought he was a lawyer.

5       A    Correct.  That's my understanding.

6       Q    And it looks like he was actively involved

7   in representing one or more parties in the agreement

8   of sale upon which you were interpreting on behalf of

9   Mr. Carlisle?

10      A    I don't know what you mean by "actively

11  involved," but my recollection is that Mr. Kookogey

12  was the attorney who drafted the agreement of sale.

13      Q    Okay.

14      A    My recollection is that he did that as the

15  attorney for Fisher & Young.

16      Q    Did you ever subpoena his file?

17      A    I don't recall.  I do recall examining

18  him.  I believe he was a witness at trial.  I believe

19  I cross examined him.

20      Q    You don't recall reviewing his file

21  separate and apart from that subpoena?

22      A    Well, certainly, I served document requests

23  on Matson, and certainly I asked that they produce any

24  documents not only in their possession, custody or

25  control, but that of their attorneys and accountants

129

1   and so forth.  I don't recall whether we got documents

2   that came from Mr. Kookogey's office.  We may have.  I

3   don't recall.

4        Q     Maybe to complete that subject,

5   Mr. Kookogey would have been an independent contract

6   or, would he not, as to Matson?

7        A     I didn't know what relationship, if any, he

8   had to Matson.  I don't recall.  I don't know if he

9   was asked that question in his testimony at trial.  It

10  might appear on the record.

11       Q     In any case, you don't recall issuing a

12  subpoena to Mr. Kookogey?

13       A     I don't recall.

14       Q     In the summer of 1997, were you asked to

15  make a settlement demand in this case on behalf of

16  Mr. Carlisle?

17       A     I don't recall when the topic of settlement

18  came up and I don't recall whether Bert asked me to

19  make a demand.  I do recall that we actually filed a

20  motion with the court pursuant to the local rules,

21  asking that the court refer this case to mediation.

22  And in fact, we conducted a nearly day-long mediation

23  in front of Nora Barry Fischer, whose office is across

24  the street.

25             (Thereupon, Hare Deposition Exhibit No. 17

130

1        was marked for identification.)

2    BY MR. CONNER:

3        Q    I'm showing you a document that's marked

4    Exhibit 17.  The purports to be a letter of June 24,

5    '97, prepared by yourself.

6            Do you recognize it as such?

7        A    I do recognize that.

8        Q    Do you recognize that to be the demand

9    letter that you prepared and sent in this case?

10       A    That's what it is.

11       Q    And then sent to Mr. Fossee to review?

12       A    Exactly.

13       Q    And sent a copy to Mr. Carlisle?

14       A    That is correct.

15       Q    Do you have a recollection as to what

16   prompted that settlement demand letter?

17       A    Yes, the mediation session the day before

18   as I recount in the first sentence.

19       Q    The mediation that took place the day

20   before, as you have indicated, was there a demand made

21   at the mediation?

22       A    Yes.  The next sentence says, "Let this

23   letter confirm the demand that we set forth at that

24   time," the mediation session yesterday.

25       Q    And that was $5 million?

131

1    A    $5 million together with Matson's agreement

2  to vacate the property.

3    Q    And meaning vacating the property, leaving

4  the property at that time period and never coming

5  back?

6    A    Correct.

7    Q    As that was -- as I understand that, that

8  was one of Mr. Carlisle's primary goals, was it not?

9    A    It was the overriding goal.

10    Q    The overriding goal was to get them to

11  leave?

12    A    Right.

13    Q    And that was your assignment, to try to see

14  if you could do that; is that correct?

15    A    My assignment was to assert his rights

16  under the agreement.  And the objective or the goal of

17  that assignment was to get Matson Lumber off the land,

18  if possible.

19    Q    Now, at the mediation session, did Matson

20  make an offer?

21    A    No, Matson refused to make any offer.

22    Q    Subsequently, the sequence of events, the

23  next letter I have is a July 21st letter that is from

24  Mr. Fossee, that I don't think is really responsive to

25  your letter.

**Plaintiff's Appendix**
**000278**

133

1  negotiations.

2      Q      Is that what you were trying to do?

3      A      Naturally.  The timber company was

4  uninterested in settling and never believed at any

5  point in the litigation, even after we won, that it

6  had any liability or exposure.

7      Q      What reliance, if any, were you making on

8  the Hall damage report for purposes of making the $5

9  million demand?

10      A      Evidently, I had this report in hand at the

11  time of the mediation and at the time of my letter

12  demand.  So I don't know what reliance I was making on

13  the Hall report, although the $5 million figure

14  certainly is in keeping with the sorts of numbers that

15  appear in Jim's report.

16      Q      Certainly, but there was an indication of a

17  taking of $3.6 million in trees and there was another

18  indication of $8 million in damages to tree.

19      A      That is all premised on the notion, by the

20  way, that Matson was never entitled to remove anything

21  because of the provisions under 15(a) and 15(b.)  The

22  court ultimately decided that question against us.

23      Q      Just out of curiosity, when that issue was

24  decide asked against you, and I'm going forward

25  because that is later in time I believe --

Plaintiff's Appendix
000279

134

1      A      That's correct.

2      Q      -- were you aware at that time that there

3  might be a timber deed that passed timber rights from

4  Mrs. Kinkead to Fisher & Young that may have been

5  recorded after Mr. Carlisle's?

6      A      Let me see if I can make this easy for you.

7  I was never aware of that.  I'm not aware of that to

8  this instance.  You made a number of references to

9  that today.  I have no information regarding that.

10     Q      Okay.  Now, with regards to the $5 million,

11  in light of what you just said, did you think that

12  demand was reasonable?

13     A      As I said, I thought the demand was an

14  aggressive demand that was intended to bring about

15  some settlement negotiations.  I can also tell you

16  that the strategy was, if we could get them to go off

17  the property, even in the absence of any payment of

18  money damages, we would have achieved our goal.

19             I believe the thinking was that by building

20  in a very substantial money component to our initial

21  demand, we would have substantial room to move on that

22  aspect of the demand, of the settlement demand, and

23  including going down as far as to zero in exchange for

24  getting Matson off the property.

25     Q      That was the primary goal, was to try to

135

```
 1  figure out a remedy of a procedure that could get them
 2  off the property?
 3      A    That was the goal.  If they wanted to pay
 4  us $5 million along the way, we would be happy to take
 5  it.  No one anticipated or believed or expected at the
 6  time we made this demand that here would be a payment
 7  of $5 million.
 8      Q    So, again, just to maybe complete the
 9  subject, I asked you whether or not that was a
10  reasonable demand or not, and I don't think I got an
11  answer.  Can you tell me whether or not --
12          MR. HABER:  I think he did answer.  I think
13      he told you he thought it was an aggressive
14      demand.  I think he explained it to you.  You
15      want a yes or no answer, but he didn't answer it
16      with a yes or no.
17          MR. CONNER:  I understand.  Yes.  Let me
18      rephrase the question.
19  BY MR. CONNER:
20      Q    Are you able to tell us whether or not it
21  was a reasonable or unreasonable demand?
22      A    I don't know what you mean by reasonable.
23  I can tell you that I believed it was not only
24  reasonable but an advisable settlement strategy on our
25  part to make this demand or I wouldn't have made it.
```

145

1   Bert can assert.  If Matson owns the timber, Matson is

2   entitled to damage its own property.

3       Q     All right.  Maybe just to pursue that for a

4   second, did Matson ever prove at the time of trial

5   that they owned that timber?

6       A     I don't know if that was an issue in

7   dispute.  I don't know what proof or evidence was

8   offered on that point.

9       Q     All right.

10      A     Plaintiff certainly did not -- well,

11  plaintiff asserted that Matson did not based on

12  theories and reasons that we have already talked

13  about.

14      Q     But at the time of trial, you don't have a

15  recollection that Matson affirmatively proved that

16  they owned the timber other than what I'll call the

17  1969 agreement of sale between Mr. Carlisle and Fisher

18  & Young?

19      A     I don't think that was an issue in dispute

20  in the trial.

21            Matson Lumber had filed counterclaims

22  against Bert Carlisle, including claims for damage by

23  Bert or his agent to timber owned by Matson Lumber

24  Company.  Had those counterclaims preceded the trial,

25  who knows, maybe that would have been an element of

149

1   jury answered was the width of the no cut zone.

2       Q      And was the jury finding a 100 foot no cut?

3       A      I think that's right.  I think they gave us

4   the widest possible reach of the no cut zone, which of

5   course, has the effect that forever after, the timber

6   company is forbidden from that 100 foot stretch.

7       Q      And they gave you about 25 percent of the

8   damages that Mr. Hall estimated?

9       A      Yeah.  So for Allegheny County or Western

10  Pennsylvania, that is not a bad jury verdict.

11      Q      Let me then go back to the trial itself.

12  With regards to the dismissal of any counts, do you

13  have any recollection of any of the counts being

14  dismissed?

15      A      Sure, I do.

16      Q      What is your recollection of that?

17      A      You're speaking, I gather, other than

18  summary judgement?

19      Q      Yes.

20      A      Okay.  We -- as I say, when we learned at

21  the final pre-trial conference that the court had

22  grant, sua sponte, the motion for summary judgement,

23  at least in part, I forget what all defendants were

24  asking to be dismissed in their original motion, at

25  that point, we had to do some pretty quick and pretty

150

1  extensive restructuring of our trial strategy.  And in
2  connection with that, we talked to Bert, and the idea
3  of carving out a part of the case to pursue in a
4  separate action.  The idea, the underlying strategy
5  was that we're going forward.  Obviously, these counts
6  for declaratory relief were of principal importance to
7  him.  You see those are the counts that appear at the
8  front end of the complaint, counts I and II and so
9  on.  We thought that it would be worthwhile and
10 advisable to have some damage claims in there and even
11 a couple of home run claims if you will, much like in
12 our demand letter.  We had this $5 million demand as
13 part of the overall settlement.  We thought that it
14 would have been useful to have some big number claim
15 in the case when we take it to jury, to the extent
16 we're able to.
17        Indeed, that's what gave rise to Jim Hall's
18 original damage report with these very substantial,
19 very sizable numbers in the millions of dollars.  We
20 had no particular confidence that we would recover a
21 figure like that at trial.  And I think you see from
22 the observations you had with respect to Exhibit 20
23 that the jury was conservative with respect to money
24 damages.  In any event, the objective was to go to
25 trial with our declaratory judgement claims, but also

151

1   some big number claim if we could put one together.

2           As of the week before trial, we had a big

3   damage claim that we had put together, and that is

4   embodied in Jim Hall's original report, Exhibit 15.   A

5   week before trial, the judge took that away from us.

6           And we suggested to Bert that if he wanted

7   to proceed on some big dollar damage theory, that

8   maybe a way to do it would be to carve out a part of

9   the pending claim and allow him to file that in

10  another proceeding and try to develop that and move

11  forward with that.

12      Q    When did that discussion that take?

13      A    That was after the final pre-trial

14  conference with the judge.

15      Q    And who was present at that discussion?

16      A    There may have been multiple discussions.

17  Certainly, we talked about it in person in a meeting

18  attended by Bert, myself, I think Lainard Bush may

19  have been there.   I believe we discussed it in one of

20  these strategy sessions that Mike Bruzzese attended.

21          Again, the idea was, you know, if you want

22  to go after Matson Lumber Company for some big dollar

23  claim, this is a way of doing it, recognizing that the

24  claim that we also thought we could go forward on now

25  had suddenly been taken away from us.

1          Obviously, we were able to go forward on

2   and prevail on all of our claims for declaratory

3   relief and a subset of our claim for damages.

4       Q    The big dollar claim, that was within count

5   V you said; is that correct?

6       A       No.  The big collar claim appears riddled

7   throughout the complaint, because virtually every one

8   of those counts would entitle -- to the extent we were

9   able to proceed on them, every one of those counts

10  would have entitled Bert to at least make a claim for

11  damages like those set forth in Exhibit 15.

12      Q    Okay.  So those would include counts V, VI

13  and VII; is that correct -- as well as other claims?

14      A    Yeah.  The breach of contract claims, the

15  trespass claims, conversion, accounting, all of

16  those.  Again, that is all premised on the underlying

17  argument that the option agreements had been

18  violated.

19          (Thereupon, Hare Deposition Exhibit No. 21

20      was marked for identification.)

21      Q    Let's go back for a second.  Exhibit 21,

22  that is the stipulation for dismissal.  It looks like

23  it's a December 15, '97 date?

24      A    Yeah.  I think this was the morning of the

25  first day of trial.  And this is a rule 41

153

1  stipulation.

2      Q     What is rule 41?

3      A     Rule 41 is a rule of federal procedure that

4  allows the parties to dismiss an action or counts

5  within an action under various terms, depending on

6  what the circumstances are.  For instance, a plaintiff

7  can dismiss it unilaterally at certain stages of the

8  case.  At other stages, the consent of all parties is

9  required.

10            In this case, because the litigation had

11  progressed as far as it did, it was necessary to have

12  the consent of all parties.  And that's why we

13  provided for and obtained the consent of the

14  defendants through their counsel, Chet Fossee.

15            Of course, rule 41 provides that a

16  dismissal is without prejudice to re-filing the claim

17  unless the parties expressly set forth that the

18  dismissal is with prejudice.

19            Of course, the stipulation for dismissal

20  that we prepared is not with prejudice.

21      Q     First of all, did you obtain Mr. Carlisle's

22  permission to dismiss count V?

23      A     Absolutely.

24      Q     When did you obtain that permission?

25      A     Prior to preparing the stipulation for

154

1  dismissal and presenting it to Chet Fossee and to the
2  court.
3      Q     Where did you obtain permission?
4      A     In my small conference room on the 18th
5  floor of this building.
6      Q     Who was present when you obtained
7  permission?
8      A     I was there, Bert Carlisle, Mike Bruzzese
9  was there, and as I said, I believe Lainard Bush may
10 have been there, but I'm not certain about that.
11     Q     What representations, if any, did you make
12 to Mr. Carlisle that he could re-file, in a sense,
13 what is set forth in count V and the second action?
14     A     I explained to him what I just explained on
15 the record, namely, the purpose and affect of rule 41
16 and the difference between a stipulation with
17 prejudice -- pardon me.  A dismissal with prejudice
18 and a dismissal without prejudice.
19           In fact, I recall after returning from
20 the -- after leaving the pre-trial colloquy with the
21 judge, on the morning -- I guess it was
22 December 15th, I recall reporting to Bert how
23 delighted I was that Chet Fossee had in fact agreed to
24 signed the stipulation for dismissal without even
25 raising the issue of prejudice.

1          Frankly, I thought he was asleep at the

2    switch and I thought we had got one over on him in

3    effect as a strategic matter.  And I recall explaining

4    that to Bert and explaining that I was pleased with

5    that result.

6        Q     What kind of research, if any, did you

7    conduct at that time, or prior to that time, for the

8    purpose of trying to identify whether or not any

9    re-filing of count V, either in state court or federal

10   court?

11       A     I'm not sure to what extent they are, if

12   it's a dismissal without prejudice.  I don't know what

13   research if any we did at the time on that question.

14       Q     Okay.  You don't recall?

15       A     I don't recall.

16       Q     Was it your anticipation from discussions

17   with Mr. Carlisle -- let me rephrase the question and

18   restate it.

19             Did you represent in whole or in part --

20       A     Pardon me?

21       Q     Did you represent in whole or in part in

22   discussions with Mr. Carlisle that he could re-file

23   these claims that are set forth in count V in state or

24   federal court?

25       A     Not only did I represent that, I told him

Plaintiff's Appendix
000289

1  that that is something that we could do.  That was the

2  whole idea behind carving out that bit of count V.

3  And moreover, I prepared the pr(i)rit of

4  summons that was subsequently filed in Warren County

5  in the Court of Common Pleas.

6       Q     You are getting ahead of yourself.

7             With regards to the quantification of

8  damages that could be recovered in a re-filed action,

9  what was your understanding of the quantification of

10 damages that could be recovered in that action?

11      A     In my view, it was about zero because this

12 was the weakest part of our case.  This was the least

13 compelling part of our case.  There was this idea that

14 Bert could develop a hunt club on the property and

15 he'd make millions of dollars by operating some hunt

16 club.  Juries don't give you money because you talk

17 about some hunt club you'd like to develop.

18      Q     What about with regards to damages to the

19 property itself?

20      A     That was the theory, that as a result of

21 Matson's inartful harvesting practices, the earth had

22 been so badly scarred that he couldn't develop this

23 hunt club that he otherwise would have developed,

24 putting aside that for 25 years before Matson Lumber

25 Company started timbering, there was never any

157

1  evidence that he had taken any steps to develop this

2  hunt club.  In fact, as I recall, the whole idea was

3  Steve Madewell's.  And these kind of speculative

4  theories just don't lead to jury damage awards.

5        My view is, what kind of damages he could

6  have got on theory in a trespass claim, it's probably

7  about zero.

8     Q    Was it your understanding that from the

9  standpoint of dollar damages that at the conclusion of

10 the December 1997 trial that -- let me state this

11 right.

12       What was your perception, if any, as to

13 what the residual dollar damages that Mr. Carlisle

14 could recover from Matson in any subsequent action?

15    A    Residual, you mean how much, what remained

16 to be collected on?

17    Q    Right.  Right.

18    A    What I just said, zero.  I don't believe

19 what we dismissed was a compelling case that gave rise

20 to any kind of significant damages.

21    Q    Was there any portion of damages that were

22 articulated in the Hall reports, because there's three

23 Hall reports --

24    A    Right.

25    Q    -- that could have been recovered in any

158

1   re-filed action that you know of?

2       A     Not in light of the court's ruling with

3   respect to the option issue.  Maybe Bert could have

4   filed a cross appeal with respect to that question.

5   That happened at the hands of other counsel.  We were

6   no longer representing Bert on appeal to the Third

7   Circuit.  To my knowledge, he never did file a cross

8   appeal to try to resurrect that damage claim with

9   respect to the option question and all of the counts

10  of the complaint that derived from that.

11             (Thereupon, Hare Deposition Exhibit No. 22

12      was marked for identification.)

13      Q     Let me just keep on going.  Let me show you

14  this, Exhibit 22, which is a portion of the

15  proceedings in federal court.  It is just excerpts,

16  which I picked out of the basics.  I just want to ask

17  you some questions about that.

18      A     Sure.  Forgive me.  You've got a cover

19  page, and then the first page you have is 104, and at

20  line 1, can you tell me who is speaking?  It might be

21  the Court.  I don't know.

22      Q     It might be the Court.  That wasn't the

23  reason why.  I see down below, Mr. Hare, at line 19.

24  That's the only thing I was referring to.

25      A     Is this closing arguments?

160

1  was, I think, a lot of witnesses that spent a lot of

2  time talking about how they perceived there to be

3  damage to the property.  I'm trying to pull a verdict

4  from a jury.  I'm trying to get them to focus on the

5  issues that are in front of them.  That's what I'm

6  talking about.

7      Q    I understand.  Let me just ask you to

8  review this portion of this and ask you a question.

9          I believe this is you speaking.  It says,

10  "I appreciate your patience as you sat through a long

11  elaborate talk about how badly the farm was damaged

12  and not damaged, how badly the trees were marked up or

13  not, how many times the stream was subject to erosion

14  or not.  Those are clearly important issues.  They are

15  important issues for another case another day."

16      A    Correct.

17      Q    That, in a sense, is a reference to the

18  possibility of filing an action for those damages at a

19  later date?

20      A    That's right.

21      Q    My understanding of your testimony on that

22  issue is that you did not think there were any

23  recoverable damages quantified that were recoverable

24  under that context; is that right?

25      A    I'm sorry.  You are asking whether my view

163

1    '95, meaning that you could have gone back two years

2    if the conversion statute had provided a viable

3    remedy; you could have gone back to any conversion

4    between '93 to March '95?

5        A    Essentially, yes.  I take some issue with

6    part of that question.

7            There is a common law cause of action for

8    conversion and there's a statute.  And we asserted a

9    count for conversion that derives from both the common

10   law and the statute.  But in any case, yes, it's a

11   two-year statute of limitations.  We could only

12   recover damages on that claim going back for a period

13   of two years, roughly some time in '93.

14       Q    So if your investigation led you to believe

15   that Matson had converted Mr. Carlisle's timber

16   between '93 and '95, then Mr. Carlisle would have had

17   a remedy under the conversion statute in the common

18   law for that conversion; is that correct?

19       A    We did conclude that Matson Lumber Company

20   converted his timber between '93 and '95, and

21   thereafter.  They continued to convert, under our

22   theory, after we filed the complaint because they

23   didn't halt their timbering operations.

24       Q    Understood.  I'm talking about separate and

25   apart from the timbering in the no cut zone because we

1   under seal.

2       Q     If I understand, when you say "too

3   difficult," didn't Jim Hall quantify the timber that

4   was taken by years?

5       A     He did, but that's not what this issue is.

6   This issue is, if you're talking about timber to given

7   stump within the no cut zone, can you tell me whether

8   that was cut within the last two years or prior to two

9   years ago?  That's what's impossible to determine.

10      Q     You could determine a dollar amount?

11      A     Yes, but if you look at Matson's chart, we

12  harvested 1.2 million board feet in '86, that doesn't

13  tell you where in the property it came from, whether

14  it was within or without the no cut zone.

15            Prior to the revisiting of summary

16  judgement, that was not a question we had to deal

17  with.  Once the court dismissed our option theory, and

18  we're limited now to the no cut zone trees, then

19  determining when those trees had been cut was an

20  impossibility.  There are no records that set that

21  forth.  Visual inspection, unless it's very fresh cut

22  timber, would be unavailing.

23            As I say, it was all unnecessary because we

24  got the same damages under our contract claim.  And

25  that is the subject of the amended report that we

166

1  talked about, Exhibit 20 I believe.

2      Q      So if I understand it, as far as the timber

3  taking outside of the no cut zone, and putting aside

4  the question of your arguments under 15(a) and 15(b)

5  that the court ruled on sua sponte, prior to trial, it

6  was your understanding -- was it your understanding

7  that Carlisle had a right to take that timber outside

8  the no cut zone in the time period '93, '94 and '95?

9      A      I'm sorry.  You are asking if it was my

10  understanding that Bert Carlisle had the right to cut

11  in the no cut zone?

12          MR. HABER:  You said Carlisle.

13          MR. CONNER:  If I did say Carlisle,

14      I apologize.

15      A      Let's strike it and start over.

16      Q      I'm just trying to get to the bottom of

17  this.

18          Recognizing that the court has granted a

19  motion for partial summary judgement on your option

20  argument 15(a) and 15(b) and taking that off the

21  table.

22      A      Right.

23      Q      Was it your understanding that Matson had

24  had a right to take that timber which it took in the

25  '93, '94, '95 time period, other than the timber that

167

1    it had taken in the no cut zone?

2        A    Whether they had the right to or not, we

3    were not permitted to proceed to the jury on that

4    claim.

5        Q    But did you make a determination one way or

6    the other as to whether or not they had a right to

7    take that timber?

8        A    The court made the determination.

9        Q    Okay.

10       A    You see.  And the court determined that

11   they did, and that our option claim was unavailing.

12   To my knowledge, no cross appeal was taken on that

13   issue.

14       Q    And if I understand, just to complete the

15   subject, you didn't make any argument or claim in that

16   federal declaratory judgement action that Matson's

17   rights were really based on a timber deed whose rights

18   had expired as of the time period of '93, '94, '95; is

19   that correct?

20       A    I don't believe I made any claim to that

21   effect.

22       Q    Okay.

23       A    I'm unaware of any claim to that effect.

24       Q    Now, just so I understand it, it says,

25   "Mr. Hare:  We are prepared to withdraw that."

168

1          So do I understand that in effect, you were

2   withdrawing any conversion claim; is that correct?

3   And the reason why I that, I didn't see a document

4   that was similar to the other documents.

5       A     A rule 41 stipulation?

6       Q     Yes.

7       A     What I'm saying, if I recall, this page 76

8   is taken from the portion of the transcript that

9   transcribes the colloquy with the judge after both

10  parties had rested and before closing and the jury

11  charge.  And there was a potentially prickly proof

12  issue here; and that is, if we're going to ask for an

13  award under count VII for conversion with regard to

14  the timber in the no cut zone, how do we know what

15  portion of that timber was removed within two years.

16          And I said, "Judge, we can obviate that

17  issue because I get the same damages on breach of

18  contract and we are going to go forward seeking those

19  damages on breach of contract."

20          And the jury gave us those damages on

21  breach of contract.  There was no need to answer this

22  impossible question.

23      Q     Okay.  okay.  All right.  Let me then just

24  go back for a second.  In your discussions with

25  Mr. Carlisle about the withdrawal of count V, was

169

1 there any written document prepared by you that would

2 have been shown to Mr. Carlisle to evidence his

3 consent of the withdrawal of count V, if you know?

4     A    You're asking did I ask my client in the

5 days before trial to sign a consent to dismiss count

6 V?  No, I did not.

7     Q    Any type of document?

8     A    Yeah.  Exhibit 21 is a document that

9 manifests his consent because I talked to him before

10 doing this.

11    Q    I'm just trying find out if there is any

12 document that bears his signature or refers to him

13 that you talked to him, a memorandum or anything like

14 that?

15    A    No.  I didn't anticipate that 10 years

16 later, I'd be getting sued over this.  I didn't ask

17 him to sign a document confirming his consent.

18    Q    Let me just move forward for a second.

19 With regards to the claims under the conversion

20 statute which is made reference to on page 76, what

21 discussions, if any, can you recall that you had with

22 Mr. Carlisle about that?

23    A    I'm not sure if I had any discussions with

24 him on that topic.

25    Q    Let's go forward a second.