171

1  he got from the jury was sizable and represented all

2  of the damages he was ever likely to recover in light

3  of the pre-trial rulings in this case.  Obviously, had

4  we been permitted to proceed on the theories espoused

5  in the first expert report, we would have argued for a

6  different number.

7      Q    I am showing you Exhibit 23.

8          (Thereupon, Hare Deposition Exhibit No. 23

9     was marked for identification.)

10     Q    This is a document that purports to be a

11  letter.  Attached to it is a mediation statement, to

12  Albert T. Carlisle.

13         Was this a document that you had prepared,

14  that is the mediation statement prepared for the Third

15  Circuit, as a consequence of the mediation

16  proceedings?

17     A    Yes, it is.

18     Q    And by reading this, it refreshes your

19  recollection that Matson did take an appeal, and

20  summarizing the issues, among, other things that were

21  presented on appeal; is that correct?

22     A    It appears, yes.

23     Q    Among other things.

24     A    I'm not sure to what extent I was

25  characterizing Matson's issues on appeal.  I just

172

1    don't recall as we sit here.

2        Q      In the documents itself, I want to first of

3    all address the Carlisle settlement position.

4        A      Pardon me?

5        Q      I want to address Carlisle's settlement

6    position discussed on page 5.

7        A      Okay.

8        Q      You prepared this; is that correct?

9        A      That's right.

10       Q      And what was the amount of damages that you

11   were requesting in this mediation document?

12       A      It appears that we indicated that we would

13   agree to settle for the same terms that we had

14   proposed during the pre-trial mediation.

15       Q      Maybe we can refer to page 6.

16       A      Right.  Matson leaves the property and pay

17   $5 million.

18       Q      It was a demand that you were making on

19   behalf of Mr. Carlisle.  This would have been three

20   months or four months post verdict?

21       A      Roughly, yes.

22       Q      And with regards to the $5 million that was

23   being claimed in the settlement demand, again, did you

24   perceive that to be a reasonable demand?

25       A      I perceived that demand to be a well-

1  calculated demand to try to prompt settlement

2  negotiations.

3       Q    Okay.

4       A    I didn't anticipate that Matson would agree

5  to pay $5 million.

6       Q    What kind of response in a dollar amount

7  were you hoping to elicit by making a $5 million

8  demand?

9       A    I was hoping to get Matson to leave the

10 property.

11      Q    So from a standpoint of the components that

12 made up the $5 million demand now post-trial, did they

13 change at all pre-trial to post-trial?

14      A    That's the same number.  Again, I'm not

15 sure to what extent there were "components," to use

16 your terms.  It's the same dollar amount that we had

17 demanded pre-trial.

18      Q    I notice in the upper part of page 6, there

19 was a reference that says, "Although Matson does not

20 yet know this fact, Carlisle intends to file another

21 lawsuit in state court to recover for the damages that

22 Matson has caused the property by reason of careless

23 harvest practices"; is that correct?

24      A    Right.

25      Q    With regards to -- and then you go on and

Plaintiff's Appendix
000302

174

1    state, "For example, Matson has caused tons of topsoil

2    to wash into Spring Creek, has placed skid trails in

3    and through the Clough Farm streams, and has generally

4    damaged the land and the health of the forest."

5           Did you have an idea at least at the time

6    that you prepared this letter that there was a dollar

7    amount of damage that could be claimed that would fit

8    within that category?

9    A     That could be claimed, sure.

10   Q     What was the dollar that could be claimed?

11   A     Any dollar number you want to assign to it.

12   This is the same thing that I described before as

13   being in my view not likely to lead to any substantial

14   jury award.

15   Q     Understood.  I was just trying to find out

16   if you had a specific dollar amount?

17   A     No.  No.

18   Q     And at least at this point in time period,

19   was it your understanding in March of 1998 that you

20   were going to re-file the second action on

21   Mr. Carlisle's behalf?

22   A     Correct.

23   Q     And it was going to be re-filed in state

24   court; is that correct?

25   A     That is correct.

Plaintiff's Appendix
000303

176

1    Q     So you were in Warren County on several

2  occasions with regards to the Carlisle claim; is that

3  correct?

4    A     With regards to the Carlisle claim and for

5  social get-togethers.

6    Q     Again, for completeness, on any of those

7  occasions, did you go to the courthouse or the

8  recorder of deeds?

9    A     I am going to have to give you the same

10  answer I gave you before.  I don't believe so.

11          (Thereupon, Hare Deposition Exhibit No. 24

12      was marked for identification.)

13    Q     I am showing you, Mr. Hare, what has been

14  marked Exhibit 24.  It purports to be a letter of

15  June 23rd, '98 to Lainard Bush; is that correct?

16    A     Correct.

17    Q     Just give me the background or the purpose

18  of that letter?

19    A     This is to transmit to Lainard for filing

20  in the Court of Common Pleas of Warren County, a

21  prb.rit of summons that I prepared on Bert's

22  behalf.

23    Q     And this was to initiate the second action

24  that we talked about with respect to that other

25  document; is that correct?

177

1      A      That's correct.

2      Q      And was there some urgency at that time

3  period from your perspective for that second action to

4  be re-filed?

5      A      Not that I recall.

6      Q      So there wasn't any time constraint?

7      A      Not that recall.

8            (Thereupon, Hare Deposition Exhibit No. 25

9      was marked for identification.)

10      Q      I'm going to show you what has been marked

11  as Exhibit 25.  I'd like to see if you can identify

12  that document if you would.

13      A      This is a copy, although it's been

14  obviously attached as exhibits in other proceedings, a

15  copy of the filed pr(a)rit of summons, the

16  unsigned, unfiled original or draft of which was

17  enclosed in Exhibit 24.

18      Q      If I understand it correctly, the actually

19  typewritten portion of that document, that would have

20  been prepared under your supervision?

21      A      In fact, I probably did the key stroking.

22      Q      And with regards to the claim or claims

23  that were being included under this writ of summons,

24  why don't you tell me what you perceived to be the

25  claim or claims that would have been covered by the

178

1   summons?

2       A       Anything under the sun.  Pennsylvania State

3   Court writ of summons standing alone does not identify

4   the claims being asserted.

5       Q       And with regards to your perception, with

6   regards to the potential claims that Mr. Carlisle had

7   that would be that were dismissed from the prior

8   action, which of those claims would have been included

9   in this particular writ of summons?

10      A       Any or all of them.  The objective was that

11  this would be the action in which he proceeds with the

12  trespass claims.  Certainly, this could -- this action

13  could be a vehicle for him to assert any other claims

14  that he believed he had, including any new claims that

15  may have arisen since the day of the verdict.

16      Q       Okay.  Now, the reason why I asked you if

17  there was any you were referring to, I see in the

18  second sentence of the first paragraph, it says, "The

19  filing of this pr(2)initiate a new lawsuit on

20  Bert's behalf against Matson" --

21      A       I'm sorry.  Are you looking at the letter?

22  Okay.

23      Q       -- "and toll the running of any statute of

24  limitation."

25      A       Right.  That's what a writ of summons --

Plaintiff's Appendix
000306

179

1    I mean, that's the effect that a writ of summons has.

2        Q    Understood.  What statute of limitations

3    were you referring to in that letter, if you recall?

4        A    I say, "toll the running of any statute of

5    limitations," so any statute of limitations.

6        Q    Okay.  Were you concerned about any

7    particular statutes of limitations, in the latter part

8    of June of 1998 that had you thought were particularly

9    relevant to any claim or claims that Mr. Carlisle had?

10       A    Not in particular, other than, as I recall,

11   I wanted to -- if I remember, there may be an issue

12   under federal rule 41 to filing within a year after

13   the filing of the stipulation.  I'm not -- I don't

14   recall about that.

15       Q    Let me just pursue that for a second.  In

16   your mind, did the effect of filing this writ of

17   summons in June '98 save or resurrect any of the

18   claims that you filed in the previous complaint for

19   purposes of the statute of limitations?

20       A    Well, I believe that most of the claims he

21   filed in his complaint had been litigated.  To the

22   extent we dismissed count V, I believe that the filing

23   of the prii.rit of summons effected a tolling

24   or a savings with regard to the running of the statute

25   on count V.

180

```
 1      Q      Okay.  That was the, as I recall, trespass
 2  claim?
 3      A      Correct.
 4      Q      And just again, for purposes of
 5  completeness, would that also fall under the statute
 6  of limitations that the conversion claim you may have,
 7  recognizing that conversion and trespass are sometimes
 8  considered the same?
 9      A      The answer is I don't know.  I don't recall
10  ever giving thought to that question.
11      Q      Okay.  Okay.  The other part of the
12  question I have is, there is a reference in the second
13  paragraph about signing the pr(i)rt's behalf
14  and taking it to the courthouse for filing.
15             If there wasn't any urgency in filing, why
16  were you asking Mr. Bush to do that?
17      A      If you don't -- I'm not sure.  I'm not sure
18  there was any urgency, but I can tell you the reason
19  I'm asking Lainard Bush to do that is, first of all,
20  my understanding was that Bert had authorized him to
21  do that.  And secondly, Lainard was sort of the artist
22  and resident on Bert's property in Warren County.
23  Bert lives in Ashtabula County.  It's almost two hours
24  away.  It was much easier for Bert if Lainard would
25  sign the priii.ake it to the courthouse for
```

182

1  Circuit.

2            And the subject matter of these notes -- by

3  the way, Exhibit 28 are my notes of a phone call with

4  Adam Freid who I believe is or was an associate of

5  Mr. Krembs.  This likewise was in the summer of '98.

6  It probably is within a few weeks after I sent the

7  prc.rit of summons to Lainard Bush.  Peter

8  took the view and his associate Adam Fried took the

9  view, as I understand it, that the dismissal without

10  prejudice under rule 41 was not effective to toll the

11  statute of limitations under the Pennsylvania savings

12  statute.  And that's the position that they expressed

13  to me in a couple of phone calls.

14            Exhibits 26 and 27 appear to be notes that

15  I made in doing some research on the question under

16  the Pennsylvania statute, title 42, section 5335.  I

17  see notes of a couple of cases that I had looked at.

18  And then my phone call with Adam Freid came later.

19  Peter Krembs raised this issue with me that in his

20  view, our stipulation was not effective to toll the

21  statute of limitations.  He raised that I think the

22  first time we spoke.  Then in follow-up conversation,

23  I spoke with Adam Fried.  And Exhibit 21 -- pardon

24  me -- 28 is a copy of my notes of my conversations.  I

25  think I had two with Adam.  This would have been one

183

1  of my phone calls with Adam Freid regarding this

2  issue.  You can see, I got topic 1 here, q. "Re: Sol +

3  tolling statute,"  statute of limitations.

4        I think Peter had asked Adam to research

5  the same question.  And here they are in the summer of

6  1998.  At this point, their Bert's attorneys and

7  they're saying that in their view this strategy of the

8  rule 41 stipulation followed by a subsequent filing

9  was not effective to toll the statute of limitations.

10    Q     Is your conclusion different than theirs?

11    A     I concluded to the contrary, that's

12  correct.

13        (Thereupon, Hare Deposition Exhibit No. 29

14    was marked for identification.)

15    Q     Okay.  Okay.  And the statute that you were

16  interpreting was it not, what is marked as

17  Exhibit 29?  You mentioned that.

18    A     Forgive me.  I will come to 29.

19        I talked about a one-year issue under rule

20  41.  Here is what I'm referring to.  Under the saving

21  statute, 5535, the statute of limitations is tolled if

22  the action, the same cause of action, is filed within

23  one year after termination.

24        So let me just supplement my answer.  There

25  was no urgency in that regard in connection with

185

1  getting dry.  Those circumstances include or are a

2  proceeding action or an action proceeding terminated

3  by a voluntary non-suit.  A voluntary non-suit is a

4  specific device in the Pennsylvania rules of civil

5  procedure.  A discontinuance is a specific device.

6  Dismissal for neglect to prosecute, or a final

7  judgement on the merits, none of these is a rule 41

8  stipulation for dismissal.  So the exclusion, in my

9  view, does not apply.

10      Q     So the consequences -- the bottom line is,

11  the consequences of rule 41, what we will call a rule

12  41 dismissal and the consequences of your

13  interpretation of that situation, whatever trespass

14  claims you had in -- articulated in count V of the

15  original cause of action were re-filed in that writ of

16  summons?

17      A     Actually, they were preserved by the

18  two-part effect of a dismissal without prejudiced,

19  coupled with a timely re-filing within the period

20  allowed by the savings statute.

21      Q     And that was defined by a year, so that was

22  timely in June of '98; is that correct?

23      A     That is certainly my view.

24      Q     In addition to --

25      A     Peter Krembs disagreed.

186

1    Q    Just for purposes of completeness, does
2  that also include the re-filing of any conversion
3  claims?

4    A    It would be a re-filing of anything that
5  had been dismissed on any basis other than those in
6  the exclusionary paragraph.

7         By the way, I don't believe that there was
8  a dismissal of a conversion count.  I think that was
9  the premise of your question.  I don't believe.

10   Q    There was a withdrawal of the conversion
11 count, was there not?

12   A    No.  There is no rule 41 stipulation on the
13 docket with respect to count 7.  The colloquy with the
14 judge was to the effect that we were withdrawing, from
15 the jury's consideration, the need to discern which
16 trees were cut within two years because we got all of
17 those same damages under a breach of contract claim,
18 which is a 20-year statute.

19   Q    That had the effect of allowing the jury to
20 consider any type of conversion claim, did it not?

21   A    It had the effect of us not needing to
22 puzzle over this unanswerable question.  I don't know
23 what other effect --

24   Q    Let me just say it another way.
25        For all intents and purposes, as a

187

1  consequence of withdrawing the conversion claim, as

2  you have indicated, that conversion claim was not

3  presented to the jury, was it?

4      A    I don't know.  I don't recall what charge

5  the court gave the jury.  That may be in the record.

6      Q    And just for purposes of completeness, was

7  the summons that you filed broad enough to include any

8  conversion claim that you had articulated in

9  Count VII?

10     A    A pr(1)rit of summons is broad

11  enough to include every claim under the sun.

12     Q    Including the conversion claim that was

13  encompassed within count VII?

14     A    Sure.  If he had wanted to, after the

15  filing of this pr(2)his writ of summons,

16  Bert Carlisle could have filed this same complaint,

17  word-for-word, and every count in there.  He would

18  have encountered, I think, a ruling that he has res

19  ajudicata as to those issues that have already been

20  decided.

21         Your question is, is this writ of summons

22  broad enough to include any particular claim.  This is

23  broad enough to include any conceivable claim in the

24  universe.

25     Q    Did you discuss with him at any time, at

 1   the time of dismissal or withdrawal, any of the

 2   counts, if there was a risk that any re-filed claim

 3   would meet res ajudicata or exceed the statute of

 4   limitations?

 5       A    I discussed with him when we contemplated

 6   preparing and filing the rule 41 stipulations, the

 7   issues surrounding the statute of limitations, and my

 8   view and my reading of the statute to the effect that

 9   the statute would be tolled.  Now this of course goes

10   back on a tort claim to the date two years prior to

11   the filing of the federal court action, that statute

12   would be tolled provided he filed a second action

13   within one year.

14           So yes, we talked about the statute of

15   limitations.  I don't believe we discussed collateral

16   estoppel because we proceeded on the other counts.

17   And naturally, there's an estoppel as to those issues.

18       Q    There's a reference to a case called

19   Maxwell Downs.  You might want to see that.

20       A    I noticed those in these notes.

21           (Thereupon, Hare Deposition No. 30 was

22       marked for identification.)

23       Q    Downs v. Philadelphia.

24           Just for purposes of completeness, is that

25   a case that he had brought to your attention?

189

1    A    I think, I believe, it is a case that Adam

2 Fried cited, I think.  These are notes of my phone

3 call with him.  I suspect this is a cite that he

4 identified to me during that phone call.

5    Q    Just for purposes of completeness, I can

6 assure you that that appeared at the 162

7 PA Commonwealth cite.  The cite is really unimportant

8 to my question.

9         Is that a case that you read in the context

10 of talking to the associate of Peter Krembs?

11    A    He cited this case to me, I believe, as I

12 just said.  I don't recall whether I read it

13 afterwards or not, because by this point, we were no

14 longer representing Bert.

15    Q    Understand.  Okay.  I wanted to find out if

16 you had any recollection with regards to it.

17         Let me then go forward a second.  Maybe we

18 can do this in an expeditious manner.

19    A    Forgive me.  I'm not sure, in fact, whether

20 we were still representing Bert in June of '98 when I

21 prepared --

22    Q    I'm not saying you did.  Let me see if I

23 can do it this way.

24    We don't have a beginning date of your

25 representation of Mr. Carlisle, but we know it was

190

1  some time in the fall of '94; correct?

2      A    Correct.

3      Q    And probably the best evidence of the

4  formal retention would be the retention letter or the

5  fee agreement; is that correct?

6      A    I agree.

7      Q    We don't have that request.  Maybe at some

8  later date, we can find that.

9          Do I understand that you then would have

10  been representing Mr. Carlisle with regards to what I

11  call the Matson timber claims between that we have

12  been talking about here today, continuously, from

13  whatever it was, all the way up until mid June of '98?

14      A    As I recall, that's correct.

15      Q    And then to expedite things, there was a

16  delinquency by Mr. Carlisle to pay some or all of your

17  bills; is that correct?

18      A    There were many various times,

19  delinquencies, sometimes running longer than a year at

20  a time.

21      Q    And then triggering the letter in mid June

22  of '98 that for all intents and purposes was a letter

23  to Mr. Carlisle saying that you were separating and

24  you could no longer work with Mr. Carlisle because of

25  the money due for legal services; is that correct?

1   what the urgency was in the summons?

2        A      Well, whether this was of any consequence

3   or not is a separate question.  What I'm suggesting to

4   Bert is that as of June 27th, 1989, the Pennsylvania

5   20-year statute of limitations with respect to

6   contracts under seal was going to be repealed.  And

7   all contracts, whether under seal or otherwise, would

8   be subject to the ordinary four-year statute of

9   limitations.  My suggestion to him was to get the most

10  possible bang for your buck, you want to file this

11  prd.rit of summons prior to the repeal of

12  that statute to keep all of your options open.

13  Obviously, a 20-year statute has no bearing on a

14  trespass claim which is separate -- subject to a

15  separate two-year statute of limitations.  I'm saying

16  to him, if you want to continue your offensive against

17  this timber company and keep all of our options open,

18  you might want to get this filed before that statute

19  is repealed.

20       Q      And it was your perception that the

21  trespassing conversion claims were protected by the

22  tolling statute, that is, the trespass conversion

23  claims that were not submitted in the federal court

24  proceedings were preserved by the tolling statute by

25  filing within one year of the dismissal in federal

1   court?

2       A       I'm not sure anyone had in mind proceeding

3   further on a conversion claim.  I don't think that was

4   in the discussion anywhere.  Certainly, with respect

5   to the trespass claim, that's correct.

6       Q       Now, let me see if we can maybe address the

7   billing issue in the June 15, 1998 letter.  It looks

8   like there was a balance due of about $15,000, $15,768

9   that was due at that time; is that correct?

10      A       That's what the letter reflects.

11      Q       Let me then do this in a way that would

12  save some time.  Let's go off the record for a

13  second.  Maybe I can save some time here.

14              THE VIDEOGRAPHER:  We are off the record.

15      The time is 3:11 p.m.

16              (Discussion off the record.)

17              THE VIDEOGRAPHER:  We are on the record.

18      The time is 3:27 p.m.

19              (Thereupon, Hare Deposition Exhibit No. 32

20      was marked for identification.)

21  BY MR. CONNER:

22      Q       Mr. Hare, possibly we can go through the

23  summary document that we just previously handed you.

24  And if you would just hand me the document, I lost

25  track of the exhibit number.

194

1    A    32.

2    Q    So that we're on the same page, we have

3  prepared a summary.  And I'm not asking you to agree

4  or not agree with the summary.

5          Generally speaking, is at least the

6  billings starting on 12/7/94 through the 3/17/99 time

7  period consistent with your recollection with billing

8  documents that would have been dated, forwarded to

9  Mr. Carlisle for payment for services in regard to the

10  timber?

11    A    As a general manner, that's right.

12    Q    And we have totaled those.  And we have, as

13  I represented before, all the underlying documents and

14  did total them as being charges of $46,244.56.

15          Is that approximately what you recall the

16  total billings were?

17    A    That sounds approximately correct.

18    Q    And then we also have listed the payments

19  that were either made by Mr. Carlisle or on behalf

20  Mr. Carlisle starting with the February 27, '95 time

21  period through the 5/4/99 time period totaling

22  $45,319.19, which left a difference of about $925.37.

23          Does that generally coincide with your

24  recollection of the payments you received?

25    A    Painting with a broad brush, sure.  I don't

196

1  payment.

2      Q    Do you have any recollection of discussing

3  the matter with Peter Krembs?  I'm talking about the

4  specific dollar amount.

5      A    Yeah, he tried to beat me up on my bill.

6  We talked probably three or four times about that.

7      Q    And do you recall coming to the conclusion

8  with Mr. Krembs that you would accept $16,635 as

9  payment in full?

10     A    Evidently we did.  I don't recall that.

11          (Thereupon, Hare Deposition Exhibit No. 34

12     was marked for identification.)

13     Q    Let me then just proceed through the

14  remaining exhibits.  Exhibit 34 purports to be the

15  bill that Mr. Bruzzese submitted for the consultation

16  work that he did?

17     A    Right.  During the month of December '97,

18  as I indicated earlier, he provided some assistance in

19  the final pre-trial preparation.

20     Q    Without trying to go thorough the

21  individual documents, do you recall whether or not you

22  billed that under the billing head of your firm,

23  Bartony & Hare, or did you bill that separately?

24     A    I don't recall.

25     Q    To the best of your knowledge, was

1  to the $17,000 number, at least best of your knowledge

2  is accrual of interest on the outstanding balance?

3      A    I believe it is, in part, interest.  I

4  suspect there were additional billings, because --

5      Q    Between January of '98 and the time of that

6  letter?  The reason I say that, I thought you said

7  that you were out of the case?

8      A    We withdrew in June of '98.  I don't know

9  whether we generated an invoice after that date for

10  services let's say in the month prior to our

11  withdrawal.  The billing records in any case would

12  reflect that.

13      Q    It will reflect -- all of those copies and

14  files will speak for themselves.

15          You don't recall one way or the other as to

16  whether or not that in fact bills for the letters that

17  he sent to Lainard Bush?

18      A    I don't think I billed for that.

19          There's also a reference, incidentally, in

20  this letter to the real estate matter, the separate

21  real estate matter in which Mr. Carlisle owes us

22  money.  I don't know what that is though.  I think he

23  had asked my partner to look at some issue on another

24  property.  I forget.

25      Q    You know, earlier on in the deposition, I

206

1    asked you whether you knew Bob Gabrich from Ashtabula?

2        A        Right.

3        Q        And Bob Gabrich, I think as you recall, was

4    a CPA in Ashtabula?

5        A        That sounds right.

6        Q        Between the time of the jury verdict in

7    December of '97 and June of '98, did you ever attend a

8    meeting with Mr. Carlisle and Mr. Travis and

9    Lainard Bush?  Do you have any recollection of

10    attending --

11        A        I have no idea.  It's certainly possible.

12    I don't recall.  A meeting on what topic?

13        Q        I'm not talking about the general topics we

14    talked about today, the dismissal of the claims in

15    federal court and the prospects or possibilities of

16    re-filing those claims in the state court system?

17        A        It's possible.  I can't imagine why an

18    Ashtabula County accountant would be participating in

19    a meeting on that topic, but I can't say either way.

20        Q        So, how about with regards to Bert, how

21    many times did you meet with Bert and Lainard Bush

22    from -- I'm talking about after the time that the

23    verdict came in federal court in Pittsburgh and June

24    of '98.  How many meetings were there in the

25    intervening period of time?

1  very much our strategy.

2      Q      What were the representations that you made

3  to them in this time period of March of '98?

4      A      I can't say whether I made representations.

5  I suspect that to the extent we discussed the subject,

6  the discussion was along the lines that we would file

7  a second action in state court and continue to bring

8  proceedings against Matson Lumber Company, keeping in

9  mind, that at this point, we were still in litigation

10  with them, albeit as the appellant in an appeal from a

11  successful jury verdict.

12      Q      Did you provide him any information at that

13  time?  I'm talking about the Third Circuit mediation.

14  We know that you provided Mr. Carlisle a copy of the

15  documents you submitted when you were litigating; is

16  that correct?

17      A      Right.

18      Q      And did you provided any information at

19  that time or any of the later times prior to

20  withdrawal from representation of Mr. Carlisle that

21  there was a qualifier or limitations on his right to

22  recover up to the $5 million calculation you were

23  demanding in mediation?

24      A      I don't understand your question.

25      Q      You may recall, in your mediation document

209

1   that you submitted there was a demand for $5 million.

2           Did I read that correctly?

3   A     Right.

4   Q     And I'm only asking whether or not either

5   at the time that was submitted or any time between

6   that time and the time that you ceased representing

7   Mr. Carlisle in June '98, did you provide any

8   information or advice that qualified his right to $5

9   million of damages?

10  A     I never said he had a right to $5 million

11  in damages.  We made a settlement demand at various

12  times before trial and after trial for $5 million.

13  I'm not convinced that Bert had the right or the

14  likelihood of recovering $5 million.  I have a hard

15  time responding to your question in that fashion.

16  Q     Just for purposes of completeness, was

17  there a lesser dollar amount than $5 million that was

18  greater than zero that you thought Mr. Carlisle had a

19  right to, as to what would be a reasonable recovery in

20  the re-filed action?

21  A     Again, he wanted to bring some proceeding

22  in which he made a claim for a home run damage award.

23  The second action was going to be -- at the time we

24  proceed in that fashion, the second action was going

25  to be the venue in which he made that claim.

211

1    A    I'm sorry.  I'm looking at Peter Krembs'

2  name.  It's a letter from Chet Fossee to Peter Krembs

3  reporting that he has got the funds to pay the

4  judgment, and it is copied to me.  I have entirely

5  mispoken.  I'm sorry.

6    Q    That's a May 1999 letter?

7    A    No.  This time I can disagree with you.

8  It's an April 1999 letter.

9    Q    April, what date?

10    A    April 28th.

11    Q    And as I understand it, that was the report

12  that the settlement or the verdict was being paid or

13  had been paid by Matson; is that correct?

14    A    It's Chet Fossee's notice to Peter Krembs,

15  Bert's lawyer, that Chet has in his possession a check

16  payable to Bert's counsel in satisfaction of the

17  judgement.  And it appears that this check also

18  includes payment of accrued interest on the judgment.

19  I think the judgement was $110,000, and Chet is

20  referencing a judgement for $119,000 and change.

21    Q    And you received your check for $16,700

22  within a week of that letter; is that correct?

23    A    Peter's check to us is dated approximately

24  a week later, and I trust that I received it some time

25  thereafter.

Plaintiff's Appendix
000325

213

1   utterly no idea what this is.

2        Q     I believe that would be --

3              MR. CONNER:  Let's just take a little break

4        here and save some time.  Let's go off the

5        record.

6              THE VIDEOGRAPHER:  We are off the record.

7        The time is 3:52 p.m.

8              (Discussion off the record.)

9              THE VIDEOGRAPHER:  We are on record.  The

10       time is 3:59 p.m.

11  BY MR. CONNER:

12       Q     Mr. Hare we have marked for the record some

13  deeds and some documents that you may or may not have

14  seen.  And we already went through them.  For purposes

15  of completeness, we want to make sure that we

16  understood what you knew, if anything, about these

17  documents.

18             (Thereupon, Hare Deposition Exhibit No. 41

19       was marked for identification.)

20       Q     I want to show you what's been marked as

21  Exhibit 41.  And this purports to be an agreement

22  between Marion Kinkead and Fisher & Young, an article

23  of agreement from April 1, 1968.

24             Can you tell us whether or not, as part of

25  your investigation of you representing Mr. Carlisle,

214

1   you have ever seen that document?

2        A    I don't recall.

3        Q    If you had obtained that document as part

4   of your investigation, would that have been retained

5   in your file documents?

6        A    In all likelihood.

7        Q    Okay.  I'd like to then just do the same

8   thing with other documents that we have.

9             (Thereupon, Hare Deposition Exhibit No. 42

10       was marked for identification.)

11       Q    I want to show you what has been marked as

12  Exhibit 42.  And this is a deed from Marion Kinkead to

13  Fisher & Young, and I believe it's dated the 27th of

14  March 1969.  It says it was recorded in April of 1969.

15            Take a moment and look at that document and

16  tell us whether or not as part of your investigation

17  in representing Mr. Carlisle you had ever seen that

18  document?

19       A    I don't recall.

20       Q    And the same question, if you had obtained

21  that document as part of your investigation, would you

22  have retained that in your file?

23       A    In all likelihood.

24            (Thereupon, Hare Deposition Exhibit No. 43

25       was marked for identification.)

**Plaintiff's Appendix**
**000327**

215

1      Q      I'm showing you what's been marked as

2   Deposition Exhibit 43.  This purports to be an April

3   1, 1968 article of agreement between Marion Kinkead

4   and Fisher & Young.

5           Same question, can you tell us whether or

6   not as part of your investigation or representation of

7   Mr. Carlisle you had ever seen that document?

8      A      I don't recall, but I don't think so.

9      Q      With regards to -- I show you what is

10  marked -- again, if you had obtained that document as

11  part of your investigation, would you have retained it

12  in your file?

13     A      I would have certainly attempted to.

14          (Thereupon, Hare Deposition Exhibit No. 44

15      was marked for identification.)

16     Q      I want to show you what has been marked as

17  Exhibit 44.  This purports to be a deed that is dated

18  April 20th of 1973.  It looks like it's recorded on

19  April 23, 1973 in Warren County Courthouse.  This is

20  the deed from Marion Kinkead to Fisher & Young.  For

21  purposes and just maybe for the record, this has been

22  previously been referred to as the deed, so you

23  understand what that is.

24          Did you ever see that document or obtain

25  that document and see that document as part of your

216

1  investigation that was conducted on behalf of

2  Mr. Carlisle?

3       A      I don't recall.

4       Q      Again, if you had obtained that document as

5  part of your investigation, would you have retained

6  that document as part of your file?

7       A      I would have certainly intended to.

8              (Thereupon, Hare Deposition Exhibit No. 45

9       was marked for identification.)

10      Q      And lastly, with regards to these

11 documents, I'll show you Exhibit 45, which is a little

12 out of order, which purports to be the deed between

13 Fisher & Young and Mr. Carlisle.  And this deed is

14 dated January 19, 1970 -- excuse me.  It's dated

15 January 9, 1970.  I think that you did in fact make

16 reference at some point in your prior testimony that

17 you had seen the deed as well as the article of

18 agreement.  And I could be wrong about that.  I don't

19 mean to suggest that's the deed.

20             Nonetheless, take a look at that document

21 and tell us whether or not you had seen that document?

22      A      My pre-trial narrative in the federal

23 action lists, as one of my exhibits, a deed dated

24 January 9, 1970.  I believe that is the same deed that

25 you have marked as Exhibit 45.

217

1     Q     So there's a difference with regards to

2  Exhibit 45 as it relates to the others.  That is a

3  document you did have; is that correct?

4     A     It was one of the documents that

5  Bert Carlisle gave to me together with the agreement

6  of sale.

7     Q     Okay.  Now, with regards to, I think you

8  previously indicated that on one more occasion you had

9  made a request for documents from Matson; is that

10 correct -- that related to timber rights?

11    A     In discovery?

12    Q     Yes.

13    A     Yes.

14          (Thereupon, Hare Deposition Exhibit No. 46

15    was marked for identification.)

16    Q     Let me show you what had been marked

17 Exhibit 46.  And to expedite things, take a look at

18 paragraph 4.

19          First of all, can you identify that as the

20 request to Matson?

21    A     This is plaintiff's first request for

22 production of document.  If you take a look at

23 paragraph 4., it appears paragraph 4 is the portion of

24 the request that would deal with deeds.

25    A     You mean request No. 4?

218

1     Q     Yes.

2     A     I think.

3     Q     I think that's the relevant paragraph.  I

4  think in paragraph 4 you make a request for such

5  documents?

6     A     We certainly do.  We request all

7  documents.  And naturally, there is a definition of

8  documents that is broad and comprehensive.  "All

9  documents reflecting or relating in any way to any

10  transaction whereby you purport to have acquired

11  rights to harvest timber in the Clough Farm."

12           (Thereupon, Hare Deposition Exhibit No. 47

13           was marked for identification.)

14     Q     Okay.  I want to show you what has been

15  marked as Exhibit 47 and show you what purports to be

16  a response of June 15, '95.  If you want to take a

17  look at that, that is the response you received from

18  Mr. Fossee to the request for documents?

19     A     Well, his response that you have marked as

20  Exhibit 47 doesn't specify that it's in response to

21  the first request for production of documents.  And he

22  doesn't retype the requests themselves, so I can't be

23  certain about that.

24     Q     Looking at paragraph 4.  I think

25  paragraph 4 of Mr. Fossee's response is responsive to

219

1  paragraph 4 of your response.

2      A      Looking at the dates on the certificate of

3  service, this is probably in response to our first

4  request for production of documents.

5      Q      You have the document in front of you.

6  What is Mr. Fossee's response if you recall?

7      A      His response, the deed and agreement, by

8  which I trust he means the 1969 agreement of sale and

9  the 1970 deed.  "The deed and agreement are attached

10  to the complaint."

11          "Merger documents," that relates to

12  merger -- the inter-corporate merger, if you will,

13  between Matson Lumber and Matson Hardwoods.  "Merger

14  documents are available at defendants's offices in

15  Brookville, and may be viewed there during regular

16  business hours with appropriate notice."  And

17  naturally, we got those subsequently.

18      Q      Did you go to Brookville?

19      A      No.  As I recall, I asked him to provide

20  those to me and he did.

21      Q      The merger documents?

22      A      That's right.

23      Q      And as part of your request, I mean, at

24  this point in time, when you were requesting these

25  documents from Matson, was it your understanding that

220

1  they would have had the Fisher & Young documents?

2      A    I don't know either way.  Obviously, one of

3  the objectives in discovery is to cast a wide net and

4  get anything that might be useful.

5      Q    Sure.  Did you ever specifically request

6  from Matson that they produce the document or

7  documents which we have previously identified as the

8  source document for the timber rights?

9      A    I don't know what you mean by source

10 documents.

11     Q    Source document.  Have you ever heard the

12 term used by title searchers as a source documents for

13 under which parties reach an agreement?

14     A    I have never heard that particular jargon.

15     Q    Okay.  Let me see if I can rephrase it

16 then.

17          Did you ever make a specific request to

18 Matson for them to produce, specifically, the document

19 or documents which they had from Fisher & Young which

20 represented the conveyance of the timber rights on the

21 Clough Farm to Fisher & Young?

22     A    Yes.

23     Q    Okay.

24     A    Request No. 4.

25     Q    Request No. 4?

221

1     A     And there may be others, but request No. 4

2 is illustrative of that request.

3     Q     In the response -- you read the response,

4 and you just read it into the record.  In that

5 response, do they -- in that response, do they respond

6 that they have that document?

7     A     They responded that the deed and the

8 agreement are attached to the complaint.  The deed and

9 the agreement were in my possession.

10     Q     And when you read that response, did you

11 think that the deed and the agreement were the

12 documents that had conveyed timber rights to Fisher &

13 Young?

14     A     I thought that what he was doing was

15 responding to my request for documents relating in any

16 way to any transaction whereby they purport to have

17 acquired rights.  The transaction between Fisher

18 & Young and Bert Carlisle memorializing the agreement

19 of sale of 1969 retaining to Fisher & Young timber

20 rights.

21     Q     I understand.

22     A     Matson is the successor-in-interest to

23 those rights.  I perceived this to be responsive to my

24 request.

25     Q     Knowing that, you understood, did you not,

222

1   when you were looking at the deed documents and the

2   agreement between Mr. Carlisle and Fisher & Young,

3   that that document didn't convey from the owner of the

4   timber rights, timber rights to Fisher & Young, did

5   you not?

6      A    Which owner?

7      Q    Who was the owner prior to Fisher & Young?

8      A    Marion Kinkead.

9      Q    And that -- did you ever see any document

10  or ask for any document that conveyed Marion Kinkead's

11  timber rights to Fisher & Young?

12     A    I think my document request No. 4

13  encompasses that.

14     Q    You had asked them for those documents;

15  that is, you asked for the documents from Matson's

16  counsel and they gave you the response and they never

17  provided any document, agreement or deed that conveyed

18  the timber rights from Marion Kinkead to Fisher &

19  Young; is that correct?

20     A    Not that I'm aware of.

21     Q    If I understand it correctly, you never

22  obtained that from any other source; is that correct?

23     A    Not that I recall.

24     Q    Did you know who represented Marion Kinkead

25  in any transaction between Marion Kinkead and Fisher &

223

```
 1   Young when Marion Kinkead conveyed those timber
 2   rights?
 3       A    I have no idea.  I don't know if I ever
 4   knew that.
 5       Q    If I understand correctly, that wasn't part
 6   of your investigation; is that correct?
 7       A    Not that I recall.
 8       Q    With regard to -- did you ever advise
 9   Mr. Carlisle at any time prior to your representation,
10   at any time that you were representing him in June of
11   '98, that you had never seen the document or documents
12   that had conveyed timber rights from the owner of the
13   timber on the farm to Fisher & Young?
14       A    I don't recall having a conversation to
15   that effect.  I don't know whether --
16       Q    Was there any reason why you did not
17   disclose that to Mr. Carlisle?
18       A    That was not an issue presented.  If you
19   are asking why did I withhold that information, the
20   answer is, I did not withhold that information.
21       Q    If I understand it correctly, you have
22   indicated you didn't have those documents; is that
23   correct?
24       A    As far as I recall.
25       Q    And I'm asking why you didn't say to
```

Plaintiff's Appendix
000336

224

1    Mr. Carlisle, "Hey, I have never seen the document or

2    documents that conveyed the timber right to Fisher &

3    Young"?

4        A    For the same reason I didn't tell him,

5    "Bert, I have never seen the documents that conveyed

6    the rights to Marion Kinkead from her successor-in-

7    interest or that owner's successor-in-interest going

8    all the way back to 1066," that was not at issue.

9        Q    Was it a relevant part of your

10   investigation?

11       A    That was not presented to me by the client.

12       Q    Do you think that the client would have had

13   access to those documents?

14       A    I have no idea.  I know that the client was

15   represented by a very fine attorney in 1969 and into

16   the 1970s in connection with the purchase of this real

17   estate.

18       Q    And did you ever ask that attorney for

19   those documents?

20       A    I would assume, and would have assumed at

21   the time, that any issues as to title with respect to

22   Bert's ownership of that property were investigated

23   and addressed by him and his counsel at the time.  It

24   was not an issue in my mind.  It was not a question in

25   my mind.  It was not an issue that was presented by

226

1  I apologize.

2     Q     That's all right.  Let me ask you this,

3  maybe this will close the subject, for this to be a

4  transfer of timber rights from the owner of the timber

5  right to Fisher & Young, it is your understanding that

6  that would have to be in writing?

7     A     I believe it would have to be in writing if

8  it's a conveyance of standing timber.  I think the

9  statute of frauds would require a writing.  Once it's

10  cut and it's board lumber, I don't think it would need

11  to be set forth in writing, absolutely.

12     Q     Any other statutes that you are familiar

13  with that would have referred to that?

14     A     I don't recall.  There may be, I don't

15  know.

16     Q     Was it your understanding that in the '94

17  time period that any conveyance of timber rights to

18  Fisher & Young in all probability would have required

19  a written document?

20     A     I believe it would.  We talked about it

21  before.  It's referenced in the agreement of sale.

22     Q     And you're saying that is the document that

23  evidences the conveyance of timber to Fisher & Young?

24     A     Presumably.

25     Q     Okay.  Let me then just keep on going for a

Plaintiff's Appendix
000338

228

1    A    I don't recall the holding in that case

2  today.

3    Q    Understood.  In fairness to you, you asked

4  if this came out of your file.  It did not come out of

5  your file but was cited in the case.  Understood.  I'm

6  not trying to mislead you in any way.

7    A    Exhibit 48 is a copy of the opinion of a

8  case that is cited in a case that was in my file?

9    Q    Yes.

10    A    Okay.  I understand.

11    Q    I want to be absolutely correct and not try

12  to mislead you, this document did not come out of your

13  file.

14    A    Okay.

15    Q    The reason why I asked you whether or not

16  you -- first of all, do you have a recollection of

17  reviewing this case?

18    A    I couldn't tell you either way.

19    Q    Okay.  Do you have -- do you have any

20  recollection as to whether or not you did any research

21  into the issue of whether or not the conveyance of

22  timber in this particular case to Fisher & Young would

23  be personalty or whether it would be considered

24  realty?

25    A    I don't recall.

Plaintiff's Appendix
000339

229

1    Q    Did you have any knowledge as to the status

2  of law in Pennsylvania as to how Pennsylvania treated

3  those two issues?

4         MR. HABER:  Treated what two issues?

5         MR. CONNER:  Okay.  Sorry.

6  BY MR. CONNER:

7    Q    Specifically, does Pennsylvania distinguish

8  between timber conveyance as realty as opposed to a

9  timber conveyance that would be considered personalty?

10   A    At what time?

11   Q    The time you were representing

12 Mr. Carlisle.

13   A    No.  No.  No.  The Pennsylvania law on that

14 issue as of what time?

15   Q    As of '94, '98 time period?

16   A    I doubt that I looked at that because he

17 took title in 1969.  So the sate of the law in '98,

18 I'm not sure, would have had any bearing on it.

19   Q    Did you check in the 1969 time period?

20   A    I don't recall.

21   Q    Okay.  Was it relevant to any of the issues

22 that you were litigating for Mr. Carlisle whether

23 Pennsylvania would consider the conveyance of timber

24 to Fisher & Young as personalty as opposed to realty?

25   A    I don't believe that was relevant with

230

1    respect to any of the claims we asserted.

2                (Thereupon, Hare Deposition Exhibit No. 49

3        was marked for identification.)

4        Q     Thank you.  I have some exhibits here that

5    are stapled together if you will.  And there may be

6    documents you saw or may be documents you have not

7    seen as part of your research.  They are stapled

8    together in one exhibit and they are identified as

9    Exhibit 49.

10               Can you take a moment and look at that

11   document.  I'd like to ask you some questions about

12   that if I may.

13       A     Okay.

14       Q     A couple of quick questions.  Starting with

15   the statute, Exhibit 49, the first statute we copied

16   was 28 PS --

17       A     21 PS.

18       Q     You are correct.  21 PS 521.  And it talks

19   about the sale of timber or bark by deed, it

20   identifies in the title.

21       A     That's what it says.

22       Q     And were you familiar with that statute

23   during the time period that you represented

24   Mr. Carlisle?

25       A     I can't recall.

231

```
 1      Q      And no recall of researching anything under

 2  that statute?

 3      A      I don't recall.

 4      Q      And then we can talk about 21 PS 522.

 5      A      My answer will be the same as to each of

 6  these sections of Title 21.

 7      Q      So to complete the subject, were you aware

 8  that there was a section in the statutes that dealt

 9  with deeds as it relates to conveyance of timber?

10      A      I don't recall.

11      Q      And with regards to the other statute

12  section that are cited there, that's another statute

13  section which I believe is, just for purposes of

14  completeness, section 351 of Title 21.

15             You are not familiar with that document?

16      A      As I say, the answer is the same as to all

17  of these sections of Title 21.  I don't recall.

18      Q      Okay.  And you don't recall looking at any

19  of them and making any representations to

20  Mr. Carlisle; is that correct?

21      A      I don't recall.

22             (Thereupon, Hare Deposition Exhibit No. 50

23        was marked for identification.)

24      Q      I want to ask you some questions regarding

25  your answer and new matter, Exhibit 50.
```

Plaintiff's Appendix
000342

242

1    production of documents.  This issue is an issue of

2    contract interpretation with respect to the language

3    in the 1969 agreement of sale.  There's a provision in

4    there accepting and reserving all timber and trees

5    standing and falling.  And it was that term that we

6    assert to them, in the first instance, unambiguous and

7    unambiguously providing that the only reservation was

8    with respect to existing timber.  We prevailed on that

9    issue.

10    Q    The parties to that agreement were only

11    Fisher & Young and Mr. Carlisle?

12    A    That is all the parties that there need to

13    be to that agreement because that's the agreement

14    under which we were litigating that issue.

15    Q    Understood.  But that -- as a consequence

16    of that agreement only being between those parties,

17    the owner of the timber that was conveyed to Fisher &

18    Young was not a party to that agreement; is that

19    correct?

20    A    Sure.  That's correct.

21    Q    Okay.  That's all the questions I have.

22         MR. CONNER:  Okay.  We will suspend under

23         the circumstances previously mentioned.

24         MR. HABER:  The questions about the intra-

25         family dispute file?

HARE II

1

SCOTT HARE
- - - -

1                IN THE UNITED STATES DISTRICT COURT

2             OF THE WESTERN DISTRICT OF PENNSYLVANIA

3                        CIVIL DIVISION

4

5

6      ALBERT T. CARLISLE,            )

7             Plaintiff,             )

8             vs.                    ) CA No. 04-25 Erie

9      BARTONY, HARE & EDSON; SCOTT )

10     M. HARE, ESQUIRE; HENRY E.    )

11     BARTONY, JR., ESQUIRE; and    )

12     JOHN JOY EDSON, V., ESQUIRE, )

13             Defendants.           )

14

15

16

17        REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED

18        WITHOUT THE AUTHORIZATION OF THE CERTIFIED

19                        AGENCY.

20

21

22        DEPOSITION OF SCOTT HARE, VOLUME II

23            Wednesday, March 15, 2006

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000344

2

SCOTT HARE
- - - -

1                DEPOSITION OF SCOTT HARE, VOLUME II

2

3

4        taken pursuant to the Federal Rules of Civil

5        Procedure, before Judith Buckler, Court

6        Reporter-Notary Public in and for the

7        Commonwealth of Pennsylvania, on Wednesday, March

8        15, 2006, at the offices of Weinheimer, Schadel

9        and Haber, 602 Law & Finance Building, 429 Fourth

10       Avenue, Pittsburgh, PA  15219, commencing at

11       10:00 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000345

3

SCOTT HARE
- - - -

1                    A P P E A R A N C E S

2

3        On behalf of the Plaintiff:

4                        Andrew J. Conner, Esquire

5                        Conner Riley & Fryling

6                        17th West Tenth Street

7                        P.O. Box 860

8                        Erie, PA  16512-0860

9

10       On behalf of the Defendants:

11                       David L. Haber, Esquire

12                       Weinheimer, Schadel & Haber

13                       602 Law and Finance Building

14                       429 Fourth Avenue

15                       Pittsburgh, PA  15219

16

17       Also present:

18                       None.

19

20

21

22

23

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000346

4

SCOTT HARE
- - - -

1                    I N D E X

2

3

4    WITNESS              EXAMINATION BY    PAGE

5    Mr. Hare             Mr. Conner         5

6                         Mr. Haber          -

7

8

9    OBJECTION BY             PAGE        LINE

10   Mr. Haber                 23          6

11                             48          20

12                             49          7

13                             55          15

14                             58          9

15

16

17                               MARKED FOR

18   EXHIBIT NO.                IDENTIFICATION

19   53 through 57                  5

20

21   (Exhibits 56 and 57 were retained

22    by counsel for the Plaintiff.)

23

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000347

5

SCOTT HARE
- - - -

1           P R O C E E D I N G S

2              (10:05 o'clock a.m.)

3                  SCOTT HARE,

4      the deponent, having been first duly sworn, was

5      deposed and testified as follows:

6                  (Hare Deposition Exhibit Nos. 53,

7                  54, 55, 56 and 57 were marked for

8                  identification.)

9                  EXAMINATION

10     BY MR. CONNER:

11     Q.   Mr. Hare, we're continuing with your

12     deposition which was taken last year, as you

13     know.  We have -- and maybe to expedite things a

14     little bit we have marked some exhibits here that

15     are to be exchanged between the parties, one of

16     which was previously marked in the prior

17     deposition.  And I just want to run through these

18     with you and then I want to come back and ask

19     questions regarding...

20         Exhibit 53 is the Answer and New Matter --

21     excuse me, Answer and Affirmative Defenses I

22     believe that were filed on your behalf and your

23     firm's behalf in these proceedings.  Do you

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

SCOTT HARE
- - - -

1    Q.   Let me then just keeping on going for a

2    second.  I want to show you what's been marked as

3    Exhibit 54.  Ah, 54 was a document, a billing

4    document which I believe is in February of 1999,

5    that, if you can help me out a little bit, was

6    marked in John Edson's deposition as Exhibit 6,

7    but I don't think it was marked in the previous

8    proceeding for -- not, ah, suggesting in any way

9    that it was held back or anything at all, I'm

10   saying it wasn't previously marked.  Do you

11   recognize this as a billing document that was

12   prepared by you and sent out under your

13   signature?

14   A.   Well, Exhibit 54 is not signed.  This

15   appears to be an invoice prepared by the billing

16   software that we use.  I don't know whether there

17   was a cover letter that went with it.  So when

18   you say under my signature I don't know if that's

19   the case.

20   Q.   Okay.

21   A.   But Exhibit 54 does appear to be an invoice

22   that our firm sent.  I don't know whether I

23   prepared it or my administrative assistant did

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

8

SCOTT HARE
- - - -

1    back in 1999.

2    Q.    Who would have been your administrative

3    assistant as of that time period?

4    A.    I could only guess, and I don't want to

5    guess.

6    Q.    What were the choices?   In other words, you

7    had two or three?  One, two or three?

8    A.    Well, over a period of a number of years,

9    yes.  We had a very fine young lady named Jill

10   Koval (phonetic) who worked for us, and it may

11   have been at that period.  I'm not sure.  There

12   was another gal, Carolyn Compstan (phonetic) I

13   think was her name.  I can't recall what years

14   she worked for us.

15   Q.    Okay.

16   A.    That would be my best guess, that it's one

17   of those two.

18   Q.    Looking at the document itself it looks like

19   it's dated -- tell us what date is on the

20   document.

21   A.    Well, this is an invoice that apparently was

22   generated on February 7, 1999.

23   Q.    And this is for the services that you

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000350

SCOTT HARE
- - - -

1    provided on 6/23/98?

2    A.    Well, what this document -- invoices would

3    be any open time entries or expense entries as of

4    February 7th, 1999.  Open meaning not previously

5    billed.

6    Q.    Okay.

7    A.    You can see there is a previous balance

8    reflected on this, something in excess of

9    $15,000.  But the February 7th, 1999 invoice

10   reflects a time entry of June 23rd, 1998.  And

11   that appears to be the only time entry that was

12   billed in this invoice.

13   Q.    Would that suggest then that that was the --

14   that is the 6/23/98 was the, ah, the last time

15   that you performed professional services on

16   behalf of Mr. Carlisle between June 23 of '98 and

17   February 7, 1999?

18   A.    Not necessarily.  It would suggest that

19   that's the only time entry I billed for --

20   Q.    Okay.

21   A.    -- as of February 7th, 1999.

22   Q.    With regards to the subject matter, or the

23   work if you will that you billed for the time

Plaintiff's Appendix
000351

10

SCOTT HARE
- - - -

1    that you spent on 6/23/98, by looking at the

2    document does this document describe what

3    services you provided on behalf of Mr. Carlisle

4    that you billed for, ah, for 6/23/98?

5    A.    Yes, it provides a description.

6    Q.    Of what it is that you did on June 23, '98,

7    that you billed for on that particular day?

8    A.    Are you asking me just to read the

9    description of --

10    Q.    Yes, and you can tell me what you did do.

11    A.    Exhibit 54 indicates phone call with Peter

12    Krembs; draft Praecipe for Writ of Summons;

13    letter to Lainard Bush.

14    Q.    And let me expedite things.  The Praecipe

15    for the Writ of Summons that we're talking about,

16    that would have been the Praecipe for Writ of

17    Summons that would have been anticipated or

18    expected to be filed in Warren County, is that

19    correct?

20    A.    I believe so.

21    Q.    Yeah, because I think it has a Warren County

22    reference on it.  And this was the Writ of

23    Summons that would be sent in with the letter to

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000352

13

SCOTT HARE
- - - -

1    A.    Okay.  I don't recall that, but that's fine.

2    Um, and the effect if any of that dismissal under

3    the Federal Rules with regard to tolling the

4    statute of limitations for those actions, Mr.

5    Krembs and his associate with whom I also spoke

6    at or about that time had the view, as I recall,

7    that the statute of limitations was not tolled,

8    and that in fact the procedure of dismissing that

9    -- those counts with the intent of refiling them

10   in a subsequent state court action would not be

11   successful.  As I recall their view as they

12   expressed it to me was that the statute will have

13   run by the time the subsequent state court action

14   is filed and gets underway.

15   Q.    Okay.  Let me just make sure I understand

16   what you're saying with regards to the statute of

17   limitations, and what your conclusion was.  Was

18   it your understanding, at least at the time you

19   had this discussion with Mr. Krembs, that Mr.

20   Carlisle's refiled action in Warren County would

21   be -- which included either Counts 5 or 7 or both

22   would be considered timely filed to the extent

23   that your Declaratory Judgement action was timely

14

SCOTT HARE
- - - -

1    filed?

2    A.    I don't understand if you're asking, is that

3    my understanding or is it my understanding as to

4    what Mr. Krembs believed?

5    Q.    What your understanding is as opposed to Mr.

6    Krembs, what Mr. Krembs believed?

7              MR. HABER:   What his understanding was

8    back in 1998?

9              MR. CONNER:   Yeah.

10   Q.    Right when you had this discussion with Mr.

11   Krembs --

12   A.    Sure.

13   Q.    -- and you had a difference of opinion?

14   A.    I'm not sure I follow your question, but let

15   me try to give you an answer that may help.   When

16   we filed the stipulation of dismissal without

17   prejudice in the Federal Court action of

18   whichever counts were reflected in that

19   stipulation, my view was that pursuant to the

20   saving statute we could refile those counts in a

21   subsequent state court proceeding provided we did

22   so within the -- I think it's a one-year period

23   of time.   And that subsequent filing would be

Plaintiff's Appendix
000354

SCOTT HARE
- - - -

1    within the statutory period relating back to the

2    date on which we filed the Complaint in Federal

3    Court originally.

4        Mr. Krembs took a different view, and he

5    expressed it to me in the summer of '98, in fact,

6    I think during my very first conversation with

7    him.  I think you may have notes of that phone

8    call that --

9    Q.    It was marked in a previous deposition.

10   A.    Mr. Krembs took the view that in fact there

11   was not a tolling of the statute, and that any

12   subsequent filing would not be timely with regard

13   to any claims that arose earlier than two years

14   before the date of that filing in the event of a

15   two-year statute of limitations; likewise, four

16   years prior with regard to any claim that is

17   subject to a four-year statute.  So the position

18   Mr. Krembs took as Bert Carlisle's attorney in

19   the summer of '98 was that the statute would have

20   run by the time we filed the Praecipe.

21   Q.    Okay.  Now, let me just -- just one other

22   follow-up question with regards to that.  I think

23   that you filed the declaratory judgement action

16

SCOTT HARE
- - - -

1    on March 13 of 1995?

2    A.    You're talking about the federal action?

3    Q.    Right.

4    A.    There was far more to that case than the the

5    declaratory judgement claim, but certainly that

6    was part of it.

7    Q.    Well, the initial Complaint, irrespective of

8    whatever you call it.

9    A.    Okay.

10   Q.    The initial Complaint was filed on March 13,

11   1995.  And if I understand it, and correct me if

12   I'm wrong, was it your conclusion that as a

13   consequence of your dismissal that you took for

14   whatever counts we're talking about, either Count

15   5 or Count 7, that you took pursuant to Rule 41

16   of the Federal Rules of Civil Procedure, that as

17   long as the refiled action was filed within a

18   year of its dismissal, that those claims would be

19   timely filed to the extent that the original

20   Complaint was -- for declaratory relief was

21   timely filed as of March 13, 1995?

22   A.    Right, but the subsequent filing within the

23   savings period would relate back to the date of

SCOTT HARE
- - - -

1     the original filing of the first action.

2     Q.    Yeah, meaning --

3     A.    That's the view I had.

4     Q.    Yeah, meaning if the statute of limitations

5     for whatever claim we're talking about were two

6     years and you filed your federal declaratory

7     judgement complaint on March 13, 1995, it would

8     go back to March 13, 1993?

9     A.    Sure.

10    Q.    Is that correct?

11    A.    Using that example.

12    Q.    Okay.

13    A.    Right.

14    Q.    Now, in addition to -- first of all, I know

15    you mentioned Mr. Krembs, and we also have taken

16    -- Mr. Haber has taken Mr. Krembs' deposition,

17    and there was also a reference in the prior

18    deposition that you were talking also to an

19    associate, and so that I'm clear here, did you

20    have -- when you were talking about you had this

21    discussion with Mr. Krembs about the statute of

22    limitations issues, is it your recollection you

23    had that conversation with Mr. Krembs and/or his

Plaintiff's Appendix
000357

SCOTT HARE
- - - -

1    Q.    Okay.  Going back a second with regard to

2    the statute of limitations, ah, discussions that

3    you had with Peter Krembs wherein you indicated

4    previously that it was your understanding that

5    because of the manner in which you took the

6    dismissal pursuant to Rule 41, and because of the

7    saving statute the claims would be timely filed

8    if they were refiled within a year of the

9    dismissal that we previously discussed, did you

10   make those statements, make those representations

11   either in whole or in part to Mr. Carlisle also?

12   A.    I'm sorry, that's a long question.

13   Q.    Yeah, I'm just trying to ask whether or not

14   you had this discussion with Mr. Krembs that

15   we've just discussed, that about your view of the

16   statute of limitations and about the propriety of

17   your taking a Rule 41 dismissal and being refiled

18   within a year of its dismissal --

19   A.    Okay.

20   Q.    -- saving the statute of limitations, ah, or

21   protecting the claims against the statute of

22   limitations defense.  In addition to having this

23   discussion with Mr. Krembs did you also have that

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

21

SCOTT HARE
- - - -

1    discussion with Mr. Carlisle prior to your

2    discussion with Mr. Krembs?

3    A.    Oh, yes, far prior because I had that

4    conversation with Mr. Carlisle before preparing,

5    signing and filing the Rule 41 stipulation.

6    Q.    Okay.

7    A.    I had more discussions with Mr. Carlisle

8    after Mr. Fossee signed the stipulation on behalf

9    of defendants, and it was entered on the docket.

10   Q.    So you had several discussions with Mr.

11   Carlisle indicating that as long as it would be

12   -- claim was refiled within a year of the

13   dismissal, that that -- those claims would be

14   considered timely filed under the Pennsylvania

15   Law?

16   A.    I don't know what you mean by several.  I

17   had more than one conversation with Bert

18   Carlisle.  I don't recall sitting here today if

19   the refiling period is one year.  If it is --

20   that's what I seem to recall, but without the

21   statute in front of me I wouldn't want to swear

22   to that.

23       But the essence of your question, yes, I had

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

**Plaintiff's Appendix**
**000359**

22

SCOTT HARE
- - - -

1    more than one conversation with Bert initially

2    before preparing and offering and filing the

3    stipulation to get his authorization to do that.

4    And again, after Mr. Fossee signed the

5    stipulation and we filed it to report back to him

6    that we had accomplished that.

7    Q.   Okay.  Um, so from the perspective of Mr.

8    Carlisle's standpoint, ah, he could have had the

9    understanding that by refiling within a year of

10   the dismissal of -- pursuant to 41 of Count 5 and

11   Count 7 which you took in December of '97, that

12   these claims that were being refiled were being

13   timely filed, is that correct?

14   A.   I can't tell you what understanding he might

15   have had from his perspective.  I can tell you

16   what I said to him, and I think we've go over

17   that.

18   Q.   Did you indicate to him either in whole or

19   in part that there was a risk that they would not

20   be considered timely filed; that is, Mr.

21   Carlisle?

22   A.   I don't recall saying anything --

23   Q.   Okay.

Plaintiff's Appendix
000360

23

SCOTT HARE
- - - -

1    A.    -- regarding that.

2    Q.    How about with regards to the possibility

3    that the refiled action would be subject to the

4    defense of res judicata and collateral estoppel?

5         MR. HABER:    Okay, I'm going to object

6    to that.    I think he's already answered that

7    question.

8         MR. CONNER:    I don't think...

9    A.    You asked that question, and what I

10   answered was I don't recall whether I had

11   conversations with anyone regarding res judicata

12   or collateral estoppel then or now or ever.

13   Q.    Okay, fine.    I think the prior question was

14   in the context of Peter Krembs as opposed to Mr.

15   Carlisle.

16   A.    Yeah.    And in answering that I said I never

17   had those conversations with anyone.

18   Q.    Let me go back just to the question -- oh,

19   why would -- why, with regards to the refiled

20   action why was the State Court chosen as opposed

21   to the Federal Court, if you know?

22   A.    As I recall, the sense was -- and I mean by

23   that the collective sense of everyone involved in

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

24

SCOTT HARE
- - - -

1    the case, the sense was that Warren County Court

2    of Common Pleas would be a more favorable forum

3    for Bert because it would impanel a Warren County

4    jury, and the second action would concern

5    specifically issues relating to property situated

6    in Warren County.  So I think just generally it

7    was a strategic consideration.

8    Q.   Was there an option in your mind that you

9    could refile it in Federal Court, or don't you

10   know?

11   A.   No, I believe so.  Certainly it would --

12   there would be the same diversity jurisdiction

13   underlying the first case.  I forget whether at

14   that point the minimum amount in controversy had

15   been raised or whether it was still the old

16   limit.  But I think the claim, the allegation

17   would have satisfied that figure.

18        And certainly with respect to Rule 41 of the

19   Federal Rules, I think there was -- I think there

20   would have been an option to file in Federal

21   Court.  But as I said, I believe everyone's

22   collective impression or sense was that Warren

23   County would be a more favorable forum for that

25

SCOTT HARE
- - - -

1    action.

2    Q.   Let me then go to the next exhibit.  I think

3    we have covered Exhibit 54.  Let me talk to you

4    about Exhibit 55.  This is -- yes, let me show

5    you what has been identified here as Exhibit 55.

6    You might want to take a moment and take a look

7    at this document.  Ah, it's a three-page

8    document.  I think the face of the document is a

9    document that's customarily used for faxing

10   another document to a party or a person or a

11   phone number.  Ah, first of all, do you recognize

12   the handwriting on the face page?

13   A.   On the first of page of Exhibit 55, yes,

14   that's my handwriting.

15   Q.   That purports to be a date of May 28, 1998,

16   correct?

17   A.   That's right.  And that date is confirmed in

18   the fax banner at the top of the page.

19   Q.   Okay.

20   A.   I presume from that fax banner that this

21   document came from Steve Madewell's file.

22   Q.   Yeah.  As I previously indicated off the

23   record that I obtained copies of his file and

Plaintiff's Appendix
000363

SCOTT HARE
- - - -

1    March of 1998?

2    A.   I don't recall the date, but yes, we

3    mediated with Joe Torgrosa (phonetic) who runs

4    the Third Circuit mediation program.

5    Q.   And just by way of reference, I think we

6    previously marked as an exhibit, and we can pick

7    it out if necessary, that that was the mediation

8    process that you had sent -- or made a five

9    million -- additional five million dollar demand,

10   was it not?

11   A.   I don't recall the details of our demand,

12   but we did make a demand at the mediation

13   conference.

14   Q.   And was this letter a response to that

15   demand, their counter proposal?

16   A.   I don't know, you'd have to ask Chet that.

17   This is, as I understand it, Matson Lumber's

18   proposal to us.

19   Q.   Did you respond to this letter, if you

20   recall?

21   A.   I don't recall.

22   Q.   Um, do you have a recollection as to what

23   Mr. Carlisle's response was to this proposal?

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

SCOTT HARE
- - - -

1    A.   This was not acceptable to him.

2    Q.   Why was this not acceptable to Mr. Carlisle?

3    A.   Well, I'm not sure I know all the reasons,

4    but as I recall he was not interested in allowing

5    Matson any further cutting on the property.  And

6    he wanted more money from Matson, neither of

7    which terms are embodied in this proposal.

8    Q.   Ah, we're getting ahead of ourselves a

9    little bit, because -- was it your understanding

10   at least as of May of 1998 that Matson did have a

11   right to reenter the property as of that time

12   period to do further timbering?

13   A.   Are you asking whether that's the -- whether

14   that's the consequence of the verdict in the

15   Federal Court action?

16   Q.   Right.

17   A.   The Federal Court verdict established the

18   limits of Matson's harvest rights.  It set

19   boundaries both physical with respect to no cut

20   zones, and temporal so-to-say, meaning that

21   Matson would was only permitted to cut timber

22   that was in existence -- the contract terminology

23   I think was standing or fallen, but timber that

Plaintiff's Appendix
000365

SCOTT HARE
- - - -

1    was in existence as of the date of the

2    conveyance.

3         Subject to those limitations, and there may

4    have been others in the contract, seasonal

5    limitations for example, yes, Matson had a

6    continuing right to enter the property and remove

7    timber to which it had title.

8    Q.   Was there any time limitation that Matson

9    had after the jury verdict to reenter the

10   property to continue its timbering operations of

11   timber that was in existence after the date of

12   the conveyance, as you said, of 1969?

13   A.   No, there is no time limit, no sunset

14   provision if-you-will --

15   Q.   Right.

16   A.   -- in the original agreement, nor was there

17   one as a result of the jury verdict.  So in other

18   words, so long as Matson stayed within the other

19   limits imposed on it it could exercise its timber

20   rights ad infinitum.

21        I mean, eventually obviously the trees will

22   no longer exist, ah, the trees to which they have

23   title because eventually trees will die.  But

Plaintiff's Appendix
000366

SCOTT HARE
- - - -

1    subject to the limitations of nature, no, Matson

2    was not limited in the period in which it could

3    exercise its rights.

4    Q.   Was there any reason why you didn't ask the

5    court or jury to impose a temporal or a time

6    limitation as to when they could reenter the

7    property to do further timbering operations?

8    A.   Yes.

9    Q.   What was the reason as to why you did not

10   request either the court or jury to establish a

11   time limitation as to when they could return to

12   continue their timbering operations?

13   A.   Because there is no such limit in the

14   agreement Bert bargained for and agreed to when

15   he bought the property.  If I had asked for that

16   I would be asking the jury to rewrite the

17   agreement and to add additional terms that

18   weren't there.  And that was expressly contrary

19   to what we were trying to achieve in the Federal

20   Court action, which was to enforce the parties'

21   agreement.

22   Q.   Um, did you indicate to Mr. Carlisle either

23   in whole or in part that as a consequence of the

Plaintiff's Appendix
000367

48

SCOTT HARE
- - - -

1    that.

2    Q.  Did Mr. Fossee ever provide access or

3    provide you access to any documents that

4    suggested that Fisher and Young timber rights on

5    the Clough farm expired as of April 1, 1978?

6    A.  Not that I'm aware of.

7    Q.  Would that have made a difference in your

8    thinking as to how you would have processed the

9    claim of Mr. Carlisle if Mr. Fossee had provided

10   you with such a document?

11        MR. HABER:  I'm not sure I understand

12   the question.  You're asking him to say how he

13   would have litigated the case if he had been

14   provided documents that may indicate that Fisher

15   & Young's rights to the treaty that expired on

16   April 1st, 1978 --

17        MR. CONNER:  Let me see if I can

18   rephrase the question and maybe --

19        MR. HABER:  Well, I'm going to object

20   to the question because I think you spent five

21   hours at his previous deposition discussing how

22   he's litigated the case.

23   Q.  Was it relevant or not relevant to your

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000368

49

SCOTT HARE
- - - -

1     thinking in deciding that Matson, I think you

2     indicated was an invitee on the property; that

3     is, on the Clough farm, ah, that there may be a

4     document that indicated that Fisher and Young's

5     timber rights expired as of April 1, 1978?

6          MR. HABER:  I'll object to the

7     question.

8     A.   That's impossible to answer.

9     Q.   Why is that impossible to answer?

10    A.   Mr. Carlisle gave me a set of documents --

11    Q.   Okay.

12    A.   -- and asked me to advise him regarding his

13    rights under those documents.  I reviewed the

14    documents, and contrary to the conclusion that

15    other lawyers before me had reached, I told Bert

16    I believed we had a cause of action on his

17    behalf.

18         We litigated that cause of action; we won.

19    As a result of that he got declaratory relief.

20    As a result of that he got money damages in

21    excess of the price he paid to purchase the

22    property.  And we vindicated his position under

23    the agreement of sale he asked me to review.

Plaintiff's Appendix
000369

50

SCOTT HARE
- - - -

1       Now, as far as I can gather, you're asking

2   me in the space of a question or two in a

3   deposition to speculate what other kind of case I

4   might have litigated under other sets of

5   circumstances.

6   Q.   I asked a --

7   A.   Forgive me, and I'm sorry but I can't do

8   that.

9   Q.   Let me ask you the question, and if you

10  can't answer it that's fine.  Would it be

11  relevant to your thinking in deciding whether or

12  not Matson was an invitee or a trespasser, ah,

13  that there were facts in the document that

14  indicated that Matson's predecessor of interest

15  and rights for that timber as --

16  A.   Well --

17  Q.   -- April 1, 1968.  The question is, was it

18  relevant or not relevant?

19  A.   Well, I can't answer.  I don't know. I don't

20  know that there is such a document.

21  Q.   In other words, you don't know that that

22  document applies to the Clough farm that's in

23  front of you, is that correct?

Plaintiff's Appendix
000370

SCOTT HARE
- - - -

1    A.    To reiterate, I don't see anything in this

2    document that identifies the Clough farm either

3    by name or by meets and bounds, long description,

4    short description or in any other fashion.  Now,

5    it could be that I'm overlooking it, and if you

6    could point out to me something that would help

7    orient me I'd be happy to look at it.  I don't

8    see anything to that effect.

9    Q.    And maybe I'll just suggest, did you ever

10    see any document that conveyed the timber rights

11    to Fisher and Young, and if so why don't you tell

12    us what the document was that you saw that

13    conveyed timber rights from the owner of the

14    timer to Fisher and Young?

15         MR. HABER:  Andy, the purpose of the

16    second part of the deposition was limited in

17    scope.  We're not going to go back and retestify

18    as to everything that happened in the first part

19    of the deposition.

20         MR. CONNER:  Well, this is a follow up

21    to that -- to his response.

22         MR. HABER:  I mean, the purpose of

23    this deposition was to discuss the documents we

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000371

SCOTT HARE
- - - -

1     produced relative to the family matter, and I've

2     given you a lot of leeway.  But that was three

3     hours' worth of testimony at the prior

4     deposition.  What documents didn't he have, what

5     documents did he have.

6                 MR. CONNER:  Well...

7                 MR. HABER:  If you can answer go

8     ahead, but I'm not going to let you retestify as

9     to the whole prior deposition.

10     A.    And the only way I could answer that

11     question is by exhuming all those exhibits we

12     looked at before and reviewing all of the deed

13     documents and other agreements that Bert Carlisle

14     provided to me.  And to do that we would be

15     reiterating day one of my deposition.

16     Q.    Well, let me ask you a real narrow question.

17     Do you have a recollection of seeing a document

18     that conveyed timber rights from Mrs. Kinkead to

19     Fisher and Young?  That's yes or no, or I don't

20     recall, whatever choice you want to make is fine.

21     It doesn't bother me.

22     A.    As I recall there was -- the estate in the

23     land was partitioned.  At some point there was a

53

SCOTT HARE
- - - -

1    conveyance of the real property separate and

2    apart from the timber.  And I would have to go

3    back to all those documents to recollect when and

4    where that happened and between which parties,

5    because then there were subsequent conveyances of

6    both the land and the timber thereafter.

7    Q.   Let me go back to --

8    A.   That's the best I can recall.

9    Q.   Do you have a recollection of seeing a

10   document that conveyed timber rights by Mrs.

11   Kinkead to Fisher and Young in representing Mr.

12   Carlisle?

13   A.   That's the best that I can recall --

14   Q.   Yes or no?

15   A.   -- what I just described.

16   Q.   Yes or no?

17   A.   The best that I can recall is that if we

18   looked through those several documents that

19   embody the various conveyances, that's where we

20   would find that.

21   Q.   And they would be conveyances between

22   Kinkead and Fisher and Young?

23   A.   Between a number of parties, because these

Plaintiff's Appendix
000373

54

SCOTT HARE
- - - -

1    rights passed through the hands of a number of

2    parties.

3                MR. HABER:  He needs to change the

4    tape.

5                (Discussion off the record.)

6    BY MR. CONNER:

7    Q.    Just to conclude that subject, you're not

8    able to identify today the document -- any

9    document that conveyed -- that represented a

10   conveyance of timber by Mrs. Kinkead to Fisher

11   and Young, is that correct?

12   A.    Not from memory, I'd have to go through the

13   documents.

14   Q.    Okay.  Um, but you believe such a document

15   exists; that is, that you in fact saw a document

16   that conveyed Kinkead timber rights to Fisher and

17   Young?

18   A.    I think we've covered that.  I think the

19   answer to that is yes.

20   Q.    Okay.  Ah, and that was -- you saw that as

21   part -- during the time you represented Mr.

22   Carlisle as opposed to subsequent, is that

23   correct?  I mean, the time period '94 to '98, is

Plaintiff's Appendix
000374

55

SCOTT HARE
- - - -

1    that correct?

2    A.   The very best of my recollection, yes.

3    Q.   Okay.  Let's then go to -- I want to ask you

4    some questions regarding the affirmative defense

5    that's been asserted on your behalf.  You've seen

6    that have you not?  I just want to run through

7    those if you will and ask you some questions.

8    With regard to the first offense, I believe it's

9    the statute of limitations defense, is the not?

10   A.   That's what it says.

11   Q.   Okay.  And can you tell us what facts and

12   information you have that you're prepared to

13   testify to that would support the statute of

14   limitations defense?

15        MR. HABER:  Again, I'm going to put

16   the same objection on I had before.  You're

17   asking for attorney/client privilege

18   conversations, because for him to -- he has a lot

19   of facts, but for him to relate the facts to the

20   defense of the statute of limitations is based on

21   conversations I had with Mr. Hare.  That is how

22   he relates the facts to the statute of

23   limitations defense.  You can ask him about

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000375

SCOTT HARE
- - - -

1    facts, but once you ask him to relate it to the

2    statute of limitations, now you're asking for

3    attorney/client privilege.

4              MR. CONNER:  Well, let me --

5              MR. HABER:   Can you understand my

6    objection?

7              MR. CONNER:  Well, I -- you have --

8              MR. HABER:   I mean, he has had a lot

9    of conversations.  He knows about the date the

10   lawsuit was filed, that's easy, that's a fact.

11   But how that impacts on the statute of

12   limitations, I mean...

13   BY MR. CONNER:

14   Q.   Let me see if I can expedite this a little

15   bit.  If I understand it correctly, it was --

16   your indication to Mr. Carlisle that he could

17   refile the second action in Warren County --

18   you've already testified to that, is that

19   correct?

20   A.   Did I indicate that to Bert Carlisle, yes, I

21   did.

22   Q.   How long could he rely on your

23   representations that he could process the second

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

57

SCOTT HARE
- - - -

1       action?

2       A.   I don't understand your question.

3       Q.   In other words, you indicated on June 23

4       that he could file the -- at least file the

5       second action.  Was there a time period after

6       that that he could no longer rely on your

7       representations that he could process that claim,

8       if you know?

9       A.   I don't know -- I don't know what you're

10      asking me when you say rely on my

11      representations.  How long he had to refile I

12      believe we talked about earlier this morning.

13      Q.   Right.

14      A.   And --

15      Q.   -- was timely filed?

16      A.   I believe you confirmed my recollection that

17      the saving statute allows for refiling within one

18      year.

19      Q.   Okay.

20      A.   So he could -- by our recogning at the time

21      he could refile within one year.

22      Q.   Okay.

23      A.   I don't understand what you mean when you

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

Plaintiff's Appendix
000377

68

SCOTT HARE
- - - -

1    issue as to which we obtained an absolute

2    victory.

3    Q.   Was one of Carlisle's goals to seek an

4    exclusion of Matson from this property after the

5    jury verdict?

6    A.   Pardon me?

7    Q.   Was one of Carlisle's goals -- ah, was to

8    seek an exclusion of Matson from the property?

9    A.   Are you asking did he have the objective in

10   the Federal Court action of having Matson barred

11   completely from the property?

12   Q.   Was that one of his goals?

13   A.   That's not an issue we litigated, nor is

14   that an issue that's consistent with the

15   agreement of sale.  Whether he harbored that goal

16   in his mind I can't say.

17   Q.   Was that --

18   A.   Excuse me.  Had he said to me, let's try to

19   get Matson barred from the property beginning

20   immediately and lasting forever, which he did not

21   say incidently to my recollection, I would have

22   said to him, your agreement doesn't provide for

23   that.

Plaintiff's Appendix
000378

SCOTT HARE
- - - -

1    Q.    And the agreement you're talking about is

2    the agreement that he had with Fisher and Young,

3    and those were attached to the Complaint, I

4    believe, is that correct?

5    A.    Yeah, the agreement by which he purchased

6    the land.

7    Q.    Um, let me touch on one last subject.  You

8    indicated that in follow up to the affirmative

9    defense that the goals were achieved in the

10   declaratory judgement action, that Carlisle was

11   pleased with the verdict and the results after

12   this time period, ah, and I'm talking about the

13   December of 1997 time period.  Ah, and just as a

14   completion of that thought was there any time

15   between the time of the verdict in December of

16   '97 and June of '98 when your firm separated as

17   acting as counsel for him that Carlisle ever

18   indicated to you -- where you ever became aware

19   that Mr. Carlisle was dissatisfied with the

20   December of '97 verdict?

21   A.    Not that I recall.

22   Q.    Okay.  You don't have any recollection

23   during the time of your representation, at least

Plaintiff's Appendix
000379

70

SCOTT HARE
- - - -

1       up until June of 1998 -- June 23, 1998, that Mr.

2       Carlisle -- having a sense that Mr. Carlisle was

3       dissatisfied with the December of 1997 verdict?

4       A.    No.  As far as I can recall, all indications

5       were to the contrary.  I think I talked to him

6       the first day about his embrace, he hugged me

7       after the jury verdict was read.  And he may have

8       been tearing up in his eyes as I recall.  But I

9       don't recall any manifestation that he was

10      displeased with the verdict.

11      Q.    And in --

12      A.    He was displeased that Matson took an

13      appeal, which of course was unsuccessful for

14      Matson.  The Third Circuit affirmed our verdict

15      in all respects.

16      Q.    And in talking to either Mr. Bush, Lainard

17      Bush or Jim Aul or Mr. Madewell, the fellow's

18      name that's on the previous exhibit, at any time

19      between the time of the verdict in December of

20      '97 all the way up through June of '98, had they

21      ever expressed to you in your presence that they

22      were -- and/or that Bert was -- or all of them

23      were dissatisfied with the December of 1997

BUCKLER & ASSOCIATES - COURT REPORTERS
(412) 471-3117

SCOTT HARE
- - - -

1    verdict?

2    A.    Not that I recall.  Once again, I think

3    everyone was frustrated by the fact that Matson

4    had taken an appeal.  Obviously Bert wanted his

5    money and wasn't getting his money while the case

6    was on appeal.  If I recall, Matson filed his

7    supersedeas bond, so Bert was not happy that he

8    wasn't being paid the verdict.  But I don't

9    recall anyone indicating that they were

10   dissatisfied with the verdict or the terms of

11   verdict itself.

12             MR. CONNER:  Okay.  That's all the

13   questions I have.

14             (Witness excused.)

15             (Signature waived.)

16             (Deposition concluded at 11:20 a.m.)

17

18

19

20

21

22

23

Plaintiff's Appendix
000381

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
                          - - -
 3
    ALBERT T. CARLISLE,              )
 4                                   )
            Plaintiff,               )
 5                                   )
         vs.                         ) 04-25 ERIE
 6                                   )
    BARTONY, HARE & EDSON; SCOTT M. )
 7  HARE, ESQUIRE; HENRY E. BARTONY,)
    JR., ESQUIRE; and JOHN JOY V.    )
 8  EDSON, ESQUIRE,                  )
                                     )
 9          Defendant.               )

10                        - - -

11      Deposition of JOHN S. KOOKOGEY, ESQUIRE

12          Tuesday, August 16, 2005

13                        - - -

14          The video deposition of JOHN S. KOOKOGEY,
    ESQUIRE, called as a witness by the Plaintiff,
15  pursuant to Notice and the Federal Rules of Civil
    Procedure pertaining to the taking of depositions,
16  taken before me, the undersigned, Deborah L. Endler, a
    Notary Public in and for the Commonwealth of
17  Pennsylvania, at the offices of Culbertson, Weiss,
    Sertoma & Schug, 228 East Central Avenue, Titusville,
18  Pennsylvania, commencing at 10:02 o'clock a.m., the
    day and date above set forth.
19
                          - - -
20
            COMPUTER-AIDED TRANSCRIPTION BY
21       MORSE, GANTVERG & HODGE, INC.
            PITTSBURGH, PENNSYLVANIA
22              412-281-0189

23                        - - -

24

25
```

Plaintiff's Appendix
000382

2

```
 1  APPEARANCES:

 2        On behalf of the Plaintiff:

 3        Conner Riley & Fryling:
          James R. Fryling, Esquire
 4        Andrew J. Conner, Esquire
          17 West Tenth Street
 5        P.O. Box 860
          Erie, Pennsylvania 16512
 6
          On behalf of the Defendant:
 7
          Weinheimer Schadel & Haber:
 8        David L. Haber, Esquire
          602 Law & Finance Building
 9        Pittsburgh, Pennsylvania  15219

10                     - - -

11  ALSO PRESENT:  Herm Stork, Videographer

12

13
                         INDEX
14
    EXAMINATION BY:                    PAGE:
15
    Mr. Fryling                          3
16  Mr. Haber                          215

17                     - - -

18

19

20

21

22

23

24

25
```

Plaintiff's Appendix
000383

3

```
1          VIDEOGRAPHER:  It's August 16th, 2005,
2     10:02 a.m.  Would each attorney present please
3     give their name and who they represent?
4               MR. FRYLING:  My name is Attorney James
5     Fryling, I represent Albert T. Carlisle, the
6     Plaintiff.
7               MR. HABER:  I'm David Haber, I represent
8     the Defendants.
9          VIDEOGRAPHER:  Would the court reporter
10     please state her name and swear the witness?
11          REPORTER:  Deborah Endler.
12               JOHN S. KOOKOGEY, ESQUIRE
13     called as a witness by the Defendant, having been
14     first duly sworn, as hereinafter certified, was
15     deposed and said as follows:
16                         EXAMINATION
17     BY MR. FRYLING:
18     Q     Thank you.  Mr. Kookogey, good morning.
19     A     Good morning.
20     Q     My name is James Fryling and along with my
21     partner Andy Conner, we represent Albert Carlisle in a
22     case that's been brought in the United States District
23     Court for the Western District of Pennsylvania.  We
24     have asked you to come here today by virtue of a
25     notice of videotaped deposition and I understand that
```

4

1  you were, received a copy of that?

2      A    Yes, yes.

3      Q    I'm going to go ahead just for the record

4  have that marked as Exhibit No. 1.

5          (THEREUPON, Deposition Exhibit No. 1 was

6      marked for identification.)

7      Q    Thank you.  Along with the notice of

8  videotaped deposition, there was a request under Rule

9  45 of the Federal Rules of Civil Procedure for

10 production of documents, correct?

11     A    Yes.

12     Q    All right.  And I'm wondering if you had an

13 opportunity to review any documents in this case and

14 bring any documents with you for today's deposition?

15     A    Very limited --

16     Q    Okay.

17     A    -- in that regard.  I don't know whether

18 you would like me to explain or not why.

19     Q    Absolutely.

20     A    I had a law office here in Titusville for

21 many years and I sold it to a successor, Kemp Scales

22 who is an elder law attorney and that's what he is

23 certified as such.  And he has gotten rid of all the

24 files in the old office except for a couple of

25 miscellaneous little things I doubted would have any

5

1  bearing on what you are doing here.

2        But in any event I brought a couple of

3  things along.  But the vast amount of all of our files

4  on Fisher & young and their successors and the title

5  to the property that's in question I guess in Warrant

6  County, they are all, been disposed of.  So I don't

7  have anything actually.

8        Like you asked for title certificates that

9  I might have, opinions that I might have given.  And I

10 did give, but I never represented Carlisle in any of

11 this.  So I don't know if I have anything that would

12 be helpful to you.  I did represent Fisher & Young.  I

13 did not represent the successors in that chain of

14 title.  I had no connection with them at all.

15     Q     Okay.

16     A     So just Fisher & Young, the original

17 landowner of the Clough farm.

18     Q     Now, you indicated that you did bring some

19 documents with you.  If you could identify for those

20 us, please?

21     A     Yeah, I have a title company certificate

22 that was, attorneys preliminary certificate of title

23 to, in favor of Albert Carlisle dated back in, well,

24 it's not executed.  It's not dated, but it's around,

25 it's referring to this property I should say.  And

9

1  and I'm fully retired.

2      Q      All right.  And you retired in 2002?

3      A      2001.

4      Q      2001?

5      A      Yeah.  Not long after the big hullabaloo in

6  New York City from the terrorists which I think was

7  2001, 9/11/2001.

8      Q      And in preparing for your deposition today

9  am I correct that you had an opportunity to go back to

10  your former office --

11      A      Yes.

12      Q      -- and look for some documents?

13      A      That's correct.

14      Q      Did you talk to anybody about the

15  deposition to prepare for it?

16      A      No, I have not.

17      Q      So you haven't talked to Attorney Dennison?

18      A      No.  Oh, I know him, though, he represents

19  Matson from Brookville, yeah.  That's who you are

20  talking about?

21      Q      Correct.

22      A      No, I have not.  I have not been talking to

23  him about anything.

24      Q      How about Attorney Fossi?

25      A      No, I hadn't talked to him or anybody.

13

1   just sort of inherited that job as a result of my

2   coming into Mr. Jack's office working for him.

3       Q      And did you do all manner of corporate work

4   for Fisher & Young or --

5       A      No.

6       Q      -- was your role limited to real estate?

7       A      Limited to real estate.

8       Q      Okay.  And what types of real estate things

9   did you do for Fisher & Young?

10      A      Well, they were a lumber company and so

11  they were interested in timber and land with timber,

12  trees on it, potential timber assets.  And that was

13  the type of, and agreements of sale and deeds and

14  mortgages in connection with the sale or purchase of

15  those items, timbering items.

16      Q      And did you know the principals of Fisher &

17  Young?

18      A      Yes, the president you mean and Phillip

19  Cochran was.  I knew Mr. Young who was the originator

20  of the corporation.  Mr. Jack as I mentioned was my

21  predecessor, incorporated Fisher & Young.  And I knew,

22  they were all Titusville people.

23      Q      So you had a professional and a social

24  relationship with the Cochrans?

25      A      I don't think I'd call it a social

17

1    Yeah, this is a letter from Pete Eaton to me, Attorney

2    Pete Eaton.  Let's see, this is yeah, I see that, I

3    don't know what you want me to do in identification,

4    give you the date and who it's from and to whom it was

5    written?

6        Q        If you would, please.

7        A        This is a letter to me as an attorney.

8    Doesn't say for whom, but obviously I think I must

9    have been for Fisher & Young, dated November 27, 1967,

10   in which he was introducing me in a sense to the

11   transaction between Fisher & Young and the Kinkeads

12   for the sale of the Clough farm.

13            The Clough farm included a lot more than

14   just one parcel.  It was an assembly of a whole lot of

15   parcels that made up probably 1,500 acres all

16   together.  So actually where Clough lived on the farm

17   was only a small part of the total farm that's

18   identified as his farm.  But in any event, this is a

19   letter introducing me to the project, as he called it,

20   of the up and coming sale in 1967 from Fisher & Young

21   to Carlisle.

22       Q        Okay.  And as I read the letter, it seems

23   that Attorney Eaton is representing Mrs. Kinkead --

24       A        Right.

25       Q        -- in the sale of this Clough farm to

18

1  Fisher & Young and he is enclosing to you a number of

2  items --

3      A    Yes.

4      Q    -- for your review.  Does that, I read that

5  letter, it seems to indicate that you are going to be

6  representing Fisher & Young in this transaction?

7      A    That's what appears that way to me.  Now,

8  I've forgotten that, but I knew Mr. Eaton well and I

9  had been connected with the Fisher & Young on other

10  transactions and I assume that that must be the case,

11  that I had been representing them.

12      Q    Okay.

13      A    I did not represent Carlisle, of course.

14      Q    Correct.  Now, I don't know if these two

15  documents are connected or not, but they were somehow

16  attached to this letter, even though they don't appear

17  to be enclosed.  Before I mark them, I'm just going

18  to, they are not even very good copies, but if you

19  could identify those?

20      A    I cannot.  I don't know what the heck road

21  is what here, but I can see that obvious roads on

22  here.  I'm familiar, I've been to this farm, I know

23  what it looks like or at least parts of it, where the

24  buildings were.

25           What Carlisle bought is the surface rights,

Plaintiff's Appendix
000390

1  of course and the mineral rights.  But it's largely a

2  wooded area, but there are a few tracks which I can

3  identify I think from this poor copy of a map.  These

4  cleared areas are close to the buildings.

5         One thing that was unique about the farm

6  were two huge barns with two very huge silos and they

7  are right along the road.  And I don't know, I would

8  guess that that would be on one of these cleared areas

9  in this general area here that I'm pointing to on the

10  east.  I don't know, I think, I'm not sure, but I

11  think maybe this is north at the top of this sheet.

12     Q    Okay.

13         MR. FRYLING:  Why don't we go ahead and

14     mark this as Exhibit No. 3.

15         (THEREUPON, Deposition Exhibit No. 3 was

16     marked for identification.)

17     Q    Does that appear to be some type of aerial

18  map of --

19     A    Yes, it does.

20     Q    -- the Clough farm?

21     A    Yes, it does.

22     Q    I'm going to show you what I've marked as

23  Exhibit 4.

24         (THEREUPON, Deposition Exhibit No. 4 was

25     marked for identification.)

23

1    Q    Okay.

2    A    His name was William Nagy, N-a-g-y, at the

3  time.  Let's see what else we got here.  Exhibit 8,

4  well, Exhibit 8 is the same as Exhibit 6 I think,

5  yeah.  Except there is no pencil notations on Exhibit

6  8 as there are on Exhibit 6.

7    Q    Okay.  And the pencil notations that are on

8  Exhibit 6, do you recognize that handwriting?

9    A    No, I don't.  I don't have any idea whose

10  that would be.  It is not mine.

11    Q    Okay.

12    A    I know that.

13    Q    And the penciled notations on the bottom of

14  that indicate land, looks like 2,782?

15    A    Right.

16    Q    Buildings 22,218?

17    A    Yes.

18    Q    Timber 100,000?

19    A    Yes.

20    Q    For a total of 125,000, is that correct?

21    A    That's right.

22    Q    Okay.

23    A    Now, that probably was done, if we can

24  indulge in my speculation, you know, the transfer tax

25  is on the land and not on the timber and if the timber

24

1    is expected to be cut within a reasonable time, and so

2    it was common practice to separate the value of the

3    timber from the value of the land and buildings and

4    you would pay the Pennsylvania transfer tax on the

5    land and buildings and not pay any on the, and that

6    was an acceptable procedure, never questioned by the

7    Department of Revenue of Pennsylvania.  And that looks

8    like that's why somebody is allocating the total among

9    those.

10        Q     Okay.

11        A     Let's see, now, 9, looks like the same as

12   7-- I don't know.  There is not, the totals of the

13   acres of certain species and sizes does not add up to

14   the, quite to the total on Exhibit 7.  But otherwise

15   you got the same species and same sizes are allocated

16   among species between, and the two Exhibits 7 and 9

17   are alike in that regard but the numbers have been

18   changed slightly.

19        Q     Okay.

20        A     Now, let me see, Exhibit 10, this is a

21   management cost summary, attorneys fees, realty

22   transfer tax.  Incidentally, the realty transfer tax

23   was commonly divided between the buyer and the seller

24   and that was I see the half of the Pennsylvania realty

25   transfer tax in this case was going to be $650 which

26

1  21, 5, 12 acre pieces that are not part of the main

2  part of the farm apparently, odd pieces that they

3  have --

4       Q    Okay.

5       A    -- as a part of their ownership, though.

6       Q    And again, do you know whether or not those

7  documents relate specifically to the Clough farm or

8  not?

9       A    No, I have no way of knowing that.

10      Q    Okay.

11      A    Actually.

12      Q    If you were representing Fisher & Young in

13  the purchase of either land or timber, would you need

14  documents like that or that type of information in

15  order to proceed with the deal?

16      A    Well, our main concern I suppose initially

17  other than the final price that was being paid by

18  Fisher & Young to Mrs. Kinkead, would have been to

19  settle on how we are going to agree on what transfer

20  tax were to be paid.  In other words, how much of this

21  is forested land and how much is vacant land or

22  pasture land or fields or whatever.  And so I would

23  assume that from what I see in these exhibits that

24  this is the result of some prior discussion that might

25  have taken place in that regard.

1  brought, first of all, I would have brought it down to
2  the current date.  This is something they would have
3  obviously done prior to that sale.  And there was a
4  problem, that I considered at least to be a problem at
5  the time, that the Kinkeads, Mrs. Kinkead was a
6  Clough, her maiden name was Clough.  And she had a
7  couple of brothers and they all apparently let the
8  title descend to her, but they did it by what was more
9  a common practice in those days by letting it go to
10  taxes and getting a tax deed from the county for the
11  farm.  And that was my main question concerning the
12  title to the property.
13         But Mr. Blackman and also Mr. Eaton, both
14  of whom were old and seasoned veterans so to speak in
15  the Bar Association in Warren County, had assured us
16  that in spite of the tax title, that this property
17  had, the sale had taken place sufficiently long enough
18  ago that they wouldn't be concerned about it and
19  neither would the Bar Association of Warren County be
20  concerned about it at all.
21     Q    All right.
22     A    But there was that little thing that I can
23  remember inquiring about to them and feeling assured
24  that it would pass muster in Warren County.
25     Q    All right.  And the purpose then of you

35

1  was well acquainted with the principals and so on and

2  so forth.  He might have done that and just asked to

3  help with this title business.

4       Q     So these two exhibits, 16 and 17, would

5  reflect then your handwritten notes presumably about

6  what the terms of the deal were going to be between

7  Fisher & Young and Kinkead, correct?

8       A     Yes, that's the way it looks.

9       Q     All right.  And then you started, I'm

10  sorry, I got you out of order, you are starting on No.

11  16, Exhibit 16?

12       A     Right.

13       Q     Indicates, unless I've got them backwards

14  now in my mind -- that's the one.  16 then has deed

15  $25,000, E&R, the timber?

16       A     Right.

17       Q     What does E&R stand for?

18       A     Excepting and reserving timber.

19       Q     Okay.  So there is going to be a deed

20  created.  The consideration is going to be $25,000 and

21  the timber from that property is going to be excepted

22  and reserved, correct?

23       A     Right.  Then there is a separate agreement

24  for the timber.

25       Q     Okay.

38

1      A      And maybe that would enter into the
2  thinking at least, I don't know.

3      Q      Okay.  I guess back before this deal is
4  struck, there is some discussion about how the deal is
5  going to be structured and what the consequences to
6  either party is going to be given any particular
7  option, is that correct?

8      A      Yes, I would assume that's correct.  That
9  would be a normal consideration.

10     Q      All right.  And if the deal is done in two
11  separate transactions, there is a transfer of the land
12  excepting and reserving the timber?

13     A      Right.

14     Q      And then a second transfer of the timber,
15  that's either going to result in the payment of a
16  transfer tax on the total of the land and the timber
17  or it's going to result in transfer tax on the
18  purchase price of the land?

19     A      Deed, yeah.

20     Q      And a personal property tax on the value of
21  the timber, is that correct?

22     A      That's right, that's true, yeah.  That
23  would enter into their negotiation, I would think.

24     Q      All right.  And that, I guess from what you
25  have written on your paper was probably 4 mills?

40

1    Q    Okay.  So your notes then would contemplate
2  an installment sales agreement --
3    A    Yes.
4    Q    -- between Kinkead and Fisher & Young.
5  Kinkead obviously not having been paid the full
6  consideration in the event that Fisher & Young would
7  timber the property before they paid off --
8    A    Yeah.
9    Q    -- their installments.  If they cut timber,
10 they would pay --
11   A    That's right.
12   Q    -- to her until she has been satisfied?
13   A    That's right.
14   Q    Okay.
15   A    Now, she wasn't paid off incidentally at
16 the time Carlisle bought this property.  She had not
17 been paid off.  But she was at the time that Carlisle
18 bought from Fisher & Young, Fisher & Young had to of
19 course be in a position to give her good title to the
20 timber.  So they had to pay Kinkead and get her
21 settled up right then.
22   Q    The next line is kind of grouped together
23 with pay for timber cut, will not pay for buildings
24 and land sold.  Do you recall what that was?
25   A    Well, as I mentioned there is huge barns

43

1  guessing again that they were saying that Fisher &

2  Young wouldn't be able to cut the timber for more than

3  10 years after they entered into this agreement with

4  Mrs. Kinkead.

5      Q     Okay.  So that would limit the rights that

6  Fisher & Young would have in the timber to a period of

7  10 years?

8      A     Yeah.  But as I said before, of course,

9  when Albert Carlisle got involved in all of this, then

10  they had to make peace with Mrs. Kinkead, get her

11  taken care of for whatever was owing to her because

12  she wasn't going to be a party to the Carlisle

13  transaction.

14      Q     Right.  Okay.  Below that we have appears

15  heading title search.

16      A     Yes.

17      Q     And there is an arrow in the left hand

18  margin.  Do you recall what that refers to?

19             MR. HABER:  The arrow or the whole thing?

20      A     The --

21      Q     The whole thing.

22      A     Says no notice of sale given.  Oh, well, as

23  I mentioned awhile ago about there was a tax sale of

24  this property.  As it was indicated here it was

25  assessed to Levi S. Clough, that was the father of