48

1    A    Oh, that's the one I have.  I thought you

2  meant that we looked at before.  Okay.  How about a

3  date on this thing?  Almost always, the very first

4  thing I did on a legal pad was put the date up in the

5  upper left-hand corner.  Although I can't see it,

6  although you can't read for sure what is up there.

7  But it would certainly be made approximately the same

8  time.

9    Q    Okay.

10         (THEREUPON, Deposition Exhibit No. 18 was

11    marked for identification.)

12    Q    I hand you what we have marked as Exhibit

13  No. 18 and ask if you can identify that document?

14    A    Yes, this is an agreement, Article of

15  Agreement as it's designated, no date on it, from

16  Marion C. Kinkead, widow, to Fisher & Young she is the

17  seller and Fisher & Young Inc. is the buyer.  And this

18  would seem to, the terms seem to conform with our

19  notes here being total of 125,000, $25,000 upon

20  execution of the agreement and the balance of $100,000

21  payable in annual installments of $10,000 each

22  commencing December 1, 1968.

23    Q    Okay.

24    A    And if there is anything due by December 1,

25  1977, it would all be paid off.

49

1    Q    All right.  Now, do you know whether

2 Exhibit 18 is the draft agreement that is referenced

3 by Attorney Eaton to you in his November 27, 1967

4 letter which is Exhibit No. 2?

5    A    It could well be, because this isn't

6 archived right, I'll just tell you that.  I think it

7 is probably Mr. Eaton's office that prepared this

8 agreement.  And that would be normal, for the seller's

9 attorney to prepare the agreement.

10    Q    All right.  And there is appears to be some

11 handwriting on the --

12    A    Yeah.

13    Q    Do you recognize the handwriting?

14    A    Yes, that's my handwriting.

15    Q    Okay.

16    A    We changed the warranty from general to

17 special.  We made a notation along the margin above

18 that, interest, INT, none.  No interest on the balance

19 due, in other words.

20    Q    All right.  Would that have been unusual

21 for a sale of real property in 1967 that installment

22 sale contract would carry no interest on it?

23    A    Not really, I don't think so.

24    Q    Okay.

25    A    I don't think that would be unusual.  But

50

1    maybe it's one of those situations where she got

2    enough income, she don't want to have any more.  And

3    if this was put on record, somebody, Internal Revenue

4    Service would find out about it and want to have her

5    account for that, maybe.  I don't know, I'm just

6    guessing again.

7         Q    Okay.  So this agreement calls for the sale

8    of the property in fee at least as the draft was sent

9    to you --

10        A    Yeah.

11        Q    -- for a total of $125,000?

12        A    Right.

13        Q    All right.  Your notes on it then, there is

14   no interest involved, there is going to be a separate

15   timber agreement for $100,000?

16        A    I guess that's right.  I see some other

17   notes off to the side there, $20,000 down, 8,000

18   annually.  That would be on the timber agreement.

19        Q    Okay.

20        A    And $5,000 down and $2,000 a year annually

21   on the land, value of 25,000.  You see that?

22        Q    I do.

23        A    I guess that's what that has to do with.  I

24   don't know whether that was ever consummated in that

25   way or not.  This not being maybe the final agreement.

Plaintiff's Appendix
000402

61

1     Q     No, no, the terms of the exception and

2  reservation.

3     A     You mean you want me to just read it?

4     Q     Yes, please.

5     A     Oh, okay, "Excepting and reserving from and

6  out of this conveyance all the timber and trees,

7  standing and down, situate on the premises above

8  described, with full right of entry for purposes of

9  cutting, skidding, piling and removing the same, and

10  of constructing roadways and skidways, saw mills and

11  piling yards for such purposes, rights in said timber

12  and trees to second party expire on April 1, 1978."

13     Q     Okay.

14     A     Let's see, when was this dated?  It doesn't

15  say what day in April 1968, so that's 10 years.

16     Q     All right.  And that would reflect then the

17  note, your notes --

18     A     Right.

19     Q     -- on the deal that Fisher & Young is going

20  to get the timber rights for a period of 10 years?

21     A     Yes, yeah.

22     Q     And the language in this Article of

23  Agreement from Marion Kinkead to Fisher & Young she,

24  as I understand it, is selling the land itself to

25  Fisher & Young for $25,000?

62

```
 1      A      Yeah.

 2      Q      She is excepting and reserving --

 3      A      The timber.

 4      Q      -- from her title the timber --

 5      A      Yeah.

 6      Q      -- on the property?

 7      A      As far as this agreement is concerned.

 8  Then she would have another agreement to sell him the

 9  timber.

10      Q      Okay.  All right.

11      A      And that wouldn't be recorded.  This one,

12  I'm sure was recorded.  Oh, yeah, I guess see down

13  here in the lower right-hand corner, you can see the

14  number of the page number of the Recorder's

15  documentation.  Page 298 I think that is.  Page 298.

16      Q      That's just a bate stamp.

17      A      That's what?

18      Q      That's just the number 298 --

19      A      That's page number as recorded.

20      Q      No, no, that's a number my office put on

21  that document to identify it for this litigation.

22      A      It is?

23      Q      Yes.

24      A      It looks like the same print as on, well,

25  let me see.
```

64

1      A      Well, this looks like the same thing we

2  just, we still have the same agreement we just, as

3  Exhibit 20, with no date, no day in April, but it's

4  April blank 1968.  This correction about that 2,000,

5  1,000 we were talking about --

6      Q      Okay.

7      A      -- has been made.  And it is for 25,000 and

8  it's for the property described, I don't know how they

9  described this, because it isn't described in this

10 agreement, specifically.  Oh, all of the real estate,

11 whether described herein or not, being attached

12 hereto.  So there apparently was an attachment showing

13 all those 18 parcels.

14     Q      All right.

15     A      Any way, otherwise it's the same thing.

16 Now, let me see, there is something on the second

17 page, oh, that's about the reservation of all the

18 trees and timber and rights in the trees and timber,

19 which would expire April 1, 1978.

20            To avoid the payment of the sales tax on

21 the timber, you had to have a day certain when the

22 timber agreement would expire and that's the reason

23 that date was put in there.

24     Q      And let's talk about that.  If, as I

25 understand it, and well, tell me what your

65

1    understanding is, if what were the consequences if,

2    for instance, the first draft of the articles of

3    agreement was the way that the property was

4    transferred, just Marion Kinkead is selling Fisher &

5    Young the fee simple absolute for $125,000?

6        A    You mean if they had executed that

7    agreement?

8        Q    Yes, if they had executed that, what would

9    have been the tax consequence, if any?

10       A    Oh, well, she would have had a big capital

11   gains income tax to pay probably, not knowing actually

12   what her income situation was, but that's generally

13   the reason why people would do this, take advantage of

14   the sales tax law which permitted this.

15            Trees, the cutting of trees is just like

16   the cutting of corn or any other crop, that is if you

17   are going to do it within a specified time certain and

18   I think it was, the limit was about 10 years that you

19   could do that, any way, that you would be excused from

20   paying any sales tax.

21       Q    Okay.

22       A    Or realty transfer tax I should say.

23       Q    And as I understand it, back even in 1968

24   that was one percent of the transaction price, one to

25   the state and one percent transaction price went to

1      Q      Customarily as I understand it, back at

2   this time there was an agreement that that one percent

3   tax was split between the buyer and the seller?

4      A      That's correct.

5      Q      Okay.  And in order to avoid paying that

6   tax, a time limit was put on the --

7      A      Yeah.

8      Q      -- the timber agreement, is that correct?

9      A      Yes, that's correct.

10      Q      All right.  And by virtue of putting a time

11   limit on, then convert the interest in timber to

12   personalty from realty?

13      A      That's right.

14      Q      And so the transfer folks said well, it's

15   not an interest in real property, we are not going to

16   tax it?

17      A      That's correct.

18      Q      It's just an interest in personal property,

19   is that where that 4 mills come into play then?

20      A      No, that's a different tax entirely.  But

21   to follow up what you are saying, there were

22   regulations published by the Department of Revenue

23   with respect to that business of transfer tax, realty

24   transfer tax, excepting and reserving the tax from

25   timber that was going to be cut within a time certain

1   and I think it was, as I said before, not in excess of

2   10 years.

3        Q     Okay.

4        A     So everybody would try to arrange their

5   agreements and so on so they would have a minimum tax

6   to have to pay.

7        Q     Okay.  And in fact at least from the drafts

8   of the articles of agreement that we have seen so far,

9   Mrs. Kinkead did that, she was granting or selling

10   actually, take that back, she is excepting and

11   reserving unto Fisher & Young the right to timber for

12   a period of 10 years?

13        A     Yes, yes, that's right.

14        Q     Okay.

15        A     Just follow up on that to make sure we

16   understand this, they would, suppose this thing were

17   consummated all at one time instead of over a period

18   of years, the customary procedure would be to give a

19   deed for the value of the land and the buildings, X

20   number of dollars for that.  And the balance of the

21   purchase price would be put in a separate agreement,

22   not necessarily recorded, but it would be a separate

23   agreement between the parties for the timber alone.

24   Put what the value is on that, and when the timber is

25   to be cut.

70

```
 1     A     You may have all of them here, but there
 2  may have been another one.  Could have been.
 3            (THEREUPON, Deposition Exhibit No. 23 was
 4     marked for identification.)
 5     Q     I'm going to show you what we have marked
 6  then as Exhibit 23.  Ask you if you can identify that
 7  document for us?
 8     A     Okay.  Now, this one has attached to it,
 9  looks pretty well the same as the other agreement that
10  we just mentioned that was recorded between the
11  parties Kinkead and Fisher & Young dated April 1,
12  1968.  Yeah, that was it.  For the land 25,000 and so
13  on.
14            And attached to this is a description of
15  the parcels involved.  And this was recorded in the
16  Recorder's Office of Warren County as I see the
17  notation on the bottom of each page.  And then there
18  are certain exceptions recited where the Kinkeads got
19  the property, the fact that Mr. Kinkead had died and
20  then made subject to an agreement on the Clough Farm
21  Club which was the fishing arrangement we talked about
22  before.  But most importantly excepting and reserving
23  out of the transaction all of the timber and trees
24  which was not a part of the 25,000.
25     Q     Okay.
```

73

 1  parties until --

 2      A      That's right.

 3      Q      -- the grantor had been paid in full?

 4      A      That's right.

 5      Q      Okay.

 6      A      That's right.

 7      Q      So if the deal goes south for some reason,

 8  there is a recorded copy of the agreement, but the

 9  actual deed wasn't going to pass until payment was

10  made?

11      A      That's right.

12      Q      Okay.

13      A      That's right, you are right.

14      Q      And again, this articles of agreement is

15  for the sale of land from Marion C. Kinkead to Fisher

16  & Young, Inc.?

17      A      That's right.

18      Q      Dated April 1st, 1968 and from this deed

19  then excepts and reserves "all of the timber and

20  trees, standing and down, situate on the premises

21  above described, with full right of entry for the

22  purpose of cutting, skidding, piling and removing the

23  same, and of constructing roadways and skidways,

24  sawmills and piling yards, for such purposes,"

25  correct?

Plaintiff's Appendix
000410

74

```
 1     A     That's right.  And then as I said
 2  repeatedly, there would have been a separate agreement
 3  for the timber --
 4     Q     I understand.
 5     A     -- at that same time.
 6     Q     I understand.
 7     A     Same date and everything.
 8     Q     Okay.
 9     A     Different amount of money.
10     Q     Different amount of money.  Okay.  So by
11  virtue of this articles of agreement, Fisher & Young
12  gets no rights to the timber and trees.  Marion
13  Kinkead is selling the land, just so I'm clear, she is
14  selling them the land, but holding back all of the
15  timber and trees?
16     A     That's true, according to this agreement.
17  We are talking about two agreements.
18     Q     No, I understand.
19     A     Okay.
20     Q     I'm trying to get clear as to what this
21  Article of Agreement accomplishes.
22     A     That's right, you are right.
23     Q     And it's the sale of the land itself
24  excepting and reserving all interest in the timber and
25  trees?
```

76

1  of taxes and whatever.  I'm saying that this probably

2  was preliminary because they still haven't put a date

3  in here for the April what, 1968.

4      Q      Okay.

5      A      Probably something, this was not the final

6  one probably.

7      Q      This one also appears to have been a

8  marked-up copy of the front page?

9      A      Yes, there is marks, somebody has

10  underlined stuff here.  That's not my writing.  I know

11  that.

12      Q      Okay.

13      A      But any way, this is all the timber, 12

14  inches and more in diameter and what not.

15      Q      All right.  So by virtue of the first

16  articles of agreement that were recorded, Marion

17  Kinkead excepted and reserved all of the timbers and

18  trees unto herself.  And then the purpose of the

19  second articles of agreement then is to transfer an

20  interest in that reservation to Fisher & Young?

21      A      Yes.

22      Q      Okay.

23      A      The real purpose is to avoid the transfer

24  tax, that's what it really boils down to.  If we would

25  have put the whole 125,000 in one agreement and put

Plaintiff's Appendix
000412

 1  that on record, then the Department of Revenue would

 2  have wanted to collect one percent.

 3      Q     Okay.

 4      A     So that's the real purpose behind it all.

 5      Q     All right.  And the $100,000 then so we got

 6  two agreements now, $125,000 which reflects what the

 7  original deal was going to be?

 8      A     Uh-huh.

 9      Q     Also pretty much follows what Fisher &

10  Young apparently had valued the land and the timber

11  for?

12      A     Uh-huh.

13      Q     And we have come to then again this appears

14  to be an installment payment?

15      A     Right.

16      Q     They are going to put $20,000 down, balance

17  of 80,000 is going to be paid --

18      A     8,000 annually.

19      Q     -- in 10 annual payments of $8,000,

20  correct?

21      A     That's correct, that's correct.

22      Q     And what Marion Kinkead, at least from this

23  draft is granting to Fisher & Young is "all of the

24  timber and trees standing and down measuring twelve

25  inches of more in diameter, one foot from the ground,

78

1  on the premises here and after described; with the

2  right to enter on said premises and to cut, skid, pile

3  and remove the same, subject to the terms of this

4  agreement until April 1, 1978, on and after which date

5  all rights hereunder on the part of the second party

6  which without notice cease and determine," is that

7  correct?

8        A     That's correct.

9        Q     All right.

10       A     That's what it says.

11       Q     So instead of granting to Fisher & Young a

12  right in all the timber and trees, she has limited

13  that grant to those trees that are 12 inches or more

14  in diameter, one foot from the ground and she is

15  limiting the time Fisher & Young can cut that until

16  April 1, 1978, after which time their rights end

17  without notice?

18       A     Uh-huh.

19       Q     Okay.

20       A     That's what it says, yeah.

21       Q     Then they talk about, the only other

22  paragraph I have on mine talks about how the taxes are

23  going to be handled on the property for 1968 and

24  thereafter?

25       A     That's right.

1      Q      From the previous copies that we have

2  looked at.

3      A      Oh, okay.  Let's see, in Exhibit 26 it says

4  all the timber, trees, standing and down, measuring 12

5  inches or more in diameter, one foot from the ground,

6  on the described premises, with the right to enter to

7  cut, skid, pile, remove the same, so on, subject to

8  the terms of this agreement until April 1 of 1978,

9  after which all rights hereunder shall revert to the

10 owner of the land.

11            Incidentally, the owner of the land it's

12 contemplated will be Fisher & Young.

13     Q      Understood.

14     A      Now, the other one, Exhibit 25 you think

15 that's different?

16     Q      Exhibit 25 just --

17     A      Referring to the --

18     Q      -- just says that on April 1st, 1978 Fisher

19 & Young's rights end.

20     A      Yeah, well both of them say that.  Well, I

21 see, the right end, yes, and the one, this later draft

22 of this same agreement appears, says that until April

23 1, '78 on or after which date all rights hereunder

24 shall revert to the owner of the lane, that's where

25 there is a difference then, yes that's right.

82

1    Q    Okay.

2    A    That's the wording that we would normally

3  have put in an agreement like this, this Exhibit 26.

4  In other words, terminating, because in the meantime

5  Fisher & Young, for example, if they sold it to

6  Carlisle, which actually happened, and at the end of

7  the time period set for this 10 years, the rights to

8  the timber would revert to Carlisle instead of, Fisher

9  & Young, I suppose.

10    Q    Right.  So on April 1st, 1978 if we go by

11  Exhibit 26, whoever owns the land on that date gets

12  the reversionary interest of the timber, versus

13  Exhibit 25 where the presumption would be the

14  reversion would go back to Marion C. Kinkead and her

15  heirs, because she is the grantor?

16    A    Right.  Now, this, the second, the Exhibit

17  26, the subsequent one put on, changing that, putting

18  in reverting to the owner of the land, I guess

19  probably assume that the timber would be paid for.

20  And that was probably done at the request of Fisher &

21  Young, if we are going to be paying for this, we might

22  as well express it maybe differently that it would

23  revert to us, the ones that paid for the timber.

24    Q    Isn't that converting, though, the timber

25  and trees, to an interest in real property which is

84

1   she?

2       Q      Not under Exhibit 26, but under Exhibit 25.

3              MR. HABER:  Are you going to take the oath

4       and testify or are you just going to let him

5       testify?

6              MR. FRYLING:  I apologize.

7       A      Well, any way, I don't know what anybody

8   was thinking about or what the intentions were, except

9   that they were, the purpose of the agreement was to

10  avoid the transfer tax.  You know, that second

11  agreement on the timber itself, that's the primary

12  reason for having that.

13      Q      Okay.

14      A      And then not bothering to record it

15  actually.

16      Q      All right.

17      A      And we know that Mrs. Kinkead was paid in

18  full or she wouldn't have signed the deed for the,

19  even for the land.

20      Q      Right.  So as I understand it then, the

21  only way that the timber can be transferred to Fisher

22  & Young to avoid paying transfer tax on it is that

23  they be given an interest in personal property with a

24  limited right to cut?

25      A      Yeah.

1     Q     Is that correct?

2     A     Yes.

3     Q     Okay.

4     A     Limited, I don't know what you mean by

5  limited.  Limited in as much as they cut they have to

6  pay for the timber that's cut for one thing.  And

7  secondly they have to have a time certain in which it

8  would be cut.

9     Q     Right, but when I say limited, I mean

10  limited within a time duration, in this case an

11  agreement that contemplated giving Fisher & Young the

12  10 years to take their personalty off the land, that

13  being the timber?

14     A     Yeah, right.

15     Q     Would that be correct?

16     A     Yeah, that's right.

17           (THEREUPON, Deposition Exhibit No. 27 was

18     marked for identification.)

19     Q     Show you then Exhibit No. 27.  Ask you if

20  you can identify that for me, please?

21     A     Well, that looks offhand like it's the same

22  as Exhibit 26, does it?  No date in April, 1968, same

23  parties.  And this would be the same exception as

24  typed in on Exhibit 27 referring to the, or not the

25  exception, the extent of the property being

94

1    Q    And since the Article of Agreement for the

2    real estate has a recording number on it, is it safe

3    to say then that it was that agreement that you sent

4    and not the timber agreement?

5    A    That's right.

6    Q    And the timber agreement, I think you said

7    customarily would not get recorded?

8    A    That's right.

9    Q    And the purpose of not recording it is so

10   the revenue people won't find it?

11   A    Well, that might be a sneaky way of

12   expressing it, but if they did ask for it, and wanted

13   some kind of a confirmation because they would see the

14   exception on the Article of Agreement referring to the

15   land itself, you would have it, you would have

16   something to show them in.  In other words, doesn't

17   have to be recorded, but it, we have it available for

18   your inspection, in other words.

19   Q    Okay.  And conversely, because it's

20   structured then with a limited time, 10 years, to be a

21   transaction in personalty, there is no requirement

22   like a transfer in real property to actually record

23   anything --

24   A    Right.

25   Q    -- to be valid, is that correct?

108

1      A      The land was purchased by Fisher & Young

2  for 125, wasn't it?  Everything.  They separated the

3  agreement for the land and the timber, one was 100,000

4  for the timber and 25 for the land.

5      Q      Okay.  Was it then Fisher & Young's intent

6  to sell the Boy Scouts not only the land but also

7  timber?

8      A      Well, I don't know.  I don't think they are

9  going to sell the timber.  It says in the notes they

10  were excepting and reserving the timber perpetually.

11     Q      Okay.

12     A      Except any trees that would have been

13  planted by the Boy Scouts.

14     Q      Okay.  How could Fisher & Young except and

15  reserve the timber rights perpetually when they only

16  had the right to timber the property until April 1st,

17  1978?

18     A      Well, if they paid for it, they would get

19  the timber rights, assuming they, as we discussed

20  before in connection with Carlisle, the same thing

21  applied here, they weren't in the position to do

22  anything in the sale to the Boy Scouts until they paid

23  off Mrs. Kinkead.

24     Q      Okay.  So at the time they are negotiating

25  with the Boy Scouts, they haven't settled up with

109

1   Mrs. Kinkead for either the land or the timber?

2       A    No, they haven't settled up with her.  They

3   weren't going to do that unless they needed to because

4   now somebody else has stepped into the picture and

5   would like to have the property and made him an offer,

6   namely the Boy Scouts who were expecting Carlisle to

7   provide the finances.

8       Q    Okay.  And your understanding, at least as

9   reflected on your notes then, the items of that

10  agreement were going to be $100,000, the timber was

11  going to be excepted and reserved perpetually?

12      A    Yeah.

13      Q    I'm sorry?

14      A    Yes.

15      Q    If in fact Fisher & Young followed through

16  with its agreement on the Kinkead deal, correct?

17      A    That's right.

18      Q    All right.  Would include the oil, gas and

19  minerals and the building and land, correct?

20      A    That's right.

21      Q    And the reason that the timber is treated

22  differently than the oil, gas and minerals was because

23  or is because Pennsylvania treats timber differently

24  than it treats oil, gas and minerals, correct?

25      A    Exactly, that's right.

129

1  1978.

2      A      Yeah.

3      Q      That's the agreement.

4      A      They have got an agreement to buy the

5  timber, too.

6      Q      I'm only aware of one agreement so far.

7      A      Well, they have got two agreements with

8  Kinkead, one for the land, one for the timber.

9      Q      Right, I understand that.  And the

10 agreement that Kinkead gave them for the timber was

11 the right of Fisher & Young to timber the property

12 until April 1st of 1978.  Are you aware of another

13 agreement --

14     A      No.

15     Q      -- other than the one that we have already

16 looked at?

17     A      No.

18     Q      Okay.  So Fisher & Young when they are

19 selling the property to Carlisle are excepting and

20 reserving the timber rights, the only timber rights

21 they have to except and reserve are the timber rights

22 they got from Kinkead?

23     A      Uh-huh.

24     Q      Would you agree with me that Fisher & Young

25 can't have any timber rights greater than what they

130

1   got from Marion Kinkead, their grantor?

2       A       Right, right.

3       Q       Okay.  All right.  In addition to whatever

4   agreement was outstanding at that time between

5   Carlisle and, or I'm sorry, between Kinkead and Fisher

6   & Young, Fisher & Young also added some additional

7   terms and conditions in the agreement with Carlisle

8   that weren't present in the agreement with Kinkead?

9       A       I don't know.

10      Q       Okay, well, for instance, if we look at

11  page, paragraph 6?

12      A       Of this last exhibit, 42?

13      Q       Yeah.

14      A       Okay.

15      Q       If we look at paragraph 6, Fisher?

16      A       Oh, yeah, that's right, they changed that

17  diameter of the timber to be cut, that they were going

18  to, they were going to, is that what you are referring

19  to?

20      Q       Yes.

21      A       They are confining the cutting of timber to

22  that measuring 16 inches or more in diameter of one

23  foot from the ground, above the ground and also

24  confine it to the season between November 1st and

25  March 31st each year.  Saw timber that would be now.

Plaintiff's Appendix
000423

141

1    suppose the fishing agreement maybe, whatever,

2    excepting the timber.

3        Q    Okay.  And again the deed from Fisher &

4    Young excepts and reserves from the conveyance all the

5    timber and trees, standing and fallen, situate on the

6    premise above described, with the right to essentially

7    come on and timber the property, subject to the right

8    of the buyer for its own purpose, all trees fallen for

9    more than one year and all tree tops remaining after

10   logging operations.

11       A    That's right.

12       Q    Correct?  Now, as I understand it, as of

13   January 9th, of 1970, at the time Fisher & Young gives

14   this deed to Carlisle, and this deed is recorded on

15   January 19th of 1970, no deed has been created between

16   Marion C. Kinkead and Fisher & Young transferring to

17   Fisher & Young an interest in the timber and trees,

18   correct?

19       A    What you are asking is whether Fisher &

20   Young got a deed from Kinkead yet?

21       Q    Correct.

22       A    At the time they did this?  No, but they

23   had a right to receive one.

24       Q    Okay.

25       A    They would be estopped from denying that,

142

1  wouldn't they?  I mean the sequence maybe isn't

2  normal, but except that they did have a right to get a

3  deed from Kinkead.

4      Q    Okay.  And they had a right to get a deed

5  from Kinkead but no deed existed as of January 9th,

6  1970?

7      A    No, I guess that's right.

8      Q    Okay.  Likewise the articles of agreement

9  for the timber between Marion Kinkead and Fisher &

10  Young was not recorded as of record at the Warren

11  County Courthouse?

12     A    For the timber you are talking about?

13     Q    Yes, for the timber.

14     A    Yes, right, right.

15     Q    Your title search and certification then

16  would not reflect a recorded timber deed or a recorded

17  articles of agreement for the timber?

18     A    No, no.

19     Q    Okay.  Let's jump ahead then.

20          (THEREUPON, Deposition Exhibit No. 48 was

21     marked for identification.)

22     Q    I'm going to show you what we have marked

23  as Exhibit No. 48.

24     A    Uh-huh.  This is a letter from Terry

25  Warren, attorney in Ashtabula, Ohio, to me dated

Plaintiff's Appendix
000425

147

1  that agreement was.  Now, let's see.  Yeah.  He is

2  wondering what effect his client might have if Fisher

3  & Young were in default on the agreement with Kinkead

4  I guess.  Talk further about making an assignment of

5  that Kinkead agreement to Carlisle if that would help

6  to ease their concerns.

7      Q    As I read your response to Mr. Warren in

8  this February 11th, 1970 letter, it appears that

9  Mr. Warren and Mr. Carlisle, prior to purchasing this

10  property, was unaware of the fact that the Kinkead

11  timber agreement existed?

12      A    Oh, I guess that's right, probably.

13      Q    And apparently Mr. Warren is writing to you

14  asking for an explanation as to what this agreement is

15  and the impact that it's going to have on his client?

16      A    Yeah, I guess I must have overlooked the

17  fact that Warren representing Carlisle and that fellow

18  Eardley that we worked with the Boy Scouts, I just

19  overlooked the fact that these weren't the same guys,

20  two different attorneys, two different clients.  Any

21  way, I was assuming that everybody knew all about that

22  any way.  But I think we got it straightened out on

23  it.

24      Q    Okay.

25      A    I think.

148

1       Q       And how did you get it straightened out?

2       A       Well, I let him know -- well, offering any

3  way, I don't know whether actually was sent or not,

4  but offering to give him an assignment with Kinkead's

5  agreement with Fisher & Young, assigning Fisher &

6  Young's rights to the timber.  I guess.  I don't know.

7  I'm a little bit foggy about all that after all this

8  time.

9       Q       Okay.

10              (THEREUPON, Deposition Exhibit No. 53 was

11      marked for identification.)

12      Q       Let me show Exhibit No. 53, a letter from

13  Mr. Warren dated February 13, 1970 and ask you if you

14  have seen that letter before?

15      A       Well, I probably saw it.  It was addressed

16  to me back in '70, 1970, but he was distressed over

17  the, whatever was going on and saying that they didn't

18  know anything about the relationship between Fisher &

19  Young and Mrs. Kinkead.  More specifically, that

20  Mrs. Kinkead had a lien on the timber rights, the

21  original amount of a $100,000 less current payments.

22  Well, I don't know, let's see, I don't know what

23  happened after this.

24      Q       Well, if I understand what occurred, based

25  on these letters, is that after the deal has been

149

1    closed, Terry Warren who represents Mr. Carlisle, find

2    out through the Union Title Company that there is some

3    agreement outstanding between Marion Kinkead and

4    Fisher & Young?

5        A    Right.

6        Q    The original amount of which is $100,000

7    for the timber?

8        A    Uh-huh.

9        Q    It appears that Mr. Warren is concerned

10   that obviously that's going to impact the title that

11   Carlisle gets --

12       A    Uh-huh.

13       Q    -- if in fact Fisher & Young default to

14   Marion Kinkead?

15       A    Yeah.  I don't know how it was finally

16   resolved, but I don't have any recollection.  But I

17   would have assumed that we would have suggested to

18   Fisher & Young to pay off Marion Kinkead and get an

19   assignment of all her reservation, in other words,

20   pass on her rights that she had to the new owner,

21   Carlisle.

22       Q    Okay.

23       A    I don't know what happened.  I don't have

24   any recollection.  I don't know who made all those

25   side notations on here.

Plaintiff's Appendix
000428

156

1  as to whether Terry Warren and Albert Carlisle were

2  ever provided with a copy of the agreement between

3  Kinkead and Fisher & Young for the timber?

4      A     I have no idea.  I don't have any idea.  I

5  don't know.

6            (THEREUPON, Deposition Exhibit No. 58 was

7       marked for identification.)

8      Q     I'm going to show you Exhibit 58 which is

9  dated February 11th --

10     A     Of '71?

11     Q     Of '71.

12     A     Letter to me from Mr. Warren and this

13 further discussion about this matter.  Whatever, he

14 wasn't satisfied with what we were doing I guess or

15 suggesting.  Talking about settlement of the 1970

16 taxes.

17     Q     Letter addresses a couple of items, one is

18 the taxes, but I guess the bottom of the first page,

19 third paragraph, talks about the Kinkead agreement and

20 as of February 11th of 1971, where that issue stands

21 at least in Mr. Warren's mind.

22     A     Yeah, we are at logger head here.  They

23 find our suggestion was unacceptable and vice versa,

24 that Fisher & Young find it unacceptable.  As I've

25 said, I don't know why the dickens Fisher & Young,

169

1  that particular problem, get Marion Kinkead out of the

2  picture.  It seems logical.

3      Q    As I recall from the original article of

4  agreement, the payments were going to be based over 10

5  years, correct?

6      A    Uh-huh.

7      Q    $8,000 a year for 10 years?

8      A    Uh-huh.

9      Q    That would have taken us to 1978 under the

10  original agreement?

11      A    Yeah, right.  But are you wondering why it

12  happened before then?

13      Q    Correct.

14      A    Well, I don't know except that it was, they

15  couldn't finalize the agreement with American

16  Hardwoods until they got Mrs. Kinkead out of the

17  picture so went ahead and paid her off and got her

18  deed.

19      Q    Okay.  And again this deed is for the

20  timber interest that Mrs. Kinkead excepted and

21  reserved when she sold the real property to Fisher &

22  Young by deed and is meant to reflect the agreement

23  that was unrecorded between Marion Kinkead and Fisher

24  & Young regarding the timber, correct?

25      A    Right, right.

Plaintiff's Appendix
000430

180

1  the deal between Kinkead and Fisher & Young for the

2  timber is this deed dated April 20, 1973?

3      A    That's all I know about, yes.

4      Q    Would you agree with me that this deed was

5  not created nor did it exist at the time Carlisle

6  purchased the land from Fisher & Young?

7      A    Let me hear that again.

8      Q    Would you agree with me that when Carlisle

9  purchased --

10     A    Yes.

11     Q    -- the land from Fisher & Young, this deed

12 dated April 20th, 1973, had not been created nor had

13 it been recorded?

14     A    That's correct.  I agree with that.

15     Q    As a consequence of that, would you agree

16 with me that Carlisle purchased the property without

17 notice of this deed?

18         MR. HABER:  I'm going to object to the form

19     of the question.  You are asking for a legal

20     conclusion.  Notice meaning legally?  Or the fact

21     that it did not exist?

22         MR. FRYLING:  The fact that it didn't

23     exist.

24         MR. HABER:  Well, ask the question that

25     way.  Of course it didn't exist if he purchased

181

1        it in 1971 and the deed was prepared in 1973.

2              MR. FRYLING:  Well, are you going to answer

3        or is he going to answer?

4        A      Well, I agree, that's right.  That's my

5    answer.

6        Q      Wasn't a trick question.  Wasn't tough.

7        A      No, but I can't imagine what the reason for

8    the question is except that you are trying to say that

9    now Mrs. Kinkead should have given a deed to Carlisle

10   for this timber.

11       Q      Well, I'm not trying to say anything.

12       A      No, I know, but --

13       Q      I'm trying to find out what documents

14   exist, what those documents say, who drafted them and

15   why.  That's my purpose of being here today.

16       A      Okay.

17       Q      You know, I've got to rely on the documents

18   that are of record like everybody else.

19              After then the sale of '73, if in fact

20   that's when it was consummated with American Hardwood,

21   I understand you wound up the operations then of

22   Fisher & Young, dissolved the corporation?

23       A      Right.

24       Q      And you were pretty much out of the scene?

25       A      Yes.

1

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                        - - -

4

5  ALBERT T. CARLISLE,                )
                                      )
6              Plaintiff,             )
                                      ) Civil Action
7          vs.                        ) No. 04-25 ERIE
                                      )
8  BARTONY, HARE & EDSON;             )
   SCOTT M. HARE, ESQUIRE;            )
9  HENRY E. BARTONY, JR., ESQUIRE;    )
   and JOHN JOY V. EDSON, ESQUIRE,    )
10                                    )
               Defendants.            )
11                        - - -

12              Deposition of PETER J. KREMBS
13            Tuesday, February 21, 2006
14                        - - -
15
        The deposition of PETER J. KREMBS, called as a
16  witness by the defendants, pursuant to notice and the
    Federal Rules of Civil Procedure pertaining to the
17  taking of depositions, taken before me, the
    undersigned, Darla J. Carabotta, Notary Public in and
18  for the Commonwealth of Pennsylvania, at the offices
    of Hermann, Cahn & Schneider, 1301 East Ninth Street,
19  Suite 500, Cleveland, Ohio 44114, commencing at 9:35
    o'clock a.m., the day and date above set forth.
20                        - - -
21
              COMPUTER-AIDED TRANSCRIPTION BY
22            MORSE, GANTVERG & HODGE, INC.
                ERIE, PENNSYLVANIA
23                 814-833-1799
24                        - - -
25

2

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3           Conner Riley & Fryling:
             Andrew J. Conner, Esquire
 4           17 West Tenth Street
             Erie, Pennsylvania  16501
 5
          On behalf of the Defendant:
 6
             Weinheimer Schadel & Haber, P.C.:
 7           David L. Haber, Esquire
             602 Law & Finance Building
 8           429 Fourth Avenue
             Pittsburgh, Pennsylvania  15219-1503
 9
                           - - -
10

11                      I-N-D-E-X

12   EXAMINATION BY:                      PAGE
     Mr. Haber                              3
13                                         39

14   Mr. Conner                            35

15
     KREMBS DEPOSITION EXHIBITS:         MARKED
16   A - January 20, 1970 Agreement of Sale    17
     B - April 23, 1973 Deed                   18
17   C - May 6, 2003 Quitclaim Deed            28
     D - June 23, 1999 Letter, Attorney Hare to
18       Lainard Bush                          34
     E - June 23, 1999 Praecipe for Writ of Summons   35
19   F - Warren County Court of Common Pleas,
         Case No. 353-1998 C.D. Amended Complaint   35
20

21                      - - -

22

23

24

25
```

Plaintiff's Appendix
000434

3

```
 1                    PETER J. KREMBS

 2   Called as a witness by the defendants, having been

 3   first duly sworn, as hereinafter certified, was

 4   deposed and said as follows:

 5                    EXAMINATION

 6   BY MR. HABER:

 7        Q     State your full name?

 8        A     Peter Krembs, K-r-e-m-b-s.

 9              MR. CONNER:  David, we're operating under

10        the usual stipulation that all objections except

11        as to the form of the question are reserved until

12        the time of trial, except for the objections that

13        we will have to interpose to attorney/client

14        privilege issues?

15              MR. HABER:  Correct.

16        Q     Mr. Krembs, my name is David Haber, and I

17   represent the defendants in a lawsuit Albert Carlisle

18   has filed in the United States District Court for the

19   Western District of Pennsylvania.

20              I'm sure you are familiar with depositions,

21   so I'm not going to go through the instructions.

22        A     Yes.

23        Q     You are licensed to practice law in the

24   State of Ohio?

25        A     Correct.
```

4

```
 1      Q      Are you licensed in any other state?

 2      A      No.

 3      Q      Were you ever licensed in Pennsylvania?

 4      A      No.

 5      Q      What is your business address here?

 6      A      1301 East Ninth Street, Suite 500,

 7  Cleveland 44114.

 8      Q      And what law school did you attend?

 9      A      Case Western Reserve University.

10      Q      And what year did you graduate?

11      A      1973.

12      Q      When did you first meet Albert Carlisle?

13      A      Sometime in 1998.  And I don't recall

14  whether it was in the spring or the summer, but it

15  was, I think, during the first half of the year of

16  '98.

17      Q      Do you know how he was referred to you, or

18  came to you?

19      A      I think I learned about Bert from a

20  gentleman by the name of Steve Madewell.  Steve is the

21  Deputy Director of the Lake County MetroParks System

22  here in this area, and I just knew Steve, and I think

23  Steve brought Bert to me.

24      Q      When you first met with Mr. Carlisle, I'm

25  assuming it was at your office?
```

7

1    him in the Federal Court action, and then seeking

2    advice relative to that, it could raise the issue

3    of the statute of limitations.

4        MR. CONNER:  Let me see if I can shortcut

5    this.  I don't think he sought -- in good faith,

6    I don't think Mr. Carlisle sought legal advice

7    with respect to any claims that are involved in

8    the claim of Mr. Carlisle against Mr. Hare.

9        MR. HABER:  Let me jump ahead.

10        MR. CONNER:  Okay.

11        MR. HABER:  And we'll get back to that.  I

12    don't necessarily agree with you, but maybe I can

13    ask it so we don't get into that.

14 BY MR. HABER:

15    Q    In the summer of 1998 Mr. Carlisle had a

16 case proceeding in the Federal Courts, correct?

17    A    Yes.

18    Q    And Mr. Hare was his attorney at that time,

19 but Mr. Hare, for reasons I'm not going to get into

20 with you, was going to withdraw or severe the

21 relationship, and Mr. Carlisle was seeking new

22 counsel.

23    A    Correct.

24    Q    At the time he came to see you, was there a

25 case pending in Warren County, do you know?

8

```
 1      A      No.

 2      Q      So the only case he had pending at that

 3 time was the case in Federal Court?

 4      A      Correct.

 5      Q      Did you ultimately represent him during the

 6 appeal to the Third Circuit?

 7      A      Yes.

 8      Q      You had discussions with Mr. Hare?

 9      A      Yes.

10      Q      Do you recall how many discussions you had

11 with Mr. Hare?

12      A      Well, I only recall one discussion back

13 during this time, and it had to do with the necessity

14 of getting his file in order to handle the appeal.

15      Q      Did you have a discussion with Mr. Hare

16 relative to the voluntary or withdrawal of claims in

17 Federal Court and the effect of that on the statute of

18 limitations?

19      A      I may have had that kind of a conversation

20 with him, but it would have been later on in time, I

21 would think.

22      Q      When you say "later on in time?"  When I

23 say this, Mr. Hare has notes of telephone

24 conversations in potentially June and July of 1998

25 with you and Mr. Fried, who was associated with you?
```

9

1      A      Mr. Fried was an associate here, yes.

2      Q      He's no longer here?

3      A      He's no longer here.

4      Q      Regarding the effect of the discontinuances

5  and whether they toll the statute of limitations or

6  not, and whether the new action in Warren County and

7  what the statute of limitations would be, do you

8  recall conversations with Mr. Hare relative to that?

9      A      I recall having conversations with Mr. Hare

10 that were directed at activities at the trial level,

11 because I needed to have a pretty substantial amount

12 of information for purposes of handling the appeal.

13           But, you know, the several conversations

14 or -- you know, there may have been as many as three

15 or four conversations with him, but I don't think

16 there were more than two or three.  I don't remember.

17 I remember the concerns I had about the case, but my

18 focus was really the appeal.

19     Q      You ultimately began to represent

20 Mr. Carlisle in the Warren County action?

21     A      Yes.

22     Q      At that point was there a concern you

23 raised regarding whether parts or part of that action

24 was time barred with Mr. Hare?

25     A      I don't think so.  I may have had one

10

1 conversation with him where I asked him -- you have to

2 understand, in order for me to even know much of the

3 detail of the trial action in the Federal Court, I had

4 to look at quite a few documents, and so I don't think

5 it was June of '98, it must have been sometime after

6 that that we had this conversation.  I don't remember.

7 But I do remember having a conversation with him where

8 I may have asked him why he dismissed these -- I

9 remember he dismissed a trespass claim, which is I

10 guess in Pennsylvania, trespass and negligence in Ohio

11 are essentially the same.

12     Q     Well, trespass and negligence are separate

13 in Pennsylvania.

14     A     Oh, okay.  Well, then referred to as

15 trespass, but he dismissed that, and he also dismissed

16 a conversion claim, and I'm sure I asked him why he

17 did that.

18     Q     My question was probably a little bit more

19 specific.

20          In Pennsylvania there's what is called a

21 "savings statute," that if you are in Federal Court

22 and for some reasons the case are dismissed, the

23 statute of limitation relates back from the date you

24 first filed.  And there was some concern raised

25 whether the voluntary dismissal of these claims would

12

```
 1  in the Warren County action?

 2       A    Yes.

 3       Q    And my understanding is the complaint was

 4  filed in late 1998

 5       A    Something like that.

 6       Q    And your office prepared the complaint?

 7       A    Yes.

 8       Q    At that time in 1998 when you prepared the

 9  complaint, did you have local counsel?

10       A    Yes.  And I don't remember her name, but we

11  did have a local attorney.

12       Q    And it wasn't from Mr. Conner's firm?

13       A    No, no, this was a person I believe that

14  was recommended by Mr. Carlisle.

15       Q    You can't recall her name?

16       A    She played a really minor role, and

17  frankly, she was a sole practitioner, and I don't

18  remember her name right now.

19       Q    Do you recall when you retained

20  Mr. Conner's firm to be local counsel?

21       A    Quite a bit later.  And I don't recall when

22  it was.

23       Q    The reason I ask the question, there's a

24  pleading filed, that was filed October 12th of '01,

25  which probably was three years after you filed the
```

13

1  complaint, and it lists them on the pleading, it's a

2  motion for partial summary judgment.  And I was just

3  wondering if it was long before then, around then, if

4  you can recall when Mr. Conner was retained as local

5  counsel?

6      A    I know the appeal was over.  I know that

7  Mr. Carlisle's deposition in the Warren County case

8  had been conducted by Matson's counsel.  And I don't

9  recall -- I remember making the oral argument on the

10  motion for summary judgment in Warren County in front

11  of Judge Millin, and I can't tell you whether

12  Mr. Conner was our local counsel by then or not.  He

13  may have been.

14      Q    But it was at least several years after the

15  commencement of the action?

16      A    It was sometime following the initiation of

17  the action, yes.  And I think Mr. Conner may have been

18  our local counsel at the time I made the oral

19  argument, he may have been.

20      Q    On the motions for summary judgment?

21      A    Yes.

22      Q    Going back to the savings statute issue,

23  you said it was a concern around the time you filed

24  the complaint in Warren County?

25      A    Or prior to filing the complaint, sure.

15

```
 1          MR. CONNER:  Okay.

 2     Q     Would I be correct that Mr. Fried probably

 3 did more research on that issue than you would have

 4 done?

 5     A     You're absolutely correct.

 6     Q     Do you know when Mr. Fried left this firm?

 7     A     No.  I don't think Mr. Fried was involved

 8 in the preparation of our motion for summary judgment,

 9 however.

10     Q     After the Federal Court case was concluded,

11 did you have any other further communications with

12 Mr. Hare?

13     A     I think I had one conversation with him, or

14 it may have just been a letter, but Chet Fosse had the

15 check for the verdict, and Chet wanted to make certain

16 that Mr. Hare was paid.

17     Q     There was a dispute for -- I don't want to

18 use the word dispute -- there was outstanding legal

19 fees due at the time the verdict was paid?

20     A     Correct.

21     Q     And that was Mr. Fosse's concern because

22 Scott Hare had raised that issue?

23     A     Correct.

24     Q     Mr. Hare retained you to -- strike that.

25          Mr. Carlisle retained you to represent him
```

1  in the Warren County action?

2     A     Correct.

3     Q     And the Warren County action was a dispute

4  with Matson over timbering on the Clough Farm,

5  correct?

6     A     Yes.

7     Q     Did you prior to filing the complaint do a

8  title search?

9     A     No.

10     Q     Did Mr. Carlisle ever request you do a

11  title search?

12     A     No.

13     Q     Is there any particular reason you did not

14  do a title search?

15     A     Frankly, it never occurred to me.  I mean,

16  I took over a case that had already been litigated.

17  And my main purpose in the Warren County action, was

18  to litigate the issues that Mr. Hare had voluntarily

19  dismissed prior to trial, and to present to the Warren

20  Court what we considered to be a contract case

21  following a dec action, where the rights of the

22  parties had been determined under that contract.

23  Because the jury, as I recall in the federal case, was

24  asked to interpret the contract for the parties, which

25  it did, and it drew some conclusions in a specific

1    jury verdict, and we were litigating those

2    conclusions, and then Judge Millin saw fit to come up

3    with a res judicata rule, which I think is wrong.

4        Q    That ruling by the Judge in Warren County

5    on res judicata has not been appealed to the Superior

6    Court?

7        A    Not to my knowledge, no.

8        Q    Are you still actively involved in the

9    Warren County action?

10        A    I'm not as involved as I used to be, but I

11    still consider it to be a case in which I'm counsel of

12    record and working with Andy.

13            (Thereupon, Krembs Deposition Exhibit A was

14        marked for identification.)

15        Q    Could you look at what I've marked as

16    Exhibit A.?  Do you recognize that document?

17        A    Yes.

18        Q    Could you tell us what it is?

19        A    This is the agreement between Fisher and

20    Young and Mr. Carlisle, in which Mr. Carlisle acquired

21    the land of the Clough Farm subject to timber rights.

22        Q    When Mr. Carlisle first saw you, did he

23    provide you a copy of this document?

24        A    I can't answer that, I don't know.

25        Q    You indicated that you basically believe

 1  that the Warren County action was a contract action,

 2  and also based on the verdict in the Federal Court?

 3  An enforcement of the verdict in the Federal Court

 4  action.

 5      A    Well, it was a contract action, it was also

 6  a negligence action, it was a conversion action, and I

 7  believe there were two contract theories that were

 8  proposed in that action.

 9      Q    Was this the contract that the Warren

10  County action was in part based on?

11      A    Yes, the jury was asked to interpret this

12  contract between the parties.  The jury in the federal

13  case.

14      Q    Correct.  It never got to the jury in the

15  Warren County case.

16      A    No.

17          (Thereupon, Krembs Deposition Exhibit B was

18      marked for identification.)

19  BY MR. HABER:

20      Q    I show you what was marked as Exhibit B,

21  and ask whether you recognize this document?

22      A    Yes, this is the -- oh, this is a deed

23  stamped April 23rd, '73 between Marion Kinkead and

24  Fisher and Young.

25      Q    You haven't seen that before today?

1    A    Oh, yes, I've seen it before today.  I

2 think.

3    Q    Do you recall when you first saw it?

4    A    I believe I first saw this after

5 Mr. Conner's firm had become more involved in the

6 case.  This would have been a relatively recent event,

7 my seeing of it.  I mean, it was well after the

8 arguments on the motion for summary judgment in the

9 State court.

10    Q    When you say "recently, after Mr. Conner's

11 firm got involved," is there anything in your file

12 that would indicate when you retained Mr. Conner as

13 local counsel?

14    A    There might be.  I just don't know.  I'm

15 not sure when I retained Mr. Conner's firm whether

16 Mr. Fryling was at the firm or not.  He may have been,

17 I just don't recall.

18    Q    Did you know Mr. Fryling?

19    A    No.

20    Q    How did you come about to retain

21 Mr. Conner's firm?

22    A    I think it was recommended to me by Bert

23 Carlisle, but I'm unsure of that.

24    Q    And you say what we marked as Exhibit B was

25 located after Mr. Conner's firm became involved as

20

```
 1  local counsel?

 2      A     That's the best of my recollection.

 3      Q     Is it your understanding that it was

 4  located through a title search?

 5      A     That I can't answer, I don't remember that.

 6      Q     You don't know how it was?

 7      A     No.

 8      Q     Do you recall any discussions with

 9  Mr. Conner regarding doing a title search?

10      A     Yes.

11      Q     Was there any event that occurred that

12  precipitated the discussions regarding having a title

13  search done?

14      A     Not that I recall.

15      Q     It was Mr. Conner's or Mr. Fryling's

16  suggestion to do a title search?

17      A     Well, not only was it their suggestion, but

18  it may have been partially conducted or completely

19  conducted before I even was aware that the title

20  search was done.

21      Q     Okay.  Did you have any discussions with

22  Mr. Hare regarding whether he had performed the title

23  search?

24      A     No.  I took the litigation over rather late

25  in the game, Mr. Hare had been around for a couple
```

21

```
 1  years, if there were any title issues, I would assume
 2  they would have been at the early end of the
 3  litigation, or at the start of the litigation.
 4      Q    When Mr. Carlisle came to you, were you
 5  aware or shortly thereafter that he had purchased this
 6  property back in 1970?
 7      A    Correct.
 8      Q    Were you aware that there had been a prior
 9  litigation in Warren County in the mid '80s over
10  somebody cutting trees?  The Chesney litigation?
11      A    I remember that.  I don't remember much
12  about that litigation, but I remember I thought it was
13  a neighbor dispute, where somebody had taken some
14  trees from this property that he was not entitled to
15  take.
16      Q    So would I be correct that you didn't
17  perform a title search because you assumed that if one
18  needed to be done, it would have been done prior to
19  your involvement?
20      A    Correct.  The issue just never came up.  I
21  mean, I would think that Matson would not even acquire
22  the property without a title search.
23      Q    We can discuss that off the record.
24           Prior to this case have you had much
25  experience in litigating, I'll say, timber cases?
```

23

1   Mr. Carlisle regarding bringing a claim against

2   Mr. Hare for legal malpractice?

3       A    When?

4       Q    In 1998?

5       A    I don't think so.

6       Q    Did you ever have a conversation with

7   Mr. Carlisle regarding bringing a negligence claim

8   against Mr. Hare?

9       A    I may have at some later date, but

10  certainly not in 1998.

11      Q    Can you give me a time frame when you may

12  have first had that conversation?

13      A    I really can't.  I remember we were all

14  disappointed when Judge Millin issued a ruling that he

15  issued.

16      Q    When you say "issued a ruling," you mean

17  his opinion in January of 2002 on the motions for

18  summary judgment?

19      A    Correct.  I think that's the only opinion

20  he ever issued.

21      Q    And you believe it was sometime after that

22  opinion?

23      A    Likely.

24      Q    Sitting here today you have no recollection

25  of any conversation with Mr. Carlisle prior to that

25

1      A      That's right, there was a small section of

2   Mr. Hare's deposition, I believe, where my name was

3   mentioned.

4      Q      And Mr. Hare testified as to conversations

5   he had with your office relative to the savings

6   statute?

7      A      His testimony where my name came up I

8   believe was about attorneys fees.

9      Q      The defendant in the Warren County action

10  raised res judicata as a defense and also the statute

11  of limitations as a defense, correct?

12     A      Correct.

13     Q      The defendant argued that the Federal Court

14  verdict barred anything that happened prior to 1997,

15  correct?

16     A      I think to.

17     Q      And that's what Judge Millin ultimately

18  ruled.

19     A      Um-hum.

20     Q      That's what you said you disagree with.

21     A      Correct.

22     Q      As pleadings were filed in the Warren

23  County action, would you keep Mr. Carlisle advised as

24  to what was going on?

25     A      You know, Mr. Carlisle as a client was not

29

1  before.

2      Q     Do you remember discussions regarding this

3  quitclaim deed being given by the estate of

4  Mrs. Kinkead to Matson Lumber?

5      A     Yes.

6      Q     Do you recall in relationship to when

7  Exhibit B was found, when this quitclaim deed was

8  given, or discussed?  B being the 1973 deed.

9      A     Well, it was sometime subsequent to the

10  title search that was performed by Mr. Fryling.

11      Q     You believe that Mr. Fryling did the title

12  search, or had someone do it?

13      A     I think so, yes.

14      Q     Do you recall how long after the title

15  search was performed that the quitclaim deed was

16  given?

17      A     No.

18      Q     Did you ever have any contact with

19  Mrs. Squatriti, I think that's how she pronounces her

20  name, regarding the quitclaim deed, or securing one

21  for Mr. Carlisle?

22      A     No.

23      Q     Did you ever meet Mrs. Squatriti?

24      A     No.

25      Q     Do you recall receiving any information

32

1      A      Correct.

2      Q      When the complaint was filed in 1998, what

3   damages were you seeking to recover through the Warren

4   County action?

5      A      We were seeking to recover damages for

6   destruction of a trout stream that ran through the

7   property by virtue of Matson's harvesting practices.

8              We were seeking damages for the destruction

9   of trees, for lack of a better word, destroyed by

10  Matson in connection with their harvest practices,

11  since the jury had concluded that Matson's right to

12  harvest was a one-time right, it was not perpetual.

13  All the trees that had sprouted since Mr. Carlisle

14  bought the property were his property, and a lot of

15  his property was destroyed by Matson.

16              And we were also seeking damages for

17  conversion, on the theory that the trees harvested by

18  Matson, since they had a one-time right to harvest,

19  had to be in existence in 1969 or 1970, whatever the

20  year was when Mr. Carlisle purchased the property.

21  And under the terms of the contract, the trees that

22  they harvested at that point in time, '69 or '70, had

23  to be 16 inches in diameter, one foot from the

24  ground.  And it was our position that if Matson

25  harvested a tree in the late '80s or '90s that was

33

```
 1  only eight inches in diameter, a foot off the ground
 2  back in 1969, that that was not their property to
 3  harvest.
 4       Q     Did you have a concern whether the statute
 5  of limitations would bar recovery for a claim of a
 6  tree that was cut down in say 1989?
 7       A     No.
 8       Q     And why not?
 9       A     Because we were pursuing -- we had concerns
10  about the statute as it related to the negligence
11  theories and the conversion theories, but we weren't
12  concerned about the statute as it related to our
13  breach of contract theory, because we interpreted the
14  federal action as a dec action, and the rights of the
15  parties under the contract were not clear until the
16  federal action had concluded.
17       Q     So your view was that the Federal Court
18  jury determined the rights of the parties under the
19  contract?
20       A     Correct.
21       Q     And if somebody had breached the contract
22  two or four years before that jury verdict, you could
23  file that suit within two years of the jury verdict?
24       A     Right.  Because the rights were unknown,
25  and the Federal Court asked the jury to declare the
```

Plaintiff's Appendix
000454

35

1   is worth if the tree is still standing there?

2        A    That's correct.

3             MR. HABER:  Subject to you finding those

4        documents and discussing whether you produce

5        them, I have nothing further.

6             MR. CONNER:  I just have a couple, they're

7        very short questions.

8             MR. HABER:  Sure.

9             MR. CONNER:  Let's go off the record a

10       second.

11            (Discussion off the record.)

12            MR. CONNER:  Back on the record.

13            I just want to mark some exhibits,

14       documents for the record.  Let's call this D, E,

15       and F, if you will.

16            (Thereupon, Krembs Deposition Exhibits D,

17       E, and F were marked for identification.)

18                      EXAMINATION

19   BY MR. CONNER:

20       Q    Mr. Krembs, you were asked by Mr. Haber

21   with regards to the Warren action, and just for the

22   record I've had some documents that have been

23   identified as deposition exhibits.  With regards to

24   the Warren action, that is Civil Action 00353, 1998

25   C.D. in the Court of Common Pleas of Warren County,

36

1    Pennsylvania, can you tell me whether or not from your

2    understanding of the file if that action was initiated

3    as a consequence of a Praecipe for a Writ of Summons

4    which was prepared by Mr. Hare's office?

5         A     Correct.

6         Q     I'm just, for the record, showing you what

7    has been marked first of all as Exhibit D, a letter.

8    Do you recognize this as a letter that when you took

9    over the representation of Mr. Carlisle, you became

10   aware of the fact that Mr. Hare had written Mr. Bush

11   on June 23rd, 1998 enclosing a writ of summons, and

12   suggesting that a writ of summons that he prepared be

13   filed by Mr. Bush in the Court of Common Pleas of

14   Warren County to initiate that one action?

15        A     I recall this, yes.  He did this as a

16   courtesy to my office.

17        Q     Let me just show you what has been marked

18   as Exhibit E just for the record, if you can take a

19   moment and look at that, and just tell us whether or

20   not at least from your understanding if that is a copy

21   of the writ with Mr. Carlisle's signature on the

22   second page that initiated what Mr. Haber has been

23   referring to as the Warren action; is that correct?

24        A     Yes.  Our focus at that time was on the

25   appeal, and it was my understanding that this was

37

1   something that should have been done under the

2   Pennsylvania law.

3       Q    Okay.  In any case, just going forward a

4   second, you were asked about the complaint that

5   eventually you filed in the Warren action, and this is

6   the amended complaint containing all four counts, and

7   it purports to be dated -- I think the affidavit or

8   verification of Mr. Carlisle is January 6, 1999.

9            Just take a moment, take a look at that,

10  and tell us whether or not that is a copy of the

11  amended complaint with all four of the causes of

12  action that you have discussed here today with

13  Mr. Haber?

14      A    Yes, it is.

15      Q    And just so we're clear, the action number

16  on the complaint is the same action number that's on

17  the Praecipe for the Writ of Summons; is that correct?

18      A    Right.

19      Q    And in other words, the same caption is on

20  Exhibit E as on Exhibit F; is that correct?

21      A    Yes.

22      Q    Let me just go back and ask you just a

23  couple of other questions.

24           You were asked about your past experience

25  with regard to doing timber cases, and I think you

38

1  indicated that this was your first timber case; is

2  that correct?

3      A    That's correct.

4      Q    How many real estate litigations -- you

5  have been involved in real estate litigation prior to

6  being involved in --

7      A    Yes, I have been.

8      Q    With what frequency have you been involved

9  in real estate litigation?

10     A    Several occasions.  Lease disputes, zoning

11  disputes, lots of them.

12     Q    Now, with that background, and recognizing

13  that you had previously testified that you were taking

14  over a case that Mr. Hare had apparently worked on for

15  three or four years, I think you indicated that you

16  had made an assumption that a title search had been

17  done by Mr. Hare's office of the subject property

18  that's filed in this case, which is the Clough Farm;

19  is that correct?

20     A    I assumed that whatever title issues were

21  involved were handled either by Mr. Hare, or there was

22  just no title issue at all.  I was familiar with the

23  history of the transaction, and I knew that Matson had

24  acquired this asset from Fisher and Young, and I can't

25  believe that timber companies don't do title searches

39

1  as well.

2      Q     And why would you have made that

3  assumption, that somebody in front of you, or prior to

4  you had made the title search, or researched the

5  title?

6      A     Well, I just think a timber case, it's

7  probably kind of a rule of thumb that that's the sort

8  of thing you do.

9      Q     At least from your experience in doing real

10  estate cases in Ohio generally, when you have been

11  involved with a client initially is that a practice

12  that you customarily follow?

13     A     Yes.

14           MR. CONNER:  That's all the questions I

15     have.

16           MR. HABER:  I just have a couple of

17     follow-up.

18                    EXAMINATION

19  BY MR. HABER:

20     Q     You have indicated, maybe I misheard you,

21  that the Praecipe for Writ that Mr. Hare prepared was

22  as a courtesy to your office?

23     A     Correct.

24     Q     You had requested that he prepare it?

25     A     I think he suggested that it be prepared.

40

1    There was something to do with a change in

2    Pennsylvania law on the statute of limitations

3    relating to a contract.

4         Q    Contract under seal, as opposed to --

5         A    Probably.  Probably.

6         Q    And when the writ was prepared at that

7    point, June 23rd, you had already been contacted by

8    Mr. Carlisle to represent him?

9         A    In the appeal, yes.

10        Q    And what about in the Warren County action?

11        A    I don't know as if we had agreed that I

12   would represent him in that action at that point.

13        Q    If you had not agreed to represent him, why

14   would you ask Mr. Hare to prepare the writ?

15             MR. CONNER:  Object.  I don't think

16        Mr. Krembs said he asked him to prepare the writ.

17        Q    You said as a courtesy to your office,

18   correct?

19        A    But it was Mr. Hare's suggestion that this

20   be prepared.

21             MR. CONNER:  When you say "this," you are

22        referring to the writ?

23        A    Yes.

24        Q    Why do you believe it was as a courtesy to

25   your office I guess would be my question?

Plaintiff's Appendix
000460

1                    IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                              - - -

ALBERT T. CARLISLE,            :
4
        Plaintiff,             :
5
        -VS-                    : NO. 04-25 Erie
6
BARTONY, HARE & EDSON, et al,:
7
        Defendants,            :
8                              - - -

9        Deposition of LAURI L. SEKERAK, taken before and by

10   Denice A. Grill, RMR, Notary Public in and for the

11   Commonwealth of Pennsylvania, on Tuesday, February 28, 2006,

12   at the Offices of Conner, Riley & Fryling, 17 West Tenth

13   Street, Erie, Pennsylvania, 16501, commencing at 11:30 a.m.

14   and concluding at 12:50 p.m.

15   For the Plaintiff:

16           James R. Fryling, Esquire
             Conner, Riley & Fryling
17           17 West Tenth Street
             Erie, Pennsylvania 16501
18

19   For the Defendants:

20           David L. Haber, Esquire
             Weinheimer, Schadel & Haber
21           602 Law & Finance Building
             429 Fourth Avenue
22           Pittsburgh, Pennsylvania 15219

23

24
             REPORTED BY:  DENICE A. GRILL, RMR
25           FERGUSON & HOLDNACK REPORTING, INC.

1                           I N D E X

2

3    TESTIMONY OF LAURI L. SEKERAK:

4          Direct Examination by Mr. Fryling . . . . . . Pg. 3

5          Cross-examination by Mr. Haber. . . . . . . Pg. 35

6     EXHIBITS

7    Deposition Exhibit          Marked for Identification

8    Exhibit No. 1                    Pg. 1

9    Exhibit No. 2                    Pg. 17

10   Exhibit No. 3                    Pg. 29

11   Exhibit No. 4                    Pg. 34

12   Exhibit No. 6                    Pg. 34

13   Exhibit No. 7                    Pg. 8

14   Exhibit No. 8                    Pg. 12

15   Exhibit No. 9                    Pg. 12

16   Exhibit No. 10                   Pg. 24

17

18

19

20

21

22

23

24

25

1                           P R O C E E D I N G S

2

3        L A U R I   S E K E R A K, having been first duly sworn,

4    was examined and testified as follows:

5

6                           DIRECT EXAMINATION

7    BY MR. FRYLING:

8

9        Q.   Miss Sekerak, my name is James Fryling and I

10   represent Albert T. Carlisle in a claim filed in Federal Court

11   against Scott Hare and his law firm, Bartony, Edson and Hare.

12       And I've asked you to come here today so that I can ask

13   you some questions with regard to the title search that -- one

14   you performed for me for the Carlisle farm.  And two, to ask

15   you questions about any other searches or title abstracts that

16   you may have performed on the Carlisle farm.    If I ask

17   you a question which you don't understand, please stop me.

18   I'll rephrase the question and re-ask it so that you do

19   understand.  If you answer one of my questions, I'll assume

20   that you understood my question and answered it to the best of

21   your ability, okay?

22       A.   Yes.

23       Q.   All right.  Have you ever had your deposition

24   taken before?

25       A.   Yes.

1    Q.   Okay.  So you know you need to give me a verbal

2    response and wait until I finish speaking?

3    A.   Yes.

4    Q.   Okay, good.  If you would -- If you need to take a

5    break for any reason, just let us know and we'll be happy to

6    accommodate you.  I don't imagine we'll be very long.  But if

7    for some reason you'd like to take a break, let us know.

8    A.   Okay.

9    Q.   Could you give me your full name, please?

10   A.   Lauri L. Sekerak.

11   Q.   What is your professional address?

12   A.   It's 311 Market Street in Warren, Pennsylvania.

13   Q.   Okay.  How old are you?

14   A.   Forty-four.

15   Q.   And your date of birth?

16   A.   6-13-61.

17   Q.   Are you married?

18   A.   Yes.

19   Q.   And your spouse's name?

20   A.   Edward Sekerak.

21   Q.   And his occupation?

22   A.   A real estate appraiser.

23   Q.   Okay.  Can you tell me a little bit about your

24   education?  Where did you go to high school?

25   A.   I went to high school in Westerly, Rhode Island,

1    Land Title Institute offered courses, I took their courses,

2    attended some seminars for like title work and research.

3        Q.    Okay.  And the training that you have for title

4    work, was that mostly done through abstract companies or

5    seminars that were put on by various companies?

6        A.    When I moved back to Warren in 1983, after I

7    graduated college, I worked for an attorney firm, Blackman and

8    Frasier in Warren and they trained me.

9        Q.    Okay.

10        A.    And I worked there up until 1985, and then I

11    started my own business.

12        Q.    Okay.  So you've been searching titles then since

13    1983?

14        A.    Yes.

15        Q.    Okay.  And REM Abstract Services, that's your

16    company?

17        A.    Yes.

18        Q.    And is it a corporation, company or sole

19    practitioner --

20        A.    Sole.

21        Q.    Sole, okay.  Did you start that service or did you

22    acquire it or how did that come about?

23        A.    I started that in 1985.

24        Q.    That was 1985?

25        A.    Yes.

1      A.   No.

2      Q.   Okay.  Now have you had an opportunity to perform

3   a title search and to prepare an abstract of title on the

4   Carlisle slash Clough farm?

5      A.   Yes.

6      Q.   All right.  And have you done that more than once?

7      A.   Yes.

8      Q.   All right.  How many times have you done a title

9   search on the Clough slash Carlisle farm?

10     A.   On the whole farm I've done it once for you,

11  Attorney Fryling.

12     Q.   Okay.

13     A.   And I've done certain parcels for Ardent Resources

14  when they drilled gas wells on certain parcels of the Clough

15  farm.

16     Q.   Okay.  When did Ardent Resources request a search

17  done on certain parcels?

18     A.   I believe it was 1991.

19     Q.   Okay.  Would they have asked you then, as opposed

20  to doing a full search, to do a search on particular parcels

21  that make up the whole of the Clough farm?

22     A.   Yes.

23     Q.   So if I understand you correctly, the first time

24  you would have done a complete title search and abstract of

25  title on the Carlisle farm was pursuant to my request?

1      A.   For the --

2      Q.   For all 16 parcels?

3      A.   Yes, for all 16 parcels.

4      Q.   Other than myself and Ardent Resources, has anyone

5 asked to you do a title search of the Carlisle slash Clough

6 farm?

7      A.   Yes.

8      Q.   Okay.  Who was that?

9      A.   It was Attorney Dennison.

10     Q.   Okay.

11     A.   And that request was in September of 2005.

12     Q.   Okay.  Anyone else?

13     A.   Not for a full title search, no.

14     Q.   Okay.  Anyone else besides those individuals or

15 companies that you've already named who have requested partial

16 searches?

17     A.   Greg Hammond's office.  Greg Hammond, an attorney

18 in Warren, received a letter from Kemp Scales in Titusville to

19 locate the heirs of Levy Clough.

20     Q.   Okay.

21     A.   I also performed curative work for Cabbot Oil and

22 Gas that held the lease on the Clough farm.

23     Q.   Okay.  Do you recall approximately when Greg

24 Hammond would have contacted you?

25     A.   I believe it was in June, 2003.

1    it was hand drawn.  It was just absolutely gorgeous.  And

2    Denny Whipple was the map room director technician at the

3    time.  Two days after Denny Whipple died, a surveyor

4    by the name of William Bevevino, Sr. came in and removed all

5    of the files, including that Clough map.

6        Q.   Okay.

7        A.   I also remember providing to William Bevevino, Jr.

8    and Rene Johnson, the attorneys, the local attorneys, I

9    believe it was for Carlisle, copies of my searches that were

10   in my file.

11       Q.   Okay.

12            MR. HABER:  What was the other name?

13            THE WITNESS:  Rene Johnson.

14            MR. HABER:  Maureen?

15            THE WITNESS:  Just Rene, R-E-N-E.

16   BY MR. FRYLING:

17       Q.   There appears, also on Exhibit 2, a mention of

18   Fisher and Young against William McChesney of approximately

19   1986.  Do you recall whether or not one of the attorneys

20   involved was looking for that file or information from that

21   file?

22       A.   I believe that that case was north of Route 426

23   and William McChesney was a timber purchaser who purchased

24   large tracts of land.  And I believe there was a boundary line

25   dispute.  And I believe that there was a dispute of where the

1    tract line was regarding the Fisher and Young.  And I believe

2    that would be what that case is about.

3        Q.    Okay.  And there's a name Jenny, with a phone

4    number and an extension.  Do you recognize that name or phone

5    number?

6        A.    Yes, that would be Jenny Phillips, and that is the

7    old number for the Prothonotary's Office in the Warren County

8    Courthouse.

9        Q.    Okay.  I'm going to show you what I've marked as

10   Exhibit Number 3 (indicating).  And again this is a copy of

11   some notes from Attorney Hare's file which they've provided

12   us.  And it appears to be a note that Attorney Hare made back

13   on 3-31-97 relating to a phone call apparently that he had

14   with you?

15       (Sekerak Deposition Exhibit No. 3 was marked.)

16       A.    Uh-huh.

17       Q.    And again you've told us that you remember this

18   big six foot map that was rolled up, and you remember the

19   Clough designation?

20       A.    Uh-huh.

21       Q.    Does that relate to the map, the Clough

22   designation?

23       A.    Yes.

24       Q.    Okay.  Denny Whipple was the map room technician,

25   and the day after Denny Whipple's funeral all the maps

1  disappeared, maps from the fishing club and Clough's deeds,
2  from way back.

3      A.    Uh-huh.

4      Q.    Prior to 3-31 of '97, had you had an opportunity
5  then to go through deeds to the Carlisle property including
6  leases or deeds regarding a fishing club?

7          MR. HABER:  Object to the form of the question.
8      What's the March 31st date?  It seems to indicate she
9      did that on March 31st.  I don't think she did that.

10         MR. FRYLING:  No, I asked prior to March 31, '97.

11         MR. HABER:  Okay.

12 BY MR. FRYLING:

13     Q.    Did you have an opportunity prior to that date to
14 have gone through maps of the fishing club from deeds from way
15 back?  I guess I'm just wondering what that refers to?

16     A.    As I recall I've had this same conversation with
17 Jim Hall.  I believe that I remember when I was doing the
18 adverse on the title search for Ardent Resources, probably
19 that I remember seeing some kind of stream for the fishing
20 club because I had -- And it stuck out in my mind because I
21 had never seen anything like that recorded before.  So it kind
22 of just stuck out in my mind that, oh, well this is new.

23     Q.    Okay.

24     A.    But I was never able to find the map.  I believe
25 that I found the lease, and I believe I found in the lease

1        A.    Are you saying Mattson directly?

2        Q.    Yes.

3        A.    No.

4        Q.    Exhibit Number 9 then, I believe you testified is

5    a spreadsheet that would show the history of the abstract of

6    title to the 16 parcels of the Clough/Carlisle farm, beginning

7    with a treasurer's deed up until the time Mr. Carlisle

8    purchased the property?

9        A.    Exhibit 9 would include title back to -- from the

10    1890's all the way up until I would say November of '02.

11        Q.    Okay.

12        A.    This would just be for the surface.  There's no

13    leases or right-of-ways or any of that, mortgages.  There's

14    nothing of that in this, it's just a pure chain of title for

15    the surface.

16        Q.    Okay, great.  And the chain of title for the

17    surface, would that include timber deeds for the timber?

18        A.    No.

19        Q.    Okay.  I'm going to show you, which I haven't

20    marked yet, which would be Exhibit Number 10 (indicating).

21    It's a package of documents.

22        And I'd ask you if you could just take a look at that

23    and see if you could identify that for me, please?

24        (Sekerak Deposition Exhibit No. 10 was marked.)

25        A.    This is a letter that you wrote to me, October

1   10th of 2002 regarding the title search on Carlisle versus

2   Mattson.  And on the back are a lot of notes that I wrote.

3   And what is -- There's also -- These are the abstract of

4   title.

5       Q.   Does that package represent a copy of the search

6   and abstract that you provided pursuant to my request?

7       A.   Yes, but there's a deed in here of 2004, and this

8   is in 2002.

9       Q.   Okay.

10      A.   So that --

11      Q.   With the exception of what appears to be a quit

12  claim deed dated May 6th, 2003, that would have been obviously

13  created after you did your search, correct?

14      A.   Yes.  And also it includes information from Thomas

15  Pierce who was an abstracter and he -- I bought -- purchased

16  his files.  And in his files I found a letter from John

17  Kookogey, who was an attorney that hired Tom Pierce to work on

18  I believe it was the McChesney and Carlisle lawsuit.

19      Q.   Okay.

20      A.   And I believe that is where these abstracts came

21  from that are included in this package that I sent -- sent

22  you.

23      Q.   Okay.  And the abstract, it's the typewritten

24  pages and has each parcels identified by number one, two,

25  three --

1    copy of it.

2        Q.    Okay.  And you're looking at an article of

3    agreement that's dated April 1, 1968 between Marion C. Kinkead

4    and Fisher and Young, and it's what we have referred to in the

5    course of this case as the Kinkead to Fisher and Young timber

6    agreement?

7        A.    Okay.

8        Q.    And this is not -- This would not -- This would

9    not have been included in your search because it's not a

10   document of record?

11       A.    Right.

12       Q.    Okay.

13       A.    I'm not sure how I had a copy in there.

14       Q.    Okay.  Is it possible that this was a document

15   that was in Mr.   --

16       A.    Pierce?

17       Q.    Pierce's records?

18       A.    It could be.

19       Q.    Okay.

20       A.    Yes, I believe it includes the timber agreements

21   and some of the out sales.

22       Q.    Okay.

23       A.    Because I see in here where the fishing document

24   is.

25       Q.    Okay, the fishing lease?

1      A.   Yes.

2      Q.   Okay.  There are within this exhibit that I could

3 find upon review, only two documents with regard to the

4 transfer of a timber interest out of the Clough farm.  The

5 first one is apparently -- Would that be record book --

6      A.   Deed book.

7      Q.   Deed book 177, page 609?

8      A.   Yes.

9      Q.   Of one year.  It's between Allison C. Clough, C.L.

10 Clough, executors of Levi S. Clough, deceased, to Gordon I.

11 Norton, N-O-R-T-O-N, entered March 27, 1934 for a period of

12 one year.

13      And then in 1973, a timber deed between Marion C.

14 Kinkead and Fisher and Young, dated April 20, 1973, and

15 recorded at book 376, page 939?

16      A.   Yes.

17      Q.   Okay.

18      A.   Yes, that's it.

19      Q.   During the course of your title search, did you

20 find any other documents of title recorded at the Warren

21 County Courthouse with regard to an interest in timber on the

22 Clough farm out of --

23      A.   You mean after 2002?

24      Q.   Yes.

25      A.   It would be this (indicating), I believe it's this

1    deed from Marion Kinkead by executor -- executrix to Mattson

2    Lumber, June 19th, 2004, in record book 1379, page 312.

3         Q.    Okay.  Have you had an opportunity to review the

4    docket after the date of that deed to see if there's any

5    subsequent deeds filed with regard to the timber on the Clough

6    farm?

7         A.    I believe I have, and I believe it was to see what

8    happened with Fisher and Young and Mattson and where the

9    timber went from there.

10        Q.    Okay.  Would that be at the request of Attorney

11   Dennison?

12        A.    Yes.

13        Q.    Okay.  I want to show you an Exhibit Number 7

14   (indicating), a portion that you identified of documents or

15   dealing with requests from Attorney Dennison.

16        Do you recall through reviewing these notes, recall

17   specifically what it was that Attorney Dennison was looking

18   for?

19        A.    I believe he wanted the opinion of the Albert

20   Carlisle versus Mattson Company, a copy of that.  And it was

21   filed January 31st of '02, and I FAX'ed it October 11th of

22   2002.

23        Q.    Okay.  And?

24        A.    And then January 28th, 2003 Attorney Dennison

25   asked me to send him copies of the timber deeds referred to on

1    have been recorded and wasn't.  So I included the copies of

2    the indexes to him.

3         Q.   Okay.  I'm going to show you what we've marked as

4    Exhibit Number 4 (indicating), which is a copy of the 1973

5    timber deed.  And it appears to have your name written on the

6    top of it.

7         Do you recall if Attorney Dennison called and asked for

8    a copy of the Kinkead timber deed?

9         (Sekerak Deposition Exhibit No. 4 was marked.)

10        A.   He may have.  I -- I can't be positive.

11        Q.   Okay.  You don't have a note or anything written

12   down with regard to a separate request?

13        A.   No.  Most of my information is -- is gone, I don't

14   --

15        Q.   Okay.  I'm going to show you what I've marked as

16   Exhibit Number 6 (indicating), and ask if you can identify

17   that?

18        (Sekerak Deposition Exhibit No. 6 was marked.)

19        A.   It is the estate of Marion Kinkead, and my

20   handwriting on -- is on there.  It is recorded at -- or

21   registers docket 73, page 701 in the Board of County Recorder

22   of Deeds Office, our offices are combined.

23        I did write down a note next to Dora Squatriti's name.

24   I also wrote down address via -- I'm not fluent in Italian,

25   but it gave her address in Italy.

1    Q.   Okay.  I took a stab at it.  I don't know how
2  close I got either.  Did you get copies of these records at my
3  request?

4    A.   I can't recall.

5    Q.   Do you recall if this is a complete copy of the
6  estate filings from Marion C. Kinkead?

7    A.   It appears to be.

8    Q.   And the only reason that I ask that is if you flip
9  back, one, two, three, four pages to the inventory and
10  valuation form.

11    A.   Yes.

12    Q.   It appears to be book 28, page 316, filed March
13  28, 1989, and at the bottom it says, total of all pages, see
14  next page.  And then the next page looks like page 318.

15    I'm just wondering if perhaps there was a page 317?

16    A.   Their should have been.

17    Q.   Okay.

18    A.   What this is is for the local -- for just Warren
19  County valuation.  This is almost an itemized inventory and
20  valuation from the actual tax schedules.

21    Q.   Okay.

22    A.   It's kind of redundant.

23    Q.   Okay.  It's actually taken from the tax schedules
24  that are filed for the estate?

25    A.   Yes.

1      A.    No.

2      Q.    This Exhibit 4 that you've been shown, that's the

3  1973 timber deed?

4      A.    Yes.

5      Q.    You located that while doing a title search on the

6  Clough farm?

7      A.    Yes.

8      Q.    Okay.  And it's properly filed in the Warren

9  County Courthouse?

10     A.    Yes.

11     Q.    Okay.  When you were doing the title search and

12  located the deed marked as Exhibit 4, did it indicate who had

13  filed the deed in the courthouse?

14     A.    A lot of times you can see by the -- That's R.

15  Pearson Eaton's signature?

16     Q.    Which is?

17     A.    Right there (indicating).

18     Q.    Under the residences of the grantee.  Does that

19  mean he filed it?

20     A.    A lot of times Mr. Eaton would not record deeds,

21  he would leave them in a drawer at the courthouse and tell

22  people to go to court.  However, because of people might have

23  been out of town, he might have recorded the deed.  It was

24  recorded.

25     Q.    It the deed was recorded in April in 1973?

Plaintiff's Appendix
000478

1      A.   Yes.

2      Q.   When you were going through the documents that you

3 brought that have been marked as Exhibit --

4        MR. HABER:   What Exhibit is that?

5        MR. FRYLING:  Seven.

6 BY MR. HABER:

7      Q.   The documents are Exhibit 8.

8      A.   Okay.

9      Q.   You had indicated there were documents in there

10 involving the McChesney lawsuit?

11      A.   Yes.

12      Q.   How did you get those documents?

13      A.   I went into the Prothonotary's Office.

14      Q.   Why did you get the documents regarding the

15 McChesney lawsuit?

16      A.   The chain of titles were the same and for the --

17 I'm not sure if it was the Mattson lawsuit or the Carlisle

18 versus McChesney lawsuit, there was a discrepancy on the tract

19 line with the Carlisle/McChesney lawsuit and I believe that

20 Mr. Kookogey was also involved in that.

21      So I just went in and looked for the chain of title,

22 which would have been the same.

23      Q.   Okay.  When did you do that?

24      A.   (No audible answer.)

25      Q.   Was that in response to Mr. Fryling's request for

# Bartony Hare & Edson

*Attorneys at Law*

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone 412/338-8632
Facsimile 412/338-6611

June 23, 1998

**VIA OVERNIGHT EXPRESS**


DEPOSITION EXHIBIT
*Bush # 2*

Mr. Lainard Bush
Rd # 1   Box 9
Spring Creek, PA   16436

Re: <u>Additional Lawsuit against Matson</u>

Dear Lainard:

I have prepared the enclosed Praecipe for Writ of Summons for filing with the Prothonotary's Office in the Court of Common Pleas of Warren County. The filing of this Praecipe will initiate a new lawsuit on Bert's behalf against Matson, and toll the running of any statute of limitations.

Please sign the Praecipe on Bert's behalf and take it to the court house for filing. The filing fee is $60.50. You can tell the clerk that Bert will arrange for service at a later date, so there is no need for them to deliver the praecipe to the sheriff.

If you have any questions, please call.

Very truly yours,

*Scott*

Scott Michael Hare

/SMH

Enclosures

IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

| | |
|---|---|
| **ALBERT T. CARLISLE,** | CIVIL DIVISION |
| Plaintiff, | NO. _____ |
| v. | CODE: |
| **MATSON LUMBER CO.** and **MATSON HARDWOODS, INC.,** | **PRAECIPE FOR WRIT OF SUMMONS** |
| Defendants. | Filed on behalf of Plaintiff |
| | Albert T. Carlisle 1210 Oak Drive Ashtabula, OH 44004 |
| | Tel: 440-964-2131 |

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,              )
                                 )
            Plaintiff,           )
                                 )
        v.                       )       No. _____
                                 )
MATSON LUMBER CO. and            )
MATSON HARDWOODS, INC.,          )
                                 )
            Defendants.          )

### PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

      Kindly issue a Writ of Summons in Civil Action against the within-named Defendants.


 

                                        _____
                                        Albert T. Carlisle
                                        1210 Oak Drive
                                        Ashtabula, OH  44004

                                        Tel: 440-964-2131

Date:        June 23, 1998



IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,

       Plaintiff,

    v.

MATSON LUMBER CO. and
MATSON HARDWOODS, INC.,

       Defendants.

CIVIL DIVISION

NO. ___000353___

CODE:

PRAECIPE FOR
WRIT OF SUMMONS

Filed on behalf of
Plaintiff

Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH 44004

Tel: 440-964-2131





Plaintiff's Appendix
000483

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,              )
                                 )
         Plaintiff,              )
                                 )
    v.                           )     No.  000353
                                 )
MATSON LUMBER CO. and            )
MATSON HARDWOODS, INC.,          )
                                 )
         Defendants.             )

## PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

        Kindly issue a Writ of Summons in Civil Action

against the within-named Defendants.


                              _Albert T. Carlisle_
                              Albert T. Carlisle
                              1210 Oak Drive
                              Ashtabula, OH 44004

                              Tel: 440-964-2130

Date:     June 23, 1998


                                      JUN    1998
                                      RECEIVED



DEPOSITION
EXHIBIT

*Carlisle I*

## THIS QUITCLAIM DEED

made and entered into as of the 6th day of May, in the year Two Thousand and Three (2003), by and between **DORA M. SQUATRITI, individually and as Executrix under the Last Will and Testament of MARION C. KINKEAD**, late of Warren, Pennsylvania, **GRANTOR,**

A
N
D

**MATSON LUMBER COMPANY**, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with offices situate at 132 Main Street, Brookville, Pennsylvania 15825, **GRANTEE.**

WITNESSETH, that in consideration of the sum of One and 00/100 Dollar ($1.00), in hand paid, the receipt whereof is hereby acknowledged, the said Grantor does hereby remise, release and quitclaim to the said Grantee, ALL of the timber and trees, standing and fallen on all those certain tracts of land situate in Spring Creek Township, Warren County, Pennsylvania, bounded and described as follows:

TRACT NUMBER 1:

BEGINNING at the northeast corner at a hemlock tree; thence South, a distance of 136 rods to a post; thence West by lands formerly owned by W. A. Irvine to the corner of land formerly owned by Francis Bates; thence by lands formerly of the said Bates, a distance of 136 rods to a post; thence East by lands formerly of W. A. Irvine to the place of beginning; CONTAINING 64 acres and 155 rods, more or less.

TRACT NUMBER 2:

BEGINNING at a post and stones in the northwest corner of the lot hereby conveyed; thence East, a distance of 169 rods to a post; thence South, a distance of 101 rods to a post; thence East, a distance of 49.1 rods to a post; thence South, a distance of 110.7 rods to a post; thence West, a distance of 166 rods to a post; thence North, a distance of 62.7 rods to a post; thence West, a distance of 53.7 rods to a post; thence North, a distance of 149 rods to a post and stones, the place of beginning; CONTAINING 237 acres of land, more or less, and being part of Tract No. 363.

1

EXHIBIT

L9   06

**TRACT NUMBER 3:**

BEGINNING at the northwest corner of said piece of land at a post; thence in a Southerly direction along the Morton Hill Road to the southwest corner of said piece of land; thence North 88-3/4° East, a distance of 134.6 rods to a hemlock; thence North 1-1/4° East, a distance of 131.4 rods to a post; thence South 89-3/4° West, a distance of 134.6 rods to a post, the place of beginning; CONTAINING about 105 acres, more or less.

**TRACT NUMBER 4:**

Being the homestead farm formerly of G. W. Nichols, and described in the three following Deeds: from Frank E. Bates and wife to C. W. Nichols dated March 21, 1890, and recorded as hereinafter set forth in Deed Book 68, page 81, as commencing at a post in the south line of said property; thence South 88-3/4° West by lands now or formerly of Smith, a distance of 55.5 perches to a post; thence North 1-1/4° West by the same to the State road, supposed to be about 145 rods; thence Eastwardly along the center of said road to the northwest corner of land deeded by Francis Bates to L. L. Bates; thence South 1-1/4° East along said lands now or formerly of L. L. Bates to a post, the place of beginning; supposed to contain about 55 or 54 acres of land out of Tract No. 303.

**TRACT NUMBER 5:**

The east one-half of 63 acres of land deeded from George Yeager to Francis Bates on July 5, 1850, and recorded on July 3, 1851, off of Tract Nos. 304 and 363.

**TRACT NUMBER 6:**

As described in a Deed from L. L. Bates and wife to C. W. Nichols dated February 21, 1886, commencing in the center of the State Road and the center of the Morton Hill Road at the junction of those two roads; thence South 1-1/4° East by land now or formerly of Cordelia Leonard and W. A. Irvine, a distance of 185.5 rods to a beech, the southeast corner of the now or formerly Francis Bates home farm; thence South 88-3/4° West along the south line of said farm, a distance of 51 rods to a post; thence North 1-1/4° West to the State Road; thence Eastwardly along the center of said road to the center of said Morton Hill Road, the place of beginning, supposed to contain about 53 acres of land.

2

TRACT NUMBER 7:

On the North by land above described; on the East by land now or formerly of F. E. Bates; on the South by land formerly of C. W. Nichols; and on the West by land now or formerly of M. Smith; CONTAINING about 31-1/2 acres of land; and also so much of the land described in a Deed from S. D. I. Newbold to the said C. W. Nichols dated March 22, 1888, and recorded in Deed Book 64, page 136, as lies west of the Morton Hill Road, and adjoining the lands hereinabove described.

TRACT NUMBER 8:

On the South by lands now or formerly owned by W. A. Irvine's heirs; on the West by the Morton Hill Road and land formerly owned by George Bates; on the North by land formerly owned by Mrs. Elias Wood; and on the East by the station road and lands formerly owned by Lewis Stoddard; CONTAINING 68 acres, 59 rods of land, more or less, out of Tract No. 304.

TRACT NUMBER 9:

On the North by land of Whitely; on the East by land formerly of Greeley; on the South by lands formerly owned by W. A. Irvine; and on the West by lands conveyed to C. W. Nichols by F. J. Jones and wife, and a public road leading to Spring Creek R.R. Station and lands now or formerly of Stoddard; CONTAINING 44 acres, more or less.

TRACT NUMBER 10:

On the North by land now or formerly of Tom Forbes; on the East by land formerly of W. A. Irvine and L. S. Clough; on the South by lands formerly of William Morton, now or formerly L. S. Clough; CONTAINING 45 acres, more or less.

TRACT NUMBER 11:

Part of Tract No. 310, described as follows: BEGINNING in the center of the State Road at a point where the same crosses the tract line between lands formerly of Sarah D. I. Newbold and that now or formerly of L. Greeley; thence South 01° 45' East, a distance of 88 rods to a post, the southwest corner of Tract No. 310; thence North 88° 45' East along the southerly line of Tract No. 310, a distance of 81 rods to a post in said tract line; thence North 2° West, a distance of 109-1/2 rods to a post in the center of the State Road; thence Westerly along the center of said road,

3

a distance of 84.3 rods to the place of beginning; CONTAINING 50 acres of land, more or less.

TRACT NUMBER 12:

BEGINNING at a point in the center of the State Road at the northeast corner of land heretofore conveyed by S. S. Wead; and running thence South 02° East, a distance of 112.6 rods to a post at the southeast corner of said Wead's land, and in the south line of Tract No. 310; thence North 88-3/4° East, a distance of 350 rods to the western bank of the Big Brokenstraw Creek at low water mark; thence Northwesterly along the western bank of the Big Brokenstraw Creek at low water mark to the center of the State Road; thence Southwesterly along the center of the State Road, to the place of beginning; CONTAINING 214 acres, 104 perches of land, more or less, and being a part of Tract No. 310. The land herein conveyed to include all of the land lying west of the Big Brokenstraw Creek belonging to Mrs. S. D. I. Newbold in said tract. Also, all of the islands in that part of Big Brokenstraw Creek which lie east of the foregoing described land.

TRACT NUMBER 13:

BEGINNING at the northwest corner of Tract No. 313; thence extending due East along the north line of said tract, a distance of 91.9 perches to the corner of land formerly of E. Jackson; thence due South along the same, a distance of 135 perches to the southwest corner of said Jackson's land; thence due West, a distance of 94 perches to the west line of said tract; thence due North along said line, a distance of 135 perches to the place of beginning; CONTAINING 78 acres and 41 perches, more or less, being the northwest corner of Tract No. 313. Being land conveyed to L. S. Clough by Dan A. Geiger and wife by Deed dated October 1, 1906, and recorded in Deed Book 105, page 260.

TRACT NUMBER 14:

On the North by lands formerly of Miles and Watts; on the East by the eastern line of the tract; on the South by the southern line of the tract; on the West by lands formerly of Yeager and Miles and Watts. Being 51 acres 18 perches from the southeast side of Tract No. 304, as conveyed to L. S. Clough by Deed of J. V. Kinyon dated March 30, 1911, and recorded in Deed Book 114, page 397.

4

TRACT NUMBER 15:

BEGINNING at the northwest corner of the whole Tract No. 314; thence South by the west line of the tract, a distance of 159 rods to a post; thence East, a distance of 53 rods, 8 links to a post; thence North by the residue of the tract, a distance of 159 rods to a post in the north line of the tract; thence West along the north line of the tract, 53 rods and 8 links to the place of beginning; CONTAINING 50 acres and allowance.

TRACT NUMBER 16:

BEGINNING at the northwest corner of the tract conveyed at a post; thence East by land formerly of Sager, a distance of 50.7 perches to lands formerly of Jackson; thence South by land formerly of Jackson, a distance of 201 perches to land formerly of Irvine; thence West by lands formerly of Irvine, a distance of 50.7 perches to a post; thence North by lands formerly of Irvine and lands formerly of Yager, a distance of 201 perches to the place of beginning; CONTAINING 60 acres, more or less, being part of Tract No. 363.

SUBJECT to rights of way for electric lines granted to Pennsylvania Electric Company by instruments dated October 15, 1957 and November 29, 1957, and recorded respectively in Deed Book 291, page 460, and Deed Book 292, page 140.

EXCEPTING AND RESERVING that portion of said premises which was conveyed by Robert M. Kinkead and wife, to Charles A. Williams and wife, by Deed dated June 6, 1958, and recorded in Deed Book 294, page 475.

TOGETHER WITH a full release for all timber and trees whensoever cut and removed from the above-described tracts.

TOGETHER WITH any and all rights of entry on and over the above-described tracts for the purpose of cutting, skidding, piling and removing said timber

BEING any timber and trees and removal rights which may have been either excepted and reserved by Marion C. Kinkead or may have reverted to Marion C. Kinkead by virtue of the following Deeds:

1. Deed from Marion C. Kinkead, widow, to Fisher & Young, Inc., dated March 27, 1969, and recorded in the Office of the Recorder of Deeds for Jefferson County, Pennsylvania, in Deed Book 357, page 349;

5

Plaintiff's Appendix
000489

2.  Deed from Marion C. Kinkead, widow, by Fisher & Young, Inc., dated April 20, 1973, and recorded as aforesaid in Deed Book 376, page 939.

The said Marion C. Kinkead died testate on July 14, 1988.  Her Last Will and Testament was duly probated in the Office of the Register of Wills for Warren County, Pennsylvania, in Will Book 73, page 701.  Letters Testamentary were issued to Dora M. Squatriti by the Register of Wills for Warren County, Pennsylvania on July 18, 1988. (Estate No. 21,581)

By her Last Will and Testament, the said Marion C. Kinkead devised her entire estate to her daughter, Dora M. Squatriti.

To comply with the Pennsylvania Realty Transfer Tax Act, it is hereby certified that the within transfer is exempt  from tax pursuant to Section 1102-C.3 (4).

IN WITNESS WHEREOF, the said Grantor has hereunto set her hand and seal as of the day and year first above written.

_____ (SEAL)
Dora M. Squatriti

_____ (SEAL)
Dora M. Squatriti, Executrix under the
Last Will and Testament of Marion C.
Kinkead

I hereby certify the precise address of the within named Grantee to be:

132 Main Street, Brookville, PA 15825

_____
Attorney for Grantee

6

COMMONWEALTH OF PENNSYLVANIA,

COUNTY OF WARREN,                    ss:

On this, the _22nd_ day of May, 2003, before me, the undersigned officer, personally appeared Dora M. Squatriti, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.

In Witness Whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Leslie A. Goldthwaite, Notary Public
City Of Warren, Warren County
My Commission Expires May 22, 2007
Member, Pennsylvania Association Of Notaries

_Leslie A. Goldthwaite_
Notary Public

COMMONWEALTH OF PENNSYLVANIA,

COUNTY OF WARREN,    ss:

On this, the _22nd_ day of May, 2003, before me, the undersigned officer, personally appeared Dora M. Squatriti, Executrix under the Last Will and Testament of Marion C. Kinkead, deceased, known to me (or satisfactorily proven) to be the person described in the foregoing instrument and acknowledged that she executed the same in the capacity therein stated and for the purposes therein contained.

In Witness Whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Leslie A. Goldthwaite, Notary Public
City Of Warren, Warren County
My Commission Expires May 22, 2007
Member, Pennsylvania Association Of Notaries

_Leslie A. Goldthwaite_
Notary Public

7

5 5

LAW OFFICES
WARREN AND YOUNG
PEOPLES SAVINGS & LOAN BUILDING
ASHTABULA, OHIO 44004
AREA CODE 216
997-6175

THEODORE E. WARREN 1897-1969
H. H. YOUNG
E. TERRY WARREN
JAMES A. MERWIGAN

WILLIAM E. RIEDEL

February 11, 1971



DEPOSITION
EXHIBIT

Carlisle L

Mr. John S. Kookogey
Jack, Kookogey & Forssell
144 West Spring Street
Titusville, Pennsylvania 16354

RE: <u>Carlisle - Fisher & Young, Inc.</u>

Dear Mr. Kookogey:

I have yours of January 26th, explaining the split-out of the timber lands and the real estate on the Carlisle property. Fisher and Young did request the appraiser to assess one-third of the total valuation to Fisher and Young for their timber lands and the balance to us. This does not seem fair to me. Under the terms of the agreement, he is prevented using same because of the existing timber rights of your client. I frankly think the split should be fifty-fifty on the assessments as you and I agreed. Mr. Carlisle has some acquaintances there with the taxing department, and he is going to look into the matter himself when next in Pennsylvania. You have agreed with me that the value of the timber rights is approximately $100,000.00 and certainly the value of the land is an equivalent amount which is indicated by the purchase price paid by Mr. Carlisle. On the basis of this, I feel that the taxes should be split on a fifty-fifty basis.

To expedite the settlement of the 1970 taxes, however, we will settle this amount on the basis of one-third two-thirds split as proposed by the comptroller of your client. Earlier, he had forwarded a check to Mr. Carlisle representing this one-third interest, but same has not been cashed by Mr. Carlisle. I, therefore, ask that the comptroller issue a stop-payment order on this check and that a new check be issued with a current date representing this one-third tax payment. This will at least clarify the matter for the tax year 1970, leaving open the remaining years. After Mr. Carlisle has conferred with the appropriate officials concerning appraisal figures on the respective interests, we will be in further communication with you in this regard.

Relating to the Kinkead Agreement, I am at a loss to understand the position of your client. They are admittedly in breach of the purchase agreement, and yet wish to do nothing concerning same. I had proposed to you that we work out some plan concerning

EXHIBIT
58

WARREN AND YOUNG

Mr. John S. Kookogey
Jack, Kookogey & Forssell

February 11, 1971

Page 2

a terminable interest of the timber rights. You have responded to
me that this is unacceptable. You have suggested that we undertake
some sort of a guarantee basis, and I find this unacceptable. It
seems rather strange to me that Fisher and Young could purchase
property including timber rights from a party for the sum of $100,000.00,
and in turn, sell the underlying land for $100,000.00 which they re-
ceived in cash. In the Kinkead arrangement, it appears that very
little, if any, cash was paid, and to date the sum of $30,000.00 or
less has been delivered by Fisher and Young to Mrs. Kinkead. This
means your client has been significantly astute in being able to
finance the acquisition of timber rights without the payment of cash.
Unfortunately, however, there was this oversight in the purchase agree-
ment and we are not willing to ignore it.

I obviously prefer not to retain other counsel in your
community or Meadville in order to institute action to enforce our
rights. However, if this must be done, then obviously the task will
be undertaken. I, frankly, would appreciate any suggestions that
you might have concerning the solution to this problem, realizing
the matter with which we are basically concerned is a terminable
interest in the timber rights or a significant portion thereof.

May I hear from you?

Yours truly,

E. Terry Warren (an)

ETW:an

cc: Mr. A. T. Carlisle

*Fry will cut timber — & pay 1/1 Mrs. K.*
*oral agt. and K cut 10-20 yrs.*

#2234

## TIMBER DEED

THIS INDENTURE, made this 1st day of April, 1973,
between FISHER & YOUNG, INC., a Pennsylvania corporation, with
place of business in Oil Creek Township, Crawford County, Penn-
sylvania, PENNSYLVANIA BANK & TRUST COMPANY, as Guardian of the
Property of Minors under the Will of Wilbert F. Young, on behalf
of Wilbert J. Cochran, a Minor, PHILIP H. COCHRAN and ESTHER Y.
COCHRAN, his wife, P. CRAIG COCHRAN, Single, and ELIZABETH F.
COCHRAN, Single, of Crawford County, Pennsylvania GRANTOR,

                            A N D

FISHER & YOUNG HARDWOODS, INC., a Pennsylvania corporation, with
place of business in Oil Creek Township, Crawford County, Penn-
sylvania, GRANTEE,

WITNESSETH, THAT the said Grantor, in considera-
tion of ONE ($1.00) DOLLAR, does grant, bargain, sell and convey
unto the said Grantee, its successors and assigns, all of the
timber and trees standing and fallen, situate on the premises
described in Schedule "A", attached hereto and incorporated herein
by reference,

TOGETHER WITH full rights of ingress, egress and
regress over and across said land and other necessary rights for
the cutting, skidding, piling and removal of said timber.

IT IS INTENDED by this Indenture to convey the
timber and timber rights reserved under a deed between the parties
hereto dated April 1, 1973.

TO HAVE AND TO HOLD THE SAME UNTO and for the
use of the Grantee herein, its successors and assigns, forever.

Plaintiff's Appendix
000494

EXHIBIT
2

BOOK           PAGE

0001          0495

This conveyance has been authorized and approved by a duly convened meeting of the Board of Directors of Fisher & Young, Inc. held on March 9, 1973.

IN WITNESS WHEREOF, the Grantor hereunto has caused this instrument to be executed the day and year first above written.

FISHER & YOUNG, INC.

Attest:

_____   By _____
       Secretary                      President

PENNSYLVANIA BANK AND TRUST COMPANY

Attest:

_____   By _____
       Secretary                  Vice President
                                              As Guardian

_____      _____
    Philip H. Cochran              P. Craig Cochran

_____      _____
    Esther G. Cochran            Elizabeth F. Cochran

OIL CREEK TOWNship
TRANSFER TAX
1% REALTY TRANSFER
TAX PAID $ 2.11
DATE PAID 19/8/
RECEIVED BY _____
CRAWFORD COUNTY
REGISTER & RECORDER

Titusville Area School District
1% Realty Transfer Tax
Date Paid _____
Tax Paid $ 6.33
Received by _____
Crawford County Reg. & Rec.

BOOK        PAGE

0001      0510

under Section XI of deed to Fisher & Young, Inc., dated January 2, 1958, recorded in Deed Book 298, Page 173.

20.    "Snavley" - containing 61.68 Acres as described in deed to Fisher & Young, Inc., dated December 3, 1970, recorded in Deed Book 365, Page 454.

21.    "Wylie" - containing 28.5 Acres as described under Section VIII paragraph 3 of deed to Fisher & Young, Inc., dated January 2, 1958, recorded in Deed Book 298, Page 173.

22.    "Wright" - containing 114 Acres, more or less, net, as describe in deed to Fisher & Young, Inc., dated July 2, 1964, recorded in Deed Book 333, Page 217.

XII.    SPRING CREEK TOWNSHIP.

1.    "Bernarding" - containing 253 Acres 142 square rods, more or less, as described in Section II of deed to Fisher & Young, Inc. dated January 2, 1958, recorded in Deed Book 298, Page 173.

2.    "Kinkead" - containing 153 Acres, more or less, described as parcel No. 16    in deed to Fisher & Young, Inc. dated March 27, 196 recorded in Deed Book 357,    Page 349.

3.    "Larimer #1" - consisting of (2) parcels of land containing 70 Acres, more or less, and 22-1/8 Acres, as described in deed to Fisher & Young, Inc. dated April 7, 1967, recorded in Deed Book 347, Page 491.

4.    "Wead - Larimer #2" - containing 60 Acres, more or less, as described in deed to Fisher & Young, Inc., dated October 22, 1957, recorded in Deed Book 290, Page 394.

XIII    TRIUMPH TOWNSHIP.

1.    "Byers" - containing 40 Acres, more or less, as described in deed to Fisher & Young, Inc., dated May 2, 1960, recorded in Deed Book 311, Page 316.

2.    "Dodds No. 2" - consisting of 2 parcels of land, 100 Acres, more or less, and 5-1/2 Acres,
as described in deed to Fisher & Young, Inc., dated January 18, 1967 recorded in Deed Book 346, Page 683.

3.    "Garber" - containing 6 Acres, more or less, as described in deed to Fisher & Young, Inc., dated June    1968, recorded in Deed Book 353, Page 505.

-7-

## LIST OF EXHIBITS

1. Lease between Robert M. Kinkead and
   Clough Farm Club - 2/1/62

2. Deed between Marion C. Kinkead and
   Fisher & Young, Inc. - 3/27/69

3. Article of Agreement between Marion C.
   Kinkead and Fisher & Young, Inc. - 4/1/68

4. Letter from John Kookogey to E. Terry
   Warren - 1/16/69

5. Minutes of the Meeting of Directors of
   Fisher & Young, Inc. - 4/2/69

6. Notes - 3/7/69

7. Letter from John Kookogey to David
   Eardley - 3/19/69

8. Letter from John Kookogey to David
   Eardley - 3/31/69

9. Letter from David Eardley to John
   Kookogey - 4/15/69

10. Letter from John Kookogey to The Pennsylvania
    Bank & Trust Company, copy of deposit slip
    and note - 4/18/69

11. Letter from John Kookogey to David
    Eardley - 4/29/69

12. Letter from John Kookogey to David
    Eardley - 5/28/69

13. Letter from John Kookogey to David
    Eardley - 7/25/69

14. Letter from David Eardley to John
    Kookogey - 7/25/69

15. Bill for Services Rendered from Jack, Kookogey
    & Forsell to Fisher & Young, Inc. - 8/25/69

16. Letter from E. Terry Warren to John
    Kookogey - 9/18/69

17. Draft Agreement of Sale between Fisher & Young,
    Inc. and Albert T. Carlisle - 5/28/69 (1/20/70)

-10-

EXHIBIT

11

18. Letter from John Kookogey to E. Terry Warren - 9/30/69

19. Letter from E. Terry Warren to John Kookogey - 10/28/69

20. Minutes of the Meeting of Directors of Fisher & Young, Inc. - 11/3/69

21. Resolution and Certificate re: sale of various parcels of land to Albert T. Carlisle - 1969

22. Letter from E. Terry Warren to John Kookogey - 1/5/70

23. Receipt of 1/5/70 correspondence acknolwdged and returned by Kookogey - 1/9/70

24. Letter from John Kookogey to William H. Kemmler, Union Title Guaranty Company - 1/12/70

25. Letter from John Kookogey to E. Terry Warren - 1/12/70

26. Letter from E. Terry Warren to John Kookogey - 1/17/70

27. Letter from John Kookogey to William H. Kemmler, Union Title Guaranty Company - 1/19/70

28. Letter and Bring-Down Certificate from John Kookogey dated 1/19/70

29. Letter from Dorothy S. Cole, Secretary to William E. Rice, Recorder - 1/19/70

30. Agreement of Sale between Fisher & Young, Inc. and Albert T. Carlisle - 5/28/69, filed 1/20/70

31. Deed between Fisher & Young, Inc. and Albert T. Carlisle - 1/9/70, filed 1/19/70

32. Letter from John Kookogey to E. Terry Warren - 1/30/70

33. Invoice for title from Union Title Guaranty Company to Albert T. Carlisle - 1/27/70

34. Attorney's Preliminary Certificate of Title - 1969

35. Letter from E. Terry Warren to John Kookogey - 2/2/70

36. Letter from John Kookogey to William H. Kemmler, Union Title Guaranty Company - 2/5/70

-11-

37. Letter from E. Terry Warren to Jack
    Kookogey - 2/6/70

38. Letter from E. Terry Warren to Union Title
    Guaranty Company - 2/6/70

39. Letter from William Kemmler to John
    Kookogey - 2/9/70

40. Letter from John Kookogey to E. Terry Warren,
    with handwritten notes, and Statement of
    Value - 2/11/70

41. Letter from John Kookogey to William Kemmler,
    Union Title Guaranty Company - 2/12/70

42. Letter from E. Terry Warren to John
    Kookogey - 2/13/70                           712/23/70
    42a. 

43. Letter from John Kookogey to E. Terry
    Warren - 4/17/70

44. Letter from John Kookogey to E. Terry
    Warren - 4/28/70

45. Letter from John Kookogey to Mrs. Keith
    Horne, Kocjancic & Horne - 5/28/70

46. Letter from Keith Horn to John Kookogey
    with report on estimated volume and value
    of timber on the Clough Farm - 6/10/70

47. Letter from E. Terry Warren to John
    Kookogey - 12/10/70

48. Letter from John Kookogey to E. Terry
    Warren - 1/4/71

49. Notes re:  tax computations

50. Letter from E. Terry Warren to John
    Kookogey - 1/19/71

51. Notice of Change in Assessment to Albert
    Carlisle - 12/31/70

52. Notice of Change in Assessment to Albert
    Carlisle - 12/31/70

53. Notice of Change in Assessment to Albert
    Carlisle - 12/31/70

54. Letter from John Kookogey to E. Terry.

-12-