COSMOS J. REALE
(1912-1984)

LAW OFFICES OF

# REALE & FOSSEE, P.C.

CHESTER S. FOSSEE

'UDITH OLMSTEAD

JOHN L. KWASNESKI

22ND FLOOR, LAWYERS BUILDING
428 FORBES AVENUE
PITTSBURGH, PA 15219
(412) 281-8117
FAX (412) 281-3849

March 21, 1996

Charles D. Sheehy
Hartford Insurance Company
1600 One PPG Place
Pittsburgh, PA  15222-5401

Re:  Claim No.:        787 L 20097
     Insured:          Matson Lumber Company
     Claimant:         Albert T. Carlisle
     Our File No.:     40-109

Dear Mr. Sheehy:

On March 18th traveled to Titusville and Segal in order to meet with attorney Kookogey and Norm Sunderland. As you may be aware Mr. Kookogey was the attorney for Fisher and Young when the Clough farm was purchased by them from Mrs. Kinkead and also represented Fisher and Young when the land was sold to Carlisle. After that transaction he started to represent Matson with regard to the Clough farm and wrote some letters for Matson and also offered Matson his opinion on a couple of occasions.

The meeting was informative in a number of ways in that I not only had the opportunity to discuss the various transactions with Mr. Kookogey, but I also was provided his file to review. While I was aware that the boyscouts were involved in the transaction, I was not aware that the agreement was initially drafted between Fisher and Young and the boyscouts and that $1,000.00 in hand money had been put down on the transaction awaiting the title to transfer the property to the boyscouts. The original agreement was entered into in March of 1969 and when the scouts had not proceeded to close the transaction by July of 1969 Mr. Kookogey wrote them on behalf of Fisher and Young and pressed them to close the deal as they had other purchasers wanting the property. Ultimately, Mr. Carlisle stepped in and after some minor alterations to the agreement, executed the agreement and ultimately paid the other $99,000.00 to obtain title to the property.

This history explains to a certain degree some of the language that is in the agreement. The reason it stayed in



DEPOSITION
EXHIBIT
Fossee

Charles D. Sheehy
March 21, 1996
Page Two

the agreement is apparently Mr. Carlisle was still of the belief that the scouts would ultimately own the land and therefore much of the language was retained.

I showed Mr. Kookogey the map that appears to be Exhibit "A" in the agreement. He indicated that he had never seen it before and was surprised that it was drawn by an engineer as he anticipated something less formal. He stated that he did not get involved with the map as that was something he believed the parties were going to work out between themselves. Unfortunately, Mr. Kookogey did not have a copy of the original agreement entered into with the boyscouts so that we could compare it to final agreement. Another document he did not possess was the title policy which was given by Union Title to Mr. Carlisle. It would appear from correspondence in the file that the timber was excluded from the title policy which is additional evidence that the timber rights were permanent in nature and not to be included in any manner with the land.

With regard to the main issue of the intent of the parties with regard to the timber rights, Mr. Kookogey will be more than happy to testify that the timber rights were to be in perpetuity and that was the intent of the parties at the time of the agreement.

Mr. Kookogey was kind enough to provide me with his file so that I could review in detail its contents and upon completing that review I will return it to him after copying the documents I deem necessary and appropriate. My initial scanning of the documents while I met with him indicated that there are some references in the correspondence and other documents that would appear to support our position. I will provide this information in greater detail after I have had an opportunity to thoroughly review the material.

I met with Mr. Sunderland in his office which is located a few miles north of Brookville. He was very friendly and cooperative and I believe he would make a good witness for us in this matter. He knew a good deal about the history of the farm and the transactions that occurred and did recall some of the meetings with Mr. Carlisle that took place at picnics. However, he will not support Carlisle's various contentions pertaining to the map in question and the delineation of no-cut zones nor will he support Carlisle's statement that after

Plaintiff's Appendix
000551

Charles D. Sheehy
March 21, 1996
Page Three

Carlisle was advised of the intent of Matson to harvest that
Carlisle attempted to ascertain from him information about the
harvest in accordance with Matson's notice to Carlisle.

Some of Mr. Sunderland's comments were not totally
favorable to us in that he had some disputes with Matson over
the manner of harvesting the Clough farm property, however,
these are not particularly relevant as they do not relate
directly to the agreement. As an example, he believed that the
appropriate location of the haul road for harvesting the trees
south of Jackson Hill Road was different than the haul road
ultimately put in at Matson's direction. He described the
problems that the contractors had getting their trucks into the
harvest area due to the steepness of the haul road and the icy
conditions.

Mr. Sunderland expressed surprised that Mr. Carlisle would
be pursuing this matter as his impression of Mr. Carlisle was
that Carlisle generally did not follow up much on anything. As
as example, Carlisle has had an opportunity to put oil or gas
wells on his property but has never been able to make a
decision with regard to entering into a contract and this
resource has never been developed. Mr. Sunderland believes
that Mr. Wood is really the one behind this action but he does
not know that for a fact.

He indicated that Carlisle had contacted him at one time
for the purpose of utilizing his services in this lawsuit.
However, Carlisle never followed up on his initial
conversation, perhaps because he realized the potential
conflict since Mr. Sunderland had worked for Matson and
continues to do some work for Matson now.

Plaintiff's pre-trial statement is due on the 22nd of
March while ours is due on Friday the 12th of April. I will
provide you with a copy of Plaintiff's pre-trial statement when
it is received.

Very truly yours,

C. S. FOSSEE, ESQUIRE

CSF/mlj
  cc: Richard Conti

WATSON LUMBER COMPANY-FISHER & YOUNG / CLOUGH FARM TRACT
Log Receipts for the period: NOVEMBER, 1988 thru APRIL, 1995

| Species | Nov-88 | Dec-88 | Jan-89 | Feb-89 | Mar-89 | Dec-89 | Jan-90 | Mar-90 | Nov-90 | Dec-90 | Jan-91 | Feb-91 | Mar-91 | Nov-91 | Dec-91 | Jan-92 | Feb-92 | Mar-92 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Red Oak | 1177 | 21852 | 11597 | 13403 | 2387 | 19564 | 9692 | 4046 | 791 | 966 | 11445 | 23179 | 27362 | 1026 | 8027 | 15985 | 15316 | 52682 |
| White Oak | 141 | 1746 | 282 | 1277 | 832 | 566 | 158 | 196 | | | 411 | 1523 | 466 | 291 | | 90 | 106 | 4322 |
| Mixed Oak | 7935 | 21874 | 60537 | 50790 | 9504 | 7353 | 37618 | 11992 | 3889 | 876 | 12017 | 42380 | 33758 | 4610 | 3897 | 9525 | 4085 | 52052 |
| Cherry | 6613 | 5678 | 41671 | 28479 | 16417 | 37607 | 21166 | 4591 | 876 | 813 | 27857 | 79766 | 38428 | 4355 | 10442 | 21898 | 74606 | 48710 |
| Ash | 17583 | 90842 | 107400 | 164220 | 37581 | 26551 | 90045 | 13327 | 19841 | 88841 | 57482 | 9670 | 20945 | 6595 | 23485 | 39124 | 67704 | 6240 |
| Maple | 3031 | 11346 | 5821 | 1229 | 1491 | 12138 | 18166 | 2030 | 1271 | 32760 | 75288 | 57500 | 4216 | 16921 | 19094 | 7006 | 9780 | |
| Poplar | 193 | 110 | 1480 | 3412 | 126 | 295 | 1270 | 661 | 177 | 240 | 236 | 18245 | | 277 | 493 | 88 | 252 | |
| Birch | 15614 | 49952 | 56283 | 70511 | 8983 | 13407 | 19135 | 8705 | | 10203 | 32644 | | 5861 | 10103 | 19094 | 8665 | 34684 | |
| Beech | | | | | | | | | | | | | 3333 | | | | 222 | 1319 |
| Gum | | | | | | | | 163 | | 1026 | 748 | | | | | | | |
| Basswood | 805 | 3009 | 9418 | 14807 | 5106 | 4937 | 3505 | | | 5714 | 7327 | 1560 | | 797 | | 5355 | 5676 | 485 |
| Hickory | | 122 | 201 | 1480 | 528 | 1247 | 36 | | | | 371 | | 102 | 834 | | 56 | 337 | |
| Pine | | | 9197 | 5142 | | 913 | | 5047 | | | | | 385 | | | 628 | 2892 | |
| Hemlock | | | | | | | | | | 100 | | 2387 | | 1350 | 56 | 255 | 499 | |
| Miscellaneous | 657 | | | | 150 | 261 | 68 | 2600 | 23 | | | 5671 | 10252 | | | | | |
| Total | 53092 | 258288 | 300660 | 366208 | 81967 | 102449 | 226387 | 132685 | 39227 | 4103 | 117183 | 352141 | 242551 | 29257 | 54975 | 103620 | 191404 | 279918 |

| Species | Nov-92 | Dec-92 | Jan-93 | Feb-93 | Mar-93 | Apr-93 | May-93 | Dec-93 | Jan-94 | Mar-94 | Nov-94 | Dec-94 | Jan-95 | Feb-95 | Mar-95 | Apr-95 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Red Oak | 1283 | 24554 | 31773 | 13650 | 13509 | 24912 | 2936 | 8766 | 121596 | 45538 | 57274 | 2152 | 12951 | 5195 | 4382 | 7650 | 616221 |
| White Oak | | 625 | 144 | | | 810 | 156 | 242 | 438 | 2852 | 95 | | 341 | 3452 | 250 | 647 | 22200 |
| Mixed Oak | 558 | | | | 234 | | | | 1151 | 805 | 131 | 803 | 77 | 341 | 77 | | 7718 |
| Cherry | 4649 | 1677 | 15969 | 1732 | 18405 | 201 | 701 | 4876 | 30006 | 4492 | 9926 | 3178 | 5195 | 7650 | 250 | 1157 | 562561 |
| Ash | 18401 | 7102 | 18710 | 7627 | 17406 | 86 | 1891 | 3933 | 16053 | 9222 | 14193 | 5563 | 1470 | 15173 | 23029 | 3937 | 690852 |
| Maple | 35996 | 10814 | 9375 | 8295 | 19711 | 1249 | 19793 | 60695 | 35264 | 12477 | 14678 | 2365 | 5742 | 10158 | 26131 | 733 | 1199204 |
| Poplar | 447 | 9460 | 4678 | 11812 | 2093 | 1238 | 187 | 9302 | | 13666 | 100 | 12396 | 1624 | 31943 | 847 | | 415744 |
| Birch | 124 | | | | 380 | | | 216 | | 135 | | 3272 | 8944 | 135 | 216 | | 14347 |
| Beech | 7049 | 5220 | 2229 | 3567 | 7206 | | 574 | 2210 | 3913 | 1119 | | 2773 | 3408 | 741 | 847 | | 468331 |
| Gum | | | | | | | | | | | | | | 135 | 106 | | 1604 |
| Basswood | 11213 | | 1616 | 585 | 140 | 2005 | 4314 | 3774 | 4158 | 2555 | 1440 | 3774 | 2741 | 15201 | 4678 | 1067 | 114709 |
| Hickory | 282 | | | 272 | 137 | | | | | 373 | | | 177 | 1695 | 166 | 299 | 11391 |
| Pine | | | 2662 | | | 915 | 1247 | | 2869 | 964 | | | | 1741 | 3680 | | 21625 |
| Hemlock | | | 134 | | | | | | | 728 | 398 | | | | 930 | | 25844 |
| Miscellaneous | 109 | 196 | 7149 | 370 | 5274 | | | 166 | 631 | 840 | 383 | | 155 | 272 | 737 | 504 | 31127 |
| Total | 79903 | 64284 | 107166 | 40059 | 108292 | 4461 | 16135 | 4091 | 258917 | 117301 | 118557 | 14806 | 48936 | 44409 | 82243 | 77214 | 4203678 |

PENGAD 800-631-6989

DEPOSITION EXHIBIT #7

*HOME PHONE #*
*827 - 2373*

*7:00 PM*

JACK, KOOKOGEY & FELTON
ATTORNEYS AT LAW
144 WEST SPRING STREET
P. O. BOX 346
TITUSVILLE, PENNSYLVANIA 16354

J. E. JACK
JOHN S. KOOKOGEY     *827 - 3338*
ROBERT J. FELTON

AREA CODE 814
827-2788

October 30, 1987

Robert Matson, President
Matson Hardwoods, Inc.
132 Main Street
Brookville, PA    15825

DEPOSITION
EXHIBIT
# 12 ok
Fosser 6.20.06
PENGAD 800-631-6989

Dear Mr. Matson:

In response to your inquiry concerning the rights of Matson Hardwoods, formerly Fisher & Young Hardwoods, in and to the timber on the Clough Farm in Spring Creek Township, Warren County, Pennsylvania, we submit the following opinion:

The rights arise out of an agreement between Fisher & Young Inc., to sell the land to Albert T. Carlisle dated May 28, 1969 and recorded in Warren County Deed Book 361, Page 32. Said agreement and the subsequent deed to Carlisle, dated January 9, 1970 and recorded in Warren County Deed Book 361, Page 13, excepted and reserved all of the timber standing and fallen, together with unobstructed access to the same for purposes of removal, subject to some harvesting restrictions discussed below.

Matson has, of course, succeeded to the rights and duties of Fisher & Young, Inc., (and Fisher & Young Hardwoods, Inc.). The principal duty or restriction is that Matson will not harvest any timber under 16" in diameter measured one foot from the gound; and that it will confine its operations between November 1 and March 31 of each year.

Matson may remove smaller trees or, in my opinon, <u>any</u> trees as "culls", e.g. when good forestry practice would so prescribe, such as in thinning operations or for pest or fire control.

Matson has the right to construct access roads, but must give Carlisle, or his successors, 120 days written notice of its intention. No portable saw mill shall be constructed on the subject premises.

The matter of real estate taxes is to be prorated between Carlisle and Matson on the basis of the proportional value of each respective interest.

Carlisle has certain rights to use the forested areas, after 120 days written notice to Matson, such as to flood the premises to the extent of two ten acre lakes or one twenty acre lake, and to construct a ski slope on the west slope of Jackson Hill and to build roads and buildings where reasonably desired, and Matson would, in such case or cases, have to clear the timber on those locations. The agreement ~~~~~ ~~ ~ ~~~~ ~~ ~n exhibit which was to locate the

JACK, KOOKOGEY & FELTON, ATTORNEYS AT LAW, TITUSVILLE, PENNA. 16354

Robert Matson, President
October 30, 1987
Page 2

possible lake sites, but we have no access to nor information relating to whether such map was ever made. Said map was to have also shown the forested areas and the areas owned solely by Carlisle.

It is further noted that Carlisle has the right to use for his own purpose all trees which have fallen for more than one year and all tree tops remaining after logging operations.

The agreement provides, also, that Matson must give Carlisle notice of any sale of the timber with the option of Carlisle to purchase the timber at the price offered by a bona fide purchaser. Likewise, when the management or ownership of Matson should change, Carlisle has a right to know and with the option of purchasing the timber at a price "to be mutually agreed upon" (Carlisle probably has waived his rights respective this item at the time Fisher & Young Hardwoods merged with Matson).

The ownership of timber and the rights and duties set forth in the agreement are in perpetuity and in general are not in violation of the rule against perpetuities with one possible exception, that being the option of Carlisle to purchase the timber if Matson should sell or change management. As long as Carlisle is living, such provision would still be effective, if Carlisle chooses to exercise the option. After Carlisle's demise, however, such option right might possibly be considered in violation of the rule against perpetuities and therefore void.

Should this opinion raise any questions, please be in touch with us.

Very truly yours,

JACK, KOOKOGEY & FELTON

John S. Kookogey

JSK:rew
Enclosure

cc. EDM  11/2
J. Davidson  11/4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,           )
                Plaintiff,    )
                              )        Civil Action No. 95-376
        vs.                   )
                              )
MATSON LUMBER CO. and         )
MATSON HARDWOOD, INC.,        )
                Defendants.   )


V E R D I C T


1)    Did the parties intend to grant the seller the right to
harvest only the timber that then existed on the property in
1969?


                    ____✓____
                       or


Did the parties intend to grant the seller the right to
harvest not only the timber that then existed on the property
in 1969, but also all the timber that will ever grow on the
property in perpetuity (excluding those trees planted by
Mr. Carlisle)?

                    _____



2)  Did the parties intend to require the seller to give Mr. Carlisle 120 days notice only before they constructed their first road?

_____
or

Did the parties intend to require the seller to give Mr. Carlisle 120 days notice each time they constructed a new road in perpetuity?

_____✓_____

3)  Did the parties intend to create a no-cut zone along the banks of the waterways on the property including Spring Creek and Tom's Run?

Yes ___✓___            No _____

If Yes, what was the width of the no-cut zone on either side of the creeks?

___100___ feet

Did the Matson Lumber Company harvest trees in the no-cut zone?

Yes ___✓___            No _____

If Yes, what amount of damages do you award Mr. Carlisle?

$ _110,000_ 00/xx (One hundred and ten thousand)

2

Date:

_____
Foreperson

_____

_____

_____

_____

_____

_____

3

Plaintiff's Appendix
000558

AO 450 (Rev. 5/85) Judgment in a Civil Case

*CASE CLOSED*

# United States District Court

WESTERN _____ DISTRICT OF _____ PENNSYLVANIA

ALBERT T. CARLISLE

**JUDGMENT IN A CIVIL CASE**

V.

MATSON LUMBER CO. and
MATSON HARDWOOD, INC.

CASE NUMBER:   C.A. 95-376

[X] **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment be and hereby is entered in favor of the plaintiff, Albert T. Carlisle, and against the defendants, Matson Lumber Co. and Matson Hardwood, Inc., in the amount of $110,000.00.

JUDGMENT SO ORDERED AND TO BE
ENTERED IN ACCORDANCE TO THE
VERDICT RENDERED BY THE JURY.

GARY L. LANCASTER, U.S. DISTRICT JUDGE

December 18, 1997
_____
Date

JAMES A. DRACH, CLERK OF COURT

Clerk

_____
(By) Deputy Clerk

AO 30 (Rev. 8/98) Certified Copy

# UNITED STATES DISTRICT COURT

WESTERN _____ DISTRICT OF _____ PENNSYLVANIA

## CERTIFIED COPY

I, _____ ROBERT V. BARTH, JR. _____ , Clerk of the United States District Court, certify
that the attached is a true and full copy of the original

**CIVIL CASE 95-CV-376:** Pleading #74, Verdict; Pleading #75, Judgment in a Civil Case.

now existing among the records of this Court.

In testimony whereof I sign my name, and affix the seal of this Court at

_____ Pittsburgh _____ , in this State, on _____ 9-8-05 _____
City                                                                Date

_R.V. Barth, J._            _Edward Taylor_
Clerk                                                          (By) Deputy Clerk

LAW OFFICES OF
# REALE & FOSSEE, P.C.
22ᴺᴰ FLOOR, LAWYERS BUILDING
428 FORBES AVENUE, PITTSBURGH, PA 15219

TELEPHONE
(412) 281-8117

E-MAIL
realefossee@palawyersonline.com

FACSIMILE
(412) 281-3849

December 23, 1997

Charles D. Sheehy
Hartford Insurance Company
1600 One PPG Place
Pittsburgh, PA  15222-5401

     RE:    Claim No.:  787 L 20097
             Insured:    Matson Lumber Company
             Claimant:  Albert T. Carlisle

Dear Mr. Sheehy:

As you are aware, the above matter was scheduled for trial to commence December 15, 1997. On the 8ᵗʰ of December, the Court called with the request that we commence trial on the 10ᵗʰ. For various reasons, including scheduling conflicts, the Court relented and decided to start the case as it had been scheduled, but also scheduled a conference for Friday morning, the 12ᵗʰ of December. On the 11ᵗʰ of December, the Court advised that the judge was interested in revisiting the option matters as it related to the summary judgment motions. At that time, I was in Brookville, having spent the morning with Mr. Kookogey preparing him for his testimony and the afternoon and part of the evening with Mr. Kane, our expert, and various Matson personnel.

At 9:30 on the 12ᵗʰ, there was a conference call with the Court and Plaintiff's counsel and after discussing a variety of matters, including Motions in Limine filed by both parties, the Court suggested I file a Motion for Reconsideration of the Motion for Summary Judgment. The Court made some decisions concerning some of the motions, but reserved a decision on the major questions for Monday morning. Approximately an hour later, Plaintiff's counsel called suggesting that a continuance might be in order as it appeared to him that the Court might dismiss his option issues which would basically terminate the case.

Counsel met with the Court Monday morning and we were directed to proceed to pick a jury after which time the Court would consider the various issues. The jury was selected and the Court met with counsel and entered various orders. At that time the Court granted my Motion for Summary Judgment with regard to the option portion of the case. The Court held that the clear reading of Paragraph 15(B) indicated present management and as a result, that would



Charles D. Sheehy
December 23, 1997
Page Two

indicate Fisher & Young and not Matson and therefore the change of management that occurred at the end of the year of 1994 was out of the case. The Court then determined that Plaintiff's interpretation of the alleged breach of Paragraph 15(A), the cutting of trees triggering the option to buy, was not contemplated by the parties in accordance with the language of the option and therefore dismissed that claim thereby eliminating all of Plaintiff's damages.

Plaintiff's counsel then advised the Court that there were three issues to be determined by the jury with regard to the interpretation of the agreement and those issues would be whether the timber rights related only to those trees on the property in 1969 or were in perpetuity, whether we were required to give 120 days notice one time or every time we planned on cutting roads and finally, whether the map that was suppose to have been attached to the Agreement of Sale contained a no-cut zones along the stream banks. The Plaintiff then stated that they were asking money damages for the trees cut in the no-cut zone. I objected on the basis that first of all Plaintiff had given up this claim and second that I had no idea what his damages were as he had failed to produce any damage information in accordance with the pre-trial rules of the Court. The judge overruled my objections and we went to trial on those four issues.

After openings to the jury, the Plaintiff testified as to the intent of the agreement, stating that it was the intent of the parties that the rights were not in perpetuity, but rather, related only to those trees in existence in 1969. He further testified that notice was to be given every time that we intended to cut roads and finally, that a map had been created, he had seen the map and while he could not say specifically what it said or showed, he did remember some method of delineating no-cut protection zones along the streams.

That evening, with the assistance of Rich Conti and Rick Conrad, it appeared that we might be in possession of the alleged map. The map certainly contains features that were mentioned in a paragraph of the agreement discussing campsites, dams and a winter sports area. Paragraph 16 referred to that Exhibit A and stated that it was to be marked showing the forested areas where cutting could occur. On prior occasions it had been noted that there were certain other lines that did not appear to have any significant meaning on that particular document. However, when compared to an aerial photograph, which was faxed to us by Mr. Conrad, those lines appeared to match the borders of the "forested area".

A plan was formulated to utilize the map and aerial photographs during cross-examination of Plaintiff's expert in order to indicate to the jury that this may very well be the map in question. Certainly if it was the map in question, the streams were not protected and the delineation was merely a forest area from the pasture lands and fields.

Charles D. Sheehy
December 23, 1997
Page Three


The next day when Plaintiff's expert commenced testifying, Plaintiff utilized his copy of the map in question in order to acquaint the jury with the boundaries of the Clough Farm. He also introduced aerial photographs showing the borders of the Clough Farm. After describing the farm to the jury, the witness then proceeded to testify about the condition of the land and the harvesting techniques and methods of Matson through the guise of his statement that these indicated that Matson did not believe the trees were his in perpetuity. Over objection, the Court allowed the witness to get into harvesting techniques and he proceeded to testify about a number of matters that should never have been a part of the case.

On cross-examination I had the witness mark an aerial photograph in red showing the separation between the pastures, fields and the timber or forest area. I then took him to his exhibit and pointed out how the lines that were on that exhibit matched the lines that he had drawn on the aerial photograph thereby separating the forest area from the pastures. I also pointed out the items that were on the map that coincided with the other paragraph contained in the agreement. At this point the judge called counsel to sidebar and raised the issue of judicial notice which he later changed to judicial estoppel. He claimed that we had taken the position that the map did not exist and therefore could not suggest that this might be the map. He indicated he would not rule on it at this time, but rule on it later.

Plaintiff's expert was permitted to testify concerning damages and testified with regard to his report, which was an improper report as far as federal pre-trial rules are concerned. He admitted he made all of these calculations Sunday night and finished them some time Monday morning. His numbers were $121,000.00 for trees cut within 25 feet of stream banks, $242,000.00 within 50 feet and $485,000.00 within 100 feet.

Plaintiff rested and after lunch I put on Mr. Kookogey who testified in accordance with our prior discussions and also in accordance with the documentation that he had provided from his file. He indicated that the parties' intent was that the trees were reserved in perpetuity and he had no recollection whatsoever of ever seeing a map and that was even after I showed him what I believed to be the map, he did not recall ever seeing it. He certainly did not attach it as an exhibit and did not record it. It is my belief that when the parties to the agreement changed and Mr. Carlisle and his counsel entered the picture, the map became a non-issue as it principally was a Boy Scout issue and that Kookogey forgot all about it when he finished the agreement and recorded it. Also, you have to consider that Carlisle's counsel apparently never got a copy of the map and made no mention of it whatsoever.

Charles D. Sheehy
December 23, 1997
Page Four

I then put on Mr. Ken Kane, who made an outstanding witness and came across as a very knowledgeable forester. He certainly was significantly better than Plaintiff's expert and countered every one of Plaintiff's expert's positions very effectively.

John Wood had been an important part of Plaintiff's original case, but they had a falling out and while Plaintiff referred to John, he did not call him. That evening I determined that Mr. John Wood lived more than 100 miles from the courthouse and I was therefore able to offer into evidence his deposition testimony. The following morning the Court made a significant evidentiary ruling. The Court ruled that we were judicially estopped from introducing and discussing the map as being the map in question. I then offered the deposition of Mr. Wood, which was held in abeyance by the Court, although the judge later permitted me to read it into evidence.

Mr. Matson had commenced testifying on Tuesday afternoon and he finished Wednesday morning. I then called Rick Conrad, who had spent Tuesday in the woods counting trees that had been harvested within 25, 50 and 100 feet of stream banks. He testified with regard to certain matters that had been raised by Plaintiff relating to harvesting practices and then testified with regard to what he had determined from his survey of the property. His values differed significantly from those offered by Plaintiff's expert in that instead of $121,000.00 for the first 25 feet, his number was $5,800.00. Instead of $242,000.00 for the first 50 feet, his figure was $19,000.00 and finally, within the first 100 feet, rather than $485,000.00, his number was $36,000.00. These numbers were taken from the market report in the first quarter of 1995 and were of high quality timber.

This basically concluded the testimony, although there was nominal rebuttal and surrebuttal and we went to the jury in the afternoon. The Court charged the jury first, then closing arguments and finally the Court instructed the jury on how to render its verdict. The jury was dismissed for the night at 5:00 and reconvened at 9:30 the morning of the 18th, returning a verdict at approximately 11:00.

The jury responded to Interrogatories and determined that the parties only intended that the timber then existing on the property was to be harvested, that Mr. Carlisle was to be given 120 days notice each time a new road was to be constructed, that the parties intended to create no-cut zones on the banks of waterways, that the width was 100 feet, that Matson harvested trees in the zone and Mr. Carlisle was entitled to $110,000.00.

Charles D. Sheehy
December 23, 1997
Page Five

A discussion with one of the jurors, who happened to be an attorney, revealed that the reason for the verdict was they did not believe Mr. Kookogey when he stated he had never seen the map. Apparently they thought, based upon their experience with lawyers at closings of their property, that no lawyer would close a transaction leaving out that attachment. Mr. Kookogey must therefore have been lying and once they determined he was lying, they quit listening. When they were given the charge of the Court, they applied everything against Mr. Kookogey who was the drafter and therefore against Matson. Hence, the verdict.

One item that was troubling was that during cross examination, Plaintiff's counsel raised the issue of valuing of trees and that some cherry trees, large, high quality veneer-type, could have a value as high as $10,000.00. As a result, based upon our determination that there were 220 trees, there were apparently some members of the jury that felt that should award Mr. Carlisle 220 times $10,000.00 or $2.2 million. Fortunately, cooler heads prevailed and they reduced that to $500.00 per tree, which is how they arrived at the $110,000.00 number.

## REMARKS AND RECOMMENDATIONS

Since the verdict was entered, I have had various telephone conferences and meetings with the insured, Plaintiff's counsel, various foresters, a member of the jury, as well as the company. At this time, it is the feeling of Matson that the decision of the jury has complicated the situation rather than simplifying it. As a result, we have gone over various solutions to the problems in the hopes that a resolution of this matter can occur without the need of further litigation.

One issue concerns the blow down wherein a substantial quantity of trees have been toppled by the wind and if they are not removed by the end of the harvest season, they will become the property of Mr. Carlisle. As it is our intention to remove these trees, we are trying to work out some arrangement with Carlisle to do that. In addition, because of all of the problems that have existed and will continue to exist between Carlisle and Matson, we would like to work out an arrangement whereby we would make a final cut and then leave the premises forever. As things stand now, we can enter the premises and cut so long as trees continue to stand that were

Charles D. Sheehy
December 23, 1997
Page Six

standing in 1969. In addition, there has been some discussion with regard to coverage for the $110,000.00 verdict and a request has been made to obtain a copy of the transcript, which I have ordered.

As to an appeal, there are several issues that certainly could be raised on an appeal. There were four issues submitted to the jury, three of which are of significance, the 120-day notice issue was certainly not significant. The errors that were committed start out with the jury selection where the Court refused to allow any voir dire beyond the voir dire you would ask if this was an automobile accident. In spite of the controversy going on about cutting trees in the national forest, we were given no tools to utilize in order to ascertain the biases of the jury.

The second issues concerns the voluminous testimony that was not relative to the issues and only designed to cast the lumber company in a bad light under the guise that it would enable Plaintiff's expert to determine that Matson did not believe it had rights in perpetuity.

With regard to the map issue, there was really insufficient evidence for anybody to have created a map. There was also substantial evidence that Plaintiff was not telling the truth about the map. Finally, there was the map that was shown to the jury by the Plaintiff which the Court specifically excluded from evidence and directed the jury to ignore it based upon "judicial estoppel." It is believed that the Court improperly utilized judicial estoppel under the circumstances and the jury should have been allowed to consider the map in question.

Finally, on the issue of damages, judicial estoppel should have been applied as Plaintiff's counsel had given up his claim for damages. He had also failed to comply with pre-trial rules regarding these claims and yet was permitted on the morning of the trial to claim damages even though at that time Defendant had not been apprised of what was being claimed or how that claim was to be calculated.

Under the rules, there is a ten-day deadline for the filing of post-trial motions, which would be due on the 29th. However, under the rules, if the time period is less than 11 days, you do not count weekends or holidays and therefore our motion is not due until the 5th of January. This basically gives us one more week to try to work things out or prepare our appeal.

Charles D. Sheehy
December 23, 1997
Page Seven


      If you have any questions concerning this trial or any part of this report, please do not hesitate to contact me.  Due to the substantial amount of time that went into the preparation and trial of this matter, I am enclosing herewith my statement for services rendered to the conclusion of the trial.  If you have any questions concerning the statement, please do not hesitate to contact me.

Very truly yours,

C. S. FOSSEE

CSF/ksb
Enclosure
cc:  Robert Powers
     Fireman's Fund Insurance Company
      (File No.:  610L9773895)

     Richard Conti
     Matson Lumber Company

     Alan Mellott
     Hartford Insurance Company

JACK, KOOKOGEY & FELTON
ATTORNEYS AT LAW
TITUSVILLE, PA

IN RE: Deed of                          Dated:
                                        Recorded:
                                        Deed Book
Fisher & Young Hardwoods, Inc.,         Consideration:
Grantor,                                Covers all of those pieces or
                                        parcels of land located in Clarion,
        to                              Crawford, Forest, Venango & Warren
                                        Counties as set forth in the
Matson Company, Grantee                 attached list of Tracts and
                                        identified by Township and County
                                        Assessment No.


### CERTIFICATE OF TITLE

John C. Dennison, II, Esq.
293 Main Street
Brookville, PA  15825

Dear Mr. Dennison:

   We hereby certify for purposes of the above-captioned deed, that we have examined the indices to the records of Clarion County at Clarion, Pennsylvania, Crawford County at Meadville, Pennsylvania, Forest County at Tionesta, Pennsylvania, Venango County at Franklin, Pennsylvania, and Warren County at Warren, Pennsylvania, and Chautauqua County, New York, insofar as they pertain to the title to the land described in the above-captioned deed, or examined reliable abstracts of title to said land covering a period of sixty years last past. And from our said examination, we are of the opinion that title to said land is satisfactorily vested in the above-named Grantees.

   SUBJECT TO easements or rights-of-way to public utilities, the precise location of which can be determined only by visual inspection of the premises.

   SUBJECT ALSO TO THE FOLLOWING:

   1.  Excepting and Reserving all of the oil, gas, minerals and coal in, on and underlying the said parcels of land, as the same have been excepted in prior deeds of record.

   2.  All easements and rights of way acquired by instruments of record or by prescription and evident by an inspection of the premises.

   3.  All legal roads and highways.

   4.  Such state of facts as an accurate survey might show.



DEPOSITION
EXHIBIT
#15 de
Fossle

EXHIBIT
64

Plaintiff's Appendix
000568

5. Taxes and assessments which may be due for 1986.

6. The mortgage of Fisher and Young Hardwoods, Inc. to Fisher and Young, Inc., dated April 1, 1973, securing a debt of $915,000.00. Duplicate originals have been recorded in 1973 in Clarion, Crawford, Forest, Venango and Warren Counties, Pennsylvania, and Chautauqua County, New York.

7. Corporate taxes which may be owing by Fisher and Young Hardwoods, Inc. at this time to the Commonwealth of Pennsylvania; and as income taxes owing to both the Commonwealth of Pennsylvania and the Federal government.

8. The timber on the Clough Farm in Springcreek Township, Warren County, Pennsylvania, the deed for which is being held in escrow as security for payment of the debt of Fisher and Young Hardwoods to Fisher and Young, Inc. and

9. Timber on all parcels, the deeds for which are being held in escrow as security pending full payment by Hardwoods of its 1973 obligation to Fisher and Young, Inc.

Very truly yours,

JACK, KOOKOGEY & FELTON

John S. Kookogey

JSK:sss

Dated: December 19, 1986

JACK, KOOKOGEY & FELTON

ATTORNEYS AT LAW

144 WEST SPRING STREET

P. O. BOX 346

TITUSVILLE, PENNSYLVANIA 16354

J. E. JACK
JOHN S. KOOKOGEY
ROBERT J. FELTON

AREA CODE 814
827-2788

December 16, 1986

DEC 1 7 1986

John C. Dennison, II, Esq.
Dennison & Dennison
Attorneys at Law
293 Main Street
Brookville, Pennsylvania  15825-1291

Dear Mr. Dennison:

We enclose our certificate of title for the properties being sold to Matson Company by Fisher and Young Hardwoods, Inc.  Please note that we have deleted the Indiana County property.  We have no knowledge that this was ever acquired by Hardwoods, and have no title notes or description concerning the same.

Otherwise, everything else is included in the certificate.  Of course, the oil, gas, minerals and coal have been reserved.  You will note references to a mortgage and timber deeds which will be satisfied and delivered upon payment by Hardwoods of the balance due on its obligation to Fisher and Young, Inc.

Our statement is enclosed.

Very truly yours,

JACK, KOOKOGEY & FELTON

John S. Kookogey

JSK:sss

Enclosures

DEPOSITION
EXHIBIT
# 16    DE
Fossee 2-2006
PENGAD 800-631-6989

IN RE: Deed of

Fisher & Young Hardwoods, Inc.,
Grantor,

      to

Matson Company, Grantee

Dated:
Recorded:
Deed Book
Consideration:
Covers all of those pieces or
parcels of land located in Clarion,
Crawford, Forest, Venango & Warren
Counties as set forth in the
attached list of Tracts and
identified by Township and County
Assessment No.

## CERTIFICATE OF TITLE

John C. Dennison, II, Esq.
293 Main Street
Brookville, PA  15825

Dear Mr. Dennison:

We hereby certify for purposes of the above-captioned deed, that we have examined the indices to the records of Clarion County at Clarion, Pennsylvania, Crawford County at Meadville, Pennsylvania, Forest County at Tionesta, Pennsylvania, Venango County at Franklin, Pennsylvania, and Warren County at Warren, Pennsylvania, and Chautauqua County, New York, insofar as they pertain to the title to the land described in the above-captioned deed, or examined reliable abstracts of title to said land covering a period of sixty years last past, and from our said examination, we are of the opinion that title to said land is satisfactorily vested in the above-named Grantees.

SUBJECT TO easements or rights-of-way to public utilities, the precise location of which can be determined only by visual inspection of the premises.

SUBJECT ALSO TO THE FOLLOWING:

1. Excepting and Reserving all of the oil, gas, minerals and coal in, on and underlying the said parcels of land, as the same have been excepted in prior deeds of record.

2. All easements and rights or way acquired by instruments of record or by prescription and evident by an inspection of the premises.

3. All legal roads and highways.

4. Such state of facts as an accurate survey might show.

5. Taxes and assessments which may be due for 1986.

6. The mortgage of Fisher and Young Hardwoods, Inc. to Fisher and Young, Inc. dated April 1, 1973, securing a debt of $915,000.00. Duplicate originals have been recorded in 1973 in Clarion, Crawford, Forest, Venango and Warren Counties, Pennsylvania, and Chautauqua County, New York.

7. Corporate taxes which may be owing by Fisher and Young Hardwoods, Inc. at this time to the Commonwealth of Pennsylvania; and as income taxes owing to both the Commonwealth of Pennsylvania and the Federal government.

8. The timber on the Clough Farm in Springcreek Township, Warren County, Pennsylvania, the deed for which is being held in escrow as security for payment of the debt of Fisher and Young Hardwoods to Fisher and Young, Inc. and

9. Timber on all parcels, the deeds for which are being held in escrow as security pending full payment by Hardwoods of its 1973 obligation to Fisher and Young, Inc.

Very truly yours,

JACK, KOOKOGEY & FELTON

John S. Kookogey

JSK:sas

Dated: December 19, 1986



**James Hall**
CONSULTING FORESTER

R.D. #1 Box 1102 • Russell, Pennsylvania 16345 • (814) 757-4488



May 2, 1997

Scott Michael Hare, Esquire
Bartony Hare & Edson
Law & Finance Building Suite 1801
429 Fourth Avenue
Pittsburgh, PA  15219



Re:  <u>Clough Farm/Matson Lumber Co.</u>

Dear Mr. Hare:

I have been engaged by Albert T. Carlisle to assess the condition and history of the timber stands and associated land on the Clough Farm, determine the value of the standing timber at various times in its history, assess the forestry practices employed by Matson Lumber Company and Matson Hardwoods (collectively "Matson") on the farm, and determine and define the damages to Mr. Carlisle caused by Matson. Further, I have been requested to assess the meaning of certain provisions contained in the Agreement of Sale between Mr. Carlisle and the original seller. Finally, I have been requested to evaluate the damage claims asserted by Matson in its counterclaims against Mr. Carlisle.

This letter describes my methodology, and reports my findings and conclusions as of this date. I offer all of the opinions expressed herein within a reasonable degree of scientific certainty.

## Description of the Property

The property in question, known as Clough Farm, is located in Spring Creek Township, Warren County, Pennsylvania. The property encompasses about 1239.6 acres. Of the total acreage, approximately 779 acres are commercial forest land.

This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine, and various other species. Based on the evidence of residual stumps and some uncut areas, I have concluded that this property was once a

Plaintiff's Appendix
000573

majestic example of the excellent timber that this area of Pennsylvania can produce. Through good forest management, under the guidance of a professional forester, this area could have been and should still be a highly productive, healthy and profitable forest. As I will detail below, because of Matson's forestry practices, it is not.

## Methodology

In order to provide a complete and accurate assessment of the 779 acres of commercial forest land on the farm, I used the following techniques.

A.    General overview and boundary line check.

B.    Typed the timber: Divided the area into homogenous stands using ground surveys and aerial photography.

C.    Took over 120 random plots using two techniques.

      1.    Plotless cruising with a 10 factor prism.
      2.    1/20 acre plots.

D.    Collected data regarding:

      1.    Species
      2.    Quality
      3.    D.B.H. (Diameter Breast High)
      4.    Merchantable Height
      5.    Number of trees
      6.    Damage to residual trees
      7.    Density

E.    Referred as needed to the following materials:

      1.    Sylvah (NSFS) Research Lab
      2.    Penn State volume tables
      3.    PA Bureau of Forestry volume factors
      4.    USDA-Forest Service research paper NE-373
      5.    USDA-FS Agricultural handbook 355
      6.    USDA-FS General technical report NE-96
      7.    USDA-FS Research paper NE-143
      8.    Timber Management Guide-Ben Roach
      9.    Forest Reference Manual-J.M. Francis
     10.    USDA-FS Agriculture Information Bulletin 419
     11.    USDA-FS Agriculture Information Bulletin 405
     12.    USDA-FS Research Paper NE-127
     13.    USDA-FS Agriculture Handbook 678

Plaintiff's Appendix
000574

14. NY State Dept. of Environmental Conservation Stumpage Price Reports—1982 to 1997
15. Penn State University—Timber Market Reports 1984-1997
16. USDA-FS Actual Bids on Timber Sales
17. Timber Sale Data collected by James Hall
18. Data supplied by Norman Sunderland, Consultant Forester
19. 1968, 1987, 1988 and 1989 Aerial Photography
20. Harvesting data supplied by Matson Lumber Company for November 1988 through April 1995
21. Agreement of sale—Fisher & Young, Seller and Albert T. Carlisle, Buyer dated September 30, 1969
22. Plaintiff's pre-trial narrative dated March 22, 1996
23. Defendant's pre-trial narrative dated April 11, 1996
24. Meyer's *Forest Mensuration*

## Significant Provisions of Agreement of Sale

During my career in the forestry industry, I have been involved in negotiating, drafting, monitoring and enforcing countless contracts governing timber rights. As a result, I am intimately familiar with the terminology and usage of the timber industry, and I am thereby able to interpret the Agreement of Sale between Mr. Carlisle and Fisher & Young to explain the meaning it has in the timber industry.

I have been asked to interpret the following provisions of the Agreement of Sale: (i) the final paragraph on page 5; (ii) paragraph 15.A. on page 8; (iii) paragraph 15.B. on page 8; and (iv) paragraph 16 on pages 8 and 9.

(i) Final Paragraph on page 5.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto set forth below, SUBJECT, however, to the right of

Buyer to use for its own purposes all trees fallen for more than one year and all tree-tops remaining after logging operations.

This provision very clearly reserves only those trees already actually existing on the date of the Agreement. This provision does not reserve any rights in any trees germinating after September 30, 1969, which are the property of Mr. Carlisle and must be respected as such.

It is possible to reserve an ownership interest in future trees, as well as existing trees, and parties sometimes agree to do so. However, such an ownership interest is always specifically identified. Furthermore, it is easy to reserve a future interest using language like this: "all trees now on this property, and all trees that ever grow on this property at any time in the future, are the property of the timber company." Such simple language clearly and plainly reserves not only trees then in existence, but all trees forever. The Agreement of Sale between Mr. Carlisle and Fisher & Young does no such thing, and anyone experienced in the forestry industry would understand the paragraph quoted above to retain ownership only in the trees that are actually existing on the date of the Agreement.

(ii) Paragraph 15.A. on page 8.

15.A.    That in the event the Seller shall desire to sell, transfer or assign the timber reserved on the premises above described, Seller shall give Buyer written notice thereof and hereby grants the Buyer the option for thirty days following the posting of said notice by Seller to Buyer of purchasing said timber at the price offered therefore by a bona fide prospective third party purchaser, transferor or assignor.

This provision refers to the timber itself, as opposed to the "timber rights" (see paragraph 15.B. below). Each and every time the Seller plans to sell, transfer or assign timber (in any quantity, including individual trees), it must give Mr. Carlisle a 30-day written notice, and the option to buy the specified trees at the price offered by the third party.

The business of a commercial timber company like Matson is to cut timber and sell the resulting logs to third-party purchasers. Such a company demonstrates a

"desire to sell, transfer or assign the timber reserved on the premises" by cutting the timber. Accordingly, Matson is required to notify Mr. Carlisle in writing each time it desires to cut timber to effectuate a sale, transfer or assignment of such timber, thereby allowing Mr. Carlisle to exercise his thirty-day option to purchase the timber. Had Matson honored this obligation, Mr. Carlisle would have been able to purchase any or all such timber (that is, individual trees) prior to its being cut. (Once cut, timber becomes logs: "timber" means standing merchantable trees. Upon being cut, therefore, the timber is transferred, in violation of the Agreement.)

Paragraph 15.A. would also apply, obviously, in the event Matson desired to sell, transfer or assign *all* of the timber. Once again, it would be required to give written notice to Mr. Carlisle and allow him thirty days to exercise his option to purchase such timber.

(iii)       Paragraph 15.B. on page 8.

15.B.    Should the present management and/or ownership of Seller change, Buyer shall be so advised by Seller in writing and shall have an thirty day option to purchase the timber rights at a price to be mutually agreed upon, or in failure thereof, by arbitration (each side to choose one of the arbitrators and the two arbitrators to select a third). The arbitrators shall establish the price which shall be binding without appeal of the parties.

Unlike 15.A., which refers to "timber" (trees), 15.B. refers to "timber rights." These are two entirely different terms with different meanings, and there is a reason for these two separate sections in paragraph 15.

In particular, under paragraph 15.B. the Seller is obligated to notify Mr. Carlisle in writing of any change in management and/or ownership of the Seller, whereupon Mr. Carlisle has 30 days to purchase the timber rights. This notice and option enable Mr. Carlisle to keep unwanted timber companies, subsequent to the original seller, off the property altogether by acquiring the remaining timber rights.

(iv) Paragraph 16 on pages 8 and 9.

It is further agreed and stipulated by and between the parties hereto that a map designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting, shall be attached hereto and made a part hereof as though fully set forth herein and marked Exhibit A as previously mentioned.

It appears that the map described in the Agreement of Sale cannot be found, although various witnesses testify that it once existed. As a professional forest manager, I can confirm that it would be ordinary industry practice to protect certain valuable resources on the property. Typically, any stream that has a breeding trout population is given a 100-foot buffer. Such a strip was probable on the Clough Farm along Spring Creek, Brokenstraw Creek, Tom's Run and its tributaries and the Greeley. There would also typically be a 100-foot buffer around any buildings, and an exclusion of swamp, wetlands, and areas used for pasture and/or agriculture.

## Conclusions

A.   Matson's Cutting Practices.

Matson Lumber Company's cutting practices show absolutely no concern for the forest as a renewable resource that should be managed to promote the continuing production of quality timber. Matson has left the average basal area of acceptable growing stock below 30 square feet, which is far below any accepted management guidelines. Damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded, and have reduced commercial value or no commercial value at all, because of sprouting from over harvesting. Skidding across and in streams is frequently evident. Excessive and unnecessary roads were built. Matson made poor use of the trees they felled, and abandoned valuable cut material to decay.

The following examples demonstrate some of the ways in which Matson was reckless in its timber practices and caused unnecessary damage on the Clough Farm:

1.    Trees removed right up to banks of Spring Creek.    Cutting along streams has been no different than anywhere else.

2.    No Respect for residual trees.    Felling damage, skidding damage, dozer damage, chainsaw damage is evident everywhere.

3.    Wasteful logging practice.    Many logs and even entire trees were cut and left in woods.    (This volume is not reflected in the damages calculations below, even though Mr. Carlisle has lost such abandoned trees.)

4.    No respect for streams and springs.    Many tops were left in water courses.    Skidder crossed and in some instances skidded logs in stream bed.

5.    There is no evidence of any sound forest management plans being used by Matson.    Stands with a high B.A. and excellent growing stock have been reduced to poor quality stands with less than 30 B.A. of acceptable growing stock.    This is so far below any graph that it is off the page.

In short (and undermining its claim that it has perpetual harvest rights on the Clough Farm), it is apparent that Matson has tried to get as much good timber from the farm as fast as possible, without regard to any damage it was causing to the timber stands or their future reproductive capacity.

B.    Damages to Carlisle.

Between November 1988 and April 1995, based on log receipts supplied by Matson, Matson and/or its agents removed 4,203,678 board feet Doyle rule from the Clough Farm.    Converted to International ¼-inch rule, this figure equals 7,125,234 board feet.    This figure does not include the logs left in the woods due to wasteful utilization practices.

The value of this timber, accounting for volume and species, based on the average value of stumpage in northwestern Pennsylvania published in the Penn State University "Timber Market Report" for the fourth quarter of 1996, is $1,891,265.00.    However, the trees removed by Matson were not average trees (the basis of the Penn State report), but very high quality trees.    The value of the Clough Farm timber removed by Matson, using timber prices

for high quality timber stumpage based on the Timber Market Report and actual timber sold in the area, is $3,655,060.40.

Because this timber was wantonly removed with no consideration for Mr. Carlisle's rights, Mr. Carlisle's damages for unlawfully removed timber (3 times stumpage value) are $10,965,181.20.

Additionally, Mr. Carlisle has endured damage to residual trees still standing of 34.4%, resulting in a loss of $584,268 times 3 = $1,752,804.

Furthermore, if this property has been properly managed with the original stand as a base, a perpetual harvest income would be realized by Mr. Carlisle. A modest 6.4% annual growth would yield $110,442.72 per year for at least thirty years, yielding a total loss of $3,313,281.60 based on today's values. This figure does not even account for the normal increase in stumpage values, ingrowth of small trees into sawtimber, quality increases (grade 1 into veneer), improved species composition, value of trees less than 11.5 DBH, or corrective work.

The total loss suffered by Mr. Carlisle as a result of Matson's violations of the Agreement of Sale and its improper harvesting methods is $16,031,266.80:

| | |
|---|---|
| $10,965,181.20 | Timber unlawfully removed |
| 1,752,804.00 | Damage to timber left standing |
| 3,313,281.60 | Lost future value |
| **$16,031,266.80** | Total |

C.   Matson's Damage Claims.

1.   Tree Stands

I have located a total of ten tree stands on the Clough Farm (one more than Matson alleges). Most of these stands were placed in trees with no commercial value, or were placed without the use of nails, so as not to damage the trees, or were erected before 1969. I have taken photographs of the trees at issue and have measured the trees. Of these, the only tree with any value damaged since 1969 is one 12" DBH Black Cherry (Volume 94 Bd. Ft. Int. ¼"), with a value of $84.60 assuming a grade 1 log.

Plaintiff's Appendix
000580

2.    Signs on trees

Roadside trees and field edge trees do not produce quality lumber, because of excessive limbs and damage to boles and root systems from road maintenance equipment. Thus, Matson's claim that 96 trees "can no longer be used for veneer resulting in a loss of $16,500.00" because of perimeter signs is nonsense.    These trees never had any veneer potential, and never would.

Some of the perimeter trees exhibit nails. However, the nails are grown over, demonstrating that they have been there more than two years (probably at least fifteen or twenty years), and were therefore already there when Matson acquired the timber rights.    All signs posted recently were put up with staples that do not penetrate through the bark, and therefore do not cause any damage.

In short, I did not find any damage to any trees from any posting of signs that would have resulted in any veneer log being down-graded.    Matson's total loss from all sign posting is exactly $0.00.

3.    Roads

Matson has not demonstrated any actual repair costs in support of this claim.    Usually road damage, such as rutting, from off-road vehicles is inexpensive to repair.

Thank you for the opportunity to undertake this interesting study.   Please call me if I can provide any additional information.

Respectfully,

James Hall
Consulting Forester

Plaintiff's Appendix
000581

DEPOSITION EXHIBIT
Hare 20
9/10/04

# TIMBER IN NO-CUT ZONE

Timber values based upon report of Mr. Kane, expert witness for Matson Lumber, and upon harvest volumes reported by Matson.

| Width of No Cut Zone | Damages |
|---|---|
| 25 feet | $121,256 |
| 50 feet | $242,112 |
| 100 feet | $485,026 |

DEPOSITION EXHIBIT
Hall #2

James F. Hall

Plaintiff's Appendix
000582

**James Hall, Consulting Forester**
69 S. Main St.
Russell, PA 16345
Home Phone 814-757-4488



DEPOSITION
EXHIBIT

Hall #3

October 7, 2005

Andrew J. Conner, Esq.
James R. Fryling, Esq.
Conner Riley & Fryling
17 West Tenth Street
P.O. Box 860
Erie, PA 16512-0860

Re:    Albert T. Carlisle v. Bartony Hare & Edson, et al.
U.S. District Court for the Western District of Pennsylvania
No. 04-025 Erie

Dear Mr. Conner and Mr. Fryling:

You have requested the following opinions regarding the quantity and value of timber removed by Matson Lumber Company and/or Matson Hardwoods, Inc. from the 1993 time period as well as the value of pre-1969 timber remaining on the Carlisle property.

As you know, I was engaged by Albert T. Carlisle to assess the condition and history of the timber stands and associated land on the Carlisle farm, to determine the value of the standing timber at various times in its history, to assess the forestry practices employed by Matson Lumber Company and Matson Hardwoods on the farm and to determine and to find damages to Mr. Carlisle caused by Matson.

I was also requested by Attorney Scott Hare of Bartony Hare & Edson to provide an expert report and testimony relating to damages for Mr. Carlisle in the case of Albert T. Carlisle v. Matson Lumber Company and Matson Hardwoods in the United States District Court for the Western District of Pennsylvania at No. 95-0376. I determined that between November 1988 and April 1995, based on log receipts supplied by Matson, that Matson and/or its agents removed 4,203,678 board feet Doyle rule from the Carlisle farm. Converted to the international 1/4 inch rule, this figure converts to 7,125,234 board feet. This figure did not include the logs left in the woods due to the wasteful utilization practices of Matson.

The value of this timber, accounting for volume and species reported by Matson, based on the average value of stumpage in Northwestern Pennsylvania published in the Penn State University <u>Timber Market Report</u> for the fourth quarter of 1996 was $1,891,265. However, the timber removed by Matson were not average trees (the basis of the Penn State Report) but were of very high quality. The value of timber removed from the Carlisle farm by Matson, using timber prices from the <u>Timber Market Report</u> for high quality timber and the actual timber sold in the area was $3,655,060.40.

The timber removed by Matson during the 1993-1994 and 1994-1995 timber harvests, accounting for volume and species as recorded by Matson was a volume of 539,746 Doyle rule having a value of $312,456.74 for 1993-1994 and a volume of 271,762 Doyle rule having a value of $125,997.26 for the 1994-1995 year. The total value of the harvest for these two years is $438,454.

The pre-1969 timber remaining on the property, excluding timber in the "no cut zones" has a value of $947,204.88 consisting of cutover stands having 6,004 board feet per acre and a value of $1,641.07 per acre, and uncut stands on 67 acres having 6,818 board feet per acre and $3,017.30 per acre.

I also calculated and was prepared to testify at trial that Mr. Carlisle suffered damage to his residual trees still standing of 34.4% resulting in a loss of $584,268.

At the time of trial, I was asked to calculate and value the timber wrongfully harvested from the "no cut zones" and these were the only damage calculations I was questioned about at trial. I offer all of the opinions expressed here all within a reasonable degree of scientific certainty.

Respectfully,

_James Hall_





132 MAIN STREET
BOX L

BROOKVILLE, PENNSYLVANIA 15825
PHONE: 814-849-5334    TELEX: 866-319    FAX No. 814-849-3811

Matson Hardwoods, Inc.

June 30, 1988

Mr. Albert T. Carlisle:
1210 Oak Drive
Ashtabula, OH 44004

Dear Mr. Carlisle:

*ORALLY?*

*ANY PURCHASE OPTION?*

As you have been previously apprised, Matson Hardwoods, Inc. is by merger the successor in interest to Fisher & Young Hardwoods, Inc. of course, Fisher & Young Hardwoods, Inc., was the successor to Fisher & Young, Inc., which latter corporation entered into and agreement with you dated May 28, 1969 for the sale and purchase of the several parcels of land known as the Clough Farm in Spring Creek Township, Warren County, Pennsylvania.

Said agreement excepted and reserved to Fisher & Young, Inc., now Matson, all of the timber and trees with the condition that Matson may cut only those trees sixteen (16") inches and more in diameter measured one (1) foot above the ground, and only in the season from November 1 to March 31 each year.

Among the several terms of said agreement is your right to prior notice of Matson's intention to conduct timbering operations on the Clough Farm. Therefore, you are to consider this letter as the required NOTICE to you that Matson intends to commence timbering operations to include the cutting, skidding, piling and removal of timber as well as the construction of access roads, all to be conducted in accordance with the terms of the aforesaid agreement of May 28, 1969.

If you desire further information or have questions regarding our intentions or the scope of the timbering program, we suggest that you be in touch with our forester, Norm Sunderland, by writing him at the above address.

Very truly yours,

MATSON HARDWOODS, INC.

By *Robert D. Matson* Pres.

*BM Ex. 2*



Plaintiff's Appendix
000585

DEPOSITION
EXHIBIT
*Hare* 7
9/1/05 JG

LAW OFFICES

**WARREN AND YOUNG**

PEOPLES SAVINGS & LOAN BUILDING

ASHTABULA, OHIO 44004

AREA CODE 216
997-6175

THEODORE E WARREN 1897-1969
M H. YOUNG
E. TERRY WARREN
JAMES A. McSWIGAN

WILLIAM E. RIEDEL

December 10, 1970

John S. Kookogey, Esq.
Jack, Kookogey & Forssell
Attorneys at Law
144 West Spring Street
Titusville, Pennsylvania 16354

RE: <u>Fisher and Young - Albert T. Carlisle</u>

Dear Mr. Kookogey:

May I hear from you concerning our request to
resolve the timber situation on Bert Carlisle's property.
We have agreed to split the real estate taxes on a fifty-
fifty basis, and I had also requested a definite date for
termination of the timber rights.

Yours truly,

E. Terry Warren

ETW:an

cc: A. T. Carlisle

787 Acres - timber

@ 44¢ = timber + land / 2

millage    8.5  G.
           9.0  Ron
          31.0  Deb
          ————
          48.5

DA17



DEPOSITION
EXHIBIT
Hare 8
9/1/05

---

*Bartony & Hare*
## Memorandum

To:        Albert T. Carlisle

From:      Scott M. Hare

Date:      November 3, 1994

Re:        Pennsylvania Farm Timber Rights

---

### PRIVILEGED ATTORNEY CLIENT COMMUNICATION
### AND WORK PRODUCT COMMUNICATION

I have reviewed in detail several documents you provided to me relating to timber rights on your Pennsylvania farm, including the May 28, 1969 Agreement of Sale and several pieces of correspondence. Based on my review of these documents, together with a preliminary investigation of the governing law, I believe you have a viable basis to bring a lawsuit against Matson Lumber Company, and perhaps Mr. Bob Matson individually, (hereinafter collectively "Matson") along the lines set forth herein.

### Causes of Action and Corresponding Objectives

You have several potential causes of action against Matson, leading to several types of potential relief. The most effective strategy will be to assert all available causes of action, thereby (a) putting the greatest

C:\MSOFFICE\WINWORD\CARLISLE\TIMBER\CORRESPO\MEMO11_3.DOC
Thursday, November 3, 1994   2:39 PM

Plaintiff's Appendix
000587

pressure on Matson, (b) multiplying your chances of success, and (c) leading to the most extensive possible relief. In practical terms, success on any one cause of action may lead to a complete resolution of the matter. Further, the broad scope of the lawsuit, together with the resulting defense costs and broad risk of liability, may lead Matson to agree to a favorable pre-judgment settlement.

1.   Breach of Contract/Specific Enforcement
     (Right of First Refusal)

     Paragraph 15 of the Agreement of Sale provides you with a thirty-day option to purchase the timber reserves on your farm in the event (i) Seller desires to sell the timber reserves (Paragraph 15(a)), or (ii) Seller's management or ownership undergoes a change (Paragraph 15(b)). (This right of first refusal is the subject of an October 4, 1990 Memorandum prepared by Robert Harper, Esquire at Springer, Bush and Perry, which you have provided to me.)

     Based on the information I have received, it appears that at various times both Paragraph 15(a) and Paragraph 15(b) of the Agreement of Sale have been implicated, giving you on each such occasion a thirty-day option to purchase the timber reserves outright. However, you were never notified of the pendency of any such

transaction and your consequent purchase option, in
violation of the Agreement of Sale. It appears that the
most recent such violation took place on December 18, 1986,
when Fisher & Young Hardwoods, Inc. merged with Matson
Hardwoods, Inc., resulting in either a sale of the timber,
thereby implicating Paragraph 16(a), or a change in
management or ownership of Fisher & Young, thereby
implicating Paragraph 16(b). In either event, a cause of
action arose on December 18, 1986.

More recently, you were notified by letter dated
June 30, 1988 that Fisher & Young Hardwoods, Inc., through a
series of transaction taking place between 1973 and 1975,
became the successor in interest to Fisher & Young, Inc.,
thereby triggering paragraph 16(b) of the Agreement of Sale.
Applying the "discovery rule" to the running of a statute of
limitations, you may argue that although paragraph 16(b) was
breached sometime during 1973 through 1975, you reasonably
discovered the breach only in June 1988, and that the
statute of limitations began to run as of that later date.[1]

X

See
3/27/73
letter
to T. Ware
and
3/15/73
letter to
BC

---

[1]    You indicated to me that Matson's on-site harvesting
management changed within the last few years. We might also
be able to argue that such a change constitutes a management
change under the Agreement of Sale, thereby giving you
another right of first refusal at that time. This reading
of the Agreement of Sale is particularly appropriate given
that Matson's harvesting practices changed dramatically
after this change in management. Such possible changes are

Plaintiff's Appendix
000589

An action for breach of contract in Pennsylvania is generally governed by a four-year statute of limitations. See 42 Pa. Cons. Stat. Ann. § 5525. An action for specific performance of a contract for sale of real property, or for damages resulting from noncompliance therewith, is governed by a five-year statute of limitations. See 42 Pa. Cons. Stat. Ann. § 5526. Applying even a five-year statute of limitations to the most recent trigger date, however, the statute would have expired in June 1993.

Notwithstanding the foregoing statutes, when a contract is signed under seal, a twenty-year statute of limitations applies, rather than the usual four-year statute. See 42 Pa. Cons. Stat. Ann. § 5529(b)(1) ("an action or proceeding upon an instrument in writing under seal must be commenced within twenty years"). The Pennsylvania Superior Court recently held that where a contract bears the preprinted word "seal," and is signed by the parties thereto, the twenty-year statute of limitations applies. Beneficial Consumer Discount v. Dailey, 644 A.2d 789 (Pa. Super. 1994).

---

precisely the risk that rights of first refusal are designed to protect against.

The signature page of the May 28, 1969 Agreement of Sale provides "IN WITNESS WHEREOF, the said parties to this agreement have hereunto set their hands and **seals** the 28th day of May, 1969." Agreement of Sale p.10 (emphasis added). Based on this use of the word "seal," we may be able to argue successfully that any breach of the Agreement of Sale is governed by a twenty-year statute of limitations, not a four- or five-year statute, and that you therefore still have a timely cause of action for the several breaches of Paragraph 15.

If we can persuade the court to adopt a twenty-year statute of limitations, we will be in a position to demand specific performance of Paragraph 15. We can then compel Matson to honor your right of first refusal, thereby enabling you to purchase the timber reserves from Matson and preclude any more timber harvesting.[2] Depending on whether Paragraph 15(a) or 15(b) applies, the purchase price under the Agreement of Sale is to be "the price offered therefor by a bona fide prospective third party purchaser" (Paragraph 15(a)), or "a price mutually agreed upon, or in failure thereof, by arbitration" (Paragraph 15(b)). In either event, however, we will argue that the purchase price should

---

[2]    Of course, you can always elect to sell your timber rights thereafter, at current market prices.

be discounted by the value of the timber Matson has harvested, because such harvesting operations should never have taken place in light of your option. Ideally, we will try to show that this discount exceeds the contractual purchase price, such that you can exercise the option and "purchase" the timber reserves at no cost, and perhaps also receive damages from Matson for the excess.[3]

2.   <u>Declaratory Judgment</u>

    You are entitled to seek a judicial declaration of rights as to issues in dispute under the Agreement of Sale. There are several such issues.

    A.   <u>Scope of Timber Rights</u>

    We can request the court to determine the scope of the timber rights under the Agreement of Sale. Our position will be that the Agreement allows only a limited, one-time or "reasonable-time" opportunity to harvest, and that such time has already expired. Unfortunately, this position is not well-supported by the language of the Agreement. Our fallback position will be that the Agreement is ambiguous on

---

[3]    Even if you decide against litigation at this time, please bear in mind that Matson remains obligated to comply with your right of first refusal in the future. Accordingly, if Matson ever desires to sell the timber rights or undergoes a change in management or ownership, you will then have a new opportunity to purchase the timber rights.

this issue, and that the court therefore should look to extrinsic evidence to construe its meaning. Such extrinsic evidence will include your testimony as to your understanding that the Agreement provided only one-time harvest rights. To succeed, we will have to convince the court that the Agreement is ambiguous.

In any event, even if the court rejects the foregoing arguments, our bedrock position will be that the Agreement of Sale reserves only "all of the timber and trees, standing and fallen, situate on the premises above described," that is, trees in existence on May 28, 1969. Accordingly, any trees that sprouted thereafter are outside the scope of Matson's timber rights, and are not subject to harvesting.

Even this last result, the least expansive for us, will substantially correct Matson's apparent impression that its timber rights are in perpetuity. Further, any of the foregoing declarations will additionally entitle you to an award of damages relating to all timber harvested by Matson outside the scope of its timber rights. (See Section 4 below.)

B.  Contents of Exclusionary Map

The Agreement of Sale incorporates as Exhibit A a map "designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting." Agreement of Sale p.10. This map is apparently missing. We will try to obtain the map from Matson or elsewhere during discovery, thereby settling any issue as to its contents. If, however, no copy of the map can be located, we will ask the court to reconstruct the map, based on whatever evidence is available, and declare its contents. To the extent Matson retains any harvesting rights after the lawsuit, it will be compelled to respect the limitations contained in the map.

C.  Applicability of Environmental Regulations

Matson has been cited by state authorities for violations of various environmental regulations. Accordingly, to the extent Matson retains any harvesting rights after the lawsuit, we are entitled to a declaration as to the applicability of any environmental regulations, including those that are readily apparent, and others that arise from special circumstances, such as the classification of Spring Creek as a Class A wild trout stream.

Plaintiff's Appendix
000594

3.    Preliminary and Permanent Injunctions

You are entitled to seek preliminary and permanent injunctions with respect to a number of issues.

A.    Preliminary Injunction Halting all Harvesting

We will seek a preliminary injunction to halt timber harvesting entirely while the merits of the case are addressed for final resolution.    To obtain a preliminary injunction, a moving party must show (i) that there is a likelihood of eventual success on the merits, (ii) that there is a threat of irreparable harm if an injunction does not issue, (iii) that greater harm would result to the moving party if the injunction is denied than would result to the non-moving party if the injunction is granted, and (iv) that the public interest is served by the issuance of an injunction.

Our basis for requesting a preliminary injunction halting timber harvesting entirely will be that Matson does not have any rights to harvest any timber (based on your right of first refusal), and in any event does not have the right to harvest in the fashion it has been harvesting (based on the proper scope of timber rights, the contents of the exclusionary map, and the application of environmental

Plaintiff's Appendix
000595

laws and regulations), and that it should be precluded from harvesting while the court sorts out such issues.

     B.    Preliminary Injunction Requiring Compliance with
           Environmental Laws and the Agreement of Sale

Based on Matson's record of violating Pennsylvania environmental laws and regulations and the Agreement of Sale in its harvesting operations, and the threat that it will continue to do so, to the extent the court denies our request for a preliminary injunction halting all timber operations, we will seek a preliminary injunction requiring Matson to conduct any timber operations consistent with all applicable laws and regulations and the restrictions contained in the Agreement of Sale.

     C.    Permanent Injunction Prohibiting or Limiting
           Timber Harvesting

We will also request in our lawsuit that the court issue a permanent injunction at the end of the case prohibiting timber harvesting on the basis that (i) Matson is required to honor your right of first refusal and convey all timber rights to you, or (ii) we will have proven that Matson has no remaining harvest rights. In the alternative, we will request that the court issue a permanent injunction limiting Matson's timber harvesting to stay within the

-10-

proper scope of timber rights, to respect the contents of the exclusionary map, and to comply with environmental laws and regulations.

4.    Claims for Money Damages

Specific performance, declaratory judgment and injunctive relief are all varieties of equitable relief. You are also entitled to seek legal damages to compensate for any monetary loss you have suffered.

A.    Breach of Contract

By failing to honor your right of first refusal, Matson has breached the Agreement of Sale, causing you to suffer monetary damages. For example, any trees that have been harvested, but should not have been, constitute a loss to you. You are entitled to recover for such loss.

B.    Trespass to Property

To the extent Matson has exceeded its timber rights in any fashion, it has committed a trespass to your property rights, for which you are entitled to seek damages. In particular, you are entitled to recover money in an amount equal to the damages to your property resulting from such excess harvesting. If we can show that Matson's

Plaintiff's Appendix
000597

trespass was willful and egregious, you may also be entitled to recover punitive damages.

    C.   <u>Constructive Trust</u>

       Although constructive trust is an equitable, not legal, remedy, it may apply in this case to entitle you to a money recovery. In particular, to the extent Matson has received revenues from harvesting timber in violation of your rights, such revenues rightly belong to you, and Matson is merely a constructive trustee of such revenues on your behalf. Accordingly, upon proof to this effect, Matson can be equitably compelled to convey such revenues to you.

                                 SMH
                                 412-338-8632

-12-

## Projected Litigation Budget
## Albert T. Carlisle Timber Matter

| | |
|---|---|
| Pre-Complaint Legal Research | 35-50 hours |
| Draft and File Complaint | 30-35 hours |
| Preliminary Objections | 0-25 hours |
| Plaintiff's Discovery | |
|     Draft Document Request | 10-15 hours |
|     Draft Written Interrogatories | 10-15 hours |
|     Take Depositions (est. 4) | 30-40 hours |
|     Review Document Production | 10-15 hours |
|     Review Interrogatory Responses | 10-15 hours |
|     Subtotal | 70-100 hours |
| Motions to Compel Discovery | 0-20 hours |
| Defendant's Discovery | |
|     Answer Document Request | 15-20 hours |
|     Answer Interrogatories | 15-25 hours |
|     Prepare and Defend Deps. (est. 2) | 15-20 hours |
|     Subtotal | 45-65 hours |
| Motion for Preliminary Injunction | 60-90 hours |
| Motions for Summary Judgment | 40-70 hours |
| Trial | 100-150 hours |

---

| | |
|---|---|
| **Total** | **380-605 hours** |
| | **@$120/hour  =  $45,600 to $72,600** |

(Does not reflect appeals from judgment at trial.)

$60
10%
15%

$50K
10%
15%

