(iv) Paragraph 16 on pages 8 and 9.

It is further agreed and stipulated by and between the parties hereto that a map designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting, shall be attached hereto and made a part hereof as though fully set forth herein and marked Exhibit A as previously mentioned.

It appears that the map described in the Agreement of Sale cannot be found, although various witnesses testify that it once existed. As a professional forest manager, I can confirm that it would be ordinary industry practice to protect certain valuable resources on the property. Typically, any stream that has a breeding trout population is given a 100-foot buffer. Such a strip was probable on the Clough Farm along Spring Creek, Brokenstraw Creek, Tom's Run and its tributaries and the Greeley. There would also typically be a 100-foot buffer around any buildings, and an exclusion of swamp, wetlands, and areas used for pasture and/or agriculture.

## Conclusions

A.    Matson's Cutting Practices.

Matson Lumber Company's cutting practices show absolutely no concern for the forest as a renewable resource that should be managed to promote the continuing production of quality timber. Matson has left the average basal area of acceptable growing stock below 30 square feet, which is far below any accepted management guidelines. Damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded, and have reduced commercial value or no commercial value at all, because of sprouting from over harvesting. Skidding across and in streams is frequently evident. Excessive and unnecessary roads were built. Matson made poor use of the trees they felled, and abandoned valuable cut material to decay.

The following examples demonstrate some of the ways in which Matson was reckless in its timber practices and caused unnecessary damage on the Clough Farm:

Plaintiff's Appendix
000650

1.    Trees removed right up to banks of Spring Creek.  Cutting along streams has been no different than anywhere else.

2.    No Respect for residual trees.    Felling damage, skidding damage, dozer damage, chainsaw damage is evident everywhere.

3.    Wasteful logging practice.  Many logs and even entire trees were cut and left in woods.  (This volume is not reflected in the damages calculations below, even though Mr. Carlisle has lost such abandoned trees.)

4.    No respect for streams and springs.    Many tops were left in water courses.  Skidder crossed and in some instances skidded logs in stream bed.

5.    There is no evidence of any sound forest management plans being used by Matson.  Stands with a high B.A. and excellent growing stock have been reduced to poor quality stands with less than 30 B.A. of acceptable growing stock.  This is so far below any graph that it is off the page.

In short (and undermining its claim that it has perpetual harvest rights on the Clough Farm), it is apparent that Matson has tried to get as much good timber from the farm as fast as possible, without regard to any damage it was causing to the timber stands or their future reproductive capacity.

B.    Damages to Carlisle.

Between November 1988 and April 1995, based on log receipts supplied by Matson, Matson and/or its agents removed 4,203,678 board feet Doyle rule from the Clough Farm.  Converted to International ¼-inch rule, this figure equals 7,125,234 board feet.  This figure does not include the logs left in the woods due to wasteful utilization practices.

The value of this timber, accounting for volume and species, based on the average value of stumpage in northwestern Pennsylvania published in the Penn State University "Timber Market Report" for the fourth quarter of 1996, is $1,891,265.00.  However, the trees removed by Matson were not average trees (the basis of the Penn State report), but very high quality trees.  The value of the Clough Farm timber removed by Matson, using timber prices

for high quality timber stumpage based on the Timber Market Report and actual timber sold in the area, is $3,655,060.40.

Because this timber was wantonly removed with no consideration for Mr. Carlisle's rights, Mr. Carlisle's damages for unlawfully removed timber (3 times stumpage value) are $10,965,181.20.

Additionally, Mr. Carlisle has endured damage to residual trees still standing of 34.4%, resulting in a loss of $584,268 times 3 = $1,752,804.

Furthermore, if this property has been properly managed with the original stand as a base, a perpetual harvest income would be realized by Mr. Carlisle. A modest 6.4% annual growth would yield $110,442.72 per year for at least thirty years, yielding a total loss of $3,313,281.60 based on today's values. This figure does not even account for the normal increase in stumpage values, ingrowth of small trees into sawtimber, quality increases (grade 1 into veneer), improved species composition, value of trees less than 11.5 DBH, or corrective work.

The total loss suffered by Mr. Carlisle as a result of Matson's violations of the Agreement of Sale and its improper harvesting methods is $16,031,266.80:

| | |
|---|---|
| $10,965,181.20 | Timber unlawfully removed |
| 1,752,804.00 | Damage to timber left standing |
| 3,313,281.60 | Lost future value |
| **$16,031,266.80** | Total |

C.   Matson's Damage Claims.

1.   Tree Stands

I have located a total of ten tree stands on the Clough Farm (one more than Matson alleges). Most of these stands were placed in trees with no commercial value, or were placed without the use of nails, so as not to damage the trees, or were erected before 1969. I have taken photographs of the trees at issue and have measured the trees. Of these, the only tree with any value damaged since 1969 is one 12" DBH Black Cherry (Volume 94 Bd. Ft. Int. ¼"), with a value of $84.60 assuming a grade 1 log.

2.    Signs on trees

Roadside trees and field edge trees do not produce quality lumber, because of excessive limbs and damage to boles and root systems from road maintenance equipment. Thus, Matson's claim that 96 trees "can no longer be used for veneer resulting in a loss of $16,500.00" because of perimeter signs is nonsense. These trees never had any veneer potential, and never would.

Some of the perimeter trees exhibit nails. However, the nails are grown over, demonstrating that they have been there more than two years (probably at least fifteen or twenty years), and were therefore already there when Matson acquired the timber rights. All signs posted recently were put up with staples that do not penetrate through the bark, and therefore do not cause any damage.

In short, I did not find any damage to any trees from any posting of signs that would have resulted in any veneer log being down-graded. Matson's total loss from all sign posting is exactly $0.00.

3.    Roads

Matson has not demonstrated any actual repair costs in support of this claim. Usually road damage, such as rutting, from off-road vehicles is inexpensive to repair.

Thank you for the opportunity to undertake this interesting study. Please call me if I can provide any additional information.

Respectfully,

James Hall
Consulting Forester

Plaintiff's Appendix
000653

*Barton, Hare & Edson*

*Attorneys at Law*

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone   412/338-8632
Facsimile    412/338-6611

DEPOSITION
EXHIBIT
Hare 6
9/15/04
PENGAD 800-631-6989

May 7, 1997

Mr. Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH  44004

Re:  Carlisle v. Matson Lumber

Dear Bert:

I am delighted to enclose a copy of our **Supplemental Pretrial Narrative Statement**, the original of which was filed today.

Please call if you have any questions.

Very truly yours,

Scott Michael Hare

SMH:crc

Enclosure

cc (w/encl.):      Mr. James Hall
                   Mr. Lainard Bush

Plaintiff's Appendix
000654

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,               )
                                  )
            Plaintiff,            )
                                  )      No. 95-0376
        v.                        )
                                  )      Judge Lancaster
MATSON LUMBER CO. and             )
MATSON HARDWOODS, INC.,           )
                                  )
            Defendants.           )

## SUPPLEMENTAL PRETRIAL NARRATIVE STATEMENT OF PLAINTIFF/COUNTERCLAIM DEFENDANT ALBERT T. CARLISLE

NOW COMES Plaintiff/Counterclaim Defendant Albert T. Carlisle, by his undersigned counsel, and hereby respectfully submits the following Supplemental Pretrial Narrative Statement. This Statement supplements the disclosures set forth in Plaintiff's original Pretrial Narrative Statement previously filed in this action.

## I. *Factual and Legal Contentions*

Plaintiff's original Pretrial Narrative Statement identifies several breaches by Matson of Carlisle's options and rights of first refusal under the Agreement of Sale. Matson additionally breached paragraph 15.A of the Agreement of Sale by cutting timber without giving notice as required in that paragraph. Paragraph 15.A gives Carlisle an option

to purchase the timber "in the event [Matson] shall desire to sell, transfer or assign the timber." Paragraph 15.A therefore requires Matson to notify Carlisle in writing each time it desires to cut timber to effectuate a sale, transfer or assignment of such timber, thereby allowing Carlisle to exercise his thirty-day option to purchase the timber. Matson repeatedly cut timber, however, without giving any such written notice, and thereby failed to honor Carlisle's purchase option provided by the Agreement of Sale. Each such failure constitutes a breach of the Agreement and a wrongful removal of Carlisle's timber.

## II.    _Damages_

As set forth in the report of James Hall attached hereto, Carlisle has suffered the following damages: (a) loss of the value of all trees wrongfully harvested and removed by Matson in the amount of $3,655,060.40, trebled equals **$10,965,181.20**; (b) loss of the value of timber damaged by Matson as a result of careless harvesting practices in the amount of $584,268.00, trebled equals **$1,752,804.00**; and (c) destruction of future sustained-yield income potential in the amount of **$3,313,281.60**. Carlisle's total damages are therefore **$16,031,266.80**.

-2-

**James Hall**
CONSULTING FORESTER
R.D. #1 Box 1102 · Russell, Pennsylvania 16345 · (814) 757-4488

May 2, 1997

Scott Michael Hare, Esquire
Bartony Hare & Edson
Law & Finance Building Suite 1801
429 Fourth Avenue
Pittsburgh, PA  15219

Re:  Clough Farm/Matson Lumber Co.

Dear Mr. Hare:

I have been engaged by Albert T. Carlisle to assess the condition and history of the timber stands and associated land on the Clough Farm, determine the value of the standing timber at various times in its history, assess the forestry practices employed by Matson Lumber Company and Matson Hardwoods (collectively "Matson") on the farm, and determine and define the damages to Mr. Carlisle caused by Matson.  Further, I have been requested to assess the meaning of certain provisions contained in the Agreement of Sale between Mr. Carlisle and the original seller.  Finally, I have been requested to evaluate the damage claims asserted by Matson in its counterclaims against Mr. Carlisle.

This letter describes my methodology, and reports my findings and conclusions as of this date.  I offer all of the opinions expressed herein within a reasonable degree of scientific certainty.

## Description of the Property

The property in question, known as Clough Farm, is located in Spring Creek Township, Warren County, Pennsylvania.  The property encompasses about 1239.6 acres. Of the total acreage, approximately 779 acres are commercial forest land.

This property once had very high quality stands of red oak, black cherry, white ash, sugar maple, red maple, eastern hemlock, basswood, white pine, and various other species.  Based on the evidence of residual stumps and some uncut areas, I have concluded that this property was once a

Management Plans · Appraisals · Timber Sales · Wetland Delineation · Wildlife Management

*Specializing In Getting the Most for the Forest Landowner*

majestic example of the excellent timber that this area of Pennsylvania can produce. Through good forest management, under the guidance of a professional forester, this area could have been and should still be a highly productive, healthy and profitable forest. As I will detail below, because of Matson's forestry practices, it is not.

## Methodology

In order to provide a complete and accurate assessment of the 779 acres of commercial forest land on the farm, I used the following techniques.

A.   General overview and boundary line check.

B.   Typed the timber: Divided the area into homogenous stands using ground surveys and aerial photography.

C.   Took over 120 random plots using two techniques.

    1.   Plotless cruising with a 10 factor prism.
    2.   1/20 acre plots.

D.   Collected data regarding:

    1.   Species
    2.   Quality
    3.   D.B.H. (Diameter Breast High)
    4.   Merchantable Height
    5.   Number of trees
    6.   Damage to residual trees
    7.   Density

E.   Referred as needed to the following materials:

    1.   Sylvah (NSFS) Research Lab
    2.   Penn State volume tables
    3.   PA Bureau of Forestry volume factors
    4.   USDA-Forest Service research paper NE-373
    5.   USDA-FS Agricultural handbook 355
    6.   USDA-FS General technical report NE-96
    7.   USDA-FS Research paper NE-143
    8.   Timber Management Guide-Ben Roach
    9.   Forest Reference Manual-J.M. Francis
    10.  USDA-FS Agriculture Information Bulletin 419
    11.  USDA-FS Agriculture Information Bulletin 405
    12.  USDA-FS Research Paper NE-127
    13.  USDA-FS Agriculture Handbook 678

Plaintiff's Appendix
000658

14. NY State Dept. of Environmental Conservation Stumpage Price Reports—1982 to 1997
15. Penn State University—Timber Market Reports 1984-1997
16. USDA-FS Actual Bids on Timber Sales
17. Timber Sale Data collected by James Hall
18. Data supplied by Norman Sunderland, Consultant Forester
19. 1968, 1987, 1988 and 1989 Aerial Photography
20. Harvesting data supplied by Matson Lumber Company for November 1988 through April 1995
21. Agreement of sale—Fisher & Young, Seller and Albert T. Carlisle, Buyer dated September 30, 1969
22. Plaintiff's pre-trial narrative dated March 22, 1996
23. Defendant's pre-trial narrative dated April 11, 1996
24. Meyer's *Forest Mensuration*

## Significant Provisions of Agreement of Sale

During my career in the forestry industry, I have been involved in negotiating, drafting, monitoring and enforcing countless contracts governing timber rights. As a result, I am intimately familiar with the terminology and usage of the timber industry, and I am thereby able to interpret the Agreement of Sale between Mr. Carlisle and Fisher & Young to explain the meaning it has in the timber industry.

I have been asked to interpret the following provisions of the Agreement of Sale: (i) the final paragraph on page 5; (ii) paragraph 15.A. on page 8; (iii) paragraph 15.B. on page 8; and (iv) paragraph 16 on pages 8 and 9.

(i) Final Paragraph on page 5.

EXCEPTING and RESERVING from and out of this conveyance, all of the timber and trees, standing and fallen, situate on the premises above described, with full right of ingress, egress and regress for purposes of cutting, skidding, piling and removing the same, constructing roadways and skidways, and piling yards for such purposes, being subject to other terms relative thereto set forth below, SUBJECT, however, to the right of

Plaintiff's Appendix
000659

Buyer to use for its own purposes all trees fallen for more than one year and all tree-tops remaining after logging operations.

This provision very clearly reserves <u>only</u> those trees already actually existing on the date of the Agreement. This provision does not reserve any rights in any trees germinating after September 30, 1969, which are the property of Mr. Carlisle and must be respected as such.

It is possible to reserve an ownership interest in future trees, as well as existing trees, and parties sometimes agree to do so. However, such an ownership interest is always specifically identified. Furthermore, it is easy to reserve a future interest using language like this: "all trees now on this property, and all trees that ever grow on this property at any time in the future, are the property of the timber company." Such simple language clearly and plainly reserves not only trees then in existence, but all trees forever. The Agreement of Sale between Mr. Carlisle and Fisher & Young does no such thing, and anyone experienced in the forestry industry would understand the paragraph quoted above to retain ownership only in the trees that are actually existing on the date of the Agreement.

(ii) Paragraph 15.A. on page 8.

15.A.    That in the event the Seller shall desire to sell, transfer or assign the timber reserved on the premises above described, Seller shall give Buyer written notice thereof and hereby grants the Buyer the option for thirty days following the posting of said notice by Seller to Buyer of purchasing said timber at the price offered therefore by a bona fide prospective third party purchaser, transferor or assignor.

This provision refers to the timber itself, as opposed to the "timber rights" (see paragraph 15.B. below). Each and every time the Seller plans to sell, transfer or assign timber (in any quantity, including individual trees), it must give Mr. Carlisle a 30-day written notice, and the option to buy the specified trees at the price offered by the third party.

The business of a commercial timber company like Matson is to cut timber and sell the resulting logs to third-party purchasers. Such a company demonstrates a

Plaintiff's Appendix
000660

"desire to sell, transfer or assign the timber reserved on the premises" by cutting the timber. Accordingly, Matson is required to notify Mr. Carlisle in writing each time it desires to cut timber to effectuate a sale, transfer or assignment of such timber, thereby allowing Mr. Carlisle to exercise his thirty-day option to purchase the timber. Had Matson honored this obligation, Mr. Carlisle would have been able to purchase any or all such timber (that is, individual trees) prior to its being cut. (Once cut, timber becomes logs: "timber" means standing merchantable trees. Upon being cut, therefore, the timber is transferred, in violation of the Agreement.)

Paragraph 15.A. would also apply, obviously, in the event Matson desired to sell, transfer or assign *all* of the timber. Once again, it would be required to give written notice to Mr. Carlisle and allow him thirty days to exercise his option to purchase such timber.

(iii)    Paragraph 15.B. on page 8.

15.B.    Should the present management and/or ownership of Seller change, Buyer shall be so advised by Seller in writing and shall have an thirty day option to purchase the timber rights at a price to be mutually agreed upon, or in failure thereof, by arbitration (each side to choose one of the arbitrators and the two arbitrators to select a third). The arbitrators shall establish the price which shall be binding without appeal of the parties.

Unlike 15.A., which refers to "timber" (trees), 15.B. refers to "timber rights." These are two entirely different terms with different meanings, and there is a reason for these two separate sections in paragraph 15.

In particular, under paragraph 15.B. the Seller is obligated to notify Mr. Carlisle in writing of any change in management and/or ownership of the Seller, whereupon Mr. Carlisle has 30 days to purchase the timber rights. This notice and option enable Mr. Carlisle to keep unwanted timber companies, subsequent to the original seller, off the property altogether by acquiring the remaining timber rights.

Page 5

(iv) Paragraph 16 on pages 8 and 9.

> It is further agreed and stipulated by and between the parties hereto that a map designating the forestry areas which shall be subject to cutting by the Seller and also designating those areas belonging solely to the Buyer, wherein the Seller agrees that there will be no cutting, shall be attached hereto and made a part hereof as though fully set forth herein and marked Exhibit A as previously mentioned.

It appears that the map described in the Agreement of Sale cannot be found, although various witnesses testify that it once existed. As a professional forest manager, I can confirm that it would be ordinary industry practice to protect certain valuable resources on the property. Typically, any stream that has a breeding trout population is given a 100-foot buffer. Such a strip was probable on the Clough Farm along Spring Creek, Brokenstraw Creek, Tom's Run and its tributaries and the Greeley. There would also typically be a 100-foot buffer around any buildings, and an exclusion of swamp, wetlands, and areas used for pasture and/or agriculture.

## Conclusions

A.   Matson's Cutting Practices.

Matson Lumber Company's cutting practices show absolutely no concern for the forest as a renewable resource that should be managed to promote the continuing production of quality timber. Matson has left the average basal area of acceptable growing stock below 30 square feet, which is far below any accepted management guidelines. Damage from skidding and felling is severe on 34.4% of the remaining trees. Almost all remaining trees are degraded, and have reduced commercial value or no commercial value at all, because of sprouting from over harvesting. Skidding across and in streams is frequently evident. Excessive and unnecessary roads were built. Matson made poor use of the trees they felled, and abandoned valuable cut material to decay.

The following examples demonstrate some of the ways in which Matson was reckless in its timber practices and caused unnecessary damage on the Clough Farm:

Plaintiff's Appendix
000662

1. Trees removed right up to banks of Spring Creek. Cutting along streams has been no different than anywhere else.

2. No Respect for residual trees. Felling damage, skidding damage, dozer damage, chainsaw damage is evident everywhere.

3. Wasteful logging practice. Many logs and even entire trees were cut and left in woods. (This volume is not reflected in the damages calculations below, even though Mr. Carlisle has lost such abandoned trees.)

4. No respect for streams and springs. Many tops were left in water courses. Skidder crossed and in some instances skidded logs in stream bed.

5. There is no evidence of any sound forest management plans being used by Matson. Stands with a high B.A. and excellent growing stock have been reduced to poor quality stands with less than 30 B.A. of acceptable growing stock. This is so far below any graph that it is off the page.

In short (and undermining its claim that it has perpetual harvest rights on the Clough Farm), it is apparent that Matson has tried to get as much good timber from the farm as fast as possible, without regard to any damage it was causing to the timber stands or their future reproductive capacity.

B. Damages to Carlisle.

Between November 1988 and April 1995, based on log receipts supplied by Matson, Matson and/or its agents removed 4,203,678 board feet Doyle rule from the Clough Farm. Converted to International ¼-inch rule, this figure equals 7,125,234 board feet. This figure does not include the logs left in the woods due to wasteful utilization practices.

The value of this timber, accounting for volume and species, based on the average value of stumpage in northwestern Pennsylvania published in the Penn State University "Timber Market Report" for the fourth quarter of 1996, is $1,891,265.00. However, the trees removed by Matson were not average trees (the basis of the Penn State report), but very high quality trees. The value of the Clough Farm timber removed by Matson, using timber prices

for high quality timber stumpage based on the Timber Market Report and actual timber sold in the area, is $3,655,060.40.

Because this timber was wantonly removed with no consideration for Mr. Carlisle's rights, Mr. Carlisle's damages for unlawfully removed timber (3 times stumpage value) are $10,965,181.20.

Additionally, Mr. Carlisle has endured damage to residual trees still standing of 34.4%, resulting in a loss of $584,268 times 3 = $1,752,804.

Furthermore, if this property has been properly managed with the original stand as a base, a perpetual harvest income would be realized by Mr. Carlisle. A modest 6.4% annual growth would yield $110,442.72 per year for at least thirty years, yielding a total loss of $3,313,281.60 based on today's values. This figure does not even account for the normal increase in stumpage values, ingrowth of small trees into sawtimber, quality increases (grade 1 into veneer), improved species composition, value of trees less than 11.5 DBH, or corrective work.

The total loss suffered by Mr. Carlisle as a result of Matson's violations of the Agreement of Sale and its improper harvesting methods is $16,031,266.80:

| | |
|---|---|
| $10,965,181.20 | Timber unlawfully removed |
| 1,752,804.00 | Damage to timber left standing |
| 3,313,281.60 | Lost future value |
| **$16,031,266.80** | Total |

C.   Matson's Damage Claims.

1.   Tree Stands

I have located a total of ten tree stands on the Clough Farm (one more than Matson alleges). Most of these stands were placed in trees with no commercial value, or were placed without the use of nails, so as not to damage the trees, or were erected before 1969. I have taken photographs of the trees at issue and have measured the trees. Of these, the only tree with any value damaged since 1969 is one 12" DBH Black Cherry (Volume 94 Bd. Ft. Int. ¼"), with a value of $84.60 assuming a grade 1 log.

Page 8

2.  Signs on trees

Roadside trees and field edge trees do not produce quality lumber, because of excessive limbs and damage to boles and root systems from road maintenance equipment. Thus, Matson's claim that 96 trees "can no longer be used for veneer resulting in a loss of $16,500.00" because of perimeter signs is nonsense. These trees never had any veneer potential, and never would.

Some of the perimeter trees exhibit nails. However, the nails are grown over, demonstrating that they have been there more than two years (probably at least fifteen or twenty years), and were therefore already there when Matson acquired the timber rights. All signs posted recently were put up with staples that do not penetrate through the bark, and therefore do not cause any damage.

In short, I did not find any damage to any trees from any posting of signs that would have resulted in any veneer log being down-graded. Matson's total loss from all sign posting is exactly $0.00.

3.  Roads

Matson has not demonstrated any actual repair costs in support of this claim. Usually road damage, such as rutting, from off-road vehicles is inexpensive to repair.

Thank you for the opportunity to undertake this interesting study. Please call me if I can provide any additional information.

Respectfully,

*James Hall*

James Hall
Consulting Forester

Plaintiff's Appendix
000665

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Supplemental Pretrial Narrative Statement of Plaintiff/Counterclaim Defendant Albert T. Carlisle** was served upon all counsel of record in this matter on this 7th day of May, 1997 by hand delivery to the following:

Chester S. Fossee, Esquire
Reale, Fossee, P.C.
22nd Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA  15219

Counsel for Defendants
Matson Lumber Company
and Matson Hardwoods, Inc.

Counsel for Plaintiff

# Bartony Hare & Edson

*Attorneys at Law*

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone  412/338-8632
Facsimile   412/338-6611

June 24, 1997

**VIA FACSIMILE TO 281-3849**
**AND VIA UNITED STATES MAIL**

Chester S. Fossee, Esquire
Reale, Fossee, P.C.
22nd Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA  15219



Re:  <u>Carlisle v. Matson Lumber Co., et al.</u>

Dear Mr. Fossee:

Thank you for participating in the mediation session yesterday.  Please let this letter confirm the demand we set forth at that time.  We will agree to settle this matter in its entirety on the following terms: (1) the Defendants and all affiliated entities must permanently vacate the Clough Farm, and must relinquish to Mr. Carlisle all rights they had, have or might have on or to that property; and (2) the Defendants must pay damages in the amount of $5,000,000.00.

Please call if you have any questions.

Very truly yours,

Scott Michael Hare

SMH:crc

cc:    Mr. Albert T. Carlisle

LAW OFFICES OF
# REALE & FOSSEE, P.C.
22ND FLOOR, LAWYERS BUILDING
428 FORBES AVENUE, PITTSBURGH, PA 15219

TELEPHONE
(412) 281-8117

FACSIMILE
(412) 281-3849

July 21, 1997



DEPOSITION
EXHIBIT
Hare 18
9|1|05 JH

Scott M. Hare, Esquire
Bartony, Hare & Edson
Law & Finance Building, Suite 1801
429 Fourth Avenue
Pittsburgh, PA 15219

> RE: Albert T. Carlisle vs. Matson Lumber Company and
> Matson Hardwoods, Inc.
> Civil Action No. 95-0376

Dear Mr. Hare:

In response to your request for information concerning the insurance limits, please be advised that Matson does have two excess policies. The first is with Firemen's Fund in the amount of $10,000,000.00 and the second is with AIG also in the amount of $10,000,000.00. Unless I hear from you to the contrary, I will assume that this correspondence is sufficient to respond to your request without the need of a formal document. If you would prefer it in a formal document, please advise and I will be more than happy to do so.

Very truly yours,

*C. S. Fossee /JO*

C. S. FOSSEE

CSF/ksb

**James Hall**
CONSULTING FORESTER
R.D. #1 Box 1102 · Russell, Pennsylvania 16345 · (814) 757-4488

Oct. 23, 1997

Scott Hare
Bartony Hare & Edson
Law & Finance Building
Pittsburgh, PA

Re: Carlisle v. Matson Lumber Company

Dear Scott:

Report of remaining value of timber over 16" diameter measured 1 foot above the ground. All volumes are expressed using International ¼" rule - Penn State tables. Methodology used was the same as so stated in my may 2, 1997 report.

Volumes on acerage where no cutting has taken place.

| | | |
|---|---|---|
| 151 acres | 2,304,456 board feet | $359,795.77 |

Volumes on acreage where cutting is completed.

| | | |
|---|---|---|
| 570 acres | 596,552 board feet | $ 50,949.95 |

Total value of trees over 16" stump diameter

| | | |
|---|---|---|
| 721 acres | 2,901,008 board feet | $410,745.72 |

Respectively submitted,

*James Hall*

James Hall

cc. Bert Carlisle
    Lainard Bush



DEPOSITION EXHIBIT
Hale 9
9/10/505

Management Plans · Appraisals · Timber Sales · Wetland Delineation · Wildlife Management

*Specializing In Getting the Most for the Forest Landowner*

Carlisle Farms timber value of trees removed by years.

| | | 88/89 | |
| --- | --- | --- | --- |
| SPECIES | Volume | $/M | Value |
| | | | |
| Red Oak | 85455 | 497 | 42471.14 |
| Cherry | 268956 | 550 | 147925.8 |
| Ash | 254179 | 325 | 82608.18 |
| Hard Maple | 424807 | 165 | 70093.16 |
| Soft Maple | 283204 | 110 | 31152.44 |
| Poplar | 38846 | 110 | 4273.06 |
| Beech | 341276 | 60 | 20476.02 |
| Misc. Oak | 7439 | 230 | 1710.97 |
| Misc. | 68215 | 68 | 4638.62 |
| White Pine | 24305 | 80 | 1944.4 |
| Hemlock | 0 | 80 | 0 |
| | | | |
| Total | | | $407293.79 |

Carlisle Farms timber value of trees removed by years.

| | | | 89/90 |
|---|---|---|---|
| SPECIES | Volume | $/M | Value |
| Red Oak | 57757 | 421 | 24315.7 |
| Cherry | 103144 | 478 | 49302.83 |
| Ash | 138724 | 287 | 39813.79 |
| Hard Maple | 181726 | 108 | 19626.41 |
| Soft Maple | 121150 | 76 | 9207.4 |
| Poplar | 76606 | 96 | 7354.18 |
| Beech | 119069 | 67 | 7977.62 |
| Misc. Oak | 3453 | 248 | 856.34 |
| Misc. | 36942 | 67 | 2475.11 |
| White Pine | 1551 | 80 | 124.08 |
| Hemlock | 8616 | 80 | 689.28 |
| Total | | | $161742.74 |

Carlisle Farms timber value of trees removed by years.

|  |  | 90/91 |  |
|---|---|---|---|
| SPECIES | Volume | $/M | Value |
|  |  |  |  |
| Red Oak | 108782 | 360 | 39161.52 |
| Cherry | 157237 | 564 | 88681.67 |
| Ash | 256423 | 233 | 59746.56 |
| Hard Maple | 179650 | 120 | 21558 |
| Soft Maple | 119767 | 86 | 8263.92 |
| Poplar | 289918 | 69 | 20004.34 |
| Beech | 109500 | 78 | 8541 |
| Misc. Oak | 10041 | 258 | 25905.78 |
| Misc. | 46738 | 78 | 3645.56 |
| White Pine | 4698 | 54 | 253.69 |
| Hemlock | 14319 | 54 | 773.23 |
|  |  |  |  |
| Total |  |  | $276535.27 |

Plaintiff's Appendix
000672

Carlisle Farms timber value of trees removed by years.

|  |  | 91/92 |  |
|---|---|---|---|
| SPECIES | Volume | $/M | Value |
| | | | |
| Red Oak | 158940 | 484 | 76936.96 |
| Cherry | 184309 | 784 | 144498.25 |
| Ash | 270961 | 270 | 73159.47 |
| Hard Maple | 145582 | 154 | 22419.63 |
| Soft Maple | 97054 | 102 | 9899.51 |
| Poplar | 89498 | 98 | 8770.8 |
| Beech | 102771 | 64 | 6577.34 |
| Misc. Oak | 7658 | 197 | 1508.63 |
| Misc. | 28505 | 64 | 1824.32 |
| White Pine | 0 | 0 | 0 |
| Hemlock | 11340 | 71 | 805.14 |
| | | | |
| Total | | | $346390.15 |

Plaintiff's Appendix
000673

Carlisle Farms timber value of trees removed by years.

| | | 92/93 | |
|---|---|---|---|
| SPECIES | Volume | $/M | Value |
| | | | |
| Red Oak | 183404 | 620 | 113090.48 |
| Cherry | 73451 | 1123 | 82485.47 |
| Ash | 120723 | 368 | 44426.06 |
| Hard Maple | 86842 | 282 | 24489.44 |
| Soft Maple | 57894 | 138 | 7989.37 |
| Poplar | 87045 | 142 | 12360.39 |
| Beech | 43807 | 103 | 4512.12 |
| Misc. Oak | 3944 | 324 | 1277.86 |
| Misc. | 50880 | 103 | 5240.64 |
| White Pine | 0 | 0 | 0 |
| Hemlock | 4739 | 71 | 336.47 |
| | | | |
| Total | | | $296208.28 |

Carlisle Farms timber value of trees removed by years.

| | | 93/94 | |
| --- | --- | --- | --- |
| SPECIES | Volume | $/M | Value |
| | | | |
| Red Oak | 395230 | 607 | 239904.61 |
| Cherry | 83564 | 1151 | 96182.16 |
| Ash | 73565 | 370 | 27219.05 |
| Hard Maple | 109676 | 308 | 33780.21 |
| Soft Maple | 73117 | 176 | 12868.59 |
| Poplar | 99020 | 124 | 12278.48 |
| Beech | 33225 | 91 | 3023.48 |
| Misc. Oak | 9302 | 286 | 2660.37 |
| Misc. | 29764 | 91 | 2708.52 |
| White Pine | 4863 | 70 | 340.41 |
| Hemlock | 3543 | 70 | 248.01 |
| | | | |
| Total | | | $431213.87 |

| Year | Subtotal |
|------|----------|
| 88/89 | $    407,293.79 |
| 89/90 | $    161,742.74 |
| 90/91 | $    276,535.27 |
| 91/92 | $    346,390.15 |
| 92/92 | $    296,208.28 |
| 93/94 | $    431,213.87 |
| | |
| Total | $  1,919,384.10 |

DEPOSITION
EXHIBIT
Hare 20
2/10/04

# TIMBER IN NO-CUT ZONE

Timber values based upon report of Mr. Kane, expert witness for Matson Lumber, and upon harvest volumes reported by Matson.

| Width of No Cut Zone | Damages |
|---|---|
| 25 feet | $ 121,256 |
| 50 feet | $ 242,112 |
| 100 feet | $ 485,026 |

James F. Hall



# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALBERT T. CARLISLE,    )
                        )
        Plaintiff,    )
                        )    No. 95-0376
   v.                 )
                        )    Judge Lancaster
MATSON LUMBER CO. and   )
MATSON HARDWOODS, INC.,  )
                        )
        Defendants.   )

## STIPULATION FOR DISMISSAL

NOW COME the undersigned, being all of the parties who have appeared in this action, by their counsel, and stipulate to the dismissal of Count V of Plaintiff's Complaint herein (Trespass) pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Scott M. Hare
Pa. I.D. No. 63818

Bartony Hare & Edson
Law & Finance Building
Suite 1801
429 Fourth Avenue

Pittsburgh, PA  15219

Tel:  (412) 338-8632
Fax:  (412) 338-6611

Attorney for Plaintiff
Albert T. Carlisle

_____
C.S. Fossee
Pa. I.D. No. 11435

Reale & Fossee, P.C.
22nd Floor, Lawyers Bldg.
428 Forbes Avenue
Pittsburgh, PA  15219

Attorneys for Defendants
Matson Lumber Co. and
Matson Hardwoods, Inc.

Date:       December 15, 1997


SO ORDERED, this 15th day of December, 1997.

_____
Gary L. Lancaster, U.S. District Judge

Plaintiff's Appendix
000679

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Stipulation for Dismissal** was served in this matter on this 15th day of December, 1997 by first class United States mail, postage prepaid, to the following:

Chester S. Fossee, Esquire
Reale, Fossee, P.C.
22nd Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA  15219

Counsel for Defendants
Matson Lumber Company
and Matson Hardwoods, Inc.

1



1       IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
     --------------------
3
   ALBERT CARLISLE,
4               Plaintiff
                                        CA 95-376
5   vs.

6   MATSON LUMBER,
               Defendant
7   --------------------

8
                         PROCEEDINGS
9       Transcript of TRIAL commencing on December 17, 1997,
   United States District Court, Pittsburgh, Pennsylvania, before
10  Honorable Gary Lancaster, District Judge.

11

12  APPEARANCES:

13  For the Plaintiff:      Scott Hare, Esq.
    For the Defendant:      Chester Fossee, Esq.
14

15

16

17                          Reported by:
                            William E. Weber, RDR
18                          Official Court Reporter
                            1027A, U.S. Courthouse
19                          Pittsburgh, Pa. 15219
                            (412)261-2446
20

21

22

23

24
   Proceedings recorded by mechanical stenography.  Transcript
25 produced by computer-aided transcription.

1    You get to it, that is a decision you will make.  I

2  have taken longer than I intended, but I'm a lawyer and

3  lawyers like to talk.  I will leave you with this:  We have

4  spent a lot of time over the past two and a half years of our

5  own and of yours because of this document.  Any lawyer who

6  drafts an agreement bears that in mind and like everybody else

7  who does anything whether an engineer trying to build a

8  building, you try to think of everything.

9    If you are a congressman trying to draft

10  legislation, you try to think of everything.  Unfortunately,

11  what happens, every once in a while you really haven't thought

12  of everything.  That is why we are here.  It would have been

13  so much easier had John Kookogey thought of everything when he

14  drafted this.  We wouldn't have gone through this and neither

15  would you.  But I thank you.  I think you have been a

16  marvelous jury, I appreciate your attention to details and

17  notes and everything else.  I'm sure you will come to the

18  correct decision.  Thank you.

19    MR. HARE:  Thank you, Your Honor.  May it please the

20  Court, Mr. Fossee.  I want to start by thanking you for your

21  patience over the last few days, in particular I appreciate

22  your patience as we sat through a long elaborate talk about

23  how badly the farm was damaged or not damaged, how badly the

24  trees were marked up or not, how many times the stream was

25  subjected to erosion or not.  Those are clearly important

1   issues, they are important issues for another case, another

2   day.

3           The issues for this jury in this Court are very

4   straightforward.  We have four of them.  First is the 120 day

5   notice.  The second is the scope of the timber rights in

6   1969.  The third is the existence of what we called a

7   convenient term, the no-cut zone.  The fourth is whether

8   Mr. Carlisle suffered any damages.

9           Like Mr. Fossee, I will begin with the 120 day

10  notice.  That really is the briefest issue.  You will see that

11  is in paragraph seven of the agreement of sale you will have

12  with you.  What does the language say?  It says the seller is

13  further granted upon 120 days' notice in writing to buyer the

14  right to construct such roads as it deems reasonably necessary

15  for its operations.  It doesn't say each time, it doesn't say

16  one time only.  That is why we are asking you to decide the

17  issue.

18          When you do that, remember the instructions His

19  Honor has already given you, if you find language to be

20  ambiguous, your instruction is to construe it strongly against

21  the party that drafted it and in favor of the party who didn't

22  draft it.  In this case, any ambiguous language you have to

23  construe against Matson and in favor of Mr. Carlisle as you

24  try to resolve that ambiguity.

25          As you go about construing this language you have

Plaintiff's Appendix
000683

1          MR. HARE:  No, that was our only comment.

2          THE COURT:  Mr. Fossee?

3          MR. FOSSEE:  Your Honor, you are supposed to make

4    some mistakes so we have something to object to.  You didn't

5    do that.

6          THE COURT:  I think I may have.  In the damages, I

7    have these damages in here is straightforward contract claim.

8    I'm reading the act here.

9          MR. HARE:  The conversion statute?

10          THE COURT:  Yes.

11          MR. HARE:  We are prepared to withdraw that.  I

12    don't think there is credible evidence one way or the other as

13    to when this cutting took place.  The conversion statute

14    provides two year statute of limitations.  Frankly, it is too

15    difficult a question to ask anyone to resolve how much if any

16    of the cutting took place within the two year period.

17          THE COURT:  Okay.  All right.

18          MR. HARE:  We are prepared to withdraw that and take

19    contract damages.

20          THE COURT:  Okay.  I'm looking at this, the statute

21    of limitations problem.  All right.

22          MR. FOSSEE:  There is a multitude of problems with

23    it, saves a lot of time and effort.

24          MR. HARE:  We will take it out.

25          THE COURT:  Okay.  I think again what I'm going to

*Barton, Hare & Edson*

*Attorneys at Law*

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone  412/338-8632
Facsimile   412/338-6611



March 23, 1998

Mr. Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH  44004

Re:  Carlisle v. Matson Lumber

Dear Bert:

I have enclosed a copy of my letter to Joseph Torregrossa, Esquire, the Director of the Third Circuit Mediation Program, together with a copy of our required Mediation Statement.

Please call so we can catch up with one another.

Very truly yours,

Scott Michael Hare

SMH:jc

Enclosures

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| **ALBERT T. CARLISLE,** | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | Case No. 98-3035 |
| | ) | |
| **MATSON LUMBER CO.** and | ) | |
| **MATSON HARDWOODS, INC.,** | ) | |
| | ) | |
| Appellants. | ) | |

## MEDIATION STATEMENT OF
## APPELLEE ALBERT T. CARLISLE

### I.  *Factual Background*

Carlisle owns a parcel of land, measuring approximately 1239.6 acres, situated in Spring Creek Township, Warren County, Pennsylvania, known as the "Clough Farm." Carlisle purchased the Clough Farm from Fisher & Young, Inc., Matson's predecessor in interest, by a written Agreement of Sale signed under seal and dated May 28, 1969. Carlisle owns this property in fee simple, subject only to certain limited timber rights. The Clough Farm is enhanced by the presence of two blue-ribbon trout streams, Spring Creek and Broken Straw River.

The 1969 Agreement of Sale conveys to Carlisle all of the land and premises set forth therein, except that it reserves in Matson "all of the timber and trees, standing and fallen, situate on the premises above described," subject to certain additional limiting provisions. Further, Matson's timber rights are limited by "a map designating the forestry areas which shall be subject to cutting by [Matson] and also designating those areas belonging solely to [Carlisle], wherein [Matson] agrees that there will be no cutting."

After acquiring the timber rights on or about December 18, 1986, Matson began logging operations on the Clough Farm. None of Matson's predecessors had conducted any logging operations on the farm.

## II. *Findings Below*

At the conclusion of a three-day jury trial, Carlisle prevailed on the following issues:

1.    The reservation of timber rights in the Agreement of Sale encompassed only trees existing at the time the agreement was executed, *as Carlisle contended*, and did not further extend to all trees that would ever grow on the property in perpetuity, *as Matson contended*.

2.    The parties designated that there would be no cutting within 100 feet of all waterways on the property (the so-called "no-cut zone" contemplated by the map mentioned above).

-2-    Plaintiff's Appendix
000687

3. Matson had, in fact, cut trees within the no-cut zone, causing Carlisle damages in the amount of $110,000.

4. Matson is required to give 120 days notice to Carlisle each time it desires to build a road on the property.

## III. *Positions on Appeal*

Matson has appealed each of the four issues set forth above, and has identified eight issues to be raised on appeal. Carlisle's position with respect to all issues on appeal is that the verdict below was rendered by a jury based on the evidence presented during trial, and should not be disturbed.

In particular, regarding the scope of the timber rights, the Court below ruled that the agreement was ambiguous and therefore required resolution by a jury. After hearing all of the evidence, the jury ruled that the timber rights were limited and not perpetual. This finding accords with several cases that have examined the issue and held that a perpetual reservation of rights must be very clearly and unambiguously expressed, which did not happen here.

Regarding the no-cut zone, the Agreement of Sale required the timber company (Matson's predecessor) to

-3-

Plaintiff's Appendix
000688

prepare and attach the exclusionary map. The timber company failed to do so, and as a result the parties do not possess any such map. This absence must be construed against Matson, not Carlisle. Further, having heard the evidence, the jury concluded that the parties did intend to create a buffer around the streams, and that the buffer was intended to be one hundred feet.

Regarding damages, the jury heard damages testimony from experts for both parties. Matson contends on appeal that Carlisle withdrew his claim for such damages. Carlisle never withdrew his claim for damages arising from timber harvesting in violation of the Agreement of Sale, and Matson is wholly mistaken in its contention.

Finally, the 120-day notice requirement under the agreement was also found by the Court to be ambiguous, and was therefore submitted to the jury for its resolution based on all the available evidence.

In short, the verdict below was based on findings of fact reached by the jury. Matson's appeal primarily challenges such findings of fact, rather than issues of law. Accordingly, its chances of obtaining a reversal are limited.

Plaintiff's Appendix
000689

## IV.  *Carlisle's Settlement Position*

Carlisle has always been willing to settle this matter.  Indeed, after the parties' cross motions for summary judgment were denied below, Carlisle filed a motion requesting the Court to refer the case to court-annexed mediation.  The Court granted Carlisle's motion, and the parties attended a half-day mediation session.  (Carlisle was accompanied by his expert witness and another witness in addition to counsel.)  During the mediation, Carlisle made a two-part settlement demand, namely (i) that Matson immediately and permanently vacate the property and (ii) that Matson pay damages in the amount of $5,000,000. Matson made no offer and, to this day, has not done so.

To settle this case now, Carlisle would require, at a minimum, that Matson fully comply with the verdict below, including by promptly paying the full measure of damages set by the jury.  Carlisle is not prepared to compromise on the damage figure, because he has actually suffered greater damages than those submitted to and found by the jury.

Further, Carlisle assumes that Matson would expect a complete release of all claims as part of any settlement.

Plaintiff's Appendix
000690

Before Carlisle would agree to release all claims, he would expect to be paid damages well in excess of the verdict below. *Although Matson does not yet know this fact,* Carlisle intends to file another lawsuit in state court to recover for the damages Matson has caused to the property by reason of its careless harvest practices. (For example, Matson has caused tons of topsoil to wash into Spring Creek, has placed skid trails in and through the Clough Farm streams, and has generally damaged the land and the health of the forest. As a result of its careless and reckless forestry practices, Matson has received at least one citation from a state agency.) These property damage claims were not part of the lawsuit below.

Assuming the parties wish to discuss a "global settlement" of all claims, including those that have yet to be filed, Carlisle would be willing to renew his prior settlement offer (that is, Matson's immediate and permanent withdrawal from the Clough Farm together with damages in the amount of $5,000,000).

Carlisle's demand that Matson vacate the property is actually a modest demand, because there is relatively little remaining timber reserved by the Agreement of Sale, and such timber is mostly remote and therefore expensive to

Plaintiff's Appendix
000691

harvest.   Specifically,   whereas  the  timber  Matson  has already  removed  was  worth  several  million  dollars,  the remaining  timber  subject  to  the  agreement  is  worth  only approximately  $600,000.   Given  the  harvest  costs  for  such timber,  moreover,  much  of  it  is  not  worth  removing  in  any event.

We  understand  that  Matson  has  approximately  twenty million  dollars  in  primary  and  excess  CGL  coverage.   We  are told  that  the  carriers  have  denied  liability  to  indemnify this  claim.   We  do  not  know  whether  a  declaratory  judgment action  has  been  commenced,  or  whether  Matson's  carriers  have agreed  to  assume  any  liability  herein.

Carlisle's  objective  in  this  case  has  always  been primarily  to  protect  and  preserve  the  land  and  streams  on the  Clough  Farm.   He  will  not  agree  to  any  settlement  that jeopardizes  the  land  and  streams.

Respectfully  submitted,

Scott M. Hare, Esquire
Pa. I.D. No. 63818

Bartony Hare & Edson
Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, PA  15219

Plaintiff's Appendix
000692

*Bartony Hare & Edson*

*Attorneys at Law*

Law & Finance Building
Suite 1801
429 Fourth Avenue
Pittsburgh, Pa. 15219

Telephone  412/338-8632
Facsimile   412/338-6611

DEPOSITION
EXHIBIT
Hare 24
9/10/50

June 23, 1998

**VIA OVERNIGHT EXPRESS**

Mr. Lainard Bush
Rd # 1  Box 9
Spring Creek, PA  16436

Re:  <u>Additional Lawsuit against Matson</u>

Dear Lainard:

I have prepared the enclosed Praecipe for Writ of Summons for filing with the Prothonotary's Office in the Court of Common Pleas of Warren County. The filing of this Praecipe will initiate a new lawsuit on Bert's behalf against Matson, and toll the running of any statute of limitations.

Please sign the Praecipe on Bert's behalf and take it to the court house for filing. The filing fee is $60.50. You can tell the clerk that Bert will arrange for service at a later date, so there is no need for them to deliver the praecipe to the sheriff.

If you have any questions, please call.

Very truly yours,

Scott Michael Hare

/SMH

Enclosures

IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

| | |
|---|---|
| **ALBERT T. CARLISLE,** | CIVIL DIVISION |
| Plaintiff, | NO. _____ |
| v. | CODE: |
| **MATSON LUMBER CO.** and **MATSON HARDWOODS, INC.,** | **PRAECIPE FOR WRIT OF SUMMONS** |
| Defendants. | Filed on behalf of Plaintiff |
| | Albert T. Carlisle 1210 Oak Drive Ashtabula, OH 44004 |
| | Tel: 440-964-2131 |

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **ALBERT T. CARLISLE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| **MATSON LUMBER CO.** and | ) | |
| **MATSON HARDWOODS, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

## PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

Kindly issue a Writ of Summons in Civil Action

against the within-named Defendants.

_____
Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH  44004

Tel: 440-964-2131

Date:      June 23, 1998

Plaintiff's Appendix
000695

IN THE COURT OF COMMON PLEAS OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,

        Plaintiff,

    v.

MATSON LUMBER CO. and
MATSON HARDWOODS, INC.,

        Defendants.

CIVIL DIVISION

NO.    000353

CODE:

PRAECIPE FOR
WRIT OF SUMMONS

Filed on behalf of
Plaintiff

Albert T. Carlisle
1210 Oak Drive
Ashtabula, OH 44004

Tel: 440-964-2131







Plaintiff's Appendix
000696

IN THE COURT OF COMMON PLEAS
OF WARREN COUNTY, PENNSYLVANIA

ALBERT T. CARLISLE,      )
                     )
       Plaintiff,    )
                     )
    v.            )   No. __000353__
                     )
MATSON LUMBER CO. and   )
MATSON HARDWOODS, INC.,  )
                     )
       Defendants.  )

## PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION

TO THE PROTHONOTARY:

     Kindly issue a Writ of Summons in Civil Action against the within-named Defendants.

                                 _____
                                 Albert T. Carlisle
                                 1210 Oak Drive
                                 Ashtabula, OH  44004

                                 Tel: 440-964-2131

Date:    June 23, 1998

JUN 1998
RECEIVED

Peter Krembos

42 PaCSA § 5535 (a)(1), (2)(ii)

DEPOSITION EXHIBIT
PENGAD 800-631-6989
tarc 26
9/11/05 JG

(a)(1)   civil action timely filed
       if _terminated_, may commence a new
action upon same cause of action w/in 1 year
after termination

(a)(2)(ii)  does not apply to action terminated
       by    — voluntary nonsuit,       (Rule 230)
             — discontinuance,          (Rule 229)
             — dismissal for failure to prosecute, or
             — final jmt on merits


_Stinson_, 972 F2d 59 (3d Cir. 1992)

✪  _In re PA Footwear_, 199 BR 534 (BR ED Pa 1996)



_Stinson_ at p.63  savings statute "reflects a
legislative determination of the Commonwealth's
policy regarding limitations when a suit is
dismissed. It provides that in most instances
where the dismissal is for a reason unrelated to
the merits, limitations will not bar a new suit



<u>Pa Footwear</u>

p. 546 — cites language from <u>Stinson</u>

Pa savings statute is patterned on NY statute, which
is broadly construed

- deals w/ counterclaim

<u>Communication Workers of Am. v. AT&T</u>,
No 89-8150, 1991 US Dist LEXIS 12240 (EDPa Aug 30, 1991)
stipulation for dismissal of 1 count, rather
than entire action, treated as Rule 15 amendment
of complaint

cf <u>PIRG NJ v. Windall</u>, 51 F3d 1179 (3d Cir 1995)

X  <u>Beck v. Caterpillar</u>, 50 F3d 405 (7th Cir. 1995)

distinguish b/c federal SOL applies
(ct. refuses to borrow state savings statute)